159160

STATE OF MICHIGAN

RECEIVED
THE RECORDER'S COURT

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

93 MAR 29 AM 11: 16

THE PEOPLE OF THE STATE OF MICHIGAN, APPELLATE DIVISION

Plaintiff,

-vs-                    Case No. 92 1856

CARL HUBBARD,

Defendant,

-------------------------------/    WAIVER TRIAL

PROCEEDINGS HAD AND TESTIMONY TAKEN in the

above-entitled cause, before the HONORABLE RICHARD P.

HATHAWAY, Judge, Third Judicial Circuit, at 202

Recorder's Court Building, Detroit, Wayne County,

Michigan, on Monday, August 31, 1992.

APPEARANCES:

MR. JAMES GONZALES,  Esq.,

On behalf of the People.

MR. RONALD GILES, Esq.,

On behalf of the Defendant.

RECEIVED
FEB 1 6 1994
COURT OF APPE

RECEIVED
MAR 29 1993
THE RECORDERS COURT
APELLATE DIVISION
BY

MARY E. SKINNER, CSR-0031  -  OFFICIAL COURT REPORTER

# T_A_B_L_E___O_F__C_O_N_T_E_N_T_S

| Witness | Page |
|---|---|
| **OPENING STATEMENTS** | |
| Opening Statement by Mr. Gonzales | 3 |
| | |
| **MR. CURTIS COLLINS** | |
| Direct Examination by Mr. Gonzales | 16 |
| Cross Examination by Mr. Giles | |
| Redirect Examination by Mr. Gonzales | 53 |
| | |
| **MR. JOHN ARTHUR TRAMMEL** | |
| Direct Examination by Mr. Gonzales | 60 |
| Cross Examination by Mr. Giles | 67 |
| | |
| **MR. LEON PENN** | |
| Direct Examination by Mr. Gonzales | |
| Cross Examination by Mr. Giles | 77 |
| | |
| **MS. TRACEY SEWELL** | |
| Direct Examination by Mr. Gonzales | 85 |
| Cross Examination by Mr. Giles | 89 |
| Redirect Examination by Mr. Gonzales | 94 |
| | |
| **MR. CRAIG TURNER** | |
| Direct Examination by Mr. Gonzales | 95 |
| Cross Examination by Mr. Giles | 105 |

# E__X__H__I__B__I__T__S

| Indentification | Marked | Received |
|---|---|---|

1                              Detroit, Michigan

2                              Monday, August 31, 1992

3              --      --      --

4

5                        (The Court, counsel and defendant

6                    present in courtroom)

7

8              THE CLERK:  People of the State of

9    Michigan versus Carl Hubbard.  Case number 92-001-856.

10                      Mr. Hubbard is here today for

11   purposes of a waiver trial.

12             THE COURT:  Why don't both attorneys

13   state their names for the record.

14             MR. GONZALES: James Gonzales appearing

15   for the People.

16             MR. GILES:  Good morning, Your Honor,

17   Ronald Giles appearing on behalf of Carl Hubbard and

18   we're ready to proceed.

19             THE COURT:  Has your client filled out a

20   waiver form yet, Mr. Giles?

21             MR. GILES:  No, Your Honor.  We will

22   execute one right now.

23

24             THE COURT:  After he's done signing

25   that, Mr. Giles, have him stand behind the podium

3

1           behind you.

2                           MR. GILES:  Yes, Your Honor.

3                           THE COURT:  What is your full name?

4                           THE DEFENDANT:  Karl Lindell Hubbard.

5                           THE COURT:  How old are you?

6                           THE DEFENDANT:  27.

7                           THE COURT:  How far have you gone in

8           school?

9                           THE DEFENDANT:  Seventh grade.

10                          THE COURT:  Seventh grade?

11                          THE DEFENDANT:  Yes.

12                          THE COURT:  I have in my hand a document

13          entitled:  Waiver of Trial by Jury.

14                          Is this your signature on this document,

15          Mr. Hubbard?

16                          THE DEFENDANT:  Yes.

17                          THE COURT:  All right.

18                          Have you had an opportunity to discuss

19          your constitutional rights to have a jury trial with

20          your attorney?

21                          THE DEFENDANT:  Yes, I have.

22                          THE COURT:  Do you understand that you

23          do have a constitutional right to have a jury trial?

24          You understand that?

25                          THE DEFENDANT:  Yes, I do.

                                    4

1       THE COURT:  I am correct in

2   understanding that you do not want a jury trial in this

3   case; but you'd rather have a judge list to this case

4   and make a decision in this case; is that correct?

5       THE DEFENDANT:  Yes, I do.

6       THE COURT:  All right.

7       This Court does believe that you've made

8   a voluntary waiver and intelligent waiver of your

9   constitutional rights to have a jury trial.

10      This Court is going to accept this

11  document and place it in the court file.

12      You can have your seat.

13      MR. GONZALES:  Thank you, Your Honor.

14      THE COURT:  Thank you, counsel.

15      Mr. Prosecutor, did you wish to  make an

16  opening statement?

17      MR. GONZALES:  I do, Your Honor.

18      THE COURT:  Go right ahead.

19      MR. GONZALES:  Thank you, Your Honor.

20      Your Honor, this morning the People

21  intend to show by proofs and evidence that on January

22  17, 1992 defendant before you, Carl Hubbard in front of

23  3960 Gray Street in the City of Detroit did shoot with

24  premeditation and murder the complainant in this case,

25  Rodnell Penn.

                        5

1                    The circumstances will show, Your

2        Honor, that there was a number of factors leading up to

3        this killing.  This killing that was done by the

4        defendant with a firearm, particularly a handgun.

5                    The most important circumstances that

6        this Court should be aware of is that no person had

7        more of a motive to murder this individual, Mr. Penn,

8        than Mr. Hubbard.

9                    The proofs will show that in fact the

10       deceased in a prior case, case number, Recorder's Court

11       88 137 104, 1988, a trial was set on a separate murder

12       case involving Mr. Hubbard and that the deceased in

13       this case, Mr. Rodnell Penn, was in fact an

14       identification witness as against Mr. Hubbard in that

15       case.

16                   The proofs will show, Your Honor, that

17       on that date in time, through the testimony of a person

18       by the name of Curtis Collins, that some moments before

19       the fatal shooting, and the fatal shooting was at 9:30

20       That some moments before that, Mr. Hubbard, along with

21       the deceased entered into a party store on the corner

22       of Mack and Gray in the City of Detroit.

23                   That when they entered into that party

24       store there was in there a person by the name of Curtis

25       Collins.

6

1              That Mr. Collins will testify, Your

2       Honor, that he had known Mr. Hubbard for some period of

3       time.  In fact thirteen years.  And in fact has been

4       robbed by Mr. Hubbard at sometime before.

5              And then in fact he further knew the

6       nickname of Mr. Hubbard as being that of Goff (sp).  He

7       will testify that after observing Mr. Hubbard with the

8       person that he will later identify as being the

9       deceased in this matter, that he observed both of them

10      entering into the store and acting friendly.

11             That while he was in that store he left

12      first after spending three, approximately, minutes with

13      them.  That he said, hi, and, bye to Mr. Hubbard and

14      left.

15             And that he got around the corner a ways

16      down the street to approximately the alley area in back

17      of that store.

18             That there at that point in time he will

19      testify to hearing gunshots and to turning around and

20      looking back up Gray Street.

21             And he will testify at that point in

22      time heading in the direction of those gunshots and to

23      seeing in fact the defendant there.  And identifying

24      Mr. Hubbard standing over the person of Rodnell Penn.

25             Mr. Collins will testify to positively

7

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1    identifying Rodnell Penn as the person lying on the
2    ground.
3                    He will testify to observing Mr. Penn
4    lying on his side, his head heading up towards a house
5    on a driveway near the street area.
6                    And he will testify to observing as he
7    approached the area the defendant running from the area
8    into a vacant field.
9                    He will testify to having just seen Mr.
10   Hubbard approximately five minutes earlier, as well as
11   the deceased and seeing him again at this point in
12   time.
13                   Thereafter, Your Honor, you are going
14   hear the testimony from Curtis Collins that there was
15   no one else in the area of the two of them at the time
16   that he heard those gunshots; made that observation and
17   saw the defendant running.  No one else other than the
18   deceased lying in the driveway, and the person of the
19   defendant then running away.
20                   You are going hear the testimony, Judge,
21   of some other individuals who were in the area of the
22   shooting at that point in time.  The importance of that
23   testimony will be described for you in  this manner.
24                   You are going to hear the testimony
25   Judge, from Sgt. Joann Kinney (sp).  She will testify

8

1    to being employed with the homicide section of the

2    Detroit Police Department on January 21, 1992, had

3    occasion to advise Mr. Hubbard of his constitutional

4    rights and obtaining a lengthy statement from him.

5                    And that in that lengthy statement will

6    include the testimony from Sgt. Kinney that Mr. Hubbard

7    indicated he was not present.  That he did not know the

8    person of Rodnell Penn.

9                    That he did not have a prior case.  And

10   that Rodnell Penn didn't testify for him -- excuse

11   me -- against him in a prior case.

12                    This will by all proofs be contradicted

13   and in fact will be contradicted, particularly from a

14   number of witnesses who will testify, including John

15   Trammel and Dianthony Wilchard (sp) will testify to

16   coming to the scene and observing the person they knew

17   from the neighborhood of Mr. Hubbard to in fact being

18   at that location, shortly after that, the time of the

19   murder such that the person who was deceased was still

20   there before he had been removed.  And in fact officers

21   Gray Turner and Brian Carter and Sgt. Michelek will all

22   testify to observing the defendant at location at the

23   date and time, particularly Brian Carter will testify

24   to having a conversation with Mr. Hubbard; that I'd ask

25   the Court to highlight.

                                9

1          The combination, Judge, the

2   testimony of Mr. Collins and the contradictory

3   statements that were taken from Mr. Hubbard, all will

4   go to show that there was in fact premeditation.  There

5   was in fact deliberations.

6          There was in fact an overwhelming

7   motive for this person to murder Mr. Penn and that in

8   fact the proofs will show that beyond a reasonable

9   doubt.

10          Thank you, Your Honor.

11          THE COURT:  Mr. Giles, did you wish

12   to  make an opening statement at this time?

13          MR GILES:  No, Your Honor.

14          We will waive opening statement and

15   leave the prosecution to their proofs.

16          THE COURT:  You can begin with your

17   first witness.

18          MR. GONZALES:  Judge, prior to that I

19   understand there are -- there's going to be a

20   stipulation to the medical exam and cause of death and

21   I'd like to place that on the record.

22          THE COURT:  Go right ahead.  You can

23   place that on the record.

24          I am going to ask, Mr. Giles, that you

25   and your client listen to this stipulation because I am

10

1      going to ask if this is the stipulation that you want

2      the Court to accept.

3                          MR. GILES:  Yes.

4                          MR. GONZALES:  Yes, Your Honor.

5                          It is my understanding that both

6      defendant and defense counsel will stipulate that were

7      Benjamin Caoile, M.D. present, he will testify to being

8      a medical doctor and employed as an Assistant Medical

9      Examiner with the Wayne County Medical Examiner's

10     Office.

11                         And in fact will be certified as an

12     expert in the area of forensic pathology.

13                         And that were Dr. Caoile here present he

14     will testify in accordance with his report as follows:

15                         I hereby certify that on the 18th day of

16     January in the year 1992, at the Wayne County Medical

17     Examiner's Office, in accordance with the provisions of

18     law, there was made an examination of the body and

19     personal inquiry into the cause and manner of death of

20     unknown male number 21, Rodnell Lamar Penn, a

21     twenty-one-year-old black male who died at Saint Johns

22     Hospital, Detroit, Michigan, on the 18th day of January

23     in the year 1992.

24                         It is my opinion as an expert in the

25     area of forensic pathology that the decedent died of

11

1    multiple gunshot wounds, a total of five of the head

2    (2) and of the back, (3) with injuries to the skull,

3    brain, small intestines, mesentry, omentum and spine

4    causing spillage of intestinal contents into the

5    abdominal cavity.

6                    The gunshot wounds of the head on

7    the right side of face, revealed a wound track mark

8    which went through and through proceeding from right to

9    left, slightly deviated upward and backward through the

10   right temple, skull, brain, skull and temporal parietal

11   bone, before exiting the scalp.

12                   Another wound track mark proceeded

13   from right to left and upwards through the skull,

14   contused on the right temporal lobe and into the base

15   of the skull, (sella tursica).  Where a large caliber

16   non-jacketed slug with a detached fragment was

17   recovered and retained.

18                   There was three gunshots wounds to

19   the left side of lower back marked, C, D and E, with

20   wound tracks proceeding from back to front, left to

21   right and slightly deviated downwards through the bac'

22   muscles, small intestines, omentum, mesentery and c

23   went through the spine, (lumbar vertebrae).

24                   Two large caliber non-jac'

25   slugs would be recovered from the abdomina'

12

1      and retained.

2                    And one of the three exit the lower

3      mid abdominal wall.

4                    There was evidence of close range

5      firing on the skin.

6                    An oxidized small caliber jacketed

7      slug was recovered from the cranial cavity, base of the

8      skull in the occipital area, where the portion of the

9      right posterior temporal lobe revealed necrosis and

10     cystification of the brain parenchyma.

11                   There was evidence of previous

12     surgical intervention.  And in my opinion did not

13     contribute to the cause of death.

14                   The manner of death is homicide.

15                   And that would be in accordance

16     with this case number, 552-92.

17                   Let me indicate particularly

18     further that Dr. Caoile will testify that that oxidized

19     small caliber jacketed slug was recovered from the

20     brain cavity from the base of the skull was from a

21     prior shooting that Mr. Penn had endured some years

22     earlier and in fact was not and did not contribute to

23     the cause of his death and that particularly with

24     respect to the the gunshot wound to the head that the

25     one at the right temple, that was, he would testify, to

13

1   be of close range and exited the skull. Particularly

2   that the gunshot wound to the head, the second gunshot

3   wound to the head was near the right ear and there was

4   no evidence of close range firing there.

5                       And that as to the gunshot wound to

6   the back on the left side there was close range

7   evidence of firing on the skin there.

8                       And as to the second gunshot wound

9   to the back there was evidence of close range firing on

10  the skin there.

11                      And as to the last and third

12  gunshot wound to the back on the left side there was no

13  evidence of close range firing.

14                      And that, lastly, the wound tracks

15  for the three bullet wounds on the back were so close

16  they could have been interchanged.

17                      That's my understanding of the sum

18  and substance of the testimony, as well as the

19  stipulation for Dr. Benjamin Caoile.

20                      THE COURT:  Is that your

21  understanding, Mr. Giles?

22                      MR. GILES:  Yes, Your Honor.

23                      THE COURT:  Mr. Hubbard, do you

24  agree with your attorney?

25                      THE DEFENDANT:  Yes.

                            14

1          THE COURT:  All right.

2                    The Court had accept that

3     stipulation.

4                    MR. GONZALES:  Secondly, Judge, it

5     is my understanding both defendant and defense counsel

6     will enter into the following stipulation.

7                    That were Leon Roosevelt Penn present,

8     he would testify as being the father of the deceased

9     Rodnell Penn and that on January 18, 1992, he had

10    occasion to go to the Wayne County Medical Examiner's

11    Office for purposes of identifying, if he could, the

12    remains of the individual on case number 55 292.  And

13    that in fact he positively identified that individual

14    as being the person of his son Rodnell Lamar Penn, whom

15    he had known his whole life.

16                   MR. GILES:  That's correct, Your Honor.

17                   THE COURT:  Again, Mr. Hubbard, do you

18    agree with your attorney?

19                   THE DEFENDANT:  Yes, I do.

20                   THE COURT:  The Court will accept the

21    stipulation.

22                   MR. GONZALES:  At this time I move to

23    sequester any witnesses on behalf of the defense, as

24    well as the prosecution, with the exception of the

25    officer in charge, if one does appear.

                            15

1    THE COURT: If there are any witnesses

2    in the courtroom that are going to be testifying for

3    the defense and/or the prosecution, they are going to

4    have to wait out in the hallway; and not talk about

5    this case.

6    You can begin with your first witness,

7    counsel.

8    MR. GONZALES: Thank you, Your Honor.

9    The People call Curtiss Collins.

10    THE COURT: All right.

11

12    C U R T I S    C O L L I N S

13

14    called as a witness by the People,

15    being duly sworn by the Court Clerk,

16    was examined and testified upon his

17    oath, as follows:

18

19    DIRECT EXAMINATION

20

21

22    BY MR. GONZALES:

23    Q.  Sir, state your name for the record?

24    A.  Curtis Lenell Collins.

25    Q.  Mr. Collins, how old are you?

16

1   A.   Twenty years old.

2   Q.   Mr. Collins, do you know someone by the name of Carl

3       Hubbard?

4   A.   Yes, I do.

5   Q.   Do you see him in court today?

6   A.   Yes, I do.

7   Q.   Can you please point and indicate where and what color

8       of pants he's got on today?

9   A.   He's got on some blue dress pants.  Some blue shoes.

10   Q.   Witness pointed to and identified for the record the

11       defendant in this matter, Carl Hubbard.

12   Q.   Okay.

13                                Did you know him by any nickname,

14       sir?

15   A.   Yes.

16   Q.   What was the nickname?.

17   A.   Goff.

18   Q.   Sir, I'd like to call your attention to the area of

19       Gray and Mack in the City of Detroit.

20                           Are you familiar with that area, sir?

21   A.   Yes, I am.

22   Q.   Sir, on January 17, 1992, are you familiar -- were you

23       familiar with that area on that date in time?

24   A.   No, I wasn't.

25   Q.   You'd never been to that area before January 17th, of

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

```
 1        1992?

 2   A.   (No response)

 3   Q.   Were you familiar with that area on January 17, 1992,

 4        the area of Mack and Gray?

 5   A.   No, I wasn't.

 6   Q.   Okay.

 7                       Are you familiar with a party store

 8        that's on the corner of Mack and Gray?

 9   A.   Yes, I am.

10   Q.   Have you ever been to that party store?

11   A.   Yes, I have.

12   Q.   Okay.

13                       Do you know anybody that works at that

14        party store?

15   A.   Yes, I know everybody that works in there.

16   Q.   Okay.

17                       Sir, I'd like to call your attention to

18        the date of January 17th, 1992.

19                       On that date at approximately some

20        moments before 9:30 in the p.m., did you have occasion

21        to be at that party store?

22   A.   No, I wasn't.

23   Q.   Sir, on that date in time, did you subsequently have

24        occasion to ever be in the area of the corner of Mack

25        and Gray in the City of Detroit?
```

18

1   A.   No, I wasn't.

2   Q.   Okay.

3               Sir, on that date and time, January

4        17th, 1992, did you ever have occasion to observe the

5        person you've identified in court as Goff or Carl

6        Hubbard?

7   A.   Excuse me again?

8   Q.   I will repeat the question for you, Mr. Collins.

9               On January 17th, 1992, at approximately

10       9:30 in the p.m., or thereabouts, did you ever have

11       occasion to observe the person you've identified in

12       court here as Carl Hubbard?

13  A.   No, I haven't.

14  Q.   Sir, do you recall, do you not, testifying in a prior

15       time regarding this case in court?

16  A.   Yes, I did.

17  Q.   Well, isn't it true, sir, that you testified on

18       Tuesday, February 4, 1992, before the Honorable Willie

19       Lipscomb in the 36th District Court for the City of

20       Detroit?

21  A.   Yes, I did.

22  Q.   At that time, sir, were your sworn in under oath to

23       testify to the truth.

24  A.   Yes, I did.

25  Q.   You recall, sir, being asked questions regarding

                              19

1      January 17th, 1992?

2   A.   Yes, I did.

3   Q.   Prior to that time, sir, do you recall speaking to a

4        member of the Detroit police homicide section on

5        January 23rd, 1992 at approximately 11:15 in the a.m.

6        Detroit Police Headquarters?

7   A.   Yes, I did.

8   Q.   Do you recall being asked the questions and giving

9        answers regarding Mr. Hubbard and the date of January

10       17, 1992?

11  A.   Yes, I did.

12  Q.   Okay.

13            Now, sir, regarding your testimony --

14       excuse me, February 4, 1992, and for the record, I am

15       referring to page 12 of the preliminary examination

16       transcript.

17            Sir, isn't it true you testified you

18       were in fact on that date in time inside the store, at

19       the back of the store, for about five or ten minutes?

20       Did you testify that way?

21  A.   Yes, I did.

22  Q.   Allright.

23            Did you -- isn't it also true, sir, that

24       at that time, at that preliminary examination you

25       further testified on page 12 that you saw Carl Hubbard

                              20

1          or the person you knew as Goff (sp) come in the store

2          with the person you testified at that hearing as later

3          seeing the deceased?

4     A.   Yes, I did.

5     Q.   All right.

6     A.   Hey, can I ask you a question?

7     Q.   I am asking the questions now, Mr. Collins.

8                    Did you further not testify that in fact

9          when you were at the store you left first before he

10         did?

11    A.   Yes, sir.

12    Q.   And didn't you also further testify, carrying over to

13         page thirteen, that there came a time when you heard

14         gunshots?

15    A.   Yes, sir.

16    Q.   Did you also testify at that preliminary examination

17         that when you heard those gunshots you were about five

18         about three feet away from the store by the alley?

19    A.   Yes, sir.

20    Q.   Didn't you also testify, sir, that at that time you

21         turned around and at the bottom of page 13, you

22         testified you saw Goff run through Springlefield (sp)

23         and you ran back down there across Mack and you saw the

24         defendant -- the deceased laying in the driveway and

25         then you took off running and jumped in the cab and

                                  21

1           went home?

2    A.    Yes.

3    Q.    Did you testify to that at a prior hearing?

4    A.    Yes.

5    Q.    Okay.

6                     Did you further testify, sir, and for

7          the record page 14.  That you positively identified the

8          person that you saw on the ground in the driveway as

9          being the same person you had seen just moments before

10         with Goff or Carl Hubbard in the store?

11   A.    Yes.

12   Q.    And that at that time when you saw him in the driveway,

13         you saw him just lying there with bullet holes and

14         blood; isn't that correct, sir?

15   A.    Yes, sir.

16   Q.    And that particularly the manner in which you saw the

17         individual lying on the ground you indicated at the top

18         of page 16 that he was in the driveway; isn't that

19         correct, sir?

20   A.    Yes, sir.

21   Q.    And that would have been on Gray Street?

22   A.    Yes.

23   Q.    Okay.

24                    At the bottom of page 16, carrying over

25         to 17, sir, do you remember indicating that in fact you

                                22

```
 1            saw no one else in that immediate area, other than Carl
 2            Hubbard and the person whose lying in the driveway?
 3                          Do you remember testifying that way,
 4            sir?
 5       A.   Yes.
 6       Q.   Further own page 18 you remember testifying that in the
 7            area of the house, which was the driveway, you saw the
 8            person laying in, you did not see anyone at all in the
 9            area of the house on the porch, in the hallway at all?
10       A.   No,, I didn't.
11       Q.   Do you remember testifying that way.
12       A.   No, sir.
13       Q.   Okay.
14                          MR. GONZALES:  May I approach the
15            witness?
16                          THE COURT:  Go right ahead.
17                          Would you repeat that last question?
18                          MR. GONZALES:  Certainly, Judge.
19       BY MR. GONZALES:
20       Q.   Do you remember testifying, Mr. Collins, that in the
21            area of the house where the driveway was that you saw
22            the person laying, that house to whom the driveway
23            belonged to, you saw no one on the porch in the doorway
24            or anywhere at all?
25       A.   No, I didn't.
```

23

1  Q.  You don't remember testifying that way?

2  A.  No, no, sir.

3                      MR. GONZALES:  Now, may I approach him,

4      Your Honor?

5                      THE COURT:  Go right ahead.

6  BY MR. GONZALES:

7  Q.  I will ask you if this refreshes your recollection, Mr

8      Collins.

9                      I'd ask you to read this question here,

10     the house and the answer, no, sir.

11 A.  All right.

12 Q.  Did you have a chance to read that to yourself, Mr.

13     Collins?

14 A.  Yes, sir.

15 Q.  Now, do you remember testifying in that manner?

16 A.  No, sir.

17 Q.  Okay.

18                     Have you -- are you saying the

19     transcript is wrong?

20 A.  I didn't say I seen nobody in no doorway or nothing

21     like that.

22 Q.  Can you repeat your answer, please?

23 A.  I said:  I didn't say I seen somebody in the doorway.

24     That's what you are -- you are trying to say I said,

25     that's all.

                            24

1    Q.   I am just asking you, Mr. Collins, do you remember

2         being asked that question?

3    A.   I remember being asked that question and I said:   No, I

4         didn't.

5    Q.   Okay.

6                        So now you remember testifying in that

7         manner?

8    A.   Yes, I remember saying:   Yes.

9    Q.   Okay.   Thank you.

10                       You also remember testifying further on

11        page 19 that near the bottom, you indicated in response

12        to a question, how long had you seen them in terms of

13        how long you had seen the deceased and Mr. Hubbard in

14        the store; and you indicated about five or ten minutes.

15                       You remember giving that answer?

16   A.   Yes, sir.

17   Q.   And that when, that you stayed in the store about three

18        minutes after they arrived and then you left.   On the

19        top of Page 21.

20                       You remember giving that answer, Mr.

21        Collins?

22   A.   Yes.

23   Q.   You remember also testifying at that prior hearing, Mr.

24        Collins, that you indicated that you had not even

25        gotten a block or even a half block.   It was just like

                              25

```
 1          three feet.  It was right by the alley next to the
 2          store.
 3                         And then is the park is the area where
 4          you were at.  Do you remember testifying to, do you
 5          remember testifying in that manner, Mr. Collins?
 6     A.   Yes, sir.
 7     Q.   Okay.
 8                         THE COURT:  Hold on for about thirty
 9          seconds, counsel.  I'll be right back.
10
11                   *      *      *      *      *
12                         THE COURT:   Thank you.
13                         MR. GONZALES:  Thank you, Judge.
14     BY MR. GONZALES:
15     Q.   You also remember being asked the question on page 24:
16          And Mr. Hubbard was standing when you first saw him and
17          heard the shots.  Mr. Hubbard was standing on the side
18          way, where, in front of his house.
19                         You remember answering, yes, to that
20          question?
21     A.   What did you say again?
22     Q.   Do you remember testifying, Mr. Collins, that when you
23          first saw Mr. Hubbard he was like standing on the
24          sidewalk in front of the house near the body, on page
25          24, when -- you remember giving that testimony at that
```

26

1     prior hearing?

2    A.  No, I don't.

3    Q.  All right.

4                  MR. GONZALES:  May I approach the

5    witness again?

6                 THE COURT:  Go right ahead.

7    BY MR. GONZALES:

8    Q.  For the record, I am showing you page 24.  And there

9      are no lines here, Judge, otherwise I'll give them.

10      But it is about the eight lines down from the top on

11      page 24, I'd ask you to read that question and that

12      answer to yourself?

13    A.  Okay.

14    Q.  Did you have a chance to read that to yourself?

15    A.  Yes.

16    Q.  Can I ask you a question right now, Mr. Collins?

17                Who was that you were talking to just

18      now?  Who is the person you were talking to just now,

19      which person in court?

20    A.  Nobody.  I was looking at him.

21    Q.  Who was that you were looking at and talking to in the

22      courtroom?  Can you tell me who that was?

23    A.  I was looking at him.

24    Q.  What is his name?

25    A.  I know David.

1    Q.   Okay.

2              Are you saying the gentleman in the

3    second isle, in the blue?  The gentleman in the second

4    isle in the gray?

5    A.   Right there in the green jacket.  I was looking at him

6    but we wasn't saying nothing.

7    Q.   Who is that individual?

8    A.   That's my cousin.

9    Q.   What is his name?

10   A.   What?

11   Q.   What is his name, Mr. Collins?

12   A.   Cordell (sp).

13   Q.   Mr. Collins, do you remember reading this to yourself

14   just now?

15   A.   Yes, I do, sir.

16   Q.   Do you remember being asked the question on page 24,

17   Mr. Hubbard was standing when you first saw him and

18   heard the shots.  Mr. Hubbard was standing on the

19   sidewalk, where, in front of this house.

20              THE COURT:  Hold on a second, counsel.

21              You are going to have to take the baby

22   outside.  They can't stay in the courtroom.

23              Thank you.

24              Now, ask the question again, counsel.

25   BY MR. GONZALES:

7

28

MARY E. SKINNER, CSR-0031  -  OFFICIAL COURT REPORTER

1   Q.  Mr. Collins, did you have a chance to read this to

2       yourself?

3   A.  Yes, I did.

4   Q.  Do you remember giving this answer to that question I

5       just showed you?

6   A.  Yes, I do.

7   Q.  So in fact do you remember, sir, testifying that first

8       when you first saw Mr. Hubbard he was standing,

9       standing on the sidewalk, in the area of the front of

10      the house where you had earlier described where the

11      body was?

12  A.  Yes, I do.

13  Q.  All right.

14               Didn't you also testify at that prior

15      hearing, Mr. Collins, that you had known Carl Hubbard

16      for a long time?

17  A.  Yes, I did.

18  Q.  And in fact that you had in fact, yourself, had had a

19      prior altercation or disagreement with Mr. Hubbard,

20      yourself, back in 1990.

21               Do you remember giving that testimony?

22      I am referring to page twenty-five?

23  A.  Yes, I do.

24  Q.  And you indicated also, did you not, sir, at that prior

25      hearing, under oath, that you saw the deceased lying

1      like slanted to his side.

2                      You also remember giving that answer,

3      sir?

4  A.  Yes, I do.

5  Q.  Do you remember being asked, sir, also on page

6      twenty-six, that after you heard the gunshots and you

7      saw Mr. Hubbard running, you got a real good look at

8      him?

9                      Do you remember giving an answer:  Yes,

10     to that question?

11 A.  No, I don't.

12 Q.  May I approach the witness, Your Honor.

13                     THE COURT:  Go right ahead.

14 BY MR. GONZALES:

15 Q.  Right here.

16                     Mr. Collins, I asked you -- I will ask

17     you to read that question and that answer to yourself.

18                     Did you have a chance to read that to

19     yourself, Mr. Collins?

20 A.  Yes, I did.

21 Q.  Do you remember now, sir, being asked the question:

22     When you saw, after you heard the gunshots, and you saw

23     Mr. Hubbard allegedly running, you got a real good look

24     at him?

25                     Do you remember giving an answer:  Yes

                              30

1    to that question?

2   A.  I remember saying to the question -- but I don't

3       remember saying I got a good look at him.  I just

4       remember saying I saw a ball spot in the back of his

5       head.

6                    MR. GONZALES:  May I have one moment,

7       Your Honor?

8                    THE COURT:  Allright.

9                    MR. GONZALES:  Thank you, Judge.

10

11  BY MR. GONZALES:

12  Q.  Okay, Mr. Collins, a couple more questions about your

13      prior exam testimony.

14                    Do you remember being asked the question

15      at the bottom of page 27:

16                    Was there at one point in time or any

17      point in time you were able to see his face and

18      identify him?

19                    And I am referring to Mr. Hubbard.

20                    You remember giving the answer:  Yes?

21  A.  I don't remember saying was close up to him.

22                    I said I seen the ball spot in the back

23      of the head.  I don't remember saying yes to that

24      question.

25  Q.  You also, remember giving the answer, it wasn't a ball

31

1    spot.

2              You said you also noticed him by the

3    scar in the back of his head?

4  A.  Yes.

5  Q.  You gave that answer at the top of page 28.

6              You remember giving that testimony?

7  A.  Yes, I do.

8  Q.  You remember also being asked that in fact that that

9    scar, that in fact himself, the person you saw there

10    appeared to be the same as you had just seen

11    approximately five minutes earlier in the store.

12              Do you remember giving that answer, Mr.

13    Collins?

14  A.  Yes, I do.

15  Q.  Now, Mr. Collins, those are some of the points you gave

16    at that prior preliminary examination on February 4,

17    1992; is that not correct?

18  A.  That's correct.

19  Q.  Okay.

20              Now, even prior to that, sir, you

21    already indicated that on January 23rd, 1992, you had

22    occasion to speak with a police officer from the

23    homicide section; is that not correct?

24  A.  Yes, that's correct.

25  Q.  Okay.

32

1              MR. GONZALES:  Can I have something

2     marked, Your Honor?

3              THE COURT:  Go right ahead.

4                        (Exhibit No.1 was marked for

5                         identification by the

6                         Reporter.)

7

8     BY MR. GONZALES:

9     Q.   Mr. Collins, I'm handing you what has been marked -- I

10         am showing you what has been marked as People's

11         Proposed Exhibit Number 1.

12              I'd ask if you can identify what this

13         two page document is?

14    A.   (No response)

15    Q.   Please repeat your answer?

16    A.   My testimony stands.

17    Q.   What is that?

18    A.   My testimony -- statement.

19    Q.   Whose statement?

20    A.   My statement.

21    Q.   And is this the statement that you gave on January

22         23rd, 1992, at 11:50 in the morning, at the Detroit

23         Police Headquarters?

24    A.   Homocide, yes.

25    Q.   And in fact, sir, is that a photograph of you attached

                              33

```
 1          to it?

 2     A.   Yes, that is.

 3     Q.   Is that photograph of you when in fact you were at the

 4          police department and gave this statement?

 5     A.   Yes, I did.

 6     Q.   At the bottom of both pages, there purports to be at

 7          the bottom of each of both pages signatures.

 8                    Do you see those, Mr. Collins?

 9     A.   Yes, I do.

10     Q.   And whose are they?

11     A.   That ain't -- it ain't my name.

12     Q.   Who wrote that signature there?

13     A.   I didn't write it.

14     Q.   Okay.

15                    THE COURT:  I didn't hear your answer.

16                    THE WITNESS:  I didn't do it.  I didn't

17          sign the signature.

18     BY MR. GONZALES:

19     Q.   This statement is under the name, Tony Smith; isn't

20          that correct?

21     A.   Yes, it is.

22     Q.   When you were at the Detroit Police Department at

23          January 23rd, did you first tell them your name was

24          Tony Smith?

25     A.   Yes, I did.
```

34

1    Q.   And didn't you also tell them that your son was Tony

2         Smith, Jr.?

3    A.   No, I didn't tell them that.

4    Q.   Right here?

5    A.   I didn't -- I didn't tell them that.

6    Q.   Did you sign both of these statements with the name

7         Tony Smith?

8    A.   No, I didn't, I didn't.

9    Q.   Do you remember on January 23rd, this is sometime

10        before you testified, you remember at that time being

11        asked questions about what happened on Friday, January

12        17th, in the area of Mack and Gray?

13   A.   Yes, I do.

14   Q.   Do you remember telling them that on Friday January

15        17th, in the area of Mack and Gray, you were inside the

16        store on Mack and Gray and had been in the store for

17        about five or ten minutes, when these two guys came in

18        the store and one of them you identified as the

19        defendant Goff?

20   A.   Yes, I do.

21   Q.   You told that to the police on January 23rd; is that

22        not correct?

23   A.   Yes, I do.

24   Q.   And in fact you stayed in the store another two minutes

25        and you walked out.

35

```
 1              Do you remember giving that part of your

 2      statement to the police?

 3   A.  Yes, I do.

 4   Q.  You remember saying that I was turning south on Gray.

 5      I looked back and I noticed that Goff and the guy he

 6      was with had come out of the store and was walking

 7      across Mack and Gray.

 8              You remember giving that statement to --

 9      part of your statement, that part, to the police?

10   A.  Yes, I do.

11   Q.  You also remember indicating:  I continued to walk on

12      Gray, south on Gray.  When I reached about midblock, I

13      heard a gunshot.  I looked back and I seen Goff run

14      cross Gray to a vacant lot towards Springfield.

15              You told that to the police?

16   A.  Yes.

17   Q.  You remember indicating that you turned and you ran

18      where you seen a body laying in front of this guy, that

19      we call uncle Peter (sp).  You remember telling that to

20      the police?

21   A.  Yes, I do.

22   Q.  Do you remember telling the police that this is the

23      same guy I had seen Goff inside the store with?

24              Do you remember tell that to the police,

25      Mr. Collins?
```

1   A.  Yes, I do.

2   Q.  You remember also telling the police that I am sure

3       he's the same person and that on a scale of one to ten

4       ten being without a doubt, you indicated you were:  I

5       would say a ten because I had just seen the two of them

6       inside the store.

7              Did you tell that to the police?

8   A.  Yes, I did.

9   Q.  You also remember telling the police you had known Goff

10      about twelve years; Mr. Collins, you remember telling

11      that to the police?

12  A.  Yes, I did.

13  Q.  Okay.

14            You remember also telling the police

15      that when they asked you how was Goff and the guy

16      acting when they entered the store, they were acting

17      like they were real cool was your answer when they came

18      into the store?

19  A.  Yes, I did.

20  Q.  Do you remember being asked:  Did you notice anyone

21      else out there?

22            You remember giving the answer, no, I

23      didn't notice anyone else in the area when the shooting

24      occurred.

25            You remember giving that statement to

1      the police?

2   A.  Yes, I did.

3   Q.  Mr. Collins, you've testified here today that you were

4       not at the area of Mack and Gray on January 17th, at

5       approximately 9:30 p.m., is that correct?

6   A.  Yes, that is.

7   Q.  So then why did you give the testimony you gave on

8       February 4th, under oath, Mr. Collins?

9   A.  Okay.

10              First of all, I was a ward of the State

11      and I was in a center.  And I had a tetter on my leg

12      and my best friend had got killed and I was going under

13      saying that I really didn't know what was going on and

14      I happen -- I happened to be be Gray one morning and

15      homicide came over there and they showed us some

16      pictures and I was walking around the corner to get my

17      hair did.

18              THE COURT:  I tell you what.  Just

19      listen to the question and answer the question.

20              Why don't you ask the question again,

21      counsel.  And you just listen to the question, and

22      answer the question.

23   BY MR. GONZALES:

24   Q.  On February 4th, when you testified at 36th District

25      Court?

                            3 8

1    A.   Yes.

2    Q.   You said one thing has happened.

3                    Why did you say those things happened on

4         February 4?

5    A.   Oh, because I am I was trying to get, homocide tried to

6         get me to say the things that weren't true.  They tried

7         to get me to say something that I didn't see nothing.

8    Q.   You say they tried?

9    A.   They did.

10                   Well, they did.  They were telling me

11        they were going to do this and this to me because I was

12        on escape on a tetter.

13   Q.   Mr. Collins, are you saying that you lied under oath on

14        February 4, 1992, at the 36th District Court on this

15        case People versus Carl Hubbard?

16   A.   Yes, I did.

17   Q.   Now, homicide wasn't in the courtroom on that date in

18        time, were they?

19   A.   Yes, they was on the exam, they was.

20   Q.   Did anybody -- excuse me.

21                   When you testified on February 4th, did

22        you tell the Judge Lipscomb you had been threatened by

23        anybody?

24   A.   No, I didn't.

25   Q.   Did you tell Judge Lipscomb what homicide said to you?

                            39

1    A.   No, I didn't.

2    Q.   Did you tell anyone what supposedly homicide had done

3         to you on February 4th at the time of the exam in

4         court?

5    A.   Yes.

6              I told my mother on the phone and I told

7         everybody that I was talking to when I had went back to

8         jail what had happened, what really had happened.

9    Q.   Okay.

10             You said you told your mother and you

11        told the people in jail; is that correct?

12   A.   No.

13             I said I had told the people that I was

14        calling on the phone that is what really happened.  And

15        I told my momma what really happened.

16   Q.   You didn't tell the Judge; is that correct?

17   A.   Tell the Judge, what, sir?

18   Q.   Did you -- you didn't tell the Judge when you were

19        testifying that somebody was forcing you to testify;

20        you didn't tell that to Judge Lipscomb back on February

21        4?

22   A.   No, sir.

23   Q.   You didn't tell it to anyone other than your friends

24        and your mother; is that correct?

25   A.   Yes, sir.

40

```
 1    Q.   You didn't tell it to any of the lawyers; is that
 2         correct?
 3    A.   I got in touch with his lawyer and told him when I got
 4         out of jail.
 5    Q.   That was wednesday, wasn't it, last week?
 6    A.   Yes, it was.
 7    Q.   So between February 4th and last week, Wednesday,
 8         approximately August 26, 1992, you hadn't told anybody
 9         involved with the court; had you?
10    A.   No, sir.  I was locked -- I got locked back up until
11         July the 20th.
12    Q.   You just got out of prison on July 20th, did you not?
13    A.   Yes.
14    Q.   You are back out on the streets; is that correct?
15    A.   Yes, sir.
16    Q.   Has anyone threatened you at all since you have been
17         back out on the streets?
18    A.   No, sir.
19    Q.   Okay.
20                        Isn't it true, sir, that you are worried
21         for your own life?
22    A.   Yes, sir.  And my kids and my mother.
23    Q.   Is that why you are testifying the way you are today
24         because of your kids and your mother?
25    A.   No, sir, I -- I am just telling the truth, you know.
```

41

```
 1        am sitting up here in front of the Judge telling the
 2        Judge that I didn't see nothing, which I really didn't
 3        see nothing.  It ain't just because of my kid.
 4                     I feel that I didn't -- I shouldn't, you
 5        know, I shouldn't have did what I did but now --
 6   Q.   Why shouldn't you have did what you did?  What was
 7        wrong?
 8   A.   Because, I, you know, I wasn't there.  Like I told you,
 9        homicide tried to get me to say the things that I
10        didn't even see nothing, you know.  Homicide was
11        telling me little stuff, you know, and I was really
12        upset about my best friend got killed and what was --
13        the first thing that was coming through my mind I was
14        just saying it, you know.  It wasn't meant to be said,
15        you know.
16   Q.   Best friend?
17                     You're not talking about the deceased in
18        this case, Rodnell Penn; is that correct?
19   A.   No, sir.
20   Q.   You are talking about somebody else?
21   A.   Yes.
22   Q.   In fact, the fact that your best friend got killed, is
23        that some reason why you are testifying the way you are
24        today?
25   A.   What you said?
```

1   Q.  Is it because your best friend got killed is you are

2       not testifying the way you did before against Mr.

3       Hubbard?

4   A.  No.  That ain't the reason, no.

5   Q.  What is the difference between this Judge here, with

6       all due respect, and Judge Lipscomb?

7   A.  It's no difference between no judge.  They all the

8       same.

9               I am just -- I am just telling the

10      truth.

11  Q.  Why didn't you tell Judge Lipscomb when you had your

12      chance with that Judge?

13  A.  Because I was still under depression.  I was nervous.

14      I was on escape.  I didn't know what was going to

15      happen.

16              I was leaving my kids.  I was -- I

17      wasn't together right then and there.  My mind was just

18      off.

19  Q.  So you agree you could have told Judge Lipscomb,

20      couldn't you?

21  A.  Yes, I could have told him the truth.

22              I was so in a state of shock that I

23      didn't know what was going on at that time.

24  Q.  So were you in a state of shock some days earlier when

25      you told that to the police on January 23rd?

43

1    A.  Oh, yes.

2    Q.  And you were also in the state of shock later on

3        February 4 in front of Judge Lipscomb when you will

4        testified in court?

5    A.  I was kind of nervous, then, yes.  I was on escape.  I

6        knew I should get arrested and do the rest of my time,

7        a lot of stuff, you know.

8    Q.  Has anybody threatened any of your family members?

9    A.  No.  Ain't nobody threatened them, no.

10   Q.  Sir, what about your mother, has your mother received

11       any threats?

12   A.  No.  She had just -- people were calling and hanging up

13       but it wasn't no threats.  It wasn't no threats.

14              Ain't nobody said nothing on the phone.

15       They called and hung up.  And she moveed out of town

16       for awhile; now she came back.  She's straight.

17   Q.  Okay.

18              MR. GONZALES:  Your Honor, I'd like to

19       have the prior preliminary examination testimony of Mr

20       Collins marked as an exhibit.

21              I have an extra copy.  That would be

22       particularly pages, nine through thirty-one.

23              And I move for their admission as

24       substantive evidence, as prior inconsistent statements

25       on the part of Mr. Collins.  Large portion of those

                              44

1    particular points have already been identified.

2                    I'd separate them out and have them

3    marked as People's Proposed Exhibit Number 2.

4                    THE COURT:  Any objection?

5                    MR. GILES:   One second, Your Honor.

6                    Your Honor, I have no objection with

7    regards to the use as the sole purpose --

8                    MR. GONZALES:  Prior inconsistent

9    statements.

10                   MR. GILES:  Prior inconsistent

11   statements..

12                   MR. GONZALES:  Of the witness.

13                   THE COURT:  All right.

14                   If there are any other statements by any

15   other people, this Court will disregard -- it is my

16   understanding dealing with those pages, eighty-nine

17   through thirty-one, that this Court will consider the

18   witness' statement insofar as they are inconsistent

19   statements.

20                   So there being no objection, this Court

21   will receive those pages as Exhibit 1

22                   MR. GONZALES:  Two.

23                   THE COURT:  Exhibit 1 was the statement

24   to the police?

25                   MR. GONZALES:  Yes, sir.

1               THE COURT:  Has it been marked as

2     Exhibit Number 2 yet?

3                    MR. GONZALES:  No, not yet.

4                    THE COURT:  Let's mark it and this Court

5     will allow it into evidence.

6                    MR. GONZALES:  I have made a correction.

7     It is 9 through 30.

8                    THE COURT:  9 through 30.  Thank you.

9                         (Exhibit No. 2 was marked for

10                        identification by the

11                        Reporter.)

12

13                    THE COURT:  Did you wish to

14    cross-examine this witness, Mr. Giles?

15                    MR. GILES: Yes, Your Honor.

16    BY MR. GILES::

17    Q.   Good morning, Mr. Collins?

18    A.   Good morning.

19    Q.   Mr. Collins, do you go by any other name besides Mr.

20         Collins?

21    A.   Curt baby.

22    Q.   Do you also go by the name of Tony Smith?

23    A.   No, I don't.

24    Q.   You don't?

25    A.   I went one time.

                              46

1    Q.   One time?

2    A.   One time when I was on escape on the tetter.  I didn't

3         want them to know my real name.

4    Q.   Okay.  Just a few questions, Mr. Collins.

5

6                   It is your testimony today that in

7         court that you were not on the corner of Mack on

8         January 17, 1992.  Is that your testimony now?

9    A.   Yes, sir, it is.

10                  I wasn't on Mack and Gray at that time.

11   Q.   And you were not at that party store on Mack and Gray?

12   A.   No, I wasn't.

13   Q.   Did you see -- it is also your testimony that you did

14        not observe Mr. Hubbard at approximately 9:30?

15   A.   No, I didn't.

16   Q.   Is that true?

17   A.   True.

18   Q.   Okay.

19                  When you testified at the preliminary

20        exam, when the prosecution asked you several questions

21        about did you say this and you said:  Yes?

22   A.   Yes, I didn't -- I did say.

23   Q.   Were you lying then?

24   A.   What you say?

25   Q.   Were you lying?  When you said, yes, I saw.  Was that

                              47

1      lie?

2  A.  Yes, it was.

3  Q.  Okay.  And was it a lie when you said you saw Mr.

4      Hubbard there?

5  A.  Yes, it was.

6  Q.  Was it also a lie when you said you saw the body and

7      heard the shots?

8  A.  Yes, it was.

9  Q.  Okay.

10             When you gave your statement to the

11     police on January 23rd, were you in custody?

12 A.  No, I wasn't.

13             I was on escape at the time.  I didn't

14     know I was on escape because I had used that (sp) alias

15     name.  And they didn't go further and finding out my

16     real name; they just let me loose.  They just let me

17     go.

18 Q.  When you gave your testimony at the exam, were you in

19     custody?

20 A.  Yes, I was.

21 Q.  Your statement that you gave to the police on January

22     23rd, did you write out that statement?

23 A.  No, I didn't.

24 Q.  Can you read and write?  Can you read and write, Mr.

25     Curtis?

48

```
 1   A.  I am slow on reading.  But I know how to write.

 2   Q.  Mr. Curtis, can you tell me in regard to giving

 3       directions, north, east, west or south, what corner the

 4       store on Mack and Gray is on?

 5   A.  Sitting on Mack and Gray, on the left-hand side of the

 6       street.  I think it is going east.  I misunderstand --

 7   Q.  So would that be the northwest corner, the northeast

 8       corner, the southeast corner?  Would you be able to

 9       tell me that?

10   A.  I wouldn't be able to tell you that, sir.

11   Q.  Okay.

12                   If you were standing on, at Mack and

13       Gray, would you be able to tell me which way was north

14       and which way was south; and which way was east and

15       which way was west?

16   A.  Yes, I would.

17   Q.  Okay.

18                   When you told the prosecutor on Direct

19       that you felt that homicide division was forcing you to

20       lie?

21   A.  Yes, I did.

22   Q.  Why do you think that?  How were they forcing you to

23       lie?

24   A.  Because they was telling me little stuff like, when

25       they found out I was on escape, they were just saying
```

49

11

1      little stuff like aggravating me and I was already

2      under pressure that my friend had got killed. then,

3      you know, my mother them was out there and they were

4      saying that they would give me all of this ten thousand

5      dollars to remove me to Texas and give me a new

6      identity, stuff like that.

7                   They told me they were going to be, give

8      me the max for being on escape.

9                   So my first mind to saying, well, shoot,

10     I am going to try to get out the worst of trouble

11     because I know I was already in trouble for taking the

12     box off my leg. But now I am just ready to tell the

13     truth that I didn't see nothing. I wasn't there, you

14     know.

15  Q.  All right.

16                   When you say they were going to give you

17     the max, you are -- are you saying they were

18     threatening you?

19  A.  They were saying little stuff like, you are going back

20     to jail or stuff like that, you know.

21                   I was listening to them, you know.  I

22     was already upset.

23  Q.  Okay.

24                   It is also your testimony that you were

25     made certain promises.

50

```
 1                    You said they are going to give you ten

 2        thousand dollars and relocate you?

 3   A.   Yes.

 4                    They were saying they could move me

 5        away, stuff like that.

 6   Q.   In essence, promising some type of witness protection

 7        or relocation program for you?

 8   A.   Yes.  I guess you could call it that.

 9   Q.   You also testified on direct that you were in fear for

10        yourself and your family?

11   A.   Yes, I was.

12   Q.   And you are in fear from who?

13   A.   I mean, you know, when -- I am saying -- if you say, I

14        ain't in fear of nobody I know, but I am saying if you

15        stay around somewhere you have been staying all your

16        life and you are out there with two kids and you are

17        walking, something liable to happen to you if you are

18        out there saying you seen something that you ain't

19        seen; going around lying on people, you know, people

20        get killed like that, you know.

21                    That's why I am trying to get my name

22        cleared out of it now so I can take -- so I can go on

23        with my life and take care of my kids and leave all of

24        this nonsense along, you know, because I ain't seen

25        nothing.
```

51

1          I can't be walking out there on the

2     street watching my back every five minutes, you know,

3     looking for, around for somebody to pull a gun out on

4     me and kill me.  You know, I can't be going for that.

5     Because I got two kids out there I got to take care of

6     them.

7  Q.  Has anyone given you any threats; anyone said anything?

8  A.  No.

9          My mama told me to come in here and do

10    what is right and I am doing it because I am listening

11    to her.  So I am taking the stand telling the Judge,

12    you and the prosecutor, what is really going on, you

13    know.

14 Q.  Has the prosecutor or anybody explained to you what

15    perjury was?

16 A.  No, sir.

17          MR. GILES:  One second, Your Honor.

18 BY MR. GILES:

19 Q.  Just one more question, Mr. Collins.

20          In your statement to the police, you

21    stated that you were with another person by the name of

22    Andrew.

23          Do you remember -- do you recall making

24    that statement?

25 A.  No, sir.

                        52

1       They had asked me do I know a guy name

2   Andrew and I told them I knew a guy by the name of Levy

3   (sp). I didn't know I was with no Andrew. They went

4   and told him that and I didn't even tell them that I

5   was with no Andrew. I didn't tell them that.

6       They went to his house and told him that

7   I said that is where he stayed and everything. That

8   was another story they told on me right there that put

9   me in danger.

10      They went and told this young man and I

11  said his name and told him what kind of car he stayed

12  in and everything.

13      MR. GILES: No further questions, Your

14  Honor.

15              REDIRECT EXAMINATION

16

17  BY MR. GONZALES:

18  Q.  You remember testifying at the preliminary examination

19      regarding Andrew on February 4th?

20  A.  What you say?

21  Q.  Do you remember testifying regarding Andrew at the

22      preliminary examination on February 4th?

23  A.  No, I don't.

24  Q.  I am referring to page 18. You remember being asked

25      the question:

                        53

1                                  Question: Did you talk

2                   to anyone before you left,

3                   referring to the area of the scene

4                   on January 17, 1992?

5                   You indicated: Answer: No.

6                   Question: Did you know anybody by

7                   name of Andrew.

8                   You remember giving the answer:

9                   Yes, I do?

10  Q.  Do you remember being asked the question: Did you talk

11     with him at that scene?

12                 Do you remember giving the answer: I

13     talked to him over the phone.

14                 Do you remember giving those answers on

15     page 17 at the preliminary exam?

16  A.  No, I don't.

17  Q.  I am showing you page 17.

18                 Did you have a chance to read that to

19     yourself?

20  A.  Yes, I did.

21  Q.  Do you remember now giving those answers to those

22     questions regarding Andrew?

23  A.  Yes, I did.

24  Q.  You did testify that way back then; did you not?

25  A.  Yes.

54

1      THE COURT: Your answer is: Yes?

2 A. Yes.

3 BY MR. GONZALES:

4 Q. Mr. Collins, you indicated to the other attorney here

5   on one of his questions that you were not in court

6   custody when you gave your statement to the police and

7   that they let you loose. They let me go?

8 A. On that first day statement, yes, they did.

9 Q. And does that mean they let you walk out the building

10   and you were free to go ?

11 A. Yes, sir.

12 Q. But you knew, did you not, when you left that you had

13   broken your tetter and you had been on an escape

14   status; you knew that?

15 A. Yes, I did.

16 Q. But the police didn't know that?

17 A. No, they didn't.

18 Q. Otherwise they wouldn't have let you go; is that

19   correct?

20 A. Yes, sir, that's correct.

21 Q. How is it, Mr. Collins, they could have in any way

22   threatened you with your parole case or give you the

23   max if they let you go and they didn't know who you

24   were, Mr. Collins?

25 A. What are you saying?

1    Q.   How could they have threatened you in anyway with
2         giving you the max for your parole term, if they let
3         you go and they didn't know who you were?
4    A.   When they -- when she was telling me this, this is when
5         they had put me under custody and I was ready to go to
6         court and she was coming upstairs telling me all of
7         this.
8                        She didn't tell me about the reward and
9         all the max stuff until I was under custody.
10   Q.   Right.
11                       After you gave this statement on January
12        23rd; isn't that correct?
13   A.   Not only that statement.
14   Q.   After this?
15   A.   After that when I went under custody.
16   Q.   And you went under custody sometime between that
17        statement on January 23rd and February 4th when you
18        testified in court?
19   A.   Yes.  I turned myself in and went under custody.
20   Q.   Okay.
21                       How long had you been in custody before
22        the exam on February 4th?  How many days or weeks or
23        what?
24   A.   I was about ten days locked up in custody.  About ten
25        days.

56

1    Q.  Before February 4th, before the preliminary exam?

2    A.  Yes, I was.

3    Q.  You said you turned yourself in?  Why did you do that?

4    A.  Oh, because I knew I was on escape.  And I knew

5        homicide wanted to talk to me.  So I just went on in

6        and turned myself in.

7    Q.  All right.  That's all.

8                    MR. GONZALES: Nothing further, Judge.  I

9        guess that's all I have from this witness.

10                   THE COURT:  Anything further, Mr. Giles?

11                   MR. GILES:  Nothing further, Your Honor.

12                   THE COURT:  Just a couple of questions,

13       if I might.

14                   I might have missed these questions or

15       answers.

16                   THE WITNESS:  Yes, sir.

17                   THE COURT:  This defendant, Mr. Hubbard,

18       have you ever had a problem with Mr. Hubbard before?

19                   THE WITNESS:  Just, you know, we used

20       to -- I used to get along with him then, you know.

21       He's all right with me but he just started falling out

22       once upon a time just started disliking each other but

23       it wasn't nothing as far as physical or nothing like

24       that.

25                   THE COURT:  Why out of all the people in

                              57

1   the world did you lie at the preliminary exam and state

2   to the Judge at that time, at the preliminary exam that

3   you saw Mr. Hubbard after you heard the shots; that you

4   saw Mr. Hubbard standing over the deceased and that you

5   saw Mr. Hubbard running away from the deceased?

6              Why did you pick out Mr. Hubbard?

7              THE WITNESS:  Because I was -- I was

8   like under, you know, it was just like I didn't know

9   what was going on.  I just said, you know, people is

10  killing people and the guy that killed my boy, I was

11  just sad, you know.  I wasn't thinking right then.

12             I said, you know, if they didn't catch

13  him.  I just went on ahead and lied.  Now -- and I said

14  I seen him but I really didn't, you know.

15             I didn't mean to do it.  I was just

16  under pressure.  My mind wasn't functioning right and

17  then I was on escape, Your Honor.

18             THE COURT:  Anything else?

19             MR. GONZALES:  Nothing, Judge.

20             THE COURT:  You can step down.

21             MR. GONZALES:  Judge, may I approach for

22  one moment?

23             THE COURT:  All right.

24                  (A discussion was held at sidebar

25                   off the record between Court and

                           58

1                          counsel.)

2           *      *      *      *      *

3                THE COURT:  I am going to ask Mr.

4     Collins that you have a seat in the courtroom because

5     you might be recalled.

6                     Any objection to having him sit in the

7     courtroom?

8                THE MR. GILES:  No objections.

9                MR. GONZALES:  One minute to  make one

10    phone call.

11               THE COURT:  All right.

12

13                    (A discussion was held off the

14                     record.)

15                     *      *      *      *

16

17               THE COURT:  All right.  We are back on

18    the record.

19               MR. GONZALES:  I am ready, Your Honor.

20               THE COURT:  You can get your next

21    witness.

22          J O H N   A R T H U R   T R A M M E L.

23

24                    called as a witness by the People,

25                    being duly sworn by the Court Clerk,

                           59

```
 1                        was examined and testified upon his
 2                        oath, as follows:
 3                        DIRECT EXAMINATION
 4
 5    BY MR. GONZALES:
 6    Q.   I need one second, Your Honor.
 7
 8                        Sir, please state your name for the
 9    record?
10    A.   John Arthur Trammel.
11    Q.   Mr. Trammel, how old are you, sir?
12    A.   Forty-two.
13    Q.   Mr. Trammel, I'd like to recall your attention to the
14    date of January 17, 1992.
15                        Sir, on that date, did you know someone
16    by the name of Carl Hubbard?
17    A.   No, I didn't.
18    Q.   Okay.
19    A.   I know Goff.
20    Q.   Did you know someone with the nickname Goff?
21    A.   Yes.
22    Q.   Did you -- did you know that person's real name?
23    A.   No, I didn't.
24    Q.   Do you see that person you knew as Goff here in the
25    courtroom today?
```

                                    60

1    A.   Yes.

2    Q.   Can you please point and tell me what color pants he's

3         wearing today?

4    A.   Blue.

5    Q.   Okay.

6                        MR. GONZALES:   Witness identifying for

7         the record, Your Honor, the defendant in this matter.

8         Carl Hubbard.

9    BY MR. GONZALES:

10   Q.   Okay.

11                       Mr. Trammel, I'd like to call your

12        attention to the date of January 17, about 9:30, p.m..

13                       Did you have occasion to be in the area

14        of Gray Street in the City of Detroit?

15   A.   Yes.

16   Q.   Did you also have occasion to be in the area of

17        Dickinson in the City of Detroit?

18   A.   Yes.

19   Q.   Where are Dickinson and Gray Streets related to each

20        other in that area?

21   A.   Well, Dickinson is one block east of Gray.

22   Q.   Okay.

23                       So, they are one block apart?

24   A.   Yes.

25   Q.   Any streets in between the two of them?

61

1   A.  No.

2   Q.  All right.

3               Now, did you have occasion to on that

4       date in time observe the person you've identified in

5       Court today hear as Goff at that approximate time?

6               Was there some point during that evening

7       that you saw him?

8   A.  Yes.

9   Q.  What time was it that you saw him, sir?

10  A.  I couldn't tell you what time it was.

11  Q.  Okay.

12              Well, can you give us any idea, morning

13      evening?

14  A.  It was late evening.

15  Q.  Late evening?

16  A.  Yes.

17  Q.  What street was it that you saw Mr. Hubbard or Goff?

18  A.  Gray.

19  Q.  On Gray?

20  A.  Yes.

21  Q.  What were the circumstances?  How did you see him?

22  A.  Oh, I was coming back.

23              I was pulling up with DeAnthony (sp)

24      that and we couldn't find no place to park.  So you had

25      to park a little bit down the street.  The police and

62

1        ambulance had the park blocked out.  We got out the car
2        and walked down to where the police was.
3    Q.  The person you refer to as DeAnthony (sp) is that
4        correct?
5    A.  Yes.
6    Q.  Do you know his last name?
7    A.  All I know these people is by their street names.
8    Q.  All right.
9                          Now, you say that the police had
10       the street blocked.  Did you have occasion to see why
11       the police had the street blocked; did you see why they
12       were there?
13   A.  I didn't know that until we got out the truck and
14       walked down.
15   Q.  When you got out the truck, what street were you on?
16   A.  Gray.
17   Q.  Where did you go to?
18   A.  We walked down towards where the police were?
19   Q.  And what address was that, if you know?
20   A.  3960.
21   Q.  And, if you know, is that 3960 Gray?
22   A.  Yes.
23   Q.  And, if you know, whose house was that, as far as you
24       knew?
25   A.  Peter Baker.

63

1  Q.  Mr. Peter Baker?

2  A.  Yes.

3  Q.  Okay.

4          When you got to the area of Mr. Peter

5  Baker's house on Gray Street, what did you see,

6  anything unusual?

7  A.  No.  The ambulance sitting out there.  Police was

8  shining the lights on the ground and asking people what

9  was happening.  And he said some guy got shot.

10  Q.  Did you see anybody lying on the ground?

11  A.  No, nobody on the ground.

12  Q.  And how was it that -- can you describe -- can you tell

13  how long was it that you described this person in the

14  court?

15  A.  He was among the spectators.  Just like I was there,

16  people were there, other people were there.

17  Q.  Prior to this date in time, January 17th, '92, how long

18  had you known Goff?

19  A.  Off and on.  Oh, I mean, I have been around in the area

20  about two or three years.  I have been knowing him

21  since then.

22  Q.  You are positive you saw him there that night?

23  A.  Yes, he was.

24  Q.  And was he alone or with anybody, as far as you knew?

25  A.  As far as I know he was by himself.

64

1    Q. As far as you can recollect, how was he dressed, if you

2       know?

3    A. Let's see.  He had on Raider jacket.

4    Q. You are talking about the football team?

5    A. Yes.

6    Q. What color was that?

7    A. Black.

8    Q. Black Raider jacket?

9    A. Yes.

10   Q. Did you see him talking with anyone?

11   A. No.

12   Q. And did you speak with him at all?

13   A. Yes, I spoke with him.  I said:  What is up.

14   Q. What did Mr. Hubbard say to you?

15   A. What is up.

16   Q. Anything other than that?

17   A. Not that I can recall.

18   Q. Prior to this time had you had occasion to see him at

19      all?

20   A. No.

21   Q. Okay. Did anything unusual happen to you on Dickerson

22      street?

23   A. Did anything unusual?

24   Q. Yes.

25   A. No.

65

1  Q.  Had you been on Dickerson street?

2  A.  Yes.

3  Q.  Prior to this on being on Gray Street?

4  A.  Yes.

5         We came back.  When we were coming back

6  we came down Dickerson heading towards Mack which was

7  south.

8  Q.  What happened on Dickerson street when you went down

9  Dickerson?

10  A.  Nothing.  Other than the guy smashing us with that

11  truck going up on the sidewalk.

12  Q.  What kind of truck was it?

13  A.  A jeep.

14  Q.  What color was it?

15  A.  White.

16  Q.  If you know, on this date in time, where was Mr.

17  Hubbard living at?

18  A.  I don't know where he was living at.  All I know is

19  they said he lived on Dickerson.

20  Q.  If you know, what kind of place did he live in?

21  A.  Apartment building.

22  Q.  Where was his jeep at in relation to the apartment

23  building?

24  A.  I can't say because I don't know where the apartment

25  building is, if in fact he lived there.

66

14

1    Q.   Okay.

2              Have you ever had any animosity  or bad

3    blood between you and Mr. Hubbard?

4    A.   No.   He always been cool with me.

5    Q.   Thank you.

6              MR. GONZALES:   No further questions, Your

7    Honor.

8              THE COURT:   Any questions?

9              MR. GILES:   Yes.

10

11                 CROSS-EXAMINATION

12

13   BY MR. GILES:

14   Q.   Good morning, Mr. Trammel?

15   A.   Good morning.

16   Q.   You said you saw Mr. Hubbard on Gray Street?

17   A.   Yes.

18   Q.   Approximately what time was that?

19   A.   I can't say.

20              All I can say it was late evening.

21              To pinpoint the time exactly, I couldn't

22   say.

23   Q.   Would you repeat that answer?

24   A.   All I can say, it was late evening.  To pinpoint the

25   time exactly, I couldn't say.

1    Q.   Okay.

2              But by the time you saw Mr. Hubbard on

3         Gray, the police were there on Gray and the ambulance;

4         is that right?

5    A.   Yes.

6    Q.   And this was in front of Peter Baker's house?

7    A.   Yes.

8    Q.   Were the other people there around?

9    A.   Pete was there; I was out there, DeAnthony was out

10        there and a couple more people out there.  I don't know

11        exactly where they were.

12   Q.   You said that Mr. Hubbard was wearing a black Raiders

13        jacket?

14   A.   Yes.

15   Q.   Is that correct?

16   A.   Yes.

17   Q.   Do you recall if he had on a hat?

18   A.   (No response)

19   Q.   A cap or anything?

20   A.   I don't know.  You know, I think he had on a cap; I

21        don't know for sure.

22   Q.   You also mentioned a white jeep on Dickerson?

23   A.   Yes.

24   Q.   I didn't exactly hear your testimony regarding that

25        white jeep.

68

```
 1   A.   It was nothing.
 2                   We was just headed down towards -- were
 3        we are headed south on Dickerson.  It was coming north
 4        on Dickerson and it went up and the snow was kind of
 5        deep.  And it went up almost -- I admired it because it
 6        cut through that snow almost going up on the sidewalk.
 7   Q.   Okay.
 8                   Were you able to see who was in the
 9        jeep?
10   A.   No.
11   Q.   So you wouldn't know if it was more than one person?
12   A.   No, no.
13   Q.   Okay.
14   A.   I was looking at the jeep's capability because it was
15        cutting through that snow.  Everybody else was getting
16        stuck, you know.
17   Q.   Thank you.
18                   MR. GILES:  No further questions.  Thank
19        you.
20                   THE COURT:  Anything else?
21                   MR. GONZALES:  Nothing.
22                   THE COURT:  You can step down, thank
23        you.
24                   Do you have another witness?
25                   MR. GONZALES:  I do, Your Honor.
```

69

1

2              THE COURT:  All right.  Call your

3     witness.

4                    L E O N   P E N N

5

6                    called as a witness by the People,

7                    being duly sworn by the Court Clerk,

8                    was examined and testified upon his

9                    oath, as follows:

10

11                    DIRECT EXAMINATION

12    BY MR. GONZALES:

13    Q.  Good morning, sir.  Please state your name for the

14        record?

15    A.  Leon Penn.

16    Q.  Mr. Penn, how old are you?

17    A.  Thirty-two.

18    Q.  Mr. Penn, did you have a relation by the name of

19        Rodnell Penn?

20    A.  Yes.

21    Q.  How were you related to him?

22    A.  That's my brother.

23    Q.  All right.

24              Mr. Penn, could you move that microphone

25        close to your mouth?

                            70

1    A.   That's my brother.

2    Q.   Okay.

3                      Mr. Penn, I'd like to recall your

4    attention to the dates of Thursday, January 16th and

5    Friday, January 17th, 1992.

6                      On those dates, sir, did you have

7    occasion to see the person of your brother Rodnell

8    Penn?

9    A.   Yes.

10   Q.   First of all, sir, on Thursday -- strike that.

11                     First of all, sir, did you also on those

12   dates in time have occasion to know someone by the name

13   of Carl Hubbard or Goff?

14   A.   Yes.

15   Q.   Do you see this person in court today?

16   A.   Yes.

17   Q.   Could you please point and tell me what color of

18   clothes that person is wearing?

19   A.   Blue pants and blown shirt.

20                     MR. GONZALES:   Witness pointing to and

21   identifying for the record the defendant in this matter

22   Carl Hubbard.

23   BY MR. GONZALES:

24   Q.   On those dates, the 16th and the 17th, did you have any

25   occasion to come in contact with the person that you

                               71

            MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1        just identified in court as Goff?

2   A.   Yes.

3             I think it was Thursday I was staying in

4   apartment on Charlevoix and Springer.  And a friend of

5   mine had came by and said I seen your brother on the

6   corner at the store.

7             And I said, Oh, yes.  I said, no you

8   didn't.  He said, yes, he is.

9             So I went out the door, as I was coming

10  out the apartment, Rodnell and Goff was coming down

11  Charlevoix and they were talking for awhile and Goff

12  went down Springer and Ronell came in the apartment

13  with me and he had spent the night with me that night.

14  Q.   What time of day was this on Thursday?

15  A.   About maybe about -- I can't exactly say the time.  But

16  it was that Thursday, ten, eleven.

17  Q.   Is this in the a.m. or p.m.?

18  A.   In the evening.

19  Q.   So approximately ten or eleven in the evening on

20  Thursday, you saw the person you've identified in court

21  speaking with your brother on Charlevoix?

22  A.   Yes, and Springer.

23  Q.   How far away is Springer and Charlevoix from Gray

24  Street?

25  A.   I think it is the next street.  The next street over to

                              72

1    the right.

2    Q.  P.M. how many blocks away?

3    A.  About one block.

4    Q.  Okay.

5                    Now, if you know, sir, what, if anything

6        did Mr. Hubbard say that you overheard?

7    A.  That Rodnell had told me that they --

8                    MR. GILES:  (Interposing) Objection.

9    BY MR. GONZALES:

10   Q.  I am only concerned about what, if anything, you heard

11       Mr. Hubbard say?

12   A.  That he would see him tomorrow.

13                   THE COURT:  Listen to the question.

14                   MR. GONZALES:  I not --

15   BY MR. GONZALES:

16   Q.  Okay.

17                   I am not talking about Rodnell, Mr.

18       Penn.  I am talking about this person, Mr. Hubbard, did

19       you hear him say anything?

20   A.  I will see you tomorrow.

21   Q.  If you heard anything he said, what if anything, did

22       you hear Mr. Hubbard say?

23   A.  I will see him tomorrow.

24   Q.  And those words that you just heard -- excuse me.

25                   Those words that you just testified to,

73

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1      were those words that you heard Mr. Hubbard say?

2   A.   Right, yes.

3   Q.   What day was this?

4   A.   That was Thursday.

5   Q.   Okay.

6               Now, if you know, sir, was it unusual to

7        you in your state of mind to see Mr. Hubbard with your

8        brother Rodnell?

9   A.   No.

10  Q.   Okay.

11              If you know, sir, what, if anything, was

12       the relationship between your brother and Mr. Hubbard,

13       Goff?

14  A.   He was selling drugs for him.

15  Q.   Who was selling drugs for who?

16              MR. GILES:   I will object to the answer

17       without any foundation laid.

18              THE COURT:   I agree.   Lay a foundation.

19              MR. GONZALES:   Certainly, Judge.

20  BY MR. GONZALES:

21  Q.   Have you ever had occasion to see your brother sell

22       drugs?

23  A.   Yes.

24  Q.   Have you ever had occasion to see, when he sold drugs,

25       to be involved in the sale of drugs with this person

74

```
 1        you've identified in court?
 2   A.   Yes.
 3   Q.   Was that before this date, January 16th of 1992?
 4   A.   Before and after, before.
 5   Q.   Okay.
 6                        And for how long a period of time
 7        had your brother been selling drugs before this date in
 8        time, approximately?
 9   A.   Maybe a couple of years.
10   Q.   Okay.
11                        And how long had you known Goff or
12        Mr. Hubbard before this date, January 16th?
13   A.   About a couple of years.
14   Q.   And throughout those couple of years, how long have you
15        known the two of them to be involved together?
16   A.   For two years, about.
17   Q.   What kind of drugs did you know them to be involved in
18        selling?
19   A.   Crack.
20   Q.   Okay.  And you tell me where were they involved in
21        selling drugs at?
22   A.   First they were selling crack on the west side.
23   Q.   Then where?
24   A.   Then still on the west side.  Different places.
25   Q.   Okay.
```

75

1          Now, when you say the west side, is

2    this in an area near Gray and Mack, or Springer or

3    Mack?

4  A.  That's east.

5  Q.  So was it in a different area from the area where you

6    saw Mr. Hubbard and your brother Rodnell?

7  A.  The Thursday night -- this is a different area.

8  Q.  The area where they sold drugs, is this -- is that the

9    same area or a different area?

10 A.  A different area.

11 Q.  All right.

12          If you know, sir, were the two of

13   them involved in the sale of crack cocaine around the

14   point in time you last saw your brother on January 16th

15   and 17th?

16 A.  Yes.

17 Q.  On January 1th7, on that date, you indicated that your

18   brother had spent the night with you?

19 A.  Yes.

20 Q.  Okay.  And When was the last time you saw him on

21   January 17th?

22 A.  That morning before I left for work.

23          It was about it woke up about seven

24   or 8 o'clock in the morning.

25 Q.  Is that the last you saw him?

76

```
 1    A.   Yes.

 2    Q.   Did you have any conversation that evening, the evening

 3         before with Mr. Hubbard or Goff?

 4    A.   The last time I seen him was that night, Thursday.

 5    Q.   Did you talk to him at all yourself?

 6    A.   Just, what is up, and that's it.  Just a general

 7         conversation.

 8    Q.   Thank you.

 9                    MR. GONZALES:  No further questions,

10         Your Honor.

11                         CROSS-EXAMINATION

12

13    BY MR GILES:

14    Q.   You stated, Mr., Penn, that you were with your brother

15         and Mr. Hubbard on Thursday, January 16th?

16    A.   Yes.

17    Q.   Okay.

18                    And approximately what time were you

19         with them?

20    A.   Between 10 and eleven.

21    Q.   At night?

22    A.   Yes.

23    Q.   Okay.  And where -- where were you at?

24    A.   Where were we at when I seen him?

25    Q.   Yes.
```

```
 1    A.   On the corner of Charlevois and Springer.

 2    Q.   Who else was there?

 3    A.   My brother Rodnell.  Goff, me, that's all.

 4    Q.   That's all?

 5    A.   Yes.

 6    Q.   Okay.

 7                     Is your {your name|you remember}

 8         testimony that you left each other approximately 11:00?

 9    A.   Pardon me.

10    Q.   You left each other?

11    A.   He left, walked down Springer and me and Rodnell went

12         in the apartment.

13    Q.   Okay.

14                     Rodnell spent the night with you?

15    A.   Yes.

16    Q.   Did he ever leave?

17    A.   No.

18    Q.   You didn't see him again until -- you saw him last that

19         following morning?

20    A.   Say that again?

21    Q.   You saw Rodnell last the following morning; is that

22         correct?

23    A.   We left together that morning.

24    Q.   You testified that Rodnell used to sell drugs for Mr.

25         Hubbard?
```

78

1  A.  Yes.

2  Q.  Okay.

3          And that you knew personally?  You saw

4      your brother selling drugs?

5  A.  Yes.  I knew that he sold drugs.

6  Q.  That's not the question.

7          I said did you ever see him selling

8      drugs?

9  A.  Did I see him selling drugs?

10  Q.  Right.

11  A.  Yes.  I've seen him sale drugs, definitely seen him

12      selling drugs.

13  Q.  And where was this?

14  A.  On Martin street, Martin.

15  Q.  That's on the east or the west side?

16  A.  That's west side.

17  Q.  How long ago was that?

18  A.  This was about maybe two years or something like that.

19      Maybe more.  About two or something years, like that.

20  Q.  So the last time you personally saw your brother

21      selling drugs was at least two years ago; is that a

22      correct statement?

23  A.  Personally, yes.

24  Q.  At the time you said you personally saw your brother

25      selling drugs, your information was he's selling drugs

16

1    for Mr. Hubbard?

2  A.  Yes, he was.

3  Q.  How do you know that?

4  A.  Because he would come by and pick up the money and get

5    more dope from him.

6  Q.  Mr. Hubbard would pickup the money and get more dope?

7  A.  And give Rodnell the dope.

8  Q.  Okay.

9            Did Mr. Hubbard do this from his prison

10    cell?

11  A.  His prison cell?

12            No.  When he was out of jail.

13  Q.  You said approximately two years ago?

14  A.  I said around.

15  Q.  Excuse me, let me ask the question.

16            You said approximately two or three

17    years ago your brother was selling drugs for Mr.

18    Hubbard; is that correct?

19  A.  I didn't say the direct date.

20            But I know he was selling drugs for him

21    because I seen him.  He was there and his brother was

22    staying on the street Parker (sp) right off of Raygone

23    (sp) and Livernois.

24  Q.  Okay.

25            Now, you are saying at least two or

1     three years ago?

2  A.  Around that time.  I can't give you the right dates.

3  Q.  Since that time, two or three years ago, have you seen

4     your brother and Mr. Hubbard interact selling drugs?

5  A.  Have I seen them, yes, that's right..

6  Q.  Interact selling drugs?

7  A.  Talking about it, yes.

8  Q.  You've heard them talking about it?

9  A.  Yes.

10            MR. GONZALES:  You have to answer yes or

11     no?

12            THE WITNESS:  Yes.  I said yes..

13  BY MR. GILES:

14  Q.  When is the last time you heard them talking about

15     drugs?

16  A.  The last time I heard them was that night that he was

17     supposed to come back and meet him about that, getting

18     some stuff.

19  Q.  What night was that?

20  A.  Thursday night.

21  Q.  You are saying that Mr. Hubbard was going to --

22  A.  (Interposing) Rodnell was going to come back and get

23     some stuff.

24  Q.  That night?

25  A.  The next day.

81

1    Q.   Do you use drugs, Mr. Penn?

2    A.   No.

3    Q.   Have you ever used drugs?

4    A.   Yes.

5    Q.   When was the last time you used drugs?

6    A.   Eight months ago.

7    Q.   What kind of drugs was that?

8                    MR. GONZALES:  Relevancy.  Eight months

9         ago?

10                   THE COURT:  I will let the answer

11        stand..

12                   MR. GILES:  It was around the time that

13        this incident occurred.

14                   THE COURT:  I will let the answer stand.

15                   Go ahead.  You can continue.

16                   MR. GILES:  Thank you.

17   BY MR. GILES:

18   Q.   So it is fair to say that about the time that your

19        brother was killed, you were using drugs?

20   A.   Yes.

21   Q.   Around that general period of time?

22   A.   Yes.

23                   THE COURT:  You have to say, yes or no?

24   A.   Yes.

25   Q.   What time of drugs?

82

1    A.   Crack.

2    Q.   Okay.

3    BY MR. GILES:

4    Q.   Had you used crack on January 16th?

5    A.   No.

6    Q.   The day you saw Rodnell?

7    A.   No.

8    Q.   How much of a habit did you have, if you can say you

9         had a habit?

10   A.   I did not have a habit.

11                         I said I used it.  I didn't have no

12        habit.

13   Q.   Now, how often would you use it?

14   A.   Maybe once or twice a month, maybe.

15   Q.   One second please.

16   BY MR. GILES:

17   Q.   Mr. Penn, did you ever live on Springer?

18   A.   Yes.

19   Q.   You had an apartment there?

20   A.   Yes.

21   Q.   Just a couple more questions, sir.

22                         Mr. Penn, while you had that apartment

23        on Springer, did you ever rent out that apartment

24        before, for the use to drug dealers.

25                         MR. GONZALES:  It is immaterial Judge.

83

1    Objection.

2                          MR. GILES: I am trying to lay a

3    foundation in regard to this person's previous drug use

4    and drug habit. He's already testified to.

5                          THE COURT: All right. Go ahead.

6    BY MR. GILES:

7    Q.   Did you ever rent that?

8    A.   Yes. Goff gave me some money.

9    Q.   Okay.

10   A.   So he could sell drugs out of it, yes.

11   Q.   And is it also true you would rent out your apartment

12        and use it for other people to roll?

13   A.   When he did that, I go, changed my mind and I told him

14        no, he couldn't do it.

15   Q.   How many times?

16   A.   That was that one time I told him no. I didn't want it

17        in the apartment because I had to live there.

18   Q.   Did you allow other people to come in and have them pay

19        in order to use the drugs in your apartment?

20   A.   No.

21   Q.   All right.

22                          You said your habit was

23        approximately -- you only used once or twice a month;

24        is that right?

25   A.   Yes, maybe.

84

```
1    Q.   How much did you use?

2    A.   Maybe a dime or something like, something like that.

3    Q.   One dime?

4    A.   Yes.

5    Q.   You didn't have a forty or forty-five dollar a day?

6    A.   No, sir.

7                    MR. GILES:  No further questions.

8                    THE COURT:  Anything else.

9                    MR. GONZALES:  Nothing, Judge.

10                   THE COURT:  You can step down.  Thank

11       you.

12                   THE COURT:  Do you have another witness

13       counsel?

14                   MR. GONZALES:  Yes, I do Judge.

15                   Could I have a moment though to  make

16       that call again?

17                   THE COURT:  All right.

18

19                   THE COURT:  Have a seat and speak loud

20       and clear so everyone can hear you.

21

22                   T R A C E Y   S E W E L L

23

24                   called as a witness by the People,

25                   being duly sworn by the Court Clerk,
```

85

1                        was examined and testified upon

2                            her oath, as follows:

3

4                            DIRECT EXAMINATION

5

6    BY MR. GONZALES:

7    Q.  Please state your name for the record?

8    A.  Tracey Sewell, Detroit Police Officer.

9    Q.  And how long have you been so employed?

10   A.  Six years.

11   Q.  Were you so employed on the date of January 17th, 1992

12       at approximately 9:30 p.m.?

13   A.  Yes, I was.

14   Q.  On that date did you have occasion to go to the area of

15       3960 Gray in the City of Detroit?

16   A.  Yes, I did.

17   Q.  Were you alone or with anyone?

18   A.  I was with a partner.

19   Q.  What was your partner's name?

20   A.  Kenneth Krupa.

21   Q.  What was the state of uniform?

22   A.  Full uniform and marked vehicle.

23   Q.  What was your understanding for the reason of going to

24       that location?

25   A.  Call came out as a shooting.

86

1    Q.  Okay.

2                          What, if anything, did you observe

3        when you first arrived at that location?

4    A.  I observed a male, a man lying in the street.  He was

5        lying sideways like on his side.

6    Q.  Okay.

7                          And where at was he lying, can you

8        describe?

9    A.  It would be in the street at the mouth of the driveway.

10   Q.  And the driveway to what address?

11   A.  3960, Gray.

12   Q.  Did you notice anything unusual about his condition?

13   A.  Yes.

14                         It appeared that he had been shot

15       because blood was seeping out the side of the hood of

16       the jacket that he had on.

17   Q.  And you indicated a portion of your face, the side area

18       on the right?

19   A.  Yes, there was some blood.

20   Q.  All right.

21                         What, if anything, did you do with

22       respect to or did you observe anything else that --

23       with respect to that person lying there?

24   A.  EMS response unit showed up on the scene.

25   Q.  What, if anything, did they do that you could see?

87

1  A.  I observed them take the hood of the jacket up.

2  Q.  Okay.

3  A.  And revealed the guy's head.

4  Q.  Okay.  Anything else?

5  A.  It appeared to have two gunshots wounds to the head.

6  Q.  Did you do anything -- did you place anything on

7      evidence?

8  A.  Yes.

9               I retrieved a slug that was lying on the

10     deceased's stomach when the EMS cut-off his clothes.

11 Q.  Did you place that on evidence?

12 A.  Yes, I did.

13 Q.  What was that?

14 A.  It was placed on evidence tag 91 32 055.

15 Q.  What, if anything, else did you do at the scene?

16 A.  I preserved it for evidence techs to come out and

17     retreive evidence and take pictures.

18 Q.  Okay.

19               As best you can, can you again

20     describe the exact position of the body when you first

21     observed it?

22 A.  Okay.

23               The complainant was laying at the

24     mouth of the driveway.  His head was pointing east.  He

25     was wearing a jacket with a hood.  He had --

88

1    Q.   (Interposing) Can you describe how he was laying?

2    A.   Yes.  He was lying on his side where his face would

3         have been pointed to the east, facing the driveway

4         towards the house of thirty-six -- 3960 Gray.

5    Q.   Was he laying in any particular area where there was

6         snow?

7    A.   Yes.

8                        The streets were covered with snow

9         at this time.

10   Q.   How was he laying in relation to any snow?

11   A.   Would have been laying up on top of the snow that had

12        been packed down; just hadn't been shoveled.

13   Q.   Was he in any way obscured -- was any part of his body

14        obscured at all by the snow?

15   A.   No.

16   Q.   Okay.

17                   MR. GONZALES:  No further questions.

18                   THE COURT:  Thank you.

19                   CROSS-EXAMINATION

20

21   BY MR. GILES:

22   Q.   Officer Sewell?

23   A.   Sewell.

24   Q.   You said you were in full uniform on the 17th of

25        January, is that correct?

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    A.    Yes, I was.

2    Q.    When you went to the location.

3                    THE COURT:  Why don't you hold on for

4         one second.

5                    I am going to ask that both attorneys

6         approach the bench for one moment.

7                    MR. GONZALES:  All right, Your Honor,

8         sure.

9                    (A discussion was held at sidebar

10                    off the record.)

11                    *      *      *      *

12

13

14

15

16                    THE COURT:  Thank you for your patience

17        counsel.  I am going to ask that you continue.

18                    MR. GILES:  Thank you, Your Honor.

19

20   BY MR. GILES:

21   Q.    When you received the call regarding the shooting, did

22        you receive a specific address?

23   A.    I have to refer to my report.

24   Q.    You can refer to it, to help your recollection.

25   A.    From my report indicates it was no specific address.

90

1  Q.  You had a general location; is that correct?

2  A.  To the best of my recollection, yes.

3  Q.  Okay.

4        And how is it that you first noticed the

5     body?

6  A.  It was lying in the street.

7  Q.  Was there anyone else there on the scene?

8  A.  Not that I recall, sir.

9  Q.  Was anyone that directed you to the body?

10  A.  No.  We observed it ourselves.

11  Q.  To your recollection, this body was in the driveway; is

12     that correct?

13  A.  It was in the street at the mouth of the driveway.

14  Q.  The body was laying in the street?

15  A.  Yes.

16  Q.  Not in the driveway?

17  A.  Yes.

18  Q.  To your recollection were there street lights there?

19  A.  Yes.

20  Q.  All right.

21        So no one had to direct you to the

22     body; is that your testimony?

23  A.  Not that I can recall, sir.

24  Q.  Okay.

25        You said that the body was lying on

91

1   top of the snow, is that correct?

2 A. Yes.

3 Q. Had the driveway street in that area been shoveled?

4 A. Not that I can recall, no.

5 Q. January 17th, this was a couple of days after that very

6   large snow we had; is that correct?

7 A. I don't recall that.

8 Q. Do you recall a lot of snow being there?

9 A. It was snow covered streets, yes.

10 Q. Okay.

11         Do you recall how much snow?

12 A. No.

13 Q. Was it a little bit or a lot; you would not recall

14   that?

15 A. Not at a specific amount, no.

16 Q. Do you recall if on either side of the driveway there

17   would have been snow mounds?

18 A. I don't recall, sir.

19         I remember there being snow there.

20   Whether it was mounds of snow, I don't recall exactly.

21 Q. Are you familiar with the area there?

22 A. Yes.

23 Q. Okay.

24         Are you familiar with the store

25   that sits on the corner of Gray and Mack?

92

```
 1   A.   Yes.

 2   Q.   From where you located the body, could you see the

 3        store on the corner of Gray and Mack?

 4   A.   Yes.

 5   Q.   Approximately how far is it?

 6   A.   Maybe two hundred yards.  A rough estimate, two hundred

 7        yards.

 8   Q.   More than a half a block; approximately half a block?

 9   A.   Less than half a block.

10   Q.   At little less than half a block?

11   A.   Yes.

12   Q.   Just a couple more questions.

13                        It is your testimony that when you

14        arrived at the scene, was there anyone else at that

15        general area that you saw?

16   A.   Not that I can recall.

17   Q.   Were there other police cars in the area?  Had the

18        ambulance arrive when you arrived?

19   A.   No.

20   Q.   You were the first to arrive?

21   A.   Yes.

22                        Yes.  We were the first patrol unit,

23        yes, sir.

24   Q.   Were the other people in the area?

25   A.   Not that I can recall.
```

MARY E. SKINNER, CSR-0031  -  OFFICIAL COURT REPORTER

1    Q.   One second, please.

2

3                        MR. GILES:   No further questions, Your

4        Honor.   Thank you.

5

6                        REDIRECT EXAMINATION

7

8

9    BY MR. GONZALES:

10   Q.   Did the body have any signs of life?

11   A.   No.

12   Q.   Was he moving at all in any way when you saw?

13   A.   No movement.

14                        MR. GONZALES:   Okay.   No further

15       questions.

16                        THE COURT:   Anything else?

17                        MR. GILES:   Nothing else.

18                        THE COURT:   You can step down.   Thank

19       you.

20                        MR. GONZALES:   Thank you, officer.

21                        THE COURT:   Do you have another witness

22       Mr. Gonzales?

23                        MR. GONZALES:   Yes, Your Honor.

24

25                        C R A I G    T U R N E R

                                94

1
2                      called as a witness by the People,
3                      being duly sworn by the Court Clerk,
4                      was examined and testified upon
5                      his oath, as follows:
6                        DIRECT EXAMINATION
7
8  BY MR. GONZALES:
9  Q.  Would you state your name for the record?
10 A.  Craig Turner.
11 Q.  How are you employed?
12 A.  Police officer for the City of Detroit.
13 Q.  How long have you been so employed?
14 A.  Seven and a half years.
15 Q.  Were you so employed on the date of January 17th, 1992
16     at approximately 9:30 p.m.?
17 A.  Yes, sir.
18 Q.  All right.
19                      On that date in time were you alone
20     or with a partner?
21 A.  I was with a partner, officer Brian Carter.
22 Q.  What was your stated uniform?
23 A.  Plain clothes, semi marked vehicle.
24 Q.  What were your general responsibility?
25 A.  Routine patrol.

                          95

```
 1   Q.  All right.
 2                        On that date in time, did you have
 3       occasion to go to the area of front of 3960 Gray in the
 4       City of Detroit?
 5   A.  Yes, I did.
 6   Q.  What was your understanding of the reason why you went
 7       there?
 8   A.  Scout 583 responded to a shooting which resulted in
 9       fatal.
10   Q.  Are you familiar with who the officers were on scout
11       583?
12   A.  Yes.  Officer Kenneth Krupa and officer Tracey Sewell.
13   Q.  What were your understanding of -- for going to assist
14       them for?
15   A.  Just as backup.
16   Q.  And did there come a time when you had occasion to
17       arrive at that location?
18   A.  Yes.
19   Q.  Prior to this date in time, January 17th, 1992, -had
20       you had occasion to come in contact with someone you
21       knew as Goff or Carl Hubbard?
22   A.  Yes.
23   Q.  Do you see him in court today?
24   A.  Yes.
25   Q.  Would you please point and indicate what color clothing
```

96

1     for our records?

2  A.  Seated to your left at defense table wearing brown

3      shirt and blue pants.

4  Q.  Indicating for the record the defendant in this matter,

5      Carl Hubbard.

6                        How long prior to January 17th, 1992,

7      had you known Mr. Hubbard?

8  A.  Probably three or four years.

9  Q.  On this date in time, January 17th, 1992, did you have

10     occasion to observe Mr. Hubbard in this area?

11 A.  Yes.

12 Q.  What were the circumstances of your observing Mr.

13     Hubbard in that area?

14 A.  He walked pass the EMS truck which already had the

15     deceased in the truck.

16                        He was already in the truck and he

17     asked me what had happened.

18 Q.  And did you respond?

19 A.  Yes.

20 Q.  What did you say?

21 A.  I told him we had a homicide and that's all I knew.

22 Q.  Now, did he come directly to you to talk?

23 A.  Well, not directly up to me, but.

24 Q.  How did it happened?

25 A.  He walked south towards the truck.

97

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

```
 1                           And I was standing there and he
 2      came within a feet but not directly.  Like spoke out a
 3      little bit to, not yell, but from here to where the
 4      Judge is at.
 5   Q. Thank you.  Approximately 7 feet.  Is that right?
 6   A. Yes.
 7   Q. Now, when he asked you that question, you gave a
 8      response.  What did you indicate?
 9   A. I told him we had a homicide and I didn't know anything
10      else about it at that time.
11   Q. Did he ask you anything further?
12   A. Not at that time, no.
13   Q. Okay.
14                           Did there come a time when he did?
15   A. Yes, he left.
16                           And he returned shortly after, as
17      we sat, me and my partner, got in the scout car.
18   Q. Okay.
19                           And how much later did you have
20      another conversation with Mr. Hubbard in terms of
21      minutes, seconds hours or what?
22   A. It would have been about eight or ten minutes.
23   Q. And at this point in time how did you have this
24      conversation with Mr. Hubbard?
25   A. Okay.
```

98

```
 1                              We walked back up to the car and he
 2        asked was it one of the guys from the neighborhood.
 3   Q.   And then was there a response given?
 4   A.   Yes.
 5   Q.   And what was the response?
 6   A.   I told him:  No.
 7   Q.   And what, if anything, did Mr. Hubbard ask?
 8   A.   He asked me was the guy dead.
 9   Q.   And was there a response given?
10   A.   I told him:  Yes.
11   Q.   And anything else?
12   A.   Yes.
13   Q.   What was that?
14   A.   He stated that Mack and Gray was out cold.
15   Q.   Okay.
16                              Now, do you remember as best you
17        can the words he used when he said that?
18   A.   "Mack and Gray is out cold."
19                              And that's all I remember.
20   Q.   Do you remember -- strike that.
21                              Do you remember anything else he
22        might have said in terms of that?
23   A.   As I recall, it could have been Mack and Gray is out
24        cold as opposed to Charlevois and Lenox.
25   Q.   Do you remember the way he said that?  Is that the
```

19

99

1        exact language?

2    A.  Just like that.

3    Q.  Okay.

4    A.  And as far as I can remember.

5    Q.  Okay.

6                        MR. GONZALES:  May I approach the

7        witness for a second?

8                        THE COURT:  Yes, you can.

9                        Let me ask one question for a

10       second.

11                       Did that mean anything to you, that

12       statement?

13                       THE WITNESS:  Yes.

14                       THE COURT:  When someone says Mack

15       and Gray was out cold?

16                       THE WITNESS:  Yes.

17                       THE COURT:  What does that mean to

18       you?

19                       THE WITNESS:  To me it meant that

20       the dope was more popular and the crime was more

21       heavier in that area as opposed to the area where Mr.

22       Hubbard hangs out.

23                       THE COURT:  Okay.  Thank you

24                       MR. GONZALES:  For purposes of

25       refreshing your recollection, I'd ask you to take a

                         100

```
1        look at the middle of page 33, the question that begins
2        the defendant and the answer begins with Mr. Hubbard.
3                        I'd asked you to read that to
4        yourself and see if that refreshes your recollection.
5                        THE WITNESS:  Yes.
6                        THE COURT:  Did you have a chance
7        to read that to yourself?
8   BY MR. GONZALES:
9   Q.   Did you have a chance to read that to yourself?
10  A.   Yes.
11  BY MR. GONZALES:
12  Q.   Now, do you reconize the words that Mr. Hubbard said to
13       you that night?
14  A.   Yes.
15  Q.   What was that?
16  A.   You think Leonard (sp) and Charlevois is out cold, Gray
17       and Mack is.
18  Q.   Again, what was your understanding of the meaning to
19       you?
20  A.   That the area Gray and Mack, I guess you would say, the
21       tactics that they use at Gray and Mack was more severe
22       than the tactics they use at Leonard and Charlevois in
23       reference to dope sales, and the way they handle them.
24  Q.   Did the area of Lenox (sp) and Charlevoix, as it is
25       contained in the contents of Mr. Hubbard's statement,
```

101

1        have any meaning to you?

2    A.   Yes.

3    Q.   What was that?

4    A.   That's the area that he frequents.

5    Q.   And how do you know that?

6    A.   From past experience and observing him there on

7         surveillances at that particular location and in the

8         area.

9    Q.   Okay.

10             When you say on surveillance, do

11        you have personal observations of Mr. Hubbard in any

12        activities that he may have been involved in in the

13        area of Lenox (sp) and Charlevoix?

14   A.   Not exactly.

15             I have never arrested him for any

16        of the dope arrest that I have made over there, not him

17        personally.  I have never arrested him for dope.

18   Q.   Okay.

19             Now, up to that point in time had

20        you given Mr. Hubbard any indication whatsoever that

21        this was a dope-related or drug-related killing?

22   A.   No.

23   Q.   In terms of your conversation with Mr. Hubbard, are you

24        aware of anyone, yourself, your partner, or anyone else

25        in the area indicating in the presence of Mr. Hubbard

                          102

1    that this killing was in any way related to drug sales

2    at Mack and Gray?

3    A.  No.

4    Q.  What, if anything, happened next?

5    A.  Shortly after that conversation, my partner, officer

6    Brian Carter, asked Goff to have a seat in the car.

7    Q.  And what about was his response, if any?

8    A.  No, man.

9    Q.  Was he allowed to leave the scene at that point?

10   A.  Yes.

11   Q.  Can you recollect how he was dressed that day?

12   A.  I believe he had on a blue jacket with a hood.

13                   But the hood wasn't on at that

14   time.  I don't recall the pants.

15                   THE COURT:  I am going to ask that

16   you hold onto your notes, counsel.

17                   We're going to take about a three

18   or four minute break right now.  You can step down and

19   stretch your legs.  We will come back in a few minutes

20                   THE DEPUTY:  All rise.

21                   Court's in recess.

22                   (A short break)

23

24                   *    *    *    *

25

```
 1
 2                          THE DEPUTY:  Court's back in
 3       session.  Be seated, please.
 4                          THE COURT:  You can take the stand
 5       again, Officer Turner.
 6                          MR. GONZALES:  Just a couple more
 7       questions.
 8  BY MR. GONZALES:
 9  Q.   Officer Turner, now I believe where we left off we were
10       talking about the clothing.
11                          Can you describe again the clothing
12       you recollect Mr. Hubbard to be wearing that night?
13  A.   Yes.
14                          It was a gray jacket with a blue
15       hood or could have been, as I recall, a black hooded
16       sweat shirt.
17  Q.   Okay.
18                          Black hooded sweat shirt or a gray
19       jacket but with a blue hood?
20  A.   Yes.
21  Q.   And the hood was on or off?
22  A.   Not on, I said.
23  Q.   In terms of the last conversation you had with Mr.
24       Hubbard, after he said, no, man, what did he do next?
25  A.   He left.
```

104

1    Q.  Okay.

2                        Did you notice anything unusual

3        about his responding to your questions, and answers?

4    A.  Not until he asked me was the guy dead.

5    Q.  And what, if anything, did you notice unusual there?

6    A.  He -- his facial expression changed almost like a faked

7        shock.

8    Q.  In terms of what response, are you talking about?

9    A.  When he said -- he asked me, he said:  Is he dead?  I

10       said:  Yes.

11   Q.  And then what did he do?

12   A.  He said:  He's dead?  I said:  Yes.

13   Q.  Okay.  Nothing further.

14                       MR. GONZALES:  That's all I have at

15       this time, Your Honor..

16                       THE COURT:  Any questions?

17                       MR. GILES:  Yes, Your Honor..

18                       CROSS-EXAMINATION

19

20   BY MR. GILES:

21   Q.  Good morning, officer Turner?

22   A.  Good morning.

23   Q.  Who was at the scene when you arrived?

24   A.  Officer Kenney Crucka (sp).  Officer Tracey Sewell.

25       And some point Sergeant Michalek but I can't remember

                          105

1    if that was before we got there or right after we got

2    there.

3  Q.  Okay.  Had EMS arrived?

4  A.  Yes.

5  Q.  By the time you got there?

6  A.  Yes.

7  Q.  Was the body already loaded into the van?

8  A.  No.  EMS had not arrived by the time I got there.

9  Q.  Okay.

10                              So the body was still in the

11   street?

12 A.  Yes.

13 Q.  Where exactly was the body?

14 A.  It was, as I recall, in the driveway and of 3960, I

15   believe the address was.  Partially in the driveway

16   like the upper torso in the driveway and maybe the feet

17   in the street.  I don't recall exactly.

18 Q.  So at least at the bottom of the driveway you are

19   saying his feet?

20 A.  Yes.

21 Q.  Do you recall the snow conditions that day?

22 A.  Yes, somewhat.

23 Q.  Was there a lot of snow?

24 A.  Not really a lot of snow.  It was snow covered, the

25   grass and the street.

1    Q.    Right.

2                        Okay.   Do you recall if the

3          driveway appeared to have been shoveled?

4    A.    I don't recall.

5    Q.    Approximately how long were you there before you saw

6          Mr. Hubbard?

7    A.    Well, the EMS truck arrived shortly after we were

8          there.   I would say maybe five minutes.

9    Q.    In your conversation with Mr. Hubbard, do you recall

10         telling him, "someone coming from a crack house got

11         blown away"?

12   A.    No.

13   Q.    Do you remember telling him something to that effect?

14   A.    Did he?

15   Q.    Not using those exact words.

16                       Did you tell him something to that

17         effect after asking you who got --

18   A.    No, I don't recall saying that at all.

19   Q.    Okay.

20                       Do you recall making any

21         association with the crack house and the deceased --

22         about drugs on the deceased?

23   A.    No.

24   Q.    All right, sir.

25                       You said that Mr. Hubbard was

                                107

1     wearing a gray or blue jacket?

2  A.  Or a black hooded sweat shirt, as I recall.

3  Q.  Dark?

4  A.  Black, if it was black, yes.

5  Q.  Okay.

6                    You said when you saw him, the

7     hood -- it had a hood on it?

8  A.  Yes, it did.

9  Q.  When you saw him, the hood was not on his head?

10 A.  Correct.

11 Q.  And when you were having the discussion with Mr.

12    Hubbard, you were approximately, I believe your

13    testimony was, about seven feet away from him?

14 A.  Right.

15                   So it could have been a little

16    shorter distance than that but somewhere in there.

17 Q.  Are you aware that Mr. Hubbard has any unusual scars on

18    his body that's visibly noticeable?

19 A.  Am I aware?

20 Q.  Yes.

21 A.  Yes.

22 Q.  Where?

23 A.  On the back of his head.

24 Q.  And standing seven feet away from him that night could

25    you see the scar?

                           108

1    A.   Could I see the scar?

2    Q.   Yes.

3    A.   No.   He was facing me.

4              He wasn't talking to me with his

5    back away from me.   He was facing me.

6    Q.   Just a couple more questions.

7              You stated on direct examination

8    that when Mr. Hubbard asked you was the guy dead, you

9    said that his facial expression caused you, not for --

10   for lack of a better word -- some concern, something

11   seemed wrong, a faked shock?

12   A.   That's the term I would use.   It's just the way that he

13   said it.

14              It is not like you are talking to

15   me now, just a plain facial expression.   He made some

16   facial expression when he said that.

17   Q.   When he said:   Is he dead?

18   A.   Excuse me?

19   Q.   When he was asking you was this guy dead?

20   A.   Right.

21   Q.   That's when you're saying he was faking an unusual

22   expression?

23   A.   Yes.

24   Q.   What did -- what kind of unusual facial remarks was he

25   making; was he laughing?

109

1   A.   No, he's wasn't laughing.

2   Q.   Was he crying?

3   A.   He wasn't crying.

4   Q.   Was his eyes wide open?  I mean, what exactly was he

5        doing?

6   A.   His facial expression changed.

7   Q.   Okay.  Let me ask you this:

8                              How long have you known Mr.

9        Hubbard?

10  A.   Probably three or four years.

11  Q.   In what relationship?

12  A.   Prior arrests.

13  Q.   Okay.

14                             Over the last three or four years,

15       how much time as a result spent with Mr. Hubbard?

16  A.   How much time have I spent with him?

17  Q.   Have you spent personally with Mr. Hubbard?

18  A.   I haven't spent any time with him.  Just arrest time

19       and seeing him in custody and seeing him on the corner

20                             I stopped to talk to him almost

21       every night at Lenox and Charlevoix.

22  Q.   Based on the limited amount of time that you spent with

23       Mr. Hubbard, you feel that you could in essence give us

24       an interpretation of his facial expression?

25  A.   Are you asking me what facial expression he made?

                            110

1   Q.  Okay.

2                I asked that question earlier and

3   you really didn't answer.

4                Now, I am asking based on the

5   limited amount of time that you have spent with him in

6   the past, what makes you feel that you can interpret

7   his expression?

8   A.  Because I was there.

9                The facial expression changed and

10  not by crying or laughing.

11              It is almost sort of like if one of

12  your relatives were to die right now, and you just

13  found out; is he dead.

14  Q.  All right.  Thank you.

15             MR. GILES:  No further questions.

16             THE COURT:  Anything else?

17             MR. GONZALES:  No, Your Honor,

18  nothing from the People.

19             THE COURT:  You can step down.

20  Thank you.

21             THE COURT:  We're going to break

22  for lunch at time.

23             And this case is going to be

24  adjourned until tomorrow morning at 9:00.

25             MR. GONZALES:  Tomorrow morning?

111

1                    THE COURT:   Yes.   I will see you

2          then.  9:00.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                112

1    R_E_P_O_R_T_E_R_'_S_ _ _C_E_R_T_I_F_I_C_A_T_E

2

3    STATE OF MICHIGAN )
                       )
4    COUNTY OF WAYNE   )

5

6        MARY E. SKINNER, CSR-0031, Official Court

7    Reporter in and for the Third Judicial Circuit, Wayne

8    County, State of Michigan, do hereby certify that the

9    foregoing pages  1 through 112 , inclusive, was reduced

10   to typewritten form by means of Computer-Assisted

11   Transcription and comprise a true and accurate

12   transcript of the proceedings taken in the

13   above-entitled matter, on Monday, August 31, 1992.

14                    _____
                      MARY E. SKINNER, CSR-0031

15

16   Dated:  This ____ day of _____ 1992.

17

18

19

20

21

22

23

24

25

113