159160

1                STATE OF MICHIGAN

2        IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

3    THE PEOPLE OF THE STATE OF MICHIGAN,

4                    Plaintiff,

5            -vs-                    Case No. 92 1856

6    CARL HUBBARD,
                    Defendant,
7    _____/ WAIVER TRIAL

8            PROCEEDINGS HAD AND TESTIMONY TAKEN in the

9    above-entitled cause, before the HONORABLE RICHARD P.

10   HATHAWAY, Judge, Third Judicial Circuit, at 202

11   Recorder's Court Building, Detroit, Wayne County,

12   Michigan, on Tuesday, September 1st, 1992.

13   APPEARANCES:
                    MR. JAMES GONZALES,  Esq.,
14
                        On behalf of the People.
15
                    MR. RONALD GILES, Esq.,
16
                        On behalf of the Defendant.
17

18

19

20

21

22

23

24

25

                            1

MARY E. SKINNER, CSR-0031  -  OFFICIAL COURT REPOR'

1          T A B L E   O F   C O N T E N T S

2

3    Witness                                              Page

4    ----------------------------------------------------------

5    MR. RANDY RICHARDSON

6         Direct Examination by Mr. Gonzales          3

7         Cross Examination by Mr. Giles              22

8         Redirect Examination by Mr. Gonzales        30

9

10   MR. ANDREW SMITH

11        Direct Examination by Mr. Gonzales          32

12        Cross Examination by Mr. Giles              41

13        Redirect Examination by Mr. Gonzales        45

14

15   MS. LUZINDA GROSS

16        Direct Examination by Mr. Gonzales          46

17        Cross Examination by Mr. Giles              52

18        Redirect Examination by Mr. Gonzales        55

19              E X H I B I T S

20

21   Indentification                      Marked   Received

22   ----------------------------------------------------------

23

24

25

                              2

     MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

```
1                    Detroit, Michigan

2                    Tuesday, September 1, 1992.

3                    *      *      *      *

4

5                    THE CLERK: People of the State of

6    Michigan versus Carl Hubbard.  Case number 92-001 856.

7                    Mr. Hubbard is here today for

8    purposes of continuation of a waiver trial.

9                    MR. GONZALES:  Good morning, Your

10   Honor.

11                   James Gonzales, again, appearing

12   for the People.

13                   MR. GILES:  May it please the

14   Court, Ron Giles, appearing on behalf of Carl Hubbard,

15   who is now entering the Court.

16                   MR. GONZALES:  The People call Mr.

17   Randy Richardson to the stand.

18                   THE COURT:  All right.  Step up

19   here, sir, and give your name to the court reporter.

20

21

22             R A N D Y   R I C H A R D S O N

23

24                   called as a witness by the People,

25                   being duly sworn by the Court
```

3

MARY E. SKINNER, CSR-0031  —  OFFICIAL COURT REPORTER

```
 1        Clerk,
 2                            was examined and testified upon his
 3                            oath, as follows:
 4
 5                            DIRECT EXAMINATION
 6
 7    BY MR. GONZALES:
 8    Q.   Sir, would you state your name for the record?
 9    A.   Randy Richardson.
10    Q.   How are you employed?
11    A.   Police officer assigned to the crime scenes, as an
12         evidence technician.
13    Q.   Were you so employed on the date of January 17th, 1992?
14    A.   Yes, sir, I was.
15    Q.   Okay.
16                            Were you also so employed on the
17         date of February 12, 1992?
18    A.   Yes, I was.
19    Q.   Taking you back to January 17th 1992, did you have
20         occasion in the evening hours to attend the address of
21         3960 Gray in the City of Detroit?
22    A.   I did.
23    Q.   What was your understanding of your reason for going to
24         that location?
25    A.   I received a police run to go to this address to meet
```

4

1     someone from homicide on a fatal shooting.

2   Q.   Were you alone or with a partner?

3   A.   I had a partner.

4   Q.   What was your partner's name?

5   A.   Officer Robert Collinash.

6   Q.   What time did you arrive at that location?

7   A.   Approximately 11:45 at night, p.m..

8   Q.   At that time did you have occasion to conduct any

9        activities in terms of evidence gathering and reports?

10  A.   Yes, sir, we did.

11  Q.   What did you do?

12  A.   I made a sketch of the scene.

13                              My partner took photos in my

14       presence.  We also did some gunshot residue test of

15       some occupants of the dwelling.

16  Q.   Which particular dwelling are you referring to?

17  A.   3960 Gray.

18  Q.   What are gunshot residue tests?

19  A.   They are tests used to determine if a person has

20       handled or fired a gun that has been fired recent.

21  Q.   And how many gunshot residue tests did you do that day?

22  A.   I did two myself.  And my partner did two.

23  Q.   Did you observe him do those other two?

24  A.   Yes, sir, I did.

25  Q.   Do you know the names of the individuals that you did

5

1           those tests on?

2      A.   I would have to refer to my report.

3      Q.   And you do -- you have that with you?

4      A.   Yes, sir, I do.

5      Q.   Would that refresh your recollection?

6      A.   Yes, it will.

7      Q.   Please do so then?

8      A.   I did a gunshot test on the hands of a Peter Baker.   I

9           did a gunshot test on the hands of Basil  Dennis.

10                         My partner did a gunshot test on

11          the hands of DiAnthony Wilcher, and a John Trammel.

12     Q.   Okay.

13                         And what if anything was done with

14          the results of that or whatever was recovered as a part

15          of those gunshot residue tests?

16     A.   The gunshot kits were placed on evidence and turned

17          over to the homicide section.

18     Q.   Do you recall the evidence tag numbers?

19     A.   Yes, I have them here.

20     Q.   Can you indicate them for the record in terms of the

21          individuals who they corresponded to?

22     A.   Gunshots residue test for Peter Baker was placed on

23          evidence tag 91 3201.  Test for Basil Dennis as placed

24          on evidence tag 91 3202.  For DiAnthony Wilcher, 91

25          3203.

6

1            And for John Trammel on 91 3204.

2    Q.   All right.

3            Who did you turn them over to, if

4    you know?

5    A.   I turned them over to evidence section technicians;

6    they have an evidence locker.

7    Q.   And that was that date?

8    A.   Yes.

9            It was approximately 12:30 a.m,

10   would have been the following morning.  Once we left

11   that scene we went down town.

12   Q.   January 18 of 1992?

13   A.   Yes, sir.

14   Q.   Okay.

15            Now, you indicated that you had

16   been present when your partner took some photographs,

17   as well as you did a sketch yourself?

18   A.   Yes.

19   Q.   Okay.

20            Now, I like to call your attention

21   to the date of February 12.

22            Did you again have another occasion

23   to go to the area of 3960 Gray in the City of Detroit?

24   A.   Yes, sir, I did.

25   Q.   What was your understanding of the reason for your

7

1        going to that location at that time?

2   A.   I had had a conversation with yourself; and you

3        requested me to go out and make an expanded sketch of

4        the scene.

5                            And we also took some photographs,

6        my partner and myself.

7   Q.   And again who is your partner at this time?

8   A.   At that occasion it was officer Kenneth Comp (sp).

9   Q.   At that point in time were photographs taken on that

10       date, officer?

11  A.   Yes, sir, they were.

12  Q.   Were they taken by yourself or your partner?

13  A.   My partner took them in my presence.

14  Q.   Okay.

15                      MR. GONZALES:   May I approach the

16       witness?

17                      THE COURT:   Yes.

18  BY MR. GONZALES:

19  Q.   Officer Richardson, I will hand you a series of

20       photographs and ask you if you can identify what they

21       are by the number on the back?

22                            And, Your Honor, for the record I

23       believe all photographs have been shown to counsel.

24                            And as to the individual sketches,

25       I believe counsel has received copies of them as well.

8

1                    MR. GILES:  That's correct, Your

2        Honor.

3                    THE COURT:  Thank you.

4    BY MR. GONZALES:

5    Q.  Here you are, sir.

6    A.  People's Exhibit Number 3 is a photograph of the front

7        of 3960a Gray.

8    Q.  Does that photograph show the driveway area?

9    A.  It shows the front door.  You can see very minute

10       corner of the driveway at the right side of the

11       photograph.

12   Q.  And is that a fair and accurate photographic

13       reproduction of what you that area reflects on January

14       18, 1992?

15   A.  Yes.

16   Q.  Okay.

17                    I will show you People's Exhibit

18       Number 4?

19   A.  Yes, sir.

20                    This is an also a picture taken of

21       3960 Gray as well as the dwelling to the south of that

22       address.  It shows the driveway on the south side.  The

23       picture was taken from across the street.

24   Q.  Now, is that a fair an accurate photographic

25       reproduction of that area between the two houses on

                              9

```
 1        January 17th, of 92?

 2    A.  Yes, sir, it is.

 3    Q.  Is that particular driveway anything of significance or

 4        was it to you that night?

 5    A.  Yes, sir.

 6                        There was a stain of suspected

 7        blood in the snow at the edge of the driveway right by

 8        the street.

 9    Q.  All right.

10                        I am showing you People's Proposed

11        Exhibit 25 and ask if you can identify what that is?

12    A.  Yes, sir.

13                        This is another picture and at a

14        northeast angle showing the front of 3960 Gray, also

15        the driveway going into the street, the front yard.

16    Q.  Is that again the same driveway you referred to

17        earlier?

18    A.  Yes, sir, it is.

19    Q.  Is that a fair an accurate reproduction of what you saw

20        that particular area to look like that night on January

21        17th, sir?

22    A.  Yes, sir.

23    Q.  I am showing you People's Proposed Exhibit Number 6 and

24        ask if you can identify what that is?

25    A.  Yes.
```

10

1                          There is a picture of the suspected

2      blood in the snow that we observed that night at that

3      driveway.

4   Q.  Is that a fair and photographic reproduction of what

5      you remember that stain to look like?

6   A.  Yes, sir, it is.

7   Q.  All right.

8                          I am showing you People's Proposed

9      Exhibit Number 7?

10  A.  Yes, sir.

11                         This is a picture taken from the

12     street showing the driveway entrance 3960 Gray.

13                         You see a spot by the edge of the

14     driveway.  That was the area of suspected blood in the

15     snow.

16  Q.  Is that a fair and accurate photographic reproduction

17     of that particular angle, driveway?

18  A.  Yes, sir, it is.

19  Q.  I will show you People's Exhibit Number 8.  And ask if

20     you can identify that?

21  A.  Yes, sir.

22                         This is a picture taken from the

23     east side of Gray pointing west.  Showing the opposite

24     side of the street in the -- the upper dwellings on the

25     opposite side.

11

1   Q.  Is that a fair photographic reproduction of what you

2       recollect that scene to look like that night?

3   A.  Yes, sir, it is.

4   Q.  I am showing you People Proposed Exhibit Number 9. And

5       ask you if you can identify what that is?

6   A.  Yes.

7                       Again this is another picture

8       showing the opposite side. I believe the address is

9       55, I believe is the last two numbers. But it is the

10      opposite side of the street, 3960 Gray.

11   Q.  When you say opposite side of the street, that's what?

12   A.  The west side taken from the east side, 3960 side of

13      Gray showing the opposite side of the street.

14   Q.  And where are you standing at that time in relation

15      to --

16      where was officer Colleneck (sp) standing in relation

17      to 3960 Gray at the time that photo was taken?

18   A.  He would have been standing in the driveway of 3960

19      Gray. It would be east of the sidewalk area.

20   Q.  And is that a fair and accurate photographic

21      reproduction of what that scene looked like that night?

22   A.  Yes, sir, it is.

23   Q.  I am showing you People's Proposed Exhibit Number 10

24      and ask you if you can identify what that is?

25   A.  Yes, sir.

12

```
 1                              This is another picture taken from
 2      that location from the driveway area of 3960 Gray --
 3      correction.
 4                         Showing the driveway of 3960 Gray
 5      and showing the house just to the south.  It's taken
 6      from across the street on the west side of Gray
 7      pointing southeast.
 8   Q.  Again does that show the driveway where the suspected
 9      blood is or a different one?
10   A.  That driveway where the suspected blood was at the
11      curb, yes, sir.
12   Q.  Is this a fair and accurate photographic reproduction
13      of what you recollect that area to look like?
14   A.  Yes, sir, it is.
15   Q.  Okay.
16                         I am showing you People's Proposed
17      Exhibit Number 11.  And ask you if you can identify
18      what that is?
19   A.  Yes, sir.
20                              This is a picture of the party
21      store at the corner of Mack and Gray and from the north
22      side of Mack at Gray.
23   Q.  Was that taken on January 17th or a different time?
24   A.  That was taken on February the 12th, I believe it was.
25   Q.  On February 12th were you there and present when that
```

13

```
 1         photograph was taken?

 2    A.   Yes, sir, I was.

 3    Q.   Does that photograph represent a fair and accurate

 4         photographic reproduction of what you recollect that

 5         store to look like in that area depicted?

 6    A.   Yes, sir.

 7    A.   Yes, sir, it does.

 8    Q.   I will show you People's Proposed Exhibit Number 12 and

 9         ask you to identify what that is?

10    A.   Yes.

11                        This is a picture taken from in

12         front of the party store facing north, showing Gray

13         from the south side of Mack.

14    Q.   Does that area also include in the photograph the area

15         where the driveway was, where the suspected blood had

16         been found on January 17th of 1992?

17    A.   Yes, it does.

18    Q.   Is that a fair an accurate photographic reproduction of

19         what the area looked like on February 12 of 92?

20    A.   Yes, it is.

21    Q.   I am showing you People's Proposed Exhibit Number 13.

22         And ask if you can identify what that is?

23    A.   Yes, sir.

24                        This is another picture from in

25         front of the party store, well, actually to the corner
```

14

1      partly to the side.  It would be the east side of the

2      party store just south of the curb, showing Gray facing

3      north, showing Gray in the area where the scene was.

4   Q. Is that a fair and accurate photographic reproduction

5      of that scene?

6   A. Yes, sir, it is.

7   Q. I am showing you People's Proposed Exhibit Number 14

8      and ask if you can identify what that is?

9   A. Yes, sir.

10                      Again there is another slightly

11     different angle from in front of the party store near

12     the curb showing the scene from that location.

13  Q. Again are you looking north up Gray or --

14  A. I didn't see north up Gray.  From the south side in

15     front of the party store.

16  Q. Is that a fair and accurate photographic reproduction

17     of that scene?

18  A. Yes, sir, it is.

19  Q. I am showing you People's Proposed Exhibit Number 15.

20     And ask if you can identify what that is?

21  A. Again, this is another angle.

22                      This is near the curb facing north

23     showing the scene upgrade.  And this is taken from the

24     party store.

25  Q. Is that a fair and accurate photographic reproduction

15

1    of that view?

2  A.  Yes, sir, it is.

3  Q.  I am showing you People's Proposed Exhibit Number 16,

4    and ask if you can identify what that is?

5  A.  Yes.

6                This was taken from the curb, the

7    street, right at the curb facing north showing the

8    scene again Gray and by the party store, the curb of

9    the party store.

10  Q.  When you say the curb, is that the curb on the -- of

11    the party store on Gray?

12  A.  Yes, sir.

13  Q.  Is that a fair an accurate photographic reproduction of

14    that scene?

15  A.  Yes, sir, it is.

16  Q.  I am showing you People's Proposed Exhibit Number 17

17    and ask if you can identify what that is?

18  A.  Yes, sir.

19                This is also a picture facing

20    north, showing Gray, the scene area.

21                This was taken from the south side

22    of Mack on the opposite corner from the party store.

23    It would be the south east corner of Mack and Gray

24    facing north showing the sidewalk and the -- on the

25    east side of Gray, going north.  As well as the houses

16

```
 1          on the west side.
 2     Q.   I am showing you -- is that a fair and accurate
 3          photographic reproduction of that view?
 4     A.   Yes, sir, it is.
 5     Q.   I am showing you People's Proposed Exhibit Number 18.
 6                           Can you identify that for us?
 7     A.   Yes, sir.
 8                           This is a picture taken at the
 9          driveway of 3960 Gray facing south towards the party
10          store.  It shows the street and the party store.
11                           It would be the south west corner
12          of Mack and Gray.
13     Q.   Is that looking at the opposite side from those prior
14          photographs?
15     A.   Yes, sir.
16                           This is from the scene of the
17          driveway, the suspected stain of blood.
18     Q.   When you say from the scene, where would the
19          photographer have been standing approximately taking
20          that particular photograph at the time that the
21          photograph was taken?
22     A.   He was standing in the driveway at the curb of 3960
23          Gray facing southwest.
24     Q.   All right.
25     A.   Slightly southwest.
```

17

1   Q. Is that a fair and accurate photographic reproduction

2      of that scene from the driveway looking back up south,

3      up Gray toward the party store?

4   A. Yes, sir, it is.

5   Q. Okay.

6                        I am showing you People's Proposed

7      Exhibit Number 19 and ask if you can identify what that

8      is, sir?

9   A. Yes, sir.

10                     This is another picture facing

11     southwest from the east side of Gray north of Mack.

12                   We move further south on Gray and

13     it shows the party store a little closer.

14   Q. Okay.

15                      Is that a fair and accurate

16     photographic reproduction of that scene?

17   A. Yes, sir, it is.

18   Q. Now, I am handling you People's Proposed Exhibit Number

19      20 and ask if you can -- if you can identify what that

20      is?

21   A. Yes, sir.

22                     This is a sketch I made of the

23     scene on the night, from the night of January 17th,

24     1992, as I observed it showing the scene; the stain of

25     suspected blood and the dwellings on each side.

```
 1    Q.   Is that a reasonably fair and accurate sketch of what

 2         you recollect this area to be on that night?

 3    A.   Yes, sir.

 4                        It is not to scale but it is facts

 5         similiar to what I observed.

 6    Q.   I am showing you People's Exhibit Number 21 and ask if

 7         you can describe what is that?

 8    A.   This is an extended sketch I made of that scene,

 9         including dwellings north of and south of, including

10         the intersection of Mack and Gray.  This is the sketch

11         I made on February 12, 1992.

12    Q.   Does that include the area of where the photograph was

13         taken?

14    A.   Yes, sir.

15                        I also have a little dot there

16         where the suspected blood was observed and show several

17         vacant lots and other -- and a party store at the

18         corner, southwest corner of Mack and Gray.

19    Q.   When you say PLC lights, what are those?

20    A.   Public Lighting Commission street lights.

21    Q.   On that Proposed Exhibit Number 21 of that sketch, does

22         that include the public lights that you observed on

23         February 12th to be in that general area?

24    A.   Yes, sir, they do.  They are shown.

25    Q.   Is that a reasonably fair and accurate sketch of the
```

19

```
 1        lights, the drawing of the streets, the intersection of

 2        Gray and Mack?

 3   A.   Yes, sir, it is.

 4   Q.   Lastly, showing you People's Proposed Exhibit Number 22

 5        and ask if you can describe what that is?

 6   A.   Yes, sir.

 7                          This is a sketch showing different

 8        streets in that area of Mack, between Alcongon (sp) and

 9        Lenox, which is the center street showing several

10        streets north of Mack and several south, south to

11        Charlevoix.

12   Q.   Is that a reasonably fair and accurate sketch of the

13        surrounding streets at the intersection of Mack and

14        Gray, sir?

15   A.   Yes, sir.

16   A.   Yes, sir, it is.

17   Q.   Did you make that last sketch yourself?

18   A.   Yes, I did.  All three of them.

19                          MR. GONZALES:  Your Honor, no

20        further questions with respect to Proposed Exhibits 3

21        through 22.

22                          People would move for their

23        admission and turn the witness over for voir dire.

24                          THE COURT:  Any objections?

25                          MR. GILES:  No objections, Your
```

20

```
 1        Honor.
 2                          THE COURT:  They will be received.
 3                          MR. GONZALES:   All right.
 4   BY MR. GONZALES:
 5   Q.   Can you describe for me using Exhibit Number 22 the
 6        lighting that existed at 3960 Gray?
 7   A.   Okay.
 8                          The Public Lighting Commission
 9        lights street lights.  There was one to the north and
10        one to the south.  Each one approximately a hundred
11        feet away.  The area where the driveway was is fairly
12        dark.  The only area coming from porch lights.  The
13        scene itself was fairly dark in that area.
14   Q.   Did you ever have an occasion to stand on the area in
15        front of the Special K Store sidewalk area there where
16        the general area, the corner of Mack and Gray and view
17        the scene of the front of 3960 Gray, including the
18        driveway area?
19   A.   Yes, sir.
20                          In February when I was back there
21        making the sketch, I observed the scene from that
22        location.
23   Q.   Were you able to see the scene from that location?
24   A.   Yes, you were.
25   Q.   What is the the distance, would you indicate based on
```

21

1      your observations to be the distance between the corner

2      of 3960 -- excuse me -- the corner of Special K Party

3      Store on Gray and Mack to the driveway at 3960 Gray?

4   A.  Approximately three hundred and seventy feet,

5       seventy-five feet.

6   Q.  Was the body at the scene at the time of your arrival?

7   A.  No, sir, it was not.

8   Q.  Did you have occasion to do any search of the area for

9       any casings?

10  A.  Yes.  We checked the area for possible spent casings

11      and found none.

12  Q.  When you say checked the area, does that include

13      yourself and your partner?

14  A.  Yes, it was.

15  Q.  And the areas were what?

16  A.  The area around the driveway, streets, burm area.

17  Q.  Was any blood located anywhere else other than that

18      area?

19  A.  No, sir.

20                    The only suspected blood we

21      observed was in the driveway.

22  Q.  Any physical evidence placed on evidence other than the

23      gun shot residue kits?

24  A.  No, sir.

25  Q.  Thank you.

                              22

1          MR. GONZALES:  No further questions

2     of this witness.

3                    THE COURT:  Any cross-examination?

4                    MR. GILES:  Yes, Your Honor.

5

6                    CROSS-EXAMINATION

7

8  BY MR. GILES:

9  Q.  Good morning, officer Richardson?

10  A.  Good morning.

11  Q.  You were not the person who actually took these photos

12     right?

13  A.  No, I was not.

14  Q.  It was your partner?

15  A.  Yes.

16  Q.  But you were there?

17  A.  Yes.

18  Q.  I'd like you to look at photo identified as Exhibit

19     Number 4, please.  Can you tell us what that shows?

20  A.  Okay.

21                    This photo shows 3960 Gray.  Also

22     the dwelling to the south of it.  Shows the driveway on

23     the south side of it.  Sidewalk, street in front of it

24  Q.  Okay.

25                    Now, you have already testified

                         23

1     that when you arrived on the scene the body had already

2     been removed, correct?

3   A.  Correct.

4   Q.  Were you informed of the location of the body?

5   A.  We were told that it was at the driveway.

6   Q.  Were you told where in the driveway?

7   A.  Yes, where the blood was.

8   Q.  And that's that the area between the sidewalk and the

9     street?

10  A.  Right.

11  Q.  Right at the street?

12  A.  Right.

13  Q.  Okay.

14                The snow mounds around the

15    driveway, at both edges, can you basically describe

16    them according to the picture in your recollection of

17    how tall they were?

18  A.  At the curb, maximum maybe a foot.  Back to the

19    sidewalk as you can see in the photographs here where

20    it appeared to have been shoveled up and moved up

21    around the sidewalk.

22  Q.  Okay.  So on the corners there the snow is piled up to

23    some degree?

24  A.  Yes, sir.

25  Q.  At least a foot near the street?

24

1   A.  I would say maximum maybe a foot.

2   Q.  Maximum a foot near the street and it goes up higher as

3       we get towards the sidewalk?

4   A.  Right.

5   Q.  Directly in front of the south, 3960, there were no

6       lights; no street light, no public lighting?

7   A.  No.

8   Q.  Okay.

9                   There was no other type of post

10      lamp, lighting, whatever you want to call it?

11  A.  Not that I recall, no, sir.

12  Q.  Okay.

13                 You testified in -- regarding

14      Exhibit Number 6, the photo of what we call suspect

15      blood, were blood samples taken?

16  A.  No blood samples were taken, no, sir.

17  Q.  So you don't know if blood that was found in the

18      driveway matched that of the deceased; do you?

19  A.  No, sir, I don't.

20  Q.  You didn't personally take the picutress that were

21      taken during the daytime?

22  A.  No, sir.

23  Q.  But you were there?

24  A.  Right.

25  Q.  Okay.

```
 1                         Can you tell us where this is
 2      taken, People's Exhibit Number 12?
 3                         Can you tell us where this picture
 4      was taken from?
 5   A.  This picture was taken from in front of the party store
 6      facing slightly northeast.
 7   Q.  Okay.
 8                         When you say in front of the party
 9      store, was he standing in front of the store, where
10      exactly was he standing?
11   A.  It would be on the sidewalk in front of the --
12   Q.  (Interposing) I'll give you also Proposed Exhibit
13      Number 11, which shows -- that's the party store that
14      you are speaking about, correct?
15   A.  Right.
16   Q.  Where in front of the party store?
17   A.  General area of the doorway.  Maybe slightly towards
18      the corner.
19                         It was a large sidewalk on the east
20      side of the party store.  It was big one on the north
21      side also, but this was taken probably around the
22      doorway; maybe slightly to the east.
23   Q.  Okay.
24                         And from where that picture was
25      taken, from the party store, can you see the crime
```

26

1    scene?

2    A.  Yes, sir.

3    Q.  You can see the crime scene?

4    A.  Yes, sir.

5    Q.  This is 3960?

6    A.  Yes, sir.

7                        You can see the vacant lot in

8    between the two buildings here.  It would be right --

9    probably right behind me in this area here.

10   Q.  This is you?

11   A.  That's me walking across the street taking notes.

12   Q.  Okay.

13                        Can you point out where the body

14   was?

15   A.  It would be the stain of suspected blood, you mean?

16   Q.  Yes, where the suspected blood was?

17   A.  Okay. It would be right at the curb, the driveway and

18   the curb.

19                        It would -- it would have been

20   right at the curb by the driveway, roughly where I am

21   standing in this photograph.  It would be right behind

22   me.

23   Q.  Okay.

24                        MR. GONZALES:  What Exhibit Number

25   are you talking about?

27

```
 1                              THE WITNESS:  People's Exhibit
 2         Number 12.
 3                              MR. GONZALES:  Thank you.
 4    BY MR. GILES:
 5    Q.  Can you tell us -- this is showing you People's Exhibit
 6         Number 13.
 7                              Can you tell us what that picture
 8         is of, please?
 9    A.  Okay.
10                              This picture was taken.  It would
11         be at the east curb just slightly south of Mack on
12         Gray -- correction.
13                              That would be the west curb of Gray
14         just south of Mack.  Facing north; showing Gray.  Also
15         showing the crime scene area.
16    Q.  That picture is taken basically from the side of that
17         party store?
18    A.  Right.  Up the street at the curb.
19    Q.  And this picture shows a person standing near the
20         street down Gray?
21    A.  Again that was myself.
22    Q.  That's yourself.  Okay.
23                              Were you standing in the vacinity
24         of the crime scene?
25    A.  That would be pretty close to it, yes, sir.
```

28

```
 1   Q.   Pretty close to it?

 2   A.   Yes, sir.

 3   Q.   How close to it?

 4   A.   I don't recall.

 5   Q.   You were standing more so in the street?

 6   A.   I was standing in the street, yes, sir.

 7   Q.   Standing in the street.  All right.

 8                          You are wearing dark clothing; is

 9        that correct?

10   A.   Correct.

11   Q.   Approximately what time was this picture taken?

12   A.   If you let me refer to my report, I'll give you the

13        exact time.

14   Q.   Okay.  Sure.

15   A.   It was taken roughly 9:45 a.m.. 10 a.m. in that area.

16   Q.   Can you -- why don't you look at that picture very

17        carefully.

18                          Can you make out features in that

19        picture?

20   A.   No, sir.

21   Q.   Can you make out your head in that picture basically?

22   A.   I know where it is at.  I can see the body outline,

23        yes, sir.

24   Q.   You can basically see the body outline?

25   A.   Yes.
```

29

1   Q.  Not too much more than that; is that a far correct

2       statement?

3   A.  That's a fair statement.

4   Q.  That's a fair statement?

5                           And this picture fairly represents

6       what was taken; what was there, correct?

7   A.  Correct.

8   Q.  Thank you.

9                           MR. GILES:  One second, Your Honor.

10                          THE COURT:  Are you finished?

11                          MR. GILES:  I have a few more.

12  BY MR. GILES:

13  Q.  I am going to ask you to look at People's Exhibit

14      Number 21, please.

15                          This -- you made this sketch?

16  A.  Yes, sir, I did.

17  Q.  And this shows the general vacinity of Gray and Mack.

18      Especially Gray going down towards the crime scene; is

19      that correct?

20  A.  Yes, it does.

21  Q.  The only lighting near 3960 is identified in front of

22      the address of 3955; is that correct?

23  A.  The light as shown across the street on the front lawn.

24  Q.  So that's a yard light?

25  A.  Yard light.

30

1    Q.  And it was operational that night?

2    A.  I don't recall.  I believe it was.

3                        I think you can see it in the one

4        of the photographs as operational.

5    Q.  Okay.

6    A.  I think it is on.

7    Q.  You also testified there was some additional porch

8        lights on?

9    A.  Yes, sir.

10   Q.  Porch light at 3960 that was not on; was it?

11   A.  Not that I recall.

12   Q.  Okay.

13                       How long have you been an evidence

14       tech officer?

15   A.  Six years.

16   Q.  Six years.

17                       Do you feel competent speaking

18       about lighting?

19                       MR. GONZALES:  I object, Judge.

20       Whether or not he feels competent is irrelevant.

21                       THE COURT:  I agree.  Just ask the

22       questions, counsel.

23                       MR. GILES:  Okay.

24   BY MR. GILES:

25   Q.  There were two, at least two PLC lights on Mack and

                              31

```
 1            Gray; three according to your diagram there in Exhibit
 2            Number 22; is that correct?
 3       A.   Correct.
 4       Q.   Okay.
 5                           The crime, the crime where the
 6            killing took place at night; is that correct, according
 7            to your information?
 8       A.   Correct.
 9       Q.   It was during the winter, approximately 8:30, '9
10            o'clock.  Somewhere around there; is that correct?
11       A.   I don't know the exact time.
12       Q.   Okay.  But it was definitely dark?
13       A.   It was dark, yes, sir.
14       Q.   And these PLC lights, to your knowledge, were they
15            operational?
16       A.   The ones at Mack and Gray, are you referring to?
17       Q.   Yes.
18       A.   I have no idea.  I don't recall.
19       Q.   Okay.
20                           Let's  -- let's assume they were
21            operational.  Would the lighting impair the vision of
22            person looking down towards 3960 Mack?
23       A.   You are asking my opinion?
24       Q.   Yes.  I am asking your opinion.
25       A.   I don't believe it would, no, sir.
```

32

```
 1    Q.  This lighting in this area but no lighting in this area
 2        down there, you are saying in your opinion it wouldn't
 3        impair?
 4    A.  I don't believe it would, no, sir.
 5    Q.  Okay.  One second, please.
 6                           THE COURT:  Yes.  Hold on for
 7        one second for me, too, please.
 8
 9                              (A short break)
10                      THE COURT:  Okay.  You can
11        continue, counsel.
12                      MR. GILES:  Thank you.
13                      No further questions, Your Honor,
14        thank you.
15                      THE COURT:  Any additional
16        questions of this witness, counsel?
17                      MR. GONZALES:  For me, yes, Your
18        Honor, just a few.
19                      REDIRECT EXAMINATION
20
21    BY MR. GONZALES:
22    Q.  You indicated that there was a vacant lot.
23                      Is there a vacant lot across the
24        street from 3960 Gray?
25    A.  Yes, sir.  Slightly to the north.
```

                                     33

1    Q.   Okay.

2              You indicated in cross-examination

3         on People's Exhibit Number 9, that this shows the area

4         across the street?

5    A.   Yes, sir.

6    Q.   Does that show anything about the lighting of the area

7         across the street?

8    A.   Yes, sir, it does.

9    Q.   What is that?

10   A.   It shows a yard light in front of 3955.  Also a porch

11        light in the house just to the north of it.

12   Q.   Where would be the vacant lot in relation -- on that

13        photograph?

14   A.   It would be to the north -- to the right of this

15        photograph.

16   Q.   So you are indicating, this is the driveway where the

17        suspect blood was?

18   A.   Yes, sir.

19   Q.   Just on the other side of the street is a house where

20        the yard light that was on when you took this photo?

21   A.   Yes, sir.

22   Q.   Just across the street was a house with a porch light

23        on; is that right?

24   A.   Yes, sir.

25   Q.   All right.

34

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

```
 1                         And approximately in this area of

 2     the photograph is the vacant lot?

 3  A.  Yes, sir.

 4  Q.  Okay.  Thank you.

 5                    MR. GONZALES:  No further

 6     questions, Your Honor.

 7                    THE COURT:  Any additional

 8     questions?

 9                    MR. GILES:  No additional

10     questions, Your Honor.

11                    THE COURT:  You can step down,

12     thank you.

13                    MR. GONZALES:  Thank you.

14                    THE COURT:  So do you have another

15     witness?

16                    MR. GONZALES:  I do, Judge.  Andrew

17     Smith.

18                    A N D R E W   S M I T H

19

20                    called as a witness by the People,

21                    being duly sworn by the Court Clerk,

22                    was examined and testified upon his

23     oath, as

24                    follows:

25
```

                               35

```
 1                        DIRECT EXAMINATION

 2

 3    BY MR. GONZALES:

 4    Q.   State your name for the record, please?

 5    A.   Andrew Smith.

 6    Q.   How old are you, Mr. Smith?

 7    A.   Twenty.

 8    Q.   Mr. Smith, I'd like to recall your attention to the

 9         date of January 17th, 1992.

10                        On that date, sir, did you have

11         occasion to be in the area of the corner of Mack and

12         Gray in the City of Detroit?

13    A.   Yes, sir.

14    Q.   What is located on the corner of Mack and Gray there?

15    A.   The store.

16    Q.   And do you know the name of that store?

17    A.   Special K Party Store.

18    Q.   On that date, Mr. Smith, did you also have occasion to

19         know someone by the name of Carl Hubbard or Goff?

20    A.   I know him by Goff.

21    Q.   Okay.

22                        And do you see the person in Court

23         here today that you knew as Goff?

24    A.   Yes.

25    Q.   Could you please point and tell me who you are talking
```

36

```
 1        about?  What color pants he's wearing today?

 2    A.  Blue pants.

 3    Q.  Okay.

 4                        MR. GONZALES:  Witness identifying

 5        for the record, Your Honor, the defendant in this

 6        matter.  Mr. Carl Hubbard.

 7    BY MR. GONZALES:

 8    Q.  Are you saying you the or did not know his real name?

 9    A.  I did not.

10    Q.  Okay.

11                        On that date in time, sir, did you

12        have occasion to observe the person you knew as Goff in

13        the area of Mack and Gray?

14    A.  Yes.

15    Q.  Okay.

16                        Now, where were you travelling at

17        that time?

18    A.  West on Mack.

19    Q.  And for the record approximately what time of day or

20        night was this?

21    A.  I can't remember the exact time.

22    Q.  Okay.  What is the closes you can say?

23    A.  8:89.

24    Q.  Is this in the A.M or P.M.?

25    A.  P.M..
```

37

1    Q.    Were you alone or with anyone, Mr. Smith?

2    A.    Alone.

3    Q.    And when you say you were west on Mack, were you in a

4          car, walking or what?

5    A.    Walking.

6    Q.    And what direction were you headed towards?

7    A.    Gray.

8    Q.    And what street were you coming from?

9    A.    Dickerson.

10   Q.    And as you were walking on Gray, were you on the same

11         side of the street as the party store or the other side

12         of Gray; can you tell us?

13   A.    The same side.

14   Q.    And where were you going to?

15   A.    To the store.

16   Q.    And when you were in that area, how was it that you

17         first observed the person that you knew as Goft?

18   A.    I was walking towards Gray.

19                              But I wasn't at Gray yet and they

20         were coming from on Gray, down Gray across Mack.

21   Q.    Okay.  Was -- was Goft alone or with anyone?

22   A.    He was with two other guys.

23   Q.    Did you know who those other people were?

24   A.    No.

25   Q.    Had you ever seen those other people in your life?

38

```
 1    A.   No.
 2    Q.   Okay.
 3                   And can you describe where they
 4         were at when you first saw them; where they were
 5         standing at when you first saw them where they were at?
 6    A.   I don't understand the question.
 7    Q.   Okay.
 8                   Can you describe in relation to the
 9         intersection there between Gray and Mack, where they
10         were at when you first saw them?
11    A.   When I first saw them they were entering Mack coming
12         off Gray.
13    Q.   Okay.
14                   I am going to show you what has
15         already been admitted into evidence as Exhibit Number
16         21.  A sketch of this area.
17                   And it is my understanding that you
18         indicated that you were in the area of heading towards
19         the Special K Store.
20                   Is that a yes or a no?
21    A.   Yes.
22    Q.   Okay.
23                   And it is my understanding that you
24         were heading?
25    A.   Okay.  This direction in a westerly direction on this
```

39

1      street here to -- depicted on this sketch which is

2      Mack; is that correct?

3  A.  Yes.

4  Q.  Now, you were on the same side of the street or the

5      other side?

6  A.  Same side.

7  Q.  So you were over, approximately, this area?

8  A.  Yes.

9  Q.  And that's indicating the bottom right hand corner of

10     the People's Exhibit Number 21 -- excuse me -- Number

11     21.

12                    As you head to that area, can you

13     point on this drawing and show me where it was that you

14     first saw the person you knew as Goft with these other

15     people?

16 A.  About right here.

17 Q.  So you are indicating an area just to the west of the

18     Special K Party in the area between the street or in

19     the street, between the street; and the store or in the

20     street; is that right?

21 A.  In the street.

22 Q.  Okay.

23                    And what direction were they

24     headed; can you indicate?

25 A.  North.

                        40

1   Q.  And were they walking or with anyone?

2   A.  It was just them three.

3   Q.  Okay.

4                    And were they in a car or were they

5      walking?

6   A.  Walking.

7   Q.  Can you just show me the directions with your finger on

8      the sketch you saw them go?

9   A.  That way.

10   Q.  Okay.

11                  And where is it, for the record,

12     the witness took his finger and went up Gray in a

13     northerly direction.

14                  Can you indicate where you last saw

15     them?

16   A.  About right here.

17   Q.  Okay.

18   A.  Almost across Mack.

19   Q.  You are indicating to the portion of where on the

20     sketch is listed as thirty-seven feet, for the record,

21     and that's the area that shows the end of the block of

22     Gray, like right in the middle of the street?

23   A.  Yes.

24   Q.  You saw them in the middle of the street?

25   A.  Yes.

1    Q.   Where did you go?

2    A.   In the store.

3    Q.   Okay.

4              Now, when you saw them pass, can

5         you recollect what Goft was wearing that date?

6    A.   No.

7    Q.   Okay.

8              Do you reconize what anyone of

9         those individuals were wearing?

10   A.   Not that I can recall.

11   Q.   Okay.

12             Did you then go into store?

13   A.   Yes.

14   Q.   And while you are in the store, did you hear anything

15        unusual?

16   A.   After about three or four minutes, I heard some

17        gunshots.

18   Q.   Approximately how many?

19   A.   I can't remember.

20   Q.   More than one or less or one?

21   A.   I think it was more than one.

22   Q.   Okay.

23             And based on that, what, if

24        anything, did you do?

25   A.   Well, when I heard the shots, I was on my way out the

42

1    store.

2                    When I heard the shots, I stayed in

3    the store -- after the shot I stayed in the store for

4    about another three or four minutes.

5                    And then when I came out, I seen

6    the police down the street so I walked down there.

7  Q.  Okay.

8                    Now, at the point in time where you

9    pointed on this drawing number 21, in the area of where

10   you last saw Goft, with the other two individuals

11   heading northerly on Gray, did you ever see him again?

12  A.  No.

13  Q.  Did you go to the area where you saw the police cars?

14  A.  Yes.

15  Q.  Did you see anything unusual in that area?

16  A.  I seen a body laying on the ground.

17  Q.  Okay.

18                   And where was that body at; can you

19   just generally describe?

20  A.  What?

21  Q.  Okay.  Can you describe where the body was at when you

22   saw it?

23  A.  Laying in the street by the curb close to the curb.

24  Q.  Did you know whose house that was?

25  A.  No.

43

1    Q.   Okay.

2                              Now, was that individual that you

3         saw laying on the ground one of the same individuals

4         you had just seen moments earlier with Goft?

5    A.   I couldn't tell.

6    Q.   Okay.

7                              Are you saying it was; or, are you

8         saying it wasn't; or are you saying you don't know?

9    A.   I don't know.

10   Q.   When you got out of the store on Mack and Gray, after

11        you heard the shots, you said you saw police cars?

12   A.   I seen one.

13   Q.   And where were they at?

14   A.   Down there where the body was.

15   Q.   Okay.

16                             Did you ever talk to Goft at all

17        that day?

18   A.   No.

19   Q.   Have you talked to him at all since?

20   A.   No.

21   Q.   Thank you.

22                        MR. GONZALES:   No further

23        questions.

24

25                        CROSS-EXAMINATION

                              44

1

2      BY MR. GILES:

3      Q.   Good morning, Mr. Smith?

4      A.   Good morning.

5      Q.   When you testified on direct examination that you saw

6           Mr. Hubbard and at least two other individuals walking

7           across Mack going down Gray; is that correct?

8      A.   Yes.

9      Q.   Okay.

10                         Can you tell -- what time

11          approximately was this, sir?

12     A.   I don't remember what time it was.  It was nighttime,

13          eight, nine.

14     Q.   Okay.

15                         Do you recall having a conversation

16          with myself yesterday regarding your testimony outside

17          this courtroom?

18     A.   I recall you asking me a question.

19     Q.   You recall me asking you some questions?

20     A.   One question.

21     Q.   One question.

22                         Do you recall me asking you how

23          much time it was you saw Mr. Hubbard and the people he

24          was with before you heard the shots?

25     A.   Excuse me?

45

```
 1   Q.   Do you recall me asking you the question how much time
 2        it was you saw Mr. Hubbard and the other two people he
 3        was with before you heard the shots while you were in
 4        the party store?
 5   A.   (No response)
 6   Q.   Do you recall me asking you that question?
 7   A.   How much time?
 8   Q.   How much time lapsed from the period you saw Mr.
 9        Hubbard and the two people he was with, and when you
10        went into the party store and you heard those shots; do
11        you recall me asking you how much time lapsed?
12   A.   I can't remember.
13   Q.   Okay.
14                        Do you recall telling me that when
15        you saw Mr. Hubbard --
16                        MR. GONZALES:  Your Honor, I object
17        to that.
18                        MR. GILES:  I am asking the
19        question.  He can say no or yes.
20                        MR. GONZALES:  Well --
21                        THE COURT:  (Interposing) I didn't
22        hear the full question that he's asking.
23                        Go ahead and ask the question.
24                        MR. GILES:  Thank you, Your Honor.
25   BY MR. GILES:
```

46

1   Q.  Do you recall -- I lost my train of thought -- well,

2       let me ask you this.

3                       Do you recall telling me that it

4       was at least an hour prior to you going into the store

5       and hearing the shots when you saw Mr. Hubbard?

6   A.  Not that I can recall.

7   Q.  You don't recall that?

8   A.  No.

9   Q.  Do you know an individual by the name of Curtis

10      Collins?

11   A.  Yes.

12   Q.  When you were walking up Mack going to the -- going to

13      the store, did you see Curtis Collins?

14   A.  No.

15   Q.  When you went into the store?

16   A.  No.

17   Q.  Did you see Curtis Collins?

18   A.  No.

19   Q.  When you first -- what was the first time you noticed

20      Mr. Hubbard, when he was in the street on Mack and

21      Gray?

22   A.  Yes.

23   Q.  You didn't see where he came from?

24   A.  He came from -- he was walking north on Gray.  He came

25      from south.

47

1    Q.  Okay.

2                        From the general area of the store

3        we're talking about?

4    A.  Yes.

5    Q.  After -- okay.

6                        I believe I asked you this; but I

7        will ask you again.

8                        When you went into the store, did

9        you see Curtis Collins?

10   A.  No.

11   Q.  Okay.  When you came out of the store, did you see

12       Curtis Collins?

13   A.  No.

14   Q.  Did you have a conversation with Curtis Collins,

15       sometime later that evening?

16   A.  No.

17   Q.  You are familiar with the general area around the

18       Special K Party Store?

19   A.  Yes.

20   Q.  Is there a telephone out there?

21   A.  Yes.

22   Q.  And at any time, do you recall seeing Mr. Hubbard near

23       that telephone?

24   A.  No.

25   Q.  Well,  did you see the people that he was with near the

48

1     telephone?

2  A.   No.

3  Q.   Okay.   Thank you.

4                          MR. GILES:   No further questions,

5     Your Honor.

6                          THE COURT:   Anything else.

7                          MR. GONZALES:   Yes, Your Honor.

8                     REDIRECT EXAMINATION

9

10  BY MR. GONZALES:

11  Q.   Those two people you saw with Mr. Hubbard, with   Goft,

12     did -- were either of those people Curtis Collins?

13  A.   No.

14  Q.   You knew that?

15  A.   Yes.

16  Q.   Okay.

17                          You didn't recogonize either of

18     those other two people as Curtis Collins; is that

19     correct?

20  A.   No, I didn't.

21  Q.   Did you ever talk to Curtis Collins on the phone about

22     this incident?

23  A.   No.

24  Q.   Was it at least an hour between the time you were in

25     the store that you heard the gunshots after having just

1      seen Goft?

2   A.  No.

3   Q.  How long was it?

4   A.  About three to four minutes.

5   Q.  Thank you.

6                        MR. GONZALES:  Okay.  No further

7      questions.

8                        THE COURT:  All right.  Anything

9      else, Mr. Giles?

10                       MR. GILES:  No further questions,

11     Your Honor.

12                       THE COURT:  You can step down.

13                       MR. GONZALES:  Can I check the

14     hallway, Judge?

15                       THE COURT:  Yes.

16

17                       You may proceed.

18                    L U C I N K A   G R O S S

19

20                       called as a witness by the People,

21                       being duly sworn by the Court Clerk,

22                       was examined and testified upon her

23     oath, as

24                       follows:

25

1                    DIRECT EXAMINATION

2

3                         THE COURT:  Have a seat and speak

4      loud and clear so that everyone in the courtroom can

5      hear you.

6  BY MR. GONZALES:

7  Q.  Ma'am, please state your name for the record?

8  A.  Lucinka Gross.

9  Q.  Miss Gross, How old are you?

10  A.  Forty-four.

11  Q.  I'd like to call your attention to the date of January

12      17th, 1992.

13                         On that date, ma'am, are you

14      familiar or were you familiar with the area of Mack and

15      Gray in the City of Detroit?

16  A.  Yes.

17  Q.  In fact, ma'am, did you reside in that general area?

18  A.  Yes.

19  Q.  On what particular street?

20  A.  Gray.

21  Q.  How far away did you reside, if you know, ma'am, from

22      the address of 3960 Gray?

23  A.  3960 Gray?

24  Q.  3960 Gray, yes.

25  A.  I would imagine about a block.

                          51

1  Q.  Okay.

2                          And what was your address on that

3      date in time?

4  A.  4125.

5  Q.  Gray?

6  A.  Yes.

7  Q.  Ma'am, I'd like to call your attention to the date of

8      January 17th, 1992.

9                          On that date, ma'am, in the evening

10     hours, did you have occasion to observe anything

11     unusual on your street?

12 A.  Yes.

13                         I was going to the store.  And it

14     was cold and I was very covered up.  And I thought that

15     it was garbage bags on the street but as I got close to

16     it, I could see it was a body.

17 Q.  Okay.

18                         Now, you said it was a body.  Where

19     were you at when you first observed this?

20 A.  In the street on Gray.

21 Q.  Say that again?

22 A.  In the street, walking in the street.

23 Q.  Okay.

24                         Now, when you say in the street,

25     were you in the middle of the street?

                          52

1    A.   Yes.

2              Because a lot of snow and I was

3         walking in the middle of the street.

4    Q.   Were you heading north or south on Gray?

5    A.   I was towards Mack.  So it would be north.

6    Q.   So from -- I am going to show you People's Exhibit

7         Number 20 and ask if you can recogonize this general

8         area as being the area of Gray?

9    A.   Yes.

10   Q.   Okay.

11             Ma'am, to the south here, on this

12        sketch is Mack.  What direction were you heading,

13        towards Mack or away?

14   A.   Towards Mack.

15   Q.   You said you are walking in the center of the street?

16   A.   Yes.

17   Q.   And is your house then north on this sketch, 4125 Gray?

18   A.   Yes.

19   Q.   Okay.

20             Ma'am, when you were walking down

21        the center of the street, you said you saw this object

22        you later identified as a body?

23   A.   Yes.

24   Q.   Okay.

25             At the time that you first saw this

                        53

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    object, you identified as a body, had you seen anyone

2    in the general area where the body was?

3  A.  No.

4  Q.  Now, ma'am, had you heard any shots?

5  A.  No.

6            I don't know why I didn't but my

7    daughters told me they had heard shots but I didn't.

8  Q.  Okay.

9            And had you been in the street for

10   sometime before you saw this body or what?

11 A.  No.

12           Where I saw the person was maybe

13   about two or three houses over from where I lived.

14 Q.  You live on the same side of the street as that house

15   or driveway or the other side of the street?

16 A.  The other side.

17 Q.  So you were on the other side of the street on Gray,

18   about three or four houses away?

19 A.  Yes.

20 Q.  Is there a vacant lot on your side of the street?

21 A.  Yes.

22 Q.  And did you pass that vacant lot?

23 A.  Yes.

24 Q.  Okay.

25           Did you notice anyone at all as you

54

```
 1        passed that area?

 2    A.  No.

 3    Q.  And when you got to the area of where the body was,

 4        could you -- did you have an opportunity to observe the

 5        general condition of the way the body was?

 6    A.  Like, I thought that -- it looked like a heap of trash

 7        bags and when I got close by to see, it was a person.

 8        They were laying on their back and I thought I saw

 9        blood but when I realized it was blood and a person, I

10        stopped for a minute and someone said something that

11        lived there, the man asked me was he dead.

12                          And I said I didn't know and I went

13        on to the store.  And I asked them to call the police.

14    Q.  Okay.

15                          How close were you at the closes

16        pile you were to the body in terms of inches, feet or

17        whatever?

18    A.  I don't know.  Maybe three.

19    Q.  Okay.

20                          And did the person that was laying

21        there moving at all?

22    A.  Not that I could see.

23    Q.  How long were you in the general area of where the body

24        was?

25    A.  Very short.  When I realized what it was, it scared me
```

1      And I left.  So it was a very short time.

2  Q.  Thank you.

3                        MR. GONZALES:  No further questions

4      of this witness.

5                        THE COURT:  Any questions of this

6      witness.

7                        MR. GILES:  Yes, Your Honor.

8

9                        CROSS-EXAMINATION

10

11  BY EUPLT:

12  Q.  Miss Gross, good morning?

13  A.  Good morning.

14  Q.  You testified at the exam that you didn't hear any

15      shots, is that correct?

16  A.  No, I didn't.

17  Q.  But you said that your daughters heard some shots?

18  A.  Yes.

19  Q.  And at what point did your daughters tell you they

20      heard some shots?

21

22                        was it before you left out of the house

23      or after?

24  A.  When I came back and I was telling them what had

25      happened, they were saying that they had heard shots.

                          56

```
 1        And when I can back from the store, police were already
 2        on the scene.  So everybody was there.
 3    Q.  So your daughters weren't with you went you were
 4        walking down the street?
 5    A.  No.
 6    Q.  It is also your testimony on direct examination that
 7        when you were walking down the street, you didn't see
 8        anybody else in the street?
 9    A.  No.
10    Q.  Okay.
11                        And after you walked up to the
12        body, the only other person you saw was this person
13        standing on the porch of the house in front?
14    A.  Yes.
15    Q.  Okay.
16                        You didn't -- did you see anybody
17        else going towards the body as you got to the store, as
18        you were going to the store?
19    A.  No, I don't think -- if there was someone on the
20        street, I didn't see them.
21    Q.  You know a person by the name of Curtis Collins?
22    A.  Not that I know of.
23    Q.  Also known as Tony Smith?
24    A.  No.
25    Q.  Also known as Kurt baby?
```

57

```
 1   A.   I know a person by that name.

 2   Q.   You know a person by the name of Kurt baby.

 3   Q.   Did you happen to see him that evening?

 4   A.   When I came out when it was very cold through that

 5        time, and there was no one that I could see.

 6   Q.   Okay.

 7                              Do you know a person by the name of

 8        Andrew Smith?

 9   A.   No.

10   Q.   Okay.   One second please.

11                              You know approximately what time it

12        was when you came out?

13   A.   Yes.

14                              It was about 9:30 because I was

15        trying to catch the store before it closed.

16   Q.   9:30 P.M., correct?

17   A.   Yes.

18   Q.   Okay.

19                              You said you were trying to catch

20        the store.   Is this the Special K Party Store?

21   A.   Yes.

22   Q.   Thank you.

23                              MR. GILES:   No further questions,

24        Your Honor.

25                              THE COURT:   Any questions?
```

```
 1                          MR. GONZALES:  Just one.

 2                      REDIRECT EXAMINATION

 3

 4    BY MR. GONZALES:

 5    Q.   Did you state you did or didn't know Andrew Smith?

 6    A.   Not by that name.

 7    Q.   Okay.  Did you happened to see the witness that just

 8         testified?

 9    A.   In the hallway.

10    Q.   The young man?

11    A.   Yes.

12    Q.   Did you see him at all that night?

13    A.   No.

14    Q.   Okay.

15                          No further questions.

16                          THE COURT:  Anything else.

17                          MR. GILES:  Nothing else, your

18         Honor.

19                          THE COURT:  You can step down.

20         Thank you.

21                          MR. GONZALES:  May we approach,

22         Judge, for a moment?

23                          THE COURT:  All right.

24                          (A discussion was held at sidebar

25         off
```

59

1                          the record.)

2                     *     *     *     *

3

4                     THE COURT:  Let's take a ten

5    minutes break.

6                     THE DEPUTY:  All rise.  Court's in

7    recess.

8                     (A short break)

9

10                    *     *     *     *

11

12                    THE COURT:  You want to read

13   something into the record?

14                    MR. GONZALES:  Yes, I do.

15                    I had an opportunity to speak to

16   both -- to defense counsel regarding stipulation that I

17   understand both he and defendant would be willing to

18   enter into.

19                    And that's with respect to the

20   testimony of Sergeant Joan Kenny.

21                    She testified at the preliminary

22   examination and she would testify in this matter, it's

23   my understanding, and identify three proposed exhibits

24   I'd like to have them marked at this time.

25                    THE COURT:  Okay.

60

1           MR. GONZALES:  It's my

2    understanding that defense counsel would stipulate that

3    were Sergeant Joann Kenny to appear, she would testify

4    that she is employed with the Detroit Police Homicide

5    Section.  And was so employed on the date of January

6    21, 1992.

7                And on that date, she had occasion

8    to conduct an interview interrogation and advisal of

9    constitutional rights with the person who she would

10   identify as the defendant in this matter, Carl Hubbard.

11               First of all, with respect to

12   proposed Exhibit Number 23, she would identify this as

13   being the Constitutional Rights Certificate of

14   Notification form that she employed at the initiation

15   of her conversation with Mr. Hubbard.

16               And that was on January 21, 1992,

17   at 1 P.M..  She would testify that she advised the

18   defendant of his constitutional rights.  And that the

19   defendant, defendants rights were read to and explained

20   to him by Sergeant Kenny.  And that he signed that

21   form, proposed Exhibit Number 23 in her presence, as

22   well as herself signing the form at 1:00 P.M..

23               He also initialed the five rights

24   as well as the paragraph where indeed he was willing to

25   give a statement.

61

1              Thereafter, Sergeant Kenny would

2    further testify that with respect to Propose Exhibit

3    Number 24, that at 1:05 in the P.M. she next had

4    occasion to fill out an interrogation record, a two

5    sided document with the responses of Mr. Hubbard

6    regarding his background information.

7              And that further thereafter she

8    would testify that on People's Proposed Exhibit Number

9    25, she would identify that as being the three page

10   statement that she obtained from Mr. Hubbard on January

11   21, 1992, at approximately 1:20 in the P.M.. At 1300

12   Beaubien.

13             It is my understanding that both

14   defendant and defense counsel would stipulate to that

15   testimony, as well as the introduction and reading into

16   the record by myself of People's Proposed Exhibit

17   Number 25 the statement.

18             That's my understanding, Your

19   Honor.

20             THE COURT:  Is that correct,

21   counsel?

22             MR. GILES:  Yes, that's correct,

23   Your Honor.

24             THE COURT:  Have you had an

25   opportunity to talk to your client, Mr. Hubbard?

                        62

1        MR. GILES:  Yes, Your Honor.

2        THE COURT:  Mr. Hubbard, do you

3   agree with your attorney?

4        THE DEFENDANT:  Yes.

5        THE COURT:  All right.  The Court

6   will accept that stipulation.

7        MR. GONZALES:  At this time --

8        MR. GILES:  All right.

9        MR. GONZALES:  At this time, Your

10  Honor, I move to admit these proposed exhibits and read

11  into the record, Exhibit Number 25.

12        THE COURT:  They will be received.

13        Go ahead and read it.

14        MR. GONZALES:  Thank you.

15        Again, Exhibit Number 25 is a

16  statement of Mr. Hubbard on January 21st at 1:20 P.M.

17  at thirteen hundred Beaubien and by Sergeant Kenny.

18

19        Question:  Mr. Hubbard, did you

20        understand your constitutional

21   rights?

22        Answer:  Yes.

23        Question:  Have I promised you

24   anything

25        or threatened you in any way?

63

```
1                              Answer:  No, you haven't.

2                              Question:  Mr. Hubbard, I need you

3        to

4                              tell me everything you know about

5        the

6                              death of Rodnell Penn that happened

7                              Friday, January 17th, 1991, on Gray

8                              Street.

9                              Answer:  I don't know anything

10       about

11                             him getting killed until today.

12                             Question:  Do you know Rodnell

13       Penn?

14                             Answer:  Yes, I know him since the

15                             eighties.  Since 1986.

16                             Question:  When was the last time

17       you

18                             saw Rodnell Penn?

19                             Answer:  The last time I seen

20       Rodnell

21                             Penn was way back in the eighties.

22       And

23                             since then I only saw his older

24                             brother's name Walter Penn.

25                             He was in prison when I saw him.
```

1           Question:  Did you see Rodnell

2   Thursday

3           night, that would be January 16th,

4   1992?

5           Answer:  No.

6           That's the first page, signed at

7   the bottom, Carl Hubbard.

8           Second page.

9           Question:  Did you see Rodnell

10  Friday

11          night?  That would be January 17th

12          1992?

13          Answer:  No.

14          Question:  Do you know anything

15  about

16          a shooting that happened on Gray,

17          Friday, 18, 1992?

18          Answer:  No.

19          MR. GONZALES:  Were you on Gray

20  Street

21          Friday, January 17th, 1992?

22          Answer:  No.

23          Question:  Do you know anyone by

24  the

25          name of Bird?

65

1          Answer:  Yes.  I heard of him.

2          Question:  Is he a friend of yours?

3          Answer:  He used to be my friend a

4    long

5          time ago.

6          Question:  Do you know what bird's

7    real

8          name is?

9          Answer:  Yes.

10          His real name is Donald Peterson.

11    I

12          went to school with him.

13          Question:  When was the last time

14    you

15          saw bird?

16          Answer:  I haven't seen bird

17          since 1989.

18          Question:  Did you have a case

19    against

20          you that Rodney Penn was supposed

21    to

22          testify at?

23          Answer:  I didn't have a case

24    against

25          me.  And Rodnell wasn't supposed to

66

1          testify against me.

2          Let me reread that.

3          "I didn't have a case against me.

4     And

5          Rodnell Penn wasn't supposed to

6     testify

7          against me."

8          Question:  Did bird have a case

9     that

10         Rodnell Penn was supposed to

11    testify

12         against him?

13         Answer:  No.

14         Question:  Did you ever have --

15    excuse me -- let me reread that.

16         Question:  Did you ever stay on

17    Floyd

18         Street (sp)" that's the bottom of

19         Page 2 going onto page three.

20         Answer:  No.  I stayed on Sparta,

21    that

22         is one block over from Floyd.

23    .

24         Question:  Have you talked to, with

25         Rodnell over the phone in the last

67

1     couple of days?

2     Answer:  No.

3     Question:  Were you supposed to

4     meet

5     with Rodnell on Friday, 17, '92?

6     Answer:  No.

7     Question:  Did you hear about

8     anyone

9     getting killed over on Gray Street?

10    Answer:  No.

11    Question:  Do you know anybody that

12    lives on Gray Street?

13    Answer:  No.  I don't hang out that

14    way.

15    Question:  Do you know where bird

16    lives?

17    Answer:  No.

18    Question:  Do you know where his

19    mother

20    lives?

21    Answer:  No.

22    Question:  Is there anything else

23    about

24    this incident that I should know?

25    Answer:  No.

68

1                          Question:  Have you told me
2          everything
3                          you know about this incident?
4                          Answer:  Yes.
5                          Signed:  Carl Hubbard.
6                          And there are some additional
7          questions and answers.
8                          Question:  Carl, do you go by the
9                          nickname Goft?
10                         Answer:  I used to go by the
11         nickname of
12                         Goft a long time ago.
13                         Question:  Do all you have friends
14         and
15                         family who know you by the nickname
16         of
17                         Goft?
18                         Answer:  My mother don't like for
19         anyone
20                         to call me Goft.
21                         Signed:  Carl Hubbard.
22                         That's it, Judge.
23                         THE COURT:  Are there any other
24         stipulations that you'd like to place on the record?
25                         MR. GONZALES:  There are.

```
 1                    In addition to stipulations, Your
 2   Honor, there are waivers.
 3                    First of all, with respect to the
 4   waivers, it's my understanding both defendant and
 5   defense counsel would enter into the following waivers
 6   as being acumulative or not adding anything of
 7   relevance or significance to either side of the case.
 8                    That being with respect to the
 9   testimony of witness listed as Sergeant Robert
10   Michelek.  Police Officer Kenneth Croupa (sp).  Police
11   Officer Craig Turner.  Police officer -- Police Officer
12   Craig Turner who would testify accumulative to that of
13   Police Officer Brian Carter who already testified.
14                    MR. GILES:  Craig Turner did
15   testify.
16                    MR. GONZALES:  I had crossed off
17   the wrong name on my list.
18                    THE COURT:  What is the correct
19   name you want for waiver purposes?
20                    MR. GONZALES:  Brian Carpenter
21   (sp)..
22                    THE COURT:  Okay.  Thank you.
23                    MR. GONZALES:  His partner, Craig
24   Turner apparently testified yesterday and his partner
25   Brian Carter testimony would be cumulative today.  As
```

70

1        well as police officers Richard Colenash (sp).  Mr.

2        DiAnthony Wilcher (sp).  Sergeant Benard Fair.

3        Attorney Ross Briggs (sp).  Sergeant Elmer Harris.  So

4        all of those with the correction of one being police

5        officer Turner -- excuse me -- police officer Carter,

6        we would move for their waiver.

7                        MR. GILES:  No objections, Your

8        Honor.

9                        THE COURT:  All right.

10                       Again, have you had an opportunity

11       Mr. Hubbard, to talk to your attorney and do you agree

12       with having those witnesses being waived?

13                       THE DEFENDANT:  Yes, I do.

14                       THE COURT:  Okay.

15                       Those witnesses will be waived.

16                       Any others?

17                       MR. GONZALES:  Yes, Judge.

18                       It is my understanding, Your Honor

19       that with respect to these following witnesses both

20       defendant and defendant's counsel would enter into both

21       a waiver and stipulation of the following testimony.

22                       Your Honor, with respect to police

23       officer Martin Genter, he would testify as being

24       employed with the homicide section of the Detroit

25       Police Department.  And that he had occasion to go to

                              71

1    the Wayne County Medical Examiner's Office.

2                       And after the autopsy was performed

3    by Dr. Caoile.  That he had occasion to place on

4    evidence tags 913299, 91300.  And 913302.  On January

5    22nd he had occasion the take those to the crime lab

6    and turn them over to the person of police officer Paul

7    Dragan for analysis.

8                       And he would testify to the chain

9    of evidence, that being for those particular pieces of

10   items.

11                      That would be the sum and substance

12   of the testimony with respect to police officer Martin

13   Genter, Your Honor.

14                   MR. GILES:  That's correct.

15                   THE COURT:  Again, Mr. Hubbard, do

16   you agree with your attorney?

17                   THE DEFENDANT:  Yes.

18                   THE COURT:  The Court will accept

19   that stipulation.

20                   MR. GONZALES:  Next, Judge, with

21   respect to Police Officer Paul Dragan.

22                      It is my understanding that both

23   defendant and defense counsel would enter into the

24   following stipulation with respect to the testimony of

25   Paul Dragan.  He would testify as being employed with

                              72

1      the Detroit Police Department assigned to the crime lab

2      section.

3                          And that he's an expert in the area

4      of examination and analysis of firearms.  And that he

5      would testify in accordance with his report, that being

6      lab number 279=92, 280-92.

7                          He would testify that he received

8      those items of evidence from officer Ginter and that on

9      January 23rd, 1992, he had occasion to perform his

10     examination and classification of that fired evidence.

11                         He would testify in accordance with

12     this report that on evidence tag 913299, he found one,

13     .38 caliber lead bullet, and one lead fragment.  He

14     would testify further that on evidence tag 913300, he

15     obtained .38 caliber -- found one .38 caliber spent

16     lead bullet.

17                         He would testify further that on

18     evidence tag 913302, he found one .38 caliber lead

19     bullet.  In addition to that he would testify to also

20     having in his possession, evidence tag 913205, which he

21     received from police officer Martin Genter, which was

22     received from police officer Tracey Sewell, as being

23     the bullet that officer Sewell testified he recovered

24     at the time of his coming upon the body at the scene.

25                         He would testify that within that

73

1    evidence envelope he found one   .38 caliber spent lead
2    bullet, characteristic 8R, the results of his
3    examination were follows.
4                    First, if he would, he examined,
5    and, succeeded to perform microscopic comparison of the
6    submitted fired evidence and attempted and determined
7    the make of the gun.
8                    Results of his examination were
9    that the above evidence was examined and classified
10   microscopic compared evidence against evidence.  It was
11   determined that all of the above submitted spent
12   bullets were fired from the same weapon.
13                   The evidence was sent to the
14   property office.
15                   The submitted bullets on evidence
16   tag 91 3299.  913300.  913302, were delivered to the
17   Lab, on 1-22 by police officer Genter.  And that
18   probable make and type of weapon in his opinion, as an
19   expert in the area of fire arms examination, would be:
20   Number one, a Charter Arms.
21                   Number two, Arding. (sp).
22                   Number three.  A Rolm, as the
23   possible make and type of weapon.
24                   Further Police Officer Dragan would
25   testify, that he had occasion to examine evidence tag

                              74

1    91 3301, and found it to contain one, 25 automatic

2    spent full metal jacket bullet, class, 6, L, and that

3    he would testify as being the particular bullets that

4    was found by Dr. Caoile in the area of the brain that

5    he described as being the old bullet wound injury found

6    in the deceased that was subject to the cystification

7    that he described.

8                         And that evidence was examined and

9    classified and sent to the property office.

10                        And that probable make of weapon

11   was Ravon Arms.

12                        That's my understanding of the sum

13   and substance of the stipulation with respect to the

14   expert testimony of Paul Tray (sp).

15                        THE COURT:  Is that your

16   understanding, Mr. Giles?

17                        MR. GILES:  Yes, Your Honor.

18                        THE COURT:  Again, Mr. Hubbard, do

19   you agree with your attorney?

20                        THE DEFENDANT:  Yes.

21                        THE COURT:  Okay.

22                        MR. GONZALES:  Next, Your Honor,

23   with respect to the testimony of Mr. Dannug.  Mr.

24   Dannug would testify as being employed in the crime lab

25   of Detroit Police Department.

                              75

1      He's a civilian technician and he

2    would testify as a expert in the area of chemical

3    analysis of gunshot residue test.

4      He would testify that on January

5    21, 1992, at approximately 10:05 in the morning, he had

6    received from police officer Ginter, evidence tags

7    913201, 913202. 913303, 91 3304, and that 913201 was

8    taken -- was a gunshot residue test taken from the

9    person of Mr. Peter Baker that -- that evidence tag

10   913202 was a gunshot residue test taken from Mr. Basci

11   Dennis at 3960 Gray.

12      That evidence tag 913203 was

13   gunshot residue test taken from Mr. DiAnthony Wilcher

14   at 3960 Gray. And that evidence tag 91 3204 was a

15   gunshot residue test taken from Mr. John Trammel at

16   3960 Gray.

17      And that upon those residue tests,

18   he performed chemical analysis to determine the

19   presence of the submitted elements, antimony barium and

20   lead to determine whether or not the person had

21   recently fired a weapon.

22      And in his opinion with respect to

23   Mr. Peter Baker, a gunshot residue analysis kit

24   contained cotton swab labeled right palm, right back,

25   left palm, left back was submitted and analyzed for

76

1   gunshot residue, antimony barium and lead with the

2   results being, in his opinion, no significant amounts

3   of these elements were detected in the hands of him.

4   And that the test kits itself was destroyed in

5   analysis.

6                       Next as to the gunshot residue

7   tests for Bascil Dennis, it contained cotton swabs,

8   label right palm, right back, left palm, left back was

9   submitted and analyzed for gunshot residue elements,

10  antimony barium and lead with the results, in his

11  opinion, as an expert, being that no significant

12  amounts of these element were detected in the hand-swab

13  taken.

14                      That the test kit was destroyed in

15  analysis.

16                      Next as to the residue test kit for

17  Mr. DiAnthony Wilcher, we found it to contain cotton

18  swabs of the right palm, right back left palm, left

19  back.

20                      And that was submitted and the

21  elements of antimony, barium and lead.  And that the

22  results in his opinion, as an expert, being no

23  significant amounts of these elements were detected in

24  the hand-swabs and that again was destroyed in

25  analysis.

77

1              Lastly, as to the gunshot residue

2    analysis kit for Mr. John Trammel.

3              They found it to contain residue

4    tests for right palm, right back, left palm, left back

5    And that was submitted and analysed for the elements

6    antimony, barium, lead.

7              And in his opinion, as an expert in

8    the area of gunshot residue analysis, no significant

9    amounts of these elements were detected in the

10   hand-swabs.  And it again was destroyed in analysis.

11             That's my understanding of the sum

12   and substance of that stipulation.

13             MR. GILES:  That's true.

14             THE COURT:  Thank you, Mr. Giles.

15             Again, Mr. Hubbard, do you agree

16   with your attorney?

17             THE DEFENDANT:  Yes, I do.

18             MR. GONZALES:  I believe that's it

19   Your Honor.

20             I believe we will have one more

21   stipulation tomorrow morning regarding testimony of

22   witness Glen Paige.

23             And other than that, Your Honor, I

24   intend to call only two other witnesses.  Jenny Holcomb

25   (sp) and Christopher Harris.  With the possibility of

                          78

1      recalling Mr. Collins.

2                            THE COURT:  Fine.  9:00.

3   Please be on time.

4                            MR. GILES:  I'll be here, Your

5      Honor.

6                            THE COURT:  Not 9:30.

7                            I will see you at 9:00, tomorrow,

8      gentlemen.

9

10                           THE DEPUTY:  All rise for the

11     Court.

12                           MR. GONZALES:  Thank you.

13                           MR. GILES:  Thank you, Your Honor.

14                           THE COURT:  I would like to start

15     on time, tomorrow, gentlemen.

16                           THE DEPUTY:  Court's adjourned.

17                           (Proceedings adjourned.)

18

19                           *     *     *     *     *

20

21

22

23

24

25

                              79

1               R_E_P_O_R_T_E_R_'_S____C_E_R_T_I_F_I_C_A_T_E

2

3       STATE OF MICHIGAN )
                         )
4       COUNTY OF WAYNE  )

5                       I, MARY E. SKINNER, CSR-0031, Official Court

6           Reporter in and for the Third Judicial Circuit, Wayne

7           County, State of Michigan, do hereby certify that the

8           foregoing pages  1 through 76, inclusive, was reduced

9           to typewritten form by means of Computer-Assisted

10          Transcription and comprise a true and accurate transcript

11          of the proceedings taken in the above-entitled matter,

12          on Tuesday, September 1, 1992.

13

14          _____

15                  MARY E. SKINNER, CSR-0031

16      Dated:  This        day of             1992.

17

18

19

20

21

22

23

24

25

                            80

        MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER