159160

STATE OF MICHIGAN

RECEIVED
THE RECORDER'S COURT

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MAR 29 PM 12:28
APPELLATE DIVISION

THE PEOPLE OF THE STATE OF MICHIGAN

Plaintiff,

-vs-                                    Case No. 92-1856

CARL HUBBARD,

Defendant,
_____/   WAIVER TRIAL

PROCEEDINGS HAD AND TESTIMONY TAKEN in the

above-entitled cause, before the HONORABLE RICHARD P.

HATHAWAY, Judge, Third Judicial Circuit, at 202

Recorder's Court Building, Detroit, Wayne County,

Michigan, on Wednesday, September 2, 1992.

APPEARANCES:

MR. JAMES GONZALES,  Esq.,

On behalf of the People.

MR. RONALD GILES,  Esq.,

On behalf of the Defendant.

RECEIVED
FEB 1 6 1994
COURT OF APP.



RECEIVED
MAR 29 1993
THE RECORDERS COURT
APPELLATE DIVISION
BY

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

## T A B L E   O F   C O N T E N T S

Witness                                                          Page
---------------------------------------------------------------------

MR. CHRISTOPHER HARRIS
     Direct Examination by Mr. Gonzales                            3
     Cross Examination by Mr. Giles                               15

MS. SHANTA HOLCOMB
     Direct Examination by Mr. Gonzales                          17
     Cross examination by Mr. Giles                              28
     Redirect Examination by Mr. Gonzales                        33
     Recross Examination by Mr. Giles                            34

CURTIS COLLINS
     Direct Examination by Mr. Gonzales                          36
     Cross Examination by Mr. Giles                              45
     Redirect Examination by Mr. Gonzales                        77
     Recross Examination by Mr. Giles                            82
     Redirect Examination by Mr. Gonzales                        92

RAYMOND WILLIAMS
     Direct Examination by Mr. Giles                             94
     Cross Examination by Mr. Gonzales                          104

RONNEY FULTON
     Direct Examination by Mr. Giles
     Cross Examination by Mr. Gonzales                          117
     Redirect Examination by Mr. Giles                          125
     Recross Examination by Mr. Gonzales                        127

THOMAS SPELLS
     Direct Examination by Mr. Giles                            128
     Cross Examination by Mr. Gonzales                          131
     Redirect Examination by Mr. Giles                          143
     Recross Examination by Mr. Gonzales                        145

VANESSA SPELLS
     Direct Examination by Mr. Giles                            146
     Cross Examination by Mr. Gonzales                          149

CLOSING ARGUMENTS
     Closing Argument by Mr. Gonzales                           155
     Closing Argument by Mr. Giles                              161
     Rebuttal Argument by Mr. Gonzales                          172

VERDICT RENDERED BY THE COURT                                   173

E  X  H  I  B  I  T  S

Indentification                                    Marked    Received
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1                                          Detroit, Michigan

2                                          Wednesday, September 2,

3                                          1992.

4                          --      --      --

5

6                          THE CLERK:  People versus Mr. Carl

7    Hubbard.

8                          Mr. Hubbard is here today for

9    purposes of continuation of a waiver trial.

10                         MR. GONZALES:  James Gonzales for

11   the People.

12                         MR. GILES:  Good morning, Your

13   Honor.  Ronald Giles appearing on behalf of Carl

14   Hubbard.

15                         THE COURT:  Do you have a witness

16   at this time, Mr. Gonzales?

17                         MR. GONZALES:  I do, Your Honor.

18                         I'd like to call Christopher Harris

19   to the stand.

20

21        C H R I S T O P H E R   H A R R I S

22

23                    called as a witness by the

24                    People, being duly sworn by the

25                    Court Clerk, was examined and testified

                              4

1          upon his oath, as follows:

2

3              DIRECT EXAMINATION

4

5  BY MR. GONZALES:

6  Q.  Good morning, sir.

7              Please state your name for the

8      record?

9  A.  Christopher Harris.

10  Q.  Mr. Harris, I'd like to call your attention to the

11     dates of January 16 and 17 of 1992.

12              How old were you then, sir?

13  A.  I was 22 years old.

14  Q.  How old are you today?

15  A.  Twenty-three.

16  Q.  Mr. Harris, on that date in time did you have occasion

17     to know someone by the name of Rodnell Penn?

18  A.  Yes, I did.  He was my cousin.

19  Q.  So how long had you known him before that date in time

20     approximately?

21  A.  All of his life.

22  Q.  Okay.

23              Now, also on that date in time, did

24     you have occasion to know someone by the name of,

25     nickname of Goff?

5

1    A.   Yes.

2    Q.   And do you see that person in Court here today?

3    A.   Yes, I do.

4    Q.   Would you please point and tell me what color clothes

5         he's wearing?

6    A.   The gentleman in the -- in the shirt right there.

7         (indicating).

8                        MR. GONZALES:  Witness points to

9         and identified for the record the defendant in this

10        matter, Carl Hubbard.

11   BY MR. GONZALES:

12   Q.   How long prior to this date in time had you known Mr.

13        Hubbard?

14   A.   I saw him one time and just met him by name about, five

15        or six years ago.

16   Q.   Okay.  Mr. Harris, I'd like to call your attention to

17        the date of January 16th, 1992.

18                        Particularly on that date, sir, did

19        you have occasion to see Mr. Rodnell Penn?

20   A.   Yes, I did.

21   Q.   In fact do you know where he spent the night that

22        night?

23   A.   Yes, he did.  2:00 a.m. Friday morning.

24   Q.   Where did he spend the night at?

25   A.   At my home.

6

1    Q.   And what street was that then?

2    A.   Rosemont.

3    Q.   Okay.

4              And did you have a conversation

5         with him that night?

6    A.   Yes, sir, we did.

7    Q.   And, if you know, based on that conversation the next

8         day, January 17th, 1992, that Friday, did you have

9         occasion to go anywhere?

10   A.   Yes, I did.

11   Q.   Where did you go?

12   A.   We, myself and a friend of mine, Mr. Winston Green got

13        Ron -- dropped Rodnell over at Cadillac Square.  He was

14        to catch the Mack bus.

15   Q.   Were you the driver?

16   A.   No, I was not.

17   Q.   Okay.

18              And did you go with Mr. Penn for

19        purposes of dropping him off?

20   A.   Yes, I did.

21   Q.   And where did you drop him off at particularly?

22   A.   The Cadillac Square.

23   Q.   Okay.

24              And anywhere -- now you indicated

25        a bus.  Anywhere in relation to the bus stop?

7

1    A.   The Mack bus stop.

2    Q.   Okay.

3                        What was your understanding of the

4    reason why you were dropping him off at the Mack bus

5    drop.

6                        MR. GILES:  Your Honor, I am going

7    to object to that question.  And ask some type of

8    foundation because it could possibly call for hearsay.

9                        MR. GONZALES:  I didn't ask for any

10   quotes.

11                       I asked what was his state of mind

12   for dropping him off.

13                       THE COURT:  I will take his answer,

14   as long as it is his state of mind.

15                       THE WITNESS:  I saw him get on the

16   Mack bus and he had -- it was indicated to  --

17   indicated to me that --

18                       MR. GILES:  Your Honor, I will

19   object to that part of the answer as hearsay.

20                       THE COURT:  I agree.  Let's not ask

21   for any hearsay.

22                       MR. GONZALES:  I will rephrase the

23   question.

24   BY MR. GONZALES:

25   Q.   Was -- what was your understanding of the reason why

8

1    you dropped him off?

2  A.  He was going to pay some money.

3               MR. GILES:  Again, I am going to

4    object to the answer as possibly hearsay without any

5    further foundation.

6               He's telling you what the witness

7    is going to do.

8               THE COURT:  Tell us what you saw.

9    Tell us what you did.  Don't tell us what somebody told

10   you.

11 BY MR. GONZALES:

12 Q.  Let me ask the question.

13               You dropped him off at a particular

14   place?

15 A.  Yes, I did.

16 Q.  Where did you drop him off at?

17 A.  Cadillac Square Bus Terminable.

18 Q.  Why did you drop him off there?

19 A.  I dropped him off so he could get on the Mack Bus.

20 Q.  Okay.

21               And did you have a conversation

22   with him before you dropped him off at the Mack Bus?

23 A.  Yes.

24 Q.  And what day was this in time?

25 A.  This was is January 17th at approximately four

1       thirty-five, 5 O'clock.

2   Q.  Now, during your conversation with Mr. Penn before you

3       dropped him off, did you make any plans to meet him

4       again?

5   A.  Yes, I did.

6   Q.  What time were you to meet him again?

7   A.  9:00 that evening.

8   Q.  And what were you to do with him again?

9   A.  He was going to help me setup for a hall party I was

10      doing.

11  Q.  Was the 9:00 meeting in order for him to help you with

12      setting up of the cabaret,?

13  A.  No.  He never showed up.

14  Q.  I know.  But was that meeting for that purpose?

15  A.  Yes.

16  Q.  Now, what was the reason why you set 9:00 to meet him?

17  A.  Well, because my hall party was starting shortly

18      afterwards.

19  Q.  Okay.

20              And what was the reason why you

21      asked Marcus -- excuse me.  You asked Mr. Penn, Rodnell

22      Penn to meet you at '9 o'clock?

23  A.  Because he had indicated that.

24              MR. GILES:  Your Honor, I will

25      object at this point.

10

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1              THE COURT:  I agree.  Let's not ask

2     for any hearsay.

3  BY MR. GONZALES:

4  Q.  What was going -- Mr. Harris, I am asking a very

5     specific question.

6              What was your reasoning in your

7     mind for setting a 9:00 meeting with Rodnell Penn?

8  A.  I thought that he had to go and drop some money off.

9  Q.  Where at?

10  A.  He said he was going to --

11  Q.  Well --

12              MR. GILES:  Objection, Your Honor.

13              THE COURT:  That will be sustained.

14  BY MR. GONZALES:

15  Q.  Was your understanding of where he was to go anywhere

16     near where you were supposed to meet him?

17  A.  I'm sorry?

18  Q.  Okay.

19              Was your understanding as to where

20     Christopher Harris was to go anywhere near where you

21     were supposed to meet him at 9:00?  Were they near each

22     other?

23  A.  No.

24  Q.  Okay.

25              Did that have anything to do with

11

```
 1        why you set 9:00?

 2   A.   Yes, because --

 3   Q.   Why was that?  Can you explain why?

 4   A.   Because I had to give him time to get to me.

 5   Q.   Okay.

 6                            What was your understanding of why

 7        you had to give him time?

 8   A.   I thought that he had other business to take care of

 9        which was the reason I dropped him off at Cadillac

10        square.

11   Q.   This other business that he had to take care of, was

12        this other business in your mind going to be anywhere

13        near the 9:00 meeting at the hall?

14   A.   I thought that maybe his business would be, would be

15        finished by 9, 8:30.

16                            So I thought he would have time to

17        make it to the hall.

18   Q.   Okay.

19                            Is that why you set the 9:00

20        o'clock?

21   A.   Yes, it is.

22   Q.   Okay.

23                            Now, did you know where Mr. Penn

24        was to go?

25   A.   Yes.
```

12

1  Q.  Where was he supposed to go in your mind?

2  A.  He was going to --

3                        MR. GILES:  I am going to object at

4  this point without further foundation.

5                        It calls for an answer that draws

6  upon hearsay.

7                        MR. GONZALES:  Judge, again this is

8  all related to what his state of mind as setting the

9  time at 9:00.  So he had to know how long he was going

10 to be gone and where in relation he was going to be.

11                        THE COURT:  As long as he didn't

12 get it from somebody else.

13                        MR. GILES:  That knowledge will be

14 based upon this alleged conversation that he had with

15 somebody else outside this Court.

16                        MR. GONZALES:  Is that doesn't make

17 it admissible, it is his state of mind.

18                        MR. GILES:  It is hearsay.

19                        THE COURT:  Objection will be

20 sustained.

21 BY MR. GONZALES:

22 Q.  Did you know that your cousin Rodnell Penn was involved

23     in the sale of drugs?

24 A.  Yes, I did.

25 Q.  Did you know that on January 17th, 1992?

                              13

1    A.   Yes.

2    Q.   And did you know that on this particular evening?

3    A.   Yes.

4    Q.   What was your understanding of the reason why Mr. Penn

5         was going to take the Mack Bus?

6                        MR. GILES:  Your Honor, I am going

7         to object to the question as basically no difference

8         than the question I just objected to.

9                        He's still asking for this

10        witness -- although he's asking for this witness' frame

11        of mind is based on information that thusfar have not

12        received any legitimate foundation and is based on

13        hearsay.

14                        THE COURT:  Sounds like you are

15        asking for hearsay.  So this Court -- even though it is

16        his state of mind, that he initially got it probably

17        from somebody else.

18                        MR. GONZALES:  I will ask him if he

19        got it from anyone else.

20   BY MR. GONZALES:

21   Q.   Sir, did you ever have occasion to observe Mr. Penn,

22        Rodnell Penn, your cousin, being involved in the sale

23        of drugs?

24   A.   Yes, I did.

25   Q.   On more than one occasion?

1    A.   Yes.

2    Q.   And if you know, sir, did you ever have occasion to

3         observe Mr. Carl Hubbard, the person who is Goft

4         involved in the sale of drugs?

5    A.   As far as I know, no.

6    Q.   Okay.

7                        If you know, sir, did you observe

8         Mr. Penn with any money?

9    A.   Yes, I did.

10   Q.   And approximately when was this?

11   A.   This was January 17th, 1992.

12   Q.   About what time, approximately?

13   A.   Between 2:00 a.m. and 2:30 p.m..

14   Q.   And approximately how much money did you observe there

15        that he had?

16   A.   Anywhere from a hundred and ninety-five to two hundred

17        dollars.

18   Q.   Did you see him in any way dispose of that money

19        between the time you saw him with that money about two,

20        three in the morning until the time you dropped him off

21        later the next day or the very same day -- excuse me --

22        later the same day at approximately, as you indicated

23        4:30?

24   A.   No.

25   Q.   Were you with him that whole time?

1   A.   Yes.

2   Q   Okay..

3   Q.   Thank you.

4                    MR. GONZALES:   No further questions

5   of this witness, Judge.

6                    THE COURT:   Any cross-examination,

7   Mr. Giles.

8                    MR. GILES:   Yes, Your Honor, just a

9   couple of questions.

10   .

11                    MR. GILES:   One second, Your Honor.

12   May I have a moment?

13                    THE COURT:   Yes.

14

15                    (A discussion was held off the

16                    record between defense counsel and

17                    defendant.)

18

19                    CROSS-EXAMINATION

20

21   BY MR. GILES:

22   Q.   Good morning, Mr. Harris?

23   A.   Good morning.

24   Q.   Mr. Harris, you testified on direct examination you

25        have met Mr. Hubbard on on one occasion; is that

16

1    correct?

2   A.  Yes, this is true.

3   Q.  And that was approximately five or six years ago; is

4    that correct?

5   A.  Yes.

6   Q.  So that would make you approximately sixteen,

7    seventeen, around that age?

8   A.  Somewhere around there, yes.

9   Q.  Okay.

10               The one time that you met Mr.

11    Hubbard before, how long -- how much time did you spend

12    with him?

13   A.  It was just vision only thing.  It was an introduction.

14   Q.  Okay.

15               So you were with someone and they

16    said this is Carl Hubbard or, this is Goft, or

17    something along those lines?

18   A.  Yes, that's right.

19   Q.  And you went about your business?

20   A.  Yes, I did.

21   Q.  And he went about his?

22   A.  Exactly.

23   Q.  And you haven't seen him since; is that correct?

24   A.  Yes.

25   Q.  Okay.

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1          So you may have spent thirty

2    seconds with him, a minute, approximately?

3    A.   Somewhere around in there.

4    Q.   Thank you.

5                    MR. GILES:   No further questions.

6                    THE COURT:   Anything else.

7                    MR. GONZALES:   Nothing, Judge.

8                    THE COURT:   You can step down.

9    Thank you.

10

11                   MR. GONZALES:   I will call my next

12   witness, Your Honor.

13              S H A N N O N   B O L C O M B

14

15                   called as a witness by the People,

16                   being duly sworn by the Court Clerk,

17                   was examined and testified upon her

18                   oath, as follows:

19                   DIRECT EXAMINATION

20

21   BY MR. GONZALES:

22   Q.   Good morning, ma'am.  Please state your name for the

23        record?

24   A.   Shannon Holcomb.

25   Q.   How old are you, Miss Holcomb?

18

1    A.   Twenty-one.

2    Q.   Police Holcomb, I'd like to ask you if you knew a

3         person by the name of Rodnell Penn?

4    A.   Yes.

5    Q.   Did you know him on January 16th, and 17th, 1991?

6    A.   Yes, I did.

7    Q.   Excuse me, 1992?

8    A.   Yes.

9    Q.   Yes?

10   A.   Yes.

11   Q.   Had you known him for some period of time before that

12        date?

13   A.   Yes.

14   Q.   On that date in time, ma'am, did you also know a person

15        by the name of Goft?

16   A.   No.

17   Q.   Okay.

18                        Had you ever heard that name

19        before?

20   A.   No.

21   Q.   Okay.

22                        On Thursday, January 16th, 1992,

23        did you have occasion to see Rodnell Penn?

24   A.   Yes.

25   Q.   Approximately what time did you see him on that day?

19

1   A.  The 16th, you mean.

2   Q.  Yes.

3   A.  I saw him early that morning about 8:30.

4   Q.  Did there come another time that you saw him again?

5   A.  No.

6   Q.  Okay.

7   A.  When you saw him at about 8:30, you indicated what was

8      he doing?

9   A.  He was eating breakfast and sitting down and watching

10     T.V. with me, talking to me.

11   Q.  Did there ome a time when you saw him leave?

12   A.  Yes.

13   Q.  What time did you see him leave?

14   A.  He left my house about 12:30, 1 o'clock.

15   Q.  Okay.

16                     And did you have any conversation

17     with him while he was at your place?

18   A.  Yes.

19   Q.  Okay.

20                     Were you supposed to see him again?

21   A.  Yes.

22   Q.  Were you supposed to talk to him again?

23   A.  Yes.

24   Q.  Did there in fact come a time when you did have

25     occasion to talk to him later?

20

1   A.   Yes.

2   Q.   Did there come another time when you actually saw him

3        again or not?

4   A.   No.

5   Q.   Okay.

6                        When was the next time that you

7        spoke with him?

8   A.   It was Friday night, Friday, on the 17th.

9   Q.   Approximately what time?

10  A.   Nine.   It was about 9:20 when he called.   9:20, 9:25,

11       something like that.

12  Q.   Where were you at when he called?

13  A.   I was at home.

14  Q.   Was there anything unusual about this particular phone

15       call?

16  A.   Yes.

17  Q.   What was that?

18  A.   For one, he was -- he sounded like he was very happy.

19                       And I kept asking him why you so

20       happy because usually he just -- he --.

21  Q.   (Interposing) Let me ask you this.

22                       When you say he was very happy,

23       what, if anything, what sounds was he making that you

24       thought were unusual?

25  A.   He kept rushing like he was rushing off the phone.   I

21

```
 1        kept asking him why you keep rushing me off the

 2        telephone?

 3                          He said he had to do something.

 4                          He said I will call you later but I

 5        am going to get off the phone now.

 6                          MR. GILES:  I am going to object to

 7        any hearsay remarks.

 8                          MR. GONZALES:  Judge, I am trying

 9        to lay a foundation for excited utterances.

10                          THE COURT:  All right.  Go ahead.

11   BY MR. GONZALES:

12   Q.  Now, how long did this conversation last?

13   A.  About five minutes.

14   Q.  Okay.

15                          And throughout the period of time

16        five minutes, did you speak with Mr. Penn on the phone,

17        ma'am?

18   A.  Yes.

19   Q.  Okay.

20                          Did you talk to anybody else on

21        that phone conversation?

22   A.  No.

23   Q.  Did you hear anybody else's voice beside Mr. Penn on

24        that phone conversation?

25   A.  Yes.
```

MARY E. SKINNER, CSR-0031  -  OFFICIAL COURT REPORTER

1    Q.  Okay.

2    A.  Did you reconize that voice at all?

3    A.  No.

4    Q.  Is that a voice you had -- you had ever heard before as

5        far as you knew?

6    A.  No.

7    Q.  Other than that other voice -- strike that.

8                        That other voice, did you ever

9        speak with that person on the phone?

10   A.  No.

11   Q.  What were the circumstances of your hearing this other

12       voice?

13   A.  I heard someone rushing him off the phone.

14   Q.  Okay.

15                       And when you say:  Rushing him off

16       the phone, is this during the time that you are

17       speaking with Rodnell?

18   A.  Yes.

19   Q.  Okay.

20                       Now, during the time that you are

21       speaking with Rodnell, how would you characterize the

22       manner of his speaking?

23   A.  Rodnell or --

24   Q.  Yes, Rodnell.

25   A.  Well, I have to hurry up and go; I have to go, like

                              23

 1      that.   That's what he was telling me.

 2  Q.  Okay.

 3                      And the way he spoke those words,

 4      was that same way he spoke to you in the past, or was

 5      that different than the way he spoke with you in the

 6      past?

 7  A.  Different.

 8  Q.  Different in what manner?

 9  A.  He never rushed me off the phone, for one.   And

10      basically that's about all.

11                      He always tell me, tell me he love

12      me after every conversation.   But he didn't get a

13      chance.

14  Q.  When you say he didn't get a chance.   What did he do

15      instead of giving you a chance?

16  A.  He hung up.

17  Q.  Okay.   Now, who called who?

18  A.  He called me.

19  Q.  And was it your understanding that he was to call you

20      at that time?

21  A.  No.

22  Q.  Okay.

23                      When he spoke with you, were you

24      able to hear all of his words?

25  A.  Yes.

MARY E. SKINNER, CSR-0031    -    OFFICIAL COURT REPORTER

1    Q.   When you listened to him did -- strike that.

2                        When you listened to him and you

3    heard his words, what did his mental condition sound

4    like to you?

5    A.   Sounded like he was happy at the time.

6    Q.   Anything else?

7    A.   He was just rushing off the phone.  He got off so fast.

8    Q.   Okay.

9                        Did you have any understanding

10   about whether or not you were to meet with him or speak

11   with him again later?

12   A.   Yes.

13   Q.   Okay.

14   A.   He told me that.

15   Q.   I am not asking you what he said.

16                   MR. GILES:  Objection.

17

18                   MR. GONZALES:  All I am asking is

19   for his state of mind as to what she was planning on

20   doing next, if anything with Mr. Penn.

21                   MR. GILES:  That state of mind is

22   still based on another conversation with a person

23   outside of this courtroom.

24                   MR. GONZALES:  That's an exception

25   to hearsay.

25

1          THE COURT:  What is the exception,

2    state of mind?

3          MR. GONZALES:  Yes.

4          MR. GILES:  Excited utterance?

5          THE COURT:  You can ask her if she

6    was to meet up with him later.

7          MR. GONZALES:  All right.

8    BY MR. GONZALES:

9    Q.   Were you supposed to meet up with him later?

10   A.   Yes.

11   Q.   When were you supposed to finish?

12   A.   After he got done with whatever he was doing, he told

13        me he was going to come over to my house about 11:00.

14   Q.   Did he ever show?

15   A.   No.

16   Q.   All right.

17          Judge, I am going to ask that the

18   content of the conversation; and I would base it on a

19   combination of the state of mind exception as well as

20   excited utterances exception.

21          MR. GILES:  Your Honor, I am going

22   to object.

23          Several reasons.  As far as state

24   of mind exception, this witness has already testified

25   that the conversation lasted five minutes at most.

                        26

1          So very short period and I doubt if

2     she had the opportunity to determine what the other

3     person's state of mind was, as far as excited

4     utterance, Judge, there's a foundation to be laid.

5          The only foundation has been that

6     the person on the other end of the phone sounded happy.

7     And obviously, and over the phone, I don't think that

8     falls into any area of excited utterances.

9          THE COURT:   I think that the

10    foundation has not been laid.          .

11          I think for excited utterance

12    exception there has to be some type of startling event

13    that makes the particular person that wants to testify

14    about the event, has to be spontaneous, has to show

15    some type of excitement.

16          I think defense counsel has

17    basically stated that all this witness said thus far is

18    is that the person that she talked to was in her mind

19    happy; and rushed along.

20          So I don't think the foundation has

21    been laid.

22          MR. GONZALES:   Thank you, Your

23    Honor.   I will move on.

24    BY MR. GONZALES:

25    Q.   Did you have occasion prior to seeing Mr. Penn leave

27

1  your home, observe whether or not he had any money?

2 A. Yes.

3 Q. And this is on the 16th?

4 A. Yes.

5 Q. How much money did you see him have, ma'am?

6 A. About at the time, about, I would say, two hundred, two

7  fifty, something like that.

8 Q. This phone conversation you indicated you heard another

9  voice other than Mr. Penn's?

10 A. Yes.

11 Q. But you didn't speak with this other person; is that

12  correct?

13 A. Right.

14 Q. Was that other voice, did you hear how many other

15  voices, one or more or what?

16 A. One.

17 Q. And this phone conversation -- this phone conversation,

18  was it, if you know, was it a phone conversation that

19  Rodnell was calling from a normal phone or from like an

20  outdoor, at a pay phone, if you can hear?

21 A. Outdoors.

22 Q. Did you hear that?

23 A. Yes.

24 Q. What did you hear that made you believe it was

25  outdoors?

28

1  A.  I heard like static, wind passing the phone; wind

2      passing the phone, or something like that.

3  Q.  And how long later was it your understanding you were

4      to speak again with Rodnell?

5  A.  About ten minutes after he hung up from me.

6  Q.  And ten minutes after he hung up from you, what were

7      you expecting to happen?

8  A.  For him to come over.  I was expecting for him to come

9      over or call.

10 Q.  Okay.

11                      What street are you talking about?

12 A.  On Troester (sp) Street.

13 Q.  How far away is that where he was supposed -- how far

14     away is that area from the area of Mack and Gray, if

15     you know?

16 A.  I don't know.

17 Q.  Thank you.

18                      MR. GONZALES:  No further

19     questions, Judge.

20                      MR. GILES:  Just a few questions,

21     Your Honor.

22                      CROSS-EXAMINATION

23

24 BY MR. GILES:

25 Q.  Good morning, Miss Holcomb.

29

1          You testified on direct examination

2     that when you had the conversation with Rodnell over

3     the phone that you heard one other voice.

4               Are you sure you only heard one

5     other voice?

6     A.   Yes.

7     Q.   Okay.

8               MR. GILES:  May I approach the

9     witness, Your Honor?

10              THE COURT:  Go right ahead.

11    BY MR. GILES:

12    Q.   Do you recall giving testimony -- giving a statement to

13         the police?

14    A.   Yes.

15    Q.   And I am going to show you a statement.  Is that your

16         signature?

17    A.   Yes.

18    Q.   Is this also your signature on the second page of the

19         statement?

20    A.   Yes.

21    Q.   Is that your signature on the third page of the

22         statement?

23    A.   Yes.

24    Q.   Is that your signature on the fourth page?

25    A.   Yes.

30

1    Q.   Do you recall when you made this statement, the officer

2         asking you the question:  Did you hear more than one

3         voice talking to Rodnell.

4                        Do you remember your answer being:

5         I could hear two voices in the background.  It was like

6         one guy would speak to Rodnell and the voice and

7         another voice would have some conversation.

8                        Do you recall making that

9         statement?

10   A.   Yes.

11   Q.   Is it still your testimony today that you only heard

12        one voice?

13   A.   Right.

14   Q.   So then when you talked to the police, you lied; is

15        that correct?

16   A.   No.

17                       Well, that's what I said in the

18        statement but I called her about it.  I said two days

19        later and told her that I had to make some changes

20        about the name and about the voice that I said on

21        there.

22                       She told me I could clear that up

23        in court.

24   Q.   Okay.

25                       So this statement you made that you

31

```
 1          heard two voices, that's not the truth; is it?
 2     A.   No.
 3     Q.   When did you find out that Rodnell was dead -- had
 4          died?
 5     A.   Sunday.
 6     Q.   Okay.
 7                          From the time that you first made
 8          this statement from the time that you allegedly called
 9          the Sergeant to clear up your statement, did you talk
10          to anybody about this, about the incident, about
11          Rodnell's death?
12     A.   Talked to my mother, yes.
13     Q.   She's the only one you talked to?
14     A.   And my grandfather.
15     Q.   Anyone else?
16     A.   And his brother.
17     Q.   Whose brother?
18     A.   Rodnell's brother.
19     Q.   It is also your testimony on direct examination, that
20          you thought Rodnell was talking to you on the phone was
21          outside; is that correct?
22     A.   Right.
23     Q.   I will ask you to -- when you talked to the officer in
24          making this statement, where did you think Rodnell was
25          calling from?
```

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1    A.  From a telephone booth.

2    Q.  Outside?

3    A.  Outside.

4    Q.  I am going to ask you to read part of your statement

5        hear.  This is starting with your answer.  Would you

6        start here?

7    A.  Okay.  Then Rodnell hung up.

8                        MR. GONZALES:  I'd ask that she

9        reads to herself.

10                       THE COURT:  Read it quietly to

11       yourself and then the attorneys will ask some questions

12       to you about that.

13                       THE WITNESS:  Okay.

14   BY MR. GILES:

15   Q.  Right here again, ma'am?

16   A.  Okay.

17   Q.  Why don't you read the next couple of lines, too.

18   A.  Okay.

19   Q.  Does reading that statement help you to remember what

20       you said to the officer?

21   A.  That's what I --

22   Q.  (Interposing) Just answer the question, please.

23                       Isn't it true that you thought

24       Rodnell was calling you from someone's house when you

25       spoke to the officer and made this statement?

                                33

1    A.   No.

2    Q.   It is not true?

3    A.   No, sir..

4    Q.   Isn't it true that what you told the officer was you

5         thought he was calling from someone's house?

6    A.   No.

7    Q.   Again, I am going to ask you to read the last three

8         lines.

9    A.   Okay.

10   Q.   Is it true that part of your answer to the officer was

11        I think he was inside on the phone because I could hear

12        other people talking?

13   A.   Yes.

14   Q.   Thank you.

15                        MR. GILES:   No further questions,

16        Your Honor.

17                     REDIRECT EXAMINATION

18

19   BY MR. GONZALES:

20   Q.   Ma'am, when you said inside, what did you mean, inside

21        of what?

22   A.   Like a store or something like that.

23   Q.   Where did you think he was calling you from?

24   A.   The store outside on the telephone from the store or

25        something like that.

34

1    Q.   What store is that?

2    A.   Mack and Gray.

3    Q.   Okay.

4                        MR. GONZALES: No further questions.

5              Thank you, ma'am.

6                        MR. GILES:  Just a couple, Your

7         Honor.

8                   RECROSS-EXAMINATION

9

10   BY MR. GILES:

11   Q.   Okay.

12                   Answering the prosecutor's question, you

13        said inside the store or outside the store.

14                   What is your answer?

15   A.   No.

16                   He asked me where did I think he was

17        calling from.  I said a store.

18   Q.   At a store?

19   A.   At a store.

20   Q.   Inside?

21   A.   Inside or out.  It was still at a pay phone.  That's

22        how I figured.

23   Q.   Okay.

24                   And you said that the store was on

25        Mack and Gray?

1   A.  Right.

2   Q.  You know it was on Mack and Gray?

3   A.  No.

4   Q.  Thank you.

5                      No further question, Your Honor.

6                      THE COURT:  Anything further?

7                      MR. GILES:  No further questions,

8   Your Honor.

9                      MR. GONZALES:  Nothing else, Judge.

10                   THE COURT:  You can step down,

11   thank you.

12                   MR. GONZALES:  Last witness, Judge.

13

14                   MR. GONZALES:  Let me indicate that

15   I recall Curtis Collins to the stand.  And I provided

16   counsel with a new statement that Mr. Collins has given

17   to Sergeant Ron Gale, G-a-l-e.  Of the Detroit Police

18   homicide section.

19                   MR. GILES:  Your Honor, I am in

20   receipt of this statement, Your Honor.

21                   THE COURT:  Thank you.

22                   You may continue.

23

24                   MR. GONZALES:  All right.  Mr.

25   Collins, will you take the stand, please.

1

2            C U R T I S   C O L L I N S

3

4                      called as a witness by the People,

5                      being duly sworn by the Court Clerk,

6                      was examined and testified upon his

7                      oath, as follows:

8

9                      DIRECT EXAMINATION

10  BY MR. GONZALES:

11  Q.  Mr. Collins, you testified in this matter yesterday.

12                      You testified in this case the day

13      before yesterday; is that right?

14  A.  Yes, I did.

15  Q.  Mr. Collins, do you wish to testify again today?

16  A.  Yes, I do.

17  Q.  Is it at your request that you come in here and testify

18      and tell this Judge the truth?

19  A.  Yes, I do.

20  Q.  Okay.

21                      Is what you told the truth when you

22      testified Monday morning; was that the truth?

23  A.  No.

24  Q.  What was the truth, what happened on January 17th,

25      1992, what you told Judge Lipscomb at 36th District

                          37

1    Court, when you testified at the preliminary

2    examination?

3  A.  Yes, it was.

4  Q.  All right.

5    Mr. Collins, since this time you

6    have been arrested; is that correct?

7  A.  Yes, I have.

8  Q.  Mr. Collins, is the only reason you are coming in and

9    telling this Judge that you lied Monday morning merely

10    because now you are facing potential charges?

11  A.  No.

12  Q.  Why is it then that you chose to lie about what you

13    testified to -- strike that.

14    You testified Monday morning that

15    you weren't there January 17th, 1992; you were at home;

16    is that correct?

17  A.  Yes.

18  Q.  Now, was that -- and that was true or not true?

19  A.  That was not true.

20  Q.  Were you there January 17th, 1992 at approximately 9:30

21    in the p.m. in the area of the Special K Store on Mack

22    and Gray?

23  A.  Yes, I was.

24  Q.  Why is it, sir, that you chose to tell the first story

25    that you were at home and not there Monday morning to

38

1      this Judge?

2   A.  Because of my family was -- I was threatened?

3              I was hearing rumors, people were

4      saying what they were were going to do to me; do to my

5      family.

6   Q.  What was your understanding of what was going to happen

7      to you or your family?

8   A.  They was going to -- somebody was going to kill us or

9      something, if something -- they were going to catch me

10     going to work; or people knew where my mother stayed

11     and probably would throw a bomb in there while we was

12     sleep or something.

13  Q.  Were you in prison recently?

14  A.  Yes, I was.

15  Q.  Were you recently released from custody?

16  A.  Yes, I was.

17  Q.  When were you released from custody?

18  A.  July the 20th, Monday morning.

19  Q.  And you have been out on the street?

20  A.  Working.

21  Q.  Working since July 20th?

22  A.  July the 20th, yes, I have.

23  Q.  Okay.

24             Has your understanding of what

25     would happen to you developed before or after you got

39

1   out on July 20th?

2   A.   Right after I got out, I started hearing rumors.

3   Q.   When you say:  Start hearing rumors, did somebody tell

4        you these rumors?

5   A.   Yes.

6                          A lot of people were coming around

7        saying some people said when they catch you; they were

8        going to kill you and your family.

9                          MR. GILES:  Objection, Your Honor.

10                         MR. GONZALES:  I am offering it --

11       I am not offering it for the truth but for his state of

12       mind.

13                         THE COURT:  I will take his answer.

14       I will let it stand.

15  BY MR. GONZALES:

16  Q.   And when they catch you, they were going to kill you;

17       is what some folks told you?

18  A.   Yes.

19  Q.   What else did other people tell you?

20  A.   The same thing.

21  Q.   Did you believe them?

22  A.   Yes, I did.

23  Q.   And because you believed them, what did you do Monday

24       morning?

25  A.   Sit up here and told the Judge a story.

40

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    Q.  All right.

2                        Now, you have a relation by the

3        name of Raymond Williams; do you not?

4    A.  Yes, I do.

5    Q.  What was your understanding of what you were supposed

6        to say regarding Raymond Williams?

7    A.  What was I supposed to say?

8    Q.  Yes.

9    A.  I wasn't supposed to say nothing that he said.

10   Q.  What, if anything, did you understand Raymond Williams

11       to say?

12   A.  To say that I was on Corbet at the time.

13   Q.  Was that true or was this a lie?

14   A.  That's a lie.

15   Q.  And how did you know that?

16   A.  How did I know?

17   Q.  That you were supposed -- that Corbet Street was where

18       you were supposed to be.  How did you know that?

19   A.  Because I was on parole out there.  He was calling

20       my -- he was calling me and talking to me.

21   Q.  Raymond Williams was?

22   A.  Yes.

23   Q.  And was he calling you and talking to you about this

24       case?

25   A.  Yes.

41

1    Q.   Whose --

2                          MR. GILES: again I am going to

3    object.   Seem like we're doing a great deal of hearsay

4    here.

5                          THE COURT:   Let's not ask for any

6    hearsay.   I agree.

7                          MR. GONZALES:   Thank you, Judge.

8    BY MR. GONZALES:

9    Q.   So you talked to Raymond Williams about this case?

10   A.   Yes.

11   Q.   If you know, of your own mind, did Raymond Williams

12        know Goft?

13   A.   Yes, he do.

14   Q.   How many times did Raymond Williams call you,

15        approximately?

16   A.   I talked to him every other day.

17   Q.   A total of how many times, about?

18   A.   A week.

19   Q.   Altogether how many times did you talk to Raymond

20        Williams about this case?

21   A.   About three times.

22   Q.   Is Corbet street off Dickerson?

23   A.   Yes, it it is.

24   Q.   Do you know a person by the name of Big Ron?

25   A.   Big Ron?

                          42

1    Q.   What is Ron's real name?

2    A.   Ron Fulton.

3    Q.   Okay.

4                      If you know, sir, were you supposed

5    to say something about Roney Fulton, or big Ron?

6    A.   No, I wasn't.

7    Q.   If you know, sir, what were you supposed to say about

8    Corbet Street?

9                      MR. GILES:  Your Honor, I am going

10   to object as it appears to be drawing upon hearsay.

11                     THE COURT:  I agree.  Let's not ask

12   for any hearsay.

13                     MR. GONZALES:  You know, Judge, I

14   am not asking for the truth.  I am not offering it in

15   any way to prove the substance obviously of what they

16   were telling him to say.

17                     I am asking for purposes of this

18   Court's understanding about why he told you what he did

19   Monday morning; what he did.

20                     THE COURT:  Well, I'm just

21   wondering how it's relevant at this point in time.

22                     He did tell this Court that he lied

23   to the Court on Monday but everything that he told

24   Judge Lipscomb was true at the exam.

25                     MR. GONZALES:  I will move on.

43

1                    THE COURT:  Thank you.

2    BY MR. GONZALES:

3    Q.  Now, let's talk about January 17th, 1992, Mr. Collins.

4                    On January, 17th, '92, did you go

5        into the Special K Party Store on Mack and Gray?

6    A.  Yes, I did.

7    Q.  On that date in time, did you have occasion to see

8        Goft?

9    A.  Yes, I did.

10   Q.  Is that is the same person you've identified in court

11       prior to today?

12   A.  Yes, it is.

13   Q.  Did you see him also with a person you later came to

14       know as Rodnell Penn?

15   A.  Yes, I did.

16   Q.  Did you have occasion to leave the party store?

17   A.  Yes, I did.

18   Q.  And at that date in time, sir, did you hear anything

19       unusual?

20   A.  Yes, I did.

21   Q.  What did you hear?

22   A.  Gunshots.

23   Q.  When you heard gunshots, how many did you hear?

24   A.  About three or four.

25   Q.  And when you heard three or four gunshots, what did you

                            44

1  do?

2 A. Turned around and looked back across Mack and then I

3  ran.  I ran.  I ran across Mack.  And I saw this guy

4  laying in the driveway.

5 Q. That person that was laying in the driveway, is that

6  the same person you had seen with Goft earlier in the

7  store?

8 A. Yes, it is.

9 Q. Approximately how many minutes earlier?

10 A. Between five and ten minutes.

11 Q. Between five and ten minutes?

12 A. Yes.

13 Q. When you turned around and you looked; did you have

14  occasion to see Goft?

15 A. Yes, I did.

16 Q. Where did you see him?

17 A. Running through the field.

18 Q. Did you see him with any weapon?

19 A. No, I didn't.

20 Q. Did you see anyone else in the area other than the

21  person on the driveway; and the person you identified

22  as Goft running through -- running away?

23 A. No, I didn't.

24 Q. Are you saying this merely because you have been

25  arrested since this incident?

45

1    A.   No, I am not.

2    Q.   Okay.

3                        MR. GONZALES:   No further

4    questions, Judge.

5                        THE COURT:   Cross-examination.

6                        CROSS-EXAMINATION

7

8    BY MR. GILES:

9    Q.   All right, Mr. Collins.

10                       It is your testimony now that when

11   you were hear on Monday that you lied; is that correct;

12   is that right?

13   A.   Yes.

14   Q.   You are saying now when you were in 36th District

15   Court, when you testified, you were telling the truth;

16   is that right?

17   A.   Yes.

18   Q.   When you talked to -- let me ask you this:

19                       When you talked to the police

20   officer and gave the police a statement, was that a lie

21   or was that the truth?

22   A.   The truth.

23   Q.   Yes.

24                       When you talked to the police

25   officer, You gave your statement to the police, I

46

1     believe it was on January 23rd, did you lie or did you

2     tell the truth?

3  A.  The truth.

4  Q.  You told the truth?

5

6              When you left out of the courtroom

7     on Monday, you were arrested?

8  A.  Yes, I was.

9  Q.  What was your understanding of the reason why you were

10     arrested?

11  A.  For sitting there telling the -- telling the Judge a

12     lie because I was scared.

13  Q.  And who talked to you about that?

14  A.  About what?

15  Q.  About anything after you were arrested?

16  A.  Who talked to me?

17  Q.  Did the officer come up and tell -- talk to you and

18     say: I am arresting you because you told a lie?

19  A.  No, he didn't.

20  Q.  What did he tell you?

21  A.  He just told me I was being arrested for -- I don't

22     recall what you call it.

23  Q.  Perjury?

24  A.  Perjury.

25  Q.  Is that all he told you?

1   A.   Yes.

2   Q.   He read your rights?

3   A.   Yes, he did.

4   Q.   Did he ask you any questions?

5   A.   Yes, he did.

6   Q.   What kind of questions did he ask you?

7   A.   He asked me why I lied.

8   Q.   What did you tell him?

9   A.   I told him the reason.  The same reason I told the

10        prosecutor.

11  Q.   In Court today?

12  A.   Yes.

13  Q.   And when did he ask you the question?

14  A.   About three and a half hours later after I was on the

15        9th floor.

16  Q.   Okay.  Let's back up.

17                          When you were arrested and told you

18        were being charged with perjury here in this courtroom,

19        outside this courtroom, okay?

20  A.   Yes.

21  Q.   One second, Your Honor.

22                          We have a potential witness in the

23        Courtroom.

24                          THE COURT:  Have the witness wait

25        in the hallway.

1

2           MR. GILES:  Thank you, Your Honor.

3           MR. GONZALES:  Let me indicate that

4    that woman has been in the courtroom since the

5    beginning of this case I am not sure of her name but I

6    have seen her throughout.

7           In fact I spoke to her at the

8    beginning of case Monday morning and asked her if she

9    wasn't a witness; and she said she wasn't.  And I'm

10   indicating that --

11          MR. GILES:  Your Honor, I don't

12   believe she's in the courtroom.

13          She has been outside the courtroom.

14   I have talked to her on several occasions.

15          THE COURT:  You can ask her some

16   questions as soon as she takes the stand by way of voir

17   dire, if you like.

18          MR. GILES:  Thank you.

19   BY MR. GILES:

20   Q.   When you were arrested outside the courtroom, the

21        officer read you your rights, then; is that correct,

22        Mr. Collins?

23   A.   Yes, he did.

24   Q.   Okay.  Did he ask you any questions then?

25   A.   No, he didn't.

49

1   Q.  He didn't say anything to you?

2   A.  No.

3   Q.  He just took you and locked you up?

4   A.  Yes, he did.

5   Q.  Is it your -- did he later come back and see you?

6   A.  Yes, he did.

7   Q.  Okay.  On your request or he just came on his own?

8   A.  On my request.

9   Q.  That's when you told him you lied?

10   A.  Yes, I did.

11   Q.  Okay.

12                    Did he at any time tell you

13   anything to the effect that if you came back and told

14   the truth that you would not be charged with perjury?

15   A.  No, he didn't.

16   Q.  Did he make any promises to you?

17   A.  No, he didn't.

18   Q.  Okay.

19                    Did he tell you about testifying

20   today that they would not charge you?

21   A.  No, he didn't.

22   Q.  Did he tell you about testifying today they could not

23   charge you?

24   A.  No, he didn't.

25   Q.  So is it you are frame of mind now that you believe

1     when you walk out of this courtroom today, you are

2     still going to be charged with perjury?

3  A.  I ain't?

4  Q.  Is that yes or no.

5                         Do you believe when you leave here

6     that you are still charged with perjury?

7  A.  Yes.

8  Q.  Is it your testimony that you were on -- that you were

9     in the area of Gray and Mack on January 17th; is that

10    correct?

11 A.  Yes.

12 Q.  And you were in the party store?

13 A.  Yes.

14 Q.  What is the name of that party store?

15 A.  Gray and Mack Party Store.

16 Q.  It is the Gray and Mack Party Store?

17 A.  Yes.

18 Q.  Do you live in that area?

19 A.  Yes, I do.

20 Q.  Was the name of that party store the Special K?

21 A.  Yes, Special K.

22 Q.  Now, it is Special K?

23 A.  Special K.

24 Q.  Not the Gray and Mack Party Store?

25 A.  (Interposing) Not --

51

1    Q.   I want to understand your testimony.

2                        It is Special K?

3    A.   Special K.

4    Q.   You are inside the store?

5    A.   Yes.

6    Q.   How long were you inside the store?

7    A.   About five or ten minutes.

8    Q.   Oklay.

9                        So it is your testimony today that

10   while inside the store, you saw Mr. Carl Hubbard?

11   A.   Yes.

12   Q.   You saw him with anybody else?

13   A.   Yes.

14   Q.   Who did you see him with?

15   A.   The deceased person.

16   Q.   The deceased person.

17                       Do you know the deceased person's

18   name?

19   A.   Not right offhand.

20   Q.   Had you ever seen that person before you saw them in

21   the party store?

22   A.   No, I haven't.

23   Q.   Did you talk to that person while you were in the party

24   store?

25   A.   No, I haven't.

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

```
 1    Q.  Did you talk to, with Mr. Hubbard?

 2    A.  Just spoke.

 3    Q.  You said Hi.

 4                        How long were you in the party

 5        store after you said Mr. Hubbard was allegedly there;

 6        can you tell us?

 7    A.  A couple of minutes after.

 8    Q.  What was Mr. Hubbard wearing?

 9    A.  I can't recall.

10    Q.  You don't know what he was wearing?

11    A.  I don't recall.

12    Q.  Are you saying that now, this testimony that you are

13        giving is true and that you lied before because you

14        were threatened?

15    A.  Yes.

16    Q.  Who threatened you?

17    A.  It wasn't nobody right offhand; people just coming

18        telling me.

19    Q.  People.  What people?

20    A.  People out on the street that was hearing the stuff.

21    Q.  What are those people's names?

22    A.  I can't tell you what their names are.

23    Q.  You don't know their names?

24    A.  No.

25    Q.  And you are saying, no, you do not know their names?
```

1   A.   No, I don't.

2   Q.   Okay.

3        So what you are telling me and you

4        are telling this Court is that you know these people,

5        though?

6   A.   I've seen them around at clubs, yes.

7   Q.   So what you are telling me is that people that you do

8        not know except by seeing them around in clubs walked

9        up to you and tell you that you are going to be killed?

10       Is that what you are saying?

11  A.   They know Carl.

12  Q.   Is that what you are saying, yes, no, or I don't

13       understand your question?

14  A.   Yes.

15  Q.   And you started receiving these threats after you were

16       released from custody; is that correct?

17  A.   While I was in custody and when I was released.

18  Q.   While you were in custody someone threatened you?

19  A.   They were writing me telling me.

20  Q.   Writing you?

21  A.   They were writing me.

22       My sister was writing me and

23       telling me what people saying they are going to do to

24       me.

25  Q.   All right.

1           And you don't know who these people

2    are; is that correct?

3    A.   Some people that he know.

4    Q.   Who are these people?

5    A.   I don't know their names.  I just seen them around.

6    Q.   When your sister wrote to you and said somebody is

7         going to do something, she said in the letter these

8         were some people that Mr. Hubbard knows?

9    A.   Yes.

10   Q.   And how did she -- she found out from these same

11        folks --

12                          MR. GONZALES:  (Interposing) Well,

13   Your Honor, speculation.

14                          THE COURT:  Let's not ask for any

15   speculation.

16                          MR. GILES:  I'll withdraw the

17   question, Your Honor.

18                          THE COURT:  Thank you.

19   BY MR. GILES:

20   Q.   You testified that you spoke at least three times to

21        Mr. Williams; is that correct?

22   A.   Yes.

23   Q.   You were out when you spoke to him?

24   A.   Yes, I was.

25   Q.   So this was after July 20th, 1992?

55

1    A.  Yes, it was.

2    Q.  Can you recall approximately when you talked to him?

3    A.  I can't recall.

4    Q.  Would it have been in July?  Would it have been in

5        August or both?

6    A.  In August.

7    Q.  You talked to him in August.  He called you collect?

8    A.  No.

9                         He called his girlfriend and she

10       called me.

11   Q.  You didn't talk to him?

12   A.  I talked to him and his girlfriend.

13   Q.  Okay.

14                        While you had this conversation

15       with him his girlfriend was on the line?

16   A.  Yes, she was.

17   Q.  Did Mr. Williams threaten you?

18   A.  No.

19   Q.  Did he tell you anything about hearing that you were

20       going to be killed?

21   A.  I just was hearing it from people.

22   Q.  From these people that you don't know?

23   A.  Yes.

24   Q.  Okay.  Let's go back to the party store.

25                        You left out of the party store?

56

1   A.   Yes.

2   Q.   When you left out of the party store, was Mr. Hubbard

3        still in the party store?

4   A.   Yes.

5   Q.   What happened?  Where did you go?

6   A.   I was walking down the street.

7   Q.   How far down the street did you get -- what street were

8        you walking down?

9   A.   Gray.

10  Q.   How far down the street did you get?

11  A.   About by the alley.

12  Q.   Which is about how far?

13  A.   I really don't know.

14  Q.   Is it behind the store, the length of the store?

15  A.   About behind the store.

16  Q.   At least fifty, seventy-five feet.

17                      You are talking about the length of

18       the store; is that correct?

19  A.   Yes.

20  Q.   Do you recall what you testified to during the

21       preliminary exam?

22                      Do you recall your testimony at

23       the preliminary exam?

24  A.   Yes, I do.

25  Q.   Do you recall at the exam testifying that you got

57

1    approximately three feet away from the door?

2                              MR. GONZALES:  What page?

3                              MR. GILES:  Looking at page twenty,

4    two-thirds down.

5

6                              MR. GONZALES:  Okay.  Thank you.

7    BY MR. GILES:

8    Q.  Do you recall that testimony?

9                              MR. GONZALES:  I don't see that on

10   page twenty, Judge.

11                             MR. GILES:  One second.

12                             MR. GONZALES:  22, I believe in the

13   middle.

14                             MR. GILES:  Okay.  You are right.

15                             MR. GILES:  Page 21.

16   BY MR. GILES:

17   Q.  Do you recall that testimony?

18   A.  Yes.

19   Q.  Okay.

20                             Today you are telling us that you

21   were fifty or seventy-five five feet down Gray;

22   correct?

23   A.  No.

24   Q.  That's what you just told me?

25   A.  That's what you stayed.

58

1    Q.  I asked you and you said:  Yes?

2    A.  Over by the alley.  I don't know how many feet it is.

3    Q.  Approximately.

4                        You said it is towards the end of

5    the store; correct?

6    A.  It is about the side of the store.

7    Q.  The alley is at the side of the store?

8    A.  Yes.

9    Q.  So the alley runs into the store?

10   A.  Yes.

11   Q.  Runs into the store?

12   A.  It runs behind the store.

13   Q.  It runs behind the store?

14   A.  Yes, it do.

15   Q.  You testified you were at the alley at Gray.

16                  Is that, testimony?

17   A.  Yes.

18   Q.  So your behind the store?

19   A.  I wasn't behind on -- I was --

20   Q.  (Interposing) At the side but passed the store; is that

21   correct?

22   A.  This is --

23   Q.  (Interposing) The alley runs behind the store.

24                MR. GONZALES:  Judge, he's got to

25   give him a chance to answer.

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1          THE COURT:  I agree.  Give him an

2     opportunity to finish his answer.

3          THE WITNESS:  This is the store and

4     this is the street.

5     BY MR. GILES:

6     Q.  We can't see your hands.

7          I am showing you a diagram.  I

8     believe it is marked People's Exhibit Number 21.

9          Is that correct, People's Exhibit

10    Number 21.

11    BY MR. GILES:

12    Q.  The basic diagram of the area of Mack and Gray.

13         This shows a block area here, identified

14    as Special K Party Store; is that correct?

15    A.  Yes.

16    Q.  Can you identify where you were standing when you heard

17    the gunshot?

18    A.  This is the --

19    Q.  This is the store right here, yes.

20         MR. GONZALES:  May I approach to

21    look, Judge?

22         THE COURT:  Go right ahead.

23    BY. MR. GILES:

24    Q.  This is Mack here.  This is Gray.  This is the Special

25    K Party Store.

60

1         The entrance to the Special K Party

2  Store is in the front of the building; is that correct,

3  sir?

4 A. Yes.

5 Q. It is your testimony that you came out of the building

6  and you were walking down Mack -- which?

7 A. Which building?

8 Q. Came out of the party store?

9 A. Yes.

10 Q. You were walking which way down Gray?

11 A. Right here.

12 Q. Which way?

13 A. This way.

14 Q. This is Mack and this is Gray?

15 A. This is Mack right here.

16 Q. No.

17        This right here is Mack.  It says

18  Mack.  Okay.  This wide street here is Mack.

19        This street is Gray.  This is the

20  party store.

21        When you came out of the party

22  store, which way did you walk?

23        Did you go to your left or did you

24  go to your right?

25 A. To my left.

11

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1    Q.   You came out and went to your left, so you walked down

2         Mack.  You didn't walk down Gray?

3    A.   I walked down Gray.

4    Q.   So you went to your right.   Okay.

5                        I am also going to show you a

6         photograph which is People's Exhibit Number 11.

7                        Is that the Special K Party Store?

8    A.   Yes.

9    Q.   All right.

10   A.   I went this way.

11   Q.   So you were -- on the diagram it would be coming down

12        this -- is that correct, Mr. Gonzales?

13                        MR. GONZALES:  Yes, that's right.

14   BY MR. GILES:

15   Q.   The alley is --

16   A.   I was right about here.

17   Q.   At the alley; is that correct?

18   A.   Yes.

19   Q.   That's behind the store?

20   A.   That's on the side of the store.

21   Q.   You are pointing?

22   A.   I am pointing at the phone booth.

23   A.   It is by the alley -- before the alley, right.

24   Q.   Okay.

25                        Now, you are saying you were by the

62

1    phone booth?

2  A.  I was on the sidewalk but I was right, facing the phone

3    booth but I wasn't by the alley, you know.

4  Q.  I am just trying to clarify your testimony.

5                    Now you are saying you were by the

6    telephone; is that what you are saying?

7  A.  By the alley and the telephone.  It is right by the

8    same places.  I was right here.

9                    I was right about on the sidewalk

10    right here by this garage can; by the telephone booth.

11                    I didn't go no farther than that.

12  Q.  Would you say that the distance from the door to where

13    you were standing is three feet?

14  A.  No.  I wouldn't say that since I see the picture.

15  Q.  I mean you were there.  Okay?

16  A.  I was --

17  Q.  How far do you think I am from you now?

18  A.  About five feet.

19  Q.  I see, five feet.

20                    Can you estimate how far in miles

21    you were?

22  A.  I can't estimate.  I can't do that.

23  Q.  Would you say, it's a fair statement to say, that you

24    were at least forty to fifty feet?

25  A.  About thirty, twenty, twenty-five, something like that.

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1   Q.   Okay.

2                        You got approximately twenty-five,

3        thirty feet.  You heard some gunshots; is that correct,

4        Mr. Collins?

5   A.   Yes.

6   Q.   You turned around ; is that correct?

7   A.   Yes.

8   Q.   You looked down Gray?

9   A.   Yes.

10  Q.   Okay.

11                       What did you see when you looked

12       down Gray?

13  A.   I seen -- I looked down Gray and I seen Carl Bubbard

14       running through the field.

15  Q.   Running through what field?

16  A.   Springer.

17  Q.   So when you saw him, which side -- if I show you this

18       diagram, again.

19                       I am going to show you the diagram

20       again identified as People's Exhibit Number 21.

21       According -- this is the building here, Special K Party

22       Store on the diagram, the side, the telephone is

23       towards the back of the building and that's in the

24       approximate area that you were; is that correct?

25  A.   Yes.

                             64

1  Q.  It is your testimony that you turned and looked down

2      Gray.  And you saw Mr. Hubbard running through a field.

3      These are the houses on Gray.

4                      This shows one vacant lot on this

5      side of the street.

6                      Is this the field that you are

7      speaking about?

8  A.  Yes.

9  Q.  Where the vacant lot is.

10                     You saw Mr. Hubbard in the vacant

11     lot when you saw him?

12 A.  Running through the vacant lot.

13 Q.  You saw him running through.

14                     So the first time you saw Mr.

15     Hubbard is he was running through this vacant lot?

16 A.  Yes.

17 Q.  When you turned around and saw Mr. Hubbard running

18     through this vacant lot, did you also see the body?

19 A.  On on the ground.

20 Q.  So from standing back near this party store on Gray and

21     Mack, you could see the body laying on the ground?

22 A.  No, not -- I didn't see it until I got close.

23 Q.  Okay.

24                     So it is your testimony you heard

25     the gunshots, you turned around and saw Mr. Hubbard

                           65

1        running through this vacant lot, or field, or whatever

2        you want to call it, and that you ran back to this

3        area; is that correct?

4    A.  Yes.

5    Q.  Okay.

6                           Mr. Hubbard was running towards you

7        or away from you?

8    A.  Away from me.

9    Q.  So he had his back to you; is that correct?

10   A.  Yes.

11   Q.  You could not see his face, could you?

12   A.  No.

13   Q.  Can you tell me what he had on?

14   A.  I can't fairly recall.

15   Q.  Can you tell me how, sir, it is that you know it was

16       Mr. Hubbard?

17   A.  The scar.

18   Q.  A scar?

19   A.  On the back of his head; the side of his head.

20   Q.  The scar on the back?

21   A.  The side of his head.

22   Q.  Back, side, side of his head?

23                          How tall are you, Mr. Collins?

24   A.  About five, eleven.

25   Q.  Mr. Collins, do you recall giving your statement to the

66

1       police?

2                               Do you recall giving a statement to

3       the police?

4    A.  Yes, I do recall.

5    Q.  I believe when I asked you earlier, you said that that

6        statement was also true, correct?  The statement that

7        you gave to the police was the truth?

8    A.  Yes.

9    Q.  Okay.

10                              For your recollection, Mr. Collins,

11       I am going to ask you to reread this segment of your

12       statement to yourself, please.

13                              I am going to have some questions.

14                              THE COURT:  Take your time while

15       you read it.

16                              MR. GILES:  Okay.

17                              (A discussion was held off the

18                              record.)

19                              *       *       *       *

20

21

22   MR. GILES:

23   Q.  Mr. Collins, did you read that?

24   A.  Yes, I did.

25   Q.  Does that help you remember what you told the police

                              67

1      officer?

2   A.   Yes, I do.

3   Q.   Okay.

4                        Isn't it true, that when you gave

5   this statement that you said you told the officer that

6   you got, as you were walking down Gray, you got mid

7   block, half way down the block, down Gray; you need to

8   see your statement?

9   A.   Midblock from where?

10  Q.   Quote, unquote, I looked back and I noticed Goft and

11  the guy he was with come out of the store and were

12  walking across Mack and Gray.

13                        I continued to walk south on Gray.

14  When I reached about midblock, I heard gunshots.

15                        Is that your statement?

16  A.   Yes.

17  Q.   Is that true?

18  A.   Yes.

19  Q.   Is it true, did you got midblock or is it true you got

20  to the side of the party store?

21  A.   To the side of the party store.

22  Q.   So midblock is not the truth?

23  A.   No.

24  Q.   It's a lie; isn't it?

25  A.   Yes.

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1  Q.  So you lied to the police department? .

2  A.  No.

3              I told them that I was on the side

4       of the store.  I don't know where they said.

5  Q.  Is this your signature at the bottom of this statement,

6       sir?

7  A.  Yes, it is.

8  Q.  That's your signature?

9  A.  Yes, it is.

10  Q.  You read and signed this statement; is that correct?

11  A.  Yes, it is.

12  Q.  You read and signed it as being the truth; isn't that

13       correct?

14  A.  Yes, it is.

15  Q.  But you getting midblock is not telling the truth?

16  A.  They probably put that down.

17  Q.  Answer the question, please.

18              You're saying that they got to

19       midblock; that is not the truth, is it?

20  A.  Not midblock.

21  Q.  It's a lie, correct?

22  A.  Yes, I was on the side of the store.

23  Q.  Correct.

24              Please answer the question.

25              It's a lie, correct?

69

1   A.   Correct.

2   Q.   Isn't it is your testimony that you ran in the

3        direction of the gunshots?

4   A.   Yes.

5   Q.   Is that correct?

6   A.   Yes.

7   Q.   Didn't you testify on Monday that a close friend of

8        yours was killed?

9   A.   Yes.

10  Q.   Was he shot?

11  A.   Shot and killed, yes.

12  Q.   Shot and killed.  That was your testimony.

13                     Do you know a gentleman by the name

14       of Andrew, I believe it is Smith.

15                     You know a gentleman by the name of

16       Andrew Smith?

17  A.   Yes, I do.

18  Q.   Do you see him anywhere in the area of the store?

19  A.   No, I didn't.

20  Q.   Did you talk to him that day?

21  A.   No, I didn't.

22  Q.   No, you didn't?

23                     Andrew Smith was not in the area

24       when this occurred; is that correct; was that your

25       testimony?

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    A.   No, he wasn't.

2    Q.   Okay.

3                       I am going to ask you to read a

4    portion of your statement that you gave to the police

5    department, the second page?

6    A.   I don't recall saying that part.

7    Q.   Please, don't make any statements until I ask the

8    questions.

9                       Is this your signature at the

10   bottom of the page?

11   A.   Yes, it is.

12   Q.   Do you recall -- you do remember making a statement to

13   the police?

14   A.   Yes, I do.

15   Q.   That is your signature at the bottom of that page?

16   A.   Yes, it is.

17   Q.   You were asked the question:

18                       Was there anyone else in the area

19   when this happened?

20                       Your answer was: Yes.  A friend of

21   mine Andrew Smith black male

22   nineteen.  He lives on the west

23   side off 12th street.

24   He was inside the street while

25   I was in the store.

71

1           He stayed on the corner when I

2                    left.

3   Q.  You made that statement to the police?

4   A.  I don't recall that statement.

5   Q.  But you recall all the other statements that you made

6       to the police but you don't remember making that

7       statement?

8   A.  No, I don't.

9   Q.  Did you -- I believe I asked you about, did you talk to

10      Mr. Smith over the telephone that evening?

11  A.  No, I didn't.

12  Q.  Okay.

13              It is your testimony that you gave

14      at the preliminary exam is the truth?

15  A.  Yes.

16  Q.  And again I am going to ask you regarding -- you read

17      your testimony at the exam starting at page seventeen

18      at over half way down the road -- do you know the page?

19              Do you recall testifying at that

20      time, the preliminary exam, that you did in fact say

21      that you called Andrew Smith?

22  A.  No, I don't.

23  Q.  Did you don't recall that?

24  A.  No, I don't.

25  Q.  You are saying that this transcript is incorrect?

                         72

1                             MR. GONZALES:  Your Honor, I object to

2       that.

3                             MR. GILES:  Let me read the transcript

4       into the record then.

5                             THE COURT:  Thank you.

6                             MR. GILES:  Starting -- there are no

7       numbers on here.

8                                   "Question:  Do you know anybody by

9                                   the name of Andrew?

10                                  Answer:  Yes, I do.

11                                  Question:  Did you talk with him at

12                                  the scene?

13                                  Answer:  Talked to him over the

14                                  phone?

15      Q.  Now, you are saying that that is not true; correct?

16      A.  That's not true.  I didn't talk.

17      Q.  That's a lie?

18      A.  I told them I know a guy.

19      Q.  And the question is -- is this a lie?

20      A.  About talking to him over the phone?

21      Q.  Talking to him over the phone?

22      A.  Yes.

23      Q.  That's a lie?

24      A.  Yes.

25      Q.  So you lied at the exam?

                                    73

A.   I didn't tell them that I talked to them over the
phone.

            I told them that I knew an Andrew
Smith.

Q.   The question was:   Did you talk to him at the scene?

            Answer:   I talked to him over the
phone.

A.   I don't fairly recall that.

Q.   Do you recall -- do you have any medical problems, Mr.
Collins?

A.   No, I don't.

Q.   Have you ever been treated for any psychological
problems?

A.   No, I haven't.

Q.   Currently use drugs?

A.   No.

Q.   Have you ever used drugs.

            MR. GONZALES:   Relevancy, Judge,
objection.

            MR. GILES:   Your Honor, this
witness testimony memory is very selective.

            THE COURT:   I think you should be
specific as to any dates, now only the date in
question.

            MR. GILES:   All right.

74

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1              I'll withdraw the question, Your

2       Honor.

3                      THE COURT:  Thank you.

4    BY MR. GILES:

5    Q.  You know Raymond Williams; correct?

6    A.  Yes, I do.

7    Q.  Were you with Raymond Williams on the 17th?

8    A.  No, I wasn't.

9    Q.  You were not?

10             You didn't see him on the 17th at

11      all?

12   A.  No, I didn't.

13   Q.  You know a gentleman by the name of Roney Felton?

14   A.  Yes, I do.

15   Q.  Were you with him on the 17th?

16   A.  No, I wasn't.

17   Q.  Did you see him at all on the 17th?

18   A.  Earlier that day.

19   Q.  Earlier that day.

20             Were you staying in his home during

21      this period, around that time?

22   A.  I was staying with my mother.

23   Q.  Okay.

24                      MR. GILES:  Off the record.

25                      (A discussion was held off the

                        75

1           record.)

2   BY MR. GILES::

3   Q.   Mr. Collins, you said after hearing the shots and

4        seeing Mr. Hubbard running through a vacant lot, you

5        ran down the street and you saw the body laying there;

6        correct?

7   A.   Yes.

8   Q.   Did you touch the body?

9   A.   No, I didn't.

10  Q.   Can you tell me what you saw?

11  A.   I seen him laying on his stomach.

12  Q.   Laying on his stomach?

13  A.   His sideways like.

14  Q.   Can you tell me what he was wearing?

15  A.   I don't fairly recall.

16  Q.   It is the same person that you felt you saw in the

17       store; correct?

18  A.   Yep, yes.

19  Q.   Can you tell me what he was wearing when he was in the

20       store?

21  A.   I don't fairly recall.  It's been a long time.

22  Q.   Can you tell me what he looked like?

23  A.   That was my first time ever seeing him in my life.

24  Q.   In the store?

25  A.   Yes.

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1   Q. So how do you know this is the same person that you

2       saw, are you saying you saw on the street?

3   A. (No response)

4   Q. Did this person have any -- well, answer the question.

5       How do you know it was the same person?

6   A. Because when I ran, I looked and I just looked at him

7       and I just knew it was him; and then I just ran.

8   Q. You looked at him?  Did you see his face?

9   A. No, I didn't.  I seen the way, you know.

10               I knew him because it wasn't but

11      five or ten minutes before I seen him in the store.

12   Q. You didn't see the face while you he was lying on the

13      ground?

14   A. No, I didn't.

15   Q. You can't tell me what he was wearing?

16   A. No, I can't.

17   Q. Okay.  Did you have any identifiable scars that you

18      could see?

19   A. No.

20   Q. On his face or head?

21   A. Head?

22   Q. Yes.

23   A. No.

24   Q. Just one more question, Mr. Collins.

25               There is -- is there -- you are

77

1      familiar with the inside of the Special K Party Store?

2   A.   Yes, I am.

3   Q.   Is there a telephone on the inside of that store?

4   A.   Behind the counter.

5   Q.   Behind the counter.  There is not a public phone inside

6        the store?

7   A.   No, it is not.

8   Q.   Okay.

9                         The photograph that I showed you, I

10       believe it is People's Exhibit Number 11, you

11       identified it on the side of this store, a telephone.

12                         Is that the only telephone at that

13       party store to the best of your recollection?

14   A.   Around the store, you are saying?

15   Q.   Yes.

16   A.   Yes.  That's the only one.

17   Q.   When you came out of the store walking down the street,

18       at any time did you see Mr. Hubbard or the person he

19       was with make a telephone call?

20   A.   No, I didn't.

21   Q.   Thank you.

22                         MR. GILES:  No further questions.

23                         THE COURT:  Anything else.

24                         MR. GONZALES:  Yes, Your Honor.

25                         THE COURT:  All right.  Let's move

                              78

1       on.

2

3                        REDIRECT EXAMINATION

4

5   BY MR. GONZALES:

6   Q.  Mr. Collins, you didn't see Goft and the person you

7       later saw laying on the street before you were in

8       Special K Store, had you?

9   A.  What?

10  Q.  You hadn't seen them at all before you were in the

11      store?

12  A.  No, I haven't.

13  Q.  Did you see them at all that day?

14  A.  No.

15  Q.  The statement you were shown that said midblock, you

16      were at an area; you pointed to near a garbage can,

17      this photograph in Exhibit Number 11?

18  A.  Yes.

19  Q.  And that also is in the area of the alley at the rear;

20      is that right?

21  A.  Yes.

22  Q.  Now, when you heard the shots, you indicated you turned

23      and ran?

24  A.  Yes.

25  Q.  You ran up towards the direction of, up Gray Street?

                          79

1    A.   Yes.

2    Q.   So you weren't standing at that point in time, or were

3         you, were you standing at that location, at that point

4         in time when you saw Carl Hubbard?

5    A.   Across Mack.

6    Q.   You had crossed Mack?

7    A.   No.

8              I seem him going across Mack.

9    Q.   Where were you at?

10   A.   By that telephone going down the street.

11   Q.   You were going down the street; is that correct?

12   A.   Yes.

13   Q.   You weren't standing there stationery at the moment?

14   A.   No.

15   Q.   You were moving?

16   A.   Yes, slow.

17   Q.   Okay.

18              When you say moving slow, you were

19         walking?

20   A.   Yes.

21   Q.   Did there come a time when you started running towards

22         the scene?

23   A.   Yes.

24   Q.   And when you are running towards the scene, did you --

25         is that when you said you saw Mr. Hubbard?

80

```
 1    A.   The back of his head, yes.

 2    Q.   Okay.

 3                         Now, you said you got a phone call

 4         from Raymond Williams; at least, you talked to him at

 5         least three times through his girlfriend; is that

 6         correct?

 7    A.   Yes.

 8    Q.   Okay.

 9                         Now, was there a three-way

10         conversation on the phone?

11    A.   Yes.

12    Q.   What is her name?

13    A.   Angie.

14    Q.   Now, you were asked by counsel here -- did he tell you

15         people were going to kill you.  And I am referring to

16         Raymond Williams?

17    A.   No, no.

18    Q.   Did he tell you that?

19    A.   No.

20    Q.   Did he threaten you in any way?

21    A.   No.

22    Q.   Did he tell you about Corbett Street?

23    A.   Yes.

24    Q.   What did he tell you about Corbett Street?

25    A.   That I said --
```

81

1            MR. GILES:  I will object.  It is

2    hearsay.

3            MR. GONZALES:  The door was opened,

4    Judge.

5            He asked about threats.  He asked

6    about threatening to kill him and I'm asking him what

7    he did say.

8            MR. GILES:  Those questions lead

9    directly to the issue that the prosecutor had already

10   laid regarding this witness' previous testimony and

11   lying.

12           MR. GONZALES:  Then he goes and

13   asked him about what he did say.

14           He can't pick and choose only what

15   parts --

16           THE COURT:  I tell you what.  You

17   might have opened up the door but there is an objection

18   of hearsay.

19           I think you are asking for hearsay.

20   So I am going to sustain the objection.

21           MR. GONZALES:  Okay.

22   BY MR. GONZALES:

23   Q.  Now, you said that Mr. Fulton, you know, you had seen

24       earlier that day; is that correct?

25   A.  Yes.

1    Q.  Did you talk to him at all this period of time?

2    A.  No.

3    Q.  Thank you.

4                         MR. GONZALES:  That's it, Judge.

5    Judge, I have nothing else.

6                         THE COURT:  Anything else?

7                         MR. GILES:  A couple of questions,

8    Your Honor.

9

10                       RECROSS-EXAMINATION

11

12   BY MR. GILES:

13   Q.  Mr. Collins, it is your testimony that you saw Mr.

14       Hubbard and someone else walking across Gray and Mack,

15       correct, leaving the store, the area of the store?

16   A.  Yes.

17   Q.  Okay.

18                       At the time you saw them walking

19       across -- excuse me.  Walking across Mack onto Gray,

20       you were then at the side of the store; correct?

21   A.  Yes.

22   Q.  Okay.  And then you kept walking?

23   A.  Yes.

24   Q.  Yes?

25   A.  Yes.

1    Q.   So when you heard the gunshots, where were you?

2    A.   About by the garbage can.

3    Q.   I believe on redirect the -- with the prosecutor, you

4         said you were by the telephone?

5    A.   Did I --

6    Q.   (Interposing) Let me finish the question.

7                        I believe when the prosecutor asked

8         you on redirect, you said you were by that telephone,

9         the garbage can, that general vacinity when you turned

10        and saw Mr. Hubbard and this guy walking across Mack.

11                       Was that your testimony?

12                       MR. GONZALES:  I disagree with

13        that, Judge.  I don't believe that was indicated at

14        all.

15                       I think that's the point and time

16        after he heard the shots.  It's a mischaracterization

17        of my questioning and prior testimony.

18                       THE COURT:  Your objection is

19        noted.  Let me hear the answer.

20                       Go ahead and ask the question

21        again.

22   BY GILES:

23   Q.   I believe when the prosecutor asked you went you first

24        saw Mr. Hubbard and the, this other guy leaving the

25        store, when you saw them -- you testified that you did

84

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1      see them walking across Mack; correct?

2  A.  Yes.

3  Q.  Going down Gray?

4  A.  Yes.

5  Q.  Okay.

6                When you saw them walking across

7  Mack and going down Gray, where were you?

8  A.  By the garbage can and the telephone booth.

9  Q.  By the garbage can when you turned and saw them on Mack

10  and Gray?

11  A.  Yes.

12  Q.  Did you hear the shots immediately then?

13  A.  No.

14  Q.  How much time passed; how much time passed?

15  A.  About three or four minutes.

16  Q.  And during this time you were walking, weren't you?

17  A.  Yes.

18  Q.  It was cold outside, wasn't it?

19  A.  I don't recall.

20  Q.  Okay.

21                 But you continued to walk down

22  Gray?

23  A.  Yes.

24  Q.  Yes?

25  A.  Yes.

1   Q.  In the opposite direction they were going?

2   A.  Yes.

3   Q.  So is it fair to say that you got passed the alley and

4      the garbage can by the time you heard the gunshot?

5   A.  No.

6   Q.  It is your testimony it took you three to four minutes

7      to walk from the area of the telephone booth to the

8      area of the alley; is that correct?

9   A.  Yes.

10  Q.  Maybe one further question, Your Honor.

11                THE COURT:  All right.

12                MR. GILES:  A couple more

13   questions, Your Honor.

14  BY MR. GILES:

15  Q.  Do you recall at the preliminary exam you were asked

16     the question:

17                THE COURT:  Hold onto your notes,

18   counsel.  We're going to take five minutes.

19                MR. GILES:  Thank you.

20             (A short break)

21

22          *     *     *     *     *

23

24                THE DEPUTY:  Court's back in session.

25            Please be seated.

86

1          THE COURT:  All right.

2               Do you have any other questions,

3     counsel.

4               MR. GILES:  Yes, Your Honor.

5

6               THE COURT:  I should state before

7     you begin, the Court is going to take pictures at 2

8     o'clock.

9               So anybody who wants to be in the

10    pick can be here this afternoon because the Court is

11    going to take pictures of anyone in the courtroom.  So

12    I thought I would put everyone on notice.

13               MR. GONZALES:  Let me indicate also

14    that I had a chance to speak with Mr. Giles.

15               He indicated to me he had no

16    objection to a proposal that would close the courtroom

17    for both sides during the remainder of Mr. Collins'

18    testimony which I expect to be very brief.

19               In that regard I talked to the

20    family members involved on my side of the case and they

21    have already sequestered themselves.  They have no

22    objections.

23               So it is my understanding that he

24    didn't have that concern so I would ask that that be

25    implemented if there are no objections.  No objection

                          87

1    to it.

2                  THE COURT:  I tell you what.  I

3    appreciate your concerns.  But this is a public

4    courtroom and anybody should be able to come and go as

5    they please.

6                  But I did want to place anyone on

7    notice since it is a public courtroom that pictures

8    will be taken at 2 o'clock.

9                  MR. GONZALES:  Thank you, Your

10    Honor.

11                  MR. GILES:  Thank you.

12

13    BY MR. GILES:

14    Q.  Mr. Collins, you testified on direct and cross

15        examination and redirect that you saw Mr. Hubbard and

16        Mr. Penn, walking across Mack down Gray after you left

17        the store; is that correct?

18    A.  Yes.

19    Q.  Isn't it true that during your testimony at the

20        preliminary exam you testified that you didn't see

21        them?

22    A.  No, I didn't.

23    Q.  Looking at page thirteen of the preliminary exam.  No.

24        All right..

25                  Let's go to page fifteen, Mr.

1    Collins.

2                          At the exam you were asked the

3    question:  Did you ever at any point in time before you

4    will heard the shots fired, did you ever at any point

5    in time see Goft and this person leave the store or

6    walking anywhere?

7                          Answer:  I seen him.  I seen him

8                          come inside the store.  They were

9                          talking like they was really cool.

10                         Question: After that happened, sir,

11                         after you left the store, was there

12                         ever any point and time that you

13                         saw Goft and the person you

14                         identified in this photo leave

15                         the store or walking together?

16                         And your answer was:  No, sir..

17   Q.   Do you recall making those statements?

18   A.   Yes, sir?

19   A.   Yes.

20   Q.   And what you are testifying to date is different; is

21        that correct?

22   A.   No.

23   Q.   You testified here that you did not see them at any

24        time leaving the store.

25                         But you testified today in Court

1      that you did.  You saw them walking across Mack?

2    A.   I seen at the street walking across Mack?

3    Q.   So what you are saying is what is in the exam and from

4         your testimony in the preliminary exam is not true; is

5         that correct?  Is that correct?

6                        MR. GONZALES:  I will object.

7                        That's improper impeachment.  He's

8    indicating on one hand he didn't see him leave the

9    store.  And on the other hand, he did see them walking

10   walking across Mack.

11                        THE COURT:  I am going to ask that

12   you rephrase the question, counsel.

13   BY MR. GILES:

14   Q.   Okay.

15                        The question specifically asked at

16   the exam, it says:  After you left the store, was there

17   ever any point in time that you saw Goft and the person

18   you identified in this photo leave the store or walking

19   together?

20                        Answer:  Answer was:  No, sir.  The

21   answer was:  No, sir.

22                        That's what you testified to; is

23   that correct?

24   A.   Right.

25   Q.   Okay.

1            Are you now saying that you did see

2    them at some time after they left the store?

3            That's your testimony today;

4    correct.  That you did see them; is that correct?

5    A.  I saw them walking across the street.

6    Q. Okay.  So what you said at the exam is a lie; is that

7    correct?

8    A.  No.

9    Q.  No?

10    Q.  At the exam you said you didn't see them.

11            MR. GONZALES:  I object to that,

12    Judge.  That's not quite correct.

13            THE COURT:  It is cross

14    examination, so I'll allow it.

15            THE COURT:  Go ahead and ask the

16    question.

17    BY MR. GILES:

18    Q.  At the exam you said you did not see -- did not see

19    them walking across -- did not see them at any time,

20    was the question.

21            You said:  No.

22            Now, you are saying you did see

23    them?

24    A.  I don't fairly recall.

25    Q.  You don't remember now.

1          MR. GILES:  No further questions.

2             REDIRECT EXAMINATION

3

4    BY MR. GONZALES:

5    Q.  Did you actually see them leave the store?

6    A.  I didn't see them leave the store.  I seen them by the

7    street.

8                    MR. GONZALES:  Nothing further.

9                    THE COURT:  Anything else?

10                   MR. GILES:  No, Your Honor.

11                   THE COURT:  You can step down, sir.

12   Thank you.

13                   MR. GONZALES:  Judge, no further

14   witnesses for the People.

15                   But there is one remaining

16   stipulation with respect to the last witness.  I

17   believe we have not dealt with on the witness list.

18                   That being assistant prosecutor

19   attorney Glenn Paige.

20                   Your Honor, it is my understanding

21   that both defendant and defense counsel would enter

22   into the following stipulation with respect to Mr.

23   Paige's testimony.

24                   It would be that he would testify

25   as being employed with the Wayne County Prosecutors

                            92

1   Office and in fact was assigned as the assistant

2   prosecuting attorney handling case number 88 1371.

3                       He would testify that in that

4   regard he was required to prosecute that case and that

5   that case was scheduled for trial in front of the

6   Honorable -- excuse me -- on April 18, 1988.  And that

7   it involved charges of murder in the first degree as

8   against the defendant Carl Hubbard, as he would

9   identify as being the one in this matter.

10                      He would testify that on that trial

11  date, the case was essentially dismissed without

12  prejudice by Judge Roberson for the failure of

13  essential witnesses to appear.

14                      He would further testify that one

15  of the essential witnesses who failed to appear would

16  be in fact the deceased in this case, Mr. Rodnell Penn.

17                      He would further testify that it

18  was other additional witnesses beside Mr. Penn that

19  failed to appear.  But that in fact Mr. Penn himself

20  was a witness who had in fact testified at the

21  preliminary exam in case number 88 1371.

22                      And for that matter the case was

23  dismissed.

24                      Further, Your Honor, there are two

25  exhibits that have been shown to counsel.

93

1           It is my understanding that we will

2   stipulate to their entry.  And I will have them marked

3   now.

4           MR. GILES:  That's correct, Your

5   Honor.

6           MR. GILES:  May I have a discussion

7   with my client?

8           THE COURT:  Yes, you may.

9           (A discussion was held off the

10          record.)

11

12          *     *     *     *     *

13          MR. GONZALES:  Any objections?.

14          THE COURT:  Are there any

15   objections?

16          MR. GILES:  No, objections, Your

17   Honor.

18          MR. GONZALES:  Your Honor, I submit

19   to the Court now People's Proposed Exhibits Number 26,

20   and 27.

21          26 identified as a two-page

22   document that represents the Order of the Recorders

23   Court, Honorable Murphy on the date January 16th, 1988,

24   which would be -- would be a bench warrant for the

25   person of Rodnell Penn for failure to appear.  In the

1    case I just described.

2                    And also an affidavit to that

3    effect attached thereto.

4                    Secondly, the People's Proposed

5    Exhibit Number 27, is the motion and order of dismissal

6    of case number 88, 1371, involving the People of the

7    State of Michigan versus Carl Hubbard.

8                    And that the defense moved for

9    dismissal of the case based on the fact that essential

10   witnesses had failed to appear.  And this the order of

11   dismissal was without prejudice.  Signed 4-14-88 by the

12   Honorable Dalton A.  Roberson.

13                   I move for their admission at this

14   time, Your Honor.

15                   THE COURT:  Any objection?

16                   MR. GILES: No objection, Your

17   Honor.

18                   THE COURT:  Court will receive

19   Exhibits 26 and 27 into evidence.

20                   No objection as to the waiver and

21   stipulation that was read into the record, as to

22   assistant prosecutor Glenn Paige; is that correct?

23                   MR. GILES:  That's correct, Your

24   Honor, no objection.

25                   THE COURT:  All right.

95

1                          Mr. Hubbard, do you agree with your

2    attorney?

3                          THE DEFENDANT:  Yes.

4                          THE COURT:  All right.

5                          The Court will accept the

6    stipulation.

7                          MR. GONZALES:  Lastly, Judge, I'd

8    ask the Court to take judicial notice of, first of all,

9    the scar at the back and side of Mr. Hubbard's head for

10   what it is worth.

11                         I would ask the Court to accept and

12   I ask counsel to accept my description of it as being

13   on the left side of the back of his head, above the

14   ear, approximately three or four inches length.

15                         THE COURT:  The Court will take

16   judicial notice and accept the stipulation.

17                         MR. GONZALES:  That's it, Judge.

18                         No further witnesses.  And the

19   People would rest.

20                         THE COURT:  Any defense at this

21   time?

22                         MR. GILES:  Yes, Your Honor.

23                         I have a -- prior to beginning with

24   defense witnesses, we have a motion for directed

25   verdict on dismissal.

96

1              THE COURT:  Go right ahead.

2              MR. GILES:  Your Honor, the motion

3      goes primary to the prosecutor has not in fact

4      presented a prima facie case here.

5              Moreover going to the point that

6      they have not shown that the defendant in this case,

7      Mr. Carl Hubbard, ddid in fact kill, especially with

8      malice aforethought, Rodnell Penn.

9              There was no testimony going to the

10     fact that, or any evidence presented regarding a

11     weapon, other than the bullets taken out of the

12     deceased.

13              No guns were found on my client.

14     No weapons.  There is no testimony that he was ever

15     seen with a weapon.

16              There -- the only testimony that

17     even remotely -- that put my client in the general

18     vicinity, two witnesses testified that he was in the

19     general vicinity, Your Honor.  Mr. Andrew Smith, who

20     testified that he was in the area with two other males.

21     And at sometime afterwards, he heard the shots.  He

22     came out and didn't see anybody in the area.

23              He also testified that he did not

24     see Mr. Curtis Collins in the area.

25              The only testimony, the only other

                          97

1    testimony putting my client in the general area at the

2    time is that of Mr. Collins.

3                    It was testified that he did see

4    him in the store.  He identified him and the deceased.

5    That upon leaving the sstore, there is testimony, his

6    testimony, is that he saw him today in court, was that

7    he saw them walking across Mack.  However, in the

8    preliminary exam testimony, his testimony was somewhat

9    different.

10                   When asked the question,

11   specifically at the exam:  Did you see -- did you ever

12   see after he left  the store -- was there ever any

13   point in time that you saw Goft and the person

14   identified in the photo leave the store walking

15   together?

16                   His answer was:  No, sir.

17                   So at that time of the exam, he's

18   saying he didn't see them, Your Honor.

19                   He then testifies that he, upon

20   hearing the shots, he turns and a minimum distance of

21   half block, according to one officer who testified, the

22   evidence technician, approximately twenty-three hundred

23   yards that he saw Mr. Hubbard running through a vacant

24   lot.  He couldn't identify what Mr. Hubbard was

25   wearing.

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    He couldn't -- he testified that he

2  did not see his face.

3    He testified that he identified him

4  by the scar on the back of Mr. Hubbard's head which you

5  have already taken judicial notice of.

6    Your Honor, I would say a picture

7  is worth a thousand words.

8    The prosecutor has put in, I

9  believe, the photo, People's Exhibit Number 21 which

10  shows was taken February, during the daytime, Your

11  Honor. And it was taken from the area during the

12  front -- the side of the store, a picture going down

13  the street on Mack -- I am sorry, Your Honor.

14    People's Exhibit Number 13 in the

15  in photo, Your Honor, taken during the daytime, shows

16  the officer standing in the general vacinity of where

17  the crime scene was and from this distance during the

18  daytime, you can just make out the silhouette of the

19  officer.

20    On cross-examination with this

21  officer and in viewing the picture, I asked him could

22  he even make out his head. As I recall his testimony

23  was that: No, he couldn't make it out but that he knew

24  he had one because he knew this was him standing in the

25  picture.

1          Your Honor, I would say that the

2    creditability of the witness Collins, he has no

3    creditability. He lied to this Court on Monday. He

4    has come back here today and recanted that testimony,

5    obviously.

6          He has told several different

7    versions of what happened versus the testimony given

8    here today and the testimony given at the exam, versus

9    the testimony or the statement given to the police

10   which he signed.

11          You know, several areas were

12   conflicting in his own testimony. I would say that

13   he's not credible.

14          I would say that under the

15   conditions that this crime occurred, that it being at

16   night; that the picture in and of itself will show that

17   it would be virtually impossible for Curtis Collins to

18   see what he said he saw.

19          Basically with that in mind, Your

20   Honor, I would move to dismiss.

21          THE COURT: This Court had an

22   opportunity to listen to the witnesses; listen to the

23   testimony of numerous witnesses. And this Court does

24   understand that this Court must look in the light most

25   favorable to the non-moving party, and/or whether or

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1    not the People have presented proof where a jury could

2    find guilt beyond a reasonable doubt.

3                        This Court specifically listened to

4    the testimony of Curtis Lenell Collins.

5                        This Court had an opportunity to

6    examine that witness on Monday.

7                        And also had an opportunity to exam

8    that witness today while he testified.

9                        And this Court knows full well that

10   this Court is free to accept and believe all, some or

11   none of the testimony of any of the witnesses.

12                        But based upon all the witnesses

13   that I have heard thusfar, and based upon some of the

14   testimony that this Court does believe centering in and

15   around Curtis Linell Collins' testimony, this Court

16   does find that this prosecution has satisfied its

17   burden of proof at this point in time.

18                        I am going to deny your request for

19   a directed verdict.

20                        Do you have any defense that you'd

21   like to present at this time, counsel?

22                        MR. GILES:  Yes, Your Honor.

23                        I'd like to call Raymond Williams.

24

25               R A Y M O N D   W I L L I A M S

                              101

```
 1
 2                           called as a witness by the Defendant,
 3                           being duly sworn by the Court Clerk,
 4                           was examined and testified upon his
 5                           oath, as follows:
 6
 7                           DIRECT EXAMINATION
 8
 9    BY MR. GILES:
10    Q.   Mr. Williams?
11    A.   Yes.
12    Q.   I want to ask you, do you know a person by the name of
13         Curtis Collins?
14    A.   Yes, I do.
15    Q.   And how are you acquainted with Mr. Collins?
16    A.   We have been best friends for about seven or eight
17         years.
18    Q.   Okay.
19                           You know a gentleman by the name of
20         Carl Hubbard?
21    A.   I do now.  I knew him by his street name.
22    Q.   What is his street name?
23    A.   Goft.
24    Q.   You know a person by the name of Roney Fuller?
25    A.   Pardon me?
```

102

1    Q.   I said: Do you know a person by the name of Roney

2         Fuller?

3    A.   No, sir.

4    Q.   You know a person by the name of big Ron?

5    A.   Yes, I do.

6    Q.   Okay.

7                          Mr. Williams, I am going to ask you

8         to recall the day of January 17th, 1992.

9                          But before I do that, I want to ask

10        you:  Did you know a person by the name of Rodnell

11        Penn?

12   A.   No, sir, I don't.

13   Q.   Do you know about a fatal shooting that occurred on

14        Gray Street in January?

15   A.   I heard about the shooting the next day but I don't

16        know about it.  No, I do not.

17   Q.   The next day.  That would be the 18th, correct?

18   A.   Yes, sir.

19   Q.   January 17th of 1992, did you see Curtis Collins?

20   A.   Yes, I did.

21   Q.   At what time did you see him?

22   A.   Around about prior to about, around about 8 o'clock.

23   Q.   Where were you at when you saw him?

24   A.   I was at big Ron's house on Dickerson and Corbett

25        around about five houses off the corner.

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    Q.   Curtis Collins was at the house?

2    A.   Yes, sir, he was.

3    Q.   You said this was around 8 o'clock?

4    A.   Yes, sir, it was.

5    Q.   And what time did you leave the house?

6    A.   I left the house around about ten o'clock or 10:05.

7       Somewhere around in there.

8    Q.   Okay.

9                And during the time you were at the

10      house, Curtis Collins was there?

11   A.   Yes, sir, he was.

12   Q.   He was there the entire time from 8, around 8 o'clock

13      to 10 o'clock?

14   A.   Yes, he was.  We were gambling.

15   Q.   To your knowledge did he leave your presence?

16   A.   No, sir, he didn't.

17   Q.   During that two-hour period?

18   A.   No, sir, he didn't.

19   Q.   Okay.

20              You had left the house around 10

21      o'clock?

22   A.   Yes, sir, I did.

23   Q.   When you left the house, was Curtis Collins still

24      there?

25   A.   Yes, he was.

1   Q.   Can you tell me, Mr. Williams, how is it that you can

2        remember January 17th?

3   A.   (No response).

4   Q.   Does anything else stick out in your mind about that

5        day?

6   A.   The motion picture Juice came out and I went to see

7        Juice that night?

8   A.   That was my reason for leaving at 10:00, 10:05.

9   Q.   Okay.

10                          Just one more question please, Mr.

11       Williams.

12                          Has anybody promised you or offered

13       you anything regarding your testimony here today?

14  A.   No, sir.

15  Q.   Okay.

16                          Your testimony here today is the

17       truth as you know and understand it?

18  A.   Yes.

19  Q.   Thank you.

20                          MR. GILES:  No further questions,

21       Your Honor.

22                          CROSS-EXAMINATION

23

24  BY MR. GONZALES:

25  Q.   Good morning, Mr. Williams?

                          105

```
 1    A.   Good morning.

 2    Q.   You are friends with Mr. Hubbard, are you not?

 3    A.   Mr. Hubbard?

 4    Q.   Goft?

 5    A.   We -- well, not exactly friends.  We speak to each

 6         other on a friendly basis.

 7    Q.   You sold crack for him; didn't you?

 8    A.   What?

 9    Q.   You sold drugs for him?

10    A.   I didn not do such a thing.

11    Q.   You never sold drugs for him?

12    A.   No, sir, I haven't.

13                        I barely know the man.

14    Q.   You said you were with Curtis Collins?

15    A.   Yes, sir.

16    Q.   And you are saying Curtis Collins was with you on

17         Corbett street; is that correct?

18    A.   He wasn't with me.  He was there.

19    Q.   He was there with you at that time?

20    A.   Yes, sir, he was.

21    Q.   And you agreed with Curtis Collins -- excuse me.

22                        You agreed that Curtis Collins was

23         there until approximately 10:00 to 10.05; is that

24         correct?

25    A.   Yes, sir, I do.
```

1    Q.  But you don't agree that you you sold crack for him?

2    A.  No, I do not agree that I sold crack for that man.

3    Q.  Okay.

4             Now, the testimony I understand is

5    that you had to leave at 10:05 p.m., is that correct,

6    sir?

7    A.  No.  I didn't have to leave at 10:05 p.m..

8    Q.  Why did you say that was the reason you left at 10:05

9    p.m.?

10   A.  The reason I left at 10:05 p.m., was because I was

11   going to the show.

12   Q.  The show?

13   A.  Yes, sir.

14   Q.  And you wanted to get there on time?

15   A.  No, sir .

16   Q.  You wanted to be late?

17   A.  It ain't that I wanted to be late.

18             It is that I was losing my money

19   gambling.  I got -- I got carried off with that game,

20   you know.

21   Q.  So what did 10:05 have to do with your losing at

22   gambling?

23   A.  What did it have to do with losing at gambling.

24   Q.  Yes.

25   A.  It had to do with me making a date to the show.

107

1     Q.   Okay.

2                    So the fact that you left at 10:05

3          had nothing to do with the fact that you were losing

4          the game; isn't that correct?

5     A.   Yes, sir.

6     Q.   The reason you left at 10:05 is because you wanted to

7          make the movie?

8     A.   Yes.

9     Q.   But then you didn't make the movie; you were late?

10    A.   I did make the movie so I -- I was late.

11    Q.   After 10:05 you have no idea whatsoever what Curtis

12         Collins did, do you?

13    A.   No, sir, I do not.

14    Q.   All right.

15                   You don't know if he went over to

16         the Mack and Gray Party Store, do you?  You don't know

17         that; is that right?

18    A.   Mack and Gray Party Store had closed.

19    Q.   Sir, I didn't ask you if it was opened or closed; did

20         I?

21    A.   No, sir, you didn't.

22    Q.   I asked you:  You don't know when -- whether he went

23         over there; whether it was opened or closed; do you,

24         sir?

25    A.   No, sir, I don't know whether he did.

```
 1    Q.  Is there any particular reason that you wanted to tell
 2        us that the Mack and Gray Party Store was closed at
 3        10:00?
 4    A.  No particular reason.
 5    Q.  You thought you would throw that out for the Judge to
 6        hear it?
 7    A.  It was closed?
 8    Q.  Why did you bring that up?
 9    A.  Why won't I bring it up?
10    Q.  Well, how about this:
11                         The reason you had to bring it up
12        is so that you would make sure that this Court heard
13        that Curtis Collins wouldn't go over there, if the
14        store was closed; isn't that correct?
15    A.  Maybe.  Maybe not.
16    Q.  You also know that Curtis Collins has talked to you
17        about this case; has he not?
18    A.  Yes, sir, he has.
19    Q.  You've called him?
20    A.  Called him, no, no, no.
21    Q.  Well, you used your girlfriend's three-way line?
22    A.  My girlfriend called him.
23    Q.  You used your girlfriend's three-way phone conversation
24        before today; isn't that correct?
25    A.  Yes, sir, it is.
```

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1    Q.  And the two of you cooked up this plan to come in here

2        and both say that you were on Corbett street; isn't

3        that correct?

4    A.  No, sir, it isn't.

5    Q.  So Curtis Collins was on Corbett Street with you; isn't

6        is that correct?

7    A.  Yes, sir, it is.

8    Q.  If he came in here and said he was on Corbett Street,

9        he's telling the truth; isn't he?

10   A.  Yes, sir.

11   A.  Yes, sir, he is.

12   Q.  That's all I have, Mr. Williams..

13                        MR. GONZALES:  Nothing further,

14       Your Honor.

15                        THE COURT:  Any other questions,

16       Mr. Giles?

17                        MR. GILES:  No further questions.

18                        THE COURT:  Just a couple of

19       questions, if I might.

20                        On January 17th, you had an

21       opportunity to see the movie Juice?

22                        THE WITNESS:  Yes, sir, I did.

23                        THE COURT:  You like movies?

24                        THE WITNESS:  Yes, sir, I do.

25                        THE COURT:  You saw the movie Boys

MARY E. SKINNER, CSR-0031   —   OFFICIAL COURT REPORTER

1       in the Hood?

2                               THE WITNESS:  Yes, sir, I did.

3                               THE COURT:  And what date and what

4       time did you see that movie?

5                               THE WITNESS:  Boys in the Hood?

6                               THE COURT:  Yes.

7                               THE WITNESS:  I am not sure.

8                               THE COURT:  I have no more

9       questions.

10                              You can step down.  Thank you.

11                      R O N E Y   F U L T O N

12

13                      called as a witness by the Defendant,

14                      being duly sworn by the Court Clerk,

15                      was examined and testified upon his

16                      oath, as follows:

17

18                              DIRECT EXAMINATION

19

20      BY MR. GILES:

21      Q.   Good afternoon, Mr. Fulton.

22                              Mr. Fulton, do you know a person by

23          the name --

24                              THE COURT:  What is your full name,

25          witness?

                                111

1          THE WITNESS:  Roney Fulton.

2          THE COURT:  Thank you.

3          Now, you may proceed. Ahead.

4    BY MR. GILES:

5    Q.  Mr. Fulton, what street do you live on?

6    A.  12822 Corbet.

7    Q.  And, Mr. Fulton, do you know a person by the name of

8        Curtis Collins?

9    A.  Yes.

10   Q.  And how long have you known him?

11   A.  For about twelve years.

12   Q.  Is he a friend of yours?

13   A.  Yes.

14   Q.  And do you know a person by the name of Raymond

15       Williams?

16   A.  Yes.

17   Q.  Let me backup.

18          Curtis Collins has a nickname or a

19       street name; does he?

20   A.  Kurt Baby.

21   Q.  And he's also known by Kurt Baby?

22   A.  Yes.

23   Q.  Raymond Williams, does he have a street name?

24   A.  Murphy.

25   Q.  How long have you known him?

                        112

1    A.   Twelve years.

2    Q.   Do you know anything about a fatal shooting on January

3         17th, 1992 on Gray and Mack?

4    A.   Yes, I knew it was a shooting, I know.  I know that.

5    Q.   Okay.  Let me stop you there.

6                        When did you first hear about this

7         shooting?

8    A.   I was at home when a friend of mine had called and she

9         asked me --

10                       MR. GONZALES:  Objection to any

11        hearsay.

12                       THE COURT:  Let's not ask for any

13        hearsay.

14

15                       MR. GILES:  All right, Your Honor,

16        thank you.

17   BY MR. GILES:

18   Q.   All right.  Do you know --

19                       THE COURT:  (Interposing) Actually,

20        if you don't mind, we're going to break now.

21                       We're going to break a little bit

22        earlier.  So I am going to ask that you have this

23        witness come back at 2 o'clock.

24                       THE COURT:  You are going to have

25        to come back at 2 o'clock.  Don't be late.  2 o'clock

                              113

1       sharp.

2                               Thank you, gentlemen.  I will see

3       2 o'clock, counselors.

4                               THE DEPUTY:  All rise.

5                               This Court is in recess.

6                               (Lunch break)

7                               *       *       *       *

8                               *       *       *       *

9

10                              THE DEPUTY:  Court's back in

11      session.  Please be seated.

12                              THE COURT:  All right.  Whenever you

13      are ready, counsel, you can proceed.

14                              MR. GILES:  Thank you, Your Honor.

15      BY MR. GILES:

16      Q.   Mr. Fulton, you've already stated that you have

17           known -- you know Curtis Collins, right?

18      A.   Yes.

19      Q.   You've known him approximately twelve years?

20      A.   Yes.

21      Q.   The same thing with Mr. Williams.

22                              You have known him for about

23           approximately twelve years?

24      A.   Right.

25      Q.   Do you recall the day -- I want you to recall the day

                                114

1        of January 17th, 1992.

2                        Did you see Curtis Collins on that

3        day?

4    A.  Yes.

5    Q.  Okay.  Where did you see him at?

6    A.  At my house.

7    Q.  Approximately what time was he at your house?

8    A.  Well, he had spent the night; spent the whole day

9        there.

10   Q.  And how long was he there?

11   A.  He was there -- he was there for several days after the

12       17th.

13   Q.  Okay.

14                       But on the 17th he was there, is

15       your testimony he was there all day?

16   A.  Yes.

17   Q.  Okay.  Were you at home all day on the 17th?

18   A.  Yes.

19   Q.  In particular that evening, do you recall being at

20       home?

21   A.  Yes.

22   Q.  Okay.  And Mr. Collins was with you also?

23   A.  Yes.

24   Q.  Was there -- was Mr. Williams with you on the 17th?

25   A.  For a little while.  For a short while, you know.  He

1       was there for about three hours.

2   Q.  Okay.

3                       What tiem did Mr. Williams arrive

4       at your house?

5   A.  About 8 o'clock.

6   Q.  And what time did he leave?

7   A.  About 10, 10:30.

8   Q.  Okay.

9                       Are you aware there was a shooting

10      on Gray and Mack on the 17th?

11  A.  Yes.

12  Q.  When did you become aware of that?

13  A.  At about 9:30.  A little while before Murphy had left.

14      I figured it was about 9:30, 10 o'clock.  Around that

15      time.

16  Q.  You said around 9:30, 10 o'clock?

17  A.  Right.

18  Q.  This is on the 17th?

19  A.  Yes.

20  Q.  Okay.

21                      It is also your testimony that Mr.

22      Collins was still at your house at least a couple of

23      days after that?

24  A.  Right.

25  Q.  Are you aware of a Detroit Police Detective by the name

116

1     of Sergeant Kenny?

2   A.   Yes.

3   Q.   How did you become aware of Sergeant Kenny?

4   A.   Well, she called my house and she asked for --

5                         MR. GONZALES:   (Interposing)

6     Hearsay objection.

7                         THE COURT:   What is the basis of

8     the objection?

9                         MR. GONZALES:   Hearsay, Your Honor.

10                        THE COURT:   Let's not ask for any

11    hearsay.

12  BY MR. GILES:

13  Q.   Have you ever met Sergeant Kenny?

14  A.   Yes.

15  Q.   And where did you meet Sergeant Kenny at?

16  A.   On Gray and Mack.

17  Q.   And how is it that you met her?

18  A.   Okay.

19                        She drove up and she had two

20    pictures in her hand and she asked, you know, did I

21    know anybody on the pictures.

22  Q.   She showed you some pictures?

23  A.   Right.

24  Q.   Who was with you then?

25  A.   Curtis and Murphy.

1    Q.  That's Curtis Collins and Raymond Williams?

2    A.  Right.

3    Q.  Thank you.

4                         MR. GILES:  No further questions,

5    Your Honor.

6                         MR. GONZALES:  I have some

7    cross-examination, Your Honor.

8                         CROSS-EXAMINATION

9

10   BY MR. GONZALES:

11   Q.  Good afternoon, Mr. Fulton?

12   A.  Good afternoon.

13   Q.  Okay.  Mr. Fulton, you have been in this courtroom

14       during the time that testimony has been taken; have you

15       not, sir?

16   A.  Yes, sir.

17   Q.  You were here yesterday when witnesses were testifying

18       and you were also here Monday; isn't this correct?

19   A.  Yes.

20   Q.  You heard witnesses testifying, did you not?

21   A.  Yes, sir.

22   Q.  Weren't you advised to wait outside in the hallway?

23   A.  Sir?

24   Q.  Didn't somebody tell you to wait outside in the

25       hallway, Mr. Fulton?

                              118

1   A.   And I did so, sir.

2   Q.   You were in here during the time witnesses would

3        testify; were you not?

4   A.   Yes, sir.

5   Q.   Yes.

6   A.   But I was advised to do so, step out, I stepped out.

7   Q.   Okay.

8                              Now, how is it that you know that

9        there was a shooting at 9:30 or ten o'clock?

10  A.   Well, because one of my friends had called and said

11       somebody had got killed on Gray.

12  Q.   And you weren't on Gray, were you?

13  A.   No, sir.

14  Q.   You have no idea what time anybody was killed, do you?

15  A.   No, sir .

16  Q.   Why do you say 9:30 or ten?

17  A.   Because that's the time I got the phone call.

18  Q.   And who did you get the phone call from?

19  A.   From Kay.

20  Q.   What is Kay's full name?

21  A.   I am not really for sure.  I know we call him Kay;

22       that's all I know.

23  Q.   He knows your phone number?

24  A.   Yes, he does.

25  Q.   And he called you out of blue to tell you somebody was

1    killed on Gray?

2    A.   Yes.  He called me to say somebody was killed on Gray

3    because I am -- I be on Gray everyday.

4    Q.   And you had, yourself, not been on Gray at that point

5    in time; is that correct?

6    A.   Right.

7    Q.   You were over at your premises, you say on Corbet or

8    Dickerson?

9    A.   Corbet.

10   Q.   Corbet.

11                         Okay.  Now, you were thre, you

12   said --

13   A.   (Interposing) All day.

14   Q.   I didn't finish asking the question.

15   A.   Okay.  Thank you.

16   Q.   You were there in the evening hours with a person by

17   the name of Raymond Williams; is that correct?

18   A.   And Curtis Collins.

19   Q.   I didn't ask about him yet.

20   A.   Yes.

21   Q.   You were there also with a person by the name of Curtis

22   Collins?

23   A.   Yes.

24   Q.   How was it, sir, that you particularly remember not

25   only the day, but you also remember the time that these

MARY E. SKINNER, CSR-0031    -    OFFICIAL COURT REPORTER

1    folks left?

2    A.  Well, because, Raymond Williams said he was going to

3    the show.  He had to be there at 10 o'clock.  He had a

4    ten o'clock show.  He was going to the show.

5                        And I particularly remember because

6    he was playing around in front of house with his Jeep

7    in the snow.  That's how come I particularly remember

8    plus someone had got killed.

9    Q.  Now, how do you know that it was a 10 o'clock show?

10   A.  Excuse me?

11   Q.  How do you know it was a 10 o'clock show?

12   A.  Because that's what he said.

13   Q.  Did you talk with Mr. Williams at all before this

14   trial?

15   A.  No.

16   Q.  How did you know to come here?

17   A.  How did I know, because Curtis my friend.  I came down

18   here with Curtis.  I came to bring him down here.  I

19   really didn't come to testify at all.

20   Q.  When did you first find out that you were going to

21   testify?

22   A.  Yesterday.

23   Q.  Who told you?

24   A.  His lawyer.

25   Q.  Mr. Giles?

1      A.  Right.

2      Q.  When you say his lawyer, you are talking about Goft's

3          lawyer?

4      A.  Yes.

5      Q.  And you knew Goft some period of time before this date?

6      A.  No, I don't even really -- I have never had a

7          conversation with Goft.

8      Q.  My question was:  Did you know him at all?

9      A.  No.

10     Q.  Now, did you also know that Curtis Collins testified

11         that he was not at your premises on Corbet?

12     A.  No.

13     Q.  Okay.

14                              Mr. Fulton, your nickname is Big

15         Ron?

16     A.  No.

17     Q.  Your nickname is not Big Ron?

18     A.  No.

19     Q.  Little Ron?

20     A.  No.

21     Q.  Okay.

22                              You said that you know Mr. Williams

23         as Murphy?

24     A.  Right.

25     Q.  And you've known him for twelve years?

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1   A.   Yes.

2   Q.   Do you know him to have any association with Goft?

3   A.   No, not really -- no.

4   Q.   Can you explain your answer?

5   A.   No, not really.

6            I mean, I wouldn't know if he

7   had any conversations with him.  But I don't really see

8   Goft on Gray and I be on Gray everyday.

9   Q.   My question is:  Do you know if Murphy and Goft know

10   each other?

11   A.   Yes, I know they know each other.

12   Q.   How do you know that?

13   A.   Just from hearsay, you know, hearing it around.

14   Q.   From who?

15   A.   From numerous -- a lot of people.

16   Q.   Did you talk to Raymond Williams at all before this

17   trial?

18   A.   No.

19   Q.   What time, if any, did Mr. Collins leave your premises

20   that day?

21   A.   He didn't.

22   Q.   He stayed there all night?

23   A.   Yes.

24   Q.   He never left?

25   A.   No.

123

```
1    Q.  You watched him the whole time?

2    A.  We were shooting dice together, the whole time.

3    Q.  Okay.

4                        Now, you said that you met Sergeant

5        Kenny in the presence of Curtis Collins; isn't that

6        correct?

7    A.  Yes, sir.

8    Q.  And isn't it true, that at that point in time Curtis

9        Collins indicated he recognized someone in the

10       photos;is that right?

11   A.  Yes.

12   Q.  And he went with Sergeant Kenny?

13   A.  Yes.

14   Q.  He wasn't arrested, was he?

15   A.  No.

16   Q.  He wasn't -- he went voluntarily?

17   A.  Yes.

18   Q.  She didn't pull out a gun and put cuffs on him and take

19       him with her?

20   A.  No.

21   Q.  Murphy, though, Raymond Williams, didn't recogonize

22       anyone, did he?

23   A.  No.

24   Q.  And did you recogonize anyone in the photos?

25   A.  No.
```

124

```
 1    Q.   Was it -- was either of those photographs of Mr.

 2         Hubbard?

 3    A.   Yes.

 4    Q.   And you said --

 5    A.   (Interposing) One of them.

 6    Q.   And you said you didn't reconize them?

 7    A.   Yes.

 8    Q.   Oh, you did recogonize --

 9    A.   I said I didn't recognize it.

10    Q.   Okay.

11                         So you are saying that Curtis

12         Collins went, as far as your understanding, voluntarily

13         with Sergeant Kenny?  She didn't force him?

14    A.   Right.

15    Q.   Did you know if Curtis Collins in fact was wanted by

16         the police?

17    A.   Yes, I did know that he was wanted by the police.

18    Q.   Okay.

19                         So you know that fact and still

20         your testimony is that he went voluntarily over with

21         the police?

22    A.   Yes.

23    Q.   Okay.

24                         MR. GONZALES: Nothing further.

25                         I have Nothing further, Judge.
```

125

```
 1              THE COURT:  Anything else?

 2              MR. GILES:  A couple of questions.

 3          REDIRECT EXAMINATION

 4

 5   BY MR. GILES:

 6   Q.  Mr. Fulton, you testified on cross-examination that you

 7       just become aware yesterday that you were going to be a

 8       witness in this trial; is that correct?

 9   A.  Right.

10   Q.  And that's after you had a conversation with myself,

11       correct?

12   A.  Yes.

13   Q.  It is after that point that you become aware that you

14       would be a witness, had you been in the courtroom?

15   A.  No.

16   Q.  After the point that you had contact with Sergeant

17       Kenny, and you know that, as you have already testified

18       to, that Curtis Collins had conversations and went with

19       the police, to talk to Sergeant Kenny.

20              Did at any time after that point

21       did he come back and talk to you about that?

22   A.  He -- well, they didn't take him anywhere.

23              They took him on the side of the

24       building and talked to him.  And then they left.

25   Q.  Okay.
```

126

1              At any point after that, are you

2     aware that Sergeant Kenny contacted Curtis Collins or

3     contacted you?

4     A.   Yes.

5     Q.   All right.

6     A.   She called my house.  And left a message with me to

7     give to Curtis; to give to Tony Smith.

8     Q.   Okay.

9              Did you give him that message?

10    A.   Yes.

11    Q.   And to your knowledge did he contact Sergeant Kenny?

12    A.   Yes, he did.

13    Q.   And is that the point that he was arrested, to your

14    knowledge?

15    A.   Yes.

16    Q.   After he was -- after he was arrested and in particular

17    after his testimony at the preliminary exam, did you

18    have any conversations with Curtis Collins regarding

19    his testimony?

20    A.   Yes.

21    Q.   Can you tell us the essence of that conversation?

22              MR. GONZALES:  Well, Judge,

23    hearsay.

24              THE COURT:  I agree.

25              MR. GILES:  Well, Your Honor, in

127

1    regard to hearsay we have had a great deal of hearsay

2    regarding what this witness knows what Mr. Collins

3    said.

4                        THE COURT:  We might have but if

5    there is no objection, it comes in.

6                        If there is a objection, I am going

7    to have to sustain the objection.  So the objection is

8    sustained.

9                        MR. GILES:  Thank you, Your Honor.

10                       No further questions.  Thank you.

11                       THE COURT:  Anything else?

12                       MR. GONZALES:  Yes, Judge, one

13   moment.

14                       RECROSS-EXAMINATION

15

16   BY MR. GONZALES:

17   Q.   Do you know if Curtis Collins and Raymond Williams had

18        any conversation?

19   A.   No, I do not know that.

20                       MR. GONZALES:  Nothing further,

21   Judge.

22                       THE COURT:  You can step down.

23   Thank you.

24                       THE COURT:  Do you have another

25   witness at this time, counsel.

                              128

1          MR. GILES:  Yes, Your Honor.

2

3              T H O M A S    S P E L L S

4

5          called as a witness by the Defendant,

6          being duly sworn by the Court Clerk,

7          was examined and testified upon his

8          oath, as follows:

9               DIRECT EXAMINATION

10

11   BY MR. GILES:

12   Q.  Good afternoon, Mr. spells.

13                   Could you please give your full

14   legal name to the Court?

15   A.  Thomas James Spells.

16   Q.  And, Mr. Spells, do you know a person by the name of

17   Carl Hubbard?

18   A.  Yes.

19   Q.  How long have you known him?

20   A.  About ten, twelve years.

21   Q.  What is your relationship to Mr. Hubbard?

22   A.  Friend.

23   Q.  A friend?

24   A.  Yes.

25   Q.  All right.

```
 1                        Mr. Spells, I want to call your

 2    attention to the evening of January 17th, 1992.

 3                        Do you recall seeing Mr. Hubbard

 4    that day?

 5    A.   Yes.

 6    Q.   Okay.  Where did you see him at?

 7    A.   At my house.

 8    Q.   What time was he at your house?

 9    A.   About 6, 7 o'clock.

10    Q.   Was anyone else there?

11    A.   No.

12    Q.   He was at your house until what time?

13    A.   We had left and then came back.  That's after my wife

14    had came.

15                        We were going to go pick my son up

16    from the babysitter.

17    Q.   You left with Mr. Hubbard?

18    A.   Yes.

19    Q.   Do you know approximately what time?

20    A.   About 9, 10 o'clock.

21    Q.   When you left with Mr. Hubbard, where did you go?

22    A.   We was going over to see mother's house.

23    Q.   Over to Carl Hubbard's mother house?

24    A.   Carl's mother's house.

25    Q.   Did anything happen on your way to Carl's mother's
```

1       house?

2   A.  We seen an ambulance over on the next street.

3   Q.  That was on the next street.  What street is that?

4   A.  On Gray.

5   Q.  Gray?

6   A.  Yes, Gray.

7   Q.  Did you go over on Gray?

8   A.  Yes.

9   Q.  What happened?

10  A.  We got over there.

11              The ambulance was there and the

12      police was there.  And one of the detectives had talked

13      to Carl and then we left.

14  Q.  Where did you go then?

15  A.  To Carl's mother's house.

16  Q.  You said your wife came home while you and Carl were

17      still at your house?

18  A.  Yes.

19  Q.  Is that a house or apartment?

20  A.  Apartment.

21  Q.  Approximately what time did she come home?

22  A.  About 8:15, 8:20.

23  Q.  During the period between 6 or 7, when you described

24      that Carl first came to your house; and between 9 and

25      10 when both you and he left, did Mr. Hubbard ever

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1      leave your apartment?

2   A.  No.

3   Q.  You were with him the entire time?

4   A.  Yes.

5   Q.  Thank you.

6                    MR. GILES:  No further questions

7      Your Honor.

8                    CROSS-EXAMINATION

9

10  BY MR. GONZALES:

11  Q.  Good afternoon, Mr. Spells?

12  A.  Good afternoon.

13  Q.  Mr. Spells, you attended the preliminary examination,

14     did you not, of this case?

15  A.  Yes.

16  Q.  Did you know the officer-in-charge on this case by the

17     name of Sergeant Joann Kenny?

18  A.  No.

19  Q.  Did you ever talk to her?

20  A.  No.

21  Q.  The testimony you have given relates to the whereabouts

22     of Mr. Hubbard.

23                    On what date are you, sir, saying

24     on what date?

25  A.  I can't exactly remember the day.

132

1   Q.  So you have no idea what day this what that you are

2       talking about?

3   A.  I can't remember the date but I know he was over there.

4   Q.  So you don't know when this was?

5   A.  I just know that he was over there.

6                              I can't tell you what date it was,

7       no, sir.

8   Q.  Keep your voice up?

9   A.  I can't tell you what date it was because I don't

10      remember the date.

11  Q.  You are saying though that you remember the times as

12      being 6 and 7 p.m. that Mr. Hubbard was at your

13      apartment; is that correct?

14  A.  Yes, when he came over.

15  Q.  And that you said that you left to go about 9:45 to 10

16      P.M?

17  A.  Between 9 and 10.

18  Q.  You left on foot to go walking?

19  A.  Yes.

20  Q.  And you walked on Gray Street?

21  A.  After we seen the ambulance, yes.

22  Q.  And you walked on Gray Street.

23                              Is that anywhere in the vicinity

24      that you walked, the vicinity of the party store on

25      Gray and Mack?

133

1    A.   I haven't -- I never said that I went to the store on

2         Gray and Mack.

3    Q.   I asked you:  Did you go anywhere in the vicinity of

4         this store on Gray and Mack?

5    A.   To get on Gray, to get on Gray.  To get -- to get on

6         the -- Okay.  Yes, because I am right across the

7         street.

8    Q.   Which way were you coming from Gray Street?

9    A.   From Dickerson.

10   Q.   So you were heading east?

11   A.   I was going towards Gray, yes.

12   Q.   Now, where were you going; to what street?

13   A.   We was on our way on Lenox.  But we ended up on Gray

14        because we seen an ambulance.

15   Q.   Did you go up to the scene of the ambulance?

16   A.   No.

17   Q.   You never went up there?

18   A.   No.

19   Q.   Did Mr. Hubbard go up there?

20   A.   No.

21   Q.   How is it that Mr. Hubbard, you say, spoke with some

22        detectives?

23   A.   Because they was in the street.

24                          We was on the sidewalk; they came

25        up to the sidewalk.

                              134

```
 1    Q.   Were you present at the point in time that you spoke --
 2         excuse me.
 3                             Were you present at the point in
 4         time that you say Mr. Hubbard spoke to the detective?
 5    A.   Yes, I was standing on the sidewalk.
 6    Q.   What did Mr. Hubbard say?
 7    A.   I don't know because I wasn't listening to them.
 8    Q.   What was Mr. Hubbard wearing?
 9    A.   I just had on a coat because it was winter time and a
10         pair of pants.
11    Q.   What color coat?
12    A.   I can't remember..
13    Q.   Were you wearing your Michigan coat?
14    A.   Who, me?
15    Q.   Yes.
16    A.   No, I had on a Piston coat.
17    Q.   The two of you were walking together?
18    A.   Yes.
19    Q.   Did you know a person by the name of Rodnell Penn?
20    A.   No.
21    Q.   Not at all?
22    A.   No.
23    Q.   Okay.
24                             Now, did you see anybody injured
25         when you were in the area of the ambulance?
```

135

```
 1    A.   I didn't see nobody laying on the pavement, no.

 2    Q.   You didn't?

 3    A.   I take it he was already in the ambulance, I don't

 4         know.

 5                                  Wasn't nobody laying out on the

 6         pavement if that's what you are asking me.

 7    Q.   Actually I didn't ask you that.

 8                                  How do you know somebody was laying

 9         on the pavement?

10    A.   I didn't say that.

11                                  I said I didn't see nobody laying

12         out in the street.

13    Q.   Did you know if anybody was laying out on the pavement

14         or in the street?

15    A.   When we got there, all we seen was the ambulance.  I

16         didn't see nothing else.  The ambulance and the police.

17    Q.   So you had no idea if anybody was laying anywhere, did

18         you?

19    A.   No.

20    Q.   Okay.  Well, why did you mention that you didn't see

21         anybody laying on the pavement or on the street, Mr.

22         Spells?

23    A.   Why did I mention it?

24    Q.   Yes.

25    A.   The ambulance was right there.  Somebody had to be
```

136

1    laying somewhere and they kept us away from where --

2    what supposedly he was laying at, the scene of the

3    crime or whatever.  They sectioned off a certain part

4    of the street.

5  Q.  Up to that point in time you hadn't heard any gunshots,

6    had you?

7  A.  No.

8  Q.  So you didn't know there was any crime at all, did you?

9  A.  No, sir.

10  Q.  Did you pick up your son?

11  A.  Yes.

12  Q.  Did you go back to the apartment?

13  A.  Yes.

14  Q.  Was your wife there?

15  A.  Yes.

16  Q.  What time was that that you arrived?

17  A.  Between 10 and 11.

18  Q.  Mr. Hubbard with you the whole time?

19  A.  Yes.

20  Q.  You were on foot?

21  A.  Yes.

22  Q.  Okay.

23                When did you learn you were going

24    to be a witness on this case?

25  A.  When they came to his house and then his mother, when I

MARY E. SKINNER, CSR-0031   --   OFFICIAL COURT REPORTER

1        called down there, his mother had told me.

2   Q.   You learned right away that he was arrested?

3   A.   Not right away.

4                        I didn't know until I got home from

5        work.

6   Q.   This was how many days after you were on Gray?

7   A.   I don't know.

8   Q.   A week, two weeks a month?

9   A.   I don't know.

10  Q.   Can you give us any estimate?

11  A.   It was -- probably that week.

12  Q.   Within seven days approximately?

13  A.   Yes.

14  Q.   Did you ever receive any messages from Sergeant Kenny?

15  A.   She called and talked to my wife.  She didn't talk to

16       me.

17  Q.   Did you ever talk to her?

18  A.   No.

19  Q.   Did you know she was the homicide detective in charge

20       of this case?

21  A.   Well, my wife told me she called, yes.

22                       I didn't know she was in charge but

23       she had called the house.

24  Q.   After she call the house at that point in time, did you

25       know she was a homicide detective in this case?

138

1   A.  No until we came to the preliminary hearing.

2   Q.  You mean, on February 4, 1992, the time of preliminary

3       exam?

4   A.  I guess that's the date.  I don't know.

5   Q.  You went to the preliminary exam on that date, didn't

6       you?

7   A.  Yes.

8   Q.  Do you remember being there and being identified by

9       Officer Turner?

10  A.  Yes.

11  Q.  You remember him indicating that you were with Mr.

12      Hubbard on the street that night?

13  A.  Yes.

14  Q.  After that point in time, you knew you were going to be

15      a witness in this case?

16  A.  Yes.

17  Q.  You knew you were going to be testifying about where

18      Mr. Hubbard was at that point in time?

19  A.  Yes.

20  Q.  You knew you were going to be testifying not only at

21      this trial but at the earlier trial date we had for Mr.

22      Hubbard?

23  A.  Yes.

24  Q.  Okay.

25                  You told this to this Court what

1    you recollect as being the whereabouts of Mr. Hubbard,

2    is that correct?

3    A.  Yes, sir.

4    Q.  Is there any reason why you didn't talk to Sergeant

5    Kenny when she called?

6    A.  I was at work.

7    Q.  She called you before the trial date that was

8    originally scheduled in this case; didn't she?

9    A.  As far as I know, she called once.

10    Q.  My question is:  When she called was before the earlier

11    trial date in this case?

12    A.  Before today.

13    Q.  You know this case was originally scheduled to go on

14    June 15th?

15    A.  Yes.

16    Q.  She called before June 15th, didn't she?

17    A.  Yes.

18    Q.  And you said your wife talked to her?

19    A.  Yes.

20    Q.  But you didn't talk to her?

21    A.  No.

22    Q.  You never talked to any police officer about what you

23    are telling Judge Hathaway today; is that correct?

24    A.  That's correct.

25    Q.  You never told any police officer whether related to

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    this case or not related to this case regarding what

2    you knew to be the whereabouts of Mr. Hubbard; is that

3    correct?

4  A.  The Detective Turner when we was in the preliminary

5    hearing, he remembered us being down there and he know

6    we was down there but that's the only one.

7  Q.  You didn't tell him, did you, that earlier you had just

8    been with Mr. Hubbard?

9  A.  I don't understand what you are saying.

10  Q.  All right.

11           Did you tell Detective Turner at

12    the preliminary exam on February 4th that Carl Hubbard

13    couldn't have done this because he was with you walking

14    down the street?

15  A.  Yes.

16  Q.  Did you tell that to Sergeant Kenny?

17  A.  No.  Because I hadn't talked to her.

18  Q.  Why didn't you call her back?

19  A.  I don't even know if she left a number.

20  Q.  You are saying you couldn't get ahold of a Detroit

21    police officer from homicide?

22  A.  She called the house.  She talked to my wife.  She

23    didn't talk to me.

24           I called the lawyer.  And he told

25    me I didn't have to talk to her.

141

```
1    Q.   You had Mr. Giles number to call?

2    A.   Yes.

3    Q.   You didn't want to talk to Sergeant Kenny, did you?

4    A.   I didn't want to?

5    Q.   You didn't want to tell her about that you knew Carl

6         Hubbard couldn't have done this, right?  You didn't

7         want to tell her that?

8    A.   I could have told her that.

9    Q.   But you didn't want to?

10   A.   (No response)

11   Q.   Isn't that correct?

12   A.   What?

13   Q.   Isn't that correct that you didn't want to tell her

14        that?

15   A.   It ain't that I didn't want to tell her.  I would have

16        told her the same thing that I am saying now.

17   Q.   But you didn't; isn't that correct?

18   A.   Yes, that's correct.

19   Q.   Do you recall what your wife was doing when you

20        returned?

21   A.   Returned with my son, you mean?

22   Q.   Correct.

23   A.   She was taking a bath.

24   Q.   Why is it that you remember the time so accurately?

25   A.   Why I remember?
```

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    Q.   The times.

2    A.   Just was -- I wasn't watching no clock or nothing.

3    Q.   So it could have been different times?

4    A.   (No response)

5    Q.   Is that correct?

6    A.   I don't know.

7                          I just know what time he came over.

8         I know what time he left to go get my son and I know

9         what time I came back.

10   Q.   You are positive about the times but you weren't

11        looking at no clock, as you say, is that correct?

12   A.   No.

13   Q.   So you are not positive about the times?

14   A.   I am positive about the times because of what was on

15        T.V. at certain times.

16   Q.   What was on T.V.?

17   A.   I can't tell you what was on T.V, exactly.

18   Q.   Then how do you know that the T.V. told you what time

19        it was?

20   A.   Because when certain shows come on, I know what time I

21        left.  We was gone for about a hour or so.  So I

22        just --

23   Q.   Mr. Spells?

24   A.   Yes.

25   Q.   Isn't it true you were with Carl Hubbard at the time he

143

1      shot Rodnell Penn?

2      A.   No.

3      Q.   Isn't it true you had been up in the store with him and

4           you saw Curtis Collins there?

5      A.   No.

6      Q.   Isn't it true that you walked up Gray with him when he

7           put two bullets in his brain and three more in his

8           back?

9      A.   No.

10     Q.   Nothing else.

11                         MR. GONZALES:   Nothing further,

12          Judge.

13                      REDIRECT EXAMINATION

14

15     BY MR. GILES:

16     Q.   Mr. Spells, you testified that you really weren't sure

17          regarding the date, is that correct?

18     A.   Yes.

19     Q.   Okay.

20                         But you do recall some of the

21          incidents of that day, some of the incidents of that

22          day; is that true?

23     A.   Yes.

24     Q.   For example, going on Gray and seeing the ambulance and

25          the police?

                              144

1    A.   Yes.

2    Q.   From that you know that Mr. Hubbard was with you that

3         day; is that correct?

4    A.   Yes.

5    Q.   What time does your wife normally get home from work?

6    A.   About 8:15, between 8:15 and 8:30.  Depending on if she

7         has to walk or get a ride.

8    Q.   And it is your testimony that's approximately the time

9         that she came home on that evening, too; correct?

10   A.   Yes.

11   Q.   Did you leave immediately after she came home?

12   A.   No.

13   Q.   Okay.

14                       You came to the preliminary exam in

15        February; is that correct?

16   A.   Yes.

17   Q.   When there was testimony being given were you sitting

18        in the courtroom?

19   A.   I was at first but then they had me leave out of the

20        courtroom.

21   Q.   That was after they asked all potential witnesses to

22        leave, is that correct?

23   A.   Yes.

24   Q.   You said that Sergeant Kenny called your home and

25        talked to your wife?

```
 1    A.   Yes.

 2    Q.   To your knowledge or belief did she ask to speak to

 3         you?

 4    A.   She asked for either one of us.

 5    Q.   Okay.

 6    A.   I wasn't there so she talked to my wife.

 7    Q.   To your -- to your information did she leave any

 8         message regarding if she wanted you to call her or

 9         contact her?

10    A.   She wanted us to come down there to the police station,

11         yes.

12    Q.   Okay.

13                         MR. GILES:   Excuse me.

14                         (A discussion was held off the

15                         record.).

16                         *      *      *      *

17

18                         MR. GILES:   No further questions,

19         Your Honor.

20                         RECROSS-EXAMINATION

21

22    BY MR. GONZALES:

23    Q.   You knew to go down to the police station, thirteen

24         hundred Beaubien, the Detroit Police Headquarters;

25         isn't that correct?
```

                                    146

1     A.   Yes.

2     Q.   And you never went down there?

3     A.   No.

4     Q.   So you never told the police at all about the

5     whereabouts of Mr. Hubbard; is that correct?

6     A.   No.

7     Q.   Thank you.

8                         MR. GONZALES:  Nothing else.

9                         THE COURT:  Anything else.

10                        MR. GILES:  Nothing further.

11                        THE COURT:  You can step down.

12    Thank you.

13                  V A N E S S A   S P E L L S

14

15                        called as a witness by the Defendant,

16                        being duly sworn by the Court Clerk,

17                        was examined and testified upon

18                        her oath, as follows:

19                        DIRECT EXAMINATION

20

21    BY MR. GILES:

22    Q.   Miss Spells, please give your full legal name for the

23    Court?

24    A.   Venessa Spells.

25    Q.   Okay.

                              147

1                          Miss Spells, are you married to

2      Thomas Spells?

3   A.   Yes.

4   Q.   And you have one child?

5   A.   Yes, a son.

6   Q.   Do you know a person by the name of Carl Hubbard?

7   A.   Yes, I do.

8   Q.   How long have you known Mr. Hubbard?

9   A.   About a year or so.

10   Q.   You've known him for about a year.

11                          Miss Spells, I am going to ask you

12      to direct your attention to January 17th, 1992.

13                          Can you recall approximately what

14      time you came home from work?  You did -- you went to

15      work that day?

16   A.   Yes, I did.

17   Q.   Do you recall what time you came home from work?

18   A.   Around 8:15, 8"20.

19   Q.   And who was at your home when you arrived there?

20   A.   My husband Thomas Spells and Carl Hubbard.

21   Q.   And at any time did your husband and Carl leave your

22      home while you were there?

23   A.   Yes, they did.

24   Q.   And what time did they leave?

25   A.   Around 10 o'clock.

```
 1    Q.   And did you see your husband and Carl any time again

 2         that day?

 3    A.   Yes, I did.

 4    Q.   Around, approximately what time?

 5    A.   Half hour later.  About 10:30.

 6    Q.   Are you aware of a Detroit Police Officer by the name

 7         of Sergeant Kenny?

 8    A.   Yes.

 9    Q.   And how are you aware of her?

10    A.   She called me at my home and asked me could I come down

11         to police station to give a statement.

12    Q.   Did you go down to the police station and give a

13         statement?

14    A.   No.

15    Q.   Did you talk to Sgt. Kenny about what you know of

16         January 17th?

17    A.   No, I didn't.

18    Q.   Did she ask you any questions about what you know of

19         January 17th?

20    A.   No.

21                        She just wanted me to come down.

22    Q.   Thank you.

23                        MR. GILES:  No further questions,

24         Your Honor.

25                        THE COURT:  Any questions?
```

1          MR. GONZALES:  Yes, Judge.

2

3                    CROSS-EXAMINATION

4

5   BY MR. GONZALES:

6   Q.  Good afternoon, Miss Spells.

7                        Miss Spells, why didn't you tell

8       Sergeant Kenny?

9   A.  Tell her what?

10  Q.  What you are telling the Court today?

11  A.  Because I spoke to Mr. Hubbard's lawyer.

12  Q.  Mr. Giles?

13  A.  Yes.

14  Q.  All right.

15  A.  And he told me that I didn't have to go down there and

16      say anything.

17  Q.  He didn't tell you not to go down there, did he?

18  A.  No, he didn't.

19  Q.  So you made the decision, you made the decision after

20      talking to him that you wouldn't go down?

21  A.  Right.

22  Q.  And you wouldn't go and tell the police who were

23      investigating this case what you know?

24  A.  No.

25                        She told me that -- she sent me a

                              150

1       letter and told me that I didn't have to go down there

2       unless I wanted to.

3    Q. And you didn't want to go down there, is my point,

4       ma'am, isn't that correct?

5    A. Yes.

6    Q. You didn't want to go and tell the police who were

7       investigating this case, that hey, this guy couldn't

8       have done it because I saw him?

9                       You didn't want to go tell the that

10      to the police?

11   A. I already said -- told everything I had to said to his

12      lawyer.

13   Q. Why didn't you want to tell it to the police who were

14      investigating the case, ma'am?

15   A. Because she called and said that I could have been held

16      in contempt of court if I didn't go down and say what I

17      had to say.

18                      And I was told by his lawyer that I

19      didn't have to go down there.

20   Q. So you decided not to go down and tell her that this

21      guy couldn't have done it?  You didn't want to tell

22      that to the police?

23   A. I was told that I didn't have to so I just decided not

24      to.

25   Q. And this was before the last trial; before June 15th;

1    isn't that correct?

2    A.  Yes.

3    Q.  Since June 15th, you never decided to call Sergeant

4    Kenny; is that correct?

5    A.  No.  Yes, that's correct.

6    Q.  You never wrote her any letter or told her your version

7    of what happened?

8    A.  No.

9    Q.  Your husband Mr. Spells never did that either?

10    A.  No.

11    Q.  You never told anybody in law enforcement investigating

12    this case whatsoever what you knew, other than the

13    defense attorney; isn't that correct?

14    A.  Right.

15    Q.  So you had Mr. Giles' number before this date in time;

16    is that right?

17    A.  Yes, I did.

18    Q.  You decided -- your first inclination was to call him,

19    Carl Hubbard's lawyer; isn't that correct?

20    A.  Yes.

21    Q.  You're concerned about Carl Hubbard; isn't that

22    correct?

23    A.  Yes.

24    Q.  You don't want anything to happen to Mr. Hubbard; do

25    you?

152

1   A.   Right.

2   Q.   Okay.

3                         And you are going to come in here

4        and testify as best you can so nothing will happen to

5        him; isn't that correct?

6   A.   I am going to testify what I know about what is going

7        on.

8   Q.   Let's talk about what you know about what is going on.

9                         How long were they gone, that you

10       didn't see them?

11  A.   Half hour.

12  Q.   Positive of that?

13  A.   Yes.

14  Q.   You remember; you clocked the time?

15  A.   They went down got the baby.  My son and came back to

16       the house.

17  Q.   You clocked the time?

18  A.   Yes, I did.

19  Q.   You had a stop watch?

20  A.   No, I didn't.

21  Q.   You checked the time they left?

22  A.   I checked the time they left and I checked the time

23       when they got back.

24  Q.   What were they wearing?

25  A.   My husband had on some blue jeans and a jacket.

153

1                          And Mr. Hubbard had on a jogging

2     suit.

3     Q.  Jogging suit?

4     A.  Yes.

5     Q.  He didn't have a coat on?

6     A.  Not that I remember.

7     Q.  You are positive of those items?

8     A.  Yes.

9     Q.  While they are gone, that exact half hour from your

10    house, you have no idea what they did; isn't this

11    correct?

12    A.  I know they came back with my son; that's all.

13    Q.  My question is:  While they are gone, you have no idea

14    what they did?

15    A.  No, I don't have no idea what  happened.  They was

16    gone.

17    Q.  You didn't see them?

18    A.  No.

19    Q.  You were in your house?

20    A.  Right.

21    Q.  And what were you doing were when they returned?

22    A.  Watching T.V.

23    Q.  You are positive of that?

24    A.  Yes.

25    Q.  You weren't doing anything else but watching television

1          when they came in the door?

2     A.   Yes.

3     Q.   Thank you.

4                         MR. GONZALES:   Nothing further,

5     Judge.

6                         THE COURT:   Anything else, Mr.

7     Giles.

8                         MR. GILES:   No. I have nothing

9     else.

10                        THE COURT:   You can step down.

11    Thank you.

12                        MR. GILES:   Defense will rest, Your

13    Honor.

14                        MR. GONZALES:   No rebuttal.

15                        THE COURT:   Let's start in about

16    ten minutes for closing in arguments.

17                        We will take a break right now,

18    counsel.

19                        MR. GONZALES:   Thank you.

20                        THE DEPUTY:   All rise.

21                        Court's in recess.

22                        (A short break)

23

24            *      *      *      *      *

25

155

1              THE COURT:  Court's back in

2  session.

3              THE COURT:  You are ready for your

4  closing arguments?

5              MR. GONZALES:  I am, Your Honor.

6              MR. GILES:  Yes, Your Honor.

7              THE COURT:  Go right ahead.

8              MR. GONZALES:  Thank you.

9              I thank the Court for his

10  attention.  I would ask the Court at this time to find

11  the defendant guilty as charged.

12              Now, as the Court is well aware

13  that motives don't prove everything.  But the fact that

14  the defendant in this case had a significant motive to

15  want to eliminate Mr. Rodnell Penn.  For the fact that

16  Rodnell Penn had testified against him at a prior

17  hearing.

18              And that prior case was in fact,

19  was in fact a first degree murder case.  And that in

20  fact the Court is to instruct itself that motives do

21  not in and of itself have the ability to prove guilt

22  beyond a reasonable doubt.

23              I would be asking the Court to

24  combine that with the following evidence.  I know

25  further that the Court is well aware that guilty

156

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    knowledge can be found from a false exculpatory

2    statement. A statement that exactly in the manner in

3    which the defendant gave in this case, in and of itself

4    does not prove guilt beyond a reasonable doubt.

5                          And I am sure the Court recognizes

6    the particular points of that statement of the

7    defendant on January 21, 1992. That that would show

8    clearly to be false and -- clearly to be a falsely

9    exculpatory statement and that that can be used by this

10   Court to show the defendant's own guilty knowledge for

11   what happened on that night.

12                         And I am referring to those

13   particular portions of the confession -- excuse me --

14   admissions that were made on that date.

15                         When he was asked do you know

16   anything about a shooting that happened on Gray on

17   Friday, January 17th, 1992. And he answered: No.

18                         To the question: Were you on Gray

19   Street Friday, January 17th, 1992? And he indicated:

20   No.

21                         And that also did you hear about

22   anyone getting killed over on Gray Street? And he

23   answered: No.

24                         Do you know anybody that lives on

25   Gray Street? And he answered: No. I don't hang out

1       that way.

2                       Directly in contradiction to the

3       testimony of his own witness, Mr. Spells, and Miss

4       Spells.  That in and of itself, I know, Judge, is not

5       by itself alone enough evidence to prove beyond a

6       reasonable doubt the defendant's guilt.

7                       But I'd ask the Court to combine it

8       with the further evidence.

9                       The fact that we know from the

10      testimony of the family members of Rodnell Penn, that

11      he himself was involved in the sale of drugs for this

12      defendant.  And that fact in and of itself does show a

13      relationship between the two of them involved in

14      criminal enterprise.  That in and of itself doesn't

15      show the potential for motive for this person to have a

16      killing of Mr. Penn.

17                      But you combine that further,

18      Judge, with the fact that the testimony of the officer

19      that testified, he was Craig Turner; and that he was at

20      the scene.

21                      And the fact that he obtained from

22      the defendant a statement that indicates that the

23      killing was drug related.  That up to -- at that point

24      in time nothing had been mentioned to him involving in

25      anyway that this killing was anything to do with drug

                              158

1    related. But nonetheless the defendant indicates at

2    that date and time to officer Turner that the murder is

3    drug related. Before anyone had said anything to him.

4                    I'd ask the Court to combine that

5    with the further testimony, the fact that we have

6    evidence that witnesses were in fact coached in this

7    case.

8                    That we have Curtis Collins clearly

9    testifying what he was supposed to say. He was

10   supposed to say that he was on Corbett street. And

11   that he had been told who to say that by, that being

12   Raymond Williams. And what we have -- we have Raymond

13   Williams coming in and saying that exact statement.

14                    Well, you can't finish there,

15   Judge. You got to go on and consider that basis for

16   believeability of Mr. Collins' testimony.

17                    The Court will recognize initially

18   when he testified, he testified that he was somewhere

19   else. But throughout the lines of his testimony -- I

20   am sure the Court heard in between the lines constant

21   citing to his family, to his daughter, to his mother,

22   things that he was concerned and scared about. I think

23   at that point in time it is reasonable for this Court

24   to have heard between the lines an overwhelming fear

25   that that person had regarding what he knew to be the

1    truth.

2                    Similarily he testified that he

3    observed the body, the body laying in a particular, and

4    I would cite peculiar way on its side and he described

5    that both in his statement to the police. And in his

6    statement today in court and in his statement Monday he

7    indicated that he had said earlier. Clearly only

8    description that someone would have had if he had been

9    at that location.

10                    He knows, Judge, he faces perjury

11   charge; he knew that yesterday.

12                    I submit that that was the reason

13   why he changed but that not only. That he realized he

14   had in fact he himself was being threatened and decided

15   to bring that to the Court. That in and of itself is

16   not complete evidence but you got to combine that

17   further,

18                    Judge. Combine that with what I

19   would argue is incredible and clearly inconsistent

20   alibi testimony. Inconsistent in the sense of what

21   Miss Spells was doing upon the return, and incredible

22   and the testimony of Mr. Spells. Unbelievable that

23   both of them would remember so particularly and so

24   exactly and so perfectly the time his and would in'

25   that that was the times involved.

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT RE:

1          But would not have the ability to

2  remember other facts.  That if their memory was so

3  perfect they would be able to remember.  Combine that

4  with the, that Curtis Collins could have, in fact did

5  have the ability and the applicability to observe what

6  he says he observed.

7          Take a look at Exhibit Number 13,

8  if the Court needs to, I have it here.  It clearly

9  shows approximately where Mr. Collins was standing in

10  the person of the witness who testified, officer

11  Richardson was standing, the Court could see with its

12  own eyes where the defendant is and the manner in which

13  Mr. Collins would have had the opportunity to see him.

14          Exhibit Number 18 shows the reverse

15  angle, showing the store.  Also he indicated there was

16  the ability of light for him to see that night.

17          We have the photograph, Exhibit

18  Number 9 showing the light across the street and the

19  porch light in the house across the street.

20          The photographs show the driveway

21  and show the body was not obscured by any snow but was

22  within the range of the observations of Mr. Collins as

23  he indicated he was able to see.

24          It is the combination of those

25  factors, Judge, that I would ask the Court to consider

161

1    as a whole when the Court is considering what basically

2    is a credibility call the Court is going to have to

3    make.

4              Consider the combination of all of

5    those factors and find the defendant guilty.

6              Thank you, Your Honor.

7              THE COURT:  Mr. Giles?

8              MR. GILES:  Thank you, Your Honor.

9              Your Honor, I'd like to thank you

10   on behalf of myself and my client for your patience in

11   listening to all the witnesses and testimony in this

12   case because I know that's what you are here to do;

13   that's your job.  But I thank you anyway.

14             I'd like to speak first to a couple

15   of issues that the prosecution brought up, more likely

16   an issue of motive.

17             The prosecution here relates that

18   this motive for my client to kill Rodnell Penn would

19   have been that for a -- for Mr. Penn's testimony

20   against him at a trial and a murder one trial that was

21   dismissed four years ago, Your Honor, four years ago.

22             It was also testimony in particular

23   from Mr. Penn's brother Leon Penn that Rodnell Penn has

24   had a great deal of, for lack of a better word,

25   activity involvement with Mr. Hubbard in the last few

162

1    years.

2              Your Honor, I would think that this

3    motive was in itself very weak in that if Mr. Hubbard

4    was going to kill someone for testifying against him at

5    a trial that was dismissed on a case that was dismissed

6    four years ago, he would -- and if that would have been

7    a motive for killing that person, he would have done it

8    a lot sooner than now.

9              Your Honor, in regard to the

10   statement my client gave, the statement that was read

11   into the court, I would say to this Court that in some

12   of the questions that were asked by Sergeant Kenny to

13   my client, that he obviously lied, did not tell the

14   truth.  He lied about not having -- not -- Rodnell Penn

15   not being involved in a case that he was previously

16   involved in.

17              In regard to the questions about,

18   specifically about the killing and the shooting on Gray

19   Street, Your Honor, I would say that those questions in

20   and of themselves were vague.

21              He was asked whether or not he knew

22   anything about the shooting.  He said:  No.

23              He wasn't asked specifically what

24   he knew, if he was on -- in the area, et cetera et

25   cetera, did he do it.  Very specific question.  He was

1           asked very general questions.

2                          I'd like Your Honor to take that

3           into consideration.

4                          Your Honor, as to the witnesses

5           here being coached, I would almost have to agree with

6           the prosecutor here.  However, these are the People's

7           witnesses.  And we have a lot of inconsistency and

8           conflicting testimony from the People's witnesses, Your

9           Honor.

10                          For example, Mr. Leon Penn, Jr.,

11          Rodnell's brother, testified that his brother spent the

12          night with him on the 16th and that the last he saw him

13          was on the morning of the 17th, when he left.

14                          Yet another People's witnesses,

15          Christopher Harris, testified that Rodnell Penn spent

16          the night with him that night.

17                          There was testimony from Miss

18          Lucinda Gross, who just lives in the neighborhood.

19          Although she testified she herself didn't hear any

20          shots, as obviously she walked up on the body, had to

21          be within minutes after this shooting occurred.  Yet

22          she didn't see any of the People's witnesses who were

23          allegedly there.

24                          She did not see Curtis Collins who

25          she stated that she does not know.

                                   164

1              She did not see Andrew Smith who

2    she also stated she does not know.  And she is the one

3    who -- she left the crime scene and went directly to

4    the store and called the police.  Yet she didn't see

5    any of those witnesses, Your Honor.

6              I would think that Miss Lucinda

7    Cross was a very, very credible witness.  Had no

8    interest in this case.

9              Mr. Andrew Smith, Your Honor,

10   testified that he saw my client in the general vacinity

11   at the time with two other people.  But he could not

12   identify those two other people.  He didn't know who

13   they were.

14             He also was very specific in his

15   testimony, he did not see Curtis Collins there; that he

16   was at the store.  He had been in the store.  He came

17   back; he came out afterwards.  And that he saw Curtis

18   Collins nowhere around.

19             Your Honor, you heard rebuttal

20   witnesses testimony -- testimony from witnesses Ron

21   Rodney -- Raymond Williams and Roney Fulton.

22             As to Raymond Williams, Raymond

23   Williams testified that Curtis Collins was his best

24   friend and has been for the last seven or eight years.

25   And that Curtis was not on Gray and Mack at the time

1    this occurred because he was with him, and Mr. Fulton

2    in Mr. Fulton's house gambling. And that he was there

3    until approximately 10 o'clock. And had been there and

4    arrived on the scene sometime around 8.

5            Also heard from Mr. Fulton who was

6    also a friend of Mr. Collins; he's not a friend -- he

7    was very specific in his testimony. He does not know

8    Mr. Hubbard.

9            He met Mr. Hubbard once through

10   introduction; he said hello. He said, hi. And that

11   was the extent of his conversation and relationship

12   with Mr. Hubbard. He was not here. His testified, as

13   he testified here, was basically haphazard.

14           He didn't come to this Court

15   because he got a subpoena to testify. He just happened

16   to be here in the courtroom. And then he and I had a

17   conversation and that's what led to his testimony, Your

18   Honor.

19           Your Honor, you also heard alibi

20   testimony from Mr. and Mrs. Spells, Thomas and Venessa

21   Spells. The Spells are friends of Mr. Hubbard and they

22   testified that he was in fact in their home at the time

23   that this alleged event happened.

24           I would differ with the prosecution

25   in regard to the consistency of their testimony.

1                    Mr. Spells was very, even general

2     in his times that he gave.

3                    He said that Mr. Hubbard arrived at

4     his home at approximately 6, 7 o'clock.  They left

5     sometime between 9 and 10.  He couldn't even remember

6     what date this was.  Only reason he knew about the date

7     was because of the other incident and the killing that

8     happened on Gray.  And that's the only way he could

9     relate it altogether.

10                    So in regard to very specific

11    questions about what was this person wearing, what was

12    this person doing, I think they are irrelevant, Your

13    Honor.  I think that he was specific that Mr. Hubbard

14    was with him.  And that he was consistent in that

15    testimony.

16                    The fact that he neither went to

17    the police is irrelevant.  He came to Court and

18    testified to say what he had to say.

19                    It is also testimony from several

20    police officers in particular, Your Honor, I will

21    direct your attention to police officer Richardson who

22    is the evidence tech.  Who described and gave detailed

23    pictures and illustrations of the general area and

24    scene.

25                    Police officer Richardson who was

1    there that night testified that the crime scene, quote

2    unquote, was in itself dark. That there were street

3    lights on the corner of Gray and Mack. The houses that

4    were where the crime scene was halfway down the block,

5    Your Honor. And the only lighting was some porch

6    lights and one yard light. That is shown in the

7    picture.

8                    Your Honor, I would again ask you

9    to closely examine People's Exhibit Number 13. Which

10   is the picture showing police officer Richardson

11   standing around the crime scene while the other officer

12   is standing in the vicinity of the store on Gray and

13   Mack.

14                   In that picture you can make out

15   the outline of officer -- officer Richardson but you

16   cannot make out any detail of his face, et cetera, et

17   cetera.

18                   THE COURT: Before you continue,

19   why don't you hand up the exhibits, counsel.

20                   MR. GONZALES: All of them, Your

21   Honor?

22                   THE COURT: I'd like to see all of

23   them but specifically right now I'd like to see 13 and

24   25.

25                   Okay. Thank You. You can go

168

1    ahead, counsel.

2              MR. GILES: I would ask you to pay

3    close attention to that picture for the reason that the

4    I.D. made by Curtis Collins, and I will speak in

5    greater detail to his testimony. But the I.D. made by

6    Curtis Collins specifically was that the only way that

7    he identified Mr. Hubbard as the person running from

8    that scene was because he identified him from a scar on

9    the back of his head. At a distance of, according to

10   officer Richardson, at least two hundred yards in the

11   dark.

12             We heard testimony from a Miss

13   Shanta Holcomb who was the girlfriend of Rodnell Penn.

14             She testified that she talked to

15   him somewhere between 8:30 and 9:00. And that she

16   thought he was outside. However, the other testimony

17   from Curtis Collins, from Andrew Smith, they had no

18   testimony they saw anybody with Mr. Hubbard outside on

19   the telephone; or that they saw anyone on the

20   telephone, period.

21             As to Curtis Collins, Your Honor,

22   the issue of creditability -- Curtis Collins, as you

23   are aware, came into this Courtroom on Monday and said

24   that lie -- that he lied at the exam. Everything he

25   said at the exam was a lie. Everything he told the

                              169

1   police was a lie.

2                   And that he did so because he was

3   in fear from the police. That the police had

4   threatened him; that they were going to put him away

5   for a long time. That the police had made promises to

6   him; that they were going to change his I.D.. They

7   were going to give him ten thousand dollars. They were

8   going to relocate him to another state and set him --

9   set him up and he would have a new life, in essence.

10                  Now, Your Honor, he comes back into

11  Court and he says he no longer fears the police. But

12  he's in fear of his life and his family's life.

13                  Not because, Your Honor, he has

14  received any specific threats from anyone. Because he

15  heard from someone he did not know. Did not know their

16  names. Someone who he was acquainted with, he may have

17  seen around in a lounge or a bar, a club, as he called

18  it. And they told him that there were rumors that

19  people were going to get him.

20                  And now he fears for his life

21  again.

22                  Your Honor, there were many

23  inconsistencies in his testimony, even as he said the

24  testimony of the part that was -- or the part that was

25  supposed to be true.

170

1        In his testimony today, Curtis

2    Collins said he left the store.  He walked around the

3    corner.  Started going south on Gray.

4        He approached towards the area of

5    the alley, the alley near the telephone, the garbage

6    can, disposal unit, Your Honor, and at that point he

7    heard shots.  He turned and over half-a-block away he

8    saw Mr. Hubbard running through a field.

9        His previous testimony and exam was

10    that he got three feet from the door.  And he heard the

11    shots.  His previous testimony at the exam was that he

12    did not see Mr. Hubbard or anyone leave the Special K

13    Store.  However today, Your Honor, he says as he's

14    leaving the store walking south on Gray, he turns and

15    sees Mr. Hubbard and a person walking across Gray.

16        Your Honor, Mr. Collins did not

17    also testify or explain what Mr. Hubbard was wearing.

18    He testified that he saw the deceased.  A person he

19    identified as the deceased coming to the store with Mr.

20    Hubbard and saw him for a very quick moment.

21        He then after hearing the shots and

22    running back down to the area where he heard the shots

23    coming from, which is in and of itself doesn't make a

24    whole lot of sense, although, I don't know a lot of

25    people that would run towards gunshots.

171

1            But Mr. Collins would have you

2   believe that he ran towards the gunshots and then

3   observed the body again and identified it as the same

4   person that he saw Mr. Hubbard with.

5            Yet he also said that he did not

6   see the face of a man lying in the snow.  He could not

7   testify to what he had on.  He did not testify to what

8   he had on.  But he's saying it is still the same

9   person.

10            Your Honor, there were also

11   numerous other inconsistencies in Mr. Collins'

12   testimony.

13            Mr. Collins took the stand today

14   and all of a sudden had a sudden memory loss, to many

15   of the questions asked he could not remember.  From

16   that standpoint, Your Honor, I would say, that Mr.

17   Collins was not a very credible witness.  And that's

18   believed that Mr. Collins over two rebuttal witnesses,

19   Your Honor, who are testifying that while he's their

20   friend that those two rebuttal witnesses were, as Mr.

21   Williams -- Mr. Williams is Mr. Collins' cousin.  And

22   that they were Mr. Collins' friends for numerous years

23   and that they, Mr. Collins was with them.

24            And, two, over the alibi witnesses

25   who in fact said that my client was with them.

172

1          Your Honor, I don't believe there

2   has been a showing here beyond a reasonable doubt that

3   in fact my client did kill with malice aforethought

4   deliberately killed Rodnell Penn.

5          There has been no showing, Your

6   Honor.

7          And I would ask you to dismiss this

8   case, Your Honor.

9          MR. GONZALES:  I respectfully

10  disagree, Your Honor.  And ask the Court to find the

11  defendant guilty.

12          The evidence is clear that just

13  because, just because the case is dismissed four years

14  or four years, he was asked a specific question, where

15  was he on Gray Street on January 17th, 1992.  And he

16  indicated he was not there.  Anthony Smith was

17  credible.  He indicated, yes, he saw Goft.  And he saw

18  two other people out there that night and that's

19  corrobative of Mr. Collins' testimony.  And I'd ask the

20  Court to find the defendant guilty.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Let's take five minutes.

24          THE DEPUTY:  All rise.

25          This Court's in recess for five

173

1      minutes.

2                          (A short break)

3                      *      *      *      *

4                          THE DEPUTY:  All rise for the

5      Court.

6                          Court's back in session.  Please be

7      seated.

8                          This Court did have an opportunity

9      to listen to numerous witnesses in this cause.

10                         This Court did also have an

11     opportunity to review the exhibits that were presented

12     to the Court.

13                         One of the first witnesses that was

14     presented to this Court, in this matter was done by way

15     of stipulation, that was the forensic pathologist, who

16     determined that the cause of death was a gunshot wound

17     to the head and face.  And also gunshot wound to the

18     lower back.

19                         The stipulation also was that there

20     was evidence of close range firing.

21                         There was also a stipulation

22     presented to this Court by way of the father of the

23     victim, specifically, Lamar Rodnell Penn's father, who

24     identified the body.

25                         The first witness that was

                                    174

1    presented to this Court in a live fashion was a Curtis

2    Lionell Collins. He told this Court that he knows the

3    defendant. He knows him as Goft. He identified him in

4    the courtroom. Told this Court that he did see Goft

5    back on January 17th of 1992. And that this witness

6    had been in the area of Mack and Gray, specifically at

7    a party store. He had seen Goft in the party store

8    with the deceased.

9                He did testify in front of Judge

10    Lipscolm back on February 4th of 1992. And he also

11    made a statement to the police on January 23rd, 1992.

12                This Court had an opportunity to

13    take a look at the transcript pages that were marked

14    and admitted. This Court also had an opportunity to

15    listen to the questions presented by both the

16    prosecution, and the defense concerning those exam

17    transcript pages. Within those pages, this witness did

18    testify specifically that he saw the defendant come

19    into the party store with the deceased. That he had

20    heard gunshots, after he had left the party store.

21                He turned back after hearing the

22    gunshots and saw Goft running away from the area; that

23    the deceased was in on the ground. That this

24    particular witness ran over to the victim; looked at

25    the victim and eventually this particular witness ran

1       of Gray and Mack on January 17th, 1992.  And that he

2       saw Goft that evening talking either to the police or

3       he was in the area where the police were.  And that he

4       saw Goft wearing a Raider Jacket and that a few words

5       were spoken to Goft, such as, what is up or what is

6       happening.

7                   Leon Penn was the next witness that

8       took the the stand, and told this Court that he's

9       thirty-two years old.  He told this Court that he was

10      the brother of the deceased.  That he did in fact know

11      Goft or Carl Hubbard.

12                  He did tell this Court that on

13      January 16th, I think he stated was the date, that he

14      saw Carl Hubbard with Rodnell.  He did hear some word

15      spoken by Mr. Hubbard to the effect that I will see you

16      tomorrow.  And that he had seen his brother sale drugs

17      for the defendant, Mr. Hubbard.  And that they, Mr.

18      Hubbard and Mr. Penn, the deceased, had been together

19      for a couple of years selling crack.

20                  Tracey Sewell took the stand and

21      told this Court that she's a police officer and has

22      been for approximately six years.  That she responded

23      to a radio run, a shooting in the area of Gray and

24      Mack.

25                  She told this Court when she got

177

1    away himself and got in a cab and left the area.

2                    He did also specifically tell this

3    Court that he had an opportunity to see the scar on the

4    back of the head of the defendant, as he ran away from

5    the area of the deceased.

6                    I should state that this Court had

7    an opportunity to examine Mr. Collins while he

8    testified.

9                    This Court had an opportunity to

10   look at his demeanor; listen to him while he talked

11   about how there were threats on the street to him and

12   his family members.

13                   I would state for the record that

14   he did look quite nervous while he was in fact

15   testifying.

16                   And I do agree with Mr. Giles when

17   he states that Mr. Collins' testimony at times was very

18   conflicting and down right lying to this Court.

19                   He did tell this Court today as to

20   the reasons as to why he lied two days ago in this

21   courtroom.

22                   One of the next witnesses that took

23   the stand was a John Trammel. He said that he knew

24   Carl Hubbard as Goft. He did not know his real name.

25   But that he had an opportunity also to be in the area

176

1    there, she saw a man lying in the street in front of

2    3960 Gray. That he had been shot in the face and that

3    there was blood all over his jacket.

4               And she had an opportunity to watch

5    the EMS take the jacket and hood off of the deceased.

6    And she told this Court how she also picked up a slug

7    in the area.

8               Officer Craig Turner took the stand

9    and told this Court that he had been working as a

10    police officer for approximately seven and a half

11    years.

12               And he had an opportunity to be

13    working on the night of January 17th, 1992.

14               He said he was working with his

15    partner, both were in plain clothes in a semi-marked

16    vehicle. This officer told this Court that he had an

17    opportunity to see the defendant, Mr. Hubbard that

18    night and Mr. Hubbard had asked this particular officer

19    what had happened.

20               The officer told Mr. Hubbard that

21    there was a homicide; that this defendant left the area

22    and then returned about ten minutes later. And asked

23    if it was one of the guys from the neighborhood and

24    also asked if he was dead.

25               He also told the officer that the

1    Black and Gray area was cold. And this particular

2    officer said that he saw the defendant on that evening

3    wearing a gray jacket with an attached hood.

4                    He also told this Court that the

5    defendant would not allow himself to be placed into the

6    back of the car.

7                    He told this Court that this

8    defendant gave this officer the impression of a faked

9    shock when this officer told the defendant that the

10   deceased was in fact dead.

11                   This officer told the Court that he

12   has known the defendant for approximately three or four

13   years but he -- because he has had an opportunity to

14   actually talk to the defendant who is out on the

15   streets in the evening practically every night.

16                   Officer Randy Richardson took the

17   stand and told this Court that he is with the crime

18   scene unit. That he in essence is an evidence

19   technician. He told this Court how he took gunshot

20   residue tests with regard to four individuals and he

21   was the one who took the photographs, or at least had

22   the opportunity to be present when photographs were

23   taken.

24                   And he had the opportunity to make

25   the sketches in the area.

179

1                Andrew Smith took the stand and

2    told this Court that he's twenty years old and he

3    identified the defendant, Mr. Hubbard.

4                He said that he had the opportunity

5    to see Mr. Hubbard also in the area of Gray and Mack on

6    January 17th.

7                He told this Court that he had also

8    heard shots that evening and he also had an opportunity

9    to see the deceased laying on the ground.

10              A Miss Luzinda Gross told this

11    Court that she lives in the area of Gray and Mack and

12    she is forty-four years old.

13              And that she told this Court that

14    she was walking to the store on that particular evening

15    and saw the body in the snow.

16              This Court did receive into

17    evidence the constitutional rights and statement that

18    was made by Mr. Hubbard, specifically, Exhibits, I

19    think it was 23, 24 and 25.

20              This Court also had an opportunity

21    to listen to the testimony of Christopher Harris.

22              He told this Court that back in

23    January of '92, he happened to be twenty-two years old.

24    That he was the cousin of the deceased Mr. Penn.

25              And that on this particular evening

he had an opportunity to talk to and be with Rodnell

Penn.  And that Rodnell was to help him setup for a

caberet on that particular evening.  I think it was his

understanding that his cousin on that particular

evening had about two hundred dollars on him.  I think

he also indicated to the Court that his cousin was

involved in the sale of drugs.

Shanta Holcomb also took the stand

and really could not offer too much to this Court.

This Court does recall that there

were objections to an argument centering around an

excited utterance.  But she told this Court that she

did in fact know Mr. Penn and she did see Mr. Penn on

the 16th of January of '92; but she did not know Goft.

Mr. Collins again took the stand

and told this Court as to why he lied on Monday.  And

told this Court that he was ready and willing to tell

the truth.  And basically enumerated all the things

that he told Judge Lipscomb were in fact the truth and

everything in his statement was in fact true.

There was a stipulation presented

to this Court as a result of the Assistant Prosecutor

Glenn Paige not testifying.

This Court does recall the

stipulation as to how a case was dismissed against the

1    defendant Mr. Hubbard as a result of one of the

2    witnesses, Rodnell Penn, not showing up to testify.

3                        One of the first defense witnesses

4    that took the stand was a Mr. Raymond Williams.  He

5    told this Court the that he also had an opportunity to

6    be a friend of witness Collins.  That he had been best

7    friends with him for seven or eight years.

8                        He told this Court how they were

9    all gambling on January 17th, in the evening.  And that

10   he had an opportunity to, that evening, to go see the

11   movie Juice at approximately 10:05, 10:08.

12                       Mr. Collins was with him and not on

13   the street on that particular evening.

14                       Mr. Roney Fulton took the stand and

15   gave his version as to what took place and his memory

16   centering in and around January 17th.

17                       Mr. and Mrs. Spells also took the

18   stand.  Mr. Spells told this Court that he is in fact a

19   friend of Mr. Hubbard.  And that Mr. Hubbard was in

20   fact with him on the night of January 17th.  And the

21   only time that they left the house was to go to the

22   mother's house.  And they went to the mother's house.

23   They in fact saw an ambulance on Gray Street.

24                       He told this Court that he was with

25   Carl Hubbard for most of the evening.

182

1              He did tell this Court that one of

2      the detectives talked to Carl Hubbard.

3              Again Mrs. Spells took the stand

4      and she told this Court that she's in fact a friend of

5      the defendant for approximately a year.

6              She told this Court that Mr.

7      Hubbard and her husband left the house but only for a

8      half hour.

9              This Court has had an opportunity

10     to take a look at the confession.  I shouldn't say the

11     confession, but rather a statement that was made to the

12     police by this defendant Mr. Hubbard.

13             Mr. Hubbard in essence was asked

14     when was the last time you saw Rodnell Penn.  The

15     answer on this statement was:  The last time I saw

16     Rodnell Penn was back in the '80's.

17             And since then I only saw his older

18     brother name Walter Penn.

19             He also went on to state that he

20     didn't know anything about a killing.

21             He also stated that he did not see

22     the deceased on January 17, 1992.  And he also stated

23     that he was not in the area on Gray and Mack on January

24     17th, 1992.

25             Specifically the question was

                              183

 1     asked:  Were you on Gray Street, Friday January 17th,

 2     1992.

 3                      And the answer to that question

 4     specifically was:  No.

 5                      Also do you know anything about a

 6     shooting that happened on Gray, on Friday, January

 7     17th, 1992?  The answer was:  No.

 8                      The prosecution did in fact during

 9     the course of this case argue motive.

10                      This Court does understand that

11     motive is not one of the elements that need to be

12     proven to the Court.

13                      I would state that the elements

14     that have to be proven to this Court, beyond a

15     reasonable doubt is that the deceased did in fact die

16     of gunshot wounds.  That the defendant must have had

17     the state of mind or the intent to kill and that that

18     killing and that intent was done with premeditation and

19     deliberations.  Also with malice aforethought.  And

20     that the killing was not justified in any manner.

21                      I would state to both the

22     prosecutor and to Mr. Giles, specifically Mr. Giles, I

23     thought Mr. Giles did a excellent job in representing

24     his client.  However, one of things that Mr. Giles

25     cannot change is the facts of this case; that he cannot

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER

1    produce any magic in changing the facts.

2                    Due to the fact that the

3    prosecution, I see on the Information, has charged Mr.

4    Hubbard with a count of felony firearm, specifically

5    felony must be committed with a firearm; they have

6    listed in the Information a handgun.

7                    This Court has not seen a handgun.

8    There has been no exhibit marked as a handgun.  I don't

9    know as a result of this close range firing that this

10   was a saw-off rifle; what the length of any gun might

11   have been.

12                   I do not believe that the People

13   have satisfied Count 2 to this Court.

14                   However, this Court does believe

15   after looking at all of the elements and listening to

16   all the facts in this case that all of the elements of

17   murder in the First Degree have been satisfied to this

18   Court beyond a reasonable doubt.

19                   That is what this Court is going to

20   find Mr. Hubbard guilty of is Murder in the First

21   Degree.

22                   As a result of this Court so

23   finding, Mr. Hubbard is going to have to come back for

24   sentencing on the date of September 22, 1922.  9:00 in

25   the morning.

1                              He's going to be remanded to the

2      Wayne County Jail until sentencing.

3                              MR. GONZALES:  Thank you, Your

4      Honor.

5                              THE COURT:  Thank you both for

6      doing a great job.

7                              (The proceedings concluded)

8

9                         *       *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              R E P O R T E R ' S   C E R T I F I C A T E

2

3      STATE OF MICHIGAN )
                        )
4      COUNTY OF WAYNE  )

5

6              I, MARY E. SKINNER, CSR-0031, Official Court

7      Reporter in and for the Third Judicial Circuit, Wayne

8      County, State of Michigan, do hereby certify that the

9      foregoing pages  1 through 186, inclusive, was reduced

10     to typewritten form by means of Computer-Assisted

11     Transcription and comprise a true and accurate transcript

12     of the proceedings taken in the above-entitled matter,

13     on Wednesday, September 2, 1992.

14

15                                    MARY E. SKINNER, CSR-0031

16

17     Dated:   This  19th  day of  March  1992.

18

19

20

21

22

23

24

25

MARY E. SKINNER, CSR-0031   -   OFFICIAL COURT REPORTER