311

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL HUBBARD,
   Petitioner,

v.

                            Case Number 13-14540

                            Honorable David M. Lawson

WILLIE SMITH
   Respondent.           /

AMENDED

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF

HABEAS CORPUS BY A PERSON IN STATE CUSTODY

      Petitioner, Carl Hubbard, in pro se, petitions this Court to grant a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, and states in support that:

      1. Petitioner was convicted after a bench trial on September 2, 1992, in the Third Circuit Court for the County of Wayne, before the Honorable Richard P. Hathaway, of murder in the first degree (MCL § 750.316).

      2. On September 23, 1992, Petitioner was sentenced to imprisonment to the mandatory term of life without the possibility of parole for this conviction. Petitioner was represented by Ronald Giles (P-38107) throughout all proceedings held in the trial court.

      3. Petitioner is currently incarcerated at the Carson City Correctional Facility at 10274 Boyer Road in Carson City, MI 48811-5000, serving the aforementioned sentence.

      4. On August 4, 1993, being represented by Frederick M. Finn (P-32268), Petitioner filed a Motion to Remand for an Evidentiary Hearing and appealed by right to the Michigan Court of Appeals raising the following issues:

-1-

POOR QUALITY ORIGINALS

I. THIS CASE SHOULD BE REMANDED FOR AN EVIDENTIARY HEARING ON THE ISSUE OF WHETHER THE RECALL OF THE PEOPLE'S WITNESS CURTISS COILLINS AND HIS LATER TRIAL TESTIMONY WAS THE PRODUCT OF IMPROPER COERCION BY THE PROSECUTION AND/OR DETROIT POLICE.

II. THIS CASE SHOULD BE REMANDED FOR AN EVIDENTIARY HEARING ON THE ISSUE OF WHETHER DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

III. THIS CASE SHOULD BE REMANDED FOR AN EVIDENTIARY HEARING ON THE ISSUE OF WHETHER THE WARRANTLESS ARREST AND DELAYED ARRAIGNMENT OF DEFENDANT WAS A VIOLATION OF CONSTITUTIONAL RIGHTS AND WHETHER HIS IN-CUSTODY POLICE STATEMENT SHOULD HAVE BEEN EXCLUDED AS EVIDENCE AT TRIAL.

IV. WHERE THE PROSECUTION'S CASE FAILED TO SET FORTH EVIDENCE BEYOND A REASONABLE DOUBT AS TO EACH OF THE ELEMENTS OF THE DEFENSE, THE LOWER COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR A DIRECTED VERDICT.

V. DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE EVIDENCE PRESENTED AT TRIAL FAILED TO PROVE HIS GUILT BEYOND A REASONABLE DOUBT.

VI. DEFENDANT'S BENCH TRIAL CONVICTION SHOULD BE OVERTURNED BECAUSE THE LOWER COURT'S DECISION WAS NOT ADEQUATELY SUPPORTED BY FINDINGS AND CONCLUSIONS, AND THE TRIAL JUDGE'S DECISION AMOUNTED TO AN IMPROPER, INCONSISTENT VERDICT.

On February 9, 1994, Mr. Finn moved the trial court to withdraw as appellate counsel and, on February 14, 1994, the Honorable Dalton A. Reberson granted appellate counsel's request. On October 28, 1994, Judge Roberson appointed Gerald Surowiec (P-21172) as Petitioner's new appellate counsel and he merely added the additional argument that Petitioner did not provide a valid waiver of his right to a jury trial when he chose to take a bench trial. In his pro se supplemental brief on appeal, Petitioner raised the following issues:

I. THE INVESTIGATING OFFICERS AND THE PROSECUTION USED INTIMIDATING UNPROFESSIONAL CONDUCT TO OBTAIN STATEMENT AND SECURE TESTIMONY FROM PEOPLE'S KEY WITNESS CURTISS COLLINS

II. THE ADMISSION OF THE PRELIMINARY EXAMINATION TESTIMONY WAS IMPROPER WHERE THE WITNESS WAS PRESENT AT TRIAL AND REPUDIATED HIS PRIOR TESTIMONY.

III. IMPROPER IMPEACHMENT/RES GESTAE WITNESS/PROSECUTORIAL

MISCONDUCT.

IV. INADMISSIBILITY OF EVIDENCE OF UNCHARGED CRIME/SIMILAR ACT/PROSECUTORIAL MISCONDUCT.

V. ADMISSIBILITY OF PRIOR CONSISTENT STATEMENT/IMPROPER REHABILITATION OF WITNESS/PROSECUTORIAL MISCONDUCT.

VI. PROSECUTORIAL MISCONDUCT/FALSE TESTIMONY.

On September 13, 1993, the Motion to Remand for an Evidentiary Hearing was denied and on December 19, 1995, Petitioner's conviction was affirmed in Court of Appeals Docket #159160.

5. Petitioner subsequently applied for leave to appeal in the Michigan Supreme Court, arguing that the Michigan Court of Appeals' September 13, 1993, and December 13, 1995 decisions were erroneous. Petitioner had represented himself in pro se in regards to this appeal which was denied on October 28, 1996 in Docket #105540

6. On December 28, 2011, Petitioner filed a motion for relief from judgment in pro se and argued that:

I. DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON THE NEWLY DISCOVERED EVIDENCE PRESENTED TO THIS COURT.

II. DEFENDANT'S CONVICTION THAT WAS BASED ON PERJURED TESTIMONY VIOLATED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.

III. DEFENDANT WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR KNOWINGLY USED PERJURED TESTIMONY TO OBTAIN THIS CONVICTION.

IV. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT WAS VIOLATED TO THE EXTENT THAT THE STATE FAILED TO DISCLOSE AGREEMENTS FOR MR. COLLINS' FAVORABLE TESTIMONY.

V. DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL COUNSEL FAILED TO (A) INVESTIGATE AND CALL ROY BURFORD AND STEVE KONJA TO TESTIFY AT TRIAL, (B) QUESTION CURTISS COLLINS ABOUT HIS PENDING PAROLE VIOLATION AND WHETHER HE BELIEVED OR EVEN ONLY HOPED THAT HE WOULD SECURE IMMUNITY OR A LIGHTER SENTENCE, OR ANY OTHER FAVORABLE TREATMENT FROM THE PROSECUTION, (C) MOVE FOR THE SUPPRESSION OF MR. COLLINS' IN-COURT IDENTIFICATION OF DEFENDANT, AND (D) DO ALL OF THE ABOVE WHICH, WHEN CONSIDERED CUMULATIVELY, DEMONSTRATES THAT DEFENDANT WAS PREJUDICED BY COUNSEL'S ERRORS.

-3-

VI. DEFENDANT IS ENTITLED TO A NEW TRIAL ON THE GROUNDS THAT THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

VII. THE "GOOD CAUSE" REQUIREMENT OF MCR 6.508(D)(3)(a) SHOULD BE WAIVED WHERE DEFENDANT HAS SHOWN THAT HE IS ACTUALLY INNOCENT.

VIII. DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHICH PROVIDES THE "GOOD CAUSE" REQUIRED BY MCR 6.508(D)(3)(a).

7. Petitioner appealed the trial court's March 15, 2012 denial by leave to the Michigan Court of Appeals which was denied on May 7, 2013 in Docket #311427, Judge Cynthia Stephens dissenting.

8. Petitioner subsequently appealed the Michigan Court of Appeals' May 7, 2013 denial to the Michigan Supreme Court in an application for leave to appeal which was denied on September 30, 2013 in Docket #147211.

9. On October 30, 2013, Petitioner filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254.

10. Upon discovering new evidence, Petitioner requested that this Court hold his petition in abeyance and on February 5, 2015, his request to return to the State court to exhaust new issues based upon this new evidence was granted.

11. Upon return to the Wayne County Circuit Court, Petitioner filed his second Motion for Relief from Judgment, raising the following issues:

I. DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL LAWYER FAILED TO INVESTIGATE AND CALL THE STORE OWNERS SAMIR AND RAAD KONJA TO TESTIFY AT TRIAL, AND ALSO FAILED TO CALL "BARBARA" TO TESTIFY ON THE THIRD DAY OF TRIAL.

II. THE "GOOD CAUSE" REQUIREMENT OF MCR 6.508(D)(3)(a), ALONG WITH THE APPLICATION OF MCR 6.502(G)(2), SHOULD BE WAIVED WHERE DEFENDANT HAS SHOWN THAT HE IS ACTUALLY INNOCENT.

III. DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHICH PROVIDES THE "GOOD CAUSE" REQUIRED BY MCR 6.508(D)(3)(a).

12. On March 30, 2015, the Wayne County Circuit Court denied Petitioner

relief in docket #92-001856-01-FC.

13. Petitioner then applied for leave to appeal to the Michigan Court of Appeals raising those issues as were raised in the trial court and the Michigan Court of Appeals denied this appeal on June 2, 2015, in Docket #326995.

14. Petitioner then applied for leave to appeal to the Michigan Supreme Court again raising those same issues that were raised in the trial court and this appeal was likewise denied on July 26, 2016, in Docket #151806. People v Hubbard, 499 Mich 982 (2016).

15. Petitioner then returned to this Court but on March 16, 2018, this matter was once again held in abeyance to exhaust new issues related to the discovery of new evidence.

16. Petitioner then filed his third motion for relief from judgment in the Wayne County Circuit Court, raising the following issues:

> I. DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON THE NEW EVIDENCE WHICH SHOWS THAT HIS CONVICTION WAS OBTAINED THROUGH PERJURED TESTIMONY.
>
> II. DEFENDANT WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTION KNOWINGLY USED PERJURED TESTIMONY TO OBTAIN A CONVICTION.
>
> III. DEFENDANT WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE POLICE AND PROSECUTOR THREATENED AND INTIMIDATED CURTIS COLLINS INTO COMMITTING PERJURY.
>
> IV. DEFENDANT WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR WITHHELD EVIDENCE.
>
> V. THE "GOOD CAUSE" REQUIREMENT OF MCR 6.508(D)(3)(a) SHOULD BE WAIVED WHERE DEFENDANT HAS SHOWN THAT HE IS ACTUALLY INNOCENT.

This motion was denied on October 2, 2019 in case #92-001856-01-FC.

17. Petitioner then applied for leave to appeal to the Michigan Court of Appeals raising those same issues as were raised in the trial court and additionally argued that it was a violation of due process to deny his motion for a new trial brought in Argument I and the Michigan Court of Appeals denied this appeal on March 19, 2020, in docket #351605.

18. Finally, Petitioner applied for leave to appeal to the Michigan Supreme Court raising those same issues discussed in paragraph #17 above and this appeal was also denied on June 17 , 2020 , in Docket #161212 .

19. Petitioner now raises the following claims in this amended habeas corpus petition:

I. PETITIONER TIMELY FILED HIS PETITION WITHIN THE ONE-YEAR STATUTE OF LIMITATIONS PERIOD AS DEFINED BY 28 U.S.C. § 2244(d)(1)(D) AND, ADDITIONALLY, HAS MADE A COLORABLE CLAIM OF ACTUAL INNOCENCE WHICH EQUITABLY TOLLS THE AEDPA'S STATUTE OF LIMITATIONS, OVERCOMES ANY PROCEDURAL BARS APPLICABLE TO ANY ISSUES PRESENTED, PERMITS AN EVIDENTIARY HEARING IN THIS COURT, AND SUPPORTS A FREESTANDING CLAIM OF ACTUAL INNOCENCE.

II. PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT'S DENIAL OF HIS MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE WAS SO EGREGIOUS THAT IT VIOLATED HIS RIGHT TO A FUNDAMENTALLY FAIR TRIAL.

III. PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR KNOWINGLY USED PERJURED TESTIMONY TO OBTAIN A CONVICTION.

IV. PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE POLICE AND PROSECUTOR THREATENED AND INTIMIDATED CURTIS COLLINS INTO COMMITTING PERJURY.

V. PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR WITHHELD EVIDENCE.

VI. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT WAS VIOLATED TO THE EXTENT THAT THE STATE FAILED TO DISCLOSE AGREEMENTS FOR MR. COLLINS' FAVORABLE TESTIMONY.

VII. PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL COUNSEL FAILED TO (A) INVESTIGATE AND CALL ROY BURFORD, STEVE KONJA, SAMIR KONJA AND RAAD KONJA, AND ALSO FAILED TO CALL "BARBARA" TO TESTIFY ON THE THIRD DAY OF TRIAL, (B) QUESTION CURTIS COLLINS ABOUT HIS PENDING PAROLE VIOLATION AND WHETHER HE BELIEVED OR EVEN ONLY HOPED THAT HE WOULD SECURE IMMUNITY OR A LIGHTER SENTENCE, OR ANY OTHER FAVORABLE TREATMENT FROM THE PROSECUTOR, (C) MOVE FOR THE SUPPRESSION OF MR. COLLINS' IN-COURT IDENTIFICATION OF PETITIONER, (D) OBJECT TO THE ADMISSION OF PETITIONER'S STATEMENTS OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT, AND (E) DO ALL OF THE ABOVE WHICH, WHEN CONSIDERED CUMULATIVELY, DEMONSTRATES THAT PETITIONER WAS PREJUDICED BY COUNSEL'S ERRORS.

VIII. PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE

EVIDENCE PRESENTED AT TRIAL FAILED TO PROVE GUILT BEYOND A REASONABLE DOUBT.

IX. THE INCONSISTENT VERDICT OF THE TRIAL COURT VIOLATED THE FOURTEENTH AMENDMENT.

X. PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE COUNSEL FAILED TO RAISE ARGUMENTS II, III, VI AND VII.

Therefore, Petitioner Hubbard asks this Court to either release him unconditionally or to order a new trial.

Respectfully submitted,

Carl Hubbard #205988

Carl Hubbard #205988
Petitioner In Pro Se
Carson City Correctional Facility
10274 Boyer Road
Carson City, MI 48811-5000

Dated: 6-29-20

-7-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL HUBBARD,
    Petitioner,

                                        Case Number 13-14540

v.
                                        Honorable David M. Lawson

WILLIE SMITH,
    Respondent._____/

BRIEF IN SUPPORT OF AMENDED

PETITION FOR HABEAS CORPUS

By: Carl Hubbard #205988
    Petitioner in Pro Se
    Carson City Correctional Facility
    10274 Boyer Road
    Carson City, MI 48811-5000

STATEMENT OF FACTS

(Parenthetical reference "PE" refers to the February 4, 1992 preliminary examination transcript, "T1", "T2" and "T3" refer to the August 31, September 1 and September 2, 1992 trial transcripts respectively. Numbers following indicate page number).

Defendant was charged with Murder, First Degree, and Possession of a Firearm During the Commission of a Felony. The Information filed charged that on January 17, 1992 in front of 3960 Gray Street, in Detroit Michigan, Defendant shot and killed Rodnell Penn (Count I), while armed with a firearm (Count II). Defendant entered a waiver of right to jury trial. (T1, 3-5).

Curtis Collins was the first witness called and denied being at the party store on January 17, 1992 at about 9:30 p.m. and denied seeing Defendant at the time and place the crime occurred. (T1, 18-19). Collins testified that Homicide (Detroit Police) got him to say things that weren't true and that he lied under oath in his preliminary examination testimony as to seeing Defendant at the time of the crime. (T1, 39). Collins stated that homicide detectives pressured him to lie with promises of money and protection and threats regarding his pending prison escape charge. (T1, 49-51). He states that although he was afraid for is family, he was now telling the truth which was that he did not see anything on the evening of January 17, 1992. (T1, 41-42).

John Trammel testified to knowing Defendant, to being present on Gray on January 17, 1992, and to seeing Defendant after the murder standing among the spectators at the crime scene. (T1, 60-62).

Leon Penn testified that on January 16, 1992 he saw Defendant and Rodnell Penn walking down Charlevoix and heard Defendant tell Mr. Penn that he would see him tomorrow. (T1, 73-74).

Officer Sewell testified that on January 17, 1992 he responded to Gray Street regarding a shooting and observed a man laying in the driveway at 3960 Gray. (T1, 86-87). He didn't observe anyone else when he arrived. (T1, 90-91). He said that the party store was approximately two hundred yards away from where the body had been found. (T1, 93).

Officer Turner testified that on January 17, 1992 at about 9:00 p.m. he saw Defendant on Gray (T1, 96-97) and had two conversations with him. (T1, 97-99).

On the second day of trial, Evidence Technician Randy Richardson testified that he had responded to the scene at 3960 Gray (T2, 4-5) and described the area where Mr. Penn was shot as fairly dark. (T2, 21). He estimated the distance from the front of the party store to the location of the body was about three hundred and seventy five feet. (T2, 21-22).

Andrew Smith testified that on January 17, 1992 at 8:30 p.m. he saw Defendant walking from Gray across Mack with two other guys. (T2, 35-40). Mr. Smith went into the party store and three or four minutes later heard gunshots. (T2, 42). Mr. Smith stayed in the store another few minutes, came out, saw the police down the street, and walked down Gray and saw the body. (T2, 42-43). Mr. Smith testified to knowing Collins and that he did not see him that night. (T2, 47-49).

Lucinka Gross testified that on January 17, 1992 she found Mr. Penn's body laying in the street. (T2, 51-53). She didn't see anyone else in the area but went into the store and asked the store owner to call the police. (T2, 53-55).

On the third day of trial, Christopher Harris testified that Mr. Penn spent the night on January 16, 1992 and that he dropped Penn off the next day and planned to meet him that evening at 9:00 p.m. (T3, 5-10).

-2-

Shannon Holcomb testified that she knew Mr. Penn and had some telephone conversation with him that Friday evening. (T3, 18-21). She said that she heard two voices during the call (T3, 29-30) and thought the call was coming from the party store. (T3, 34-36).

Collins was then recalled and testified that he didn't tell the truth on the first day of trial when he gave testimony exonerating Defendant and that his preliminary examination testimony implicating Defendant was now the truth. (T3, 36-38). Collins testified to being arrested for perjury after his testimony at the first day of trial but that he was given no promises regarding his new testimony on the third day of trial. (T3, 47-51). Rather, Collins said that his earlier testimony was the result of threats to him and his family. (T3, 38-40). He claimed to have saw Defendant with Mr. Penn, heard four gun shots, turned around, looked down Gray "And I seen Carl Hubbard running through a field" and identified him by a scar on the back of his head. (T3, 44-46, 64-65).

Defendant presented his alibi defense (T3, 129-132, 147-149) and was found guilty of murder but acquitted of possessing a firearm. (T3, 185).

ARGUMENT I

PETITIONER TIMELY FILED HIS PETITION WITHIN THE ONE-YEAR STATUTE OF LIMITATIONS PERIOD AS DEFINED BY 28 U.S.C. § 2244(d)(1)(D) AND, ADDITIONALLY, HAS MADE A COLORABLE CLAIM OF ACTUAL INNOCENCE WHICH EQUITABLY TOLLS THE AEDPA'S STATUTE OF LIMITATIONS, OVERCOMES ANY PROCEDURAL BARS APPLICABLE TO ANY ISSUES PRESENTED, PERMITS AN EVIDENTIARY HEARING IN THIS COURT, AND SUPPORTS A FREESTANDING CLAIM OF ACTUAL INNOCENCE.

"Section 2244(d)(1)(D) requires a habeas petitioner to file a claim within one year of the time in which new evidence 'could have been discovered through the exercise of due diligence.'" McQuiggin v Perkins, 133 S Ct 1925, 1935 (2013). If a petitioner provides several affidavits, as was done here, and the most recent affidavit relied on provides new evidence, the petition is timely if it is filed within one-year of that affidavit. Cf. Souter v Jones, 395 F 3d 577, 586-588 & 600 n. 15 (6th Cir. 2005) and McQuiggin v Perkins, supra at 1930 ("McQuiggin filed his habeas petition nearly six years after he obtained the last of the affidavits, rendering his petition untimely under the 1-year time limit in § 2244(d)(1)(D).")(Emphasis added).

Five of Petitioner's affidavits fall within this one-year period as Petitioner became aware of Askia Hill's statement in January of 2011 (see ¶ 4 & Notary date on page 3 of Exhibit A) & (¶ 1 of Exhibit B), Roy Burford's statement in September of 2011 (see Notary date on page 2 of Exhibit C) & (¶ 2 of Exhibit B), and he filed his first motion for relief from judgment on December 28, 2011. (See page 37 of Answer to initial Petition for Writ of Habeas Corpus).

Petitioner subsequently became aware of Raad and Samir Konja's affidavits in July of 2014 (see Exhibit D & E) & (¶ 5 of Exhibit B) and had filed his second motion for relief from judgment within one year. (See Exhibit F).

Petitioner then was provided with an affidavit from Curtis Collins in November of 2017 and filed his third motion for relief from judgment with the

-4-

trial court within one year of that affidavit, on June 21, 2018. (See page 3 of Exhibit H).

Petitioner acknowledges that he has the burden of showing that he exercised due diligence in the search for the factual predicate of his habeas claims, Stokes v Leonard, 36 Fed App'x 801, 804 (6th Cir. 2000), and to do that he must "specify how the factual predicate of his claim could not have been discovered earlier" and "indicate what steps, if any, he took to discover these claims." Grayson v Grayson, 185 F Supp 2d 747, 750 (E.D. Mich. 2002). But in assessing the due diligence requirement of 28 U.S.C. § 2244(d)(1)(D), this Court should not "ignore[] the reality of the prison system and impose[] an unreasonable burden on prisoner's seeking appeal" and should "note that § 2244(d)(1)(D) does not require the maximum feasible diligence, only 'due', or reasonable, diligence". DiCenzi v Rose, 452 F 3d 465, 470 (6th Cir. 2006)(internal quotation marks and cites omitted); see also Ford v Gonzalez, 683 F 3d 1230, 1235-1236 (9th Cir. 2012)(collecting cases).

Petitioner "[s]pecif[ied] how the factual predicate of his claims could not have been discovered earlier," Grayson v Grayson, 185 F Supp 2d at 750, through Askia Hill's affidavit which states that he never told anybody because "I was afraid for my life and I didn't want any trouble with anybody in the neighborhood, because I have to live in that neighborhood." (See page 2, ¶ 4, of Exhibit A). But when he got out of that neighborhood and was "serving lengthy sentences for carjacking and assault with intent to murder," (see page 39 of the initial Answer to Petition for Habeas Corpus) and "had a chance encounter" with Petitioner "while incarcerated," id. at 36, he divulged the contents of his affidavit to Petitioner. (See ¶ 1 of Exhibit B).

In Schlup v Delo, 513 US 298 (1995), former prison inmate John Green stated in his affidavit that he had previously denied witnessing a murder

because "I was concerned about my safety" but that "I am not afraid now because I haven't been in prison for more than 7½ years." Id. at 310, n. 21. The Court rejected the suggestion that Schlup "did not provide adequate cause for failing to raise his new claims more promptly," id. at 309, and Petitioner has likewise specified how the factual predicate could not have been discovered earlier as both Hill and Green shared the same concerns for their safety and only came forward when they were no longer in the same environment that formed those concerns.

As for Roy Burford, he never knew Petitioner personally, knew his name, or knew where he lived. (See ¶ 1 of Affidavit in Support of Evidentiary Hearing contained in Petitioner's 2017 Amended Petition for Writ of Habeas Corpus). And Mr. Burford "is in prison for second-degree murder, prisoner possessing weapons, and felony firearm" (see page 39 of the initial Answer to Petition for Writ of Habeas Corpus) and, obviously, Petitioner is also in prison. In recognizing the "reality of the prison system", DiCenzi v Rose, 452 F 3d at 470, this Court will see that it was only through the incarceration of Burford and Petitioner that Burford's affidavit could have been facilitated when, through a chance encounter while they were incarcerated, this information was passed along to Petitioner by him. (See ¶ 2 of Exhibit B).

As for Raad and Samir Konja, no testimony or police report was ever produced indicating whether they witnessed Collins in their store on the night of Mr. Penn's murder even though Sergeant Kinney was on Gray and Mack looking for evidence in this case (T3, 117) and Petitioner's lawyer investigated the crime scene. (See ¶ 2 of Affidavit in Support of Evidentiary Hearing contained in Petitioner's 2017 Amended Petition for Writ of Habeas Corpus). This left Petitioner with the burden of finding out for himself who was working in the party store on the night of the murder but he was unable to do so until July

-6-

of 2014. (See ¶ 5 of Exhibit B).

As for Curtis Collins, while he stated in 2014 that he would do an affidavit, he:

> "backed out of it because I was afraid and feared what AP Gonzalez, Sergeant Kinney and Sergeant Gale would do to me and I didn't want to face perjury charges again and be put in jail and threatened by these government officials." (See ¶ 6 of Exhibit G).

Collins stated in his 2017 affidavit, however, that:

> "I went to prison in 2014 and got out in 2015. While in prison I realized how hard and difficult it was in prison during that ten months. I also learned that AP Gonzalez was no longer prosecuting cases and that Sergeant Kinney and Sergeant Gale were no longer on the police force. As a result, I no longer had to worry about their threats and I was tired of running from the fact that I had put and innocent man, Carl Hubbard, in prison." (See ¶¶'s 6 & 7 of Exhibit G).

In Schlup v Delo, 513 US 298 (1995), former prison inmate John Green stated in his affidavit that he had previously denied witnessing a murder because "I was concerned about my safety" but that "I am not afraid now because I haven't been in prison for more than 7½ years." Id. at 310, n. 21. The Court rejected the suggestion that Schlup "did not provide adequate cause for failing to raise his new claims more promptly," id. at 309, and Petitioner has likewise specified how the factual predicate could not have been discovered earlier as both Collins and Green shared the same concerns for their safety and only came forward when they were no longer in the same environment that formed those concerns.

And without an affidavit being provided to the trial as an offer of proof that Collins would have provided any favorable testimony, the Petitioner would have been unable to establish the factual predicate of any of the claims raised relating to Collins' recantation. People v Lloyd, 463 Mich 900, 990 (2001), People v Kowalski, 230 Mich App 464, 486 (1998), and MCR 2.611(D)(1).

The State trial court held that:

"the only relevancy of the affidavit is a reiteration of the

claim that Collins was not near the area of Gray and Mack the night of the murder. This is the exact claim he made in his recanting testimony at trial. Even the reason for the disavowal are not new, as Collins has already claimed that pressure from the police caused him to lie. Cress, Id." (See pages 11-12 of Exhibit H).

While Collins did testify that the Detroit Police had coerced him to say things that weren't true and that he lied under oath at the preliminary examination when he testified to seeing Petitioner at the scene of the crime (T1, 39), there has never been any sworn claim by Collins that he was again coerced by the Detroit Police to lie under oath at trial. To the contrary, on the third day of trial Collins testified that he was the one who had requested to testify (T3, 37) and that there had been no promises for his current testimony. (T3, 50-51). Moreover, there has never been any previous testimony or sworn claim that APA Gonzalez had coerced or threatened Collins for his testimony implicating the Petitioner of murder on the third day of trial. (See ¶ 8 of Exhibit G).

If a new recanting affidavit from Collins could not allow the Petitioner to show that his evidence is new under 28 U.S.C. § 2244(d)(1)(D) under circumstances such as presented here, then the Prosecutor's Office and the Detroit Police will continue in their behavior. To be sure, the Prosecutor's Office has been so brazen as to "reach out to Curtis Collins", then make "a call", and then make "a visit to his home on May 20, 2019" while accompanied by the Detroit Police (see page 11 of Exhibit H); (See also page 9 of Exhibit I), in what appears to be another attempt to apply pressure on Collins to once again forcefully extract a statement to their liking.

As for the answers to the questions given at his polygraph examination (see Exhibit J) and its corresponding DVD/disk of Collins' polygraph examination and interview (this DVD/disk cannot be attached as Petitioner is incarcerated and not allowed to possess DVD's (see PD 04.02.120(19)) and the

trial court relied on it in reaching its decision (see pages 3-4, 9 & 12 of Exhibit H) so it is part of the state court record that should be provided to this Court as part of the Rule 5 materials), the trial court found that:

> "none of the questions that were used in the test are new evidence. Indeed, the polygraph questions are things both sides agreed to in 1992. Collins never testified that he was with Hubbard when Hubbard shot Penn or that he saw the shooting or that Hubbard shot anyone else. The questions all presupposed that Collins had testified to seeing the shooting." (See page 12 of Exhibit H).

But the third question was "Were you present when Carl Hubbard shot that man?" And his response to that questions was "No." (See Exhibit J). This is not something "both sides agreed to in 1992" as held by the trial court. (See page 12 of Exhibit H). Collins actually testified in 1992 that he was saw Petitioner with Mr. Penn, heard four gun shots, turned around, looked down Gray "And I seen Carl Hubbard running through a field" and identified him by a scar on the back of his head. (T3, 44-46, 64-65).

Finally, as for the discovery that the prosecution had subpoenaed records from the Checker Cab Company (see Exhibit K), this fact was not discovered until a Freedom of Information Act request was made on January 14, 2016 and received on August 9, 2016. (See Exhibit L). And while Petitioner did not initiate postconviction proceedings incorporating this piece of evidence until June 21, 2018 (see page 3 & 13 of Exhibit H), the factual predicate of those claims relying on the results of that subpoena also rely on the affidavit from Collins and the answers to questions given to him during a polygraph test which Petitioner asserts are the items of evidence which form the factual predicate of these claim. Just like in Souter v Jones, supra, Petitioner "claims that several pieces of new evidence, which he has collected over the past several years, form the factual predicate for his habeas corpus claim[s]." Id. at 586. And because Collins' affidavit was the "last" affidavit, the results of the subpoena for the Checker Cab Company records,

along with the fact that a request for this information was made, are new. Id.
at 586-588 & 600 n. 15; see also McQuiggin v Perkins, supra at 1930.

The State trial court found that the cab company subpoena is not new
because the Petitioner:

> "does not include the results of the subpoena. Knowing that the
> People attempted to gather information before trial is not new
> evidence. Absent the results of the subpoena and a Brady
> violation regarding those results, the subpoena is not evidence
> of anything." (See page 13 of Exhibit H).

It is interesting to note that the Prosecutor has still not provided
the Petitioner with the results of the subpoena and "if a party has it
particularly within its power to produce [evidence or] witnesses whose
testimony would elucidate the transaction, the fact that he does not do it
creates a presumption that the [evidence or] testimony, if produced, would be
unfavorable." Graves v United States, 150 US 118, 121 (1893). The fact that
the best the Prosecutor could come up with in response to Petitioner's claim
was to essentially say "You can't prove that this evidence was of any value
because we will not provide it to you" will change when the Respondent
provides this evidence as part of the Rule 5 material and Petitioner asserts
that he will be entitled to provide further briefing based on the production
of this previously undisclosed evidence.

And even without the actual evidence that was produced as a result of
that subpoena, it was clearly erroneous for the trial court to hold that
"[k]nowing that the People attempted to gather information before trial is not
new evidence." (See page 13 of Exhibit H). Either there was a cab dispatched
to the area of the murder or there wasn't and the jury would have understood
that the subpoena did not produce evidence of a cab being dispatched to the
area of the crime scene or the Prosecutor surely would have presented that
information. The only logical conclusion that the jury would have been able to
reach would have been that no cab was dispatched to the area of the murder and

-10-

that Collins was being untruthful when he testified at the preliminary examination that, after seeing "the decease[d] guy laying in the driveway ... I took off running. I jumped in a cab and went home." (PE, 13).

For these reasons, Petitioner timely filed his petition within the one-year statute of limitations period as defined by 28 U.S.C. § 2244(d)(1)(D).

ACTUAL INNOCENCE EXCEPTION TO STATUTE OF LIMITATIONS

In addition to being timely, Petitioner has demonstrated a credible claim of actual innocence which provides an exception to the AEDPA's statute of limitations. In McQuiggin v Perkins, 133 S Ct at 1932, the United States Supreme Court announced that "[s]ensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is the AEDPA's statute of limitations." "To invoke the miscarriage of justice exception to the AEDPA's statute of limitations ... a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 1935.

In House v Bell, 547 US 518 (2006), the Court explained that a claim of actual innocence must be both "credible" and "compelling." Id. at 521. For a claim to be "credible," it must be supported "with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup v Delo, 513 US 298, 324 (1995). As long as the petitioner has presented "some new reliable evidence," the court may proceed to the "compelling" prong of the claim, at which point the court's analysis "is not limited to [new reliable] evidence" but must be based on "all the evidence, old and new." House v Bell, 547 US at 537 (emphasis added). For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a

-11-

reasonable doubt". <u>Id</u>. at 538.

CREDIBLE

Petitioner has presented several affidavits, answers to questions asked during a polygraph examination, and the fact that the prosecutor had subpoenaed evidence from the Checker Cab Company, as new reliable evidence in support of his actual innocence claim and asserts that these items present evidence that is "new" for actual innocence purposes. Indeed, "[a]s long as the evidence relied on was 'not presented at trial,'" as was the case here, "it may be considered 'new,'" for purposes of showing actual innocence irrespective of whether [Petitioner] acted with reasonable diligence in discovering it and pursuing relief." <u>Freeman</u> v <u>Trombley</u>, 483 Fed App'x 51, 57 (6th Cir. 2012), citing <u>Souter</u> v <u>Jones</u>, 395 F 3d at 596 n. 9, 601 n. 19. The question for this Court is then whether these pieces of evidence are "reliable".

Hill's affidavit-an affidavit claiming that he witnessed another suspect commit the murder (see Exhibit A)-is new reliable evidence because it is a "trustworthy eyewitness account[] ... that was not presented at trial." <u>Schulp</u>, 513 US at 324. Indeed, in <u>Lopez</u> v <u>Miller</u>, 915 F Supp 2d 373, 399 n. 14 (E.D.N.Y. 2013), the Court pointed to "<u>Muchinski</u> v <u>Wilson</u>, 694 F 3d 308, 338 (3d Cir. 2012)(noting that '<u>Schlup's</u> three categories are not an exhaustive list of the types of evidence that can be "reliable,"' and that in <u>House</u>, 'the Supreme Court spent a large portion of its analysis on <u>evidence that implicated another suspect</u>." (citing <u>House</u>, 547 US at 548-53, 126 S Ct 2064)."

While it did take 18 years for Hill to come forward with his information about another man murdering Mr. Penn and "[u]nexplained delays in presenting new evidence bears on the determination whether the petitioner has made the requisite showing," <u>McQuiggin</u> v <u>Perkins</u>, 133 S Ct at 1935, "the

-12-

passage of time is [not] sufficient in and of itself to render [an] affidavit unreliable." Lopez v Miller, 915 F Supp 2d at 403, citing Cleveland v Bradshaw, 693 F 3d 626, 641 (6th Cir. 2012). In fact, delay is only "relevant if it is '[u]nexplained' or 'unjustified,' and if it 'bear[s] on the probable reliability of [the petitioner's] evidence'". Id. But the delay in obtaining Hill's affidavit is explained and justified as his affidavit clearly states that the reason that "I never told anybody what I seen that day is because I didn't want any trouble with anybody in the neighborhood, because I have to live in that neighborhood" (see ¶ 4 of Exhibit A), and that now he is out of the neighborhood "serving lengthy sentences for carjacking and assault with intent to murder," (see page 39 of the initial Answer to Petition for Writ of Habeas Corpus) and "had a chance encounter" with Petitioner "while incarcerated," id. at 36, he divulged the contents of his affidavit to Petitioner. (See ¶ 1 of Exhibit B).

And the types of crimes that Hill is serving time for are not relevant for evaluating honesty. Lopez v Miller, 915 F Supp 2d at 406. To be sure, the fact that Hill was a prisoner, and that Hill and Petitioner were fellow inmates does nothing but support the reliability of Hill's affidavit as it explains why this affidavit was not previously produced until this chance encounter while incarcerated.

The reliability of Hill's affidavit becomes no more apparent than when considering the fact that Hill--who has "no evident motive to lie," House v Bell, 547 US at 552--claims to have eyewitnessed the murder of Mr. Penn and says that it was not the Petitioner that shot him, it was Mark Goings (see ¶¶¶'s 2, 3 & 6 of Exhibit A), in combination with the fact that Collins now claims that he was not present when Mr. Penn was murdered. (See Exhibit G & J). There can be little doubt about the reliability of Collins' affidavit and

subsequent statements given during a polygraph examination. According to the fact finder, the entire case centered in and around the testimony of Collins which was reliably recanted according to polygraph expert Michael Anthony. (See Exhibit J). Additionally, as is discussed in detail later, Collins' recantation is shown to be reliable as it is verified by several other pieces of evidence, while Collins' testimony at trial implicating Petitioner in the murder of Mr. Penn is contradicted by other witnesses and/or is against the laws of nature. This leaves Mr. Hill as the only eyewitness to the crime, an eyewitness that has never been investigated even when the media requested that it be done. (See Exhibit M). Because neither Hill nor Collins are stating in their affidavits that it was Petitioner that killed Mr. Penn, this "cross-corroboration of statements support[] their reliability." Lopez v Miller, 915 F Supp 2d at 401.

Emanuel Randall's affidavit states that the word on the street was that Mark Goings was the one who actually killed Rodnell Penn on Gray and Mack on January 17, 1992. (See ¶¶'s 6 & 7 of Exhibit N). In responding to Petitioner's original habeas corpus petition, the Attorney General claimed that this affidavit was not credible because "it took Randall almost 17 years to say that he, too, was with Curtis Collins and Raymond Williams playing dice on the night of the murder [which] is questionable, given that Williams testified to this at trial." (See page 38 of Answer to initial Petition for Writ of Habeas Corpus). While it is true that Williams says that he saw Collins (T3, 103, 106), he never testified "that [Randall], too, was with Curtis Collins and Raymond Williams playing dice on the night of the murder" as claimed by the Respondent. In any event, Randall states in his affidavit that "on the night of January 17, 1992," (see ¶ 2 of Exhibit N), he "was on the run for escape," id. at ¶ 3, Randall wasn't arrested but Collins was, id. at ¶ 5, Collins only

-14-

testified against Petitioner at the preliminary examination because homicide detectives pressured him to lie with promises of money and protection regarding his pending prison escape charges (T1, 49-51), "Randall is in prison for several drug offenses," (see page 39 of Answer to initial Petition for Writ of Habeas Corpus), and Petitioner "was unaware of Randall's affidavit until June 2009, when they had a chance encounter while incarcerated." Id. at 36 & ¶ 3 of Exhibit B. So it makes perfect sense as to "why it took Randall almost 17 years to say that he, too, was with Curtis Collins and Raymond Williams playing dice on the night of the murder" even if Williams had "testified to this at trial." Id. at 38. It should also be pointed out that while "Randall is in prison for several drug offenses," id. at 39, "possession of an illegal substance [is] hardly probabtive of truthfulness or untruthfulness." Lopez v Miller, 915 F Supp 2d at 406.

Moreover, both Randall and Collins claim that Collins was not on Gray on January 17, 1992 (compare ¶ 2 of Exhibit N with ¶ 1 of Exhibit G and page 1 of Exhibit J (along with the DVD/disk of Collins' polygraph examiantion), and that Collins told them he was pressured to lie. Compare ¶ 8 of Exhibit N and ¶¶¶'s 3, 5 & 8 of Exhibit G with page 1 of Exhibit J (along with the DVD/disk of Collins' polygraph examination). Hill and Randall both also indicate in their affidavits that it was Mark Goings that killed Mr. Penn. Compare ¶ 6 of Exhibit N with ¶¶¶'s 2, 3 & 6 of Exhibit A. These "cross-corroboration[s] of statements support[] their reliability." Lopez v Miller, 915 F Supp 2d at 401.

Raymond Williams will testify that, while incarcerated with Collins between August 31, 1992 and September 2, 1992, he heard him crying in another cell and when he asked him what was wrong, Collins said that Sergeant Kinney and Sergeant Gale were forcing him to lie on Petitioner at trial on September 2, 1992 or else he would be charged with the murder rather than Petitioner.

(See ¶¶¶'s 3, 4 & 7 of Exhibit O). Williams also states that Steve Konja told him, if subpoenaed, he would testify that while working at the party store on the night of January 17, 1992 he did not see Collins in the store (see ¶¶'s 2 & 3 of Exhibit P); contrary to Collins' claim. (T3, 44, 52). Because Williams was informed by Collins that Sergeant Kinney and Sergeant Gale would make sure that he was charged with the murder case rather than Petitioner, (see ¶ 4 of Exhibit O), Williams must have feared that he himself could also be put in Collins' position of being threatened with the murder as it was only after Sergeant Kinney and the Detroit Police Department's illegal coercive practices were exposed (see Exhibit Q) that Williams came forward with the information that he had. And Williams and Collins both state in their affidavits that Collins was claiming that Sergeant Kinney and Sergeant Gale had coerced Collins, compare ¶¶¶'s 3, 4 & 7 of Exhibit O with ¶¶¶¶'s 5, 6, 7 & 8 of Exhibit G and page 1 of Exhibit J, which also coincides with what Randall says in his affidavit. (See ¶ 8 of Exhibit N). This "cross-corroboration of statements supports their reliability." Lopez v Miller, 915 F Supp 2d at 401.

Roy Burford also states in his affidavit that the word on the street was that Mark Goings was the one who actually killed Mr. Penn on Gray and Mack on January 17, 1992. (See ¶ 10 of Exhibit C). Elton Carter states in his affidavit that he will testify that Collins admitted to him that the testimony he provided at Petitioner's trial was forced upon him by the officers from Detroit's 5th Precinct and that if he did not agree to give the testimony that he gave, that he would be charged with the murder rather than Petitioner. Collins further admitted to Carter that he was not at the scene of the crime when the murder occurred. (See ¶¶¶ 2, 3 & 5 of Exhibit R). The Respondent previously argued that these affidavits were not credible because "it took Burford and Carter so long to reveal the information they had (see page 38 of

Answer to initial Petition for Writ of Habeas Corpus), "Burford is in prison for second-degree murder, prisoner possessing weapons, and felony firearm," and that "it appears that Carter has previously absconded from probation." Id. at 39. But, as was explained previously, "the passage of time is [not] sufficient in and of itself to render [an] affidavit unreliable," Lopez v Miller, 915 F Supp 2d at 402, citing Cleveland v Bradshaw, 693 F 3d at 641, and the types of crimes that Burford and Carter are serving time for are not relevant for evaluating honesty. Id. at 406. In fact, the incarceration of Burford and Petitioner was the cause of the delay and it was only through a chance encounter while they were incarcerated together that this information was able to be passed along to Petitioner. (See ¶ 2 of Exhibit B).

Raad and Samir Konja are willing to testify that Collins was not allowed in their party store (see ¶ 2 of Exhibit D & ¶ 1 of Exhibit E) and Raad Konja will testify that he would have seen anyone that walked into the store and that Collins did not enter the store on the night Mr. Penn was shot and killed. (See ¶ 2 of Exhibit D). These affidavits could not have been previously obtained by Petitioner as he does not know Raad or Samir Konja and had to rely on Williams to obtain their affidavits as he has no immediate family in the State of Michigan. (See ¶ 5 of Exhibit B). The reliaility of these two affidavits is readily apparent as these two witnesses have "no evident motive to lie". House v Bell, 547 US at 22. In fact, when responding to Petitioner's previous petition for writ of habeas corpus, Respondent did not even refute the reliability of Raad and Samir Konja. Very telling is the fact that the Wayne County Prosecutor's Office has never produced a police report or any other item of evidence indicating that anyone had talked to the store owners but instead insisted on chasing Collins around Wayne County with the police in tow to question Collins (see page 9 of Exhibit H) & (page 11 of

-17-

Exhibit I) in what appears to be yet another attempt in a long history of extracting the testimony that they desire. After all, if the prosecutor's office wanted so badly to question Collins then why would they turn around and argue so hard against an evidentiary hearing. (See page 23 of Plaintiff-Appellee's Brief Opposing Leave filed in the Michigan Supreme Court).

Also, Randall, Hill and Burford all indicate in their affidavits that it was Mark Goings that killed Mr. Penn. Compare ¶ 6 of Exhibit N with ¶¶'s 2, 3 & 6 of Exhibit A and with ¶ 10 of Exhibit C. Carter, Randall and Williams state that Collins told them that he was forced by police to testify against Petitioner (see ¶¶¶¶'s 2, 3, 4 & 6 of Exhibit R, ¶ 8 of Exhibit N & ¶¶¶'s 3, 4 & 7 of Exhibit O), and Burford, Carter and Randall state that Collins was not on Gray and Mack or in the Special K Party Store on the night of the murder (see ¶ 6 of Exhibit C, ¶ 5 of Exhibit R & ¶¶¶'s 2, 3 & 4 of Exhibit N) which is further corroborated by Raad and Samir Konja (see ¶ 2 of Exhibit D & ¶ 2 of Exhibit E), corroborating what Collins says in his affidavit (see Exhibit G) and during his polygraph examination. (See Exhibit J). These "cross-corroboration[s] of statements support[] their reliability", Lopez v Miller, 915 F Supp 2d at 401, especially when considering that the polygraph expert opined that Collins' recantation was credible. (See Exhibit J).

The reliability of the claim that the records from the Checker Cab Company did not support Collins' claim that he fled the murder scene in a cab is supported by Collins' affidavit (see Exhibit G), the DVD/disk of the polygraph examination and the polygraph report indicating that polygraph expert Michael Anthony was of the opinion that he was being truthful when he stated that he was not present. (See Exhibit J). Indeed, Collins' claim that he was not present is irrefutably supported by every piece of evidence in this case as is explained in the "compelling" portion of this argument.

Collins' affidavit recanting his trial testimony on the third day of

trial implicating Petitioner in the murder of Mr. Penn is reliable because Petitioner's "post-conviction proceedings were still pending at the time" Collins provided his affidavit and he "presumably expected to be subject to cross-examination on [its] contents, suggesting to the court that the affidavits were truthful." Lopez v Miller, 915 F Supp 2d at 401. Indeed, Collins was subject to quite an intense interrogation prior to him passing a polygraph examination as is shown on the DVD/disk recording of that process from which his demeanor can be observed. And as discussed above, Collins' affidavit is cross-corroborated with every other affidavit. Additionally, as discussed in the "compelling" portion of this actual innocence argument, Collins' recantation is verified by every piece of evidence while Collins' testimony at trial implicating Petitioner in the murder of Mr. Penn is contradicted by other witnesses and is against the laws of nature.

COMPELLING

To make a "compelling" claim of actual innocence, Petitioner must demonstrate that this new evidence would "make it more likely than not [that] no reasonable juror would find him guilty beyond a reasonable doubt." House v Bell, 547 US at 538. "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather, the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup v Delo, 513 US at 329.

Collins was the only prosecution witness to provide testimony that Petitioner was even at the scene of the murder of Rodnell Penn. And when first called to testify at trial on Monday, August 31, 1992, Collins said that he had given false testimony implicating Petitioner in the murder at the preliminary examination. He specifically denied being present at the party

-19-

store on Gray and Mack on January 17, 1992 at the time Mr. Penn was killed and also denied seeing Petitioner at that time and place. (T1, 18-19). Collins testified that homicide detectives from the Detroit Police coerced him to say things that weren't true and that he lied under oath in his preliminary examination testimony. (T1, 39). He testified that the homicide detectives pressured him to lie with promises of money and protections, and threats regarding his pending prison escape charge. (T1, 49-51). A woman named "Barbara" was also told by Collins prior to trial that "the police are trying to make me say Carl did this." (See Exhibit S).

After his Monday, August 31, 1992 trial testimony, Collins was arrested for perjury and held in the custody of the homicide detectives from the Detroit Police. (T3, 47-50). On Wednesday, September 2, 1992, Collins was recalled by the prosecution and recanted his testimony given at trial on Monday. Collins testified that he had lied on Monday and that now his preliminary examination testimony was really the truth. (T3, 36-40). He claimed that his testimony exonerating Petitioner at trial on Monday was given out of fear of death threats (T3, 40) and without any promises from the homicide detectives (T3, 50-51), Collins ignored his fear for the life of his family and himself that he had just two days earlier and gave testimony implicating Petitioner.

It was based on this questionable foundation that Collins gave his testimony implicating Petitioner on Wednesday, the third day of trial. Collins testified that he did not actually see Petitioner shoot Mr. Penn but that he heard three or four gunshots, turned around, looked down Gray "And I seen Carl Hubbard running through a field." Collins couldn't see Petitioner's face but made his identification by a scar on the back of his head. (T3, 64-65)(See also Exhibit T, photograph of scar). Petitioner has marked Exhibit U with an

-20-

"A" to indicate where Petitioner was alleged to have been running when he was identified by Collins. (See Exhibit U). But Officer Randy Richardson testified that the party store on the corner of Gray and Mack, where Collins claims to have been standing when he identified Petitioner--indicated by a "B" on Exhibit U--was about three hundred to three hundred and seventy five feet away from the location of Mr. Penn's body. (T2, 21-22). Officer Richardson also testified that the area where Mr. Penn was found--indicated by a "C" in Exhibit U--was fairly dark. (T2, 21). In fact, after being shown People's Exhibit 13 (see Exhibit V) that was taken from the side of the party store at roughly 9:45 to 10:00 a.m., which depicted himself standing "pretty close to" the crime scene (T2, 28-29), Officer Richardson could not see any of his features but could make out no more than a silhouette of himself. (T2, 29-30).

Under the concept known as the "physical facts rule," the testimony of a witness which is opposed to the laws of nature, or which clearly conflicts with the principles that are established by the laws of science cannot be given any probative value by the jury. See Harris v General Electric Corp., 201 F 3d 800, 803, (6th Cir. 2000). When looking at Exhibit V, it is apparent that the testimony from Collins that he identified Petitioner by a scar on the back of his head under the conditions which he claims to have is "opposed to the laws of nature" and would not "be given any probative value by the jury." Id. After all, if Officer Richardson could make out no more than a silhouette of his body in the photograph showing him at around 9:45 to 10:00 in the morning that was taken at the party store (T2, 28-30) where Collins claimed to have identified Petitioner (T3, 64), then how could Collins have possibly identified Petitioner from the same distance at night in a fairly dark area (T2, 21) by only a scar on the back of Petitioner's head? (T3, 64-65).

-21-

The only logical conclusion is that Collins committed perjury due to being coerced by the police and prosecutor as was claimed in his affidavit and during his polygraph examination (see ¶¶¶'s 5, 6 & 8 of Exhibit G & DVD/disk) and verified by the Polygraph Report indicating that he was being honest when claiming that he was not present when Mr. Penn was shot. (See ¶ 3 & "Results" of Exhibit J). This is further supported through an investigation conducted by the Justice Department which revealed that homicide detective Sergeant Joann Kinney--the same sergeant that Collins said coerced him to commit perjury on the third day of trial (see ¶¶'s 5 & 6 of Exhibit G)--admitted to threatening other witnesses. (See Exhibit Q).

Everything about this case verifies Collins' claim that he was not present when Mr. Penn was shot and did not see Petitioner on the night of his murder. (See ¶¶'s 1 & 2 of Exhibit G & page 2 of Exhibit J). In fact, Detroit Police reported that witnesses told them that there was "a Black female approaching 3960 Gray" with the deceased moments before gunshots were heard and the deceased was observed laying on the ground. (See Exhibit W). After being shot, a black female was witnessed "saying something to" the deceased and then walking into 3960 Gray. (See Exhibit Y). But Collins says nothing of this black female in this trial testimony or of Lucinka Gross who was walking down the street at that time also. (T2, 52-53).

Collins claimed to have been able to identify the deceased as the same person that he saw with Petitioner five to ten minutes earlier in the party store (T3, 45) even though he had never seen the deceased before in his life (T3, 52), couldn't describe what he looked like or what he was wearing (T3, 76), and didn't even see his face when he saw him dead in the driveway. (T3, 77).

Collins also claimed that, after seeing "the decease[d] guy laying in

the driveway ... I took off running. I jumped into a cab and went home." (PE, 13). The trial judge relied on this claim. (T3, 175-176). But after a subpoena was issued for the production of all fares handled in that area on that night (see Exhibit K), nothing favorable was able to be presented in support of Collins' claim. (See trial transcripts generally). Perhaps this was because there "was a snow storm and there were no buses" or other public transportation running that night. (See ¶ 9 of Exhibit C). As the Supreme Court in Graves v US, 150 US 118 (1893) explained, "if a party has it particularly within its power to produce [evidence or] witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the [evidence or] testimony, if produced, would be unfavorable." Id. at 121.

Nothing corroborates Collins' claim that he was present at the scene of the crime on the night of Mr. Penn's murder. In fact, every piece of evidence and testimony shows otherwise. Raymond Williams (T3, 103-104), Roney Fulton (T3, 115-116), and Emanuel Randall (see ¶¶¶'s 2, 3 & 4 of Exhibit N) all claim that Collins was with them that night. Moreover, even after being arrested two days after Petitioner's preliminary examination and charged with the murder of Mr. Penn (see Exhibit AA), Andrew Smith's testimony contradicted Collins' testimony that the two were together that night. Compare (T2, 47-49) with (T3, 71-74).

Moreover, Collins' claim that he was at the Special K Party Store talking to the store owner (PE, 12) when he saw Petitioner accompanied by Mr. Penn right before the murder (T3, 38, 44, 52) is rebutted by Roy Burford (see ¶ 6 of Exhibit C) and the owners of the Special K Party Store, Samir and Raad Konja, who will testify that Collins was not allowed in their store (see ¶ 2 of Exhibit E and ¶ 1 of Exhibit D) and Raad will further testify that he would

have seen anyone that walked into the store and that Collins did not. (See ¶ 2 of Exhibit D). Steven Konja did not see him either. (See ¶ 2 of Exhibit P).

At a new trial where Collins were testifying that he did not witness Petitioner at the scene of the crime--the witness the trier of fact centered its finding of guilt on (T3, 101)--Askia Hill testifying that he was there and witnessed Mark Goings commit the murder (see ¶¶¶'s 2, 3 & 6 of Exhibit A) which was the word on the street (see ¶ 10 of Exhibit C) & (¶¶'s 6 & 7 of Exhibit N), and three witnesses testifying that Collins told them that he was coerced to lie at Petitioner's trial (see ¶ 8 of Exhibit C), (¶ 8 of Exhibit N), and (¶¶¶'s 3, 4 & 7 of Exhibit O), the result of the proceeding would have been different.

The trial court held that this "evidence would not render a different result probable on retrial." (See page 14 of Exhibit H). "[P]robable" means "more likely than not", Sutter v Briggs, 377 Mich 80, 89 (1966), which is the same standard required to make a colorable showing of actual innocence. See McQuiggin v Perkins, 133 S Ct at 1935 ("To invoke the miscarriage of justice exception to AEDPA's statute of limitations ... a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in ight of the new evidence.").

In coming to the conclusion that a different result was not probable, the trial court found that "[t]he circumstantial evidence against Defendant was surprisingly strong". (See page 14 of Exhibit H). The trial court does not elaborate on what "circumstantial evidence against Defendant was surprisingly strong" but this is verbatim what the prosecutor stated in his response (see page 22 of Exhibit I) as was nearly every other factual and legal determination. Because the trial court adopted the prosecutor's response without exception, Petitioner will now rebut the facts relied on by the

-24-

prosecutor used to show that "[t]he circumstantial evidence ... was surprisingly strong" that was adopted verbatim by the trial court. First, the prosecutor began by arguing that "Collins would be impeached with his statement to the police, his preliminary examination testimony, and his disavowal at trial of the claim that he was not on Gray and Mack." (See page 18 of Exhibit I). But these facts would have no bearing on a jury after hearing the facts and arguments presented previously and hereinafter.

For example, as for his "disavowal at trial of the claim that he was not on Gray and Mack" (see page 18 of Exhibit I), he testified that this was done out of fear of death threats made on him and his family. (T3, 40). But despite his belief in these death threats (T3, 40) and without any promises from the homicide detectives (T3, 50-51), Collins ignored his fear for the life of his family and himself that he had just two days earlier and made a request to give the testimony (T3, 37) implicating Petitioner. No jury would believe that he honestly believed that either he or his family would be killed if he testified against the Petitioner when he turned right around and asked to testify against him two days later (T3, 37) without any assurances from the homicide detectives. (T3, 50-51).

The prosecutor next pointed to "[o]ne of the most damaging facts about Collins's recantation at trial" in support of the position that the new evidence would not have any effect on retrial. (See page 19 of Exhibit I). But this was a different recantation than is being relied upon in the current appeal. The Petitioner is not asking for a new trial based on "Collins's recantation at trial" given on the first day, he is claiming that he is entitled to a new trial based on the recent recantation from Collins that indicates why he testified the way he did on the third day of trial. And the belief that because "the nineteen year old gave a phony name would seem to

make it more likely that the information in the police statement was the truth" because "[h]is reasoning may have been that the defendant would never know it was Collins who had informed", and the facts relied on by the prosecutor which are claimed to have "supported Collins's testimony" (see pages 19-20 of Exhibit I) would mean nothing in light of the facts and arguments in support of the credibility of Collins' testimony discussed both previously and hereinafter.

Collins testified at trial that he saw Mr. Penn and the Petitioner at the store together and that when he next saw them moments later Mr. Penn was laying in the driveway and the Petitioner was running through a field. (T3, 44-46). But a witness reported "that he observed the complainant and a Black female approaching 3960 Gray" moments before hearing "several gunshots" and "observing the complainant laying on the ground". (See Exhibit W).

Also, Lucinka Gross testified that she only lived "about a block" from the murder scene (T2, 51) and that, when she left to go to the store (T2, 52), her daughters had heard gunshots. (T2, 54 & 56). And when she discovered the body (T2, 53), there was no one else in the area. (T2, 54 & 57). And Herman Luckey said in his police report that, after he heard gunshots, he "saw a lady bending over the guy like she was asking him something. Then she went into 3960 Gray". (See Exhibit X); (See also Exhibit Y). But at trial Collins testified that when he heard gunshots (T3, 44) and ran down the street (T3, 80) and saw the man laying in the driveway, there was no one else in the area. (T3, 45).

Collins claimed to have been able to identify the deceased as the same person that he saw with the Petitioner five to ten minutes earlier in the party store (T3, 45) even though he has never seen the deceased before in his life (T3, 52), couldn't describe what he looked like or what he was wearing

(T3, 76), and didn't see his face when he saw him dead in the driveway. (T3, 77). So if he didn't see his face and didn't know what he was wearing, how in the world could he have identified him? So Collins' claim that "he could not see the victims face" being "confirmed by the officer on the scene" (see page 20 of Exhibit I) really supports the Petitioner's position.

Collins' recantation is also corroborated by an investigation conducted by the Justice Department which revealed that homicide detective Joann Kinney--the same Sergeant that Collins said coerced him to commit perjury (see ¶¶'s 5 & 6 of Exhibit G)--admitted to threatening other witnesses. (See Exhibit Q). And this is not the only time she has done so. (See pages 4-5 of Exhibit Z).

And it is significant that the prosecutor did not even try to argue that Collins claim that after seeing "the decease[d] guy laying in the driveway[,] ... I took off running[,] I jumped into a cab and went home" (PE, 13) could be corroborated. If the prosecutor could have done so it would seem like that would have happened here in light of the extraordinary effort made to make it appear as though Collins' testimony implicating the Petitioner would have been accepted by the jury. (See pages 18-20 of Exhibit I).

The prosecutor's assertion that Andrew Smith somehow would support Collins' testimony (see pages 19-20 & 21-22 of Exhibit I) is quite a stretch when considering the fact that Smith's testimony contradicted Collins' testimony claiming that the two were together that night. Compare (T2, 47-49) with (T3, 71-74).

Collins' claim that he was in the Special K Party Store talking to the store owner (PE, 12) when he saw the Petitioner accompanied by Mr. Penn right before the murder (T3, 38, 44, 52) would be impeached by Roy Burford (see ¶ 6 of Exhibit C) and the owners of the Special K Party Store, Samir and Raad Konja, who will testify that Collins was not allowed in their store. (See ¶ 2

-27-

of Exhibit E) & (¶ 1 of Exhibit D). And Raad and Steve Konja will testify that they would have seen Collins come into the store that night but he didn't. (See ¶ 2 of Exhibit D & ¶ 2 of Exhibit O). The prosecutor acts as though these witnesses can somehow remember the events of a single ordinary night twenty years ago (see page 22 of Exhibit I) but this night would have stuck out in their minds as Lucinka Gross testified that she went to the party store and "asked them to call the police" to report a murder that happened just down the street. (T2, 55, 58). It is again ironic that the prosecutor finds "unbelievable" the Petitioner's "claim that the police never spoke to them about the crime" yet does not even include a police report indicating that the police had talked to the store owners, but instead chased Collins around Wayne County with the police in tow to question Collins (see page 11 of Exhibit I) & (page 9 of Exhibit H) in what appears to be yet another attempt in a long history of extracting the testimony that they desire.

Finally, Raymond Williams (T3, 103-104), Roney Fulton (T3, 115-116), and Emanuel Randall (see ¶¶¶'s 2, 3 & 4 of Exhibit N) all claim that Collins was with them that night. The trial court found "that Defendant's alibi witnesses were not credible" without any explanation as to why. (See page 16 of Exhibit H). Petitioner can only assume that the trial court adopted the prosecutor's position on this as was done on every other finding made by the Court. And the prosecutor's claim that "defendant's alibi witnesses were unbelievable" is due in part to what Detroit Police "Officer Turner testified defendant had done". (See page 21 of Exhibit I). But anything that Officer Turner would have to tell the jury would carry little weight as the jury would also be hearing that other officers from the Detroit Police had coerced Collins to say that he was present when the Petitioner shot Mr. Penn and that he claimed to have witnessed th= Petitioner running from the scene by a scar

on the back of his head at night at a distance that would have been impossible to have been done, proving that he was coerced to testify falsely. Turner's testimony as to observing the Petitioner at the scene of the crime and as to his interactions with him at that time (see page 21 of Exhibit I) would also be viewed in the shadow of this credible claim of police corruption. It would also not appear surprising to the jury that Spells did not want to talk to the police and instead chose to testify in court (see page 22 of Exhibit I) in light of the way in which Collins would have been shown to have been pressured. The claim that Spells' testimony "contradicts not only Collins but also Andrew Smith" (see page 21-22 of Exhibit I) relies on testimony from Collins that has been credibly recanted and Andrew Smith, a witness who was arrested and charged with the very murder he was testifying about. (See Exhibit AA). The other minor inconsistencies testified to nine months after they had occurred is hardly surprising and not likely to discredit this alibi. In any event, nothing is said of Emanual Randall's alibi.

And "corroboration ... provided by the victim's brother, cousin, and girlfriend" (see page 20 of Exhibit I) who must have been grieving the death of their loved one and were being told that the Petitioner was the killer certainly had motive to testify favorably for the prosecution.

The prosecutor's argument that "defendant had motive to finally eliminate the person who had given preliminary examination testimony in his previous murder charge" (see page 27 of Exhibit I) does not make sense as there was "a stipulation that" he "had failed to appear at trial" (see page 21 of Exhibit I) and the charges were dismissed. (See Exhibit BB). The prosecutor wants this Court to believe "that the victim sold drugs for the defendant and had been doing so for two years" (see page 20 of Exhibit I) before luring him into a store and then out onto a public street to kill him in retaliation for

refusing "to appear for trial" (see page 21 of Exhibit I) which led to those charges being dismissed. (See Exhibit BB). If the Petitioner were truly so calculated as to wait two years for the perfect opportunity to kill Mr. Penn, this certainly was not it. After two years of "selling crack" at "[d]ifferent places" on the "west side" of Detroit (T1, 75) and coming to his house to "pick up the money and get more dope for him" (T1, 8), it would only seem logical that he would have had a better opportunity to kill him in a secluded area rather than killing him in the street.

And this Court should not forget that, on retrial, the jury will hear evidence that the Petitioner was acquitted of the Possession of a Firearm During the Commission of a Felony charge (T3, 185) even though APA Gonzalez argued that the "killing was done by the defendant with a firearm". (T1, 6). So the circumstantial evidence was not "surprisingly strong" as alluded to by the prosecutor and accepted as true by the trial court.

And the jury would also hear that Askia Hill witnessed Mark Goings, not the Petitioner, kill Mr. Penn. (See ¶¶¶¶'s 2, 3, 5 & 6 of Exhibit A). And while the prosecutor faulted Petitioner because Hill "has not been given a polygraph exam" (see page 22 of Exhibit I), the prosecutor has not investigated Hill's claim even in the face of media requests for it to be done (see Exhibit M) which makes the persistent attempts by the prosecutor's Conviction Integrity Unit (see Exhibit CC) disingenuine, especially in light of the manpower utilized in chasing Collins around Wayne County to talk to him (see page 11 of Exhibit I) & (page 9 of Exhibit H) to investigate his claims. So the fact that "Defendant fired his most recent attorney and insisted that the prosecutor's conviction integrity unit not [] investigate his case" (see page 9 of Exhibit H)--a unit headed by Richard P. Hathaway (see Exhibit CC), the very judge that presided over his bench trial and accepted Collins'

-30-

testimony that he could identify Petitioner by a scar on the back of his head at night in a dark area from 300 to 375 yards away after seeing People's Exhibit 13 showing and officer from the same distance which provides no more than a silhouette of him (see Exhibit V)--is perfectly logical. What is not is that the prosecutor has only sought to question Collins, refused to provide the results of the subpoena from the cab company or any police reports indicating that the police did talk to the Special K Party Store owners, and yet the trial court nearly verbatim accepted the prosecutor's position even after being informed that the prosecutor had not investigated the claim by Askia Hill that Mark Goings was the real killer. (See Exhibit M).

And while it is true that "affidavits recanting prior sworn testimony are suspect" (see page 14 of Exhibit H), "given the inherent weakness in [Collins'] prior testimony at trial his recantations should not be viewed with as much suspicion as generally accorded. In fact," as discussed above, Collins' "recantation was supported by the record." People v Johnson, 502 Mich at 578.

Several other items of new evidence demonstrate that Collins was not only given a "deal" for his testimony implicating Petitioner on the third day of trial, but also that the perjury charges he was faced with after he provided testimony exonerating Petitioner on the first day of trial were never pursued after he gave testimony implicating Petitioner on the third day of trial. Search results from the Michigan Department of States' Uniform Commercial Code Debtor Information file revealed that a LEIN was place on Collins on August 25, 1992 for a parole violation (see Exhibit DD); less than a week before he first testified at trial on August 31, 1992. Collins gave testimony exonerating Petitioner and he was immediately arrested for perjury. (T3, 47-50) & (Exhibit EE). Collins was recalled two days later and testified

that he had lied on the first day of trial and that the testimony he gave implicating Petitioner during his preliminary examination was now the truth (T3, 36-40) and only a few days later, on September 5, 1992, the LEIN for the parole violation was recalled. (See Exhibit DD). Moreover, a Freedom of Information Act request to the Michigan State Police produced a criminal history on Collins verifying the fact that he was never charged with perjury (see Exhibit FF) and Collins' trial court docket entries support this as well. (See Exhibit GG). Petitioner's trial attorney, Ronald Giles, provided Petitioner with a post-trial affidavit indicating that his recollection of the perjury charge was that "Mr. Collins was released and not charged when he changed his testimony the following day." (See ¶ 5 of Exhibit HH). Petitioner's attorney also wrote a post-trial letter to Petitioner explaining to him "that Mr. Collins was on ... parole, and was given a 'deal' in order to maintain his ... parole, after his testimony." (See Exhibit II).

The judge sitting as the trier of fact considered all of Collins' testimony (T3, 173-175) and stated his belief that "Mr. Collins' testimony at times was very conflicting and down right lying to this Court." The judges' opinion here addressed Collins' testimony from the first day of trial as that which was disbelieved as he goes on to state that Collins "did tell this Court today as to the reasons as to why he lied two days ago in this courtroom." (T3, 176).

Had the judge known that Collins was coerced by homicide detectives from the Detroit Police to commit perjury on the third day of trial, the day he told the "Court ... the reason as to why he lied two days ago in this courtroom," the testimony given "two days ago" on August 31, 1992 that exonerated Petitioner would have been the testimony accepted as true by the judge and Petitioner would have been acquitted.

-32-

Furthermore, had the trial judge known that Collins was given "a 'deal' in order to maintain his ... parole, after his testimony" (see Exhibit II) and that he was to be "released and not charged when he changed his testimony" (see ¶ 5 of Exhibit HH), the outcome would have been different. The trial judge was of the opinion that the entire case centered in and around Collins' testimony (T3, 101) and accepted his explanation for lying in the first day of trial (T3, 176) which was because of his belief in the alleged death threats made on him and his family. (T3, 38-40). Had the trial judge had knowledge that Collins explanation for lying on the first day of trial was only given on the third day of trial after making agreements and being threatened by the police and prosecutor, considered in combination with the fact that Collins claimed to have abandoned his fear for the life of his family and himself (T3, 38-40) without any promises from homicide detectives (T3, 50-51) and with all of the other facts detailed above belying Collins' testimony implicating Petitioner in this crime, the testimony exonerating Petitioner would have been the testimony accepted as true and Petitioner would have been acquitted. To be sure, Collins testified that he never saw Petitioner with a weapon (T3, 44-46) and Petitioner was found not guilty of the possession of a firearm during the commission of a felony charge (T3, 185) even though the prosecution's case was that the "killing was done by the defendant with a firearm, particularly a handgun." (T1, 6). And Hill would be testifying that he witnessed Mark Goings killing Mr. Penn. (See ¶¶¶'s 2, 3 & 6 of Exhibit A).

For all of these reasons, Petitioner asserts that it is "more likely than not, in light of the new evidence, [that] no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt." House v Bell, 547 US at 538.

<u>OVERCOMING PROCEDURAL BARS</u>

The Supreme Court has applied the actual innocence exception to

overcome a procedural default in state court in <u>Coleman</u> v <u>Thompson</u>, 501 US 722, 750 (1991), <u>Murray</u> v <u>Carrier</u>, 477 US 478, 495-496 (1986), and in <u>House</u> v <u>Bell</u>, 547 US at 521-522, and because Petitioner has made a colorable showing of actual innocence, no procedural bars are applicable to any claims presented in this petition.

<u>ENTITLEMENT TO AN EVIDENTIARY HEARING</u>

Petitioner first argues that he is entitled to an evidentiary hearing in relation to the claims raised in his post-conviction motions for relief from judgment that were filed in the Wayne County Circuit Court under subchapter 6.500 of the Michigan Court Rules to the extent that they were not adjudicated on the merits. The United States Supreme Court explained in <u>Cullen</u> v <u>Pinholster</u>, 131 S Ct 1388 (2011) that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." <u>Id.</u> at 1400. But, "if the state court did <u>not</u> adjudicate the petitioner's claim on the merits, <u>Pinholster</u> explains that a federal court can still hold an evidentiary hearing, subject of course to the restrictions of 28 U.S.C. § 2254(e)(2)." <u>Ballinger</u> v <u>Prelesnik</u>, 709 F 3d 558, 562 (6th Cir. 2013), citing <u>Cullen</u> v <u>Pinholster</u>, 131 S Ct at 1401 & n. 10.

The last reasoned opinions were from the Wayne County Circuit Court Judge who denied Petitioner's first motion for relief from judgment by stating that:

> "All of the issues raised in defendant's current motion were raised, in one form or another, and rebuffed on direct appeal and/or in his first post-appeal motion. Accordingly, and since defendant does not make an accurate claim of a retroactive change in law, the defendant is not entitled to relief because of MCR 6.508(D)(2)(3)." (See Exhibit JJ)

But:

> "The trial court could not have simultaneously concluded both that [Petitioner's] claim had already been litigated on direct appeal <u>and</u> that [Petitioner] lost his claim by failing to raise

-34-

it on direct appeal. Most likely, the invocation of the procedural default rule ... was a typographical error, and the court dismissed the claim under M.C.R. 6.508(D)(2)." Peoples v Lafler, 734 F 3d 503, 511 (6th Cir. 2013)(emphasis in original).

"The erroneous invocation of M.C.R. 6.508(D)(2) to deny a habeas petitioner's claim is not considered an adjudication on the merits". Marion v Woods, 128 F Supp 3d 987, 993 (E.D. Mich. 2015). To the extent that any of Petitioner's claims raised in his first 6.500 motion "were raised, in form or another, and rebuffed on direct appeal and/or in his first post-appeal motion" (see Exhibit JJ), "[t]he provision of subrule (D)(2) regarding issues that were decided against the defendant in a prior appeal state familiar principals drawn from the doctrine[] of ... law of the case." People v Jackson, 465 Mich 390, 398 (2001). But "the law-of-the-case doctrine applies only if the facts remain substantially the same", People v Bryant, 289 Mich App 260, 271 n. 2 (2010), and Petitioner was not in possession of the affidavits from Hill (see page 3 of Exhibit A), Burford (see page 2 of Exhibit C), Randall (see page 2 of Exhibit N), or Williams. (See page 2 of Exhibit O). Therefore, the invocation of MCR 6.508(D)(2) on the first 6.500 motion filed by the Petitioner was erroneous and was not based on the merits, Marion v Woods, 128 F Supp at 994, and Petitioner is entitled to an evidentiary hearing. Ballinger v Prelesnik, 709 F 3d at 562.

The denial of Petitioner's second motion for relief from judgment was denied pursuant to MCR 6.502(G). (See Exhibit F). "Michigan's rule against successive motions prevents a second petition from even being considered by the court." Williams v Birkett, 670 F 3d 729, 733 (6th Cir. 2012). Therefore, here too, "the state court d[id] not adjudicate the petitioner's claim on the merits" and this Court "can still hold an evidentiary hearing." Ballinger v Prelesnik, 709 F 3d at 562.

"Although the Supreme Court has explained that 'it may be presumed that

[a] state court adjudicated [a] claim on the merits,' this presumption is limited to situations in which there is an 'absence of any indication or state-law procedural principles to the contrary.' Harrington v Richter, 562 US 86, 99, 131 S Ct 770, 178 L Ed 2d 624 (2011). A dismissal of a claim explicitly acknowledging a court's procedural inability to sufficiently consider it constitutes an 'indication' that the court did not adjudicate the claim on the merits." White v Warden, Ross Corr. Inst., 940 F 3d 270, 274 (6th Cir. 2019).

Also, as for Argument VI(C) and VII which were raised on direct appeal in th 1990's, an evidentiary hearing held to make a determination as to whether these arguments can be equitably tolled is not barred. As the Court in Chavez v Florida, 647 F 3d 1057, 1060 n. 1 (11th Cir. 2011) explained, the:

> "AEDPA does contain additional restrictions on a federal court granting an evidentiary hearing in a state prisoner's habeas proceedings. See 28 U.S.C. § 2254(e)(2); Cullen v Pinholster, ___ US ___, 131 S Ct 1388, 1398, 179 L Ed 2d 557 (2011); see also Schriro, 550 US at 474, 127 S Ct at 1490 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in determining whether an evidentiary hearing is appropriate."). Those additional restrictions do not, however, apply to the § 2254(d) statute of limitations tolling issues before us, because whether the statute is equitably tolled is a purely federal issue, which did not arise until Chavez's federal habeas petition was filed."

Petitioner also asserts that the Michigan Court of Appeals' decision on direct appeal back in the 1990's was an unreasonable determination of the facts. As explained in Argument VI(D), the Michigan Court of Appeals had several items of evidence presented to it to factually support his claim but ignored this evidence in making its ruling. (See page 4 of Exhibit KK). In Taylor v Maddox, 366 F 3d 992 (9th Cir. 2004), it was held that "if a state court makes evidentiary findings without holding a hearing and giving a petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." Id. at 1001. Because the

Michigan Court of Appeals made an evidentiary finding without holding a hearing, it made an unreasonable determination of the facts and, as the Court in Caudill v Conover, 871 F Supp 2d 639, 647 (E.D. Ky. 2012) explained, Cullen v Pinholster "does not completely shut the door on further factual development if needed. If, after reviewing the extensive state court records, this Court determines that any of the claims adjudicated by the state court were based on an unreasonable determination of the facts, § 2254(d) deference would not apply and new evidence can be considered."

For all of these reasons, Petitioner is entitled to an evidentiary hearing in this Court. In fact, "[w]here newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal courts must grant an evidentiary hearing." Townsend v Sain, 372 US 293, 317 (1963)(emphasis added). At a minimum, this Court has it within its discretion to hold an evidentiary hearing on Petitioner's actual innocence claim. Simmons v Winn, 361 F Supp 3d 719, 739 (E.D. Mich. 2019). After such an evidentiary hearing, Petitioner asserts that he will have presented "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error," Schlup v Delo, 513 US at 316, and Petitioner asserts that his trial was not free of non-harmless constitutional error as is now addressed.

## FREESTANDING CLAIM OF ACTUAL INNOCENCE

The Supreme Court of the United States has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence," McQuiggin v Perkins, 133 S Ct at 1931, and Petitioner argues that, in light of the compelling circumstances of this case detailed above, he has made out an exceptional case for which the Supreme Court to

-37-

resolve this question.

### ARGUMENT II

PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT'S DENIAL OF HIS MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE WAS SO EGREGIOUS THAT IT VIOLATED HIS RIGHT TO A FUNDAMENTALLY FAIR TRIAL.

To establish a constitutional due process claim based upon a state court's denial of a motion for a new trial based on newly discovered evidence, Petitioner must demonstrate that the trial court's denial of his motion for a new trial was so egregious that it violated his right to a fundamentally fair trial. Kelley v Burton, 377 F Supp 3d 748, 757 (E.D. Mich. 2019), citing Pudelski v Wilson, 576 F 3d 595, 611 (6th Cir. 2009).

Petitioner asserted that he was entitled to a new trial based on the affidavit (see Exhibit G), Polygraph Report (see Exhibit J), and DVD/disk of the polygraph examination. The trial judge, who was the factfinder in this case, was of the opinion that the entire case centered in and around the testimony from Curtis Collins (T3, 101) which was that he heard four gun shots, turned around, looked down Gray "And I seen Carl Hubbard running through a field" and identified him by a scar on the back of his head. (T3, 64-65).

In his affidavit and on the DVD/disk of his polygraph examination, Collins claims that he was not present at the scene of the crime for which Petitioner stands convicted, did not witness Petitioner running from the crime scene, and only testified otherwise on the third day of trial because he was threatened by Detroit Police and Assistant Wayne County Prosecutor, James Gonzalez. (See Exhibits G & DVD/disk).

The claim in his affidavit and on the DVD/disk that he was not present at the scene of the crime for which Petitioner stands convicted is bolstered by the Polygraph Report indicating that he was being truthful in this regard.

-38-

(See ¶ 3 of Exhibit J). "Polygraph test results may be considered in deciding a motion for a new trial where ... (1) they are offered on behalf of the defendant, (2) the test was taken voluntarily, (3) the professional qualifications and quality of the polygraph equipment meet the approval of the court, (4) either the prosecutor or the court is able to obtain an independent examination of the subject or of the test results by an operator of the court's choice, and (5) the results are considered only with regard to the credibility of the subject." People v Mechura, 205 Mich App 481, 484 (1994).

First, the polygraph results were being offered on behalf of Petitioner as evidenced by Exhibit G, J and the DVD/disk. Second, the test was taken voluntarily. (See ¶ 9 of Exhibit G ("I am willing to take a polygraph test"). Third, the professional qualifications and the quality of the polygraph equipment could have been shown to meet the approval of the court through the testimony of licensed polygraph examiner, Michael Anthony. (See ¶ 1 of Exhibit LL). Fourth, either the prosecutor or the court would have been able to obtain an independent examination of the subject or of the test results by an operator of the court's choice as Collins is "willing to take a polygraph test," "willing to testify to" the facts contained in his affidavit (see ¶ 9 and the introduction of Exhibit G), and licensed polygraph examiner, Michael Anthony, was willing to provide this Court with the test results at an evidentiary hearing on remand or by request. (See ¶ 2 of Exhibit LL). And fifth, an examination of the arguments made demonstrated that Petitioner was only asking the Court to consider the polygraph test results with regard to the credibility of Collins.

Several other affidavits were presented with his motion that not only provided support for the claim by Collins that he was forced to commit perjury, but also provided another possible suspect and presented a person who

would have testified to witnessing the murder and that it was not Petitioner.

Specifically, there were three affidavits from three people with information that Collins was coerced by homicide detectives from the Detroit Police to commit perjury on the third day of Petitioner's trial. (See Exhibit C, N & O). First, there was Roy Burford who would have testified that he knows Collins personally and was told by him that he lied on Petitioner Hubbard because Mr. Hubbard had personally robbed him around 1996 and that the police had something on him as well. (See ¶ 8 of Exhibit C).

Second, there was Emanuel Randall who would have testified that he couldn't understand why Collins lied in court about Petitioner Hubbard, he never would say. All he would say was that the police had something over his head and that he had to. (See ¶ 8 of Exhibit N).

Third, there was Raymond Williams who would have testified that, while being held in police custody at the Detroit Police Headquarters on the 9th floor Homicide Division between August 31, 1992, and September 2, 1992, he heard Collins crying in another cell. He asked Collins what was wrong and he told Mr. Williams that homicide officers Sergeant Joann Kinney and Sergeant Ronald Gale were forcing him to lie on Petitioner Hubbard on September 2, 1992 at Petitioner's murder trial or else he would be charged with the murder rather than Petitioner. (See ¶¶¶¶'s 3, 4, 6 & 7 of Exhibit O).

And then there were the affidavits which provided another possible suspect. Roy Burford and Emmanuel Randall stated in their affidavits that the word on the street was that Mark Goings was the one who actually killed Rodnell Penn on Gray and Mack on January 17, 1002. (See Exhibit C & N). Roy Burford would have testified that:

> "After 'CARL HUBBARD' got convicted for the murder in front of 'UNCLE PETER'S' house, everyone was saying that 'MARK GOINGS' was the one who actually killed the guy. This was due to 'MARK GOINGS' believing that the victim had something to do with his brother 'DARRYL GOINGS' murder on Gray Street. It was said these

are the same people who w[ere] trying to rob and kill 'DARRYL GOINGS' as well." (See ¶ 10 of Exhibit C).

And finally there was an affidavit from Askia Hill which stated that he would testify to witnessing Mark Goings killing a man on Mack and Gray on the evening of January 17, 1992. (See Exhibit A).

The discovery that testimony introduced at trial was perjured may be grounds for a new trial. People v Barbara, 400 Mich 352, 363 (1977). "In order to merit a new trial on the basis of such a discovery, a defendant must show that the evidence (1) is newly discovered, (2) not merely cumulative, (3) would probably have caused a different result, and was not discoverable and producible at trial with reasonable diligence." People v Mechura, 205 Mich App at 483.

First, the claim made by Collins that he was threatened and coerced by Detroit Police and APA Gonzalez to provide testimony on the third day of trial implicating Petitioner in the murder of Rodnell Penn was "not discoverable or producible at trial with reasonable diligence" and was therefore "newly discovered", People v Mechura, 205 Mich App at 482, as evidenced by the following statements from Collins made in his affidavit:

> 6. I contacted Raymond Williams in 2014, informing him that I had lied on Carl Hubbard and I told him that it was because Assistant Prosecutor Mr. James Gonzalez, Sergeant Joann Kinney and Sergeant Gale continued to threaten me and that I would do an affidavit saying that but I backed out of it because I was afraid and feared what AP Gonzalez, Sergeant Kinney and Sergeant Gale would do to me and I didn't want to face perjury charges again and be put in jail and threatened by these government officials.

> 7. I went to prison in 2014 and got out in 2015. While in prison I realized how hard and difficult it was in prison during that ten months. I also learned that AP Gonzalez was no longer prosecuting cases and that Sergeant Kinney and Sergeant Gale were no longer on the police force. As a result, I no longer had to worry about their threats and I was tired of running from the fact that I had put an innocent man, Carl Hubbard, in prison. (See ¶¶'s 6 & 7 of Exhibit G).

The DVD/disk of Collins' polygraph examination provided further support

-41-

that the evidence that his testimony was perjured could not have been discovered or produced at trial with reasonable diligence. (See DVD/disk). Indeed, recanting testimony properly qualifies as newly discovered evidence. <u>People</u> v <u>Barbara</u>, 400 Mich at 363, <u>People</u> v <u>Canter</u>, 197 Mich App 550, 559 (1992).

> The trial court found that:
>
> "As argued above, the evidence is not newly discovered. The witness testified on the first day of trial that he was not on Gray and Mack. Two days later he admitted that he was present on Gray and Mack and that his new testimony was a lie. Moreover, because Collins had told Williams information in 2014 and Williams was helping Defendant gather information in 2014 which was part of Defendant's 2015 motion, Defendant had information about Collins in time for the 2015 motion for relief. The polygraph results add nothing because the questions upon which it was based are all new things both parties agree on during trial. Collins' latest claims are not new." (See page 14 of Exhibit H).

But as discussed in Argument I found in his Delayed Application for Leave to Appeal from the denial by the trial court of his third 6.500 motion, this evidence, along with the cab company subpoena, are new and Petitioner utilizes and incorporates that argument into this argument at this point to support his position that his evidence is new.

And all of the other affidavits were also "not discoverable and producible at trial with reasonable diligence" and were therefore "newly discovered". <u>People</u> v <u>Mechura</u>, 205 Mich App at 483. Roy Burford stated in his affidavit that it was only after the Petitioner was convicted that he heard everyone saying that it was Mark Goings that committed the murder that Petitioner stands convicted of. (See ¶ 10 of Exhibit C). Petitioner was unaware of Roy Burford's affidavit until a chance encounter while incarcerated. (See ¶ 2 of Exhibit B). This constituted new evidence. <u>Cf.</u> <u>People</u> v <u>Taylor</u>, 2008 Mich App LEXIS 2468 at *2 & *5 ("According to the witness, he met defendant years later while they were both incarcerated.

-42-

During a conversation with defendant, the witness realized that the killing he had witnessed years prior was the crime underlying defendant's conviction." "The trial court found that the evidence was newly discovered based on the witness's testimony that he did not come forward until after meeting defendant, this conclusion is not in error." (Attached as Exhibit MM)); see also People v Corley, 503 Mich 1004, 1006 (2019)(Finding that a "holding that the witness is not credible solely as a result of his criminal conviction [i]s erroneous.").

Petitioner was also unaware of the contents of Emanuel Randall's affidavit until a chance encounter while incarcerated. (See ¶ 3 of Exhibit B). This too is new evidence. People v Taylor and People v Corley, supra.

Raymond Williams stated that he never told anyone about what Curtis Collins had told him until he made contact with Petitioner in late 2010 through 2011. (See ¶ 6 of Exhibit O). Therefore, this is new evidence. People v Burton, 74 Mich App 215, 222-223 (1977).

Askia Hill stated in his affidavit that "I never told anybody what I s[aw] that day because I was afraid for my life and I didn[']t want any trouble with anybody in the neighborhood, because I have to live in that neighborhood." (See ¶ 4 of Exhibit A). It is only now that he is out of that neighborhood that he is willing to testify to what he saw that night because he knows that Petitioner Hubbard is innocent. Id. at 5. In Schlup v Delo, 513 US 298 (1995), former prison inmate John Greene stated in his affidavit that he had previously denied witnessing a murder because "I was concerned about my safety" but that "I am not afraid now because I haven't been in prison for more than 7½ years." Id. at 310, n. 21. The Court rejected the suggestion that Schlup "did not provide adequate cause for failing to raise his new claims more promptly," id. at 309, and Petitioner had likewise specified how this

affidavit could not have been discovered earlier as both Hill and Green shared the same concerns for their safety and only came forward when they were no longer in the same environment that formed those concerns.

In fact, the trial court found the affidavits from Roy Burford, Emanuel Randall, Raymond Williams and Roy Burford were new when holding that:

> "Defendant[] present[ed] other new evidence provided by other prisoners who have heard Collins regret his testimony against Defendant or who now remember that they were at the party store that night and Collins was not in there". (See page 14 of Exhibit H).

Next, none of the evidence presented was "merely cumulative." People v Mechura, 205 Mich App at 483. While Collins did testify that the Detroit Police had coerced him to say things that weren't true and that he lied under oath at the preliminary examination when he testified to seeing Petitioner at the scene of the crime (T1, 39), there was never any testimony that he was again coerced by the Detroit Police and AP Gonzalez to give testimony implicating Petitioner of murder on the third day of trial. In fact, on the third day of trial Collins testified that he had requested to testify (T3, 37) and that there had been no promises for his current testimony. (T3, 50-51). Because the affidavit from Collins "is diametrically opposed to his trial testimony," it is not cumulative. People v Lapresto, 9 Mich App 318, 322 (1967).

Furthermore, there was no other testimony given at trial indicating that Mark Goings was responsible for the murder of Rodnell Penn. Accordingly, this new evidence does not support a fact already established by existing evidence and adds greatly to the probative force of the testimony given supporting Petitioner's alibi defense (T3, 129-132, 147-149) and testimony indicating that Collins was not on Gray and Mack on the evening in question. (T1, 18-19, 47-48), (T2, 47-49), and (T3, 101-105, 123-124).

The trial court did not address whether or not testimony indicating

-44-

that Mark Goings was responsible for the murder of Rodnell Penn was cumulative but it was held that Collins' affidavit:

> "would be cumulative because this exact witness testified to this same claim at trial and the polygraph results would not be admissible. Defendant cannot meet the second prong of the Cress test." (See page 14 of Exhibit H).

But Collins had not "testified to this same claim at trial" as ruled by the trial court. (See page 14 of Exhibit H). In reality, Collins testified at trial that it was at his request that he testify (T3, 37) and that there had been no promises for his testimony. (T3, 50-51). But in his affidavit he now swears that his testimony would be that his testimony on September 2, 1992 was "coerced from me by threats from AP Gonzalez, Sergeant Kinney and Sergeant Gale". (See ¶ 8 of Exhibit G). And just because Collins was coerced and threatened on two separate occasions into testifying favorably for the State does not make his testimony cumulative. For instance, if the State were successful in their efforts to privately question Collins (see page 11 of Exhibit I) & (see 9 of Exhibit H) and he claimed that they had threatened him again at that time, would this evidence be cumulative to his testimony on the first day of trial that the police had threatened and coerced him into testifying at the preliminary examination? Simply put, Collins never testified that his September 2, 1992 testimony was the product of threats and coercion by the police and prosecutor. To the contrary, Collins testified that it was at his request to testify and tell the truth (T3, 37) and that there had been no promises for his testimony given on the third day of trial. (T3, 50-51).

Finally, this new evidence "would probably have caused a different result". People v Mechura, 205 Mich App at 483. And to the extent that this portion of Petitioner's argument relies on affidavits and exhibits previously submitted to the trial court, their use "is not in contravention with MCR 6.508(D)(2)" as "Cress ... requires a determination of whether 'the new

-45-

evidence makes a different result probable on retrial.' Cress, 468 Mich at 692." People v Johnson, 502 Mich 541, 577 n. 17 (2018). Collins was the only prosecution witness to provide testimony that Petitioner was even at the scene of the murder of Rodnell Penn. And when first called to testify at trial on Monday, August 31, 1992, Collins said that he had given false testimony implicating Petitioner in the murder at the preliminary examination. He specifically denied being present at the party store on Gray and Mack on January 17, 1992 at the time Mr. Penn was killed and also denied seeing Petitioner at that time and place. (T1, 18-19). Collins testified that homicide detectives from the Detroit Police coerced him to say things that weren't true and that he lied under oath in his preliminary examination testimony. (T1, 39). He testified that the homicide detectives pressured him to lie with promises of money and protections, and threats regarding his pending prison escape charge. (T1, 49-51). A woman named "Barbara" was also told by Collins prior to trial that "the police are trying to make me say Carl did this." (See Exhibit S).

After his Monday, August 31, 1992 trial testimony, Collins was arrested for perjury and held in the custody of the homicide detectives from the Detroit Police. (T3, 47-50). On Wednesday, September 2, 1992, Collins was recalled by the prosecution and recanted his testimony given at trial on Monday. Collins testified that he had lied on Monday and that now his preliminary examination testimony was really the truth. (T3, 36-40). He claimed that his testimony exonerating Petitioner at trial on Monday was given out of fear of death threats (T3, 40) and without any promises from the homicide detectives (T3, 50-51), Collins ignored his fear for the life of his family and himself that he had just two days earlier and gave testimony implicating Petitioner.

-46-

It was based on this questionable foundation that Collins gave his testimony implicating Petitioner on Wednesday, the third day of trial. Collins testified that he did not actually see Petitioner shoot Mr. Penn but that he heard three or four gunshots, turned around, looked down Gray "And I seen Carl Hubbard running through a field." Collins couldn't see Petitioner's face but made his identification by a scar on the back of his head. (T3, 64-65)(See also Exhibit T, photograph of scar). Petitioner has marked Exhibit U with an "A" to indicate where Petitioner was alleged to have been running when he was identified by Collins. (See Exhibit U). But Officer Randy Richardson testified that the party store on the corner of Gray and Mack, where Collins claims to have been standing when he identified Petitioner--indicated by a "B" on Exhibit U--was about three hundred to three hundred and seventy five feet away from the location of Mr. Penn's body. (T2, 21-22). Officer Richardson also testified that the area where Mr. Penn was found--indicated by a "C" in Exhibit U--was fairly dark. (T2, 21). In fact, after being shown People's Exhibit 13 (see Exhibit V) that was taken from the side of the party store at roughly 9:45 to 10:00 a.m., which depicted himself standing "pretty close to" the crime scene (T2, 28-29), Officer Richardson could not see any of his features but could make out no more than a silhouette of himself. (T2, 29-30).

Under the concept known as the "physical facts rule," the testimony of a witness which is opposed to the laws of nature, or which clearly conflicts with the principles that are established by the laws of science cannot be given any probative value by the jury. See Harris v General Electric Corp., 201 F 3d 800, 803, (6th Cir. 2000). When looking at Exhibit V, it is apparent that the testimony from Collins that he identified Petitioner by a scar on the back of his head under the conditions which he claims to have is "opposed to

-47-

the laws of nature" and would not "be given any probative value by the jury."
Id. After all, if Officer Richardson could make out no more than a silhouette
of his body in the photograph showing him at around 9:45 to 10:00 in the
morning that was taken at the party store (T2, 28-30) where Collins claimed to
have identified Petitioner (T3, 64), then how could Collins have possibly
identified Petitioner from the same distance at night in a fairly dark area
(T2, 21) by only a scar on the back of Petitioner's head? (T3, 64-65).

The only logical conclusion is that Collins committed perjury due to
being coerced by the police and prosecutor as was claimed in his affidavit and
during his polygraph examination (see ¶¶'s 5, 6 & 8 of Exhibit G, and
DVD/disk) and verified by the Polygraph Report indicating that he was being
honest when claiming that he was not present when Mr. Penn was shot. (See ¶ 3
& "Results" of Exhibit J). This is further supported through an investigation
conducted by the Justice Department which revealed that homicide detective
Sergeant Joann Kinney--the same sergeant that Collins said coerced him to
commit perjury on the third day of trial (see ¶¶'s 5 & 6 of Exhibit G)--
admitted to threatening other witnesses. (See Exhibit O).

Everything about this case verifies Collins' claim that he was not
present when Mr. Penn was shot and did not see Petitioner on the night of his
murder. (See ¶¶'s 1 & 2 of Exhibit G & page 2 of Exhibit J). In fact, Detroit
Police reported that witnesses told them that there was "a Black female
approaching 3960 Gray" with the deceased moments before gunshots were heard
and the deceased was observed laying on the ground. (See Exhibit W). After
being shot, a black female was witnessed "saying something to" the deceased
and then walking into 3960 Gray. (See Exhibit Y). But Collins says nothing of
this black female in this trial testimony or of Lucinka Gross who was walking
down the street at that time also. (T2, 52-53).

Collins claimed to have been able to identify the deceased as the same person that he saw with Petitioner five to ten minutes earlier in the party store (T3, 45) even though he had never seen the deceased before in his life (T3, 52), couldn't describe what he looked like or what he was wearing (T3, 76), and didn't even see his face when he saw him dead in the driveway. (T3, 77).

Collins also claimed that, after seeing "the decease[d] guy laying in the driveway ... I took off running. I jumped into a cab and went home." (PE, 13). The trial judge relied on this claim. (T3, 175-176). But after a subpoena was issued for the production of all fares handled in that area on that night (see Exhibit K), nothing favorable was able to be presented in support of Collins' claim. (See trial transcripts generally). Perhaps this was because there "was a snow storm and there were no buses" or other public transportation running that night. (See ¶ 9 of Exhibit C). As the Supreme Court in _Graves_ v _US_, 150 US 118 (1893) explained, "if a party has it particularly within its power to produce [evidence or] witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the [evidence or] testimony, if produced, would be unfavorable." _Id_. at 121.

Nothing corroborates Collins' claim that he was present at the scene of the crime on the night of Mr. Penn's murder. In fact, every piece of evidence and testimony shows otherwise. Raymond Williams (T3, 103-104), Roney Fulton (T3, 115-116), and Emanuel Randall (see ¶¶¶'s 2, 3 & 4 of Exhibit N) all claim that Collins was with them that night. Moreover, even after being arrested two days after Petitioner's preliminary examination and charged with the murder of Mr. Penn (see Exhibit AA), Andrew Smith's testimony contradicted Collins' testimony that the two were together that night. Compare (T2, 47-49) with (T3,

71-74).

Moreover, Collins' claim that he was at the Special K Party Store talking to the store owner (PE, 12) when he saw Petitioner accompanied by Mr. Penn right before the murder (T3, 38, 44, 52) is rebutted by Roy Burford (see ¶ 6 of Exhibit C) and the owners of the Special K Party Store, Samir and Raad Konja, who will testify that Collins was not allowed in their store (see ¶ 2 of Exhibit E and ¶ 1 of Exhibit D) and Raad will further testify that he would have seen anyone that walked into the store and that Collins did not. (See ¶ 2 of Exhibit D). Steven Konja did not see him either. (See ¶ 2 of Exhibit P).

At a new trial where Collins were testifying that he did not witness Petitioner at the scene of the crime--the witness the trier of fact centered its finding of guilt on (T3, 101)--Askia Hill testifying that he was there and witnessed Mark Goings commit the murder (see ¶¶¶'s 2, 3 & 6 of Exhibit A) which was the word on the street (see ¶ 10 of Exhibit C) & (¶¶'s 6 & 7 of Exhibit N), and three witnesses testifying that Collins told them that he was coerced to lie at Defendant's trial (see ¶ 8 of Exhibit C), (¶ 8 of Exhibit N), and (¶¶¶'s 3, 4 & 7 of Exhibit O), the result of the proceeding would have been different.

Petitioner was aware that, in order to be entitled to a new trial, the evidence must be admissible. People v Darden, 230 Mich App 597, 606 (1998). But he pointed out that Askia Hills' testimony that he witnessed Mark Goings kill Mr. Penn (see ¶¶¶'s 2, 3 & 6 of Exhibit A) is admissible. Wynne v Renico, 279 F Supp 2d 866, 882 (E.D. Mich. 2003)(holding that evidence that someone else other than the defendant may have committed the crime is crucial exculpatory evidence that the defendant is entitled to present to the jury). Moreover, the three witnesses that will testify that they were told by Collins that he had lied at trial on September 2, 1992 due to the coercion from

-50-

homicide detectives and Detroit Police would be admissible as "extrinsic proof tending to establish a reason on the part of a witness to fabricate is never collateral and may not be excluded on that ground." Wynne v Renico, 279 F Supp 2d at 882.

All but Askia Hill's affidavit may be found to constitute hearsay. Nonetheless, the testimony of Raymond Williams should be admitted as evidence on retrial under the "excited utterance" hearsay exception found in MRE 803(2). "MRE 803(2) defines an excited utterance as '[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." People v Smith, 456 Mich 543, 550 (1998). The abandonment by Collins of his belief in the death threats made on him and his family (T3, 38-40) after Sergeant Kinney and Sergeant Gale forced him to lie (see Exhibit G, Exhibit C at ¶ 8, Exhibit N at ¶ 8 & Exhibit O at ¶ 3) upset him so much that he was overheard crying by Mr. Williams. (See ¶ 3 of Exhibit O). Surely this must have been a startling event and the trial court should have been convinced that this statement by Collins was made while he was still under the overwhelming influence of the police coercion as he was still crying and, therefore that the statement was reliable and admissible. Cf. People v Smith, 456 Mich at 552.

In any event, when the enforcement of the evidence rules excludes evidence critical to the defense, the due process clause can require the admission of evidence, despite the rule. Chambers v Mississippi, 410 US 284 (1973); Davis v Alaska, 415 US 308 (1974); People v Arenda, 416 Mich 1 (1982). Petitioner asserts that such is the case here.

In light of the fact that "other evidence did not decisively undermine [Collins' recent affidavit and], in fact, there [are] many reasons to believe" him, Collins' affidavit--"bolstered by the results of the polygraph test"--

entitles Petitioner to a new trial. People v Mechura, 205 Mich App at 484. See also People v Jackson, 91 Mich App 636, 640 (1979)(concluding that a different result was probable on retrial due to the lack of incriminating evidence at trial); and People v Burton, 74 Mich App 215, 223 (1977)(holding that in light of the weakness of the convicting evidence, the newly discovered evidence could make a significant impact at retrial).

In rejecting the argument that all of this new evidence "would probably have caused a different result", People v Mechura, 205 Mich App at 483, the trial court first held that:

> "The evidence would not render a different result probable on retrial. Under Michigan law, affidavits recanting prior sworn testimony are suspect. People v Dailey, 6 Mich App 99, 102 (1967). Recantation alone does not require the court to order a new trial if the court determines that the recanted testimony is untrustworthy. People v Van den Dreissche, 233 Mich 38, 46 (1925).
> The circumstantial evidence against Defendant was surprisingly strong and Collins' recanting at a retrial would not make a difference. Defendant's presentation of other new evidence provided by other prisoners who have heard Collins regret his testimony against Defendant or who now remember that they were at the party store that night and Collins was not there would also not likely change the result." (see page 14 of Exhibit H).

First, "[i]n order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." People v Johnson, 502 Mich 541, 566-567 (2018)(emphasis added). The trial court could not make that credibility determination for Collins' testimony found in his affidavit relied on by the Petitioner in the trial court because, "where a motion for a new trial is predicated upon the affidavit of a recanting witness, the court should have had the opportunity to observe and hear the witness at the original trial or hearing on the motion before passing on the witness's credibility." People v Blair, 44 Mich App 469, 471 (1973). Therefore, it was an abuse of discretion for the trial court to not hold an evidentiary hearing and observe the

-52-

demeanor of Collins as Judge Talon did not preside over the trial in 1992; Richard P. Hathaway did. Id. at 472. Because the trial court did not hold an evidentiary hearing before concluding that a different result was not probable on retrial, as required by Johnson, "the record discloses a clear mistake or omissions that preclude meaningful review" and the trial court abused its discretion. People v Blevins, 314 Mich App 339, 361 (2016).

Second, it was clearly erroneous for the trial court to hold that "[t]he circumstantial evidence against Defendant was surprisingly strong". (See page 14 of Exhibit H). The trial court did not elaborate on what "circumstantial evidence against defendant was surprisingly strong" but this is verbatim what the prosecutor stated in his response (see page 22 of Exhibit I) as was nearly every other factual and legal determination. Because the trial court adopted the prosecutor's response without exception, Petitioner will now rebut the facts relied on by the prosecutor used to show that "[t]he circumstantial evidence ... was surprisingly strong" that was adopted verbatim by the trial court. First, the prosecutor began by arguing that "Collins would be impeached with his statement to the police, his preliminary examination testimony, and his disavowal at trial of the claim that he was not on Gray and Mack." (See page 18 of Exhibit I). But these facts would have no bearing on a jury after hearing the facts and arguments presented previously and hereinafter.

For example, as for his "disavowal at trial of the claim that he was not on Gray and Mack" (see page 18 of Exhibit I), he testified that this was done out of fear of death threats made on him and his family. (T3, 40). But despite his belief in these death threats (T3, 40) and without any promises from the homicide detectives (T3, 50-51), Collins ignored his fear for the life of his family and himself that he had just two days earlier and made a

-53-

request to give the testimony (T3, 37) implicating Petitioner. No jury would believe that he honestly believed that either he or his family would be killed if he testified against the Petitioner when he turned right around and asked to testify against him two days later (T3, 37) without any assurances from the homicide detectives. (T3, 50-51).

The prosecutor next pointed to "[o]ne of the most damaging facts about Collins's recantation at trial" in support of the position that the new evidence would not have any effect on retrial. (See page 19 of Exhibit I). But this was a different recantation than is being relied upon in the current appeal. The Petitioner is not asking for a new trial based on "Collins's recantation at trial" given on the first day, he is claiming that he is entitled to a new trial based on the recent recantation from Collins that indicates why he testified the way he did on the third day of trial. The belief that because "the nineteen year old gave a phony name would seem to make it more likely that the information in the police statement was the truth" because "[h]is reasoning may have been that the defendant would never know it was Collins who had informed", and the facts relied on by the prosecutor which are claimed to have "supported Collins's testimony" (see pages 19-20 of Exhibit I) would also mean nothing in light of the facts and arguments in support of the credibility of Collins' testimony discussed previously and hereinafter.

Collins testified at trial that he saw Mr. Penn and the Petitioner at the store together and that when he next saw them moments later Mr. Penn was laying in the driveway and the Petitioner was running through a field. (T3, 44-46). But a witness reported "that he observed the complainant and a Black female approaching 3960 Gray" moments before hearing "several gunshots" and "observing the complainant laying on the ground". (See Exhibit W).

-54-

Also, Lucinka Gross testified that she only lived "about a block" from the murder scene (T2, 51) and that, when she left to go to the store (T2, 52), her daughters had heard gunshots. (T2, 54 & 56). And when she discovered the body (T2, 53), there was no one else in the area. (T2, 54 & 57). And Herman Luckey said in his police report that, after he heard gunshots, he "saw a lady bending over the guy like she was asking him something. Then she went into 3960 Gray". (See Exhibit X); (See also Exhibit Y). But at trial Collins testified that when he heard gunshots (T3, 44) and ran down the street (T3, 80) and saw the man laying in the driveway, there was no one else in the area. (T3, 45).

Collins claimed to have been able to identify the deceased as the same person that he saw with the Petitioner five to ten minutes earlier in the party store (T3, 45) even though he has never seen the deceased before in his life (T3, 52), couldn't describe what he looked like or what he was wearing (T3, 76), and didn't see his face when he saw him dead in the driveway. (T3, 77). So if he didn't see his face and didn't know what he was wearing, how in the world could he have identified him? So Collins' claim that "he could not see the victims face" being "confirmed by the officer on the scene" (see page 20 of Exhibit I) really supports the Petitioner's position.

Collins' recantation is also corroborated by an investigation conducted by the Justice Department which revealed that homicide detective Joann Kinney--the same Sergeant that Collins said coerced him to commit perjury (see ¶¶'s 5 & 6 of Exhibit G)--admitted to threatening other witnesses. (See Exhibit Q). And this is not the only time she has done so. (See pages 4-5 of Exhibit Z).

And it is significant that the prosecutor did not even try to argue that Collins claim that after seeing "the decease[d] guy laying in the driveway[,] ... I took off running[,] I jumped into a cab and went home" (PE,

13) could be corroborated. If the prosecutor could have done so it would seem like that would have happened here in light of the extraordinary effort made to make it appear as though Collins' testimony implicating the Petitioner would have been accepted by the jury. (See pages 18-20 of Exhibit I).

The prosecutor's assertion that Andrew Smith somehow would support Collins' testimony (see pages 19-20 & 21-22 of Exhibit I) is quite a stretch when considering the fact that Smith's testimony contradicted Collins' testimony claiming that the two were together that night. Compare (T2, 47-49) with (T3, 71-74).

Collins' claim that he was in the Special K Party Store talking to the store owner (PE, 12) when he saw the Petitioner accompanied by Mr. Penn right before the murder (T3, 38, 44, 52) would be impeached by Roy Burford (see ¶ 6 of Exhibit C) and the owners of the Special K Party Store, Samir and Raad Konja, who will testify that Collins was not allowed in their store. (See ¶ 2 of Exhibit E) & (¶ 1 of Exhibit D). And Raad and Steve Konja will testify that they would have seen Collins come into the store that night but he didn't. (See ¶ 2 of Exhibit D, and ¶ 2 of Exhibit P). The prosecutor acts as though these witnesses can somehow remember the events of a single ordinary night twenty years ago (see page 22 of Exhibit I) but this night would have stuck out in their minds as Lucinka Gross testified that she went to the party store and "asked them to call the police" to report a murder that happened just down the street. (T2, 55, 58). It is again ironic that the prosecutor finds "unbelievable" the Petitioner's "claim that the police never spoke to them about the crime" yet does not even include a police report indicating that the police had talked to the store owners, but instead chased Collins around Wayne County with the police in tow to question Collins (see page 11 of Exhibit I) & (page 9 of Exhibit H) in what appears to be yet another attempt in a long

history of extracting the testimony that they desire.

Finally, Raymond Williams (T3, 103-104), Roney Fulton (T3, 115-116), and Emanuel Randall (see ¶¶¶'s 2, 3 & 4 of Exhibit N) all claim that Collins was with them that night. The trial court found "that Defendant's alibi witnesses were not credible" without any explanation as to why. (See page 16 of Exhibit H). Petitioner can only assume that the trial court adopted the prosecutor's position on this as was done on every other finding made by the Court. And the prosecutor's claim that "defendant's alibi witnesses were unbelievable" is due in part to what Detroit Police "Officer Turner testified defendant had done". (See page 21 of Exhibit I). But anything that Officer Turner would have to tell the jury would carry little weight as the jury would also be hearing that other officers from the Detroit Police had coerced Collins to say that he was present when the Petitioner shot Mr. Penn and that he claimed to have witnessed the Petitioner running from the scene by a scar on the back of his head at night at a distance that would have been impossible to have been done, proving that he was coerced to testify falsely. Turner's testimony as to observing the Petitioner at the scene of the crime and as to his interactions with him at that time (see page 21 of Exhibit I) would also be viewed in the shadow of this credible claim of police corruption. It would also not appear surprising to the jury that Spells did not want to talk to the police and instead chose to testify in court (see page 22 of Exhibit I) in light of the way in which Collins would have been shown to have been pressured. The claim that Spells' testimony "contradicts not only Collins but also Andrew Smith" (see page 21-22 of Exhibit I) relies on testimony from Collins that has been credibly recanted and Andrew Smith, a witness who was arrested and charged with the very murder he was testifying about. (See Exhibit AA). The other minor inconsistencies testified to nine months after

-57-

they had occurred is hardly surprising and not likely to discredit this alibi. In any event, nothing is said of Emanual Randall's alibi.

And "corroboration ... provided by the victim's brother, cousin, and girlfriend" (see page 20 of Exhibit I) who must have been grieving the death of their loved one and were being told that the Petitioner was the killer certainly had motive to testify favorably for the prosecution.

The prosecutor's argument that "defendant had motive to finally eliminate the person who had given preliminary examination testimony in his previous murder charge" (see page 27 of Exhibit I) does not make sense as there was "a stipulation that" he "had failed to appear at trial" (see page 21 of Exhibit I) and the charges were dismissed. (See Exhibit BB). The prosecutor wants this Court to believe "that the victim sold drugs for the defendant and had been doing so for two years" (see page 20 of Exhibit I) before luring him into a store and then out onto a public street to kill him in retaliation for refusing "to appear for trial" (see page 21 of Exhibit I) which led to those charges being dismissed. (See Exhibit BB). If the Petitioner were truly so calculated as to wait two years for the perfect opportunity to kill Mr. Penn, this certainly was not it. After two years of "selling crack" at "[d]ifferent places" on the "west side" of Detroit (T1, 75) and coming to his house to "pick up the money and get more dope for him" (T1, 8), it would only seem logical that he would have had a better opportunity to kill him in a secluded area rather than killing him in the street.

And Petitioner reminded the trial court that, on retrial, the jury will hear evidence that the Petitioner was acquitted of the Possession of a Firearm During the Commission of a Felony charge (T3, 185) even though APA Gonzalez argued that the "killing was done by the defendant with a firearm". (T1, 6). So the circumstantial evidence was not "surprisingly strong" as alluded to by

the prosecutor and accepted as true by the trial court and Collins' recanting at retrial "would probably have caused a different result". People v Mechura, 205 Mich App at 483; People v Cress, 468 Mich at 692.

This is especially true as Askia Hill will testify that he witnessed Mark Goings, not the Petitioner, kill Mr. Penn. (See ¶¶¶¶'s 2, 3, 5 & 6 of Exhibit A). And while the prosecutor faulted Petitioner because Hill "has not been given a polygraph exam" (see page 22 of Exhibit I), the prosecutor has not investigated Hill's claim even in the face of media requests for it to be done (see Exhibit M) which makes the persistent attempts by the prosecutor's Conviction Integrity Unit (see Exhibit CC) disingenuine, especially in light of the manpower utilized in chasing Collins around Wayne County to talk to him (see page 11 of Exhibit I) & (page 9 of Exhibit H) to investigate his claims. So the fact that "Defendant fired his most recent attorney and insisted that the prosecutor's conviction integrity unit not [] investigate his case" (see page 9 of Exhibit H)--a unit headed by Richard P. Hathaway (see Exhibit CC), the very judge that presided over his bench trial and accepted Collins' testimony that he could identify Petitioner by a scar on the back of his head at night in a dark area from 300 to 375 yards away after seeing People's Exhibit 13 showing an officer from the same distance which provides no more than a silhouette of him (see Exhibit V)--is perfectly logical. What is not is that the prosecutor has only sought to question Collins, refused to provide the results of the subpoena from the cab company or any police reports indicating that the police did talk to the Special K Party Store owners, and yet the trial court nearly verbatim accepted the prosecutor's position even after being informed that the prosecutor had not investigated the claim by Askia Hill that Mark Goings was the real killer. (See Exhibit M).

And while it is true that "affidavits recanting prior sworn testimony

-59-

are suspect" (see page 14 of Exhibit H), "given the inherent weakness in [Collins'] prior testimony at trial his recantations should not be viewed with as much suspicion as generally accorded. In fact," as discussed above, Collins' "recantation was supported by the record." People v Johnson, 502 Mich at 578.

And again, the trial court adopts the prosecutor's response verbatim from page 23 of Plaintiff's Brief (see page 23 of Exhibit I) when holding that:

> "The last thing Defendant has to show is that he could not have, with reasonable diligence, discovered and produced the evidence at trial. This factor points out that not only could Defendant have presented this evidence at trial, this evidence was actually presented at trail. Collins testified at trial that he was not on Gary and Mack that night. This is exactly what he would testify to at a new trial. As such, Defendant cannot show any of the Cress factors and his motion would be denied, even if he could get past the successive motion bar." (See page 15 of Exhibit H).

In reality, Collins testified at trial that his testimony indicating "that he was not on Gray and Mack that night" was not true (T3, 36-40) and that he had given that testimony on the first day of trial because of death threats made on him and his family. (T3, 38-40). And he would testify at retrial that he was coerced by police and the prosecutor once again to give testimony implicating the Petitioner in the murder of Mr. Penn on the third day of trial.

Thus, the Petitioner had met all of the Cress factors and was entitled to a new trial. People v Mechura, supra. Moreover, the trial court's denial of Petitioner's motion for a new trial was so egregious that it violated his right to a fundamentally fair trial. Kelley v Burton, 377 F Supp 3d at 757.

### ARGUMENT III

PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR KNOWINGLY USED PERJURED TESTIMONY TO OBTAIN A CONVICTION.

The "deliberate deception of a court and jurors by the presentation of

known false evidence is incompatible with the rudimentary deamnds of justice." Abdus-Samad v Bell, 420 F 3d 614, 625 (6th Cir. 2005), quoting Giglio v US, 405 US 150, 153 (1972). It is thus well-settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." US v Agurs, 427 US 97, 103 (1976)(footnote omitted). "To prevail on such a claim, [Petitioner] must show (1) that the prosecutor presented false testimony (2) that the prosecutor knew was false, and (3) that was material." Akrawi v Booker, 572 F 3d 252, 265 (6th Cir. 2009)(cites and internal quotation marks omitted).

The prosecutor knowingly used perjured testimony when he allowed Collins to testify that he had witnessed Petitioner fleeing the scene of the crime. (T3, 44-46, 64-65).

First, Petitioner has shown that the prosecutor presented false testimony through the affidavit, Polygraph Report, and DVD/disk recording of the polygraph of Collins. His affidavit states that he "lied on Carl Hubabrd" because Assistant Prosecutor James Gonzalez" threatened and coerced him. (See ¶¶'s 6 & 8 of Exhibit G); (See also DVD/disk).

Furthermore, Collins states that he was "threatened by Homicide Officers Sergeant Kinney and Sergeant Gale with being charged with the murder of Mr. Penn if" he "didn't say that" he "saw Carl Hubbard at the murder scene of Mr. Penn." (See ¶ 6 of Exhibit G); (See also DVD/disk).

His claim that he was forced to give perjured testimony is corroborated by the Polygraph Report, indicating that he was being truthful about not being present at the crime scene on January 17, 1992. (See ¶ 3 of Exhibit J). And that this is even further corroborated by the other exhibits and arguments presented in support of Argument II and those exhibits and arguments are

hereby incorporated into this argument at this point. In fact, the prosecutor charged Collins with perjury when he refused to provide favorable testimony for him. (See Exhibit EE).

Second, Petitioner has shown that the prosecution knew that this testimony was false. As was discussed in Argument II, there was no way for Collins to have possibly witnessed Petitioner fleeing the scene and to identify him from such a large distance in the dark by a scar on the back of Petitioner's head, there was nothing favorable obtained from a subpoena served on the taxi company that Collins claimed to have patroned in his departure from the crime scene, Collins could not have possibly identified Mr. Penn's body as he said he could not see his face as he laid dead in the driveway and did not even know what he was wearing, Collins would not have abandoned his fear for the life of his family and himself that he possessed just two days earlier (his reason for not implicating Petitioner then) if that fear were real, and the prosecutor would not have had to threaten and coerce Collins if his fears were not real. The prosecutor obviously knew that he had threatened and coerced Collins into testifying falsely as his affidavit making this claim is overwhelmingly supported by the evidence and arguments put forth in Issue II which are hereby incorporated into this argument at this point.

Third, "evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." Giglio v US, 405 US at 154. Had the factfinder known that the testimony from Collins was false, the outcome of Petitioner's trial could have been different. The trial judge was of the opinion that the entire case centered in and around the testimony of Collins (T3, 101) who was the only witness to even put the Petitioner at the scene of the crime. Had the factfinder known that Collins was coerced into committing perjury, "there is a reasonable probability that ... the result of

the proceeding would have been different." <u>Akrawi</u> v <u>Booker</u>, 572 F 3d at 265.

The trial court disagreed and held that:

"Defendant attempts to use Collins' affidavit to prove that the Court should grant him a new trial. He avers that the People used perjured testimony. However, when Collins recanted on the first day of trial, the prosecutor immediately impeached him with his preliminary examination testimony." (See page 15 of Exhibit H).

But when impeaching him didn't work, the prosecutor had Collins arrested (see Exhibit EE) and then did nothing when Collins perjured himself on the third day of trial by implicating the Petitioner in the murder. We know that this testimony was perjured and that the prosecutor knew it was as evidenced by the following facts.

Collins testified at the preliminary examination that he was located at the side of the party store when he heard gunshots and turned to see the Petitioner running through a field (PT, 13 & 22) a half a block away in the dark. (PT, 24 & 29). Collins could not see if the Petitioner had anything in his hands, could not see the Petitioner's face (PT, 27), and could only identify the Petitioner by a scar on the back of his head. (PT, 28). But when APA Gonzalez became aware of the crime scene photographs (see Exhibit V) taken from the party store depicting an officer standing at the crime scene (T2, 28-29), he should have been aware that Collins was being untruthful. APA Gonzalez surely realized that if he could make out no features on the officer's face in broad daylight that Collins could not have identified the Petitioner from the same distance by a scar on the back of his head at night.

But instead of abandoning his pursuit of convicting Petitioner, APA Gonzalez looked to Collins' preliminary examination testimony indicating that he left the scene of the murder in a cab (PE, 13 & 26) and subpoenaed all records from the cab company for the night of the murder. (See Exhibit K). APA Gonzalez discoved that the results of that subpoena did not support Collins'

claim of fleeing in a cab so he elicited no testimony at trial about him getting into a cab when fleeing the scene.

APA Gonzalez also tried to at least clear up the inconsistencies between Collins' preliminary examination testimony where he testified that he had not talked to Andrew Smith at the crime scene but that he instead talked to him on the phone (PT, 16-18) and his police report where he claims that Andrew Smith told him in person that he saw the Petitioner shoot the person that he was with. (See page 2 of Exhibit NN)(NOTE: This statement was made under Collins' alias, "Tony Smith" (see T1, 33-34)). To do this, he began by arresting Andrew Smith two days after the preliminary examination, charging him with the murder (see Exhibit AA), and then had him questioned by the police. (See Exhibit OO). But Andrew Smith told police that he did not see the Petitioner shoot anyone and that he had never told anyone that he had. (See page 2 of Exhibit OO).

Collins testified at trial that he saw Mr. Penn and the Petitioner at the store together and that when he next saw them moments later Mr. Penn was laying in the driveway and the Petitioner was running through a field. (T3, 44-46). But a witness reported "that he observed the complainant and a Black female approaching 3960 Gray" moments before hearing "several gunshots" and "observing the complainant laying on the ground". (See Exhibit W).

Collins testified that he saw no one other than the Petitioner (PE, 15-16) but Lucinka Gross testified that she only lived "about a block" from the murder scene (T2, 51) and that, when she left to go to the store (T2, 52), her daughters had heard gunshots. (T2, 54 & 56). And when she discovered the body (T2, 532), there was no one else in the area. (T2, 54 & 57). And Herman Lucky said in his police report that, after he heard gunshots, he saw a black female saying something to Mr. Penn as he lay on the driveway and walk away and enter

the residence at 3960 Gray. Then another black female walked out of 3960 Gray and ran up to Mr. Penn and then went back into 3960 Gray. (See Exhibit X & Y). But at trial Collins testified that when he heard gunshots (T3, 44) and ran down the street (T3, 80) and saw the man laying in the driveway, there was no one else in the area. (T3, 45). "[W]hen the government learns that part of its case may be inaccurate, it must investigate." US v Freeman, 650 F 3d 673, 680 (7th Cir. 2011). Had APA Gonzalez investigated the story of Ms. Gross as he should have, and compared that with the many police reports indicating that there were several other people in the area of the crime scene immediately before and after Mr. Penn's murder which directly contradicted Collins' claim that no one else was in the area, in combination with everything else discussed above, it could have only left him to believe that Collins was not being truthful. But he went ahead with the prosecution and when Collins did not give testimony implicating Petitioner in the Murder of Mr. Penn, the prosecutor arrested him for perjury (see Exhibit EE), threatened and coerced him to give testimony implicating the Petitioner in the murder of Mr. Penn (see ¶¶¶'s 6, 7 & 8 of Exhibit G), and then let that testimony go uncorrected. So that fact that "the prosecutor immediately impeached [Collins] with his preliminary examination testimony" after Collins "recanted on the first day of trial" (see page 15 of Exhibit H) does not mean that Collins did not commit perjury on the third day of trial and that the prosecutor did not know about it.

The prosecutor also knowingly used perjured testimony when he asked Collins at trial, "is the only reason you are coming in and telling the Judge that you lied Monday morning merely because now you are facing potential charges?", and allowed Collins to respond, "No." (T3, 38). First, Petitioner must show that the prosecutor presented false testimony. Akrawi v Booker, 572

-65-

F 3d at 265. Search Results from the Michigan Department of States' Uniform Commercial Code Debtor Information file revealed that a LEIN was placed on Collins on August 25, 1992 for a parole violation (see Exhibit DD) less than a week before he first testified at trial on August 31, 1992. Collins gave testimony exonerating Petitioner on the first day of trial and he was immediately arrested on the perjury charges. (T3, 47-50). Collins was recalled two days later and testified that he had lied on the first day of trial and that the testimony he gave implicating Petitioner during the preliminary examination was now the truth (T3, 36-40) and only a few days later, on September 5, 1992, the LEIN for the parole violation was recalled. (See Exhibit DD).

Ronald Giles, Petitioner's defense counsel, specifically stated in a letter to Petitioner sent after trial "that Mr. Collins was on ... parole, and was given a 'deal' in order to maintain his ... parole, after his testimony." (See Exhibit II). He also stated in a post-trial affidavit that it was his recollection that, on the perjury charges, "Mr. Collins was released and not charged when he changed his testimony the following day." (See ¶ 5 of Exhibit HH). Moreover, a Freedom of Information Act request to the Michigan State Police produced a criminal history on Collins verifying the fact that he was never charged with perjury. (See Exhibit FF). These facts demonstrate that the prosecutor presented false testimony when he allowed Collins to respond "No" when asked if "the only reason you are coming in and telling this Judge that you lied Monday morning merely because you are facing potential charges?" (T3, 38).

Second, Petitioner must show that the prosecution knew that this testimony was false. Akrawi v Booker, 572 F 3d at 265. The fact that Collins was released and not charged after he changed his testimony (see Exhibit DD,

FF & HH) indicates the "tip of the iceberg" of the undisclosed deal. See e.g., US v Shaffer, 789 F 2d 682, 690-691 (9th Cir. 1986). Additionally, defense counsel wrote Petitioner a letter after trial recalling that "Mr. Collins was on ... parole, and was given a 'deal' in order to maintain his . . parole, after his testimony." (See Exhibit II).

It follows that the prosecutor knew Collins was committing perjury when he testified that he was not coming in and telling the Judge that he had previously lied because of the charges he was facing. (T3, 38). After all, Collins claimed that his testimony exonerating Petitioner on the first day of trial was given out of fear of death threats made on him and his family (T3, 38-40) but, despite his belief in these death threats (T3, 40), he makes the claim that he was promised nothing for his testimony (T3, 38, 50-51) yet mysteriously abandoned his fear for the life of his family and himself and gave testimony implicating Petitioner. He was then "released and not charged when he changed his testimony". (See ¶ 5 of Exhibit HH)(See also Exhibit DD, FF & II).

Third, Petitioner must show that this evidence was material. Akrawi v Booker, 572 F 3d at 265. "[E]vidence is 'material' ... where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v Bell, 129 S Ct 1769, 1783 (2009). Had the trial judge known that Collins was given "a 'deal' in order to maintain his ... parole, after his testimony" (see Exhibit II) and that he was to be "released and not charged when he changed his testimony" (see ¶ 5 of Exhibit HH) and in fact wasn't charged (see Exhibit DD & FF), the outcome would have been different. The trial judge was of the opinion that the entire case centered in and around Collins' testimony (T3, 101) and accepted his explanation for lying on the first day of trial (T3, 176) which was because of

-67-

his belief in the alleged death threats made on him and his family. (T3, 38-40). Had the trial judge had knowledge that Collins' explanation for lying on the first day of trial was only given on the third day of trial after making agreements with the prosecutor and police, "there is a reasonable probability that ... the result of the proceeding would have been different." Akrawi v Booker, 572 F 3d at 265.

### ARGUMENT IV

PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE POLICE AND PROSECUTOR THREATENED AND INTIMIDATED CURTIS COLLINS INTO COMMITTING PERJURY.

Petitioner contends that he was deprived of a fair trial because the prosecutor and the police threatened and intimidated Collins into committing perjury. "It is well settled that prosecutor's may not intimidate witnesses in or out of court," People v Layher, 238 Mich App 573, 587 (1999), "since such actions usually deprive the defendant of his right to a fair trial." People v Harley, 49 Mich App 729, 733 (1973). And it does not matter "whether the witnesses are defense witnesses or prosecution witnesses." People v Crabtree, 87 Mich App 722, 725 (1979). "Police actions which intimidate witnesses from testifying may also be attributable to the state in its prosecution." Johnson v Renico, 314 F Supp 2d 700, 709 (E.D. Mich. 2004). Therefore, "[i]ntimidation by the police or prosecution to ... persuade a witness to change his testimony, when combined with a showing of prejudice to the defendant, violates a defendant's 'due process' rights." Guerra v Collins, 916 F Supp 620, 626 (S.D. Tex. 1995), quoting US v Heller, 830 F 2d 150, 152-153 (11th Cir. 1987).

Although Webb v Texas, 93 S Ct 351 (1972) itself dealt with coercive warnings by the trial judge, "the conduct of prosecutor's, like the conduct of judges, is unquestionably governed by Webb." US v Vavages, 151 F 3d 1185, 1189 (9th Cir. 1998). And "in extreme circumstances, government misconduct, could

-68-

occur through improper efforts to shape testimony to the government's liking."
US v Hall, 434 F 3d 42, 57 (1st Cir. 2006).

To establish a claim of witness intimidation by the prosecution or an arm of the prosecution, Petitioner must demonstrate "government conduct which amounts to substantial interference with a witness's free and unhampered determination to testify" and must prove that any inappropriate conduct was not harmless. US v Thomas, 488 F 2d 334, 336 (6th Cir. 1973); US v Foster, 128 F 3d 949, 953 (6th Cir. 1997).

In his affidavit Collins states that:

> 5. I returned on the third day of Carl Hubbard's trial after spending two days at the 1300 Precinct where I was threatened by Homicide Officers Sergeant Joann Kinney and Sergeant Gale with being charged with the murder of Mr. Penn if I didn't say that I saw Carl Hubbard at the murder scene of Mr. Penn. This is why I testified in the manner I did on the third day of Carl Hubbard's trial, because of the fear I had of Sergeant Kinney and Gale's threats of charging and prosecuting me for a crime that I had no knowledge of. (See ¶ 5 of Exhibit G).

Collins also states that he gave false testimony on September 2, 1992 because Assistant Prosecutor James Gonzalez threatened and coerced him. (See ¶¶'s 6 & 8 of Exhibit G). In fact, Mr. Gonzalez had Collins arrested for perjury after his testimony exonerating Petitioner on the first day of trial. (See Exhibit EE). The veracity of the affidavit from Collins is bolstered by his Polygrpah Report indicating his truthfulness. (See Exhibit J). And it is even further corroborated by the other exhibits and arguments presented in support of Argument II and these exhibits and arguments are hereby incorporated into this argument at this point.

This conduct clearly demonstrates government conduct which amounts to substantial interference with the free and unhampered determination by Collins to testify that he did not witness Petitioner at the scene of the crime, as he did on the first day of trial (T1, 18-19); the government's conduct forced Collins to testify favorably for the prosecution in violation of the due

-69-

process clause of the Fourteenth Amendment.

This error was not harmless as there was no other witness presented by the prosecution at trial that placed Petitioner at the scene of the crime as it occurred other than Collins and, the trial judge, sitting as the trier of fact, states that his finding of guilt centered in and around the testimony of Collins. (T3, 101). And without that testimony, Petitioner could not have been found guilty and the coercion and intimidation exerted upon him by government officials from Wayne County prejudiced him.

The trial court disagreed with this argument and held that:

"Neither the police nor the prosecutor intimidated the witness after his initial recanting. The police and prosecutor have not intimidated the witness because the witness was forced to face perjury charges or testify against a man accused of murder. There was no intimidation, only a tough choice that Collins had brought about by his own actions." (See page 15 of Exhibit H).

Again, based on all of the exhibits and arguments discussed throughout this pleading which are hereby incorporated into this argument at this point, it is clear that the testimony exonerating Petitioner was the truth and that he was put in the position to give testimony implicating Petitioner in the murder through the threats and coercion of the police and prosecutor.

ARGUMENT V

PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR WITHHELD EVIDENCE.

In Brady v Maryland, 373 US 83, 87 (1963), the Supreme Court held that due process requires the prosecution to disclose upon request evidence favorable to an accused when such evidence is material to guilt or punishment. "To establish that a Brady violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the State suppressed the evidence, either willfully or inadvertently; and (3) prejudice ensued." Skinner v Switzer, 131 S Ct 1289,

1300 (2011)(internal cites and quotation marks omitted). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v Whitley, 514 US 419, 433 (1995), quoting US v Bagley, 473 US 667, 685 (1985). The Supreme Court has further stated that:

> "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown where the government's evidentiary suppression 'undermines confidence in the outcome of trial.'" Kyles v Whitley, 514 US at 434, quoting US v Bagley, 473 US at 678.

"[E]vidence of any understanding or agreement as to future prosecution would be relevant to ... credibility and the jury was entitled to know of it." Giglio v US, 405 US 150, 154 (1972).

The first portion of this argument deals with three separate crimes for which undisclosed agreements were made with Collins for his favorable testimony. First, there was the perjury charge, the only one mentioned in court. (T3, 47). Second, there was the parole violation listed in the Michigan Department of States' Uniform Commercial Code Search Results Debtor Information. (See Exhibit DD). Third, there was the agreement not to charge Collins with the murder of Mr. Penn made by the Detroit Police. (See ¶ 8 of Exhibit C, ¶¶'s 5 & 8 of Exhibit G, page 1 of Exhibit J, ¶ 8 of Exhibit N, ¶¶¶'s 3, 4, & 7 of Exhibit O, and ¶¶¶¶'s 2, 3, 4 & 6 of Exhibit R).

Petitioner must first show that "the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching." Skinner v Switzer, 131 S Ct at 1300. The first component of the Brady test is satisfied because, as in Giglio, Petitioner discovered evidence that the government had failed to disclose a promise of dismissal of Collins' charges

in exchange for testimony favorable to the prosecution at trial. "The evidence which [Petitioner] was convicted was entirely circumstantial" and there were "no eyewitnesses to the killing of Rodnell Penn." (See page 1 of Exhibit KK). Furthermore, a directed verdict was denied because the trial judge found, "centering on Curtis Lindell Collins' testimony, ... that this prosecution has satisfied its burden of proof at this point in time." (T3, 101). Considering the circumstantial nature of the evidence and the importance placed on Collins' testimony, the "evidence of any understanding or agreement as to future prosecution would be relevant to [Collins'] credibility and the ju[dge] was entitled to know of it." Giglio v US, 405 US at 155.

Second, Petitioner must show that "the State suppressed the evidence." Skinner v Switzer, 131 S Ct at 1300. First, the prosecution suppressed the deal made with Collins to provide favorable testimony in exchange for the dismissal of the charges of perjury. Petitioner's trial lawyer stated in a post-trial affidavit that it was his recollection that, as for the perjury charge, "Mr. Collins was released and not charged when he changed his testimony the following day." (See ¶ 5 of Exhibit HH). Moreover, a Freedom of Information Act request made to the Michigan State Police produced a criminal history on Collins verifying that he was never charged with perjury. (See Exhibit FF).

Second, Search Results from the Michigan Department of States' Uniform Commercial Code Debtor Information file revealed that a LEIN was placed on Collins on August 25, 1992 for a parole violation (see Exhibit DD) less than a week before he testified on the first day of trial. When Collins gave testimony exonerating Petitioner, he was immediately arrested (T3, 47-50). Collins was recalled two days later and testified that he had lied on the first day of trial and that the preliminary examination testimony was now the

-72-

truth (T3, 36-40) and only a few days later, on September 5, 1992 the LEIN for the parole violation was recalled. (See Exhibit DD). Defense counsel's post-trial letter to Petitioner explains "his recollection that Mr. Collins was on ... parole, and was given a 'deal' in order to maintain his ... parole, after his testimony." (See Exhibit II).

Third, the affidavits of Roy Burford, Collins, Emanuel Randall, Raymond Williams and Elton Carter, along with Collins' statement given during his polygraph examination, provide evidence that the homicide detectives from the Detroit Police had coerced Collins into agreeing to testify favorably in exchange for not being charged with the murder of Mr. Penn. (See ¶ 8 of Exhibit C, ¶¶'s 5 & 8 of Exhibit G, page 1 of Exhibit J, ¶ 8 of Exhibit N, ¶¶¶'s 3, 4, & 7 of Exhibit O, ¶¶¶¶'s 2, 3, 4 & 6 of Exhibit R, and the DVD/disk of Collins' polygraph examination). While it was the police, not the prosecutor that made the agreement with Mr. Collins, this is of no consequence to Petitioner's argument as "the Brady disclosure requirement applies to relevant evidence in the hands of the police, whether the prosecutor[] knew about it or not." Akrawi v Booker, 572 F 3d at 263.

Finally, Petitioner must show that "prejudice ... ensued." Skinner v Switzer, 131 S Ct at 1300. This he can do as, had the trial judge learned of the undisclosed agreements, the outcome would have been different. The trial judge was of the opinion that the entire case centered in and around Collins' testimony (T3, 101) and accepted his explanation for lying on the first day of trial (T3, 176) which was because of his belief in the alleged death threats made on him and his family. (T3, 38-40). If the trial court had knowledge that Collins' explanation for lying on the first day of trial was only given after making agreements with the prosecutor and police, it would have put "the case in such a different light as to undermine confidence in the verdict." Kyles v

-73-

<u>Whitley</u>, 514 US at 435.

The State also suppressed the fact that Collins was coerced and intimidated by the assistant prosecutor and Sergeant Kinney and Gale to give false testimony implicating Petitioner in the murder of Mr. Penn. In his affidavit Collins states that:

> 5. I returned on the third day of Carl Hubbard's trial after spending two days at the 1300 Precinct where I was threatened by Homicide Officers Sergeant Joann Kinney and Sergeant Gale with being charged with the murder of Mr. Penn if I didn't say that I saw Carl Hubbard at the murder scene of Mr. Penn. This is why I testified in the manner I did on the third day of Carl Hubbard's trial, because of the fear I had of Sergeant Kinney and Gale's threats of charging and prosecuting me for a crime that I had no knowledge of. (See ¶ 5 of Exhibit G).

Collins also states that he gave false testimony on September 2, 1992 because AP Gonzalez threatened and coerced him. (See ¶¶'s 6 & 8 of Exhibit G). The veracity of his affidavit is bolstered by his Polygraph Report indicating that Collins was being truthful. (See Exhibit J). And this is even further corroborated by the other exhibits and arguments presented in support of Argument II which are hereby incorporated into this argument at this point.

This evidence is favorable to Petitioner as it is exculpatory. There was no other witness presented at trial that placed Petitioner at the scene of the crime as it occurred other than Collins and, the trial judge, sitting as the trier of fact, stated that his finding of guilt centered in and around the testimony of Collins. (T3, 101). And without his testimony Petitioner would not have been found guilty.

Next, the State suppressed the evidence, either willfully or inadvertently. The defense was never provided with any information about the intimidation and coercion of Collins by the police or the prosecutor as evidenced by his attempt on cross-exam at trying to establish that fact. (T3, 48-51). And "<u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not the

-74-

prosecutor." <u>Youngblood</u> v <u>W. Virginia</u>, 547 US 867, 869-870 (2006)(internal quotation marks and cites omitted).

And finally, prejudice ensued. Petitioner "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." <u>Wearry</u> v <u>Cain</u>, 136 S Ct 1002, 1006 (2016)(quoting <u>Smith</u> v <u>Cain</u>, 132 S Ct 627, 630 (2012)). "He must only show that the new evidence is sufficient to 'undermine confidence' in the verdict." <u>Ibib</u>. This the Petitioner has done as there were no other witness presented at trial that placed Petitioner at the scene of the crime as it occurred other than Collins and, the trial judge, sitting as the trier of fact, stated that his finding of guilt centered in and around the testimony of Collins. (T3, 101). And without that testimony, Petitioner could not have been found guilty and the suppression of the coercion and intimidation exerted upon him by government officials from Wayne County prejudiced him.

The trial court disagreed and held that:

"The prosecutor did not withhold evidence. Neither the police nor the prosecutor had a reason to threaten Collins. As the facts have shown, there was no <u>Brady</u> violation." (See page 15 of Exhibit H).

While the trial court does not elaborate on why it felt that "the police nor the prosecutor had a reason to threaten Collins", the prosecutor in his response did. He said that because Collins "was charged with perjury in a murder case, neither the police nor the prosecutor had any reason to threaten Collins with a murder charge." (See pages 25-26 of Exhibit I). But Andrew Smith (see Exhibit AA), Peter Baker (see Exhibit PP), and a 35 year old balck female (see Exhibit QQ) were also arrested for the murder of Mr. Penn. Moreover, first degree murder carries no more time than "perjury in a murder case." <u>Compare</u> MCL 750.316 <u>with</u> MCL 750.422 <u>and</u> MCL 750.423(1). Even "[i]f the false statement was made during the investigation of a crime punishable by

imprisonment for life," the penalty is still only "imprisonment for life or for any number of years." MCL 767A.9(1)(b). In any event, Collins claims on the DVD/disk of his polygraph and preliminary questions that APA Gonzalez offered to drop the perjury charges in exchange for testimony implicating Petitioner in the murder of Mr. Penn. (See DVD/disk).

The prosecutor also pointed to the testimony of three witnesses who indicated that Petitioner was in the vicinity of the crime scene shortly before and after the murder of Mr. Penn but this "is insufficient to establish guilt under Michigan law." Matthews v Abramajtys, 92 F Supp 2d 615, 632-633 (E.D. Mich. 2000). In any event, all of the witnesses providing this testimony are suspect. Andrew Smith was arrested for the murder of Mr. Penn (see Exhibit AA), John Trammel did not see Petitioner talking to anyone at the scene of the crime (T1, 65) even though police officer Craig Turner testified that he had talked to Petitioner twice at the scene of the crime. (T1, 97, 99-102, 105). Trammel also saw a white jeep (T1, 68-69) which is the type of vehicle thought to be involved in the murder. (See Exhibit RR); (See also page 2 of Exhibit SS). And of course Officer Turner worked for the Detroit Police, the same department that the jury would be hearing had threatened and coerced Collins into giving false testimony which would be shown to necessarily be false through People's Exhibit #13 (see Exhibit V) and the many other items of evidence discussed throughout this pleading.

ARGUMENT VI

PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL COUNSEL FAILED TO (A) INVESTIGATE AND CALL ROY BURFORD, STEVE KONJA, RAAD KONJA, SAMIR KONJA, AND ALSO FAILED TO CALL "BARBARA" TO TESTIFY ON THE THIRD DAY OF TRIAL, (B) QUESTION CURTIS COLLINS ABOUT HIS PENDING PAROLE VIOLATION AND WHETHER HE BELIEVED OR EVEN ONLY HOPED THAT HE WOULD SECURE IMMUNITY, A LIGHTER SENTENCE, OR ANY OTHER FAVORABLE TREATMENT FROM THE PROSECUTOR, (C) MOVE FOR THE SUPPRESSION OF MR. COLLINS' IN-COURT IDENTIFICATION OF PETITIONER, (D) OBJECT TO THE ADMISSION OF PETITIONER'S STATEMENT OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT, AND (E) DO ALL OF THE ABOVE WHICH, WHEN CONSIDERED CUMULATIVELY, DEMONSTRATES THAT PETITIONER WAS PREJUDICED BY COUNSEL'S ERRORS.

The Sixth Amendment, applicable to the States by the Fourteenth

Amendment, provides that the accused shall have the assistance of counsel in all prosecutions. The right to counsel is the right to effective assistance of counsel." Missouri v Frye, 132 S Ct 1399, 1404 (2012). "[D]efendant's claiming ineffective assistance of counsel must satisfy the familiar framework of Strickland v Washington, 466 US 668, 687 ... (1984), which requires a showing that counsel's performance was deficient and that the deficient performance prejudiced the defense." Woods v Donald, 135 S Ct 1372, 1375 (2015)(internal quotation marks omitted).

## ARGUMENT VI(A)

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary." Strickland v Washington, 466 US at 691. Had Pettioner's lawyer conducted a reasonable investigation, he would have discovered that Mr. Burford, Steve Konja, Raad Konja and Samir Konja were at the party store at the same time that Mr. Collins claimed to have witnessed Petitioner in that store (T3, 44, 52) and that none of them saw Mr. Collins. Specifically, had Mr. Burford been called as a defense witness at trial, he would have testified that he never saw Mr. Collins or Petitioner in the store that night. (See ¶ 6 & 7 of Appendix C). Had Steve Konja been called to trial he would have testified that he is the owner of the party store where Mr. Collins claims to have witnessed Petitioner immediately prior to murdering Mr. Penn and that he never saw Mr. Collins in the store that night. (See ¶ 2 of Exhibit P ). Samir and Raad Konja would have testified that Mr. Collins was not even allowed in their store (see ¶ 2 of Exhibit E  and ¶ 1 of Exhibit D ) and Raad Konja would have testified that he would have seen anyone that walked into the store and that Mr. Collins did not enter the store. (See ¶ 2 of Exhibit D ). The testimony from all of these witnesses would have contradicted

Mr. Collins' testimony that he was in that party store when he claimed that he was (T3, 38, 44, 52) and Petitioner's lawyer had an "obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." Towns v Smith, 395 F 3d 251, 258 (6th Cir. 2005). Petitioner's lawyer should have been on notice that Mr. Collins was claiming that he was at the party store talking to the store owners immediately prior to the charged crimes (see preliminary examination transcript page 12 & Exhibit NN) and it would have been reasonable for trial counsel to question any of these witnesses about what they saw at the party store on the night of the murder which, as explained above, would have contradicted Mr. Collins claim of being in the party store. The neutral disinterested testimony of these witnesses would have created "a reasonable probability that ... the result of the proceeding would have been different." Strickland v Washington, 466 US at 694.

Trial counsel was also aware of a witness named "Barbera" that was told by Mr. Collins that "the police are trying to make" him "say that" Defendant committed the murder. (See Exhibit S ). Trial counsel was ineffective for failing to call Barbera to testify to this fact. This testimony would have supported Mr. Collins' testimony on the first day of trial that homicide detectives pressured him to lie with promises of money and protection and threats regarding his pending prison escape charge (T1, 49-51), and would have contradicted Mr. Collins' testimony on the third day of trial that he was testifying out of fear of threats on him and his family's life. (T3, 38-40).

While Andrew Smith did testify that he knew Mr. Collins and that he never saw him at any time that evening, either at the party store or on the streets near the party store or the shooting scene (T2, 47-48), the testimony of these four witnesses would have nonetheless corroborated Petitioner's version of the events and the Sixth Circuit has ruled that counsel may be

-78-

deemed deficient for failing to call witnesses whose testimony would corroborate the defendant's version of the events, and that such evidence is not merely cumulative. See Stewart v Wolfenbarger, 468 F 3d 338, 358-359 (6th Cir. 2007)(citing cases and holding that the testimony of two alibi witnesses was not cumulative to the defendant's own testimony); see also Workman v Tate, 957 F 2d 1339, 1345-1346 (6th Cir. 1992)(finding that the testimony of two defense witnesses, which would have corroborated certain witnesses' testimony and contradicted police officers' testimony, was not merely cumulative).

As discussed previously (see Argument II of this Brief), there was relatively little evidence to support the guilty verdict to begin with and, "[i]n evaluating a claim of ineffective assistance of counsel, where there is relatively little evidence to support the guilty verdict to begin with, the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." Ditrich v Woods, 602 F Supp 2d 802, 808 (E.D. Mich 2009), citing Brown v Smith, 551 F 3d 424, 434-435 (6th Cir. 2008). Because this case centered on Mr. Collins' testimony (T3, 101), the neutral disinterested testimony of Mr. Burford and Mr. Konja would have created a "reasonable probability that ... the result of the proceeding would have been different." Strickland v Washington, 466 US at 694.

### ARGUMENT VI(B)

Search results from the Michigan Department of States' Uniform Commercial Code Debtor Information files reveals that a LEIN was placed on Mr. Collins on August 25, 1992 for a parole violation. (See Exhibit DD). This was less than a week before Mr. Collins testified on the first day of trial that he had lied under oath at Petitioner's preliminary examination because of coercive tactics employed by the homicide detectives from the Detroit Police (T1, 39). Immediately after giving this testimony, Mr. Collins was arrested

for perjury. (T3, 47-50). Two days later, on the third day of trial, Mr. Collins returned and now claimed that the preliminary examination testimony was the truth. (T3, 36-40). He claimed that his testimony exonerating Petitioner given on the first day of trial was given out of fear of death threats made on him and his family. (T3, 38-40).

Apparently curious as to what had transpired between the first day of trial and the third day of trial to make Mr. Collins abandon his belief in the death threats made on him and his family (T3, 40) and to give testimony implicating Petitioner, Petitioner's trial lawyer made the strategic choice to question Mr. Collins about whether, after being arrested for perjury (T3, 47), if the arresting officers had made any promises to him such as promising not to charge him with perjury. (T3, 50-51).

But defense counsel failed to follow through on his strategy and to question Mr. Collins about whether he had any belief or even only a hope on his part that he would secure immunity, a lighter sentence, or any other special treatment concerning his pending parole violation. See Farakas v United States, 2 F 2d 644, 647 (6th Cir. 1924).

This was deficient performance, Strickland v Washington, 466 US at 688, as, only a few days later after testifying favorably for the prosecution, the LEIN for the parole violation was recalled on September 5, 1992. (See Exhibit DD). In fact, Petitioner's trial lawyer stated in a post-trial letter to Petitioner that it was his "recollection that Mr. Collins was on ... parole, and was given a 'deal' in order to maintain his ... parole, after his testimony." (See Exhibit II).

Had Petitioner's trial lawyer brought out the "deal" that Mr. Collins' parole violation would be recalled after giving favorable testimony, the outcome would have been different. Strickland v Washington, 466 US at 694.

"[E]vidence of any understanding or agreement as to future prosecution would be relevant to [Mr. Collins'] credibility," <u>Giglio</u> v <u>United States</u>, 405 US at 155 and, considering the questionable nature of Mr. Collins' testimony discussed throughout this Brief, the trial judge would have found Petitioner innocent.

It is unclear where Petitioner's trial lawyer became aware of the "deal" either before or after trial. However, even if defense counsel became aware of the "deal" only after trial, he should have nonetheless brought out the fact that Mr. Collins was facing additional charges. Had he done so, the trial judge would have considered the fact that Mr. Collins was facing not only the perjury charge, but was also facing the parole violation and would have found it implausible that Mr. Collins had abandoned his belief in the death threats allegedly made on him and his family (T3, 40) without being promised any favorable treatment for his testimony (T3, 38, 50-51) in light of the multiple charges.

## ARGUMENT VI(C)

Due process protects the accused against the introduction of evidence that results from an unreliable identification obtained through unnecessarily suggestive procedures. <u>Moore</u> v <u>Illinois</u>, 434 US 220, 227 (1977). Whenever an identification is "[u]nnecessarily suggestive and conducive to irreparable mistaken identification," it must be suppressed. <u>Stovall</u> v <u>Denno</u>, 388 US 293, 302 (1967); <u>Manson</u> v <u>Brathwaite</u>, 432 US 98 (1977). <u>Neil</u> v <u>Biggers</u>, 409 US 188 (1972) "is, of course, the preeminent ruling on the subject of in-court identification challenged on the basis of suggestive pre-trial identification process." <u>Mills</u> v <u>Cason</u>, 572 F 3d 246, 250 (6th Cir. 2009). "To determine whether an identification procedure violates due process, courts first discern whether the procedure was impermissibly suggestive." <u>Johnson</u> v <u>Warren</u>, 344 F

Supp 2d 1081, 1090 (E.D. Mich. 2004).

Roney Fulton testified that Sgt. Kinney showed him and Mr. Collins "two pictures" (T2, 117) and Mr. Collins the told Sgt. Kinney that he recognized Petitioner. (T2, 124-125). Petitioner was in custody at this time, "[t]here was ample opportunity to conduct a traditional lineup," Biggers v Tennessee, 390 US 404, 407 (1968), and identification by photograph should not be used when a suspect is in custody. People v Strand, 213 Mich App 100 (1995). Mr. Fulton knew Mr. Collins was wanted by police (T2, 125) and Mr. Collins was arrested (T2, 127) and gave a statement to police implicating Petitioner in the murder of Mr. Penn. (See Exhibit NN ; NOTE: This statements was made under Curtiss Collins' alias, "Tony Smith", see T1, 33-34).

Petitioner submits that these facts demonstrate that Mr. Collins' identification was impermissibly suggestive. To be sure, Mr. Collins testified that homicide detectives from the Detroit Police had coerced him to lie and say that he saw Petitioner (T1, 39) and "[u]nnecessary suggestiveness generally depends upon whether the witness's attention was directed to a suspect because of police conduct." Howard v Bouchard, 405 F 3d 459, 469-470 (6th Cir. 2005).

Before Mr. Collins was allowed to testify when recalled on the third day of trial, Petitioner's trial "counsel's performance was deficient," Strickland v Washington, 466 US at 688, for failing to move for the suppression of Mr. Collins' in-court identification of Petitioner based on the police coercion described by Mr. Collins which demonstrated an unnecessarily suggestive procedure, without a strategic reason for doing so.

At that point, the burden would have been shifted to the prosecutor to prove that the identification was reliable, independent of the suggestive procedure. United States v Wade, 388 US 218, 240 n. 31 (1967).

This the prosecutor would not have been able to do as Mr. Collins had

testify that he "didn't see nothing" (T1, 39), a fact supported by the evidence Indeed, Officer Richardson testified that he could make out no more than the outline of his own body in a photograph admitted as People's Exhibit Number 13 showing him at the crime scene at about 9:45 to 10:00 in the morning taken at the party store (T3, 28-30) where Mr. Collins later claimed to have observed the crime take place (T3, 64) Thus, it would have been in defiance of the realities of the physical facts of this case for Mr Collins to have identified Petitioner from the same distance at night in a fairly dark area (T3, 21) by only a scar on the back of Petitioner's head (T3, 64-65); (Exhibit T). Petitioner has shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland v Washington. 466 US at 694. where the in-court identification would have been suppressed and the trial judge's decision to convict centered on Mr Collins testimony (T3, 101).

## ARGUMENT VI(D)

In Kimmelman v Morrison. 477 US 365. 384 (1986) the Supreme Court stated that "the failure to file a suppression motion does not constitute per se ineffective assistance of counsel" The court also indicated that an attorney's failure to timely file a suppression motion does not constitute ineffective assistance of counsel if the failure is due to strategic reason Id at 384-385 Attorney strategy, however, must be sound Id at 384 .

Also by reading of Id at 383 in summary, we reject petitioner argument that Stone's restriction on Federal Habeas review of Fourth Amendment [383] claims should be extended to Sixth Amendment ineffective assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue, where a state obtains a criminal conviction in a trial in which the accused is deprived of the effective assistance of counsel, the state. .. unconstitutionally deprives the defendant of his liberty "Cuyler, 446 US at 343 the defendant is thus in custody in violation of the constitution. 28 U.S.C § 2254(a) and federal courts have habeas jurisdiction over his claim We hold that federal court may grant habeas relief in appropriate case Regardless of the nature of the underlying attorney error

Petitioner argues his trial counsel was ineffective for failure to challenge the validity of the warrantless arrest and warrantless search enter

of his home and warrantless search. and trial counsel failure to move for a
suppress hearing to suppress the petitioner statement amounted to ineffective
assistance of counsel and the petitioner seeking an evidentiary hearing in the
Federal court, and also trial counsel was also ineffective for telling the
petitioner to stipulate to his statement into evidence against the petitioner.
knowing the petitioner didn't understand his constitutional right, by trial
counsel ineffective the petitioner was denied an opportunity to fully and
fairly litigate  his Fourth Amendment claim in the state courts, also see.
Payton v New York, 445 US 573  100 SCt  1371 and also see United States of
America v Hurston 12  F Supp 2d 630. 1998 U S  Dist LEXIS 17661.

> THIS CASE SHOULD BE REMANDED FOR AN EVIDENTIARY
> HEARING ON THE ISSUE OF WHETHER THE WARRANTLESS
> ARREST AND DELAYED ARRAIGNMENT OF DEFENDANT WAS
> A VIOLATION OF CONSTITUTIONAL RIGHTS AND WHETHER
> HIS IN-CUSTODY POLICE STATEMENT SHOULD HAVE BEEN
> EXCLUDED AS EVIDENCE AT TRIAL

Defendant-Appellant CARL LYNDELL HUBBARD'S in-custody statement to police
investigators was made while he was held four (4) days on a warrantless arrest
before being charged with any crime and taken before a magistrate. Defendant
contends that his arrest. without probable cause, and the delay in his
arraignment on the murder charge were in violation of his Fourth Amendment
rights  Defendant's January 23, 1992 police statement was derivative of his
illegal arrest, and that this statement should have been excluded as evidence
in the lower court trial

As argued in Issue II, supra. of this Brief on Appeal, Defendant contends
that his trial counsel's failure to challenge the validity of the arrest and
counsel's failure to move to Suppress Defendant's statement amounted to
ineffective assistance of counsel and Defendant seeks a post-conviction
evidentiary hearing pursuant to People v Ginther, 390 Mich 436 (1973).

From the files and records of the lower court and of the Detroit Police
Department. the applicable dates are as follows: (See Appendix ✱) G G

The deceased Complaint. Rodnell Penn, was kill by close-range gunshot
wounds on Friday. January 17. 1992

Defendant HUBBARD was arrested at his home on the morning of Tuesday,

January 21, 1992 by Detroit Police Officers. This was a warrantless arrest and there was a warrantless search of his home, but no physical evidence linking Defendant to the Penn killing was recovered. The arresting officers then transported Defendant to the Detroit Police Headquarters and Defendant HUBBARD was held overnight on the 9th floor holding facility. Defendant was not charged with the Penn killing, nor any other crime. (See Appendix X). G. G.

On Wednesday, January 22, 1992, Defendant remained in custody all day at Police Headquarters. Defendant was not charged with the Penn killing, nor any other crime, but was again held overnight by the Detroit Police.

On Thursday, January 23, 1992, Defendant remained in custody all day at Police Headquarters. During an interrogation by Sergeant Joann Kenny, Homicide Section, Defendant made a statement (People's Exhibit #25) [TI. 63-69]; Defendant denying seeing Penn on the dates of January 16, 1992 and January 17, 1992; denying any knowledge of the Penn shooting; and denying being at the scene of the crime at Gray near Mack. Following his statement, Defendant was again held overnight, though not arrested for this crime nor any other criminal act.

On Friday, January 24, 1992, Defendant continued to be held at Police Headquarters, and then later brought before a 36th District Court Magistrate to be arraigned on the murder charge (See Appendix 46). G. G.

The Fourth Amendment of the United States Constitution prohibits unreasonable seizures of the person. An "arrest" is a particular kind of seizure to hold an individual to answer for a crime charged against him. Dunaway v NEW YORK 42 US 200 (1979), and a warrantless arrest must be supported by probable cause, Beck v Ohio 379 US 89 (1964); People v Harper 365 Mich 494 (1962). Whether a warrantless arrest violates Fourth Amendment protections depends upon whether the facts and circumstances within the police officer's knowledge at the time of the arrest would warrant a reasonable belief that the suspect had committed or was committing an offense, Beck v Ohio, supra; People v Harper, supra.

Under both Michigan and Federal law, the Fourth Amendment right to be free from unreasonable seizures includes the protection against extended detention without just cause. The constitutional right to a prompt judicial determination of probable cause on a warrantless arrest is set forth under Michigan statutes.

MCL 764.13 provides:

-85-

"A peace officer who has arrested a person
for an offense without a warrant shall without
unnecessary delay take the person arrested before
a magistrate of the judicial district in which
the crime was committed, and shall present to the
magistrate a complaint stating the charge against
the person arrested

MCL 764 26 requires that:

"Every person charged with a felony shall.
without unnecessary delay after his arrest, be
taken before a magistrate or other judicial
officer and. after being informed of his rights,
shall be given an opportunity publicly to make
any statement and answer any questions regarding
the charge that he may desire to answer "

United States Supreme Court decisions have consistently held that the Fourth Amendment of the United States Constitution requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest. Gerstein v Pugh 420 US 103 (1975); County of Riverside v McLaughlin 500 US ____; 114 L Ed2d 49 (1991)

Defendant HUBBARD contends that his warrantless arrest lacked probable cause and that the arrest and his extended detention at Police Headquarters was for the purpose of eliciting incriminating evidence against him Before making his January 24th statement to Sergeant Kenny, Defendant was denied access to counsel and family was repeatedly questioned by Homicide investigators Defendant HUBBARD was essentially held incommunicado for three (3) days before making his statement to the Detroit Police

While it is conceded that immediately prior to his police statement on January 24, 1992, Defendant HUBBARD executed a Detroit Police Miranda Miranda v Arizona 384 US 486 (1964) rights form (People's Exhibit #23) on the third day of his detention. this fact is not dispositive of the constitutional issue raised in this case  The fact that Defendant HUBBARD'S police statement did not amount to a specific "confession" should also not be conclusive, because the prosecution used this statement at trial (People's Exhibit #25) as evidence of "motive" or "knowledge" as to the Penn killing

Under both Michigan Supreme Court and United States Supreme Court

-86-

decisions, it has been held that evidence taken in violation of a defendant's Fourth Amendment right to prompt judicial determination of probable cause may be suppressed as the fruit of the poisonous tree. Wong Sun v United States 371 US 471 (1963), of the illegal arrest

The United States Supreme Court has held that an illegal arrest invalidates a subsequent statement given, even after proper Miranda, supra, warnings, unless the prosecution can clearly show that defendant's statement was freely given and was independent of the illegal arrest. Brown v Illinois, 422 US 603 (1975) (See Appendix ꞈ).G.G

In Michigan, the Supreme Court has also held that delay in post-arrest arraignment used to obtain evidence is contrary to MCL 764 13 and 764 26 and such evidence should be suppressed, See People v Mallory 421 Mich 229 (1984) While the Supreme Court has somewhat modified the Mallory decision in holding that delay in arraignment contrary to MCL 764 13 and MCL 764 26 is only one factor in evaluating the voluntariness of defendant's statement, and that the test is the totality of the surrounding circumstances, See People v Cipriano 431 Mich 315 (1988), the Supreme Court has not overruled the underlying rationale of either People v Mallory supra, or Brown v Illinois, supra

In the instant case, the lower court record establishes that Defendant HUBBARD did not give any statement to the police until the third day following his warrantless arrest, and was not brought before an impartial magistrate until the fourth (4th) day of the warrantless detention Defendant contends that the arrest and extended detention violated his constitutional rights against unreasonable seizure and his right to be promptly arraigned before a magistrate or a judicial officer under Michigan law To the extent that the issue was not raised by motion and evidentiary hearing in the lower court should not preclude appellate review, as under the facts presented in the lower court. inaction by trial counsel in addressing this issue constituted ineffective assistance of counsel

Prior to ruling on the merits of the issue of Defendant's arrest and extended detention, this Court of Appeals should enter an Order remanding this case to the lower court with instructions that an evidentiary hearing be held. pursuant to People v Ginther, supra, to make a testimonial record on the issue of whether Defendant's arrest and detention amounted to a violation of his protections under the Fourth Amendment. United States Constitution

ARGUMENT V(E)

In United States v Dado, 759 F 3d 550, 563 (6th Cir. 2014), the Sixth Circuit explained that "examining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case,'" citing Landrum v Mitchell, 440 F 3d 754, 770 (6th Cir. 2006). Petitioner asserts that, if individually these errors do not show prejudice under the second prong of the Strickland analysis, then when considered cumulatively these errors do demonstrate that prejudice.

ARGUMENT VII

PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE EVIDENCE PRESENTED AT TRIAL FAILED TO PROVE HIS GUILT BEYOND A REASONABLE DOUBT.

In this case, by bench trial verdict in the trial court, Petitioner was convicted of the crime of Murder, First Degree, MCL 750.316. In this appeal, Petitioner contends that the evidence presented at trial, when taken as a whole, failed to prove his guilt beyond a reasonable doubt. Specifically, that the evidence presented did not establish that Petitioner had taken the life of the deceased, Rodnell Penn. Second, that the evidence presented did not prove beyond a reasonable doubt each of the necessary elements or Murder, First Degree, MCL 750.316. And, that the People's evidence did not overcome Petitioner's alibi defense beyond a reasonable doubt.

It is a fundamental princiole of our system of justice that an accused's guilt must be proven beyond a reasonable doubt. In re Winship, 397 US 358, 364 (1970): US Const, Amend XIV. Under Jackson v Virginia, 443 US 307 (1979), habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 319. The Jackson standard must be applied "with explicit reference to the substantive

-88-

elements of the criminal offense as defined by state law." Id. at 324 n. 16. Petitioner contends that the prosecution failed to meet this burden and that the trial court judge's legal conclusions were not properly supported by factual findings supporting Petitioner's conviction.

In Michigan, first-degree murder is defined as:

"Murder which is perpetrated by means of poison, lying in wait, or any other wilful, deliberate, and premeditated killing, or which is committed in the preparation, or attempt to perpetrate arson, criminal sexual conduct, breaking and entering of a dwelling, larceny of any kind, extortion, or kidnapping, is murder in the first degree ..." MCL 750.316.

In order to establish the elements of Murder, First Degree, MCL 750.316, the prosecution must show that: 1) defendant caused the death of the deceased, 2) defendant intended to kill the deceased, 3) the intent to kill was premeditated, 4) the killing was deliberate, and 5) the killing was not justified, excused or done under circumstances that would reduce the offense to second-degree murder or manslaughter. For the crime of first-degree murder there must be actual, specific intent to take life and the intent must be deliberate and premeditated. People v Scott, 6 Mich 287, 293 (1859). Malice aforethought is an essential ingredient of this offense as the act which causes death, and the presumption of innocence applies equally to both ingredients of the crime. People v Martin, 392 Mich 533 (1974); See also People v Lyles, 100 Mich App 232 (1980); People v Morrin, 31 Mich App 301 (1971).

Petitioner contends that the evidence presented at trial failed to prove beyond a reasonable doubt that the death of Rodnell Penn was the result of first-degree murder. The Wayne County Medical Examiner's autopsy report (by Dr. Caoile) indicated that Mr. Penn died of multiple gunshot wounds, with large caliber non-jacketed slugs recovered from his body (T1, 11-14), and the stipulated firearms identification evidence (Police Officer Dragan, Detroit

Police crime lab) indicated that the two (2) slugs recovered from Mr. Penn's body were .38 caliber handgun ammunition fired from the same weapon. (Stipulation; T3, 72-75). While it is conceded that the People's proofs proved that Mr. Penn's death was the result of gunshot wounds and that slugs recovered from Mr. Penn's body came from the same handgun, Petitioner contends the circumstances surrounding Mr. Penn's death do not prove first-degree murder beyond a reasonable doubt. Indeed, Petitioner was found **not** guilty of the Possession of a Firearm During the Commission of a Felony charge (T3, 185) even though the prosecution's case was that the "killing was done by the defendant with a firearm, particularly a hand gun." (T1, 6). How could the trial judge have found that Petitioner killed Mr. Penn with a firearm when he was presented with insufficient evidence to find that he even possessed a firearm. Moreover, none of the People's witnesses testified as eyewitnesses to the actual shooting of Mr. Penn. (See Appendix S, page 1, where it was found that "[t]here were no eyewitnesses to the killing of Rodnell Penn"). People's witness Andrew Smith (T3, 35-50). Mr. Collins (T1, 16-58) & (T3, 36-92) and John Trammel (T1, 6-69) were the only witnesses who placed Petitioner in the general vicinity of the crime on January 17, 1992 before the shooting. Police Officer Turner (T1, 95-111) could only testify as to the events after police responded to the shooting on Gray Street. Witnesses Smith and Collins testified that they had seen Petitioner at the scene before the shooting, but neither of these prosecution witnesses witnessed the actual event; both men testifying that they heard several gunshots. Neither witness saw Mr. Penn being shot; neither saw who shot Mr. Penn; neither saw Petitioner in front of 3960 Gray Street where Mr. Penn had been shot; neither witness saw Petitioner at any time with any weapon; and neither witness could identify what conduct (by Mr. Penn or others) occurred immediately before the shooting death of Mr. Penn. Also, no prosecution witness could testify as to any threatening conduct

by Petitioner toward Mr. Penn before his death on January 17, 1992.

Under _People_ v _Martin_, _supra_; _People_ v _Lyles_, _supra_; and _People_ v _Morrin_, _supra_, Murder, First Degree, MCL 750.316 requires proof beyond a reasonable doubt of a deliberate, premeditated act with malice aforethought. As no prosecution witness could directly testify as to what had occurred at the time of the shooting, and no admissible evidence was presented to substantiate the _mens_ _rea_ of the killing by prior conduct on the part of Petitioner in relation to Mr. Penn, the court's verdict of guilty under a first-degree murder charge is without evidentiary support. Where the evidentiary support was so lacking to sustain this charge, at most, the verdict should have been to a lesser form of homicide; Murder, Second Degree, MCL 750.317 or Manslaughter, MCL 750.321.

However, Petitioner contends that the prosecution evidence presented in his bench trial not only failed to establish beyond a reasonable doubt that he was guilty of the first-degree murder of Mr. Penn, but that the People's proofs failed to prove that Petitioner had committed any crime related to the death of Mr. Penn.

The People's evidence, when taken as a whole, could at best show that Petitioner was in the general area of Gray Street and Mack Avenue on Friday evening, January 17, 1992. The keystone of the People's case was witness Collins (T1, 16-58) & (T3, 36-92), and Petitioner contends that his trial testimony was so compromised by his demonstrated disregard of the witness oath as to lack the credibility required to sustain a criminal conviction. Even if Mr. Collins' testimony of the third day of trial were to be accepted, the evidence at best would show that Mr. Penn and Petitioner may have been together shortly before the shooting, and that Petitioner was running away from the general area after Mr. Collins had heard the sound of gunshots. (T3,

44-46). However, even Collins' testimony could not place Petitioner at the scene in front of 3960 Gray Street where Mr. Penn was killed.

The changed trial testimony of People's witness Collins (T3, 36-92) was also lacking in credibility based on other trial evidence presented by the People; evidence which brought into question Mr. Collins's ability to observe, and whether Mr. Collins was even at Mack and Gray at the time that Mr. Penn was murdered as he had claimed in his subsequent testimony.

Police Officer Randy Richardson (T2, 3-35), the police evidence technician who examined the crime scene, testified that the party store at the corner of Gray and Mack, where Mr. Collins claimed to be standing when he witnessed the event, was about three hundred (300) to three hundred seventy five (375) feet away from the location of the body. (T2, 21-22). Officer Richardson also testified that the area where Mr. Penn was shot was fairly dark. (T2, 21). Thus, to be believed, one would have to accept the notion that Mr. Collins, standing well over the length of a football field away (see map and pre-lim transcript in Appendix B), could identify a person in a dark area, running away from the direction where he was standing, with a claim that he saw a scar on that person's head. Petitioner contends that such testimony was so incredible that it could not sustain a rational verdict of guilt under the standard of Malcum v Burt, 276 F Supp 2d 664, 686 (E.D. Mich. 2003):

> "In examining claims of insufficiency of the evidence in habeas corpus, a federal court must presume that the [trier-of-facts'] findings in evaluating the credibility of the witness is correct and may ignore the testimony only when it finds it to be 'inherently incredible'. Such a finding may be made only where the testimony is 'unbelievable on its face'; i.e., could not have occurred under the laws of nature." (cite omitted).

Further, Mr. Collins' claim that he was really at the scene that Friday evening is contradicted by the testimony of three (3) prosecution witnesses; Andrew Smith (T2, 35-50), John Trammel (T1, 6-69) and Lucinka Gross. (T2, 50-59).

People's witness Mr. Trammel (T1, 60-69) testified, that he saw Petitioner on Gray Street among the spectators after the EMS and police arrived, but could not pinpoint the exact time (T1, 67) and did not testify to seeing Petitioner before the shooting incident. Mr. Trammel did not testify to seeing Mr. Collins at the scene of Friday evening.

People's witness Smith (T2, 35-50) testified that he saw "Goff" walking on Mack (T2, 35-36), before he went into the party store. Mr. Smith testified that he was in the store when he heard gunshots, then he went down the street to the shooting scene and saw Mr. Penn's body on the ground. (T2, 42-43). Mr. Smith specifically stated that he knew Mr. Collins, and that he never saw him that evening, either at the party store or on the street near the area of the crime scene (T2, 47-49); contradicting Mr. Collins' testimony.

People's witness Gross (T2, 50-59), the witness who first came upon Mr. Penn's body on Gray Street, testified that she came upon the body, then immediately went up Gray Street to the party store at the corner of Mack and Gray to call the police. (T2, 51-55). Ms. Gross testified that she didn't see anyone on the street. (T2, 57-59). She also testified that she knew Mr. Collins by the nickname "Kurt baby", but did not see him at anytime that evening (T2, 57-58); contradicting Mr. Collins' trial testimony.

Finally, the defense called two (2) witnesses: Raymond Williams (T3, 101-111) and Roney Fulton (T3, 111-128) who both testified that People's witness Collins was at Mr. Fulton's house on Corbett and not at Mack and Gray on Friday, January 17, 1992, when Mr. Penn was killed. Petitioner's trial lawyer also called two (2) other witnesses: Thomas Spells (T3, 129-147) and Vanessa Spells (T3, 147-155) who set forth an alibi defense that Petitioner was not on Gray Street at the time of Mr. Penn's death.

Under Michigan law, an alibi is established as a defense by the

-93-

testimony that the accused was somewhere else at the time the crime was committed. People v Mullane, 256 Mich 54 (1931). When the trial evidence sets forth an alibi, the prosecution bears the burden of overcoming this defense beyond a reasonable doubt, and if any reasonable doubt exists as to the accused's presence at the scene of the crime, the defendant should be acquitted. People v Loudenslager, 327 Mich 718 (1950); People v Burden, 395 Mich 462 (1975); People v Erb, 48 Mich App 622 (1973).

Defense alibi witness Thomas Spells testified that Petitioner was at his house from 6:00 to 7:00 in the evening of Mr. Penn's death, that Petitioner and him had left together between 9:00 and 10:00, and that they were at the scene of the crime amongst the spectators when police and EMS arrived. (T3, 129-132). The fact that Petitioner was in the crowd of spectators when the police and EMS arrived is verified by John Trammel (T1, 62-64) and Officer Turner. (T1, 95-98). Officer Sewell (T1, 90-91) and Lucinka Gross (T2, 51-53, 57-59) both testified that they did not see anyone when they arrived at the scene of the crime. The only witnesses who claimed to have seen Petitioner at the scene of the crime before Mr. Penn was killed were Mr. Collins and Andrew Smith. Of course, Mr. Collins claims both that Defendant was there at the time of the murder (T3, 44-46) and that he wasn't. (T1, 18-19). As discussed previously, his testimony was "inherently incredible" as the events which he claimed to have witnessed "could not have occurred under the laws of nature." Malcum v Burt, 276 F Supp 2d at 686. In fact, Mr. Smith (T2, 47-49) and Ms. Gross (T2, 57-58) both testified that they never saw Mr. Collins on Gray and Mack and Raymond Williams (T3, 101-111) and Roney Fulton (T3, 11-128) both testified that Mr. Collins was with them at Mr. Fulton's house on Corbett and not on Mack and Gray at the time of Mr. Penn's death. And while Mr. Smith claims to have seen Petitioner on Gray and Mack prior to the

death of Mr. Penn, he never saw Mr. Collins which also "could not have occurred under the laws of nature," Malcum v Burt, 276 F Supp 2d at 686, as Mr. Collins claims to have been right outside of the party store when he witnessed Petitioner running away from the scene of the crime. (T3, 64). Accordingly, the prosecution did not overcome Petitioner's alibi defense beyond a reasonable doubt, providing insufficient evidence of Petitioner's guilt.

<div align="center">ARGUMENT VIII</div>

THE INCONSISTENT VERDICT OF THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS.

In this case, the prosecution's evidence proved by the stipulated testimony of the Wayne County Medical Examiner (by Dr. Caolie) that Mr. Penn died as the result of gunshot wounds fired by a large caliber weapon using a non-jacketed ammunition. (T1, 11-14). By the stipulated testimony of firearms expert Police Officer Dragan (T2, 72-75), the People proved that the slugs recovered from Mr. Penn's body were fired from the same .38 caliber handgun. The autopsy report also showed that the close-range handgun firing was the sole cause of death of Mr. Penn. (T1, 11-14).

No witness ever testified to witnessing Petitioner in possession of firearm, including Mr. Collins. (T3, 44-46). The judge, sitting as the trier-of-fact, acquitted Petitioner of possessing a firearm because "[t]his Court has not seen a handgun. There have been no exhibit marked as a handgun". (T3, 185). The prosecution's case was that the "killing was done by the defendant with a firearm, particularly a handgun." (T1, 6).

Since Petitioner's guilt was determined by a judge rather than a jury, this inconsistent verdict was in violation of Petitioner's constitutional rights. United States v Maybury, 274 F 2d 899, 902-903 (2d Cir. 1960). This was clearly an inconsistent verdict as Petitioner could not have killed Mr.

<div align="center">-95-</div>

Penn without a handgun when this was determined to be the cause of death. (T1, 11-14, 72-75). But the Michigan Court of Appeals held that:

> "Defendant also asserts that the court gave inconsistent verdict. The trial court noted that defendant was charged with felony firearm based on the possession of a handgun. MCL 750.227(b); MSA 28.424(2). Because he was not persuaded beyond a reasonable doubt that a handgun rather than a sawed-off shotgun was used in the shooting, the trial court acquitted defendant on this charge. We find no reversible error in the trial court's failure to convict defendant of felony firearm as charged, yet find him guilty of first-degree murder." (See Appendix RK page 5).

Again, Petitioner was acquitted of possessing a firearm because "[t]his Court has not seen a handgun. There have been no exhibit marked as handgun." (T3, 185). But there were also no sawed-off shotguns or exhibits of sawed-off shotguns. In fact, the only reference to a sawed-off shotgun came from the trial judge when he stated that "I don't know as a result of this close range firing that this was a saw-off rifle; what length of any gun might have been." Id. Accordingly, if there was insufficient evidence to find Petitioner guilty of possessing a handgun then it is even more the case that there was insufficient evidence to find him guilty of possessing a sawed-off shotgun as the firearm expert opined that it was a .38 caliber handgun that was the murder weapon. (T1, 72-75). Thus, the trial judge's verdict violated Petitioner's constitutional right against an inconsistent verdict. United States v Maybury, 274 F 2d at 904-906.

## ARGUMENT VIII

PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE COUNSEL FAILED TO RAISE ARGUMENTS II, III, IV AND V.

"Ineffective assistance of appellate counsel can constitute cause to excuse a procedural default." Landrum v Mitchell, 625 F 3d 906, 916 (6th Cir. 2010). The same standard announced in Strickland v Washington, supra, applies when analyzing claims of ineffective assistance of counsel. Burger v Kemp, 483 US 776, 781-781 (1987). "As a general rule, it is only when ignored issues are

clearly stronger than those presented that the presumption of effective assistance of counsel can be overcome." <u>Baker</u> v <u>Barrett</u>, 16 F Supp 3d 815, 846 (E.D. Mich. 2014)(internal quotation and citations omitted). But if an "omitted issue is so plainly meritorious that it would have have been unreasonable to winnow it out even from and otherwise strong appeal, its omission may directly establish deficient performance." <u>Smith</u> v <u>Robbins</u>, 528 US 259, 288 (2000). "[T]o demonstrate prejudice Petitioner must show a reasonable probability that his claim would have succeeded on appeal." <u>Baker</u> v <u>Barrett</u>, <u>supra</u>. Petitioner asserts that the issues he presents here are clearly stronger than those raised by his appellate counsel on direct review and that, had these issues been raised, he would have succeeded on appeal and has therefore established the ineffective assistance of appellate counsel that is required to overcome any procedural default for failing to raise these issues on direct apepal.

<center>RELIEF REQUESTED</center>

Therefore, Petitioner asks this Honorable Court to hold an evidentiary hearing and either release Petitioner unconditionally or to order a new trial.

<div style="margin-left:40%">
Respectfully submitted,

Carl Hubbard #205988

Carl Hubbard #205988<br>
Petitioner in Pro Se<br>
Carson City Correctional Facility<br>
10274 Boyer Road<br>
Carson City, MI 48811-5000
</div>

Dated: 6-29-20 , 2020

EXHIBIT A

STATE OF MICHIGAN)

            )SS

COUNTY OF MOUNTCALM

## AFFIDAVIT OF FACT

I Askia Hill Id ç331718, being duly sworn deposes and sayeth as followed:

1) The statement made in this affidavit is to the best of my said knowledge, true and If called upon as a "Witness". I can testify Competently, as to the truth of the statement made in this affidavit

2). I was on my way to the store on the corner of Gray & Mack on Janurary 17, 1992, when I was across the street in the vacant lot across the street from Uncle Peter's house. That is when I saw Mark Going arguing with somebody in the front of Uncle Peter's house. Then I saw the other guy turn his back and start to walk away from Mark Going.

3). Then I heard some gunshots fired and the guy arguing with Mark Going fell to the ground. Then Mark Going stepped over him and started shooting the guy again. Then he turned around and got in his car in front of Uncle Peter's house with some other guys sitting already in the car that was parked in front ofUncle Peter's house.

I

2

Affidavit Page II.

4)   Then  they  drove  the  car  down  Gray  Street,  and  this  is  when
I  turned  around  and  ran  back  to  my  house.  I  live  at  Algonguin
4210,  Detroit,  Michigan  ç  48215.   I  never  told  anybody  what  I  seen
that  day  is  because  I  was  afraid  for  my  life  and  I  didnt  want  any
trouble  with  anybody  in  the  neighborhood,  because  I  have  to  live
in  that  neighborhood.

5)  So  I  kept  silent  about  what  I  saw  that  night.  I  heard  everybody
saying  that  this  guy  name  "Ghost"  got  charged  with  the  murder/case
shooting  in  front  of  uncle  Peter's  house  on  Gray  street.  I  don't
know  Carl  Hubbard  (Ghost)  personally,  but  I  am  willing  to  testify
to  what  I  saw  that  night ,  because  I  know  he  is  "Innocent"  of  the
crime  of  murder  that  he  is  in  prison  for  now.

6).  I  Askia  Hill  state  that  I  don't  know  Carl  Hubbard  Personally
but  I  have  seen  him  in  the  neighborhood  and  I  can  truly  say  that
he  was  not  the  person  that  I  seen  shoot  and  kill  this  guy  that
night  outside   Uncle  peter's  house.  It  was  "Mark  Going",  because
I  do  remember  the  "Other  guy"  was  "Tall"  and  was  "wearing  some
kind  of  hood  on  his  head  because  it  was  snowing  outside.  I  know
the  difference  between  Mark  Going  and  Carl  Hubbard  because  I  grew
up  with  both  of  them  in  the  neighborhood.

7).  One  thing  for  sure  is  that  I  can  truly  say  and  will  never  forget
somebody  got  shot  and  killed  that  day  and  plus  I  remember  everybody
the  next  day  was  talking  about  the  guy  who  got  killed  in  front
of  uncle  peter's  house.

3

8). I Askia Hill ç 331718, state that I have not been promised anything, nor threaten to come forth with this information. I state that all above statements and facts within this affidavit are true, and If called upon to testify to the same in court of law. I will do so under oath, subject to the penalties of perjury.

Respectfully submitted:

_Askia Hill_

Askia Hill ç 331718
Carson City Correctional
Facility:    P.O.    Box
                5000
Carson City, MI 48811-
                5000.

Subscribed and Sworn to this day

1st day____ of February 2011

C. Schrauben : 
       Notary public

C. SCHRAUBEN
NOTARY PUBLIC, STATE OF MI
COUNTY OF IONIA
MY COMMISSION EXPIRES Jun 16, 2016
ACTING IN COUNTY OF

III.

4

EXHIBIT B

AFFIDAVIT OF CARL HUBBARD

COUNTY OF MONTCALM)
                   )ss.
STATE OF MICHIGAN )

Carl Hubbard, being duly sworn, deposes and says:

1. I was unaware of any information contained in Askia Hill's affidavit until a chance encounter while incarcerated with him.

2. I was unaware of any information contained in Roy Burford's affidavit until a chance encounter while incarcerated with him.

3. I was unaware of any information contained in Emmanuel Randall's affidavit until a chance encounter while incarcerated with him.

4. I was unaware of any information contained in Elton Carter's affidavit until he unexpectedly wrote me.

5. I could not have previously obtained the affidavits of Samir and Raad Konja as I do not know these people and had to rely on Raymond Williams to obtain these affidavits as I have no immediate family in this State. Furthermore, Mr. Williams informed me that it was not until July 2014 that he was able to obtain these affidavits for me.

I certify under the penalty of perjury that the foregoing is true and correct. Executed on March 28, 2018

                                   _Carl Hubbard_

                                   Carl Hubbard

R. Loomis   3-28-2018

NOTARY PUBLIC
R. LOOMIS
NOTARY PUBLIC, STATE OF MI
COUNTY OF GENESEE
MY COMMISSION EXPIRES May 11, 2018
ACTING IN COUNTY OF Montcalm

EXHIBIT C

7

SWORN AFFIDAVIT OF ROY A. BURFORD

STATE OF MICHIGAN   )

SS                  )

COUNTY OF MONTCALM  )

### AFFIDAVIT OF FACT

I ROY A. BURFORD #248543, being duly sworn deposeth and sayeth as followed:

1.  The statements made in this affidavit are, to the best of my knowledge, true and if called upon as a witness, I can testify competently as to the truth of the statements made in this affidavit.

2.  I was in the "SPECIAL K" party store on January 17, 1992 around 8:00 p.m. until closing, when I heard some shooting outside the store on Gray Street and Mack Avenue on Detroit's eastside.

3.  I stepped outside for a moment and seen a car light down the street by "UNCLE PETER'S" house. Then I went back in the store and I finished talking to "SAM" and older guy works in the "Special K" party store which is owned by "STEVE" and "SAMIR".

4.  Then this older black lady came in the store to cash a check told the store owner "STEVE" to call the police because there looks like a body is laying in the driveway of "UNCLE PETER'S" house.

5.  Then "STEVE", the owner of the store, cashed the woman's check then called the police. The woman waited for a little while then she left the store. After she left the store I stepped outside and saw nothing but people standing around along with the police and an ambulance. The street was blocked off by the police car and other people.

6.  I can testify that I know "CURTIS COLLINS" a.k.a. "CURTIS BABY" and that I never seem him on Gray and Mack Avenue the night of January 17, 1992 before the shooting occurred or after the shooting occurred.  Plus I know "CURITS COLLINS" personally and he was never on Gray and Mack Avenue or in the "SPECIAL K" party store on the night of January 17, 1992.

7.  I personally do NOT know "CARL HUBBARD" a.k.a. "GHOST", but I am willing to testify truthfully that I never seen him on Gray and Mack Avenue on January 17, 1992 or in the "SPECIAL K" party store the night of the shooting. This is because I

know him when I see him and he was NOT any of the people in the store that night. Further he lives in the neighborhood and I stay on Springle Street around the corner from "Special K" party store on Gray and Mack Avenue.

8.   I am also willing to testify that I lived on Springle Street around the time of the shooting at "SPECIAL K" party store. I know "CURTIS COLLINS" personally and he told me he lied on "CARL HUBBARD" a.k.a. "GHOST" because Mr. Hubbard supposedly robbed him around 1986 and the police has something on him as well.

9.   I remember that night because it was a snow storm and there were no buses running and everybody outside on Gray Street were walking around, plus I hustle up there all the time.

10. After "CARL HUBBARD" got convicted for the murder in front of "UNCLE PETER'S" house, everyone was saying that "MARK GOINGS" was the one who really killed the guy.  This was due to "MARK GOINGS" believing that the victim had something to do with his brother "DARRYL GOINGS" murder on Gray Street. It was said these are the same people who was trying to rob and kill "DARRYL GOINGS" as well.

11. I ROY A. BUFORD #248543, state that I have NOT been promised anything, nor threatened to come forth with this information, and that all of the above statements and facts within this affidavit are true, and that if I am called upon to testify to the same in a Court of law, I will do so under oath and under the penalties of perjury.

*Roy Buford 243543*

Roy A. Buford #243543
Carson City correctional Facility
P.O. Box 5000
Carson City, MI 48811-5000

LAURA NEVINS, Notary Public
State of Michigan
County of Montcalm
My Commission Expires December 13, 2012
Acting in the County of *Montcalm*

Subscribed and sworn to me.
this ___8th___ day ___September___ 2011

NOTARY PUBLIC *Laura Nevins*

4))

EXHIBIT D

# AFFIDAVIT OF RAAD KONJA

**STATE OF MICHIGAN**

**COUNTY OF WAYNE**

7/28/2014

I, Raad  Konja,  being duly sworn,  deposes and says the following:

1.  On October 2, 2011, I was discussing Mr. Hubbard's case with Raymond Williams, during this discussion I came to understand the importance of the fact that I knew Curtis Collins and that he was not in the Special K Party Store on January 17, 1992. I was the co-owner of the store then and Mr. Collins was not allowed in my store because of problems I had with him.

2.  On January 17, 1992, I was working in the front of the Special K Party Store, where I would have seen anyone who entered the store and Mr. Curtis Collins did not enter the store.

3.  No one came to question me about what I saw that night including any lawyer, police officer or anyone from the prosecutor's office.

**NOTARY PUBLIC**

**RAAD KONJA**

JUANITA PETERSON
Notary Public - Michigan
Wayne County
My Commission Expires Oct 2, 2018
Acting in the County of WAYNE

EXHIBIT E

**AFFIDVIT OF SAMIR KONJA**

**STATE OF MICHIGAN**

7/28/2014

**COUNTY OF WAYNE**

I, Samir Konja, being duly sworn, deposes and says:

1. That on January 17, 1992, I was one of the co owners of the Special K Party Store, located in Detroit, Michigan, on the corner of Gray and Mack.

2. That Mr. Curtis Collins was not allowed in the Special K Party Store by myself, nor my brothers, who were also co owners during the years of 1990 threw 1999, because of problems we had with him.

3. That no one came to question me about what i saw the night of January 17, 1992, including any lawyer, police officers or anyone from the prosecutor's office.

**NOTARY PUBLIC**                                                    **SAMIR KONJA**

JUANITA PETERSON
Notary Public - Michigan
Wayne County
My Commission Expires Oct 2, 2018
Acting in the County of _WAYNE_

13

EXHIBIT F

STATE OF MICHIGAN
THIRD CIRCUIT COURT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF MICHIGAN
      Plaintiff,

                         Case No: 92-001856-01-FC

                         Hon: Michael M. Hathaway

CARL HUBBARD,
      Defendant,

---

## OPINION AND ORDER DENYING DEFENDANT'S SUCCESSIVE MOTION FOR RELIEF FROM JUDGEMENT

At a session of said Court held at the Frank Murphy Hall
Of Justice in the City of Detroit, Wayne County, Michigan,

**MAR 3 0 2015**

ON: _____

PRESENT: **Hon. Michael M. Hathaway**

On September 2, 1992 defendant was convicted of first degree murder and sentenced to life in prison without parole. His conviction was affirmed by the Michigan Court of Appeals on December 19, 1995 (Court of Appeals #159160) and his application for leave to appeal to the Michigan Supreme Court was denied on October 28, 1996. Defendant has since filed a number of frivolous motions in various venues which were summarily denied wherever he filed them. Finally, defendant filed a motion for relief from judgment with this court which was denied on March 15, 2012 as were his subsequent motions for rehearing and application for leave to appeal to the Michigan Court of Appeals and Michigan Supreme Court.

He keeps trying.  Now he has filed a successive motion for relief from judgment under MCR 6.502 claiming ineffective assistance of counsel and "actual innocence." This successive motion under MCR 6.502 is summarily denied pursuant to MCR 6.504 (B) (2).

Defendant could have raised the ineffective assistance of counsel claim before; or does he claim that his self-representation in his last several filings was "ineffective."? Either way, he has failed to satisfy any of the exceptions baring successive motions set forth in MCR 6.508 (D). Also, his claim of "actual innocence" is as unconvincing now as it was the first dozen times he raised it, by implication or directly.

Defendant's successive motion for relief from judgment is **DENIED**.

CIRCUIT COURT JUDGE

Hon. Michael M. Hathaway

EXHIBIT G

STATE OF MICHIGAN )
                  ) ss.                          AFFIDAVIT OF CURTISS COLLINS
COUNTY OF WAYNE   )

After being duly sworn, I, Curtis Collins, swear that I am willing to testify to the following:

1. That I was not present on, or anywhere near, the corner of Gray and Mack of January 17, 1992, i.e., Special K party store.

2. That I did not witness Carl Hubbard fleeing from where Mr. Rodnell Penn was found dead.

3. Sergeant Kinney forced me to falsely testify at the preliminary examination that Carl Hubbard was running from the scene.

4. I testified truthfully on the first day of Carl Hubbard's trial.

5. I returned on the third day of Carl Hubbard's trial after spending two days at the 1300 Precinct where I was threatened by Homicide Officers Sergeant Kinney and Sergeant Gale with being charged with the murder of Mr. Penn if I didn't say that I saw Carl Hubbard at the murder scene of Mr. Penn. This is why I testified in the manner I did on the third day of Carl Hubbard's trial, because of the fear I had of Sergeant Kinney and Gale's threats of charging and prosecuting me for a crime that I had no knowledge of.

6. I contacted Raymond Williams in 2014, informing him that I had lied on Carl Hubbard and I told him that it was because Assistent Prosecutor Mr. James Gonzalez, Sergeant Kinney and Sergeant Gale continued to threaten me and that I would do an affidavit saying that but I backed out of it because I was afraid and feared what AP Gonzalez, Sergeant Kinney and Sergeant Gale would do to me and I didn't want to face perjury charges again and be put in jail and threatened by these government officials.

7. I went to prison in 2014 and got out in 2015. While in prison I realized how hard and difficult it was in prison during that ten months. I

-1-

also learned that AP Gonzalez was no longer prosecuting cases and that Sergeant Kinney and Sergeant Gale were no longer on the police force. As a result, I no longer had to worry about their threats and I was tired of running from the fact that I had put an innocent man, Carl Hubbard, in prison.

8. That my statements that I provided on January 23, 1992 to Sergeant Kinney and Sergeant Gale, on February 4, 1992 at Carl Hubbard's preliminary examination, and on September 2, 1992 at Carl Hubbard's trial, were false. Whereas today I recant those statements which were coerced from me by threats from AP Gonzalez, Sergeant Kinney and Sergeant Gale.

9. That today I am willing to take a polygraph test to prove that my statements to AP Gonzalez, Sergeant Kinney and Sergeant Gale were false statements, and that the statements in this affidavit is the truth.

Furthermore, Deponent sayeth not.

Dated: ___10-31-2017___


Curtis Collins

On ___10-31___, 2017, Curtis Collins appeared before me and declared that the above statements are true to the best of his knowledge, information and belief, and acknowledged that he signed the above Affidavit of his own free act and deed.

Subscribed and sworn before me this 31 day of OCTOBER, 20 17

_____
NOTARY PUBLIC

___03-28-2022___
My Commission Expires

Dated: ___10-31___, 20 17



JAMES OTRIC SAIN
Notary Public - State of Michigan
Wayne County
My Commission Expires Mar 28, 2022
Acting in the County of ____

-2-

19

EXHIBIT H

# STATE OF MICHIGAN
## CIRCUIT COURT FOR THE COUNTY OF WAYNE
### CRIMINAL DIVISION

**PEOPLE OF THE STATE OF MICHIGAN**
                    **Plaintiff,**

**vs.**                                          **Case No. 92-001856-01-FC**
                                                 **Hon. Lawrence S. Talon**

**CARL HUBBARD,**

                         **Defendant.**

_____/

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY

DEPUTY CLERK

## ORDER AND OPINION DENYING DEFENDANT'S
## SUCCESSIVE (3RD) MOTION FOR RELIEF FROM JUDGMENT

At a session of said Court held in the Frank
Murphy Hall of Justice on  OCTOBER 2, 2019
PRESENT: HON. LAWRENCE S. TALON
Circuit Court Judge

## PROCEDURAL POSTURE

On September 2, 1992, following a bench trial before Judge Richard P. Hathaway,

Defendant was found guilty of **Homicide – Murder First Degree – Premeditated MCL**

**750.316-A;** the Defendant was found not guilty of Weapons Felony Firearm and the

Court dismissed the Habitual Fourth Offense Notice.

On September 23, 1992 Judge Richard P. Hathaway sentenced Defendant to a

term of life imprisonment for the **Homicide-Murder First Degree-Premeditated**

conviction.

21

On December 19, 1995 the Michigan Court of Appeals unpublished per curiam Opinion [Docket No. 159160] Affirmed Defendant's conviction and life sentence for Homicide-Murder First Degree-Premeditated.

On October 28, 1996 Michigan Supreme Court Order [Docket No. 105540] Denied Defendant's Application for Leave to Appeal.

On March 18, 2009 Judge James R. Chylinski Denied Defendant's Motion to Expand the Record or for an Evidentiary Hearing.

On March 15, 2012 Judge Michael M. Hathaway Denied Defendant's Motion for Relief from Judgment.

On May 31, 2012 Judge Michael M. Hathaway Denied Defendant's Motion for Reconsideration.

On May 7, 2013 the Michigan Court of Appeals [Docket No. 311427] Denied Defendant's Delayed Application for Leave to Appeal the March 15, 2012 Order Denying Defendant's Motion for Relief from Judgment and Motion to Remand.

On September 30, 2013 the Michigan Supreme Court Order [Docket No. 147211] Denied Defendant's Application for Leave to Appeal the Michigan Court of Appeals Order; Defendant failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).

On March 30, 2015 Judge Michael M. Hathaway Denied Defendant's successive Motion for Relief from Judgment.

On June 2, 2015 Michigan Court of Appeals Order [Docket No. 326995] Motion to Remand is Denied; Defendant's Delayed application for Leave is Dismissed; no appeal

22

may be taken from the denial or rejection of a successive motion for Relief from Judgment **MCR 6.502(G)(1).**

On July 26, 2016 Michigan Supreme Court Order {Docket No. 151806] Denied Defendant's Leave to Appeal the June 2, 2015 Michigan Court of Appeals Order.

On May 17, 2018 Defendant filed pro se the instant Motion for Relief from Judgment (3rd Successive).

On June 21, 2018 Defendant filed a supplement to the Motion for Relief from Judgment with a DVD recording in which Defendant contends he obtained a videotaped copy of the polygraph examination of Curtis Collins that reveals his demeanor in answering questions prior to and during the polygraph examination.

Defendant now claims and contends in his third (3rd) successive MRJ that he is entitled to a new trial based on new evidence that was not discovered before his earlier motions which shows that his conviction was obtained through perjured testimony and in Defendant's Supplement to the Motion for Relief from Judgment[1] requests the Court to allow him to supplement Exhibit B[2] of the Motion for Relief from Judgment to include a recorded polygraph examination of Curtis Collins[3] which reveals his demeanor in answering questions prior to and during the polygraph examination. Defendant argues that this will better assist the Court in determining whether or not to grant his motion for an evidentiary hearing pursuant to MCR 6.508(C).[4]

---

[1] DVD/disk included with Defendant's Motion to Supplement Motion for Relief from Judgment
[2] Motion for Relief from Judgment Exhibit B Copy of a Polygraph Report dated February 1, 2018
[3] Prosecution's key witness (COA Opinion December 19, 2015 Dkt No. 159160)
[4] March 18, 2009 Order Denying Defendant's Motion to Expand the Record Pursuant to MCR 6.507(A) or for an Evidentiary Hearing Pursuant to MCR 6.508(D)

23

Following review and inspection of the DVD/disk submitted by Defendant, the DVD/disk was found to be unreadable to play any audio or content and appears defective.

On October 17, 2018 the Court held Defendant's Motion for Relief from Judgment and Supplemental Motion for Relief from Judgment were held in abeyance for thirty (30) days to allow the Defendant to present to the Court a working DVD/disk and to file a proper proof of service.[5]

On or about November 14, 2018 Defendant presented to the Court a working DVD/Disk representing a recorded polygraph exam of Curtis Collins.

January 22, 2019 Defendant by and through his attorney filed a Stipulated Adjournment of Defendant's 6.500 Motion for (60) days to allow counsel for defendant to supplement Defendant's existing successive 6.500 motion and to have the prosecutor's conviction and integrity unit review the underlying conviction.

On April 3, 2019, the Court entered an Order Granting Defendant's Counsel Motion to Withdraw and Order for the Prosecutor to Respond to Defendant's Successive Motion for Relief from Judgment.

**FACTUAL SUMMARY**

Defendant was tried for the homicide of Rodnell Penn. Defendant stipulated that he had been charged with a prior murder and that the case had been dismissed after Rodnell Penn and other witnesses failed to come to court on the date of the trial.

---

[5] MCR 6.503(B)

24

Penn had testified against defendant at the preliminary examination. Defendant also agreed that he has a three to four inch scar on the left and backside of his head.[6]

The victim's brother, Leon Penn, testified that the night before the murder he saw his brother Rodnell with the defendant. He heard Defendant tell Rodnell that he would see Rodnell the next day. Penn knew that his brother was selling drugs for Defendant for approximately two years and had personally seen Defendant picking up money from the victim and dropping of drugs.

The first witness called at trial was twenty-year-old Curtis Collins. Contrary to his police statement given under the alias of Tony Smith, and his preliminary examination testimony, Collins, testified that he was not at the party store or in the area at the time of the crime. He claimed unfamiliarity with the area of Gray and Mack. He also claimed to know Defendant as Ghost. Collins was impeached with his preliminary examination testimony. He admitted that at the preliminary examination he had testified that he was in the party store on that date and time, that he saw Defendant and the deceased in the store. He stated that he left before Defendant, that he heard gunshots, turned around and saw Defendant running and when Collins ran back across Mack, he saw the deceased lying in a driveway. Collins knew it was the Defendant because he could see the scar on Defendant's head and he had gotten a good look at him. He also testified that he saw no one else in the area. Collins was very particular about what he did and did not say at the exam about the events at the store, while at the same time claiming that it was all a lie because he had not been at the scene at all.

---

[6] Trial Transcript, Vol. 9/2/1992, Page 96

Collins also admitted giving a statement to the police just days after the crime further admitting that he had given a false name to the police when he gave them a statement because he was on escape status and did not want the police to know. Collins admitted at trial that in his police statement he said he was inside the party store, saw the defendant with the victim, that he left the store first, after he heard a gunshot, he looked back and saw a body lying in front of a house, and he saw the defendant run across a vacant lot towards Springfield.[7] When asked why he told the police that he was present, Collins claimed that he was on a tether and the police told him "they were going to do this and this to me because I was on escape on a tether."[8] Collins did not explain how the officers could have known he was on tether considering he had given a false name. Collins was already in custody when he gave his testimony at the preliminary examination. On cross examination Collins added that the police offered him $10,000 to send him to Texas and give him a new identity. He felt that something could happen to him because he was lying on someone so he wanted to clear it up to stop being afraid. This was part of Defendant's explanation for recanting his preliminary examination testimony.

The trial judge asked him if he had ever had a problem with Defendant before the crime. Collins stated that they had started disliking each other, but there was nothing specific between them. The judge asked why "out of all the people in the world", did he tell the police that you saw Carl Hubbard after you heard the shot; that you saw Mr. Hubbard standing over the deceased and that you saw Mr. Hubbard

---

[7] Trial Transcript, Vol. 8/31/1992, Pages 35-38
[8] Trial Transcript, Vol 8/31/1992, Page 39

running away from the deceased?[9] Why did you pick out Mr. Hubbard? Collins' reply was long, unclear and did not tell the judge why he chose to say that it was Hubbard.

During his testimony, Collins admitted that he was worried about his life and that of his mother and children.  He also stated that he had not been threatened and it was not why he was recanting.  "Homicide" had made him lie. "Homicide" was telling him little stuff, and he was really upset about his best friend who had been killed and "the first thing that was coming through my mind I was just saying it, you know. It wasn't meant to be said, you know"[10]

On the third day of trial the People called Collins back to the stand.  He testified that he wanted to tell the truth.  He admitted that he had lied to the Court on the first day of trial.[11] He was present on the scene on January 17, 1992 at approximately 9:30 p.m.  He had lied because he heard rumors about what was going to happen to his family. He believed the rumors and that is why he "told the judge a story."[12]

Collins affirmed that he had been at the party store on January 17th and did see Defendant with a person he would later find out was the victim. He had heard gunshots after he left the store and he had turned around and looked back across Mack in the direction of the victim. He seen the deceased lying in the driveway and he had seen the Defendant running through the field. He recognized the Defendant from the scar on his head.[13]

---

[9] Trial Transcript, Vol 8/31/1992, Page 58
[10] Trial Transcript, Vol 8/31/1992, Page 42
[11] Trial Transcript, Vol 9/2/1992, Page 37
[12] Trial Transcript, Vol 9/2/1992, Page 40
[13] Trial Transcript, Vol 9/2/1992, Page 66

7

Defendant presented four witnesses in his defense. Raymond Williams and Rodney Fulton both testified that they were with Curtis Collins at the time of the murder. Defendant also presented the testimony of Thomas and Vanessa Spells. On the evening of the 17th Thomas Spells and Defendant left the house at about 9 or 10 p.m. to go to Defendant's mother's house to pick up their son. Vanessa Spells testified that on the 17th she came home from work around 8:15 or 8:20 p.m. Her husband and Defendant were at the house at the time she arrived and they left at 10 p.m.[14]

The trial judge found that Collins seemed quite nervous when he testified. The judge then reiterated all of the testimony that he heard and found Defendant guilty of first-degree murder.[15]

On appeal, Defendant moved the Court of Appeals for a remand to explore the reasons for Curtis Collins' trial recantation. The People argued that the reasons for recantation were of record.[16] The Court denied the motion.

In March of 1994, defendant filed a supplemental brief on appeal including a claim that Curtis Collins lied to the police initially. However, at trial Collins admitted that he had given that first statement using the alias Tony Smith.

The Court of Appeals affirmed Defendant's conviction in 1995 and Defendant continued to raise questions about Curtis Collins in the Michigan Supreme Court.

Defendant filed several motions in the trial court. He filed a motion for an evidentiary hearing in 2009[17] and his first motion for relief from judgment in 2011.

---

[14] Trial Transcript, Vol 9/2/1992, Page 148
[15] Trial Transcript, Vol 9/2/1992, Pages 176, 185
[16] People's response filed August 18, 1993

Attached to this motion were affidavits from prisoners Askis Hill, Ray Burford, Emmanuel Randall, and Elton Carter. This motion was denied in 2012.[18]

Defendant filed his second motion for relief in 2015. To this motion he attached affidavits from the party store owners who claim to remember that on January 17th, 20 years ago Collins had not been allowed in the store that night. The motion was denied in 2015.[19]

Defendant's third motion for relief is based on his claim that Curtis Collins is again recanting his police statement, preliminary examination testimony, and the trial testimony taken on September 2, 1992. He also provides a report stating Collins passed a polygraph examination on three questions and a video of the polygraph test and the interview.

This court ordered the People to answer Defendant's current motion. The People reached out to Curtis Collins. He agreed to come to the Prosecutor's office on Friday, May 17th, but did not keep his appointment and would not return the call. During a visit to his home on May 20, 2019 he told Detective Richard Pomorski that his attorney, Jon Posner, told him not to talk to the prosecutors. Jon Posner, however, died in 2017 leaving the People without a way to interview the witness.

Defendant fired his most recent attorney and insisted that the prosecutor's conviction and integrity unit not to investigate the case.

---

[17] On March 18, 2009 Judge James R. Chylinski Denied Defendant's Motion to Expand the Record or for an Evidentiary Hearing.
[18] On March 15, 2012 Judge Michael M. Hathaway Denied Defendant's Motion for Relief from Judgment.
[19] On March 30, 2015 Judge Michael M. Hathaway Denied Defendant's successive Motion for Relief from Judgment.

## STANDARD OF REVIEW

The standard of review is de novo for all issues of law on appeal. *People v. Laws*, 218 Mich App 447; 554 NW2d 586 (1996). Factual findings are reviewed to see if they are clearly erroneous. **MCR 2.613(C)**; *People v. Tracey*, 221 Mich App 321; 561 NW2d 133 (1997). Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made. *People v. Lombardo*, 216 Mich App 500; 549 NW2d 596 (1996).

In order to advance an allegation in a motion for relief from judgment that could have been made in a prior appeal or motion, a defendant must demonstrate "good cause" for failure to raise the grounds on appeal and actual prejudice resulting from the alleged irregularities that support the claim of relief, pursuant to **MCR 6.508(D)(3)(b)**. The cause and prejudice standards are based on precedent from the United States Supreme Court. *Wainwright v Sykes*, 433 US 72; 97 S Ct 2497; 53 L Ed 2d 594 (1977).

A court may not grant relief, if the defendant alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction of the sentence or in a prior motion for relief from judgment; unless defendant demonstrates good cause for the failure to previously raise the grounds and actual prejudice from the alleged irregularities that support the claim. **MCR 6.508(D)(3)**; *People v Brown*, 196 Mich App 153; 492 NW2d 770 (1992), *People v Watroba*, 193 Mich App 124; 483 NW2d 441 (1992).

**ANALYSIS**

To file a successive motion for relief from judgment defendant must show a retroactive change in the law or new evidence that was not discovered before the prior motion. In the case at bar Defendant presents a recanting witness who had already recanted at trial and his polygraph results regarding questions were not relevant. Defendant's evidence does not meet the test for filing a successive motion.

Even if a defendant could meet the test barring a successive motion for relief, the proposed evidence would have to meet the *Cress* test for newly discovered evidence. *People v. Cress*, 468 Mich 578, 692 (2003). Collins recanted at trial and his current recantation is not new, and is considered cumulative, as the evidence would not make a different result probable on retrial, and was actually discovered before his prior to Defendant's first motion for relief. As such, Defendant cannot meet the *Cress* test for newly discovered evidence. *Id.*

Defendant moves for relief from judgment raising four issues. He maintains that he may file a successive motion because he has new evidence that was not discoverable before his other motions for relief. The witness now providing an affidavit had already recanted at trial, thus his recanting affidavit is not actually new. This fact bars his successive motion.

Defendant claims that the affidavit amounts to new evidence because Collins is claiming at trial he disavowed his prior recanting testimony because of pressure by the police and prosecutor. However, the only relevancy of the affidavit is a reiteration of the claim that Collins was not near the area of Gray and Mack the night of the murder.

11

31

This is the exact claim he made in his recanting testimony at trial. Even the reasons for the disavowal are not new, as Collins has already claimed that pressure from the police caused him to lie. Cress, *Id.*

Moreover, Defendant provides a report and videotape of Collins' polygraph examination and interview. However, none of the questions that were used in the test are new evidence. Indeed, the polygraph questions are things both sides agreed to in 1992. Collins never testified that he was with Hubbard when Hubbard shot Penn or that he saw the shooting or that Hubbard shot anyone else. The questions all presupposed that Collins had testified to seeing the shooting. Because the questions do not prove anything that was not known in this case, the polygraph test results cannot meet the test for new evidence not discovered before the previous motions. **MCR 6.502(G).** Therefore, the polygraph results also do not help Defendant meet the bar against successive motions.

In the affidavit, Collins states that he told Raymond Williams in 2014 that he was again willing to claim that he had not been present on Gray and Mack. Williams was the person Collins claimed had told him to say he was on Corbet Street on the night of the crime and Williams himself testified at trial that Collins was with him on Corbet. In paragraph six Collins states, "I contacted Raymond Williams in 2014 informing him that I had lied on Carl Hubbard...and that I would do an affidavit..."

Raymond Williams, then, was helping defendant gather affidavits in 2014, and Williams had this information in 2014. As such, Collins' desire to sign an affidavit was known to Defendant in 2014 before his 2015 motion for relief. **MCR 6.502(A)** requires

12

32

that every motion for relief from judgment must include all of the grounds for relief which are available to the defendant. Collins' newest desire to recant is not new evidence. Defendant had the information in 2014 and was required to raise the claim in his 2015 motion.

Defendant also contends that the cab company subpoena is new evidence but he does not include the results of the subpoena. Knowing that the People attempted to gather information before trial is not new evidence. Absent the results of the subpoena and a *Brady* violation regarding those results, the subpoena is not evidence of anything. *Brady v. Maryland,* 373 US 83 (1963).

Defendant attached other evidence for the court's consideration, but all of the other exhibits have been previously presented in other motions for relief and cannot be considered newly discovered so as to meet the successive motion bar.

Therefore, Defendant's motion should be barred because it is a successive motion which does not present new evidence not discovered before his previous successive motion.

Even if Defendant could get past the successive motion bar, the affidavit from Collins and the polygraph test result would not merit Defendant a new trial. *People v. Cress,* 468 Mich 578, 692 (2003), held that evidence is newly discovered if: (1) the evidence, not just its materiality, is newly discovered; (2) is such that its admission would render a different result probable upon a retrial of the case; and (4) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial.

As argued above, the evidence is not newly discovered. The witness testified on the first day of trial that he was not on Gray and Mack. Two days later he admitted that he was present on Gray and Mack and that his new testimony was a lie. Moreover, because Collins had told Williams the information in 2014 and Williams was helping Defendant gather the information in 2014 which was part of Defendant's 2015 motion, Defendant had the information about Collins in time for the 2015 motion for relief. The polygraph results add nothing because the questions upon which it was based are all new things both parties agree on during trial. Collins' latest claims are not new.

Even if it was new, the evidence would be cumulative because this exact witness testified to this same claim at trial and the polygraph results would not be admissible. Defendant cannot meet the second prong of the *Cress* test.

The evidence would not render a different result probable on retrial. Under Michigan law, affidavits recanting prior sworn testimony are suspect. *People v. Dailey*, 6 Mich App 99, 102 (1967). Recantation alone does not require the court to order a new trial if the court determines that the recanted testimony is untrustworthy. *People v. Van den Dreissche*, 233 Mich 38, 46 (1925).

The circumstantial evidence against Defendant was surprisingly strong and Collins' recanting at a retrial would not make a difference. Defendant's presentation of other new evidence provided by other prisoners who have heard Collins regret his testimony against Defendant or who now remember that they were at the party store that night and Collins was not in there would also not likely change the result.

14

The last thing Defendant has to show is that he could not have, with reasonable diligence, discovered and produced the evidence at trial. This factor points out that not only could Defendant have presented this evidence at trial, this evidence was actually was presented at trial. Collins testified at trial that he was not on Gray and Mack that night. This is exactly what he would testify to at a new trial. As such, Defendant cannot show any of the *Cress* factors and his motion would be denied, even if he could get past the successive motion bar.

Defendant attempts to use Collins' affidavit to prove that the Court should grant him a new trial. He avers that the People used perjured testimony. However, when Collins recanted on the first day of trial, the prosecutor immediately impeached him with his preliminary examination testimony.

Neither the police nor the prosecutor intimidated the witness after his initial recanting. The police and prosecutor have not intimidated the witness because the witness was forced to face perjury charges or testify against a man accused of murder. There was no intimidation, only a tough choice that Collins had brought about by his own actions.

The prosecutor did not withhold evidence. Neither the police nor the prosecutor had a reason to threaten Collins. As the facts have shown, there was no *Brady* violation.[20]

Even if these claims could be sustained now, Defendant would still have to show good cause for failing to raise the issues previously and prejudice in order to prevail.

---

[20] *Brady v Maryland*, 373 US 83, 87 (1963).

15

Defendant argues that he does not need to do so because he is actually innocent. However, Defendant was seen in the area both before and after the shots. Indeed, Defendant's multiple lies to the police showed his guilty state of mind. This court also finds that Defendant's alibi witnesses were not credible.

As Defendant proffers no claim upon which relief may be granted, his argument, and his motion for relief from judgment must be denied for lack of merit.

Therefore, **IT IS HEREBY ORDERED** that Defendant's Successive (3rd) Motion for Relief from Judgment is **DENIED**.

DATED:_____OCT 0 2 2019_____

**LAWRENCE S. TALON**
_____
Judge Lawrence S. Talon
Circuit Court Judge


PROOF OF SERVICE

    I certify that a copy of the above instrument was served upon the attorneys of record and/or self-represented parties in the above case by mailing it to the attorneys and/or parties at the business address as disclosed by the pleadings of record, with prepaid postage on _10/02/2019_.

_____
Name

EXHIBIT I

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT

**THE PEOPLE OF THE STATE OF MICHIGAN**

Plaintiff-Appellee,

**v**

**CARL HUBBARD**

Defendant-Appellant.

Third Circuit
No. 92-001856

## PLAINTIFF'S BRIEF OPPOSING RELIEF

**KYM L. WORTHY**
Prosecuting Attorney
County of Wayne

**JASON W. WILLIAMS**
Chief of Research,
Training, and Appeals

**VALERIE M. STEER (P-38489)**
Assistant Prosecuting Attorney
11th Floor, 1441 St. Antoine
Detroit, MI 48226
Phone: (313) 224-0205

38

# TABLE OF CONTENTS

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Counterstatement of Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Counterstatement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      A. To file a successive motion for relief from judgment defendant
        must show a retroactive change in the law or new evidence that was
        not discovered before the prior motion. Defendant presents a
        recanting affidavit from a witness who had already recanted at trial
        and his polygraph results regarding questions that were not relevant.
        Defendant's evidence does not meet the test for filing a successive
        motion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Standard of review and Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B. Even if a defendant could meet the test barring a successive
        motion for relief, the proposed evidence would have to meet the
        *Cress* test for newly discovered evidence. Collins recanted at trial and
        his current recantation is not new, would be cumulative, would not
        make a different result probable on retrial, and was actually
        discovered before his prior motion for relief. Defendant cannot meet
        the *Cress* test for newly discovered evidence. . . . . . . . . . . . . . . . . . . . . . . 17

II.     A court may order a new trial on any ground that would support
        appellate reversal of the conviction or because it believes that the
        verdict has resulted in a miscarriage of justice. The prosecutor did not
        knowingly present perjured testimony, Collins was not intimidated
        just because he felt the natural pressure of a difficult choice, and the
        prosecutor did not withhold evidence regarding the perjury charges.
        Defendant presents this Court with no grounds to grant a new trial...
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        Standard of review and Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

39

# INDEX OF AUTHORITIES

## FEDERAL CASES

*Brady v Maryland*, 373 US 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v Provost*, 969 F2d 617 (CA 8 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATE CASES

*People v Bass*, 317 Mich App 241 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v Bersine*, 48 Mich App 295 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v Bradford*, 10 Mich App 696 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v Canter,* 197 Mich App 550 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v Cress* 468 Mich 678 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v Dailey* 6 Mich App 99 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v Dupree,* 128 Mich App 368 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v Harris*, 31 Mich App 100 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v Johnson*, 502 Mich 541 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v Reed*, 449 Mich 375 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v Swain* 499 Mich 920 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v Tyburski*, 445 Mich 606 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v Van den Dreissche*, 233 Mich 38 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v Williams*, 77 Mich App 119 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## RULES

MCR 6.431(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MCR 6.502(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16

MCR 6.502(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

MCR 6.508(D)(3)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

40

## Counterstatement of Questions Presented

I.

**A. To file a successive motion for relief from judgment defendant must show a retroactive change in the law or new evidence that was not discovered before the prior motion. Defendant presents a recanting affidavit from a witness who had already recanted at trial and his polygraph results regarding questions that were not relevant. Does defendant's evidence meet the test for filing a successive motion?**

The People answer: No
The Defendant answers: Yes

**B. Even if a defendant could meet the test barring a successive motion for relief, the proposed evidence would have to meet the *Cress* test for newly discovered evidence. Collins recanted at trial and his current recantation is not new, would be cumulative, would not make a different result probable on retrial, and was actually discovered before his prior motion for relief. Can defendant meet the *Cress* test for newly discovered evidence?**

The People answer: No
The Defendant answers: Yes

**II. A court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice. The prosecutor did not knowingly present perjured testimony, Collins was not intimidated just because he felt the natural pressure of a difficult choice, and the prosecutor did not withhold evidence regarding the perjury charges. Does defendant present this Court with sufficient grounds to grant a new trial?**

The People answer: No
The Defendant answers: Yes

iii

## Counterstatement of Facts

In 1992, twenty-one-year old Rodnell Penn had been selling drugs for defendant Carl Hubbard.[1] 8/31, 74. Penn had some money to deliver on the evening of the January 17th and he was seen with defendant in the Special K party store in the area of Gray and Mack. 9/3, 28; 8/31, 81, 9/3, 9, 15. Curtis Collins was in the store and saw them. 9/2, 44. Andrew Smith had seen defendant with two others just before Smith went into the store, though he did not know the other men. 9/2, 35-42. After Collins left the store and was walking away, he heard gunshots and went back to the area. 9/2, 44-45. He saw the man he had seen with defendant lying on the ground, and he saw defendant running from the scene. 9/2, 45. Curtis recognized defendant by the scar on his head. 9/2, 66. Smith heard the shots and waited in the store for some minutes and when he went out he saw a dead body and the police. 9/1, 43. He did not remember seeing Curtis Collins. 9/1, 48. Penn died from three gunshots to the back and two to the head. 8/31, 11-13. Smith estimated that he had seen defendant outside the store three or four minutes before the shooting. 9/1, 49-50. There was evidence of close range firing on some of the wounds. 8/31, 13-14.

The first officer to arrive at the scene saw the victim, Rodnell Penn, lying on his side in the street at the mouth of a driveway. 8/31, 87. Blood was oozing from his hood and he showed no sign of life. 8/31, 87, 94. John Trammel, a man who had known defendant for two to three years, saw defendant among the spectators after the shooting. 8/31, 60-64. Officer Craig Turner had also known defendant for three to four years and had talked to defendant on a daily basis as

---

[1] Transcripts are cited throughout this brief in the following form: month/day of proceedings, page numbers.

42

defendant sells drugs in the Lenox and Charlevoix area. 8/31, 97, 110. Defendant approached the officer and asked him what had happened. 8/31, 97. The officer told him it was a homicide. 8/31, 97. Defendant left and returned eight to ten minutes later and asked if it was a guy from the neighborhood and the cop told him it was not. Defendant asked if the victim was dead and the cop said yes. Defendant said, "You think Lenox and Charlevoix is out cold, Gray and Mack is." 8/31, 101. The officer understood defendant to mean that the tactics in drug sales and the way they handle problems is more severe in the area of Gray and Mack. 8/31, 101. The officer saw defendant in the area of Lenox and Charlevoix almost every night. 8/31, 110.

Officer Turner had never said anything to defendant to indicate that the death had involved drugs or even that the person had been found on the street. 8/31, 102. The officer remembered that defendant had a faked look of shock when told that the victim was dead. 8/31, 105. He has arrested defendant before and defendant has a scar on the back of his head. 8/31, 108-110.

When defendant gave a statement to the police on January 21, 1992, he told them that he had known nothing about Penn being killed until he heard it that very day. 9/2, 63-69. He said that he had known Penn since 1986, but he had not seen him since the 80's. 9/2, 63-69. He had not seen Penn on the night of the 16th or the 17th. 9/2, 63-69. He knew nothing about the shooting on Gray and Mack. 9/2, 63-69. He himself was not on Gray and Mack the night of the shooting. 9/2, 63-69. He denied that he ever had a case lodged against him for which Rodnell Penn was to be a witness. 9/2, 63-69. He had no plans to meet with Rodnell on the 17th. 9/2, 63-69. He had not heard about anyone getting killed over on Gray Street. 9/2, 63-69. He said he does

2

not hang out around there. 9/2, 63-69. And he acknowledged that his nickname is Ghost. 9/2, 63-69.

## A. The trial

Defendant was tried for the homicide of Rodnell Penn. In addition to the above evidence, defendant stipulated that he had indeed been charged with a prior murder and that the case had been dismissed after Rodnell Penn and other witnesses failed to come to court on the date of trial. 9/2, 92-93. Penn had, however, testified against defendant at the preliminary examination. 9/2, 92-93. Defendant also agreed that defendant has a scar on the left and backside of his head that is three to four inches long. 9/2, 96.

The victim's brother, Leon Penn, testified that the night before the murder he saw his brother Rodnell with the defendant. 8/31, 70-72. He heard defendant tell Rodnell that the defendant would see Rodnell the next day. 8/31, 73, 81. Penn knew his brother was selling drugs for defendant for about two years. 8/31, 74-75. He had seen defendant picking up money from the victim and dropping off drugs. 8/31, 80.

At trial, the first witness was twenty-year-old Curtis Collins and, contrary to his police statement given under the alias of Tony Smith, and his preliminary examination testimony, Collins testified, that he was not even at the party store or in the area at the time of the crime; he said he was lying when he testified at the preliminary examination. 8/31,17-38. Collins testified that he was not familiar with the area of Gray and Mack, but he had been to the party store there. 8/31, 17-18. He did know the defendant as Ghost.[2] 8/31, 17. Collins testified that he was not in

---

[2] The court reporter spells the defendant's nickname as "goff" or "goft" but defendant acknowledged to the police that he has the nickname "Ghost." The People will use the spelling that defendant used in his police statement and that is listed on the Department of Corrections website.

44

the area of Gray and Mack on January 17 at 9:30. 8/31, 19. He was impeached with his

preliminary examination testimony. 8/31, 19-20. He admitted that at the preliminary examination

he had testified that he was in the party store on that date and time, that he saw defendant and the

deceased in the store, that he left before defendant, that he heard gunshots, that he turned around

and saw defendant running, and when Collins ran back across Mack he saw the deceased lying in

a driveway. 8/31, 19-21. Collins knew it was defendant because he could see the scar on

defendant's head and he had gotten a good look at him. 8/31, 30, 32. He also had testified that he

saw no one else in the area. 8/31, 22-23. He had not even gotten a half block away,  and when he

first saw defendant after the shooting, defendant was near the body. 8/31, 25-26, 29. The body

was on its side. 8/31, 29.  He agreed at trial that he had also testified that the deceased was the

person Collins had seen with Ghost. 8/31, 22. Collins was very particular about what he did and

did not say at the exam about the events at the store, while at the same time claiming that it was

all a lie because he had not been at the scene at all.[3]

Collins also admitted giving a statement to the police just days after the crime. 8/31, 32.

The witness admitted that he had given a false name to the police when he gave them a statement

because he was on escape status and did not want the police to know. 8/31, 34-35, 46-47.  He

identified the picture taken at the time of the statement as him and admitted that he had given the

name Tony Smith, but he denied that the signature was his. 8/31, 34.  He admitted at trial that in

his police statement he said he was inside the party store, saw defendant with the victim, that he

left the store first, after he heard a gunshot, he looked back and saw a body lying in front of a

house, and he saw defendant run across a vacant lot towards Springfield. 8/31, 35-38.

_____

[3] See for example 23-25, 26-27, 30-31.

4

45

When asked why he told the police that he had been present, Collins claimed that he was

on tether and the police told him they were going to do "this and this to me because I was on

escape on a tether." 8/31, 39. He acknowledged that the officers did let him go after this

statement because they did not bother to find out his real name. 8/31, 48. He did not explain how

the officers could have known he was on tether if he had given a false name. 8/31, 55. He was

already in custody when he gave testimony at the preliminary examination. 8/31, 48. On cross-

examination he added that the police had offered him $10,000 to send him to Texas and give him

a new identity and that they would give him "the max" for being on escape. 8/31, 50. He felt that

something could happen to him because he was "lying" on someone so he wanted to clear it up

so he could stop being afraid. 8/31, 51. "I can't be walking out there on the street watching my

back every five minutes, you know, looking for, around for somebody to pull a gun out on me

and kill me. You know, I can't be going for that. Because I got two kids out there and I got to

take care of them." 8/31, 52. This was defendant's explanation for recanting his preliminary

examination testimony.

The trial judge asked him if he had ever had a problem with the defendant before the

crime and Collins stated that they had started disliking each other, but there had been nothing

specific between them. 8/31, 57. The judge asked why "out of all of the people in the world" did

he tell the police that Carl Hubbard was the person at the scene.  Collins gave a long, meandering

non-answer, never telling the judge why he chose to say that it was Hubbard. 8/31, 58.

At one point the prosecutor asked who he appeared to be talking to in the courtroom

during his testimony and Collins admitted that he was looking at his cousin in the court, but that

his cousin Cordell was not saying anything. 8/31, 27-28. Collins testified that he had just gotten

46

out of prison on July 20th. 8/31, 41. (Trial began August 31st). Collins admitted that he was worried about his life and that of his mother and children, but he had not been threatened and it was not why he was recanting. 8/31, 41. "Homicide" had made him lie. 8/31, 42. He was really upset about his friend who had been killed and "the first thing that was coming through my mind I was just saying it, you know. It wasn't meant to be said, you know." 8/31, 42.  His mother had been getting some phone calls which ended in hang ups and she had moved out of town for awhile. 8/31, 44.

On the third day of trial the People called Curtis Collins back to the stand. 9/2, 37. Collins testified that he wanted to testify again and tell the truth. 9/2, 37. He admitted that he had lied to the Court on the first day of trial. 9/2, 37.  His preliminary examination testimony had been the truth. 9/2, 38. He had been arrested after his testimony on the first day of trial, but that was not the only reason he was admitting he lied. 9/2, 38. He was present at the scene on January 17, 1992, at about 9:30.  9/2, 38. He had lied because he had been hearing rumors about what was going to happen to him and his family. 9/2, 39.  "...somebody was going to kill us or something, if something– they were going to catch me going to work; or people knew where my mother stayed and probably would throw a bomb in there while we was sleep or something." 9/2, 39. He started hearing these rumors after he got out of prison on July 20th. 9/2, 40. He believed the rumors and that is why he "told the judge a story." 9/2, 40. Raymond Williams wanted him to say that he was on Corbet street at the time, but that was a lie. 9/2, 41. Williams had been calling him. 9/2, 41.

Then Collins affirmed that he had been at the party store on January 17th, and that he did see defendant with a person he would later find out was the victim. 9/2, 44. He had heard

6

gunshots after he left the store, and he turned around and looked back across Mack in the direction of the victim. 9/2, 45. He had seen the deceased lying in the driveway and he had seen defendant running through the field. 9/2, 44-45. He saw no weapon and he saw no one else. 9/2, 45. He recognized defendant from the scar on his head. 9/2, 66.

Collins admitted that he lied on the first day because he was scared. 9/2, 47. When he was arrested for perjury he told the officer why he lied. 9/2, 48.  He reached out to speak to the officer. 9/2, 50. No promises had been made to him. 9/2, 50. He believed he would still be charged with perjury. 9/2, 51. He did not know the people who had been coming up and telling him what would happen to him if he testifies against the defendant, he recognized them as people who knew defendant. 9/2, 54. He had heard these threats while he was in custody but also after he was released. 9/2, 54. When he spoke to Raymond Williams, who told him to say he was on Corbet, the call was a three-way call with Williams's girlfriend, Angie. 9/2, 56, 81. Williams called his girlfriend and then she called Collins. 9/2, 56.

On cross-examination Collins said that the signature on his statement to the police was his. 9/2, 69. He never saw Raymond Williams on the 17th and he was not with Roney Felton on the evening of January 17th. 9/2, 75. He was living with his mother at that time. 9/2, 75. He could not see the victim's face while he was on the ground, he just knew it was the same person he had seen in the store with defendant. 9/2, 77.

Defendant presented four witnesses in his defense. Raymond Williams and Roney Fulton both testified that they were with Curtis Collins at the time of the murder.  Williams testified that he was with Collins on Corbet street from 8 to 10 p.m. and he knows it was until 10 because he then left for a movie and was late. 9/2, 103-105, 108.  Fulton testified that Collins was staying

with him for a couple of days around the time of the murder and that Collins was with him until

after they got a call about the murder from someone named "K." 9/2, 115-116, 119. Collins was

with him from 8 to 10:30 p.m. and they got the call about the murder between 9:30 and 10 p.m.

9/2, 116, 119. Collins stayed all night. 9/2, 123.

Defendant also presented the testimony of Thomas and Vanessa Spells. Thomas Spells

had been a friend of defendant's for 12 years.  9/2, 129. On the evening of the 17th he and

defendant left the house about 9 or 10 p.m. to go to defendant's mother's house to pick up the

Spells's son.  9/2, 130-131.  On the way, they saw an ambulance on Gray. 9/2, 130-131. They

stopped and talked to a police detective. Then they left. Defendant had arrived between 6 and 7

p.m., Spells's wife came home about 8 or 8:15 p.m. 9/2, 131.  He could not actually remember

the date of the incident but he was sure about the times. 9/2, 133. His wife was taking a bath

when they got back. 9/2, 142. He never told the police that he knew defendant was innocent even

though he knew the police were trying to talk to him. 9/2, 138-141. His lawyer had told him he

did not have to talk to the police. 9/2, 142. He had not been looking at the clock but he was sure

about the times. 9/2, 143.

Vanessa Spells testified that on January 17 she came home from work about 8:15 or 8:20

p.m. 9/2, 148. Her husband and defendant were at the house at that time she arrived and they left

at 10 p.m. 9/2, 148. They came back about a half hour later; she was positive of that. 9/2, 149,

153.  They had gone to get her baby son. 9/2, 153.  She acknowledged that the police had asked

her to come in and speak to them about the case but she never did so. 9/2, 149. No one ever

asked her why she had not picked up her son on her way home from work or why they waited

almost two hours after she got home to retrieve her baby. She did however check the time when

8

49

the two men left and checked the time again when they returned. 9/2, 153. They returned with her

son. 9/2, 154.  She was watching TV when they got back and she was positive of that. 9/2, 154.

The trial judge found that Collins had seemed quite nervous when he first testified, then

the judge reiterated all of the testimony that he heard and found defendant guilty of first-degree

murder. 9/2, 176, 185.

## B. The Appeal

On appeal, defendant moved the Court of Appeals for a remand to explore the reasons for

Curtis Collins's trial recantation.[4] The People argued that the reasons for the recantation were of

record.[5] The Court denied the motion.[6]

Again on appeal defendant raised the issue of Curtis Collins's recantation, asking the

Court to remand the case back for an evidentiary hearing. Defendant also raised the issue of his

trial counsel's effectiveness, several issues regarding sufficiency of the evidence, and the weight

of the evidence.[7] After defendant's appellate counsel filed his Brief on Appeal,  appellate counsel

moved to withdraw as counsel because defendant was writing complaint letters about the

attorney which were full of "factual distortions and false statements."[8]

In March of 1994, defendant filed a supplemental brief on appeal raising six issues, most

of which were about Curtis Collins, including a claim that Collins lied to the police initially

_____

[4] Defendant's remand motion filed August 4, 1993.

[5] People's response filed August, 18, 1993.

[6] Court of Appeals  order dated September, 8, 1993.

[7] Defendant's Brief on Appeal filed October 22, 1993.

[8] Motion to Withdraw filed February 9, 1994, para 8.

because the police threatened to imprison him for being on escape status, but, as noted above, even at trial Collins admitted that he had given that first police statement using the alias Tony Smith.

The Court of Appeals affirmed defendant's conviction in 1995 and defendant continued to raise questions about Curtis Collins in the Michigan Supreme Court.

## C. Motions in the trial court

Defendant filed a motion for an evidentiary hearing in 2009 and his first motion for relief from judgment in 2011. To this motion for relief defendant attached affidavits from four prisoners: Askia Hill, Ray Burford, Emanuel Randall, and Elton Carter. Defendant also attached an affidavit from Raymond Williams, who had testified at trial and who Collins said told him to say he was on Corbet during the crime. This motion was denied in 2012.

Defendant filed his second motion for relief in 2015. To this motion he attached affidavits from the party store owners saying that they remember that 20 years ago Collins had not been allowed in their store on that night. This motion was denied that same year.

Defendant's third motion for relief is based on his claim that Curtis Collins is again recanting his police statement, preliminary examination testimony, and the trial testimony taken on September 2, 1992. He also provides a report stating Collins passed a polygraph examination on three questions and a video of the polygraph test and the interview. The three questions and answers were:

1. Did you see Carl Hubbard shoot that man? Ans. No

2. Did you see Carl Hubbard shoot anyone at Gray and Mack in January of 1992? Ans: No

3. Were you present when Carl Hubbard shot that man? Ans: No.

10

This Court has ordered the People to answer defendant's current motion and we  reached out to Curtis Collins.  He agreed to come to the Prosecutor's office on Friday, May 17th, but did not keep this appointment and would not return a call. During a visit to his home on May 20, 2019 he told Detective Richard Pomorski that his attorney, Jon Posner, told him not to talk to us and that we should contact his attorney if we had anything to say to him.[9]  Jon Posner died in 2017 so the People are left with no way to interview the witness.

Defendant has, as this Court knows,  also fired his most recent attorney and asked the prosecutor's innocence unit not to investigate the case.

---

[9] See attached affidavit from Detective Richard Pomorski.

## ARGUMENT
### I.

**A. To file a successive motion for relief from judgment defendant must show a retroactive change in the law or new evidence that was not discovered before the prior motion. Defendant presents a recanting affidavit from a witness who had already recanted at trial and his polygraph results regarding questions that were not relevant. Defendant's evidence does not meet the test for filing a successive motion.**

**B. Even if a defendant could meet the test barring a successive motion for relief, the proposed evidence would have to meet the *Cress* test for newly discovered evidence. Collins recanted at trial and his current recantation is not new, would be cumulative, would not make a different result probable on retrial, and was actually discovered before his prior motion for relief. Defendant cannot meet the *Cress* test for newly discovered evidence.**

**Discussion**

Defendant moves for relief from judgment raising four issues. He maintains that he may file a successive motion because he has new evidence that was not discoverable before his other motions for relief. In this unusual case, the witness now providing an affidavit had already recanted at trial, thus his recanting affidavit is not actually new. This fact bars his successive motion.

**A. Defendant does not present a claim that would allow the filing of a successive motion.**

The current motion represents a third motion for relief from judgment and the court rules do not allow a successive motion absent a retroactive change in the law or new evidence that was not discovered before the first motion. The rule states in pertinent part:

(G) **Successive Motions**

12

S3

(1) Except as provided in subrule (G)(2), regardless of whether a defendant has previously filed a motion for relief from judgment, after August 1, 1995, one and only one motion for relief from judgment may be filed with regard to a conviction. The court shall return without filing any successive motions for relief from judgment. A defendant may not appeal the denial or rejection of a successive motion.

(2) A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or *a claim of new evidence that was not discovered before the first such motion*. The clerk shall refer a successive motion that asserts that one of these exceptions is applicable to the judge to whom the case is assigned for a determination whether the motion is within one of the exceptions. (Emphasis added)[10]

Defendant claims that he falls within the second exception, that is, that Curtis Collins's newest recantation and polygraph results are new evidence. But Collins recanted on the first day of trial and the trial judge had that evidence in front of him when he rendered his verdict. In addition Collins's recanting testimony was the subject of many previous appeals in this case. If a new recantation affidavit from Collins allowed defendant to get through the successive motion bar then defendant could attach a new and recanting witness affidavit from Collins every year. Something more should be required of a defendant than that he submit a newer recanting witness affidavit.

Defendant claims that the affidavit amounts to new evidence because in it Collins is claiming at trial he disavowed his prior recanting testimony because of pressure by the police and prosecutor, but the only real relevancy of the affidavit is a reiteration of the claim that Collins was not near the area of Gray and Mack the night of the murder, which is the exact same claim

---

[10] MCR 6.502(G).

13

54

he made in his initial recanting testimony at trial. Even the reasons for the disavowal are not new, as Collins has already claimed that pressure from the police caused him to lie.

In addition, defendant provides a report and a videotape of Collins's polygraph examination and interview. Defendant contends this is also new evidence which enables him to file this successive motion for relief, but none of the three questions that were used in the test are new evidence. The polygraph operator asked Collins if he saw "Carl Hubbard shoot that man?" Curtis Collins never said that he had seen the shooting. This is not new evidence. The operator also asked Collins if he had seen "Carl Hubbard shoot anyone at Gray and Mack in January of 1992?" Again, Collins never said that he saw Hubbard shoot anyone. The third question was "Were you present when Carl Hubbard shot that man?" This question too is not new evidence. Curtis Collins never told the police or the Court that he was present at the shooting. Collins testified only that after he was walking away from the store he heard shots and, when he went in the direction of the shots, saw the deceased on the ground and the defendant running from the scene. All three polygraph questions are things both sides agreed to at trial in 1992. Collins never testified that he was with Hubbard when Hubbard shot Penn, or that he saw the shooting or that he saw Hubbard shoot anyone else, and the test questions all presupposed that Collins had testified to seeing the shooting. Because the test questions do not prove anything that was not already known in this case, the polygraph test results cannot meet the test for new evidence not discovered before the previous motions, thus the polygraph results also do not help defendant meet the bar against successive motions. And a court should always be cautious in relying on polygraph results as Leonard Tyburski famously proved by passing a polygraph on whether he knew where his missing wife was after Tyburski had killed her and locked her body

14

in the freezer in his basement.[11] Thus both pieces of evidence are cumulative and are just additional or corroborative evidence on the points already established.

In addition, in the affidavit, Collins states that he told Raymond Williams in 2014 that he was again willing to claim that he had not been present on Gray and Mack. Williams was the person Collins claimed had told him to say he was on Corbet Street on the night of the crime and Williams himself testified at trial that Collins was with him on Corbet. In paragraph six Collins states, "I contacted Raymond Williams in 2014 informing him that I had lied on Carl Hubbard...and that I would do an affidavit..." In one of defendant's affidavits he indicates that Raymond Williams was the person that got the store owner affidavits in July of 2014 which defendant included in his 2015 motion for relief from judgment.[12] Defendant stated, "I could not have previously obtained the affidavits of Samir and Raad Konja as I do not know these people and had to rely on Raymond Williams to obtain these affidavits as I have no immediate family in this State. Furthermore, Mr. Williams informed me that it was not until July 2014, that he was able to obtain these affidavits for me."[13] (Oddly enough Raymond Williams's affidavit on the matter states that he got the information from the Konja's on October 2, 2011.)

Raymond Williams, then, was helping defendant gather affidavits in 2014, and Williams had this information in 2014. Thus, Collins's desire to sign an affidavit was known to defendant in 2014 before his 2015 motion for relief. The court rules require that every motion for relief

---

[11] *People v Tyburski*, 445 Mich 606 (1994).

[12] The affidavit attached to the current motion is signed March 2018, although the references are all to affidavits that were provided in the 2011 and 2015 motions for relief.

[13] Affidavit of Carl Hubbard, attached as exhibit T, para 5.

15

56

from judgment must include "all of the grounds for relief which are available to the defendant and of which the defendant has, or by the exercise of due diligence, should have knowledge.[14] Collins's newest desire to recant is not "new evidence that was not discovered before the first such motion."[15]  Defendant had the information in 2014 and was required to raise the claim in his 2015 motion.

Defendant also contends that the cab company subpoena is new evidence but he does not include the results of the subpoena. Knowing that the People attempted to gather information before trial is not new evidence. Absent the results of the subpoena and a *Brady* violation regarding those results, the subpoena is not evidence of anything.

Defendant does attach other evidence for the court's consideration, but all of the other exhibits have been previously presented in other motions for relief and cannot be considered newly discovered so as to meet the successive motion bar.  Defendant concedes this point in his brief.

Thus, defendant's motion should be barred because it is a successive motion which does not present new evidence not discovered before his previous successive motion.  The evidence is neither new nor undiscovered before his previous motion. "The specific purpose for creating the postconviction procedure was to provide finality of judgments affirmed after one full and fair appeal and to end repetitious motions for new trials. . . . Post conviction relief is provided for the

---

[14] MCR 6.502(A).

[15] MCR 6.502(G).

16

extraordinary case in which a conviction constitutes a miscarriage of justice."[16] The verdict in this case was not a miscarriage of justice.

**B. Even if defendant could get past the successive motion bar, the affidavit from Collins and the polygraph test results would not merit defendant a new trial.**

Although the test for newly discovered evidence set out in *People v Cress* does not apply to the procedural threshold of MCR 6.502(G), the defendant would still have to meet the *Cress* test to merit a new trial because the main basis for his motion is that newly discovered evidence merits a new trial.[17]  *Cress* held that evidence is newly discovered if :(1) the evidence, not just its materiality, is newly discovered; (2) the evidence is not cumulative; (3) the evidence is such that its admission would render a different result probable upon a retrial of the case; and (4) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial.[18]

### i. The evidence was not new and is cumulative

As argued above, the evidence is not newly discovered. The witness testified on the first day of trial that he was not on Gray and Mack that evening, then two days later he admitted that he was present at Gray and Mack and that his initial testimony was a lie. In addition, because Collins had told Williams the information in 2014 and Williams was helping defendant gather

---

[16] *People v Reed*, 449 Mich 375, 381 (1995).

[17] *People v Cress* 468 Mich 678, 692 (2003); *People v Swain* 499 Mich 920 (2016) *(Cress* test does not apply "to the procedural threshold of MCR 6.502,") , *People v Johnson*, 502 Mich 541, 566 (2018)(Citing and using the *Cress* test.)

[18] *Id*, 468 Mich at 692.

the information in 2014 which was part of defendant's 2015 motion, defendant had the information about Collins's desire in time for the 2015 motion for relief. The polygraph results add nothing because the questions upon which it was based are all things both parties agreed on during trial. Collins's latest claims are not new.

The evidence, even if it was new, would be cumulative because this exact witness testified to this exact claim at trial and the polygraph results would not be admissible. Defendant cannot meet the second prong of the *Cress* test.

### ii. The evidence would not render a different result probable

The evidence would also not render a different result probable on retrial.[19] Under Michigan law, affidavits recanting prior sworn testimony are suspect.[20] Recantation alone does not require the court to order a new trial if the trial court determines that the recanted testimony is untrustworthy.[21] "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character."[22]

Here Collins would be impeached with his statement to the police, his preliminary examination testimony, and his disavowal at trial of the claim that he was not on Gray and Mack. Interestingly, both times Collins recanted he was in prison or was shortly after getting out of

---

[19] See *United States v Provost*, 969 F2d 617 (CA 8 1992), *cert den* 506 US 1056 (1993).

[20] *People v Dailey* 6 Mich App 99, 102 (1967); *People v Bradford*, 10 Mich App 696, 702-703(1968); *People v Harris*, 31 Mich App 100, 102(1971).

[21] *People v Van den Dreissche*, 233 Mich 38, 46 (1925).

[22] *People v Canter,* 197 Mich App 550, 559-560 (1992), quoting *People v Van DenDreissche,* 233 Mich 38, 46 (1925).

18

prison. He had gotten out of prison on July 20, 1992, and he recanted on the first day of trial August 31, 1992. In his current affidavit he says that he went to prison in 2014 and got out in 2015. During his polygraph interview he said that he went to prison in September of 2015 and got out June 30, 2016, and it is unclear if these are two separate events or if the affidavit was written by someone who is not familiar with Collins's prison record.  According to his affidavit, however,  in 2014 he told Raymond Williams, the friend who convinced him to recant at trial, that he had lied about Carl Hubbard.

One of the most damaging facts about Collins's recantation at trial was that Collins claimed that because he was on escape status the police threatened to lock him up if he did not inculpate Hubbard, but then he was forced to admit that the police had not known his real name at the time he gave his initial statement about having seen defendant running from the scene. He had told the police his name was Tony Smith. The fact that the nineteen year old gave a phoney name would seem to make it more likely that the information in the police statement was the truth, given under the protection of a false name. His reasoning may have been that the defendant would never know it was Collins who had informed.

In addition, though defendant does not acknowledge it, there was evidence which supported Collins's testimony and there was other strong evidence presented that showed both defendant's motive, defendant's false exculpatory police statement, and defendant's false alibi.

Collins's testimony that he was present at the scene that night was supported by testimony from Andrew Smith,  who had seen defendant with two others just before Smith went into the store, and while Smith was in the store he heard the shooting.  9/2, 35-50.  Smith estimated that he had seen defendant outside the store three or four minutes before the shooting. 9/1, 49-50.

This supported Collins's testimony that defendant was at the scene before the shooting, not just afterwards as defendant's alibi witness claimed.

Also, Collins's description of the victim as lying "sideways like" so he could not see the victim's face was confirmed by the first officer on the scene who said that the victim was lying on his side and there was blood seeping out from the hood of the man's jacket but he could not see the man's head until EMS lifted the hood off of the victim's head. 9/2, 76-77; 8/31, 87-88.

Further corroboration was provided by the victim's brother, cousin, and girlfriend. The victim's brother testified that he saw defendant and the victim together the day before the shooting and defendant told the victim that he would see him tomorrow. 8/31, 73. The brother knew that the victim sold drugs for the defendant and had been doing so for two years. 8/31, 74-75. The victim's cousin said that the victim had about $200 on him when he dropped the victim off at the Mack bus. 9/2, 9, 15. The victim's girlfriend also said he had some money on him that day and that when he called her later, it sounded like the call was coming from an outdoor phone booth and someone was rushing him to get off the phone. 9/2, 21, 28-29. There was a phone booth outside the party store.

Defendant's false exculpatory statement to the police provided an abundance of evidence of his guilty mind. He told the police that he had known nothing about Penn being killed until he heard it that very day (January 21), that he had known Penn since 1986, but he had not seen him since the 80's, he had not seen Penn on the night of the 16th or the 17th, he knew nothing about the shooting on Gray and Mack, he himself was not on Gray and Mack the night of the shooting, he denied that he ever had a case lodged against him for which Rodnell Penn was to be a witness, he had no plans to meet with Rodnell on the 17th, he had not heard about anyone

20

61

getting killed over on Gray street, and he did not hang out around there. 9/2, 63-69.  At trial

almost every statement was shown to be false. Leon Penn, the victim's brother, knew Hubbard,

saw him with his brother, and heard defendant say that he would see Penn the next day. 8/31, 73-

75, 81. Leon Penn had seen defendant drop off drugs to his brother and pick up money. 8/31, 80.

This had happened in Penn's own house. 8/31, 84. Defendant's claims not to have seen the

victim since the 80's and having no plan to see him on the 17th were lies.

In addition, police officer Craig Turner knew defendant well from talking with him every

day or so over at Lenox and Charlevoix and he saw defendant at the scene after the body had

been removed to the ambulance. 8/31, 110, 97.  Defendant asked what happened and Turner told

him it was a homicide. 8/31, 97. Defendant left for 8-10 minutes and then returned to ask if it

was a guy from the neighborhood, and whether the guy was dead, then defendant made a remark

about the tough nature of the drug scene at Gray and Mack, though the officer had said nothing

about the death being a shooting or involving drugs. 8/31, 99-102. Turner thought that defendant

had a fake look of shock when he told defendant that the victim was dead. 8/31, 105.  Turner's

testimony showed defendant's claim that he was not on Gray and Mack that night to be lie.

There was also a stipulation that the victim had testified against defendant in a previous

murder case but had failed to appear for trial. This stipulation proved defendant's claim not to

have had charges lodged against him for which Penn was a witness was also a lie.

And last defendant's alibi witnesses were unbelievable.  Thomas Spells version of events

had them stopping when they saw the ambulance but never coming back 8 to 10 minutes later as

Officer Turner testified defendant had done. Turner also never mentioned someone else with

defendant. Spells also had defendant over his house from 6 or 7 p.m. on and that contradicts not

62

only Collins but also Andrew Smith, who saw defendant at the party store just before the shooting. 9/1, 36-50. Spells also knew that the detectives wanted to speak to him about this matter but he chose not to help his friend of twelve years during the nine months from the crime until the trial. 9/2, 129, 138-142. He also testified that his wife was in the bath when he returned with his son and the defendant, but his wife testified that she was watching TV. 9/2, 142, 154. She was very sure about the times. 9/2, 153. The two men left at 10 p.m. and arrived back home at 10:30 p.m. 9/2,153. Neither party explained why no one had picked up their baby boy earlier, given that Thomas Spells was home between 6 and 7 in the evening and his wife arrived home shortly after 8 p.m. , but Vanessa Spells was sure they had not gone to pick up the baby until 10 p.m.

The circumstantial evidence against defendant was surprisingly strong and Collins's recanting at a retrial would not make a difference. Defendant's parade of other new evidence provided by other prisoners who have heard Collins regret his testimony against defendant or who now remember that they were in the party store that night and Collins was not in there would also not tip the scales against a guilty verdict. The party store owners who claim to remember that on January 17th 20 years ago that Collins was not allowed in the store and did not enter the store that night is unbelievable, as is their claim that the police never spoke to them about the crime. The one prisoner who said in 2011 that he saw the shooting and the killer was someone else has not been given a polygraph exam and his affidavit does not explain how he came to give this affidavit to the defendant nineteen years after the fact. Defendant's parade of prisoners is not likely to sway a jury. Thus defendant cannot show that a different result would be probable on retrial.

22

### iii. Not only could defendant have produced this evidence at trial, the evidence was produced at trial.

The last thing defendant has to show is that he could not have, with reasonable diligence, discovered and produced the evidence at trial. This factor points out the absurdity of claiming that Collins's affidavit is new evidence; not only could defendant have presented this evidence at trial, this evidence was presented at trial. Collins testified at trial that he was not on Gray and Mack that night, which is literally what he would testify to at a retrial.

Thus, defendant cannot show *any* of the *Cress* factors and his motion would be denied, even if he could get past the successive motion bar. Appellate courts are reluctant to find an abuse of discretion in the denial of a motion for new trial founded on the recanting testimony of a trial witness.[23]

---

[23] *People v Dupree,* 128 Mich App 368 (1983); *People v Williams*, 77 Mich App 119 (1977).

64

## II.

**A court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice. The prosecutor did not knowingly present perjured testimony, Collins was not intimidated just because he felt the natural pressure of a difficult choice, and the prosecutor did not withhold evidence regarding the perjury charges. Defendant presents this Court with no grounds to grant a new trial.**

## Discussion

Defendant also attempts to use Collins's affidavit in several other ways to prove that he should be given a new trial. A court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice.[24] He claims that the People used perjured testimony, that the police and prosecutor intimidated the witness, and that the prosecutor withheld evidence. Each of these claims will be addressed below.

### A. The prosecutor did not knowingly present perjured testimony.

When Collins unexpectedly recanted on the first day of trial, the prosecutor immediately impeached him with his preliminary examination testimony. A prosecutor is not knowingly presenting perjured testimony when he or she is actively trying to reveal the lies to the trier of fact. Although, even when a witness is just mistaken, just because the witness has been impeached does not mean that the prosecutor is presenting false testimony.[25] And when on the

---

[24] MCR 6.431(B).

[25] *People v Bass*, 317 Mich App 241, 272 (2016).

24

third day the witness wanted to correct his lies the prosecutor called him back to the stand and allowed him to do just that. The prosecutor was not presenting perjured testimony; he was actively seeking to prevent perjured testimony.

**B. Neither the police nor the prosecutor intimidated the witness after his initial recanting.**

Collins put himself in a difficult position. Just as consent is not involuntary merely because a defendant is making a choice between two undesirable options; the police and prosecutor have not intimidated the witness because he was forced to face perjury charges or testify against a man accused of murder.[26] It was a tough position to be in, but Collins had committed perjury, either at the exam or at the trial and he had put himself in that position. Collins himself testified, on the third day of trial, that he had asked to the speak with the officer and he then told the officer that he had lied on the stand. There was no intimidation, only a tough choice that Collins had brought about by his own actions.

**C. The prosecutor did not withhold evidence.**

Everyone in the case knew that Collins had been detained in the courtroom and was arrested at the courthouse. The witness testified to the fact that he had been arrested for perjury and afterwards had asked to speak with an officer and had explained why he lied on the stand. This evidence was not a surprise to the defense. Defendant's claim that the police threatened to charge Collins with the murder does not make sense. Defendant was charged with perjury in a murder case, neither the police nor the prosecutor had any reason to threaten Collins with a

---

[26] *People Stricklin*, __ Mich App __ (Docket no 340614, decided April 18, 2019) (Blood alcohol content scenario).

murder charge. There was no intimidation by the police or prosecutor so there was nothing to withhold. There was no *Brady* violation.[27]

## D. Collins was not the only person who put defendant at the scene before the shooting

In all of these issues defendant claims that Collins was the only witness who put him at the scene of the crime that night, but that is not true. Andrew Smith saw defendant that night as Smith was approaching the party store and while Smith was inside he heard the shooting. 9/1, 36-42, 50. Smith estimated that he had seen defendant outside the store three or four minutes before the shooting. 9/1, 49-50. Smith's testimony alone refutes defendant's alibi and supports Collins's testimony. And of course, John Trammel saw him in the area after the shooting, and Officer Turner spoke to him at the scene. 8/31, 97, 60-64.

## E. Good cause and prejudice

Even if any of these claims could be sustained now, defendant would still have to show good cause for failing to raise the issues previously and prejudice in order to prevail. The court rules explain that to show "actual prejudice" after a conviction a defendant must show that "but for the error the defendant would have had a reasonably likely chance of acquittal" or that the "irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." [28]

Defendant argues that he does not have to show good cause and prejudice because he is actually innocent and his conviction is a miscarriage of justice. Defendant is wrong. The circumstantial evidence supporting defendant's conviction was strong. Defendant was seen in the

---

[27] *Brady v Maryland*, 373 US 83, 87 (1963).

[28] MCR 6.508(D)(3)(b).

area both before and after the shots. Defendant's multiple lies to the police showed his guilty state of mind.  Defendant's alibi witnesses were unbelievable. And defendant had a motive to finally eliminate the person who had given preliminary examination testimony in his previous murder charge.  The verdict in this case was reliable and his motion for relief should be denied.

## Relief

ACCORDINGLY, the People respectfully request this Honorable Court to deny

defendant's motion for relief from judgment.


Dated: May 28, 2019


Respectfully submitted,

KYM L. WORTHY
Prosecuting Attorney
County of Wayne

JASON W. WILLIAMS
Chief of Research,
Training, and Appeals

*Valerie M. Steer*

VALERIE M. STEER  (P-38489)
Assistant Prosecuting Attorney
11th Floor, 1441 St. Antoine
Detroit, Michigan  48226
Phone: (313) 224 - 0205

28

EXHIBIT J

**Mike Anthony Forensic Polygraph and Consulting Services LLC.**
**P.O. Box 36641, Grosse Pointe Farms, Michigan 48236**
**TX: 313-400-2124**
**manthonypolygraph@att.net**

## POLYGRAPH REPORT

**Client:**          Curtis Collins                    **Date of exam:**    02-01-2018
                     13695 Hendricks
                     Warren, MI 48089

**Nature of Offense:**    Witness to Homicide

**Person Examined:**     Curtis Collins DOB: 08-15-1972

**Purpose:**

All information for this polygraph examination was provided by the examinee, Curtis Collins. No police reports or court testimony transcripts were available or provided to this examiner.

The examinee Curtis Collins stated that in 1992 he was forced to testify at the homicide trial of a person named Carl Hubbard. He stated that he was interviewed by Detroit Police Homicide detectives and was told that if he did not give a statement indicating that he was present and saw Carl Hubbard shoot a man, they were going to violate his parole for possession of drugs. Collins stated that a homicide detective wrote out a statement which indicated that he was present and saw a Carl Hubbard shoot a man on January 17, 1992. Collins stated that he signed the statement.

Collins stated that he testified at the trial and initially lied by identifying Hubbard as the shooter, then testified that he lied at the direction of the police. Collins stated that this Carl Hubbard was then convicted and is now in prison.

Curtis Collins denies being present and observing Carl Hubbard shoot anyone in January of 1992. This examination is to determine if Curtis Collins is being truthful regarding being a witness to a homicide committed by a person named Carl Hubbard.

**Relevant Issue Test Questions:**

1. Did you see Carl Hubbard shoot that man? Ans. No

Act 295, P.A. (MCL338.1728): Any recipient of information, report or results from a polygraph examiner, except for the person tested, shall not provide, disclose or convey such information, report or results to a third party except as may be required by law and the rule promulgated by the State Board of Forensic Polygraph Examiners

*Collins, Curtis*          *page 2 of 2*          *February 2, 2018*

2. Did you see Carl Hubbard shoot anyone at Gray and Mack in January of 1992?
   Ans. No

3. Were you present when Carl Hubbard shot that man? Ans. No

**Results:**

Several polygraphs were completed using relevant questions. Following a thorough analysis of the polygrams, it is the opinion of this examiner that Curtis Collins did not show consistent, significant, physiological reactions to the above relevant questions, indicating TRUTHFULNESS.

It is the opinion of the undersigned examiner based upon the examination given that this subject is being truthful regarding this issue.

Michael Anthony
Licensed Polygraph Examiner
License # 6001000316

Act 295, P.A. (MCL338.1728): Any recipient of information, report or results from a polygraph examiner, except for the person tested, shall not provide, disclose or convey such information, report or results to a third party except as may be required by law and the rule promulgated by the State Board of Forensic Polygraph Examiners.

77

EXHIBIT K



JOHN D. O'HAIR
PROSECUTING ATTORNEY

GEORGE E. WARD
CHIEF ASSISTANT

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY
DETROIT, MICHIGAN

1200 FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226
TEL. 224-5777

### M E M O R A N D U M

DATE: 2/14/92

TO: SGT. JoAnn Kinney  Sq. 6

FROM: APA Jim Gonzales  224-5758

RE: Peo. v. Carl Hubbard, Rec. Ct. No. 92-1856

JoAnn,

① Please submit ET 913301 to Lab for Comparison w/ Slugs on Lab No. 279-92. This apparantly was not compared along with other Slugs recovered from M.E.; (See Lab No. 280-92)

② Please serve attached subpoena for Checker Cab records to corroborate Curtis Collins AKA "Tony Smith".

Thank You.

74

| STATE OF MICHIGAN<br>☐Third Judicial Circuit Court<br>☒Recorder's Court | **SUBPOENA**<br>and DUCES TECUM | **CASE NO.**<br>92-001856 |
|---|---|---|

| PEOPLE OF THE STATE OF MICHIGAN<br>Vs.<br>Carl Hubbard<br><div align=right>Defendant</div> | **FRANK MURPHY HALL OF JUSTICE**<br>1441 ST. ANTOINE, DETROIT, MICHIGAN 48226 |
|---|---|

| (SEAL) | **SUBPOENA FOR**<br>☒PERSON  ☒DOCUMENT(S) or OBJECT(S)<br><br>TO: KEEPER OF THE RECORDS<br>CHECKER CAB COMPANY<br>2128 TRUMBELL<br>DETROIT, MI.  (963-7000) |
|---|---|

YOU ARE HEREBY COMMANDED to appear in the Frank Murphy Hall of Justice at the place, date and time specified below to give evidence in the above-entitled case.

| PLACE<br>HON. M. JOHN SHAMO<br>COURTROOM 403<br>FRANK MURPHY HALL OF JUSTICE<br>1441 ST. ANTIONE<br>DETROIT, MI | COURT ROOM<br>403 |
|---|---|
| | DATE AND TIME<br>FRIDAY,<br>MARCH 13, 1992 @9:00AM |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):(1)

Any and all Checker Cab Company records, notes, logs, etc., including Cab Driver's name, address, and phone, for any and all fares handled in the approximate area of E. Warren and Gray streets in the City of Detroit in the PM hours (approximately between 9:30PM and 10:30PM) on FRIDAY, JANUARY 17, 1992.

☐See additional information on reverse

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| GEORGE L. GISH, Clerk of The Court    JAMES R. KILLEEN, Wayne County Clerk | DATE<br>2-11-92 |
|---|---|
| (BY) DEPUTY CLERK *Patricia Parsons* | |

| This subpoena is issued upon application of the:<br>☒Plaintiff            ☐Defendant | ATTORNEY'S NAME AND ADDRESS<br>APA JAMES D. GONZALES P-36359  (224-5758)<br>WAYNE CO. PROSECUTOR'S OFFICE<br>1200 FRANK MURPHY HALL OF JUSTICE<br>DETROIT, MI |
|---|---|

(1) If not applicable, enter "none"

Form #19 (Rev. 10/86)                    **SUBPOENA**

EXHIBIT L

76



COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 500
DETROIT, MICHIGAN 48226-3535
PHONE (313) 224-4550 • TTY:711
FAX (313) 224-5505
WWW.DETROITMI.GOV

CITY OF DETROIT
LAW DEPARTMENT

January 14, 2016

Tonya Hubbard
7581 Melrose St.
Detroit, Michigan 48211

> RE:   Freedom of Information Act Request A16-00019 Concerning Police
> Department Records Pertaining to Incident Involving Carl Hubbard [DPHD
> 92-43]

Dear Mrs. Hubbard:

This letter serves as the City of Detroit's preliminary response to the above-referenced matter. Your request was received at the City of Detroit Law Department Governmental Affairs Section Freedom of Information Division on January 4, 2016.

Your letter requests:

> "1)   POLICE REPORTS AND POLICE NOTES
> 2)   INVESTIGATOR REPORTS AND NOTES
> 3)   WITNESS STATEMENTS
> 4)   ANY   CORRESPONDENCE   FROM   A   WITNESS
> CONCERNING THIS CASE;
> 5)   ENTIRE CASE FILE"

Your request was submitted to the Detroit Police Department (DPD) to conduct a search for the requested records. According to DPD personnel, because the record pertains to a homicide which occurred prior to 2005, the record may have been archived with the City's outside vendor for storage. DPD completed the process of moving all of its files which were stored at its outside vendor to facilities controlled by DPD on or about October 9, 2015. Therefore, DPD will not be able to process your request until the organization of the files at the DPD facility has been completed. DPD personnel began the process of organizing the files in mid-October of 2015 and hope to complete this process soon.

Once the file relocation process has been completed and DPD provides me with the requested record, I will review said record and provide you with a written response regarding same.

For your information, please note that a public summary of City of Detroit FOIA procedures and guidelines is available on the City's website, www.detroitmi.gov, under "How Do I. . ." and "File".

75

Tonya Hubbard
January 14, 2016
Page 2

Please be advised that, pursuant to Section 10 of the Michigan Freedom of Information Act, being MCL 15.240, a person receiving a written denial of a request may do one of the following:

1)   Submit a written appeal to the head of the public body denying the request. Such appeal, if submitted, should specifically state the word "appeal" and identify the reason or reasons for reversal of the denial. MCL 15.240(1)(a); or

2)   Commence an action in the circuit court to compel the disclosure of the public records within 180 days after the public body's denial of the request. MCL 15.240(1)(b). If a court finds that the information withheld by a public body is not exempt from disclosure, the requesting party may receive the requested record and, at the discretion of the court, reasonable attorney fees and /or costs. MCL 15.240(6) and (7).

Sincerely,

Monique Smith
Senior Assistant Corporation Counsel
Governmental Affairs Section
(313) 237-3012

MS/

76



Tonya Hubbard
May 3, 2016
Page 2

MCL 15.243(1)(s)(vii) Witnesses' home addresses, telephone numbers, dates of birth are exempt from disclosure.

MCL 15.243(1)(w)    Individuals' Social Security numbers are exempt from disclosure.

Therefore, the above-mentioned information have been redacted for the purpose of disclosure.

The record from the City of Detroit Police Department consists of three hundred and two (302) pages and is available for your review at the City of Detroit Law Department. However, prior to your review, we require that you submit payment, pursuant to MCL 15.234(1) and (3), for the labor cost incurred as a result of complying with your request. For your request, separation and redaction of the record by the Law Department required six (6) hours of staff time at an hourly rate of $36.50. This hourly rate is commensurate with the hourly rate of the lowest paid public employee in the Law Department capable of performing this task, in accordance with MCL 15.234(3). Therefore, the actual labor cost incurred as a result of complying with your request is One Hundred and Fifty-Three and 39/100 Dollars ($153.39) [$36.50/hour x 6 hours plus fringe benefits reduced by 50% due to delay]. We are in receipt of a money order in the amount of **$77.00**, which represents a **deposit** towards the total cost of processing your request. Therefore, please submit payment in the amount of Seventy-Six and 39/100 Dollars ($76.39) [$153.39 - $77.00] should you wish to review the record. ***Please see the enclosed FOIA Fee Itemization Form.***

Should you wish to pick up a copy of the record or have a copy mailed to you, the City charges $0.10 per text page for copying costs and $1.50 per page of laser copied photographs. The following is the breakdown of the cost to either pick up the copy or have the copy mailed to you:

Pickup Cost    $106.59     (Labor cost of $153.39 plus 302 pages x $0.10 plus **less deposit of $77.00**)

Mailing Cost   $113.04     (Pickup Cost plus $ 6.45 for Postage)

Please make your money order payable to "City of Detroit" and forward to my attention. It is important to note that we do not accept cash. Please contact Ms. Pamela Jeter at (313) 237-0423 to schedule an appointment should you wish to review or pick-up the record.

Please note that pursuant to Section 10 and 10a of the Act, MCL 15.240 and 15.240a, a person receiving a written denial of a request or receiving a letter seeking labor costs may do one of the following:

77



CITY OF DETROIT
LAW DEPARTMENT

**RECEIPT**

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 500
DETROIT, MICHIGAN 48226-3535
(313) 224-4550 • TTY:711
(313) 224-5505
WWW.DETROITMI.GOV

This receipt confirms that, on August 9, 2016, Tony Hubbard received one (1) copy of Carl Hubbard – complete redacted record **pertaining** to **Freedom of Information Act Request A16-00019- Two Hundred Ninety-Seven (297) pages.**

Further, this receipt confirms that Tony Hubbard tendered a check/money order with the number 10726180438 in the amount of **$106.59** made payable to the 'City of Detroit' as payment for a copy of said documents.

_____
Tony Hubbard

8-9-16
Date

_____
Marcia Landrum

8-9-16
Date



**FOIA Fee Itemization Form**

pursuant to MCL 15.234(4), effective January 1, 2016

File Number: A16-00019

| Line | Reference | Component | Amount | Subtotal | Total |
|---|---|---|---|---|---|
| 40 | | **Amount Chargeable for Labor Costs, after applicable reduction (copied from page 1):** | | | **$153.39** |
| 41 | § 4(1)(d) | **Actual cost of paper copies** | | | |
| 42 | | number of 8½ x 11 or 8½ x 14 sheets | 302 | | |
| 43 | | price for 8½ x 11 or 8½ x 14 sheets | $0.10 | | |
| 44 | | line 42 multiplied by line 43 | | $30.20 | |
| 45 | | color or other size copies, size: ___ x ____ | | | |
| 46 | | actual price per page | | | |
| 47 | | line 45 multiplied by line 46 | | | |
| 48 | | color or other size copies, size: ___ x ____ | | | |
| 49 | | actual price per page | | | |
| 50 | | line 48 multiplied by line 49 | | | |
| 51 | | **Total - cost of paper copies** | | | **$30.20** |
| 52 | § 4(1)(c) | **Actual cost of electronic media** | | | |
| 53 | | Number of CD's @ $1.00 | | | |
| 54 | | Number of Flash Drives | | | |
| 55 | | Number of Tapes | | | |
| 56 | | Other: | | | |
| 57 | | Sum of lines 53 - 56 | | | |
| 58 | | **Total - cost of electronic media** | | | **$0.00** |
| 59 | | **Costs of paper copies and electronic media - sum of lines 51 and 58:** | | | **$30.20** |
| 60 | § 4(2) | **Reduction for indigency or qualifying non-profit** | | | |
| 61 | | Affidavit/information provided: Y/N? | | | **$0.00** |
| 62 | | **Net Charge after any reductions, but not less than zero - sum of lines 40, 59, and 61:** | | | **$183.59** |
| 63 | | Sum of deposits, previous payments, other credits: | $77.00 | | |
| 64 | | **CREDIT - for deposits and other previous payments:** | | | **($77.00)** |
| 65 | | *IF Records are emailed or viewed in person without copies:* | | | |
| 66 | | **Cost if EMAILED OR VIEWED IN PERSON - sum of lines 40 and 61 (but not less than zero), offset by any credit listed in line 64:** | | | **$76.39** |
| 67 | | *IF Records are picked up:* | | | |
| 68 | | **Cost if RECORDS are PICKED UP - line 62, offset by any credit listed in line 64:** | | | **$106.59** |
| 69 | | *IF records are mailed:* | | | |
| 70 | § 4(1)(f) | **Actual cost of mailing** | | | |
| 71 | | postage _____ | $6.45 | | |
| 72 | | **Cost of mailing:** | | | **$6.45** |
| 73 | | **Cost if RECORDS are MAILED - sum of lines 62 and 72 (but not less than zero), offset by any credit listed in line 64:** | | | **$113.04** |

Mrs. PAMELA G

313 237. 0423

Mrs. 313 237. 0479

CANDRUM

EXHIBIT M

81

**Talon, Lawrence**

| | |
|---|---|
| **From:** | Diane Bukowski <diane_bukowski@hotmail.com> |
| **Sent:** | Thursday, August 29, 2019 2:20 PM |
| **To:** | Maria Miller |
| **Subject:** | Re: case of Carl Hubbard, currently in Federal Court on habeas before Judge Lawrence Talon WCCC#92-001856-01-FC |
| **Attachments:** | Aff re murder of Rodnell Penn.pdf |

Hello, Maria this is Diane Bukowski, editor of the Voice of Detroit, LLC at http://voiceofdetroit.net. I have attached an affidavit by the sole eyewitness to the murder of Rodnell Penn, for which Carl Hubbard #205988 is currently serving life without parole in the MDOC. He was convicted in 1992, James Gonzalez was the AP at the time. VOD earlier did a story on this matter, at _http://voiceofdetroit.net/2019/05/28/judge-to-review-case-of-carl-hubbard-in-prison-since-1992-innocence-backed-by-dozens/._

Mr. Hubbard currently has a 6500 motion pending before Wayne County Circuit Court Judge Lawrence Talon. The attached affidavit, by Askia Hill, is the SOLE eyewitness account of the murder, in which Mr. Hill states that HE SAW Mark Goings kill Rodnell Penn. Mr. Hubbard was convicted on circumstantial evidence provided by another man who testified that he saw him in the general vicinity, but has since recanted that testimony (see article above). This affidavit has been present in the prosecutor's appellate files since it was written in 2011. Since Pros. Worthy and her CIU have pledged that they will ensure no convictions of innocent individuals, I am requesting to know if and when Prosecutor Worthy will investigate whether Mark Goings was in fact the killer of Rodnell Penn.

Thank you for your usual prompt response, as I am doing an update on this story.

Diane Bukowski

Editor

Voice of Detroit, LLC

P.O. Box 35278

Detroit, Michigan 48235

Phone: 313-825-6126

1

EXHIBIT N

### SWORN AFFIDAVIT OF EMANUEL RANDALL

State of Michigan)

              ss

County of chippewa

I, Emanuel Randall, being duly sworn deposeth and sayeth as follows:

1. The statement made in this affidavit are, to the best of my knowledge, true and if called upon as a witness, I can testify competently as to the truth of the statement made in this affidavit.

2. I know for a fact that Curtis Collins was not on Gray street on the night of January 17, 1992 at the time of the murder.

3. Because we both was on the run for escape and living over (Big Ron) or/ Roney Fluton house 12882 Dickson & Corbet street, the same house that Curtis cut his telther off his leg, and we both stayed there while we was on escape.

4. We where both at the house getting high when Murphy or/ Raymond William came over and we all started a dice game myself Curtis & Big Ron that night when well got a call from Heavey that someone got killed on Gray we all got into the car together to go over there to see who it was Heavey was at the store on Gray and Mack when he call us, and told us about the murder.

5. A couple days later we was walking on Mack & near Gray when the police rode up on us with two pictures and asks did we know them? we said no ! but Curtis said I do and they took his name and address & phone number and gave him a card, and said that they will call him, and that night they came and arrested Curtis.

6. The word on the street was that Mark Going kill the guy found in front of Uncle Pete house on Gray, because he believed the guy kill his brother Dearl Going on the same street about a few weeks ago.

7. The whole neighbordhood knew and was talking about this, because who ever killed Dearl Going was trying to rob him but ending up killing him.

8. Everybody couldnt understand why Curtis baby or/ Curtis Collins lied on Ghost or Mr. Hubbard, he never would say, all he would say was that the police had something over his head and he had too.

9. I Emanuel Randall, state that I have not been promised anything , nor threatened to come forth with this information, that all the above statements and facts within this affidavit are true, and that if I am called upon to testify to the same in a court of law I will do so under oath, subject to the penalties of perjury.

*Emanuel Randall*

Emanuel Randall 512941
Kinross Corr. Facility
16770 S Watertower Drive
Kincheloe Michigan 49788

Subscribed and Sworn to me this
25th Day of June 2009

**Notary Public**

*William H. Bonnee*

William Herman Bonnee
Notary Public, State of Michigan, County of Chippewa
My Commission Expires on 3-24-2012
Acting In The County of Chippewa

85

EXHIBIT O

State of Michigan   )
                    )
                    )
                    )
County of Michigan  )

## Affidavit of Raymond williams of fact.

I, Raymond Williams, being duly sworn deposes and sayeth as follows:

1) The statement made inthis affidavit is the best of my knowledge, true and if called upon as a witness I can testify competently as to the truth of the statement made in this affidavit.

2) I, Raymond Williams, while being held in police custody  at the Detroit Police Headquaters on the 9th floor Homicide Section between 8-31-92 ~~████~~ until 9-2-92.

3) When I heard somebody crying in their cell, then I found out it was(Kurtis Baby) or Curtis Collins and I asked him what was wrong  with him and he told me that the police officers Sgt. Joann Kenny and Sgt.Ronald Gale ~~████~~ making him lie on (Ghost AKA) or Mr. Carl Hubbard in his murder trial September 2, 1992.

4) I told him don't lie on him because you are playing  with a  man's  life. Then I told him to tell the truth No matter what! and whatever you do  tell the truth Curtis, and don't lie on nobody for the police, because me and you know you wasn't on Gray & Mack Curtis! Then he told me Sgt. Joann Kenny  _ Sgt. Ronald Gale was making him lie on  (Ghost) or  Mr. Carl Hubbard  in his murder trial and if he did'nt they would make sure he would  be charged with the murder case rather than (Ghost) or Mr. Carl Hubbard.

5) Mr. Curtis Collins admitted this to me during the time me and him was locked up together on the 9th floor of Homicide Sec. just before I went to testify on behalf of Mr. Carl Hubbard in his Murder trial in September 2, 1992

6) I never told anybody about what Curtis Collins told me  or  what happened while we were locked up in 1300 Beaubien on the  9th  floor  between 8-31-92 and 9-2-92until recently when I got in contact with Mr. Carl Hubbard between

87

the time of the end of 2010 and 2011. then I revealed to Mr. Carl Hubbard what Mr. Curtis Collins had told me, and I'm willing to come to open court and testify to what Mr. Curtis Collins told me while we were locked up together and I am willing to take a polygraph test as well

7) Because Curtis Collins admitted to me he lied on the witness stand when he testified against (Ghost) or Mr. Carl Hubbard in his murder trial 9-2-92, and the reason why he lied was because Sgt. Joann Kenny and Sgt. Ronald Gale was going to put the murder case on him and charge him with the murder case as well.

8) I Raymond Williams State that I have not been promised anything, nor threatened to come forth with this information. I state that all the above statement and facts within this affidavit are true, and if called upon to testify to the same in the court of law. I will do so under the oath, subject to the penlties of perjury.

respectfully Submitted,

Raymond Williams
19165 Packard
Detroit, Michigan 48234

Subscribed and sworn to this

___23 rd.___ day of _M4/_, 2011

Notary Public

SAMIR A. KONJA
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 1, 201
Acting in the County of _____

88

EXHIBIT P

89

AFFIDAVIT OF RAYMOND WILLIAMS

COUNTY OF WAYNE   )
                  ) ss
STATE OF MICHIGAN )


Raymond Williams, being duly sworn, deposes and says:

1. That on October 2, 2011, I was discussing Mr. Hubbard's case with Steve Konja, the owner of the Special K party store.

2. He informed me that he was working on January 17, 1992, the night that Rodnell Penn was murdered. He told me that he knew Curtiss Collins but that he didn't see him in his store that night.

3. He informed me that, only if subpoenaed, would he testify to these facts.


_____   1-9-2012
      Raymond Williams


Subscribed and Sworn to this

9 day of JAN 2012
NOTARY PUBLIC

SAMIR A. KONJA
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 1, 2017
Acting in the County of _WAA_

90

EXHIBIT Q

91

92-1856

# Detroit police inquiry expands

### Justice Department focuses on detainees' coerced confessions.

By Norman Sinclair
and Ronald J. Hansen
*The Detroit News*

DETROIT — Investigators from the U.S. Justice Department are looking into charges that Detroit police officers coerced false confessions or statements from people after illegally locking them up for days at a time.

A Detroit practice of arresting witnesses or suspects without warrants and holding them for days to induce cooperation has concerned local federal authorities even before Mayor Dennis Archer asked last September that the U.S. Justice Department investigate the Detroit Police Department.

FBI and Drug Enforcement Administration agents in Detroit threatened last year to stop working with Detroit police unless they were assured these practices would end. Their complaints prompted U.S. Attorney Saul Green to meet several times with Chief Benny Napoleon, Major Crimes Cmdr. Dennis Richardson and other Detroit police executives.

The Justice Department is examining some confessions as part of its larger probe of Detroit Police Department misconduct, according to federal law enforcement sources.

The News reported last summer that internal investigations into the questionable shooting deaths of nearly a dozen persons — including three by one officer — were sloppy and incomplete. In addition, nearly twice as many persons died in police lockups, also under questionable circumstances.

*Please see CONFESS, Page 4A*

(1)

92





The case of Michael Gayles began Friday, Sept. 1, with a typed statement in which Gayles confessed to the Aug. 31 rape and killing of J'nai Glasker in her bedroom.

During the next 36 hours, Gayles, who receives disability benefits from the state, signed another typed confession statement and a handwritten addendum in which he implicated his mother. Each confession was more explicit and precise in its language than the first.

His mother, Leathy Gayles Washington, was held for a weekend but never charged.

Michael Gayles, who has the IQ of an 8-year-old, lived near Glasker on the northwest side and had a juvenile record of criminal sexual conduct. At the time of his arrest, he repeatedly maintained his innocence in statements to the media.

Two weeks after charging him with first-degree murder and criminal sexual conduct, police dropped the charges when DNA evidence proved he did not rape the girl.

Deputy Chief Hall said the case proves that the department properly handles investigations. "He took a polygraph and failed it. After that, he made a full and graphic confession. The confession fit the facts of the crime. It was our investigation that cleared him in the end."

Lawyer Mark Satawa, a former Wayne County prosecutor who represented Michael Gayles after his arrest, said the confessions are signs of major problems in the department's Homicide Section.

"Most of the homicide investigators I worked with when I was a prosecutor were honest, hard-working professionals," Satawa said. "But at times, we used to scratch our heads over some of the things that happened over there. We knew something was wrong in homicide.

"The Homicide Section is overworked and under pressure to solve cases. I know the job is difficult, but the pressure forces some to cut corners. I think this is just the tip of the iceberg."

## More statements questioned

In another case involving allegedly coerced statements, Sgt. William Stevenson obtained a first-degree murder warrant against Marcus Pouncy, 12, based solely on a statement by an illiterate, mentally disabled, 15-year-old acquaintance, Donald Bliss.

On Jan. 22, 1997, Pouncy and Bliss had flagged down a police car to report a fire they spotted behind a house in the 1500 block of Lamphere. When officers found a badly burned bound body in a Dumpster behind the house, they took the boys downtown to headquarters.

Pouncy was locked up in a juvenile until his trial, Feb. 6, 1998. A jury took an hour to acquit him. In a deposition for a lawsuit against the city and the police, Bliss recanted his statement and said he signed it to avoid a beating.

Last week, the city agreed to pay Pouncy's family an undisclosed settlement negotiated by Kutinsky, the Southfield attorney.

93



# CONFESS
Continued from Page 1A

Deputy Chief Michael Hall, in charge of the Headquarters Bureau, strongly denied that the department obtains confessions improperly.

"We have no confessions being taken under coercion," said Hall, who nevertheless acknowledged that federal authorities had expressed concerns about one drug case. "To paint a broad stroke and say because of one case (there is a problem), doesn't mean we are coercing confessions."

Police spokeswoman Paula Bridges acknowledged there were high-level meetings last March and September with Green, the chief federal prosecutor in Detroit, concerning the detention of prisoners without warrants.

She said the department had no way of knowing if allegations of coerced confessions are part of the current Justice Department scrutiny.

Green declined to comment.

There are, however, several cases that have raised questions about police practices involving confessions.

## A case of coercion?

In a highly publicized case last fall, federal investigators still are trying to determine how detectives convinced Michael Gayles, a learning-disabled 18-year-old, to sign three separate false confessions that he killed J'nai Glasker, last August.

Brian Kutinsky, a Southfield lawyer who has filed a $20-million lawsuit against the city on behalf of the family, said the family has been notified that federal investigators are examining the case.

In six recent lawsuits involving questionable confessions examined by The News, the city paid several hundred thousand dollars in damages, most in confidential agreements, to people who said their statements were coerced.

In testimony in one murder case, a veteran homicide detective said she believed there was no standard procedure for how long police could hold someone without charges, and she admitted to intimidating a witness by threatening to take her children away.

In the Gayles case, "the police manufactured the confessions," Kutinsky said. "With his learning disability, he couldn't have articulated those confessions. They had him sign a waiver giving up his constitutional rights that he couldn't understand."

## Scope of federal inquiry

[In a study of court records by The Detroit News found investigators] ... for the department focus on justifying the shootings rather than determining what happened, and that the conclusions often vary little from the officers' accounts, say former ... executives and attorneys.

Last month, the department was hit with several lawsuits charging that it conducts illegal dragnets to round up friends and witnesses in murder investigations in an effort to nab the killers.

Also last month, a team of about ... federal investigators found ... wholesale problems with how ... Detroit police handle prisoners who have medical illnesses, drug addictions or are injured.

... Last May the city was criticized ... it investigates shootings ... its officers, the investigations are often inadequate and geared ... toward clearing them of wrongdoing.

tioned the minors, as state law requires. The law says that if a parent or guardian cannot be located, police must contact the Juvenile Court immediately, a requirement Stevenson later admitted he did not know.

The next day, Stevenson had Pouncy and Bliss brought back to headquarters. This time, Bliss' 18-year-old brother accompanied him. Stevenson later testified that he called Bliss' mother, but she refused to come. She testified she was never called.

Bliss was kept in a squad room most of the afternoon until Stevenson obtained a second question-and-answer statement written out by the detective and signed by Bliss.

This time, Bliss said he and Pouncy were approached by an intoxicated man who asked for cocaine. They took him to the abandoned house, where Pouncy pulled his pants down and ordered the man to perform a sex act. Bliss said the man refused. Then, Pouncy pulled out a pistol and shot the victim three times, Bliss said. Pouncy, who was five feet tall and weighed just over 100 pounds, tied the man up and carried the corpse outside to the Dumpster, Bliss added.

## Missing links

Stevenson obtained a murder warrant based on the statement, admitting in court that he did no further investigation.

Police could not link Pouncy to the victim or the gun, nor did police follow up on a neighbor's claim of hearing a woman talking loudly and people running from the house to a car just as the fire broke out. Moreover, the man was

"These cases are not just about money," Kutinsky said. "Hopefully, by bringing those lawsuits we can accomplish something worthwhile by getting the police to do the right thing."

## Another settlement

In another murder case in which the city ultimately paid a five-figure settlement, in 1995, a Wayne County Circuit Court judge harshly criticized Detroit police for locking up a mother of two children as a witness and illegally holding her until her 10-year-old daughter and 6-year-old son implicated her in the death.

You can reach No (313) 222-2034 or rsinclair@deme...

You can reach R: (313) 222-2019 or rhansen@deme...

Judge Kathleen Mc... was outraged th... Theonchelle Taylor wid... "a scintilla of evidence."

"If I have ever seen ... police have manufactu... is one," McDonald s... had facts as egregious ...

Taylor spent 130 d... County Jail before the ... the case ...

Veteran Homicide ... testified that she had ... a witness for days ... against her and said st... dard procedure as to ... es could be held with ...

Kinney also adm... to take Taylor's ch... did not cooperate ... shocked Judge Ma...

Criminal lawyer ... the Detroit Police ... officers write out o... statements, as in th...

"Every modern ... country records ... statements on the ... Kriger, a Detroit la... sense because it's ... of the process on ...

NOW AVAILABL
2001 MERCE



Judge Kathleen McDonald said she was outraged that police charged Thoanchelle Taylor with murder without "a scintilla of evidence," as the judge put it.

"If I have ever seen a case where the police have manufactured the facts, this is one," McDonald said. "I have never had facts as egregious as this case."

Taylor spent 130 days in the Wayne County Jail before the judge threw out the case.

Veteran Homicide Sgt. Joann Kinney testified that she had Taylor locked up as a witness for days without charges against her and said there was no standard procedure as to how long witnesses could be held without being arrested.

Kinney also admitted threatening to take Taylor's children away if she did not cooperate, an admission that shocked Judge MacDonald.

Criminal lawyers also are critical of the Detroit Police practice of letting officers write out question-and-answer statements, as in the Pouncy case.

"Every modern department in the country records witness or suspects' statements on videotape," said Mark J Kriger, a Detroit lawyer. "It only makes sense because it protects the integrity of the process on both sides."

*You can reach Norman Sinclair at (313) 222-2034 or nsinclair@detnews.com.*

*You can reach Ronald J. Hansen at (313) 222-2019 or rhansen@detnews.com.*

EXHIBIT R

96

MICHIGAN RECORDERS COURT

DETROIT, MICHIGAN

UNITED STATES OF AMERICA )
      Respondent/Appellee,

          V. )

CARL HUBBARD )
      Petitioner/Appellant. )

Case#159160
    LC NO:92-001856

---

### PERSONAL AFFIDAVIT OF ELTON CARTER

---

Comes Now, the affiant, after being duly sworn on his oath, hereby depose the following:

(1) That he is willing to testify before this Honorable court pertaining to the testimony given to him by Curtis Collins in the murder trial dated September 2, 1992 under the aforementioned case number indicated above against one Carl Hubbard.

(2) That Mr. Collins has admitted to me that the testimony he gave was forced upon him by the 5th Precinct of the Detroit Police Department.

(3) That Mr. Collins stated that if he did not agree to give the testimony that he gave, that he would receive the charges in the case rather than Carl Hubbard.

(4) That Mr. Collins also stated to me that he was willing to sign an Affidavit ADMITTING HIS PERJURY BUT WAS AFRAID THAT DETROIT POLICE DEPARTMENT WOULD FOLLOW THROUGH WITH THEIR THREATS.

(5) That Mr. Collins admitted to me that he was not at the scene of the crime during the time that the murder occured.

(6) That Mr. Collins was threatened and pressured into giving a false testimony by the Detroit Police Department.

97

(7) That only after Mr. Hubbard was found guilty of the murder did Mr. Collins came to him with this information.

(8) That in regards to the statements made to me by Curtis Collins, that I am willing to appear before this Honorable court to testify to it, in the open court.

Further, the Affiant Sayeth Naught.

Respectfully Submitted,

*Elton Carter* #07458-032
Elton, Carter# 07458-032

I certify that Elton Carter appeared before me on this __28__ day of January, 2004 and affixed his signature on this two pages document in my presence.

1/28/04
Myron Blair, Case Manager
"Authorized by the Act of July 7, 1955
to administer oaths (18 U.S.C 4004)"
_____
Signature of B.O.P Official

_____
Printed Name of B.O.P. Official

Dated this __28__ day of January, 2004.

*Elton Carter* #07458-032
_____

Notarized this __2nd__ day of __Jan__ 20 __08__          2

Penni L. Kotter, Notary Public
Sullivan County, Indiana
Commission Expires August 31, 2009.

*Penni L. Kotter*

98

EXHIBIT S

MEETING (w) CASSANDRA —                          2-3-92
                                                 @ 2:00 pm.

IT WAS after 9:00 pm → WHEN Carl & Tommy → went to
pick up Tommy's son From CARL's mother's House → CARL
asked CASSANDRA if she WANTED to go sit with them
at Tommies → she went → SAID Carl WAS acting
Normal.

Picture → Carl & Curt → at Party in
March "91" →

               (Muffy)
Raymond Williams →     521-0294
3543 Gray
                  Curt's Best Friend → will Testify That
Curt WAS not in Area when Shooting Occured.
(→ there is another possible witness → Vitour )

Barbara →          Curt Told Her → the police are
trying to make me SAY That CARL DID This.
(murder)

100

EXHIBIT T



103

EXHIBIT U

104



EXHIBIT V

106



EXHIBIT #13
(T2, 2A-2D)

107

EXHIBIT W

108

DETROIT
DEPARTMENT
POLICE

**CASE DRAFT**

|  | ISSUED 1992 | TELETYPE NO. None |

| ROBBERY ☐ | B&E ☐ | SEX ☐ | HOMICIDE ☒☒ | SHOOTING ☒☒ | STABBING ☐ | ASSAULT ☐ | OTHER ☐ |

| REPORTING OFFICERS PO K Krupka | UNIT/AREA 5-83/10 | TIME DISP. 9:35pm | REPORTED TO Moore | TIME 950pm |

| OFFENSE OR INCIDENT FATAL SHOOTING | NAME AND TYPE OF BUSINESS OR BUILDING public street | PHONE |

| LOCATION Front of 3960 Gray | TIME 9:30pm | DATE 1-17-92 | KNOWN WITNESSES None |

| COMPLAINANT OR VICTIM Unknown Man #21 | TITLE | AGE/SEX/RACE B M | ADDRESS unknown | PHONE (RES./BUS.) |

| INJURIES GSW head | CONDITION DOA | CONVEYED BY EMS 15 | HOSPITAL ▆▆▆ | DOCTOR ▆▆▆ | CHART # ▆▆▆ |

| PERSON REPORTING CRIME OR SECOND VICTIM ▆▆▆ | AGE/SEX/RACE 57/M/B - | ADDRESS reverse | PHONE (RES./BUS.) |

| INJURIES None | CONDITION | CONVEYED BY | HOSPITAL | DOCTOR | CHART # |

| ARRESTED | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |

| ARRESTED None | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |

| ARRESTED | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |

| INVESTIGATORS AT SCENE Caudill/Moore | SECTION Homicide | PHOTOS YES☒ NO☐ | PHOTOGRAPHER/TECHNICIAN (FOUND & TAGGED EVIDENCE) 4705 Collinash & Richardson |

| EVIDENCE HELD AT 5IOS/Homicide | TAG NUMBERS see reports | ASSIGNED 5 IOS/Homicide |

PRELIMINARY FINDINGS

Scout 5-83 received a police run to the above location.  They talked to the person reporting who stated that he observed the complainant and a Black female approaching 3960 Gray.

Moments later, the person reporting heard several gunshots, then observed the complainant lying on the ground suffering the above wound.

Morgue File #552-92.

596

*Sgt Williams NCU*

| ESCAPE: | METHOD AND DIRECTION UNKNOWN ☐ | ON FOOT ☐ | VEHICLE ☐ |

| YEAR | COLOR | MAKE | MODEL | LICENSE NO. | DIRECTION |

| NOTIFICATIONS | PRECT. ☐ | SPEC. SECT. ☐ | FIELD DUTY ☐ | EXEC. DUTY ☐ | OTHER ☐ | CASE NO. 231 |
| | Sgt Byrd #5 and Lt Dewaelsche, NCU | | | | | |

RECEIVED NCU 1100pm                     J R        109

**DETROIT POLICE DEPARTMENT**

**CASE DRAFT**

| ROBBERY ☐ | B&E ☐ | SEX ☐ | HOMICIDE ☐ | SHOOTING ☒ | STABBING ☐ | ASSAULT ☐ | OTHER ☐ |

REPORTING OFFICERS: PO KEN KRUPKA

UNIT/AREA: 5 83/5-10

TIME DISP: 9:35 P

REPORTED TO: MOORE

TIME: 9:50 P

OFFENSE OR INCIDENT: FATAL SHOOTING

NAME AND TYPE OF BUSINESS OR BUILDING: PUBLIC ST.

PHONE:

LOCATION: IN FRT OF 3960 GRAY

TIME: 9:30 P

DATE: 01-17-92

KNOWN WITNESSES: NONE

COMPLAINANT OR VICTIM: JOHN DOE # E065 - U.M #21

TITLE:

AGE/SEX/RACE: M B

ADDRESS: UNK

PHONE (RES./BUS.):

INJURIES: GSW TO HEAD DOA

CONDITION:

CONVEYED BY: EMS #15

HOSPITAL:

DOCTOR:

CHART #

PERSON REPORTING CRIME OR SECOND VICTIM:

AGE/SEX/RACE: 57 MB

ADDRESS: SEE REVERSE SIDE

PHONE (RES./BUS.):

INJURIES:

CONDITION:

CONVEYED BY:

HOSPITAL:

DOCTOR:

CHART #

| ARRESTED | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |
| ARRESTED | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |
| ARRESTED | ID # | AGE/SEX/RACE | ADDRESS | PHONE | CHARGE |

INVESTIGATORS AT SCENE: CAUDILL / MOORE

SECTION: Homi

PHOTOS: YES ☒ NO ☐

PHOTOGRAPHER/TECHNICIAN (FOUND & TAGGED EVIDENCE): 4705 COLLINASH (RICHARDSON

EVIDENCE HELD AT: #5 / Homi

TAG NUMBERS:

ASSIGNED: Homi / SIOS

PRELIMINARY FINDINGS:

CIRCUMSTANCES: OFFICERS RESPONDED TO THE ABOVE LOCATION ~~THEY T/T PRO~~ VR4H0 OBSERVED THE COMPLT AND A BLACK FEMALE APPROACHING 3960 GRAY. MOMENTS LATER PRO HEARD SEVERAL GUN SHOTS. PRO ~~THEN~~ OBSERVED THE COMPLT LYING ON THE GROUND ~~suffering from~~ ABOVE DESC WOUNDS

UM #21
M.F.# 552-92

BLOOD/SLUGS

| ESCAPE: | METHOD AND DIRECTION UNKNOWN ☐ | ON FOOT ☐ | VEHICLE ☐ |

| YEAR | COLOR | MAKE | MODEL | LICENSE NO. | DIRECTION |
| | | | | | |

NOTIFICATIONS: SGT BYRD

PRECT. ☒

SPEC. SECT. ☐

FIELD DUTY ☐ NCS - LT DEWAELSCHE

EXEC. DUTY ☐

OTHER ☐

CASE NO.: 231

USE REVERSE SIDE FOR ADDITIONAL INFORMATION

D.P.D. 54 (11-71)

Col D-531-RE

EXHIBIT X

313 —
389

DETROIT
DEPARTMENT
POLICE

## WITNESS STATEMENT
### CASE PROGRESS

| PRECINCT/SECTION | | | COMPLAINANT | FILE/CASE NO. |
|---|---|---|---|---|
| Homicide | | | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 1-17-92 | 11 15 pm | 3955 Gray | Caudill |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Herman Luckey | B M 57 | 1-13-35 | 5 11 | 185 |

| SOC. SEC. NO. | RESIDENCE | PHONE |
|---|---|---|
| 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 | 3955 Gray | BUS. RES. 822-3950 |

| EMPLOYER | DEPARTMENT | BADGE NO./CLOCK NO. |
|---|---|---|
| Budd Automotive | Electrician | 438-2289 |

| RESIDING WITH: | CHILDREN/SCHOOL: |
|---|---|
| Wife - Bernice | 823-9100 |

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
|---|---|---|
| Tom Luckey | 12320 Chandler Pk. Dr. | 822-1087 |

Tonight about 9.20 Pm I was
just arriving home in my car
with my wife. We pulled up
into the drive had unloaded the
garage and then pulled to the
front of the car I heard
several gun shots. It sounded
like two different guns.
the back door and let me
into in. then I went to place
the gate and I looked out
the drive as men laying at
the drive of 3960 Gray.
I saw a lady bending over
guy life she was asking him
something. Then she went into
3960 Gray downstairs. I went
back into my house and turned
the lights off. My wife was
looking out and I said she saw
the lady who lives at 3960
Gray come out looked at
the man and went back in
the house. I called 911.

112

EXHIBIT Y

REPORT ON: FATAL SHOOTING

ASSIGNED TO (NAME AND BADGE NO.): 9201 942

PLACE OF OCCURRENCE ☒ ON STREET: F/O 3960 GRAY

OCCURRED ON OR BETWEEN: MO. 1 DAY 17 YR. 92 DAY OF WK. Fri TIME 9 25p

DAY ☐1 NIGHT ☒2 UNK.☐

CENSUS TRACT 5127

SCOUT CAR AREA 5-2D

NAME AND TYPE OF BUSINESS

TYPE OF BLDG.: 

REPORTED TO POLICE ON: 1 17 92 Fri 9 30p

PERSON REPORTING OFFENSE — AGE 59 SEX M RACE B

COMPLAINANT'S NAME: JOHN DOE (NO. # E065) — AGE SEX M RACE B

COMPLAINANT INJURED? ☐YES ☐NO

WAS COMPLAINANT WORKING? ☐NO ☐YES

METHOD OF ENTRY ☒UNK. N/A

METHOD OF ESCAPE ☒UNK.

DESCRIBE WEAPON ☒UNK.

NO. OF PERPETRATORS ☒UNK. DESCRIBE: ☐MALE ☐FEMALE ☐JUVENILE ☒UNK. ☐ADULT ☐WHITE ☐BLACK ☒UNK. ☐OTHER

TOTAL VALUE $

VICTIM — PERPETRATOR RELATIONSHIP ☐RELATED ☐ACQUAINTED ☐STRANGERS ☒UNK.

UNIT(S) NOTIFIED: C.C. Homi. NAME: SGT. WM'S MOORE TIME 9:40pm DATE 1/17/92

**WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?**

ARREST(S) ☐YES ☒NO
DESCRIPTION(S) OF PERPETRATOR(S) ☐YES ☒NO
WITNESS(ES) ☒YES ☐NO
VEHICLE LICENSE NUMBER(S) ☐YES ☒NO
PHYSICAL EVIDENCE ☐YES ☒NO

NO DESC.

SOURCE: R.R.R. "F/O 3960 GRAY - PERSON SHOT"

CIRCUM: WRITERS RESPONDED. ARRIVED AT SCENE OBSERV. A B/M LYING IN FRT OF DRIVE-WAY OF ABOVE. COMPL. HEAD FACING EAST AND ON HIS BACK EYES FIXED, BLOOD COMING FROM MOUTH & NOSE W/NO SIGNS OF LIFE. WRITERS PRESERVED SCENE W/ POSS. FATAL SHOOTING. THIS WRITER BEGAN ASKING PERSONS AROUND IF THEY SAW ANYTHING WITH THIS WRITER GOING TO 3960 GRAY & T/T A #[redacted] B/F/34 OF SAME, N/P WHO STATED SHE HEARD 3 or 4 SHOTS COMING FROM REAR OF ADD. BUT SAW NOTHING. THIS WRITER THEN WENT TO 3955 GRAY & T/T [redacted] B/M/57 & [redacted] (PHO. [redacted]) WHO STATED THEY CALLED POLICE - CONT'D -

REPORTING OFFICER: KENNETH KRUPKA BADGE 2638 COMMAND 05 ASSIGNMENT 5-23 FURLOUGH W/T

OTHER OFFICERS INVOLVED: TRACY JEWELL 1115 05 W/10
SGT. R. MICHALAK S-59B 05 W/12

SUPERVISOR CHECKING REPORT: Carl Frederick

O.P.D. 106 C of D—783-RE (Rev. 9-81) (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED) DETROIT POLICE DEPARTMENT

114

THAT WHILE RETURNING HOME IN THEIR CAR, TRAVLING N/B
GRAY THEN INTO THEIR DRIVE-WAY AT THAT TIME OBSERV.
NO ONE IN THE STREET. PRO STATED THAT AFTER ENTERING
HIS DRIVE-WAY HE HEARD ABOUT 5 to 6 SHOTS (POSSIBLY
TWO DIFFERENT GUNS) THEN AFTER THE SHOTS, HE THEN WALKED
OUT TOWARDS THE FRT OBSERV. THE COMPL. LYING IN
FRT OF DRIVE-WAY AND A B/F (KNOWN TO P.R.O. LIVES
(4.) HOUSES NORTH FROM P.R.O.) B/F/40's, SHORT, HVY BUILD
WEARING GRAY OR BLU 3/4 LG. COAT AND A SCRAF AROUND
HER HEAD SAYING SOMETHING TO COMPL. THEN WALK AWAY
FROM COMPL. THEN ENTER ADD. OF 3960 GRAY. P.R.O. THEN
STATED A B/F SMALL BUILD WEARING GRAYISH SWEATER W/HOOD
WALKED OUT OF 3960 GRAY RUN UP TO COMPL. LOOK AT COMPL.
THEN RUN BACK INSIDE ADD. P.R.O. THEN CALLED POLICE.
EMS # 15 ARRIVED AT SCENE OBSERV. (2) GUN SHOT WOUNDS TO
RIGHT SIDE OF HEAD AND (1) IN STOMACH AREA, CONV. TO
ST. JOHN'S HOSP. I THEN NOTIFIED HOMI SECT. FROM SCENE
& T/T P.O. MOORE, CODE # 2792. SCT. 5-75 (SGT. MICHALAK)
TO ▮▮▮▮▮▮ HOSP. W/EMS # 15. - COND. "DOA" CHART #
▮▮▮▮▮▮ - DR. ▮▮▮▮▮

HELD ON EVID. TAG # 913 206 - 2-PIECES OF PAPER W/ POSS.
PHONE NO. # AND OTHER ASST. WRITING TAKEN FROM
COMPLS. B/F JKT. PKT.
KJL

E.O.R.

EXHIBIT Z

116

**VOICE OF DETROIT: The city's independent newspaper, unbossed and unbought**
*Local, national and world news from a
people's perspective*

## JUDGE TO REVIEW CASE OF CARL HUBBARD, IN PRISON SINCE 1992; INNOCENCE BACKED BY DOZENS

Posted on 05/28/2019 by Diane Bukowski



Detroit Police Gang Squad — the biggest gang in town. Residents of Hubbard's east side neighborhood knew them well. One witness says he has been stopped over 100 times by Detroit police/Photo: National Geographic

*Judge Lawrence Talon to 'review' motion for relief from judgment during hearing Wed. May 29*

*One witness swears he saw another man commit the murder, never interviewed by police; another reported victim arguing with a woman just prior to his death, she was arrested but freed*

*Curtiss Collins swears he was threatened by police to testify falsely that he saw Hubbard running away from the murder scene*

*Polygraph exam, affidavits from attorney Ronald Giles and others, police report that Collins was arrested for perjury for retracting false testimony, confirm Collins' statement*

*Justice Department earlier investigated DPD for soliciting false confessions, arresting and threatening witnesses*

**By Diane Bukowski**

**May 28, 2019 (to be updated with links to pertinent documents, etc.)**



*Editor's note: VOD has withheld some witness names in this story from publication, but they are included in the original affidavits and they have sworn they will testify. In recent weeks, Detroit police and prosecutors have been contacting witnesses in this case with unknown intentions. These witnesses have said they feel threatened.*

117

**FREE CARL HUBBARD**

(From online blog on prisoners)

Ghostmack caught a murder case based on a false positive identification.

Apparently the corrupt DPD had a thing for him due to the fact he was accused of assassinating one of their prized snitches. However he was never arrested for this.

Rumor has it a corrupt Narcotics Officer paid a drug addict to say that Ghostmack was the individual she seen leaving the scene of a murder with a gun in his hand. No weapon or fingerprints were ever found.

Since this brother's incarceration, he has started boxing again and has had great success fighting as a cruiserweight in the Nation of Islam underground Fight League. Hopefully justice will be served and this brother will be freed on appeal. What a shame, another wasted talent brought down by the corrupt hypocritical system.

**FREE GHOSTMACK!**

**DETROIT**—Detroiter Carl Hubbard (nicknamed "Ghost" in his east side neighborhood), has been incarcerated since Sept. 23, 1992 for the murder of Rodnell Penn, but has always maintained that he is innocent.

On Wed. May 29, his motion for relief from judgment, with dozens of sworn affidavits attached, some alleging police coercion and subornation of perjury, is scheduled for review by Wayne County Circuit Court Judge Lawrence Talon.

"I was on my way to the store on the corner of Gray and Mack on Jan. 17, 1992 . . . . when I saw [name withheld from publication] arguing with somebody in front of Uncle Peter's house," says a sworn affidavit from the only eyewitness to the actual murder to step forward so far. "Then I saw the other guy turn his back and start to walk away from —. Then I heard some gunshots fired and the guy arguing with — fell to the ground. Then —-stepped over him and started shooting the guy again."

The witness says he ran back to his house in fear for his life, and did not come forward until 2011 "because I have to live in that neighborhood." He says definitely the killer was NOT Carl Hubbard.

Another sworn witness who lived nearby says, "After Carl Hubbard got convicted for the murder in front of 'Uncle Peter's' house, everyone was saying that – – – -was the one who really killed the guy. This was due to – – – -believing that the victim had something to do with his brother —-'s murder on Gray Street."

In addition, there is an arrest report in Hubbard's homicide file regarding a female suspect in Penn's murder, who was seen arguing with him just prior to the event. Her name is redacted from the report.

It is questionable whether Detroit police provided the names of the other suspects to the defense. They do not appear to have interviewed witnesses who saw the first suspect, or others in the neighborhood who allegedly identified him as the killer.

If so, Hubbard has an actual innocence claim, and a possible *Brady* violation, like that which recently helped lead to the exoneration of New Yorker Keith Bush, because police concealed the existence of another suspect.



Keith Bush after exoneration; cops and prosecutors never revealed the existence of another likely suspect, also coerced witnesses.

*(Brady violation: "The suppression by the prosecution of evidence favorable to an accused upon request **violates** due process where the evidence is material either to guilt or punishment. ... **Brady** requires **disclosure** of the material exculpatory evidence early enough so that the defense can make use of the information.")*

118



**Then Judge Richard P. Hathaway conducted bench trial in Hubbard's case, didn't question why witness recanted statement to police.**

Hubbard's childhood friend Curtiss Collins, the chief prosecution witness at his bench trial, has also provided an affidavit and polygraph exam, stating that police forced him to lie about witnessing Hubbard run away from the scene of the crime, using threats to his freedom.

He did testify on cross-examination at the trial, that his testimony earlier was false, but he was arrested on perjury charges according to a police report and Hubbard's attorney, and reversed his testimony again the next day. Collins was only 19 at the time.

Collins told VOD in an interview May 25 that his friends and his mother encouraged him to come forward and tell the truth to help free Carl Hubbard. The interview below is backed up by a police arrest report by Sgt. Gales stating that he arrested Collins for perjury in the courtroom at the direction of AP James Gonzalez on Aug. 22, 1992, and by Atty. Giles in his statement.



**Curtiss Collins interview re: Carl Hubbard case 5 26 19**

". . .I did not witness Carl Hubbard fleeing from where Mr. Rodnell Penn was found dead, Collins says in his affidavit. "Sergeant [Joann] Kinney forced me to falsely testify at the preliminary examination that Carl Hubbard was running from the scene. . .I was threatened by Homicide Officers Sergeant Kinney and Sergeant [Ronald] Gale with being charged with the murder of Mr. Penn if I didn't say that I saw Carl Hubbard at the murder scene of Mr. Penn."

His statement is backed up a polygraph exam, by attorney Ronald Giles, an arrest report from Sgt. Gale which states he arrested Hubbard for perjury at the direction of Asst. Prosecutor James Gonzales, and numerous others who claim that they saw him "crying" in the Wayne County Jail about the police threats, and that he admitted to giving false testimony.

A polygraph report by Michael Anthony, of Forensic Polygraph and Accounting Services, date Feb. 1, 2018, sets forth the test questions:



James Gonzalez (r) was formerly a top prosecutor in Kym Worthy's office. Hubbard says he helped railroad him.

Did you see Carl Hubbard shoot that man? Ans. No
Did you see Carl Hubbard shoot anyone at Gray and Mack in January of 1992? Ans. No.
Were you present when Carl Hubbard shot that man? Ans. No

Anthony, who is a former police officer, concludes, "It is the opinion of the undersigned examiner based upon the examination given that this subject is being truthful regarding this issue."

Giles says, "I represented Mr. Carl Hubbard in his Bench Trial in Recorders Court. . .In my representation of Mr. Hubbard, there came a time during the testimony when the Prosecution called one Curtis Collins to the witness stand. . .on cross-examination, he drastically changed his testimony and according to my recollection, testified contrary to his testimony at the preliminary examination. . .Mr. Collins was arrested and detained following his trial testimony. To the best of my information and belief, Mr. Collins was released and not charged when his he changed his testimony the following day. . . Mr. Collins' testimony was especially critical to the Judge's verdict of guilty against Mr. Hubbard."



Ronald Giles, now a 36th District Court Judge in Detroit.

An arrest report signed by Sgt. Ronald D. Gale dated Aug. 31, 1992, states, "Writer responded to Recorders Court. Courtroom #202 and talked with APA James Gonzalez. Writer was directed by APA Gonzalez to arrest the above subject (Collins) for perjury. The above subject was a witness in a homicide case and testified at an exam held in 36th District Court and testified at a trial being held in Recorders Court this date. After being sworn the above subject in direct oppsite (sic) to his testimony at 36th District Court."

Collins goes on to say that Asst. Prosecutor James Gonzalez , Sergeant Joann Kinney and Sergeant Ronald D. Gale continued to threaten him afterwards.

Before her retirement in 2006, Kinney was exposed as a corrupt cop in at least two cases.

In an article titled, "Detroit Police Inquiry Expands," which cites Kinney, Detroit Free Press reporters Norman Sinclair and Ronald Hansen wrote, "In another murder case in which the city ultimately paid a five-figure settlement in 1995, a Wayne County Circuit Court judge harshly criticized Detroit police for locking up a mother of two children as a witness and illegally holding her until her 12-year-old daughter and 6-year-old son implicated her in the death.

"Judge Kathleen McDonald said she was outraged that police charged Thoanchelle Taylor with murder without 'scintilla of evidence,' as the judge put it. "If I have ever seen a case where the police have manufactured the facts, this is one. I have never had facts as egregious as this case."

120

"Veteran Homicide Sgt. Joann Kinney testified that she had Taylor locked up as a witness for days without charges against her and said there was no standard procedure as to how long witnesses could be held without being arrested. Kinney also admitted threatening to take Taylor's children away if she did not cooperate. . ."



**LOCAL NEWS**

## 12-year-old's confession thrown out

Earlier, in 1992, (above) Kinney interrogated a 12-year-old girl charged with the murder of an infant she was baby-sitting for. The child's attorney said the infant had epilepsy, which likely caused him to drown in the tub when the girl went to the kitchen to get food ready. Juvenile Court Judge James Lacey threw the confession out, citing the fact that the child had neither her mother nor an attorney present during Kinney's interrogation.

"The girl testified that she left the boy in the tub while she made him something to eat." the Detroit Free Press reported. "When she returned to the bathroom, Matthew was lying face up with his head beneath the water, she said. "I never pushed him in the water," the girl said, clutching her hands and slowly rocking back and forth. "I thought that he fell asleep in the tub."

She also testified that she spoke openly to Sgt. Jo Ann Kinney on April 1 because she was told she could go home if she told the truth and helped resolve how Matthew died. Police questioned her for almost four hours. 'She said when I told the truth, I could go home,' the girl said. "She said if I signed it, I could go home." The girl's mother said she sat in a nearby room while her daughter was being questioned. She said she did not know what was happening to her daughter. "I didn't know she was being interrogated," she said. "Everything was hush-hush."

Like 28 people like this. Be the first of your friends.

Share / Save 🖪 🐦 ➦

This entry was posted in Uncategorized. Bookmark the permalink.

EXHIBIT AA

122

REPORT ON (HOLD (REV. 1-1)) | ASSIGNED TO (NAME AND BADGE NO.) | INCIDENT NO. | COMPLAINT NO.

1-ARR.MURDER FILE#92-43 | SGT.KINNEY SQ-6 | | 92-43

PLACE OF OCCURRENCE ☐ ON ☐ STREET  5244 PHILIP

OCCURRED ON OR BETWEEN — MO. 02 DAY 06 YR. 92 — DAY OF WK THUR. — TIME 3:15P

DAY ☒1 NIGHT ☐2 UNK. ☐3

CENSUS TRACT

SCOUT CAR AREA

NAME AND TYPE OF BUSINESS — AND

TYPE OF BLDG. (APT., HOTEL, PRIV. RES. — SINGLE FAMILY, ETC.) | REPORTED TO POLICE ON

PERSON REPORTING OFFENSE — TITLE — ADDRESS — PHONE — AGE — SEX — RACE

WRITERS

COMPLAINANT'S NAME — ADDRESS — PHONE BUS. RES. — AGE — SEX M — RACE B

RODNELL PENN

WAS COMPLAINANT WORKING? ☐ NO ☐ YES — OCCUPATION, BUSINESS NAME AND ADDRESS | COMPLAINANT INJURED? ☐ YES ☐ NO

METHOD OF ENTRY ☐ UNK. | METHOD OF ESCAPE ☐ UNK.  IN CUSTODY | DESCRIBE WEAPON ☐ UNK.

NO. OF PERPETRATORS 1 ☐ UNK. | DESCRIBE: ☒ MALE ☐ UNK. | ☐ FEMALE | ☐ JUVENILE ☐ UNK. | ☒ ADULT | ☐ WHITE ☐ OTHER | ☒ BLACK ☐ UNK. | TOTAL VALUE $

VICTIM — PERPETRATOR RELATIONSHIP ☐ RELATED ☐ ACQUAINTED ☐ STRANGERS ☐ UNK. | UNIT(S) NOTIFIED — NAME  T/W LT.PETERSON SQ-6/AFF.ROWE | TIME 3:40P.M. DATE 02-06-92

## WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER.)

| ARREST(S) | DESCRIPTION(S) OF PERPETRATOR(S) | WITNESS(ES) | VEHICLE LICENSE NUMBER(S) | PHYSICAL EVIDENCE |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

DEF.# ▓▓▓▓ B/M/ ▓▓▓ 71,6-1,149,MED.COMPLX.SS# ▓▓▓▓

69,SUBJ.LIVES AT THE ABV.LOC.HOME PH# ▓▓▓▓▓

S:CREW WAS IN POSSESSION OF THE ABV.MENTION INFO.SUBJ.WANTED FOR MURDER

HOMI.FILE#92-43,CREW WAS ARMED W/A GOOD DESC.AND LOC.

CIR:CREW WAS ARMED W/THE ABV.MENTION INFO.RESP.TO THE ABV.MENTION LOC.

CREW HAD THE MCMU BASE BASE TO TX THE ABV.VENUE,AND A B/M ANS.SAME AND

I.D.HIMSELF AS ANDREW SMITH,BASE INFORMED THE CREW THAT THE SUBJ.WAS ON

THE LINE AND I.D. HIMSELF.CREW RESP.TO THE LOC.AND KNOCKED ON THE F/DOOR

AND A B/F ANS.THE DOOR AND I.D.HERSELF AS ▓▓▓▓▓ (SISTER)SAME GAVE

CREW PERMISION TO ENTER THE HOME.CREW ADVISED HER OF OUR PURPOSE,SAME

ADVISED CREW THAT HER BOTHER WAS NOT AT HOME.LATER PO.DONALD HUGHES #1398

advised CREW OVER HIS PREP.THAT HE HAS THE WANTED SUBJ.IN CUSTODY IN

THE R/O THE BXX ABV. LOC.PO.HUGHES ADVISED CREW THAT HE OBS.A/B/M

STANDING AT THE TOP OF THE PORCH,THE SUBJ.JUMP FORM THE TOP PORCH.PO.HUGHES

ARR.SAME AND HE ADVISED HIMSELF KX OF RIGHTS ARR.AND CONV.TO HOMI.SECTION

FOR POSSESSING. ADD:SUBJ.HAS TW.WARR.#U388-357 BOND $100.00 ROWE.

REPORTING OFFICER (PRINT OR TYPE)  CORNELIUS PORTER | OTHER OFFICERS INVOLVED | BADGE NO. | COMPUTE | FURLOUGH  IN ARR BOOK

SGT.WILLIAM PRICE #S20 MCMU

SIGNATURE  Cornelius Porter

PO.DONALD HUGHES #1398 MCMU

BADGE 2503 | COMMAND MCMU | ASSIGNMENT 2503 | FURLOUGH SF-9

PO.FRED JORGESEN #3317 MCMU

SUPERVISOR CHECKING REPORT (PRINT OR TYPE) | RANK Sgt | SIGNATURE | COMPUTER ENTRY BY

D.P.D. 108    C of D-783-RE (Rev. 9-81)    (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED)    DETROIT POLICE DEPARTMENT

123

EXHIBIT BB

124

| STATE OF MICHIGAN<br>☐ Third Judicial Circuit Court<br>☑ Recorder's Court | **MOTION AND ORDER OF DISMISSAL** | CASE NO.<br>*88-1371* |
|---|---|---|

**THE PEOPLE OF THE STATE OF MICHIGAN**

vs.

*Core Hubbert*
_____
**Defendent**

The ☐ Court  ☐ Prosecutor  ☑ Defense  now moves to dismiss the above-entitled cause
☐ with  ☐ without  prejudice on the following grounds:

☐ Insufficient evidence

☑ ~~Complaining~~ *ESSENTIAL* witness has failed to appear

☐ Complaining witness cannot be located

☐ Complaining witness refuses to prosecute

☐ Suppress the evidence

☐ Quash the information

☐ Defendent was sentenced on File_____ for _____

☐ Other _____

By_____
*Assistant Prosecuting Attorney*

_____
*Defense Attorney*

### ORDER OF DISMISSAL

IT IS HEREBY ORDERED THAT the above case be dismissed  ☐ with  ☑ without  prejudice.

Date: _____ *4-8-88* _____

_____
*Judge*

Distribution:
White - File
Canary - Police Dept.
Pink - Defense Attorney
Gold - Prosecutor
Form #30 (Rev. 9/86)

**MOTION AND ORDER OF DISMISSAL**

*Peo. Next. #27*
*MS*
*9-2-92*

EXHIBIT CC

126

KYM L. WORTHY
PROSECUTING ATTORNEY
JEROME E. CRAWFORD
CHIEF ASSISTANT
DONN FRESARD
CHIEF OF STAFF

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY
DETROIT, MICHIGAN

1200 FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-2302

TEL: (313) 224-5777
FAX: (313) 224-0974

April 12, 2018

Carl Hubbard
MDOC #205988
Carson City Correctional Facility
10274 Boyer Road
Carson City, MI 48811

Dear Mr. Hubbard:

I write in response to your filing a motion for relief from judgment where you make an
innocence claim/claim of police and prosecutorial misconduct. I am the Director of the Office's
Conviction Integrity Unit. Enclosed is a description of the Unit. The Unit reviews claims of
actual innocence, to determine if further investigation is needed.

You have the choice of first asking the Unit to investigate your innocence claim. If we decline
relief then you can still go forward with your 6.500. But if you are not successful with your
6.500 this Unit will be unable to review your case unless there is additional new evidence.

If you want the Unit to review your case complete and return the enclosed application. If you
have any questions please let me know and I will do my best to get you a prompt response.

Sincerely,

Valerie Newman
Director, Conviction Integrity Unit

PRINTED ON
RECYCLED PAPER

127



KYM L. WORTHY
PROSECUTING ATTORNEY

RICHARD P. HATHAWAY
CHIEF ASSISTANT

DONN FRESARD
CHIEF OF STAFF

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY
DETROIT, MICHIGAN

1200 FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-2302

TEL: (313) 224-5777
FAX: (313) 224-0974

---

April 20, 2018

Carl Hubbard
MDOC #205988
Carson City Correctional Facility
10274 Boyer Road
Carson City, MI 48811

Dear Mr. Hubbard:

I write in response to your recent letter and the polygraph results you sent. I write to you about a week ago regarding the motion for relief from judgment you filed. I explained in that letter that you have the choice of first asking the Unit to investigate your innocence claim. If we decline relief then you can still go forward with your 6.500. But if you are not successful with your 6.500 this Unit will be unable to review your case unless there is additional new evidence.

I sent you an application to complete and return. If you have any questions please let me know and I will do my best to get you a prompt response. I have scanned the documents you sent for my file and am returning them to you.

Sincerely,

Valerie Newman
Director, Conviction Integrity Unit

 PRINTED ON
RECYCLED PAPER







KYM L. WORTHY
PROSECUTING ATTORNEY

RICHARD P. HATHAWAY
CHIEF ASSISTANT

DONN FRESARD
CHIEF OF STAFF

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY
DETROIT, MICHIGAN

1200 FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-2302

TEL: (313) 224-5777
FAX: (313) 224-0974

April 4, 2019

Carl Hubbard
MDOC #205988
Carson City Correctional Facility
10274 Boyer Road
Carson City, MI 48811

Dear Mr. Hubbard:

I write in response to your letter received April 1. I understand that you do not want the CIU to investigate your innocence claims and did not authorize Mr. Tank to agree to any transfer of your case from appeals to CIU. Please stop writing me as CIU has closed your case and transferred it to appeals.

Sincerely,

S/Valerie Newman

Valerie Newman
Director, Conviction Integrity Unit

PRINTED ON
RECYCLED PAPER

129



EXHIBIT DD

# SEARCH RESULTS

MICHIGAN DEPARTMENT OF STATE
UNIFORM COMMERCIAL CODE
LANSING MICHIGAN 48918

**COPIES REQUESTED**

DEBTOR INFORMATION

A998157148
CURTIS COLLINS
8747 PURITAN
DETROIT MI 48238

DATE 4/12/97    TIME ___    ACCOUNT NUMBER ___    PAGE 1 OF

| FILING NUMBER | DATE/TIME OF FILING | DOCUMENT TYPE | PARTY CODE | MICROFILM LOCATION | REQUESTOR INFORMATION |
|---|---|---|---|---|---|
| S-332/1 | 01/19/92 | LEIN | WCSD | C-233A | MDOC-ESCP-HOLD |
| R-5442 | 03/10/92 | RCALL | WCSD | C-233-A1 | RECALL-LEIN |
| S-23/1 | 08/25/92 | LEIN | DPD | C-233-A1 | MDOC-PVV-OA1 / DPD-CR/HOLD |
| R-3635 | 09/05/92 | RCALL | DPD | C-233-A2 | RECALL-LEIN / RECALL-LEIN |
| | END DATA | | | | |

This is what the LEINS show over that period of time... WCSD is Wayne Cty Sher. Dept. DPD is Detroit Pol. Dept. You have an Escape from MDOC LEIN, a Parole Vio. LEIN, and CR/hold which is the LEIN and hold on the case 92-1856 we asked for... in the letter.

As you can see, that LEIN was pulled on 9-05-92, either after he testified or after the case.....

EXHIBIT EE

132

PRELIMINARY COMPLAINT RECORD

1-ARREST PREJURY

| PLACE OF OCCURRENCE | | | OCCURRED ON OR BETWEEN | MO. | DAY | YR. | DAY OF WK | TIME | DAY | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ ON ☒ STREET 1441 ST. ANTOINE | | | | 8 | 31 | 92 | MON | 11:40A | ☒ DAY | 5127 |
| NAME AND TYPE OF BUSINESS RECORDERS COURT, COURTROOM #202 | | | AND | | | | | | ☐ NIGHT 2 | SCOUT CAR AREA |
| TYPE OF BLDG. (APT., HOTEL, PRIV. RES. — SINGLE FAMILY, ETC.) COURTROOM #202 | | | REPORTED TO POLICE ON | 8 | 31 | 92 | MON | 11:40 A | ☐ UNK. 3 | 1-2D |
| PERSON REPORTING OFFENSE WRITER | TITLE | ADDRESS | | | | PHONE | | | AGE | SEX RACE |

| COMPLAINANT'S NAME WRITER | ADDRESS | | PHONE BUS. RES. | | AGE | SEX | RACE |
|---|---|---|---|---|---|---|---|

WAS COMPLAINANT WORKING? IF YES — OCCUPATION, BUSINESS NAME AND ADDRESS
☐ NO  ☐ YES —  COMPLAINANT INJURED? ☐ YES ☐ NO

| METHOD OF ENTRY ☐ UNK. | METHOD OF ESCAPE ☐ UNK. | DESCRIBE WEAPON ☐ UNK. | |
|---|---|---|---|
| NO. OF PERPETRATORS ☐ UNK. 1 | DESCRIBE: ☒ MALE ☐ UNK. ☐ FEMALE | ☐ JUVENILE ☐ UNK. ☒ ADULT | ☐ WHITE ☐ OTHER ☒ BLACK ☐ UNK. | TOTAL VALUE $ |

| VICTIM — PERPETRATOR RELATIONSHIP ☐ RELATED ☐ ACQUAINTED ☐ STRANGERS ☐ UNK. | UNIT(S) NOTIFIED | NAME | TIME DATE |
|---|---|---|---|

## WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER.)

| ARREST(S) ☒ YES ☐ NO | DESCRIPTION(S) OF PERPETRATOR(S) ☒ YES ☐ NO | WITNESS(ES) ☒ YES ☐ NO | VEHICLE LICENSE NUMBER(S) ☐ YES ☒ NO | PHYSICAL EVIDENCE ☒ YES ☐ NO |
|---|---|---|---|---|

ARRESTED:  CURTIS LENLLEN COLLINS  20/B/M  D.O.B. ▓▓▓▓▓▓

    Writer responded to Recorders Court, Courtroom #202 and talked with

A.P.A. James Gonzales.  Writer was directed by A.P.A. Gonzales to arrest

the above subject for prejury.  The above subject was a witness in a

homicide case and testified at an Exam held in 36th Dist. Ct. and testified

at a trial being held in Recorders Court this date.  After being sworn the

above subject in direct oppsite to his testimony at 36th Dist. Ct.

| REPORTING OFFICER (PRINT OR TYPE) RONALD D. GALE | OTHER OFFICERS INVOLVED | BADGE | COMMAND | FURLOUGH |
|---|---|---|---|---|
| SIGNATURE | | | | |
| BADGE S-29 | COMMAND HOMICIDE | ASSIGNMENT SO-6 | FURLOUGH | |
| SUPERVISOR CHECKING REPORT (PRINT OR TYPE) RONALD D. GALE | RANK SGT. | SIGNATURE | | COMPUTER ENTRY BY |

D.P.D. 108  C of D—705-RE (Rev. 9-81)  (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED)  DETROIT POLICE DEPARTMENT

133

| PRECINCT/SECTION HOMICIDE SECTION | | | COMPLAINANT | | |
|---|---|---|---|---|---|

| DATE 8-31-92 | TIME 3:25 PM | PLACE HOMICIDE SECTION | STATEMENT TAKEN BY SGT. RONALD D. GALE   #S-29 | | |
|---|---|---|---|---|---|

| WITNESS CURTIS LENLLEN COLLINS | RACE/SEX/AGE B/M/20 | D.O.B. 8-15-72 | HGT. 5-11 | WGT 14 |
|---|---|---|---|---|

| SOC. SEC. NO. 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 | RESIDENCE 12591 CORBETT | PHONE BUS. RES. 839-0319 |
|---|---|---|

| EMPLOYER UNEMPLOYED | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH: MOTHER---CARRIE COLLINS | CHILDREN/SCHOOL: |
|---|---|

| RELATIVES/FRIENDS: CARRIE COLLINS  (MOTHER) | ADDRESS SAME | PHONE SAME |
|---|---|---|

Q.  Mr. Collins, is it true that you had the detention officers on the 9th floor of Police Headquarters contact me, Sgt. Gale, indicating that you wish to talk to me?

A.  Yes.

Q.  Mr. Collins, did anyone force you to have the detention officers call me?

A.  No, I just ask them to call you.

Q.  So, is it correct that you actually wanted to talk to me of your own free will?

A.  Yes.

Q.  Mr. Collins, you both read your rights and had your rights read to you earlier, is that correct?

A.  Yes.

Q.  Did you understand each of your rights?

A.  Yes.

Q.  Did you have or do you now have any questions about any of your rights?

A.  No.

Q.  Mr. Collins, do you understand that you still have the same rights that read earlier and that you had read to you?

A.  Yes.

Q.  Mr. Collins, do you wish to answer some questions or to make a statement regarding your testifying at Recorders Court today, Monday, 8-31-92?

A.  Yes.

Q.  Mr. Collins, did you testify in Recorders Court today, 8-31-92 at a homicide trial?

A.  Yes.

Q.  Did you also testify at a hearing that was held at 36th Dist Court involving this same homicide case?

A.  Yes.                    x Curtis Collins

SPD 153 (REV. 4-76)                                          C:D—72-S1

134

Q. Mr. Collins, when you testified at that hearing which was held earlier at 36th Dist. Court, did you tell the truth as to what you knew about the homicide?

A. Yes.

Q. When you testified at the hearing that was held today, 8-31-92 at Recorders Court, did you tell the truth as to what you knew about the homicide?

A. No.

Q. Why didn't you tell the truth when you testified at Recorders Court today, 8-31-92?

A. I was scared.

Q. What were you scared of?

A. When I got out of jail, July 20th, I heard that people were looking for me.

Q. Who was suppose to be looking for you?

A. I don't know any body's name.

Q. Why were these people looking for you?

A. Involving this case with GHOST.

Q. Did anyone actually threaten you?

A. Not in my face or nothing like that, I was just hearing rumors.

Q. Did any of these rumors say what was going to happen to you?

A. Just that they were going to catch me and kill me or beat me up.

Q. No one actually came up to you and threaten you, is that correct?

A. That's correct.

x _Curtis Collins_

EXHIBIT FF





STATE OF MICHIGAN
**DEPARTMENT OF STATE POLICE**
LANSING

**JENNIFER M. GRANHOLM**
GOVERNOR

**COL. PETER C. MUNOZ**
DIRECTOR

DEC 2 0 2007

MS LINDA HUBBARD
14052 CARLISLE ST
DETROIT, MI 48205-1205

RE:  CR-2032-08  COLLINS, CURTIS

Dear MS HUBBARD:

The Department of State Police has received your request for certain information and has processed it under the provisions of the Michigan Freedom of Information Act (FOIA), P.A. 442, of 1976, as amended.

The records you have requested have been:

☐　　Granted.

☒　　Granted in part and denied in part.  Portions of your request are exempt from disclosure based on provisions set forth in the Act. (See comments on the back of this letter.) Under the FOIA, Section 10 (a copy of which is enclosed), you have the right to appeal to the head of this public body or to a judicial review of the denial.

☐　　Denied.  (See comments on the back of this letter.) Under the FOIA, Section 10 (a copy of which is enclosed), you have the right to appeal to the head of this public body or to a judicial review of the denial.

☐　　Your request for photographs has been sent to the Michigan State Police Photo Lab.  The Photo Lab will contact you regarding the cost for processing your request.

Please pay the amount of $ —0—  to the address below.  The check or money order should be made payable to the STATE OF MICHIGAN.  To ensure proper credit, please enclose a copy of this letter with your payment.  Once we receive payment the documents will be mailed to you.

If you have questions concerning this matter, please feel free to contact our office at the address below, and enclose a copy of this correspondence.

Sincerely,

Linda Ortiz
Assistant FOIA Coordinator
Michigan State Police

137

**DENIAL OF RECORDS:**

Denial is based on the following provision(s) of the Freedom of Information Act (those that apply will be checked.)

☐ (a)  Information of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy.
☐ telephone number(s)  ☐ address(es)  ☐ date(s) of birth  ☐ physical characteristics.  ☐ driver license number(s)
☐ other _____

☐ (b)  Investigating records compiled for law enforcement purposes, but only to the extent that disclosure would do any of the following:
    ☐ (i)  Interfere with law enforcement proceedings.
    ☐ (ii)  Deprive a person of the right to a fair trial or impartial administrative adjudication
    ☐ (iii)  Constitute an unwarranted invasion of personal privacy.
    ☐ (iv)  Disclose the identity of a confidential source, or if the record is compiled by a law enforcement agency in the course of a criminal investigation, disclose confidential information furnished only by a confidential source.
    ☐ (vi)  Endanger the life or physical safety of law enforcement personnel.

☐ (d)  Records or information specifically described and exempted from disclosure by statute.
Statute: _____

☐ (m)  Communications and notes within a public body or between public bodies of an advisory nature to the extent that they cover other than purely factual materials and are preliminary to a final agency determination of policy or action.

☐ (n)  Records of law enforcement communication codes, or plans for deployment of law enforcement personnel, that if disclosed would prejudice a public body's ability to protect the public.

☐ (s)  Unless the public interest in disclosure outweighs the public interest in nondisclosure in the particular instance, public records of a law enforcement agency, the release of which would do any of the following:
    ☐ (i)  Identify or provide a means of identifying an informer.
    ☐ (ii)  Identify or provide a means of identifying a law enforcement undercover officer or agent or a plain clothes officer as a law enforcement officer or agent .
    ☐ (viii)  Identify or provide a means of identifying a person as a law enforcement officer, agent, or informer.
    ☐ (ix)  Disclose personnel records of law enforcement agencies.

☐ (u)  Records of a public body's security measures, including security plans, security codes and combinations, passwords, passes, keys, and security procedures, to the extent that the records relate to the ongoing security of the public body.

☐ (w)  Information or records that would disclose the social security number of any individual.

☐  Your request is denied under the authority of Section 13(1)(a) above.  However, if you provide a notarized, signed release of information from the individual to whom the records pertain, you will receive that information to which the individual signing the release is entitled.

☒  To the best of the Department's knowledge, information, and belief, under the information provided by you or by any other description reasonably known to the Department, the public records do not exist within the Department.

*We do not have any records on a perjury charge.*

☐  Based on the information you provided, we are unable to locate any records pertaining to the incident you described.  In order for us to continue processing your request, please comply with the following items.  To ensure proper handling of your request, please include a copy of this letter with your response.
    ☐  Specific location (i.e. city, county.)
    ☐  Michigan State Police incident number
    ☐  Names of those involved in the incident
    ☐  Specific dates (i.e., date of incident)
    ☐  Name of driver and their birth date or driver license number
    ☐  Date of birth

☐  The report you have requested has not yet been completed and filed.  Please resubmit your request in 30 days.

**Additional Comments:**

13e




**Search Results - Printer Friendly Format**

Data Searched on:   Close   Print

| Last Name | First Name | Middle Initial | DOB | Race | Sex | More Criteria |
|-----------|-----------|----------------|-----|------|-----|---------------|
| COLLINS | CURTIS | L | 8/15/1972 | Unknown/Other | Male | |

Based on the information provided, the following is a certified result of the search as of 12/12/2007 8:29 AM

---

**Important:  Information Contained in this Record**

THE RECORD RESULTS PROVIDED HERE ARE BASED ON A COMPUTER MATCH AS EXPLAINED ON THE ICHAT HOME PAGE. THE ICHAT SYSTEM HAS LIMITATIONS THAT MAY CAUSE FALSE POSITIVES OR FALSE NEGATIVES. PLEASE REVIEW THE RESULTS CAREFULLY AND DO NOT TAKE ADVERSE ACTION BASED SOLELY ON THIS RECORD. IF YOU CANNOT DETERMINE THAT THESE RESULTS DO NOT BELONG TO THIS INDIVIDUAL, AND THE INDIVIDUAL IS DISPUTING THE RECORD, PLEASE PROVIDE THAT INDIVIDUAL WITH A COPY OF THIS REPORT AND OFFER THAT INDIVIDUAL THE OPPORTUNITY TO PERFORM A RECORD CHALLENGE BY SUBMITTING FINGERPRINTS. THIS IS EXPLAINED AT THE BOTTOM OF THIS PAGE.

---

NOTE: Highlighted fields indicate the record is not an exact match.

MICHIGAN CRIMINAL HISTORY RECORD INFORMATION MEETING DISSEMINATION CRITERIA
FOR SID: 1593896H AS OF 12/12/2007

```
NAM: COLLINS,CURTIS LENLLEE              SID: 1593896H
            SEX: M          DOB: 08/15/1972   FBI: 13761NA2
HGT: 505    WGT: 140        HAI: BLK          III: MICHIGAN ONLY
EYE: BLK    POB: MI
DLN:                                          MNU:
PRN: 217891
CIZ:


AFIS PRINTS AVAILABLE: YES
PALM PRINTS AVAILABLE: YES
PHOTO AVAILABLE: YES

SCAR/MARK/TATTOO:   SC LF ARM

ADDITIONAL IDENTIFIERS AND COMMENTS:

NAM:  COLLINS,CURTIS          COLLINS,CURTIS LENELL
      COLLINS,CURTIS L        COLLINS,CURTIS LENLLEN
```

139

```
===============================================================
CRIMINAL TRACKING NUMBER: 829111170602        INCIDENT DATE: 04/23/1991
NAME USED: COLLINS,CURTIS LENLLEE
===============================================================
ARREST SEGMENT          : CHARGE SEGMENT      : JUDICIAL SEGMENT
===============================================================
DATE: 04/23/1991        : DATE: 04/23/1991    : DATE: 07/09/1991
MI8234900               : MI8234900           : MI8320031J
DETROIT POLICE          : WAYNE COUNTY        : XX CT DETROIT RECORDERS
  DEPARTMENT            : PROSECUTING ATT     : CFN: 9100509202
OCA: 497089             : 1 CNT MCL 333.74012A4 :
1 CNT OF 3500           : FELONY              : CNT-1 MCL 333.74012A4
  FELONY                : CONTROLLED          :   FELONY
  DANGEROUS DRUGS       : SUBSTANCE-DEL/MFG   :   CONTROLLED
DISP: CHGD BY PROSECUTOR : LESS THAN 50 GRAMS :   SUBSTANCE-DEL/MFG
                        :                     :   LESS THAN 50 GRAMS
                        :                     : DISP: FOUND GUILTY
                        :                     : SENT/REMARKS:
                        :                     : CONFINEMENT FOR 01 YR
                        :                     :   00 MTH 000 DAY TO 20
                        :                     :   YR 00 MTH 000 DAY AT
                        :                     :   SPSM
```

140

```
===============================================================
CRIMINAL TRACKING NUMBER: 829330413201          INCIDENT DATE: 02/13/1993
NAME USED: COLLINS,CURTIS LENELL
===============================================================
ARREST SEGMENT              CHARGE SEGMENT          JUDICIAL SEGMENT
========================== : ================= : =======================
DATE: 02/13/1993           : DATE: 02/13/1993  : DATE: 03/25/1993
MI8234900                  : MI8234900  A      : MI820031J
DETROIT POLICE             : WAYNE COUNTY       : XX CT DETROIT RECORDERS
  DEPARTMENT               :   PROSECUTING ATT  : CFN: 9300246301
OCA: 497089                : 1 CNT MCL 333.74012A4 :
1 CNT OF 3500              :   FELONY           : CNT-1 MCL 333.74012A4
  FELONY                   :   CONTROLLED       :   FELONY
  DANGEROUS DRUGS          :   SUBSTANCE-DEL/MFG :   CONTROLLED
DISP: CHGD BY PROSECUTOR : :   LESS THAN 50 GRAMS :   SUBSTANCE-DEL/MFG
                           :                    :   LESS THAN 50 GRAMS
                           :                    : DISP: FOUND GUILTY
                           :                    : SENT/REMARKS:
                           :                    : CONFINEMENT FOR 01 YR
                           :                    :   00 MTH 000 DAY TO 00
                           :                    :   YR 00 MTH 000 DAY AT
                           :                    :   WDF
                           :                    :
                           :                    : DATE: 03/25/1993
                           :                    : MI821095J
                           :                    : 3RD   CIRCUIT COURT
                           :                    :   CRIMINAL DIV DETROIT
                           :                    : CFN: 9300246301
                           :                    :
                           :                    : CNT-1 MCL 333.74012A4
                           :                    :   FELONY
                           :                    :   CONTROLLED
                           :                    :   SUBSTANCE-DEL/MFG
                           :                    :   LESS THAN 50 GRAMS
                           :                    : DISP: FOUND GUILTY
                           :                    : SENT/REMARKS:
                           :                    : PROB & CONFN 01YR 00MTH
                           :                    :   000DAY TO 00YR 00MTH
                           :                    :   000DAY PROB: 00YR
                           :                    :   00MTH 000DAY
```

141

```
                          Print Key Output                           Page   1
5769SS1 V4R1M0 970829              S1020098            12/14/99  11:21:23

    Display Device . . . . . :  FMCTDSPHP
    User . . . . . . . . . . :  LOOKERS

CAS 00    FELONY        12/14/1999  CASE STATUS CLOSED        CASE   2 OF  2
CASE #  91005092   2  NAME  COLLINS,CURTIS,            LPD  497089       V
D36 91059798    2  PR# 91111706   2  AGCY WCS99     SID  1593896 COLLINS,CURTI
S J A I L / B A I L  S T A T U S   A T T O R N E Y S   D I S P O S I T I O N
JUDGE TENNEN       DATE 04/25/1991 A DEF ALEXANDER,MA  DISPOSED ON 07/09/1991
TYPE  10% BOND     AMNT    5000      PRO BEADLE,THOMA  CONFINEMENT      SPSM
LOCN               BND # 9101595     BDJ TENNEN        01Y      - 20Y
                                     APP              CR 3 DAYS WCJ

DOB: 08/15/1972
CHGS/RESULTS       FILINGS/RESULTS   PROCEEDING   DATE      JUDGE       RESULT
33374012A4      G  01  05/29/1991    WARRANT    04/24/1991 SHANNON    SIGNED
DEL/CNSB<50G        REFER PROB.   GR WARRANT    04/24/1991 PROSECUTOR RECOMMEN
                                     ARR-WRNT   04/25/1991 HALLORAN   MUTE N/C
                                     EXAM       05/03/1991 SVENSON    WAVD B/C
                                     ASSGNMNT   05/07/1991 ROBERSON   TEAM-3
                                     ARR-INFO   05/17/1991 TENNEN     HELD
                                     DSPN CON   05/17/1991 TENNEN     HELD
                                     CAL-CONF   05/29/1991 TENNEN     PLD GLTY
                                     SENTENCE   07/09/1991 COLOMBO    SENTENCE

                                                              Bottom
```

142

```
                    Print Key Output                              Page   1
   5769SS1 V4R1M0 970829              S1020098          12/23/99  09:49:42


      Display Device  . . . . . :  FMCTDSPFQ
      User  . . . . . . . . . :  LOOKERS


   CAS 00    FELONY          12/23/1999  CASE STATUS PROBATION    DEF   1 OF 1
   CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL        LPD  497089      V
   D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
   S J A I L / B A I L  S T A T U S    A T T O R N E Y S   D I S P O S I T I O N
   JUDGE DRAIN          DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
   TYPE  REMANDED      AMNT            PRO SKYWALKER,LU   LIFE/PROB       WDF
   LOCN               BND # 9300928    BDJ               $240 CST
                                       APP               CONT'D;30H C/S;DRUG TRM
```

DOB: 08/15/1972

| CHGS/RESULTS | | FILINGS/RESULTS | | PROCEEDING | DATE | JUDGE | RESULT |
|---|---|---|---|---|---|---|---|
| 33374012A4 | G | 01 | 02/16/1993 | WARRANT | 02/14/1993 | ATKINS | SIGNED |
| DEL/CNSB<50G | | P.A.511 ELGB | FL ARR-WRNT | 02/14/1993 | ATKINS | MUTE N/G |
| 7741 | G | 01 | 02/24/1993 | WARRANT | 02/14/1993 | PROSECUTOR | RECOMMEN |
| PROB VIOL. | | RAISE BOND | FL EXAM | 02/24/1993 | BRADFIELD | HELD B/C |
| | | 03/10/1993 | ASSGNMNT | 03/02/1993 | ROBERSON | TEAM-5 |
| | | SET BOND | FL ARR-INFO | 03/10/1993 | ROBERSON | HELD |
| | | 03/10/1993 | DSPN CON | 03/10/1993 | ROBERSON | PLD GLTY |
| | | REFER PROB. | FL SENTENCE | 03/23/1993 | ROBERSON | A/NO REF |
| | | 03/23/1993 | SENTENCE | 03/25/1993 | ROBERSON | SENTENCE |
| | | TO ADJOURN | FL VIOL HRN | 06/16/1995 | ROBERSON | HELD |
| | | 07/01/1993 | ARR-VIOL | 09/21/1999 | DRAIN | MUTE V/P |
| | | PRBN AMENDED | FL VIOL HRN | 09/21/1999 | DRAIN | PLEA/VIO |
| | | 06/09/1995 | SENTENCE | 10/08/1999 | DRAIN | RESNTNCE |
| | | | | | | | More... |

143

```
                      Print Key Output                          Page   1
   5769SS1 V4R1M0 970829              S1020098       12/23/99  09:49:42

     Display Device . . . . . :  FMCTDSPFQ
     User . . . . . . . . . :  LOOKERS


CAS 00    FELONY          12/23/1999  CASE STATUS PROBATION    DEF   1 OF  1
CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL         LPD  497089      V
D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
S J A I L / B A I L   S T A T U S   A T T O R N E Y S   D I S P O S I T I O N
JUDGE DRAIN        DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
TYPE  REMANDED     AMNT              PRO SKYWALKER,LU  LIFE/PROB        WDF
LOCN               BND # 9300928     BDJ                  $240 CST
                                     APP              CONT'D;30H C/S;DRUG TRM

DOB: 08/15/1972
CHGS/RESULTS        FILINGS/RESULTS    PROCEEDING   DATE      JUDGE       RESULT
33374012A4      G  01  02/16/1993      WARRANT    02/14/1993 ATKINS     SIGNED
DEL/CNSB<50G           P.A.511 ELGB FL ARR-WRNT   02/14/1993 ATKINS     MUTE N/G
7741            G  01  02/24/1993      WARRANT    02/14/1993 PROSECUTOR RECOMMEN
PROB VIOL.            RAISE BOND   FL EXAM       02/24/1993 BRADFIELD  HELD B/C
                      03/10/1993      ASSGNMNT   03/02/1993 ROBERSON   TEAM-5
                     SET BOND      FL ARR-INFO   03/10/1993 ROBERSON   HELD
                      03/10/1993      DSPN CON   03/10/1993 ROBERSON   PLD GLTY
                     REFER PROB.   FL SENTENCE   03/23/1993 ROBERSON   A/NO REF
                      03/23/1993      SENTENCE   03/25/1993 ROBERSON   SENTENCE
                     TO ADJOURN    FL VIOL HRN   06/16/1995 ROBERSON   HELD
                      07/01/1993      ARR-VIOL   09/21/1999 DRAIN      MUTE V/F
                     PRBN AMENDED  FL VIOL HRN   09/21/1999 DRAIN      PLEA/VIO
                      06/09/1995      SENTENCE   10/08/1999 DRAIN      RESNTNCE
                                                                      More...
```

144

```
                    Print Key Output                          Page  1
 5769SS1 V4R1M0 970829              S1020098        12/14/99  11:21:50

    Display Device  . . . . . :  FMCTDSPHP
    User  . . . . . . . . . . :  LOOKERS

CAS 00    FELONY          12/14/1999  CASE STATUS PROBATION    DEF   1 OF  1
CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL          LPD   497089     V
D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
S J A I L / B A I L   S T A T U S    A T T O R N E Y S    D I S P O S I T I O N
JUDGE DRAIN           DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
TYPE  REMANDED        AMNT              PRO SKYWALKER,LU   LIFE/PROB     WDF
LOCN              BND # 9300928         BDJ                   $240 CST
                                        APP               CONT'D;30H C/S;DRUG TRM

DOB: 08/15/1972
CHGS/RESULTS         FILINGS/RESULTS    PROCEEDING   DATE     JUDGE      RESULT
33374012A4       G  01  02/16/1993      WARRANT    02/14/1993 ATKINS    SIGNED
DEL/CNSB<50G         P.A.511 ELGB FL ARR-WRNT      02/14/1993 ATKINS    MUTE N/G
7741             G  01  02/24/1993      WARRANT    02/14/1993 PROSECUTOR RECOMMEN
PROB VIOL.          RAISE BOND   FL EXAM           02/24/1993 BRADFIELD HELD B/O
                    03/10/1993      ASSGNMNT       03/02/1993 ROBERSON  TEAM-5
                    SET BOND     FL ARR-INFO       03/10/1993 ROBERSON  HELD
                    03/10/1993      DSPN CON       03/10/1993 ROBERSON  PLD GLTY
                    REFER PROB.  FL SENTENCE       03/23/1993 ROBERSON  A/NO REP
                    03/23/1993      SENTENCE       03/25/1993 ROBERSON  SENTENCE
                    TO ADJOURN   FL VIOL HRN       06/16/1995 ROBERSON  HELD
                    07/01/1993      ARR-VIOL       09/21/1999 DRAIN     MUTE V/P
                    PRBN AMENDED FL VIOL HRN       09/21/1999 DRAIN     PLEA/VIO
                    06/09/1995      SENTENCE       10/08/1999 DRAIN     RESNTNCE
                                                                        More...
```

145

```
                          Print Key Output                          Page   1
   5769SS1 V4R1M0 970829                  S1020098           12/23/99  09:49:42


     Display Device  . . . . . :  FMCTDSPFQ
     User  . . . . . . . . . :  LOOKERS


CAS 00    FELONY          12/23/1999  CASE STATUS PROBATION    DEF   1 OF 1
CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL          LPD   497089      V
D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
S J A I L / B A I L   S T A T U S    A T T O R N E Y S    D I S P O S I T I O N
 JUDGE DRAIN          DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
 TYPE  REMANDED      AMNT              PRO SKYWALKER,LU  LIFE/PROB      WDF
 LOCN              BND # 9300928       BDJ               $240 CST
                                       APP               CONT'D;30H C/S;DRUG TRM

DOB: 08/15/1972
CHGS/RESULTS          FILINGS/RESULTS   PROCEEDING   DATE      JUDGE      RESULT
33374012A4       G  01  02/16/1993      WARRANT    02/14/1993 ATKINS    SIGNED
DEL/CNSB<50G         P.A.511 ELGB FL ARR-WRNT    02/14/1993 ATKINS    MUTE N/G
7741             G  01  02/24/1993      WARRANT    02/14/1993 PROSECUTOR RECOMMEN
PROB VIOL.          RAISE BOND   FL EXAM        02/24/1993 BRADFIELD  HELD B/O
                    03/10/1993      ASSGNMNT   03/02/1993 ROBERSON   TEAM-5
                    SET BOND     FL ARR-INFO   03/10/1993 ROBERSON   HELD
                    03/10/1993      DSPN CON   03/10/1993 ROBERSON   PLD GLTY
                    REFER PROB.  FL SENTENCE   03/23/1993 ROBERSON   A/NO REP
                    03/23/1993      SENTENCE   03/25/1993 ROBERSON   SENTENCE
                    TO ADJOURN   FL VIOL HRN   06/16/1995 ROBERSON   HELD
                    07/01/1993      ARR-VIOL   09/21/1999 DRAIN      MUTE V/P
                    PRBN AMENDED FL VIOL HRN   09/21/1999 DRAIN      PLEA/VIO
                    06/09/1995      SENTENCE   10/08/1999 DRAIN      RESNTNCE
                                                                    More...
```

14G

```
                        Print Key Output                              Page   1
  5769SS1 V4R1M0 970829                  S1020098         12/14/99  11:22:09


   Display Device  . . . . . :  FMCTDSPHP
   User  . . . . . . . . . :  LOOKERS


 CAS 00   FELONY          12/14/1999  CASE STATUS PROBATION    DEF   1 OF 1
 CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL          LPD   497089      V
 D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
 S J A I L / B A I L   S T A T U S    A T T O R N E Y S    D I S P O S I T I O N
 JUDGE DRAIN          DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
 TYPE  REMANDED       AMNT              PRO SKYWALKER,LU   LIFE/PROB       WDF
 LOCN                 BND # 9300928     BDJ                  $240 CST
                                        APP              CONT'D;30H C/S;DRUG TRM

  DOB: 08/15/1972
 CHGS/RESULTS            FILINGS/RESULTS   PROCEEDING   DATE    JUDGE      RESULT
                         WRNT VIOL PR SF
                          06/09/1995
                         WRNT VIOL PR SF
                          06/15/1995
                         VP WNT ASIDE SF
                          06/15/1995
                         PRBN CONTD   SF
                          06/16/1995
                         ASSGN COUNSL SF
                          06/16/1995
                         VP WNT ASIDE SF
                          06/16/1995
                         PRBN CONTD   SF

                                                               More...
```

149

```
                      Print Key Output                          Page  1
   5769SS1 V4R1M0 970829              S1020098        12/14/99 11:22:17

     Display Device  . . . . . :  FMCTDSPHP
     User  . . . . . . . . . :  LOOKERS


 CAS 00    FELONY       12/14/1999  CASE STATUS PROBATION    DEF   1 OF  1
 CASE #  93002463  1  NAME  COLLINS,CURTIS,LENELL          LPD  497089    V
 D36 93056914   1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
 S J A I L / B A I L  S T A T U S  A T T O R N E Y S  D I S P O S I T I O N
 JUDGE DRAIN        DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
 TYPE  REMANDED     AMNT              PRO SKYWALKER,LU  LIFE/PROB        WDF
 LOCN              BND # 9300928     BDJ                   $240 CST
                                     APP              CONT'D;30H C/S;DRUG TRM
 DOB: 08/15/1972
 CHGS/RESULTS          FILINGS/RESULTS   PROCEEDING   DATE    JUDGE      RESULT
                          08/07/1995
                       WRNT VIOL PR SF
                          09/21/1999
                       VP WNT ASIDE SF
                          09/21/1999
                       REFER PROB.  SF
                          10/06/1999
                       BRF/MEMO     FL
                          10/08/1999
                       PAY COSTS    SF
                          10/08/1999
                       COMM/SERV    SF
                          10/08/1999

                                                          More...
```

148

```
                    Print Key Output                          Page   1
  5769SS1 V4R1M0 970829              S1020098        12/14/99  11:22:25

      Display Device  . . . . . :  FMCTDSPHP
      User . . . . . . . . . . :  LOOKERS

 CAS 00    FELONY          12/14/1999  CASE STATUS PROBATION    DEF    1 OF 1
 CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL        LPD   497089     V
 D36 93056914    1  PR# 93304132   1  AGCY DPD5      SID   1593896 COLLINS,CURTI
 S J A I L / B A I L  S T A T U S    A T T O R N E Y S   D I S P O S I T I O N
 JUDGE DRAIN          DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
 TYPE   REMANDED      AMNT            PRO SKYWALKER,LU  LIFE/PROB       WDF
 LOCN             BND # 9300928      BDJ               $240 CST
                                     APP               CONT'D;30H C/S;DRUG TRM
 DOB: 08/15/1972
 CHGS/RESULTS         FILINGS/RESULTS   PROCEEDING   DATE     JUDGE      RESULT
                      PRBN CONTD     SF
```

Bottom

149

```
                    Print Key Output                          Page   1
5769SS1 V4R1M0 970829              S1020098        12/14/99  11:22:17

   Display Device  . . . . . :  FMCTDSPHP
   User  . . . . . . . . . :  LOOKERS


CAS 00    FELONY           12/14/1999  CASE STATUS PROBATION   DEF   1 OF  1
CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL          LPD  497089       V
D36 93056914   1  PR# 93304132   1  AGCY DPD5       SID   1593896 COLLINS,CURTI
S J A I L / B A I L  S T A T U S   A T T O R N E Y S   D I S P O S I T I O N
 JUDGE DRAIN          DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
 TYPE  REMANDED       AMNT             PRO SKYWALKER,LU  LIFE/PROB        WDF
 LOCN           BND # 9300928         BDJ                    $240 CST
                                      APP              CONT'D;30H C/S;DRUG TRM

 DOB: 08/15/1972
CHGS/RESULTS          FILINGS/RESULTS    PROCEEDING   DATE    JUDGE     RESULT
                        08/07/1995
                        WRNT VIOL PR SF
                        09/21/1999
                        VP WNT ASIDE SF
                        09/21/1999
                        REFER PROB.  SF
                        10/06/1999
                        BRF/MEMO     FL
                        10/08/1999
                        PAY COSTS    SF
                        10/08/1999
                        COMM/SERV    SF
                        10/08/1999
                                                           More...
```

```
                        Print Key Output                          Page   1
5769SS1 V4R1M0 970829                 S1020098        12/14/99  11:22:25

   Display Device  . . . . . :  FMCTDSPHP
   User  . . . . . . . . . :  LOOKERS


CAS 00    FELONY          12/14/1999  CASE STATUS PROBATION    DEF   1 OF  1
CASE #  93002463   1  NAME  COLLINS,CURTIS,LENELL        LPD   497089      V
D36 93056914   1  PR# 93304132   1  AGCY DPD5     SID   1593896 COLLINS,CURTI
S J A I L / B A I L   S T A T U S    A T T O R N E Y S    D I S P O S I T I O N
JUDGE DRAIN        DATE 09/21/1999 A DEF SMITH,CURTIS  DISPOSED ON 10/08/1999
TYPE  REMANDED     AMNT              PRO SKYWALKER,LU  LIFE/PROB       WDF
LOCN              BND # 9300928     BDJ                  $240 CST
                                    APP              CONT'D;30H C/S;DRUG TRM
   DOB: 08/15/1972
CHGS/RESULTS           FILINGS/RESULTS    PROCEEDING   DATE    JUDGE     RESULT
                        PRBN CONTD    SF




                                                           Bottom
```

EXHIBIT GG

152

R3   FILE NO. 92-001856-01 FY          JOURNAL OF THE RECORDERS COURT          DATE MARCH   26, 2008   PAGE   1

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:          PENN, RODNELL,

HUBBARD, CARL,

LPD NUMBER 453171
STATUTE/ORDINANCE: 750.227B-A
WEAPONS FELONY FIREARM

DATE OF EVENT          EVENT DESCRIPTION

JANUARY  24, 1992     WARRANT          NO BOND SET
                      SIGNED WARRANT
                      JUDGE: CHENEVERT, IRMA,
                                              NO CHANGE
                      REPORTER: UNREPORTED,                              CERT#: 3001

JANUARY  24, 1992     ARR-WRNT     REMANDED TO JAIL - NO BOND
                      DEFENDANT STANDS MUTE; PLEA OF NOT GUILTY ENTERED BY COURT
                      JUDGE: CHENEVERT, IRMA,
                                              NO CHANGE
                      REPORTER: DIXON, RONNIE,                           CERT#: 0000

JANUARY  24, 1992     WARRANT ISS
                      WARRANT RECOMMENDED
                      JUDGE: PROSECUTOR
                      PROSECUTION     :     SATTLER, ROBERT J
                      REPORTER: ** UNKNOWN REPORTER
                      NEXT SCHEDULED PROCEEDING:
                      EXAM-AM
                      ON FEBRUARY   4, 1992     BEFORE JUDGE LIPSCOMB, WILLIE G JR

FEBRUARY  4, 1992     EXAM     BOND CONTINUED
                      PROCEEDING HELD; DEFENDANT WAS BOUND OVER
                      JUDGE: LIPSCOMB, WILLIE G JR
                      RETAINED COUNSEL   :   ATTORNEY UNREPORTED
                      PROSECUTION   :   GRUSKIN, MICHAEL L
                      REPORTER: PETERSON, CHERYL                         CERT#: 0000
                      BAIL WAS FIXED AT       $0.00
                      NEXT SCHEDULED PROCEEDING:
                      ARRAIGNMENT ON INFORMATION
                      ON FEBRUARY  11, 1992     BEFORE JUDGE ROBERSON, DALTON A

FEBRUARY  6, 1992     ASSGNMNT
                      TEAM-6
                      JUDGE: ROBERSON, DALTON A
                      REPORTER: ** UNKNOWN REPORTER

FEBRUARY  11, 1992    ARR-INFO     REMANDED TO JAIL - NO BOND
                      HELD
                      JUDGE: O'BRIEN, JOHN PATRICK
                      RETAINED COUNSEL   :   GILES, RONALD,
                      PROSECUTION   :   RAYMOND, LISA, A
                      REPORTER: SCOTT, SHERRY,                           CERT#: 4640

                      ( C O N T I N U E D )

193

FILE NO. 92-001056-01 FY                JOURNAL OF THE RECORDERS COURT                DATE MARCH   26, 2008    PAGE  2

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:        PENN, RODNELL,

HUBBARD, CARL,                              LPD NUMBER 453171

DATE OF EVENT                           EVENT DESCRIPTION

FEBRUARY  11, 1992      DSPN CONF      REMANDED TO JAIL - NO BOND
                       HELD
                       JUDGE: O'BRIEN,JOHN PATRICK
                       RETAINED COUNSEL    :    GILES,RONALD,
                       PROSECUTION         :    RAYMOND,LISA,A
                       REPORTER: SCOTT,SHERRY,                      CERT#: 4640

FEBRUARY  11, 1992      FILING      ORDER FOR PRODUCTION OF EXAM TRANSCRIPT
                       FILED
                       REMANDED TO JAIL - NO BOND
                       JUDGE: O'BRIEN,JOHN PATRICK
                       RETAINED COUNSEL    :    GILES,RONALD,
                       PROSECUTION         :    RAYMOND,LISA,A
                       REPORTER: ** UNKNOWN REPORTER

FEBRUARY  11, 1992      FILING      APPEARANCE BY A RETAINED ATTORNEY
                       FILED
                       REMANDED TO JAIL - NO BOND
                       JUDGE: O'BRIEN,JOHN PATRICK
                       RETAINED COUNSEL    :    GILES,RONALD,
                       PROSECUTION         :    RAYMOND,LISA,A
                       REPORTER: ** UNKNOWN REPORTER
                       NEXT SCHEDULED PROCEEDING:
                            CAL-CONF
                            ON FEBRUARY  14, 1992    BEFORE JUDGE SHAMO,M JOHN

FEBRUARY  14, 1992      CAL-CONF     BOND CONTINUED
                       HELD
                       JUDGE: SHAMO,M JOHN

                       PROSECUTION     :    NO CHANGE
                                            GONZALES,JAMES             CERT#: 3001
                       REPORTER: UNREPORTED,
                       BAIL WAS FIXED AT        $0.00
                       NEXT SCHEDULED PROCEEDING:
                            FINAL-CONF
                            ON MARCH   20, 1992    BEFORE JUDGE SHAMO,M JOHN

FEBRUARY  19, 1992      FILING      SUPPLEMENTAL INFORMATION
                       FILED
                       JUDGE: SHAMO,M JOHN
                       REPORTER: ** UNKNOWN REPORTER

MARCH     13, 1992      FILING      NOTICE OF ALIBI
                       FILED
                       JUDGE: SHAMO,M JOHN
                       REPORTER: ** UNKNOWN REPORTER

                            (C O N T I N U E D)

154

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:     PENN, RODNELL,

HUBBARD, CARL,                              LPD NUMBER 453171

| DATE OF EVENT | EVENT DESCRIPTION |
|---|---|
| MARCH 20, 1992 | ARR-HBTL     REMANDED TO JAIL - NO BOND<br>HELD<br>JUDGE: SHAMO, M JOHN<br><br>PROSECUTION     :     NO CHANGE<br>REPORTER: SEGUIN, ANNETTE,     GONZALES, JAMES<br><br>CERT#: 2184 |
| MARCH 20, 1992 | FINAL-CONF   BOND CONTINUED<br>HELD<br>JUDGE: SHAMO, M JOHN<br><br>PROSECUTION     :     NO CHANGE<br>REPORTER: SEGUIN, ANNETTE,     GONZALES, JAMES<br>BAIL WAS FIXED AT     $0.00<br><br>CERT#: 2184 |
| MARCH 20, 1992 | FILING     FOR DISCOVERY<br>HEARD AND GRANTED<br>REMANDED TO JAIL - NO BOND<br>JUDGE: SHAMO, M JOHN<br><br>PROSECUTION     :     NO CHANGE<br>REPORTER: ** UNKNOWN REPORTER     GONZALES, JAMES |
| MARCH 20, 1992 | FILING     CASE TRANSFERRED<br>FILED<br>BOND CONTINUED<br>JUDGE: ROBERSON, DALTON A<br><br>PROSECUTION     :     NO CHANGE<br>REPORTER: ** UNKNOWN REPORTER     GONZALES, JAMES |
| MARCH 20, 1992 | PRETRIAL     BOND CONTINUED<br>HELD<br>JUDGE: ROBERSON, DALTON A<br><br>PROSECUTION     :     NO CHANGE<br>REPORTER: UNREPORTED,     GONZALES, JAMES<br>BAIL WAS FIXED AT     $0.00<br>NEXT SCHEDULED PROCEEDING:<br>JURY TRIAL<br>ON JUNE     15, 1992     BEFORE JUDGE DOCKET-B<br><br>CERT#: 3001 |
| JUNE 12, 1992 | TRIAL ERROR BOND CONTINUED<br>RESULT FOR TRAIL DATE ERROR<br>JUDGE: ROBERSON, DALTON A<br><br>(C O N T I N U E D) |

155

DATE MARCH 26, 2008                PAGE 4

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:        PENN, RODNELL,

HUBBARD, CARL,                   LPD NUMBER 453171

DATE OF EVENT              EVENT DESCRIPTION

                           NO CHANGE
                  PROSECUTION    : GONZALES, JAMES
                  REPORTER: UNREPORTED,
                  BAIL WAS FIXED AT      $0.00      CERT#: 3001
                  NEXT SCHEDULED PROCEEDING:
                     WVR TRIAL
                     ON AUGUST   31, 1992    BEFORE JUDGE DOCKET-B

AUGUST    31, 1992    FILING    DEFENDANT SIGNS AND FILES WAIVER OF TRIAL BY JURY
                  SIGNED AND FILED
                  BOND CONTINUED
                  JUDGE: HATHAWAY, RICHARD P
                                 NO CHANGE
                  PROSECUTION    : GONZALES, JAMES
                  REPORTER: ** UNKNOWN REPORTER

AUGUST    31, 1992    WVR TRIAL    BOND CONTINUED
                  IN PROGRESS
                  JUDGE: HATHAWAY, RICHARD P
                                 NO CHANGE
                  PROSECUTION    : GONZALES, JAMES
                  REPORTER: SKINNER, MARY,
                  BAIL WAS FIXED AT      $0.00      CERT#: 0031
                  NEXT SCHEDULED PROCEEDING:
                     WVR TRIAL
                     ON SEPTEMBER  1, 1992    BEFORE JUDGE DOCKET-B

SEPTEMBER  1, 1992    WVR TRIAL    BOND CONTINUED
                  IN PROGRESS
                  JUDGE: HATHAWAY, RICHARD P
                                 NO CHANGE
                  PROSECUTION    : GONZALES, JAMES
                  REPORTER: SKINNER, MARY,
                  BAIL WAS FIXED AT      $0.00      CERT#: 0031
                  NEXT SCHEDULED PROCEEDING:
                     WVR TRIAL
                     ON SEPTEMBER  2, 1992    BEFORE JUDGE DOCKET-B

SEPTEMBER  2, 1992    WVR TRIAL    BOND CONTINUED
                  FOUND GUILTY
                  REFERRED TO PROBATION FOR REPORT
                  JUDGE: HATHAWAY, RICHARD P
                                 NO CHANGE
                  PROSECUTION    : GONZALES, JAMES
                  REPORTER: SKINNER, MARY,
                  CURRENT CHARGE: 750.227B-A    FELONY FIREARM    CERT#: 0031
                                                                  ORIGINAL

                  (C O N T I N U E D)

DATE MARCH 26, 2008    PAGE 5

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:    PENN, RODNELL,

HUBBARD, CARL,                      LPD NUMBER 453171

DATE OF EVENT            EVENT DESCRIPTION

SEPTEMBER 22, 1992    BAIL WAS FIXED AT          $0.00
                     NEXT SCHEDULED PROCEEDING:
                        SENTENCE
                        ON SEPTEMBER 22, 1992    BEFORE JUDGE DOCKET-B

                     SENTENCE    BOND CONTINUED
                     PROCEEDING WAS ADJOURNED
                     AT THE REQUEST OF THE COURT
                     JUDGE: HATHAWAY, RICHARD P
                                      NO CHANGE
                     PROSECUTION    :   MILLER, MARIA
                     REPORTER: SKINNER, MARY,                    CERT#: 0031
                     BAIL WAS FIXED AT          $0.00
                     NEXT SCHEDULED PROCEEDING:
                        SENTENCE
                        ON SEPTEMBER 23, 1992    BEFORE JUDGE DOCKET-B

SEPTEMBER 23, 1992    SENTENCE    BOND CONTINUED
                     SENTENCED
                     WRITTEN NOTICE OF RIGHTS SERVED ON DEFENDANT
                     JUDGE: HATHAWAY, RICHARD P
                                      NO CHANGE
                     PROSECUTION    :   GONZALES, JAMES
                     REPORTER: SKINNER, MARY,                    CERT#: 0031
                     CURRENT CHARGE: 750.316-A    MURDER 1ST    GUILTY
                     CURRENT CHARGE: 769.12       HBTL-4TH NOTCE  DISMISSED
                     BAIL WAS FIXED AT          $0.00
                     NEXT SCHEDULED PROCEEDING:
                        POST CONVICTION
                        ON FEBRUARY 11, 1994    BEFORE JUDGE ROBERSON, DALTON A

APRIL    6, 1993     FILING     TRANSCRIPT OF TRIAL
                     SIGNED AND FILED
                     JUDGE: STEMPIEN, JEANNE
                     REPORTER: ** UNKNOWN REPORTER

FEBRUARY  9, 1994    FILING     TO WITHDRAW AS ATTORNEY
                     FILED
                     JUDGE: ROBERSON, DALTON A
                     REPORTER: ** UNKNOWN REPORTER

FEBRUARY 11, 1994    FILING     TO WITHDRAW AS ATTORNEY
                     GRANTED
                     JUDGE: ROBERSON, DALTON A
                     REPORTER: ** UNKNOWN REPORTER

(C O N T I N U E D)

157

DATE MARCH   29, 2008   PAGE   6

CITY OF DETROIT

STATE OF MICHIGAN

COMPLAINANT:    PENN, RODNELL,

HUBBARD, CARL,                     LPD NUMBER 453171

DATE OF EVENT            EVENT DESCRIPTION

FEBRUARY  14, 1994    FILING       TO WITHDRAW AS ATTORNEY
                      GRANTED
                      JUDGE: ROBERSON,DALTON A
                      REPORTER: ** UNKNOWN REPORTER

OCTOBER   28, 1994    FILING    TO APPOINT COUNSEL FOR APPELLATE REVIEW
                      SIGNED AND FILED
                      JUDGE: ROBERSON,DALTON A
                      ASSIGNED COUNSEL  :   SUROWIEC,GERALD S
                      REPORTER: ** UNKNOWN REPORTER

DECEMBER  19, 1995    FILING    APPELLATE COURT DECISION; AFFIRMS LOWER COURT
                      GRANTED BY THE COURT OF APPEALS
                      JUDGE: HATHAWAY,RICHARD P
                      REPORTER: ** UNKNOWN REPORTER

OCTOBER   28, 1996    FILING    APPLICATION FOR LEAVE TO FILE A DELAYED APPEAL
                      DENIED
                      JUDGE: HATHAWAY,CYNTHIA,GRAY
                      REPORTER: ** UNKNOWN REPORTER

MARCH     25, 1998    FILING    ORDER FOR PRODUCTION OF SENTENCING TRANSCRIPT
                      DENIED
                      JUDGE: HATHAWAY,RICHARD P
                      REPORTER: ** UNKNOWN REPORTER
                      NEXT SCHEDULED PROCEEDING:
                      0000********
                      ON FEBRUARY  11, 1994     BEFORE JUDGE ** UNKNOWN JUDGE

SENTENCED FOR VIOLATION OF STATUTE/ORDINANCE:750.316-A
                             HOMICIDE - MURDER FIRST DEGREE - PREMEDITAT
           ON SEPTEMBER 23, 1992    BEFORE JUDGE ** UNKNOWN JUDGE
           LIFE SENTENCE
           COMMENTS: HABITUAL DISM  247 D

158

**PRELIMINARY COMPLAINT RECORD**
ASSIGNED TO (NAME AND BADGE NO.)

REPORT ON: Murder File 92-43    Lt. Peterson    CIDENT NO.    COMPLAINT NO. 92-43

PLACE OF OCCURRENCE
☐ ON
☑ STREET  3004 Lenox

OCCURRED ON OR BETWEEN    MO  DAY  YR    DAY OF WK    TIME    DAY ☑    CENSUS TRACT 5/27
                          1   21                              NIGHT ☐

NAME AND TYPE OF BUSINESS    AND    21                               SCOUT CAR AREA 5-10

TYPE OF BLDG. (APT., HOTEL, PRIV. RES. — SINGLE FAMILY, ETC.)    REPORTED TO POLICE ON    92  Tue  12:05    PHONE    AGE  SEX  RACE

PERSON REPORTING OFFENSE    TITLE    ADDRESS    AGE  SEX  RACE

COMPLAINANT'S NAME    ADDRESS    PHONE BUS RES    AGE  SEX  RACE

WAS COMPLAINANT WORKING? IF YES — OCCUPATION, BUSINESS NAME AND ADDRESS    COMPLAINANT INJURED? ☐ YES ☐ NO
☐ NO  ☐ YES —

METHOD OF ENTRY ☐ UNK.    METHOD OF ESCAPE ☐ UNK.    DESCRIBE WEAPON ☐ UNK

NO. OF PERPETRATORS    DESCRIBE: ☑ MALE ☐ UNK.    ☐ FEMALE ☐ UNK.    ☐ JUVENILE ☐ UNK    ☐ ADULT    ☐ WHITE ☐ BLACK ☐ UNK    TOTAL VALUE $
☐ UNK    1    ☐ OTHER

VICTIM — PERPETRATOR RELATIONSHIP
☐ RELATED  ☐ ACQUAINTED  ☐ STRANGERS ☐ UNK.    UNIT(S) NOTIFIED    NAME  TW's — Ney Burn    TIME 12:50    DATE 12-1-92

**WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?**
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER.)

| ARREST(S) | DESCRIPTION(S) OF PERPETRATOR(S) | WITNESS(ES) | VEHICLE LICENSE NUMBER(S) | PHYSICAL EVIDENCE |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

#1, Carl Lindell Hubbard o/m/27 9-19-64 of 3004 Lenox

Source, Writers recieved info from Lt. Peterson of Homi Sq 6.

Circum, Writers arrived at the above Location & were permitted inside by a B/F named Petleibia Hubbard Age 50 of Same. Writers expressed our intent & purpose. At this time Carl Hubbard walked down the stairs & I.D himself. Writers arrested & advised of rights & conveyed to H.P.

REPORTING OFFICER (PRINT OR TYPE)  James Fleming
SIGNATURE

OTHER OFFICERS INVOLVED    BADGE    COMMAND    FURLOUGH
Sgt Robert Carroll  8-720  mcm4
P.O. Dennis Henden  4362  mcm4
P.O. Keith Henderson  3252  mcm4

COMMAND  mcm4    ASSIGNMENT  2506    FURLOUGH  F12

RANK  LT    SIGNATURE  Tommy R. Alston    COMPUTER ENTRY BY

SUPERVISOR CHECKING REPORT (PRINT OR TYPE)

C or D—TEX-RE (Rev 8-81)    (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED)    DETROIT POLICE DEPARTMENT

159

47

| NAME | ADDRESS | PHONE NO. |
|---|---|---|
| Mother *Parlothia Hubbard* | 3004 Lenox | 331-4816 |
| Father *Wesley Carter* | UNK | UNK |
| Brother Sister *Beverly Hubbard* | 3004 Lenox | 331-4816 |
| Brother Sister *Tricia Carter* | 3004 Lenox | 331-4816 |
| Son, Daughter *NONE* | | |
| Girlfriend Spouse *Kassandra Hubbard* | 3004 Lenox | 331-4816 |
| Associates | | |
| Associates *People In the Neighborhood* | | |
| Hangouts *Lenox And Charlevoix* 3004 Lenox | | Time/Date 12:00 pm 1-21-? |

Arrested by *MPD*    Location *3004 Lenox*    UNK

Complainant *Rodwell Penn*    Address ___    Phone No. *UNK*

Charge *Murder*    No of Previous Arrests ___    Convictions ___

Modus Operandi ___

Marital Status *Married*   Dress *Blue Jacket, Blue Sweat Shirt - Black Pant - Black Boots*

Military Serial No. *NA*    Soc. Sec. No. *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*    Draft Board No. *NA*

Years of Schooling *9th*    Last School Attended *Foch Middle*   Loc. *Charlevoix + Fairview*

Employed at *Ebony Supermarket*   Address *Charlevoix + Lenox*   Badge No. ___   How Long *1 yr*

Previous Employment *NONE*   Address ___   Badge No. ___   How Long ___

Charge Accts. and Loans *NONE*

Car *Aerostar Wise*   Year *84*   Color *Gray*   Lic. No. *UNK*   Oper. Lic. No. *NONE*

Car Registered to *Kassandra Hubbard*   Address *3004 Lenox*   Phone No. *331-4816*

Religion *Baptist*    Church Attended *Pray At Home*

Parole Probation Officer *UNK*    Period *11-21-91*   Court Date *1-30-92* Notified

Cooperative *Yes*    Disposition ___    Time/Date ___

**REMARKS**

| Sister #3 | Tomera Hubbard | 3004 Lenox | 331-4816 |
|---|---|---|---|
| Brother #1 | Maurice Carter | " " | " |
| #2 | Johnny Carter | Texas Service | |
| #3 | Elton Carter | UNK | |
| #4 | James Carter | Service | |
| #5 | Ricky Carter | Missing Sent 1983 | |

See: Appendix GG

# CONSTITUTIONAL RIGHTS
## CERTIFICATE OF NOTIFICATION

DETROIT
DEPARTMENT
POLICE

I understand that:

C.H  1. I have a right to remain silent and that I do not have to answer any questions put to me or make any statements.

C.H  2. Any statement I make or anything I say will be used against me in a Court of Law.

C.H  3. I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement.

C.H  4. If I cannot afford an attorney (lawyer), one will be appointed for me without cost by the Court prior to any questioning.

C.H  5. I can decide at any time to exercise my rights and not answer any questions or make any statement.

C.H  I understand that these are my rights under the Law. I have not been threatened or promised anything, and I now desire and agree to answer any questions put to me or to make a statement.

In the presence of:

_____     SIGNATURE _Carl Hubbard_
WITNESS

_____     DATE _1-21-92_     TIME _1:00 pm_
WITNESS

☐ This certificate of notification was read to the suspect, and he/she had an opportunity to read it. Further, the suspect was given an opportunity to ask any questions that he/she might have concerning this certificate and his/her rights.

☐ Suspect is illiterate. He/she has had the rights under the law, as defined above, explained to him/her, and has agreed to answer questions or make a statement.

☐ Suspect can read and write. The rights, as defined above, have been explained to him/her, and he/she has agreed to make a voluntary statement but has refused to sign this certificate.

REMARKS _Def completed the 7th grade at Foick middle school attended GED Class. Def have problems reading. Def rights were read to and explained to him by Sgt Finney_

DATE _1-21-92_   TIME _1:00 pm_

OFFICER _Sgt J Ann Finney_   PCT./SECTION _48 161_

PLACE _1300 Beaubien_

OFFICER _____   PCT./SECTION _____

Case 2:13-cv-14540-DML-PJK ECF No. 61-16 filed 07/01/20 PageID.2398 Page 268 of 311

See Appendi
G G

## WAYNE COUNTY
### PROSECUTING ATTORNEY'S ANALYSIS
### RECOMMENDATION

| ☐ MISDEMEANOR ☒ FELONY | IN CUSTODY? ☒ YES ☐ NO | PRECINCT (DETROIT) Homicide |
|---|---|---|

I ☐ DENY ☒ RECOMMEND THE ISSUING OF A WARRANT AGAINST:

| NAME / ADDRESS | AGE | SEX | RACE |
|---|---|---|---|
| CARL HUBBARD AKA GHOST 3004 Lenox Det, Mich | JAN 24 1992 27 | M | Blk |

O

36-92 55863

OFFENSE (TO BE FILLED IN BY PROSECUTOR)

Murder 1 Premeditated        Felony Firearm

SECTION (TO BE FILLED IN BY PROSECUTOR)

750.316-A

| COMPLAINANT'S NAME | ADDRESS | CITY | S.. |
|---|---|---|---|
| ... Floyd | | Detroit | Michigan |

SIGNED _Robert J. Ratton_
ASSISTANT PROSECUTING ATTORNEY

162

STATE OF MICHIGAN

**COMPLAINT**
**FELONY** 36-92 55963

CASE NO: 92211402 PA

36TH DISTRICT COURT
Recorders Court

The People of the State Of Michigan

vs

CARL HUBBARD 82-92211402-01

**Offense Information**

Date of Offense
1/17/92     bab

Police Agency Report No.
DPHO-92-43

Place of Offense
f/o 3960 gray, DETROIT

Complainant or Victim
RODNELL PENN

Complaining Witness
RODNELL PENN

**Charge**

State Of Michigan, County of Wayne
The complaining witness says that on the date and location stated above, the Defendant(s), contrary to law,

COUNT 1  Defendant(s) 01 MURDER 1ST DEGREE-PREMED
did, deliberately, with the intent to kill, and with premeditation, kill and murder one RODNELL PENN; contrary to MCL 750.316; MSA 28.548.  [750.316-A]
FELONY:  Life

COUNT 2  Defendant(s) 01 WEAPONS-FELONY FIREARM
did carry or have in his/her possession a firearm, to-wit: HANDGUN, at the time he/she committed or attempted to commit a felony, to-wit: MURDER FIRST DEGREE; contrary to MCL 750.227b; MSA 28.424(2).  [750.227B-A]
FELONY:  2 Years consecutively with and preceding any term of imprisonment imposed for the felony or attempted felony conviction

The complaining witness asks that the Defendant(s) be apprehended and dealt with according to law.

Subscribed and sworn to before me on  1-24-92

Complaining Witness: _____

District Judge/Magistrate

**Magistrate Irma J. Chenevert**

163

1 of 1

92001494

STATE OF MICHIGAN

CASE NO: 92211402 PA

WARRANT
FELONY

36-92 55963

36TH DISTRICT COURT
Recorders Court

**The People of the State Of Michigan**

vs

CARL HUBBARD 82-92211402-01

**Offense Information**

Date of Offense          Police Agency Report No.
1/17/92    bab           DPHO-92-43

**Place of Offense**
f/o 3960 gray, DETROIT

**Complainant or Victim**
RODNELL PENN

**Complaining Witness**
RODNELL PENN

**Charge**

State Of Michigan, County of Wayne
To any Peace Officer or Court officer authorized to make arrest:  The complaining witness
has filed a sworn complaint in this Court stating that on the date and location stated
above, the Defendant(s), contrary to law,

COUNT 1  Defendant(s) 01 MURDER 1ST DEGREE-PREMED
did, deliberately, with the intent to kill, and with premeditation, kill and murder one
RODNELL PENN; contrary to MCL 750.316; MSA 28.548.  [750.316-A]
FELONY:  Life

COUNT 2  Defendant(s) 01 WEAPONS-FELONY FIREARM
did carry or have in his/her possession a firearm, to-wit: HANDGUN, at the time he/she
committed or attempted to commit a felony, to-wit: MURDER FIRST DEGREE; contrary to MCL
750.227b; MSA 28.424(2).  [750.227B-A]
FELONY:  2 Years consecutively with and preceding any term of imprisonment imposed for the
felony or attempted felony conviction

Upon examination of the complaining witness, there is probable cause to believe that the
offense charge was committed and the Defendant committed the offense.  Therefore, in the
name of the People of the State of Michigan, I command you to arrest and bring the
Defendant before the Court immediately.

Date ____1-24-92____ (Seal)

_____
District Judge/Magistrate

**RETURN**

By virtue of this warrant, the Defendant has been taken into custody as commanded.

Date: _____     Peace Officer: _____

164

*Soo Appendix G.G*

| STATE OF MICHIGAN VS | | FELONY **WARRANT RECALL** | | 36th DISTRICT COURT CRIMINAL DIVISION 421 Madison Avenue Detroit, MI 48226 | | | |
|---|---|---|---|---|---|---|---|
| Defendant name and address | | Case no. 92U55963-01 | | BOND HISTORY | | | |
| HUBBARD, CARL, | | Offense date 1/17/92 | | Date Set | Date Posted | Type | Amount |
| 5004 LENOX | | | | 1-24-92 | | | (REMAND) |
| DETROIT, MI | | Complaint date 1/17/92 | | | | | |
| Sex: Race: DOB: M B 3/19/54 | | | | | | | |
| Defendant Alias(s) HUBBARD, CARL, | | Offense charged and section no. 750316-A MURDER 1ST 750227B-A FELONY FIREARM | | | | | |
| | | | | Defense Attorney, Address, Bar no., Telephone *Michael Faulkner 35705* *Ronald Mills 33107* | | | |

| Police No. 163173 | Police Agency DEPDM | Precinct |
|---|---|---|

ORI No. MI820031J

Next Court Date: ___2-4-92 AM___ Proceeding: ___exam___

To: DETROIT POLICE DEPARTMENT — Communications

OIC CASE: *Sgt Jo Ann Kinney* ___ Precinct or Bureau *Hom*

IT IS DIRECTED THAT THE WARRANT BE RETURNED TO THE ABOVE COURT IMMEDIATELY. INFORMATION CONCERNING THIS WARRANT IS TO BE REMOVED FROM THE LAW ENFORCEMENT INFORMATION NETWORK (LEIN) FILES IMMEDIATELY UPON RECEIPT OF THIS NOTIFICATION.

DATE: ___2-24-92___                    MAG. IRMA J. CHENEVERT
                                        Judge of the 36th District Court

ACKNOWLEDGEMENT OF RECEIPT OF THIS NOTIFICATION TO RETURN/CANCEL THE ABOVE WARRANT AND REMOVE INFORMATION FROM LEIN FILES.

| Signature | Badge No. | Date | Time |
|---|---|---|---|

WARRANT RECALL, Form No. DCY220 Revised 12/82

COURT FILE

165

EXHIBIT HH

166

STATE OF MICHIGAN )
                   )
COUNTY OF WAYNE )

## AFFIDAVIT OF FACTS

I, RONALD GILES, being first duly sworn, deposes and says:

1. I represented Mr. Carl Hubbard in his Bench Trial in Recorder's Court for the City of Detroit, wherein he was charged with First-Degree Murder.

2. In my representation of Mr. Hubbard there came a time during the testimony when the Prosecution called one Curtis Collins to the witness stand.

3. That on cross-examination of Mr. Collins, he drastically changed his testimony and according to my recollection, testified contrary to his testimony at the preliminary examination.

4. That Mr. Collins was arrested and detained following his trial testimony.

5. To the best of my information and belief, Mr. Collins was released and not charged when he changed his testimony the following day.

6. That Mr. Collins' testimony was especially critical to the Judge's verdict of guilt against Mr. Hubbard.

I declare under penalty of perjury that the statements made herein by me are true and accurate to the best of my knowledge, information and belief.

**Affiant further sayeth not.**

Ronald Giles (P38107)

Subscribed to and sworn before me
on _June 15_, 2000

Notary Public, Wayne County, Michigan

DOROTHY J. GILES
NOTARY PUBLIC WAYNE CO., MI
MY COMMISSION EXPIRES May 27, 2003

EXHIBIT II

168

January 27, 1998

Carl Hubbard #205988
Saginaw Correctional Facility 12-170
9625 Pierce Road
Freeland, MI 48623

Dear Mr. Hubbard:

I received your letter dated January 21, 1998. Currently you have
all the information that I have in regards to your file, which I
have sent to you previously. I have no additional written
documents or information.

In regards to the perjury charge against Mr. Curtis Collins,
alias Tony Smith, it is my recollection that on the first day of
his testimony, when he changed his testimony to be different from
that given during the preliminary examination, once he left the
courtroom he was arrested in regards to perjury. He was held in
the police station overnight. He agreed to change his testimony
back to the original version and he was never officially charged
with perjury. As a result, there is no written documentation in
regards to this matter as to Mr. Collins (Smith).

It is also my recollection that Mr. Collins was on probation or
parole, and was given a "deal" in order to maintain his probation
or parole, after his testimony. Again, if there is anything
documented on this subject, it would be in the papers I sent you.
But if I remember correctly, that was brought out during the
trial and should be in the transcript.

Other than the foregoing information, I have nothing else that I
can add. I don't see how I can assist you any further as I have
given you everything that I have in relation to your file.

Very truly yours,

Ronald Giles

RG:dg

1575 E. Lafayette • Suite 209 • Detroit, MI 48207 • Office (313) 259-4742 • Fax (313) 259-5314

EXHIBIT JJ

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

People of the State of Michigan

Vs.

Case No. 92-1856-01

Carl Hubbard,

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY _____

_____ Defendant /

DEPUTY CLERK

## OPINION & ORDER DENYING DEFENDANT'S MOTION
## FOR RELIEF FROM JUDGMENT

At a session of said Court
Held in the Frank Murphy Hall of Justice
On ___March 15, 2012___
PRESENT: Honorable Michael M. Hathaway
Circuit Court Judge

About 20 years ago defendant was convicted after a waiver trial of first degree murder and later sentenced to natural life without parole. In an unpublished *per curium* opinion dated December 19, 1995, the Michigan Court of Appeals affirmed defendant's conviction and sentence. His delayed application for leave to appeal to the Michigan Supreme Court was denied on October 28, 1996. In July 2007 defendant filed a motion to expand the record and for an evidentiary hearing, all of which requested post-appeal relief. That motion was denied on March 18, 2009 by Wayne County Circuit Judge James Chylinski. Defendant now files a motion for relief from judgment under MCR 6.502.

All of the issues raised in defendant's current motion were raised, in one form or another, and rebuffed on direct appeal and/or in his first post-appeal motion. Accordingly, and since defendant does not make an accurate claim of a retroactive change in law, the defendant is not entitled to relief because of MCR 6.508(D)(2)(3). Accordingly defendant's motion is summarily denied under MCR 6.504(B)(2).

___March 15, 2012___
**Date**

Hon. Michael M. Hathaway

171

EXHIBIT KK

172

# STATE OF MICHIGAN
# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CARL LYNDELL HUBBARD,

        Defendant-Appellant.

UNPUBLISHED
December 19, 1995

No. 159160
LC No. 92-001856

Before: Hood, P.J., and Saad and Thomas C. Yeotis*, JJ.

PER CURIAM.

    Defendant, who waived a jury trial, appeals as of right from his first-degree murder conviction, MCL 750.316; MSA 28.548, and life sentence. We affirm.

    The evidence upon which defendant was convicted was entirely circumstantial. There were no eyewitnesses to the killing of Rodnell Penn, who died of multiple gunshot wounds to the head and back, some of which were determined to have been the result of close-range firing.

    Defendant first argues that an evidentiary hearing should be held to determine whether the recall of a witness for the prosecution and his later trial testimony was coerced. This issue raises a question of law, which we review de novo. Cardinal Mooney High School v Michigan High School Athletic Ass'n, 437 Mich 75, 80; 467 NW2d 21 (1991); People v Connor, 209 Mich App 419, 423; 531 NW2d 734 (1995).

    At trial, the prosecution's key witness, Curtis Collins, denied being at the party store at Gray Street and Mack Avenue, near where the victim's body was found. Collins also testified that he did not see defendant near the time that the victim was killed. The prosecutor responded to this testimony with Collins' preliminary examination testimony.

    During the preliminary examination, Collins testified that he was in the party store and saw both defendant and the victim in the store. Collins left the store before defendant and the victim, and when Collins was a short distance outside of the store he heard gunshots. Collins turned and saw defendant standing near the victim's body, and he then observed defendant running away from the scene.

    When asked why his trial testimony differed from that at the preliminary examination, Collins indicated that he had been pressured by authorities to give certain testimony at the preliminary examination. Collins was on escape status for removing a tether, and testified at trial that the police told him that they would ensure that he would receive a maximum sentence for being an escapee if he did not testify as they wanted. According to Collins, the preliminary examination testimony was untrue and he was not at the scene when the shooting occurred.

    After testifying at trial, Collins was arrested for perjury. Two days later, he was recalled as a witness. At this time, Collins indicated that his earlier trial testimony had been a lie and his preliminary

---

*Circuit judge, sitting on the Court of Appeals by assignment.

-1-

examination testimony was a truthful rendition of the facts.  He testified that he lied in court at trial because he had received threats on his life regarding his testimony identifying defendant.  Collins testified that he did not change his trial testimony because he had been arrested, but that he wished to tell the truth.  He believed that he would still be charged with perjury after he left the court.

Prosecutorial intimidation of witnesses is strongly condemned.  People v Stacy, 193 Mich App 19, 25; 484 NW2d 675 (1992).  A prosecutor's attempts to intimidate a witness from testifying, if successful, amount to a denial of the defendant's constitutional right to due process.  People v Canter, 197 Mich App 550, 569; 496 NW2d 336 (1992).  Clearly, the same should hold where the prosecution attempts to intimidate a witness to fashion untruthful testimony.  A remand may be ordered where it is necessary to develop a testimonial record to support an argument that a witness was wrongfully intimidated.  Stacy, supra at 25.

In this case, defense counsel cross-examined the witness as to the reasons for his change in testimony.  Although the witness had been arrested, there is no indication from the witness' testimony that he was intimidated or coerced into testifying.  Defendant has failed to provide any factual support for his claim that the witness' testimony was coerced.  We find no error.

Next, defendant argues that the admission of Collins' preliminary examination testimony was improper as inadmissible hearsay.  Because Collins' preliminary examination testimony was admitted pursuant to MRE 801(d)(1)(A) as prior inconsistent statements given under oath, subject to penalty of perjury, and was subject to cross examination at the time it was given, there was no error in its admission at trial.

Further, according to defendant, the use of Collins' statement to police was improper impeachment because no foundation was made.  We find no error.  Defendant's failure to object to the admission of the statement precludes appellate review absent manifest injustice.  People v Stimage, 202 Mich App 28, 29; 507 NW2d 778 (1993).  Moreover, Collins' photograph was attached to the statement, and although he denied signing it using his alias of "Tony Smith," Collins admitted the statement was his.  Our refusal to review this argument does not result in manifest injustice.

Defendant further argues that the prosecution knowingly presented Collins' false testimony or allowed that false testimony to stand uncorrected.  Even if a prosecutor has not solicited false testimony, if it presented and is allowed to stand uncorrected, a defendant's right to due process is offended.  Canter, supra at 568.  Where there is a reasonable likelihood that false testimony affected the verdict, failure to correct it requires reversal.  Id.  In this case, although defendant presented inconsistencies in Collins' testimony and conflicts with the testimony of defendant's witnesses, defendant has provided no evidence that Collins' testimony was false.  Although Collins changed his testimony, there was no suggestion that the prosecutor was aware that Collins would change his story before he testified.  Because there is no evidence supporting defendant's claim, we find no error.

According to defendant, the prosecution erred in admitting a second statement made by Collins to the police after his first day of testimony and when he was recalled and recanted his prior testimony.  We find no merit in this argument because no such statement was admitted into evidence.

Defendant next asserts that he was denied effective assistance of counsel.  Specifically, defendant argues that his trial counsel was deficient in failing to (1) to move to suppress his statement; (2) to object to evidence of defendant's connection to the drug trade; (3) to object to the prosecution's recall of a witness and not requesting a hearing regarding the prosecution's intimidation of the witness; and (4) to object to the introduction of exhibits from a prior criminal case against defendant.

There are two prongs to the test to determine whether a defendant was given effective assistance of counsel.  The defendant must first "show that counsel's performance fell below an objective standard

of reasonableness, and [then demonstrate] that the representation so prejudiced the defendant as to deprive him of a fair trial." People v Pickens, 446 Mich 298, 302-303; 521 NW2d 797 (1994), adopting the standard set forth in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The defendant must also overcome the presumption that the trial counsel's actions might be considered sound trial strategy. People v Tommolino, 187 Mich App 14, 17; 466 NW2d 315 (1991).

Defendant's untimely motion in this Court for remand for a hearing pursuant to People v Ginther, 390 Mich 436; 212 NW2d 922 (1973), was denied because he failed to submit an affidavit or make an offer proof as required by MCR 7.211(C)(1)(a). Our Court has the discretion under MCR 7.211(C)(1) to determine if it would be appropriate to remand because the issue is either one which must first be decided by the trial court or one for which a record must be developed. People v Hernandez, 443 Mich 1, 14-15; 503 NW2d 629 (1993). Because a claim asserting ineffective assistance of counsel generally requires the development of a record, id. at 15, n 22, this Court properly exercised its discretion in denying defendant's motion for remand where he failed to submit an affidavit or offer proof of facts in support of his claim.

In the present appeal, defendant has again failed to make an offer of proof that his trial counsel was ineffective. However, to the extent that he has argued the matter, we will review the issue based on the record before us. People v Johnson (On Reh), 208 Mich App 137, 142; 526 NW2d 617 (1994).

Because we find no error with regard to the recalling of the prosecution's witness, defendant has failed to establish that his counsel was ineffective based on that claimed error. Defendant next argues that his counsel was deficient for failing to object to evidence of defendant's involvement in drug trafficking. Because the trial court has the discretion to admit evidence, we review its ruling on admissibility for an abuse of discretion. People v Davis, 199 Mich App 502, 516; 503 NW2d 457 (1993). An abuse of discretion will be found only if an unprejudiced person, considering the facts on which the trial court relied in making its decision, would conclude that the ruling was not justified. People v Taylor, 195 Mich App 57, 60; 489 NW2d 99 (1992).

Evidence of other crimes is admissible if (1) relevant to an issue other than the character of defendant or his propensity to commit the charged crime; (2) relevant to an issue or fact of consequence at trial; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. People v VanderVliet, 444 Mich 52, 74-75; 508 NW2d 114 (1993). We find that any objection by defendant's counsel to the introduction of evidence regarding defendant's drug dealing and his association with the victim in the drug trade would have been futile because it was offered to show defendant's motive for the crime pursuant to MRE 404(b). The testimony of witnesses indicated that defendant and the victim were both involved in the sale of drugs, and that the victim sold drugs for defendant. When defendant spoke to an officer at the scene, his comment to the officer was interpreted by the officer to indicate that the victim's death was drug-related. The prosecution used all of these facts to develop the theory that defendant had a motive for killing Penn. This is a permissible use of such evidence, and therefore had defendant's counsel objected, his objection would properly have been overruled. Therefore, defendant's claim of ineffective assistance of counsel on this basis must fail.

Next, defendant argues that his trial counsel was ineffective because he failed to object to, and in fact stipulated to, the admission of evidence regarding the dismissal of an earlier murder charge against defendant for failure of essential witnesses, one of which was Penn, to appear at trial. The parties stipulated as to the content of the testimony that would be given by the prosecutor of the previous murder charge. In addition to the dismissal of the prior murder charge, that prosecutor would have testified that Penn had testified against defendant at that previous preliminary examination. The prosecution in the instant case asserted that this evidence was indicative of defendant's intent and motive. The introduction of this evidence meets the test under VanderVliet, supra. We find that had defendant objected to its admission, the court would have allowed it in. Thus, we find that defendant has failed to demonstrate that his counsel was ineffective on this basis.

-3-

Defendant also asserts that his trial counsel was ineffective for failing to object to the validity of his arrest and to the admissibility of his statement to police. In support of his argument regarding his arrest, defendant refers to matters not contained within the lower court record. Because, as we have indicated above, our review of defendant's claim of ineffective assistance of counsel is limited to the record before us, we may not consider this evidence. Our review of the lower court record reveals no evidence pertaining to the alleged illegality of defendant's arrest. Therefore, we find no merit in defendant's claim that his counsel's failure to challenge the validity of his arrest constituted ineffective assistance of counsel.

Defendant raises his argument that his statement should not have been admitted for the first time on appeal. While review of this issue would normally be precluded, we will review constitutional questions. People v Heim, 206 Mich App 439, 441; 522 NW2d 675 (1994). In addition, however, defendant failed to object below to its admission and in fact stipulated to its admissibility. Therefore, this issue is not preserved for appeal and we decline to review this issue absent manifest injustice. Stimage, supra at 29. In light of defendant's failure to present facts or offer proof to demonstrate that his exculpatory statement was unconstitutionally obtained we find no manifest injustice would result in our failure to further review this issue.

Defendant argues that the trial court erred in failing to grant his motion for directed verdict because the prosecution failed to present sufficient evidence to prove each element of murder beyond a reasonable doubt. As an initial matter we note that where, as here, the credibility of witnesses is at issue directed verdict is inappropriate. People v Herbert, 444 Mich 466, 474; 511 NW2d 654 (1993). Although witnesses gave conflicting testimony, it was for the trier of fact, here the court, to assess and weigh their credibility and we give special deference to that credibility determination. People v Vaughn, 186 Mich App 376, 380; 465 NW2d 365 (1990).

To review a claim of insufficiency of the evidence, this Court must consider the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have concluded that the essential elements of the crime were proven beyond a reasonable doubt. People v Hurst, 205 Mich App 634, 640; 517 NW2d 858 (1994). The crime of first degree murder requires proof of an intentional killing with premeditation and deliberation. People v Saunders, 189 Mich App 494, 496; 473 NW2d 755 (1991). Premeditation and deliberation may be inferred from the circumstances. People v Buck, 197 Mich App 404, 410; 496 NW2d 321 (1992). To determine whether there was premeditation or deliberation, the court may consider the prior relationship of the parties, the defendant's actions before the killing, the circumstances of the killing, and the defendant's conduct following the killing. Id.

We find that the evidence presented, viewed in a light most favorable to the prosecution, was sufficient to support the prosecution's case. A witness saw defendant with the victim just prior to the killing and observed him fleeing the scene immediately after gunshots were heard. No other person was seen in the immediate area. This evidence was viewed together with the evidence that the victim was a key witness in an earlier dismissed murder charge against defendant, the evidence of defendant and the victim's involvement together in selling drugs was indicative of defendant's motive. Premeditation and deliberation can be inferred from these circumstances as well as the location of the close-range gunshot wounds, which were in Penn's back and head. We conclude that the prosecution presented sufficient evidence to prove each element of first-degree murder beyond a reasonable doubt.

The next argument presented by defendant is that the trial court's decision was not adequately supported by factual findings and legal conclusions and that by finding defendant guilty of murder but not guilty of felony firearm, the trial court rendered an improper, inconsistent verdict. Defendant argues that the trial court failed to indicate that defendant's alibi defense was overcome by evidence proved beyond a reasonable doubt. We disagree.

-4-

174

When a defendant waives his right to trial by a jury, the court must make a finding of facts and state its conclusions of law. MCR 6.403. The trial court's factual findings are sufficient so long as it is apparent that the court was aware of the issues involved and correctly applied the law. People v Legg, 197 Mich App 131, 134; 494 NW2d 797 (1992). Specific findings of fact on each element of the crime are not required. Id. We need not remand for failure to make specific findings of fact where it is clear that the court was aware of and resolved the factual issue and if further explanation would not facilitate review on appeal. Id. at 134-135.

The trial court here generally set forth the facts of this case and stated its conclusions of law. Although the court did not specifically address defendant's defense of alibi, by concluding that defendant committed the crime it is clear that the court rejected the defense. Our review of the trial court's findings and conclusions leads us to the conclusion that the court was fully aware of the issues before it and correctly applied the law.

Defendant also asserts that the court gave an inconsistent verdict. The trial court noted that defendant was charged with felony firearm based on the possession of a handgun. MCL 750.227(b); MSA 28.424(2). Because he was not persuaded beyond a reasonable doubt that a handgun rather than a sawed-off shotgun was used in the shooting, the trial court acquitted defendant on this charge. We find no reversible error in the trial court's failure to convict defendant of felony firearm as charged, yet find him guilty of first-degree murder.

Finally, defendant argues that the trial court denied him his constitutional right to trial by jury by failing to obtain a valid waiver of that right. Defendant asserts that the trial court did not properly question him regarding the voluntary relinquishment of his right to a jury trial. We disagree. This question of law is reviewed de novo. Connor, supra at 423.

A trial court must ensure that a defendant understands the right to a jury trial and that the right is voluntarily waived. People v Shields, 200 Mich App 554, 560-561; 504 NW2d 711 (1993). The court rules provide:

Before accepting a waiver, the court must advise the defendant in open court of the constitutional right to trial by jury. The court must also ascertain, by addressing the defendant personally, that the defendant understands the right and that the defendant voluntarily chooses to give up that right and to be tried by the court. [MCR 6.402(B).]

Defendant and his attorney completed a waiver form and the court questioned the defendant. The court specifically asked defendant whether he had signed the "Waiver of Trial by Jury" form, to which defendant answered in the affirmative. Defendant also answered the court's questions regarding whether defendant had discussed his constitutional right to a jury trial with his attorney and whether he understood he had that right. Defendant indicated that he had discussed the matter and understood his rights. Finally, the court asked defendant if he correctly understood that defendant was choosing to have a trial not before a jury but rather before the judge, who would then make the decision. Defendant told the judge that that was correct, and the court accepted his waiver. We find that the record indicates that the court's direct questioning of defendant satisfied MCR 6.402(B) and that defendant voluntarily waived his right to a trial by jury.

Affirmed.

/s/ Harold Hood
/s/ Henry William Saad

Judge Yeotis not participating.

-5-

177

*Court of appeal*    *The Defendant*
*See APPENDIX KK*    *Argument*

Under Michigan law, juries in rendering their verdicts need not be held to any rules of logic nor are they required to explain their deceisions, See People v Vaughn 409 Mich 463 (1980); See also People v Lewis 415 Mich 463 (1982). However, unlike a jury trial decision, Michigan case law holds that a trial court at a bench trial may not render an inconsistent verdict, People v Burgess 419 Mich 305,310-311 (1984); See also People v Williams 99 Mich App 463 (1980).

When the uncontroverted evidence established that Penn's death was caused by close-range gunshot wounds fired by a handgun, and the Information filed by the People in this case specifically charged that Defendant HUBBARD carried a "handgun" (See Information Count 2), and the trial judge found that the People had not proven beyond a reasonable doubt that Defendant possessed a firearm [TII] 185], the lower court's finding of guilty on the murder charge created a decision based on factual impossibility, and thus, an inconsistent bench trial verdict prohibited under the Burgess, supra; Williams, supra, decisions.

Where the deceased's death was not caused by any agent other than a handgun, and the lower court's verdict was a finding that Defendant had not possessed a handgun during the shooting death of Complainant Penn; this can only lead to the rational conclusion that acquittal on the firearm charge (Count 2) legally precluded a verdict of guilt on the first-degree murder charge (Count 1). This Court of Appeals should find that the lower court's verdict was error warranting reversal of Defendant HUBBARD'S bench trial conviction.

*add this apart to your agreement*

-44-

*179*

*See: Appendix KK Court of appeals*
*The prosecutor*
*ago argument*

Defendant also alleges that the trial judge rendered inconsistent verdicts because the Defendant was found not guilty of felony firearm even though the deceased was killed as a result of gunshots.  The verdict was not inconsistent.

Unlike a jury, the trial court at a bench trial may not render an inconsistent verdict. <u>People</u> v <u>Burgess</u>, 419 Mich 305 (1984); <u>People</u> v <u>Williams</u>, 99 Mich App 110 (1980).  The trial court, however, found the Defendant not guilty in the instant case because of a perception that there was a defect with the information.  The court stated:

> "Due to the fact that the prosecution, I see on the information, has charged Mr. Hubbard with a count of felony firearm, specifically felony must be committed with a firearm; they have listed in the information a handgun.
> This Court has not seen a handgun. There have been no exhibit marked as a handgun.  I don't know as a result of this close range firing that this was a saw-off rifle; what the length of any gun might have been.

It is clear that the court was under the belief that in order to convict of felony firearm, given the specificity of the information, that the killing had to be accomplished by a handgun and not a sawed-off rifle.  It was not because the court did not believe that the killing was not caused by a firearm.

Even if the court rendered inconsistent verdicts, which it did not, the only aggrieved party is the People of the State of Michigan.  The Defendant is not aggrieved because he benefited by the court's error.  This is illogical.

*And add this to G as well, this is tt agrume*

-21-

179

EXHIBIT LL

180

AFFIDAVIT OF CARL HUBBARD


COUNTY OF MONTCALM)
                  )ss.
STATE OF MICHIGAN )


     Carl Hubbard, being duly sworn, deposes and says:

     1. I have been informed that Michael Anthony, licensed in the State of Michigan as a polygraph examiner, if subpoenaed, is willing to testify at an evidentiary hearing. At that time this Court will have an opportunity to evaluate his professional qualifications and the quality of the polygraph equipment used.

     2. I have also been informed that Michael Anthony is willing to provide this Court with the test results at an evidentiary hearing or upon request.

     I certify under the penalty of perjury that the foregoing is true and correct. Executed on March 27th, 2018.


                      _____

                      Carl Hubbard


_____
NOTARY PUBLIC

C FENN
NOTARY PUBLIC - STATE OF MI
COUNTY OF GRATIOT
My Commission Expires 8/15/2024
Acting in the County of _____
Montcalm

EXHIBIT MM

182

**Ⓐ** Neutral
As of: November 5, 2019 2:12 PM Z

## *People v. Taylor*

Court of Appeals of Michigan

December 11, 2008, Decided

No. 284331

**Reporter**

2008 Mich . App. LEXIS 2468 *; 2008 WL 5197084

**PEOPLE** OF THE STATE OF **MICHIGAN**, Plaintiff-Appellant, *v* KEITH TRENELL TAYLOR, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH **MICHIGAN** COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Appeal denied by *People v. Taylor, 2009 Mich. LEXIS 490 (Mich., Mar. 13, 2009)*

**Prior History:** [*1] Saginaw Circuit Court. LC No. 93-008476-FC.

## Core Terms

trial court, witness's, probable, newly discovered, credibility, witness testimony, stepbrother, murder, newly discovered evidence, convicted, shooting

**Judges:** Before: Saad, C.J., and Fitzgerald and Beckering, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals by leave granted the trial court order granting defendant's motion for relief from judgment and new trial based on newly discovered evidence. We affirm.

Underlying this appeal is the 1993 shooting death of a teenage boy. The victim was shot through the head at close range while sitting in the backseat of a car stopped behind a truck driven by defendant's

stepbrother, and in which defendant and another man were riding. This third man was implicated as the shooter. In 1994, following a jury trial, defendant was convicted of second-degree murder, *MCL 750.317*, conspiracy to commit second-degree murder, *MCL 750.157a* and *MCL 750.317*, possession of a firearm during the commission of a felony (felony-firearm), second offense, *MCL 750.227b*, and carrying a concealed weapon in a vehicle (CCW), *MCL 750.227*. The conspiracy conviction was subsequently vacated by the court. Defendant was sentenced to concurrent terms of 40 to 65 years' imprisonment for second-degree murder, as a second habitual offender, *MCL 769.10*, and 36 to 90 months' imprisonment for CCW. These sentences were [*2] to run subsequent to a consecutive five years' imprisonment for felony-firearm. In a prior appeal, *People v Taylor*, unpublished opinion per curiam of the Court of Appeals, issued July 30, 1996 (Docket No. 176111), this Court affirmed defendant's convictions and sentences and denied plaintiff's cross-appeal to have the conspiracy conviction reinstated.

At trial, defendant's stepbrother testified that he saw defendant point a gun at the victim and heard the gun click. Defendant then gave the gun to the third man, who fired the fatal shot. The newly discovered evidence proffered by defendant is the testimony of a man who claims to have witnessed the shooting from his bedroom window when he was 11 years old. The witness testified that he told his mother about the shooting, but was told by her not to get involved. The witness's mother also testified and she corroborated her son's story. According to the witness, he met defendant years later while they were both incarcerated. During a conversation with defendant, the witness realized that the killing he had witnessed years prior was the crime underlying defendant's convictions.

Plaintiff argues that the trial court erred in granting defendant's [*3] motion for new trial by failing to address the requirements of *MCR 6.508(D)(3)* and properly apply the relevant four-part test set forth in

*183*

*People v Cress, 468 Mich 678, 692; 664 NW2d 174 (2003)*. We disagree. We review a trial court's decision to grant or deny a motion for new trial for an abuse of discretion, which occurs when a trial court chooses a result that is outside the range of reasonable and principled outcomes. *Id. at 691*; see also *People v Smith, 482 Mich 292, 300; 754 NW2d 284 (2008)*. "A mere difference in judicial opinion does not establish an abuse of discretion." *Cress, supra at 691*, citing *Alken-Ziegler, Inc v Waterbury Headers Corp, 461 Mich 219, 228; 600 NW2d 638 (1999)*.

In order to grant a new trial "on the basis of newly discovered evidence, a defendant must show that: (1) 'the evidence itself, not merely its materiality, is newly discovered'; (2) 'the newly discovered evidence was not cumulative'; (3) 'the party could not, using reasonable diligence, have discovered and produced the evidence at trial'; and (4) the new evidence makes a different result probable on retrial." *Cress, supra at 692*, quoting *People v Johnson, 451 Mich 115, 118 n 6; 545 NW2d 637 (1996)*, [*4] and citing *MCR 6.508(D)*.

While the trial court did not specifically mention the requirements of *MCR 6.508(D)(3)* when ruling on the motion, it is clear that its analysis encompassed its dictates. *MCR 6.508(D)(3)* provides that the trial court may not grant relief based on grounds that could have been raised in a prior appeal or motion, unless the defendant demonstrates that: (1) there is a good reason for not raising the grounds earlier; and (2) the defendant was prejudiced from the alleged irregularity. These requirements significantly overlap the four *Cress* factors. Indeed, in support of its articulation of the factors, *Cress* cited *MCR 6.508(D)*. Thus, the *Cress* analysis set forth below applies to the application of the court rule. Accordingly, we will address the *Cress* factors before returning to the issue of the court rule.

The first *Cress* factor is that the evidence itself, not merely its materiality, is newly discovered. The trial court found that the evidence was newly discovered based on the witness's failure to come forward when the incident occurred. Based on the witness's testimony that he did not come forward until after meeting defendant, this conclusion is not error. With [*5] respect to the third *Cress* factor, due diligence, the trial court stated that defendant could not with reasonable diligence have discovered and produced the evidence at trial. This conclusion was based on the fact that the witness was 11 years old at the time of the shooting and his mother's reluctance to cooperate with the police. This conclusion is also not erroneous, given that even if defendant had

investigated what **people** in the neighborhood saw, it is likely that the witness's mother would have kept him from defendant. Indeed, when the police came to her home while investigating the shooting, the witness's mother testified that she told the police she "didn't see anything."

The third *Cress* factor involves cumulative evidence. "Cumulative testimony" is defined as "[i]dentical or similar testimony by more than one witness . . . offered by a party usu[ally] to impress the jury with the apparent weight of proof." Black's Law Dictionary (8th ed). As the trial court noted, the case against defendant was "highly circumstantial . . . with the only direct evidence coming from the eyewitness testimony of" defendant's stepbrother. The newly discovered witness's testimony cannot be characterized [*6] as cumulative simply because it tends to support defendant's version of the facts, particularly in light of the disparity between the stories testified to by defendant and his stepbrother. Further, the newly discovered witness's testimony provides information not testified to by defendant.

Additionally, as the trial court observed, the newly discovered witness's testimony "suggests that [defendant's stepbrother] may have had a motive to fabricate his testimony against Defendant in order to deflect attention from his own involvement in the crimes." Similar to the trial testimony of the stepbrother, the newly discovered witness testified that something was passed between two men standing outside the victim's car before the fatal shot was fired. Under the witness's version, however, the item (presumably the gun) was passed between the shooter and another person, after a third person (presumably defendant) had gone back to the truck. Defendant testified at trial that he was sitting in the truck when the fatal shot was fired. Thus, the second *Cress* factor is established.

Plaintiff argues that the trial court most clearly erred in applying the fourth *Cress* factor, i.e., whether a different [*7] result would be probable on retrial based on the newly discovered evidence. Plaintiff argues that the trial court's error is evidenced in its comment that the witness's "contradictory testimony could have lead [sic] to a different result" and that if credited by the jury, the newly discovered witness's testimony would have made "a different result reasonably probable." Plaintiff asserts that this does not comport with the requirement in *Cress* that "the new evidence makes a different result *probable* on retrial." *Cress, supra at 692* (emphasis added). "Probable" means "likely to occur" or "having more evidence for than against." *Random House Webster's*

*College Dictionary* (1997). See also *Sutter v Biggs, 377 Mich 80, 89; 139 NW2d 684 (1996)* (observing that "probable" means "more likely than not" (internal quotation marks and citation omitted)). It does not mean, however, certain to occur. See *The American Heritage Dictionary of the English Language* (1996) (defining "probable," in part, to mean "[l]ikely but uncertain").

When the determination whether a different result is probable depends not on undeniable physical facts but the credibility of a testifying witness, the trial court has the [*8] discretion to determine the credibility of the witness. See *Cress, supra at 693, 695*. It is true that the trial court did initially speak of the probability of a different result in terms suggesting it was considering whether it was possible as opposed to "more likely than not." Later, however, the court carefully considered the witness's credibility, crediting both the factors supporting and undermining it. It considered the testimony in light of the witness's affidavit, his age in 1993, the delay in reporting, corroborating testimony, and lack of motive to lie. It also specifically found that the testimony was "believable and plausible" in light of both the witness's "live testimony" at the motion hearing and "the other evidence presented at trial." In referring to the witness's "live testimony," the trial court alluded to the significance of being able to observe a witness in assessing whether the witness is being truthful. As our Supreme Court has observed, "The credibility of a witness is determined by more than words and includes tonal quality, volume, speech patterns, and demeanor, all giving clues to the factfinder regarding whether a witness is telling the truth." *People v Lemmon, 456 Mich 625, 646; 576 NW2d 129 (1998)* [*9] (citation omitted). The trial court's reference to considering the testimony in view of "the other evidence presented at the trial" shows that the court did not view the testimony in a vacuum, but determined how well it matched up with the established facts. See *Cress, supra at 692-694*.

Although not specifically stated, we deem it implicit in the court's opinion and order that it found the witness credible and that his testimony would probably have resulted in a different verdict. The court noted that defendant had been acquitted "of all the armed robbery and assault charges," [1] which the court concluded "suggests that [the jurors] were not persuaded by the

prosecution of a concerted robbery plot between Defendant and [the shooter], and . . . instead relied on [the stepbrother's] testimony to convict" defendant of second-degree murder. Further, the jury found defendant not guilty of first-degree premeditated or felony murder. We believe it is reasonable to assume that the jury did rely heavily on the stepbrother's testimony in light of all the not-guilty verdicts. Thus, credible evidence supporting defendant's testimony and casting serious doubt on the stepbrother's story would more [*10] likely than not have led to a different result. Plaintiff argues that the newly discovered witness was unreliable. However, as noted, the trial court did consider his credibility, and we are mindful about not "substituting [our] judicial opinion regarding . . . credibility for that of the trial court." *Cress, supra at 694*. The court's credibility determination falls within the range of principled outcomes. Cf . *id. at 692* (observing that "it is within the trial court's discretion to determine the credibility of" the witness).

For the reasons indicated, we reject plaintiff's argument predicated on *MCR 6.508(D)*. The newly discovered witness testified that he did not meet defendant until the two were incarcerated together. Thus, in addition to the reasons set forth above, the issue could not have been raised in a prior motion. See *MCR 6.508(D)(3)(a)*. Further, the trial court examined the testimony in light of the existing record and concluded that it would have made "a different result reasonably probable." *MCR 6.508(D)(3)(b)(i)* provides that [*11] a defendant convicted following trial must show that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." Probable and likely are synonymous. Therefore, the trial court did not err in failing to specifically mention *MCR 6.508(D)(3)*.

Affirmed.

/s/ Henry William Saad

/s/ E. Thomas Fitzgerald

/s/ Jane M. Beckering

**End of Document**

---

[1] Defendant was found not guilty of four counts of armed robbery, *MCL 750.529*, and three counts of assault with intent to commit murder, *MCL 750.83*.

EXHIBIT NN

184

APPENDIX H

CASE PROGRESS

| POLICE | | |
|---|---|---|
| PRECINCT/SECTION Homicide Section | | |

| DATE -23-92 | TIME 11:50AM | PLACE 9th D.B. | STATEMENT TAKEN BY Richard Ivy | | |
|---|---|---|---|---|---|

| WITNESS TONY NMN SMITH | | RACE/SEX/AGE B/M/18 | D.O.B. 8-15-72 | HGT. 5-5 | WGT. 135 |
|---|---|---|---|---|---|

| SOC. SEC. NO. 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 | RESIDENCE 12832 Corbett | | PHONE BUS. RES. 371-4655 |
|---|---|---|---|

| EMPLOYER Unemployed | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH Stepfather-Ron Fullton | CHILDREN/SCHOOL: Tony Smith Jr-4 Mts  April Smith-1Mt |
|---|---|

| RELATIVES/FRIENDS Roxann Collins-Friend | ADDRESS Corbett | PHONE 839-5263 |
|---|---|---|

Q-Mr. Smith what can you tell me regarding the Shooting that occured a shooting that occured on Friday 1-17-92 in the area of Mack & Gray.

A-I was inside this store on Mack & Gray. I had been inside the store for about 5 to 10 Mins. These Two (2) guy's came into the store. I knew One of them as Ghost, I didn't know the other guy that was with him. I stayed in the store another Two (2) mins, and I walked out. I started walking E/O Mack to Gray, and I was turning S/O Gray. I looked back and I noticed that Ghost and the guy that he was with had come out of the store and were walking across Mack on Gray. I continued to walk S/O Gray, when I reached about mid block, I heard gunshot, I looked back and I seen Ghost run across Gray (West) thru A Vacant lot toward Springle. I turned and ran to where I seen a body laying in front of this guy we call Uncle Pete's house. His real name is Peter Baker. I seen this guy that was with Ghost laying in front of Peter Bakers house. This was the same guy that I had seen Ghost inside the store with.

Q-I am showing you a photo with the numbers 450171, do you know this person.
A-Yes, thats Ghost. He is the one that was with the guy I seen in the street.

Q-I am showing you a photo with the numbers 480233, do you know this person.
A-I don't know him.

**NOTE SEE APPENDIX (PAGE B-] FOR PROOF that phon is Rodni Penn**

Q-Tell me, are you sure that the person you seen laying infront of Uncle Pete's house, is the same person that you seen inside the store with Ghost about 15 Mins before you heard the gun-shot.
A-I am sure that he is the same person.

Q-On a scale of 1 to 10, 10 being without a doubt. How sure that the person that you seen laying on the ground, is the same person that was inside the store with Ghost.
A-I would say 10, because I had just seen the Two (2) of them inside the store.

X Tony Smith

tony smith

D-D 508 (REV. 8-79)

H-1

18

Q-now, long have you known Ghost.
A-About 12 Years.

Q-Did you speak to him when he walked into the store.
A-Yes, but I left because I know how he is. He robbed me back in 1986. So when ever I see him I will try to avoid him.

Q-Was there anyone else out in that area when this happen.
A-Yes, a friend of mine name ANDREW SMITH B/M/19, he lives on the West side off 12th Street He was inside the store while I was in the store. He stayed on the corner when I left. I was goins to my girlfriends house. She lives at 3149 Gray, her name is Kim Richardson B/F/17, no phone. Andrew stayed on the corner, and he told me when I came running back that he seen everthing. He said that he seen Ghost shot the guy that he was with. After I seen the body I ran toward Warren and I caught a Cab.

Q-How was Ghost and the guy acting WHXXH when they entered the store.
A-They were acting like they were real cool, when they came into the store.

Q-Did you see the guy that was with Ghost use the phone while he was in the store.
A-No.

Q-Have you heard anyone else say that they seen what HXXXXX happen that night.
A-No, not to me any way.

Q-Did you notice anyone else out there.
A-No, I didn't notice anyone else in the area when the shooting occuried.

Q-Have you seen Ghost driving.
A-I have seen him driving a Gray station wagon. I think it is a Peugot. I seen him driving that car the next day.

Q-Is there anything else you can add to this statement at this time that might help with this investigation.
A-No, thats all I know.

*X* Tony Smith
tony Smith

198

EXHIBIT OO

Case 2:13-cv-14540-DML-PJK ECF No. 51 filed 07/01/20 PageID.1426 Page 296 of 311

# WITNESS STATEMENT
## CASE PROGRESS

| | | | COMPLAINANT |
|---|---|---|---|
| PRECINCT/SECTION | HOMICIDE SECTION | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 2-7-92 | 8:50AM | HOMICIDE SECTION | SGT. RONALD D. GALE #S-29 |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| ANDREW GEORGE SMITH | B/M/20 | 12-27-71 | 6-1½ | 149 |

| SOC. SEC. NO. | RESIDENCE | | PHONE |
|---|---|---|---|
| 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 | 5244 PHILIP 48215 | | BUS. |
| | | | RES. 885-8076 |

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|
| HARDWAY S. A. K. PRODUCTIONS | | | AFTS. |

| RESIDING WITH: | CHILDREN/SCHOOL: | |
|---|---|---|
| MOTHER--- DORA SMITH | | |

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
|---|---|---|
| FELICIA SMITH (SISTER) | CHADSWORTH ST. | 886-7546 |

Q. Mr. Smith, did you know a person by the name of Rodnell Penn?

A. No.

Q. I am showing you a photograph of a person with the numbers 480233 on it, do you know who this is a picture of?

A. It looks like the one that got shot.

Q. Do you know the guy's name that is in that photograph?

A. No.

Q. You stated that the photograph looks like the guy that was shot, is that correct?

A. Yes.

Q. Prior to the time that you saw this guy shot, had you ever seen him before?

A. No, not that I can recall.

Q. Do you know a person that is called "GHOST"?

A. I know who he is.

Q. Do you know "GHOST's" real name?

A. No.

Q. Do you know where "GHOST" lives at?

A. No.

Q. The night that you saw the body of the guy that was shot, the one that you identified in the photograph, did you see "GHOST" that night?

A. Yes.

Q. Where did you see GHOST at?

A. Walking down Gray crossing Mack.

Q. When you saw GHOST was he alone or was he with someone else?

A. He was with two other guys.

Q. Was one of the two guys with GHOST the guy that you later saw shot?

A. I don't know.

Q. Did the guy that was shot, look like one of the guys that was with GHOST

DPD 103 (REV. 4-70)

X _Andrew Smith_

B-1

190

ANDREW GEORGE SMITH:

A. I didn't see the guys face that were with GHOST, it could have been, I don't know.

Q. Was the guy that was shot dressed like one of the guys that was with GHOST

A. I guess, I don't know.

Q. When you saw GHOST and the other two guys, exactlly where were you at?

A. I was walking down Mack coming towards Gray, the store.

Q. While you were out there did you hear any shots?

A. After I came back out of the store I heard some shots.

Q. How many shots did you hear?

A. It wasn't any more than three.

Q. Did the shots that you heard come from the same direction that you had seen GHOST and the other two guys going in?

A. Yes.

Q. Did you go to the area where the guy was shot at?

A. Yes.

Q. Where was the guy's body at?

A. Laying by the curb at the foot of the driveway, on Gray.

Q. When you went down on Gray and saw the body, did you see GHOST anywhere in the area?

A. No.

Q. Did you see GHOST any more that evening after you saw GHOST and the two guys walking down Gray?

A. No.

Q. Have you seen GHOST since this shooting happen?

A. Yes.

Q. When you saw GHOST did you talk to him?

A. No he was riding pass me in a car.

Q. Have you talked to GHOST since this shooting happen?

A. No.

Q. Have you heard anything about who shot the guy on Gray?

A. Yes, I heard everybody saying that GHOST did it.

Q. Have you heard anyone say that they saw GHOST shoot the guy?

A. No.

Q. Have you heard anything about why GHOST shot the guy?

A. I think somebody said the guy testified against GHOST at a murder trial.

Q. Did you ever tell anyone that you saw GHOST shoot the guy?

A. No.

Q. Did you actually see GHOST shot the guy?

A. No.

X Andrew Smith

B-2

C of D—72-ST (4-75)

191

Q. When you saw GHOST and the other two guys, did you see any of them with a gun or a weapon of any kind?

A. No.

Q. Have you ever seen GHOST with a gun or a weapon of any kind?

A. No.

Q. Is there anything else that you can tell me about this incident, regarding the shooting of the guy on Gray?

A. No.

Q. I am showing you a photograph with the numbers 453171 on it, can you tell me who this is a picture of?

A. GHOST.

Q. How long have you known GHOST?

A. About a year.

Q. During that year that you have known GHOST, how many times have you seen him?

A. A lot of times, more than twenty times.

X Andrew Smith



B-3

C of D—72-ST. (4-78)

142

EXHIBIT PP

193

# PRELIMINARY COMPLAINT RECORD

ASSIGNED TO NAME AND BADGE NO.

REPORT OF: Murder    File 92-23    T. Peterson Sr.    IDENT NO.    COMPLAINT NO.

OCCURRED ON OR BETWEEN    MO    DAY    YR    DAY OF WK    TIME    DAY / NIGHT / UNK

PLACE OF OCCURRENCE ☐ ON ☐ STREET: 3960 Gray

NAME AND TYPE OF BUSINESS

CENSUS TRACT: 5123

SCOUT CAR AREA: 5-2-0

AND    21

TYPE OF BLDG (APT., HOTEL, PRIV. RES — SINGLE FAMILY, ETC.)

REPORTED TO POLICE ON    92    Tue    PHONE

AGE    SEX    RACE

PERSON REPORTING OFFENSE    TITLE    ADDRESS

AGE    SEX    RACE

COMPLAINANT'S NAME    ADDRESS    PHONE BUS. RES.

WAS COMPLAINANT WORKING? IF YES — OCCUPATION, BUSINESS NAME AND ADDRESS

COMPLAINANT INJURED? ☐ YES ☐ NO

☐ NO    ☐ YES —

METHOD OF ENTRY ☐ UNK.    METHOD OF ESCAPE ☐ UNK.    DESCRIBE WEAPON ☐ UNK.

TOTAL VALUE $

NO. OF PERPETRATORS: 1    DESCRIBE: ☑ MALE  ☐ FEMALE    ☐ JUVENILE ☐ UNK.    ☐ ADULT    ☐ WHITE ☐ OTHER    ☑ BLACK ☐ UNK.

☐ UNK    ☐ UNK.

TIME    DATE

VICTIM — PERPETRATOR RELATIONSHIP    UNIT(S) NOTIFIED    NAME

☐ RELATED    ☐ ACQUAINTED    ☐ STRANGERS    ☐ UNK

## WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER.)

| ARREST(S) | DESCRIPTION(S) OF PERPETRATOR(S) | WITNESS(ES) | VEHICLE LICENSE NUMBER(S) | PHYSICAL EVIDENCE |
|---|---|---|---|---|
| ☑ YES ☐ NO | ☑ YES ☐ NO | ☐ YES ☑ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

#1. Peter Irving Baker B/m/36

6-30-55 - 3960 Gray

S. Info L. Peterson, DPD Homicide Section

Above Named Wanted on File

C. Writers to Above Loc.= #1 - Approached

Above Loc on Foot - IDD Adv of Charge

Arr - Conv to Homicide Section

REPORTING OFFICER (PRINT OR TYPE): PO Dennis Hernden

OTHER OFFICERS INVOLVED: Sgt Robert Correll S-720 mcmv
PO James Fleming 1745 mcmv
PO Keith Henderson 3780 mcmv

BADGE    COMMAND

SIGNATURE: Dennis Hernden

BADGE: 4318?    COMMAND: mcmv    ASSIGNMENT: 8506    FURLOUGH: 4/13

SUPERVISOR CHECKING REPORT (PRINT OR TYPE)    RANK: Sgt    SIGNATURE: Thomas Kostiu

COMPUTER ENTRY BY

DETROIT POLICE DEPARTMENT

D.P.D. 108    C of D-783-RE (Rev. 8-81)    (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED)

194

EXHIBIT QQ

195

## PRELIMINARY COMPLAINT RECORD

| REPORTED | 1 Arrest Murder | | | | | |
|---|---|---|---|---|---|---|

| PLACE OF OCCURRENCE | ☐ ON STREET 3962 Gray | | OCCURRED ON OR BETWEEN | MO. 1 | DAY | YR. | DAY OF WK. | TIME | DAY ☐1 | CENSUS TRACT 5245 |

NAME AND TYPE OF BUSINESS — AND — 18 Sat 1:20 P.M. | NIGHT ☐2 | SCOUT CAR AREA

TYPE OF BLDG. (APT., HOTEL, PRIV. RES. — SINGLE FAMILY, ETC.) | REPORTED TO POLICE ON 92 — | UNK. ☐3 | 5-7

PERSON REPORTING OFFENSE | TITLE | ADDRESS | PHONE | AGE | SEX | RACE

COMPLAINANT'S NAME ███ | ADDRESS | PHONE BUS. RES. | AGE | SEX | RACE

WAS COMPLAINANT WORKING? IF YES — OCCUPATION, BUSINESS NAME AND ADDRESS ☐ NO ☐ YES — | COMPLAINANT INJURED? ☑ YES ☐ NO

METHOD OF ENTRY ☐ UNK. | METHOD OF ESCAPE ☐ UNK. | DESCRIBE WEAPON ☐ UNK.

NO. OF PERPETRATORS ☐ UNK. 1 | DESCRIBE: ☐ MALE ☑ FEMALE | ☐ JUVENILE ☑ ADULT | ☐ WHITE ☑ BLACK | TOTAL VALUE
☐ UNK. | ☐ OTHER ☐ UNK.

VICTIM — PERPETRATOR RELATIONSHIP ☐ RELATED ☐ ACQUAINTED ☐ STRANGERS ☐ UNK. | UNITS NOTIFIED T W S Route 2 Homicide | NAME Sgt. Kinney | TIME 2:20 P.M. | DATE 1-18-92

### WERE THE FOLLOWING SOLVABILITY FACTORS PRESENT IN THIS INCIDENT?
(USING THE FORMAT ON THE INFORMATION GUIDE, GIVE DETAILS IN NARRATIVE BELOW FOR EACH YES ANSWER.)

| ARREST(S) | DESCRIPTION(S) OF PERPETRATOR(S) | WITNESS(ES) | VEHICLE LICENSE NUMBER(S) | PHYSICAL EVIDENCE |
|---|---|---|---|---|
| ☑ YES ☐ NO | ☑ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

A: ███ B/F/35 D.O.B ███

S: Sgt. Kinney Homicide Sq. #6

C: Writers rec. info. that the perp was wanted for Murder. Writers proceeded to location along with Code 2765, and were admitted into the house by the perp. She was advised of writers purpose and intent, and arrested without incident

O: Above Described Incident

T: N/A

| REPORTING OFFICER (PRINT OR TYPE) Charles Davis | OTHER OFFICERS INVOLVED P.O. Amos Fleming | BADGE 1745 | COMMAND M.C.M.U. | FURLOUGH |
|---|---|---|---|---|
| SIGNATURE Charles Davis | P.O. Keith Henderson | 3752 | M.C.M.U. | |
| BADGE 3-416 | COMMAND M.C.M.U. | ASSIGNMENT 2507 | FURLOUGH | |
| SUPERVISOR CHECKING REPORT (PRINT OR TYPE) Jo Ann Kinney | RANK Sgt. | SIGNATURE Jo Ann Kinney | | COMPUTER ENTRY BY |

D.P.D. 100 • C of D—783-RE (Rev. 9-81) • (FOUR COPIES TO BE MADE ON EACH PRELIMINARY COMPLAINT RECORD PLUS EXTRAS AS NEEDED) DETROIT POLICE DEPARTMENT

196

EXHIBIT RR

197

DETROIT
DEPARTMENT
POLICE

## WITNESS STATEMENT
### CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | COMPLAINANT | | |
|---|---|---|---|
| Homicide | | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 1-18-92 | 2 45 Am | 1300 Beaubien | Caroll |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Peter Baker | B M 36 | 6-30-55 | 6'2" | 185 |

| SOC. SEC. NO. | RESIDENCE | PHONE |
|---|---|---|
| 408 94 7492 | 3960 Gray | BUS. RES. N.P. |

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|
| unp | | | |

| RELATIVE/FRIENDS | ADDRESS | PHONE |
|---|---|---|
| Phyllis Johns (girlfriend) Theresa Baker (Mom) | | 961-8964 |

Tonight a little after 9 Pm I heard 4 or more shots outside my house. I told Maryland to git down at first. I checked on Phyllis and she was ok. Then I went and looked out front and didn't see nothing. When the police come I went out and saw a guy shot on the ground. There was 2 plain clothes cops who came by, they went into some neighbors houses and they heard one of the plain clothes cops say something about a white Ford. I had never seen the guy who was shot before.

X Peter L Baker

198

DPD 103 (REV. 4-76)

EXHIBIT SS

199

DETROIT
DEPARTMENT
POLICE

# WITNESS STATEMENT
## CASE PROGRESS

| | | | | FILE/CASE NO. 92-43 |
|---|---|---|---|---|

| PRECINCT/SECTION Homicide | | COMPLAINANT Rodnell Penn | |
|---|---|---|---|

| DATE 01/21/92 | TIME 2:55 P.M. | PLACE 1300 Beaubien | STATEMENT TAKEN BY Kinney |
|---|---|---|---|

| WITNESS Peter Baker | RACE/SEX/AGE B M 36 | D.O.B. 06/30/55 | HGT. 6'2 | WGT. 185 |
|---|---|---|---|---|

| SOC. SEC. NO. 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 | RESIDENCE 3960 Gray | PHONE BUS. RES. No Phone |
|---|---|---|

| EMPLOYER unemployed | DEPARTMENT NA | BADGE NO. NA | SHIFT NA |
|---|---|---|---|

| RESIDING WITH: Phylis Johnson Girlfriend | CHILDREN/SCHOOL: None |
|---|---|

| RELATIVE/FRIENDS: Mother Theresa Baker | ADDRESS Senior Apt On Washington Blvd | PHONE 961-8964 |
|---|---|---|

Q.  Mr. Baker I need you to tell me everything you know about the fatal shooting that happen in front of your home on Gray on January 17, 1992 start from the beginning and tell me everything you know about the inciden

A.  It was around 9:30 P.M., I heard four to five shots, when I heard the shots the first thing that came to my mind was my woman, after I found she was in the bathroom, I asked peted if any shots hit the house and she said no, normally I could hear people walking thru my yard because it's a thoroughway, to go over to Dickerson,  I had a radio on and I did not hear anyone on the side of the house, after that I went from kitchen from where I was in a cross position up to the front drapes in the front room, looking out through the window, i could not see my drive-way and the dead person in the drive, because the shots sounded too close for me to stand up and look, and I made sure everyone was secure in the hallway, where there is a bunch of walls, it was me and seven other people there.  After that I went back into the kitchen and peek out the back kitchen window and I saw nothing, approximately five minutes maybe ten my boarder Charles Ray, inform me that the police was out front, when he told me that and I seen the scout car stationary out in front of my house, i put on my coat and unlock my door and went outside and that's when I seen the body, and when I went outside there was a gathering of people, I looked at the victim, and I did not know him and I know every-body around there.  But I had seen the guy who was laying in my drive-way walking with a guy with a bright red waist length coat with no hood and the guy that was laying in my driveway had on the same coat, as the guy who was walking in the neighborhood with the guy with the red coat on.  The two narcotic officers they were in plain clothes, they went (OVER)

DPD 103 (REV. 4-78)       X _____       CofD—72-ST (4-78)
200

next door to Mr. Lucky house, and they came out of Mr. Lucky house and
went down the street to Lazinka house, that Bird's Aunt or cousin's
house, the two plain clothes officers came out of Lazinka house and
hollered, white jeep, they were in a white jeep, but before the officer'
went into Mr. Lucky house, the same two officer's ask Ghost what was he
doing down here, and Ghost replied, ya'll think Lenox and Charlevoix
is something, Grand Mack, they are cold.  Everybody gazed and looked
at the body, even the young rapper that stay next door to me upstairs
the police told us to disperse, after the EMS pick the body up and put
him in the van, i went and stood on my front porch, for about two or
three minutes, because it was cold that night and I went into the house.

Q.   The guy who was walking with the person that had on the same kind of
     coat as the person, that was found in your driveway?  Did you see that
     person with Ghost?

A.   I had never seen him before I couldn't make him out.

Q.   Was someone with Ghost when you saw him?

A.   Yes it was I don't know this guy's name but I have seen him.

Q.   I need you to describe the guy you saw with Ghost?

A.   B/M/27-28, 6'1 - 6'2, 200lbs - 215lbs, light complexion, he was wearing
     a knit hat, he was wearing a faded blue jean jacket, and I think he
     had that white fur stuff inside, i'm not sure.

Q.   What time was it when you saw Ghost on Gray?

A.   Ghost was standing in fronot of my house they were coming from Wavely
     I was outside about two minutes before I realize that Ghost was there.

Q.   Did Ghost talk to anyone while he was there?

A.   He asked me who was, and I think that he went over to the truck and
     looked at the body, and when I turn around he was gone, I don't know
     where he went he was just gone, I didn't see no cars and it wasn't
     any strange cars in the area and I know that becasue I make it my busine

X _____

ColD—72-ST (4-78)

201

(CONTINUED)                              PAGE  3

to know I know that it wasn't no white jeep there.

Q.   Did Ghost say anything else to you?

A.   No when I turn around he was gone, I didn't see which way he left.

Q.   Do you know anyone by the name of Bird?

A.   Yes I do know Bird, but I don't know his real name.

Q.   Do you know where Bird lived?

A.   He use to stay on Gray and Goethe, but that house burn down, I heard
     that he went out of town, I heard that he was in California.

Q.   When did you hear that he was in California?

A.   Maybe two to three weeks after the house got burn up, really I don't
     know where he is.

Q.   Have you ever seen Bird and Ghost together?

A.   I really have never seen them together.

Q.   Did Bird have a car?

A.   He didn't have one when that house got burn up.

Q.   Does Bird have family on Gray street

A.   His aunt and cousin lives across the street from me.

Q.   Do you know if Bird Cousin or Aunt have any company across the street
     Friday night?

A.   No.

Q.   Does Ghost come down to Bird's cousin house Friday night?

202
CofD—72-57.(4-76

A. Ghost don't come down that way for nothing, I was shock when I saw
   him in front of my house.

Q. Do you remember what Ghost was wearing when you saw him?

A. He had on dark clothing, that's all I pay attention to, I was watching
   the guy he was with.

Q. Do you know Ghost brother Easy

A. I have never got close enough to know them, but he be's with so
   many people.

Q. Mr. Baker I am showing you some photographs do you know who these
   people are?    DPD # 412723.

A. That's not Lazinka Bird, I don't know who he is, that's not the one
   that was with Ghost, I don't know who he is, I don't remember seeing
   him before, and that's not the Bird that I have been telling you about

Q. Do you know who this person is?    DPD 453171.

A. That's Ghost, he was there and the police know that he was there.

Q. Is there anything else that you can tell me about this incident that
   I should know?

A. The story on the street is that they walked him from Gray and Mack
   with the compl in the middle there was two people walking him, and
   when they got in front of my house, they shot that boy four or five
   time, and the two people that did the shooting, they ran right  pass
   Lazinka house toward Springle.  The people on the street said that
   Ghost and his boy did it.

Q. Is there anyone else saw Ghost out there beside you?

A. Yes DeAnthony saw Ghost and he know who Ghost is, and John Trammell
   was with DE Anthony and I know that he had to see him, because they
   both were together

CdD-72-51 (4-71
203

(CONTINUED)                          PAGE __5__

Q.   Do you know who saw, the compl walking down the street from
     Mack and Gray and who saw them run between the houses going towards
     Springer?

A.   I don't know who saw it, but go up to that store on Mack and Gray
     somebody had to see them togather up on the corner, I don't know
     who saw it, but somebody had to see it.

X   _Peter J. Behm_

Carl Hubbard #605788
Carson City Correctional Facility
10274 Boyer Road
Carson City, Mi 48811-5000



RECEIVED
JUL 10 2020
CLERK'S OFFICE
DETROIT

Clerk:
US District Court
Eastern District of Michigan
Theodore Levin US Courthouse
231 W. Lafayette Blvd.
Detroit, Mich 48226

US POSTAGE PITNEY BOWES

ZIP 48811 $ 014.95[0]
02 4M
0000362389 JUL 01 2020

07/01/2020

RECEIVED
JUL 10 2020
CLERK'S OFFICE
DETROIT

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

9114 9023 0722 4510 4480 97

LAB400R Aug. 2013
7690-17-000-0669