UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL HUBBARD,

                Petitioner,                Case Number 13-14540

v.                                    Honorable David M. Lawson

WILLIE SMITH,

                Respondent,

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Michigan prisoner Carl Hubbard is serving a nonparolable life sentence for first-degree murder following a 1992 conviction by a judge sitting without a jury in the Wayne County, Michigan circuit court. His conviction was affirmed on direct appeal, and his motions for post-conviction relief all were rejected by the state courts. In 2013, he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The petition was held in abeyance at Hubbard's request so he could return to state court for more post-conviction litigation, which was unsuccessful. Hubbard acknowledges that the petition was not filed within one year of most of the triggers in the habeas statute of limitations, 28 U.S.C. § 2244(d)(1), except for one: the newly-discovered-evidence provision. He also argues that equitable tolling and his actual innocence excuse the tardy filing. The Court disagrees and will dismiss the petition.

I.

Hubbard was convicted of shooting Rodnell Penn outside a party store in Detroit, Michigan. The prosecution's key witness was Curtis Collins, who initially was uncooperative at trial and denied knowledge of any information incriminating Hubbard. He had testified earlier at a preliminary hearing, however, that he saw Penn and Hubbard together outside the party store and

after walking a short distance away heard gunshots.  He turned and saw Hubbard standing over Penn's body and then saw Hubbard running from the scene.  When confronted with this inconsistent testimony, Collins said that the police pressured him to incriminate Hubbard.  Collins promptly was charged with perjury, and when he was recalled at trial two days later, he switched his testimony again, this time conforming it to the version from the preliminary hearing.  He blamed the earlier flip on threats he said he received if he were to identify Hubbard as the shooter.

Hubbard was convicted on September 2, 1992.  On direct appeal, the Michigan Court of Appeals rejected Hubbard's argument that the prosecutor improperly intimidated Collins to coerce the testimony incriminating Hubbard and otherwise affirmed the conviction.  *People v. Hubbard*, No. 159160 (Mich. Ct. App. Dec. 19, 1995).  The Michigan Supreme Court denied leave to appeal. *People v. Hubbard*, 453 Mich. 918, 554 N.W. 2d 910 (1996) (table).

Hubbard took no further action until July 16, 2007, when he filed a motion to expand the record and for an evidentiary hearing.  He filed a similar motion on May 27, 2008.  He alleged in the motions that Collins may have received concessions from the prosecutor in exchange for his testimony and that he committed perjury at trial.  Both motions were denied.  *People v. Hubbard,* No. 92-001856 (Wayne Cnty. Cir. Ct. Mar. 18, 2009).

Around December 16, 2011, Hubbard filed a post-conviction motion for relief from judgment under Michigan Court Rule 6.500.  Among the grounds raised were that Hubbard had "newly discovered evidence" that another person shot Rodnell Penn and that Collins testified falsely because he was coerced by the prosecution and had a personal motive to incriminate Hubbard.  That motion also was denied initially and on reconsideration.  *People v. Hubbard*, No. 92-001856 (Wayne Cnty. Cir. Ct. Mar. 15, 2012); *reconsideration den*. No. 92-001856 (Wayne Cnty. Cir. Ct. May 31, 2012).  The Michigan appellate courts denied leave to appeal. *People v.*

*Hubbard*, No. 311427 (Mich. Ct. App. May 7, 2013); *lv. den.* 495 Mich. 866, 843 N.W. 2d 130 (2013) (table).

Hubbard signed and dated the present petition for a writ of habeas corpus on October 22, 2013, which is considered the filing date.  *See Cretacci v. Call*, 988 F.3d 860, 865 (6th Cir. 2021) (citing *Houston v. Lack*, 487 U.S. 266, 270 (1988)).  After overcoming his confusion about paying the filing fee and working through a dismissal and reinstatement of the case, Hubbard filed a motion on October 2014 to stay the case so that he could return to the state courts to file a second post-conviction motion for relief from judgment to exhaust additional claims.  The Court granted the motion.

Hubbard filed his second post-conviction motion for relief from judgment in state court on February 25, 2015.  The state court denied that motion, citing the rule barring successive post-conviction motions for relief from judgment.  *People v. Hubbard*, No. 92-001856 (Wayne Cnty. Cir. Ct. Mar. 30, 2015) (citing Mich. Ct. R. 6.500).  Once again, the Michigan appellate courts denied leave to appeal. *People v. Hubbard*, No.  326995 (Mich. Ct. App. June 2, 2015); *lv. den.* 499 Mich. 982, 881 N.W. 2d 476 (2016) (table).

On July 26, 2016, Hubbard moved in this Court to reinstate the habeas petition and filed a separate amended habeas petition.  This Court reinstated the petition and granted the petitioner permission to file an amended habeas petition.

On February 26, 2018, Hubbard filed a second motion to stay the proceedings so that he could present to the state courts new evidence that he recently had obtained in the form of an affidavit and a report of polygraph examination of Curtis Collins, who lately averred that he testified falsely when he implicated Hubbard at trial.  On March 16, 2018, the Court granted the motion and directed the petitioner to return to state court promptly to file a third post-conviction

- 3 -

motion for relief from judgment to exhaust these claims.  Hubbard did so on June 21, 2018.  And again, the trial court denied the motion because the petitioner was barred from filing a successive post-conviction motion for relief from judgment.  *People v. Hubbard*, No. 92-001856 (Wayne Cnty. Cir. Ct. Oct. 2, 2019) (citing Mich. Ct. R. 6.502(G)).  The Michigan appellate courts denied his application for leave to appeal.  *People v. Hubbard*, No. 351605 (Mich. Ct. App. Mar. 19, 2020); *lv. den.* 944 N.W.2d 120 (Mich. 2020) (table).

Hubbard returned to this Court, which granted his motion to reopen the case and to amend his petition on July 15, 2020.  In his original and amended petitions, the petitioner seeks relief on the following grounds:

> I. Petitioner timely filed his petition within the one-year statute of limitations period as defined by 28 U.S.C. § 2244(d)(1)(D) and, additionally, has made a colorable claim of actual innocence which equitably tolls the AEDPA's statute of limitations, overcomes any procedural bars applicable to any issues presented, permits an evidentiary hearing in this Court, and supports a freestanding claim of actual innocence.

> II. Petitioner was denied his Fourteenth Amendment due process right to a fair trial where the trial court's denial of his motion for a new trial based on newly discovered evidence was so egregious that it violated his right to a fundamentally fair trial.

> III. Petitioner was denied his Fourteenth Amendment due process right to a fair trial where the prosecutor knowingly used perjured testimony to obtain a conviction.

> IV. Petitioner was denied his Fourteenth Amendment right to a fair trial where [the] police and prosecutor threatened and intimidated Curtis Collins into committing perjury.

> V. Petitioner was denied his Fourteenth Amendment right to a fair trial where the prosecutor withheld evidence.

> VI. The Due Process Clause of the Fourteenth Amendment was violated to the extent that the State failed to disclose agreements for Mr. Collins' favorable testimony.

VII. Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel where his trial counsel failed to (A) Investigate and call Roy Burford, Steve Konja, Samir Konja, and Raad Konja, and also failed to call "Barbara" to testify on the third day of trial, (B) Question Curtis Collins about his pending parole violation and whether he believed or even only hoped that he would secure immunity and whether he believed or even only hoped that he would secure immunity or a lighter sentence, or any other favorable treatment from the prosecutor, (C) Move for the suppression of Mr. Collins' in-court identification of petitioner, (D) Object to the admission of petitioner's statements obtained in violation of the Fourth Amendment, and (E) Do all of the above which, when considered cumulatively, demonstrates that petitioner was prejudiced by counsel's errors.

VIII. Petitioner's conviction should be reversed because the evidence presented at trial failed to prove guilt beyond a reasonable doubt.

IX. The inconsistent verdict of the trial court violated the Fourteenth Amendment.

X. Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel where his appellate counsel failed to raise arguments II, III, VI and VII.

Am. Pet. at 6, ECF No. 51, PageID.2136. The warden opposes the petition on several grounds, most notably because it is untimely.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") became effective on April 24, 1996 and governs the filing date for this action because the petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA amended 28 U.S.C. § 2244 to include a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments. *Vroman v. Brigano*, 346 F.3d 598, 601 (6th Cir. 2003). The one-year statute of limitations runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

- 5 -

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). A habeas petition filed outside the prescribed time period must be dismissed. *See Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000) (case filed 13 days after limitations period expired dismissed for failure to comply); *Wilson v. Birkett*, 192 F. Supp. 2d 763, 765 (E.D. Mich. 2002). Subparagraphs A and D of the statute are at play in this case.

## A.

Hubbard's direct appeal of his conviction ended when the Michigan Supreme Court denied leave to appeal on October 28, 1996. His conviction became final under section 2244(d)(1)(A) 90 days later, when the time for filing a *certiorari* petition in the United States Supreme Court expired, which was on January 26, 1997. *See Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009). Unless some other provision tolled the limitations period, Hubbard had to file his petition for writ of habeas corpus in this Court no later than January 26, 1998.

It is well accepted that "[t]he limitation period is tolled . . . during the pendency of 'a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim.'" *Wall v. Kholi*, 562 U.S. 545, 550-551 (2011) (quoting 28 U.S.C. § 2244(d)(2)). That does not help Hubbard, however, because he did not file his post-conviction motion before the one-year limitation period expired. A state court post-conviction motion that is filed after the limitations period expires cannot toll that period because there is no period remaining

to be tolled.  *Hargrove v. Brigano*, 300 F.3d 717, 718 n.1 (6th Cir. 2002).  The AEDPA's limitations period does not begin to run anew after the completion of state post-conviction proceedings.  *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001).  Hubbard's second and third motions for relief from judgment also did not toll the limitations period because they likewise were filed in the state court after the expiration of the limitations period.  *See Parker v. Renico*, 105 F. App'x 16, 18 (6th Cir. 2004).

The petition was not filed within the time allowed by section 2244(d)(1)(A).

### B.

Hubbard argues that the limitations period should not start when his conviction became final, because he has newly discovered evidence that establishes Collins lied at trial and that the prosecution coerced Collins's incriminating testimony.  Between February 2011 and October 2017, he gathered a number of affidavits from individuals who undermined the prosecution's case and asserted that Collins lied in court when he incriminated Hubbard at trial.

Section 2244(d)(1)(D) states that the one-year limitations period begins to run from the date that "the factual predicate" for a habeas claim "could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D); *see Ali v. Tennessee Board of Pardon and Paroles*, 431 F.3d 896, 898 (6th Cir. 2005).  Due diligence is the key.  The trigger trips when the petitioner knows or could have discovered the important facts for his claims, not when he recognizes the legal significance of that evidence.  *Redmond v. Jackson*, 295 F. Supp 2d 767, 771 (E.D. Mich. 2003).  And "factual predicate" refers to the core facts of a claim, not "every possible scrap of evidence that might support his claim."  *Ibid.*

A habeas petitioner bears the burden of showing that he exercised due diligence in discovering the factual predicate for his claims within the year preceding his petition

filing. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006); *Carter v. Klee*, 286 F. Supp. 3d 846, 852 (E.D. Mich. 2018).

Hubbard's "factual predicates" take the form of affidavits from several individuals, which are attached to his original and amended habeas petitions, summarized below:

• 2/1/11 Affidavit from prisoner Askia Hill

Hill avers that he saw Mark Goings shoot the victim on January 17, 1992 but that he never told anyone because he feared for his life. Hill did not know the petitioner but had seen him in the neighborhood. Hill indicates that the petitioner was not the shooter.

ECF No. 1, PageID.57-59; ECF No. 26, PageID.1451-53.

• 9/8/11 Affidavit from prisoner Roy Burford

Burford avers that he was at the Special K party store on January 17, 1992, where the shooting took place, from 6:00 p.m. until closing and that at one point the store owner called police. Burford states he saw neither Curtis Collins nor the petitioner that night in the store or near it, that Collins informed Burford that he "lied on" the petitioner because the petitioner robbed him in 1986, and that after the petitioner was convicted, people were saying that Mark Goings was the actual killer.

ECF No. 1, PageID.61-62; ECF No. 26, PageID.1471-72.

• 6/25/09 Affidavit from prisoner Emanuel Randall

Randall swears that Collins was not near the crime scene on January 17, 1992. Randall avers that Collins was with him and Raymond Williams playing a dice game when the men received a call that someone had been killed. Randall also states that the "word on the street" was that Mark Goings killed the victim, Rodnell Penn, because Goings believed that Penn had killed Goings' brother a few weeks earlier. Randall stated that no one understood why Collins would falsely accuse the petitioner of shooting the victim.

ECF No. 1, PageID.64-65; ECF No. 26, PageID.1459-60.

• 5/23/11 Affidavit from Raymond Williams

Williams swears that while being detained at the Detroit Police Homicide Section between August 31 and September 2, 1992, he overheard Collins crying in his nearby cell. When Williams asked Collins what was wrong, Collins

indicated that two police officers made him testify falsely against the petitioner at his trial on September 2, 1992.  Williams advised Collins not to lie because the men weren't near the crime scene that night.  Collins informed Williams that if he did not implicate the petitioner, the police would charge him with the murder.  Williams never told anyone about what Collins had told him while in lockup until he contacted the petitioner in late 2010 and 2011.

ECF No. 1, PageID.67-68; ECF No. 26, PageID.1462-63.

• 1/9/12 Second Affidavit from Raymond Williams

Williams avers in his second affidavit that on October 2, 2011, he discussed the case with the Special K party store owner, Steve Konja, who informed Williams that never saw Collins in the store on January 17, 1992.

ECF No. 1, PageID.70; ECF No. 26, PageID.1465.

• 1/28/04 Affidavit from prisoner Elton Carter

Carter asserts that Collins told him that his September 2, 1992 trial testimony was coerced and that the police threatened to charge him if he did not agree to so testify.  Carter avers that Collins told him that he wasn't at the crime scene. Collins revealed this information after the petitioner was found guilty.  There are two dates on this affidavit: 1/28/04 (the date of the affiant's subscription) and 1/2/08 (the date of the notary's certification).

ECF No. 1, PageID.72-73; ECF No. 26, PageID.1474-75.

The petitioner also provided his own unsworn declaration, dated October 22, 2013, where

he asserts that:

• He was unaware of the contents of Hill's affidavit until January 2011, when they had a random and unplanned encounter while incarcerated.

• He was unaware of the contents of Burford's affidavit until August 2011, when they had a chance encounter while incarcerated, and in October 2011, when Burford talked to Steve Konja.

• He was unaware of the contents of Randall's affidavit until June 2009, when they had a chance encounter while incarcerated.

• He was unaware of the contents of Carter's affidavit until January 2004, when Carter wrote to him.

- 9 -

• It was only through further conversation with Raymond Williams that the petitioner was able to get Williams' second affidavit.

ECF No. 1, PageID.75; ECF No. 26, PageID.1474-75.

• 7/28/14 Affidavit from Samir Konja

Konja indicates that he was a co-owner of the Special K Party Store on January 17, 2014. Konja states that neither he nor his brothers permitted Collins in the store because of problems they had with him. Konja indicates that he was never spoken to by the police or the prosecutor.

ECF No. 26, PageID.1477.

• 7/28/14 Affidavit from Raad Konja

Mr. Raad Konja's affidavit mirrors that of his brother except he also indicates that Collins was not in the store on the night of the murder.

ECF No. 26, PageID.1479.

• Affidavit from the petitioner

The petitioner filed an affidavit claiming that he could not obtain the affidavits from the Konja brothers earlier and had to rely on Williams to obtain these affidavits, which Williams was unable to do until July of 2014.

ECF No. 26, PageID.1481.

The petitioner attached additional new evidence and affidavits to his second amended habeas petition:

• 10/31/17 Affidavit from Curtis Collins

Curtis Collins signed an affidavit averring that he was not present anywhere near the Special K Party Store on January 17, 1992. Collins avers that he did not see the petitioner fleeing from where the victim was found shot to death. Collins claims that Sergeant Kinney forced him to testify falsely at the petitioner's preliminary examination that he saw the petitioner fleeing the murder scene. Collins states he testified truthfully on the first day of trial. He says that he spent two days at the 1300 Precinct [Detroit Police Department Headquarters] where he was threatened by Sergeant Kinney and Sergeant Gale that he would be charged with the victim's murder if he didn't implicate the petitioner. Collins also states that as a result of this coercion, he returned on the third day of the petitioner's trial and falsely implicated him in the victim's murder. Collins avers

- 10 -

that he contacted Raymond Williams in 2014 and told him that he had perjured himself at the petitioner's trial but only did so because the assistant prosecutor and the police had threatened him and he did not want to go to jail for perjury. Collins told Williams he would sign an affidavit to that effect. Collins went to prison in 2014 and 2015 and during the nine months there, realized how difficult prison was.  Upon his release from prison, Collins learned that the assistant prosecutor in the petitioner's case was no longer working and the police on his case were now retired.  Collins said he no longer had to worry about threats from these individuals to prosecute him and was "tired from running from the fact that he had put an innocent man, Carl Hubbard, in prison."

ECF No. 51, PageID.2253-54.

• Polygraph examination of Curtis Collins dated February 21, 2018.

Petitioner attached as an exhibit to his second amended petition the results of a polygraph examination performed by Michael Anthony on Curtis Collins on February 21, 2018.  Anthony asked the following questions of Collins:

1. Did you see Carl Hubbard shoot that man? Answer: No

2. Did you see Carl Hubbard shoot anyone at Gray and Mack in January of 1992?

Answer: No

3. Were you present when Carl Hubbard shot that man?

Answer: No

Anthony opined that Collins was being truthful regarding his answers to these questions.

ECF No. 51, PageID.2306-07.

• The petitioner's request to subpoena records from the Checker Cab Company.

The petitioner has evidence that the assistant prosecutor in his case requested Sergeant Kinney to subpoena the records from the Checker Cab Company to attempt to corroborate whether Collins, in fact, took a taxicab from the location of the shooting.  The petitioner only discovered the existence of the subpoena after filing a Freedom of Information Act request and receiving the information on January 14, 2016.

ECF No. 51, PageID.2309-10, 2312-17.

This evidence was presented to the state courts with Hubbard's several post-conviction motions. Hubbard provided more context to those courts, pointing out that Collins was on escape status for removing a tether and testified that the police threatened him that he would receive a maximum sentence for escape if he did not incriminate the petitioner at the preliminary hearing. Hubbard has insisted that Collins perjured himself when he denied that he had been coerced by the police or prosecutor to change his initially exculpatory trial testimony, and again when he denied that the prosecutor agreed to drop a perjury charge against him and agreed to allow Collins to remain on parole if he would incriminate the petitioner. Hubbard also argues that the prosecutor withheld from the defense evidence that the prosecutor offered lenient treatment to Collins if he would return to court and incriminate the petitioner in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

As noted above, Hubbard's habeas petition was deemed filed in this Court on October 22, 2013. Under 28 U.S.C. § 2244(d)(1)(D), Hubbard had to discover the "factual predicate" for his claim that Collins's testimony against him was coerced by the prosecution and that he was offered an inducement to testify sometime after October 22, 2012. That date can be carried back further in this case because Hubbard "properly filed" a post-conviction motion renewing these arguments and citing come of the "new" information on December 16, 2011. *See* 28 U.S.C. § 2244(d)(2). However, Hubbard may well have known the factual basis of the perjury and *Brady* claims at trial. During the trial, defense counsel asked Collins about whether he had changed his story after being charged with perjury. Collins denied changing his story for that reason but admitted that he had been charged with perjury after initially testifying that he did not witness the shooting and further acknowledged that he had been released from prison. Hubbard raised a claim in his direct appeal in 1994 that Collins's trial testimony was the product of improper coercion by the prosecutor and

- 12 -

the police.  He also separately argued that the prosecutor permitted Collins to commit perjury. Because Hubbard appeared to know about the factual basis for his perjury and *Brady* claims at the time of his direct appeal, the limitations period under section 2244(d)(1)((D) would have been triggered well before 2011.

Moreover, the petitioner acknowledges that he was informed by his trial lawyer, Ronald L. Giles, in a letter dated January 27, 1998, that Collins was charged with perjury after he initially testified favorably at trial for Hubbard but that the perjury charge was dropped after he was recalled and incriminated the petitioner.  Defense counsel also indicated that Collins was given a deal by which he would remain on parole or probation if he testified against the petitioner.  *See* ECF No. 1, PageID.92.  Giles signed an affidavit to that effect on June 15, 2000.  *Id.* at PageID.94.  Hubbard had sufficient evidence by no later than June 15, 2000 to raise his perjury and *Brady* claims.

As summarized earlier, Hubbard has presented additional evidence that he says came to him after December 2011.  It appears that he has devoted considerable effort to gathering more information that contradicts Collins's ultimate trial testimony.  But those affidavits are just that: additional information about an issue that Hubbard was aware of several years earlier.  The start of the limitations period "does not await the collection of evidence which supports the facts." *Brooks v. McKee*, 307 F.Supp.2d 902, 906 (E.D. Mich. 2004).  Newly discovered information "that merely supports or strengthens a claim that could have been properly stated without the discovery . . . is not a 'factual predicate' for purposes of triggering the statute of limitations under § 2244(d)(1)(D)." *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013) (quoting *Rivas v. Fischer*, 687 F.3d 514, 535 (2nd Cir. 2012)).

The additional affidavits in support of Hubbard's perjury and *Brady* claims are revealing and perhaps compelling, but they are cumulative of other information within Hubbard's knowledge

- 13 -

before 2011.   Hubbard contends that Collins's own affidavit from 2017 recanting his trial testimony is not merely cumulative of other evidence in support of the perjury claim but actually adds additional support for the claim, because Collins indicates in the affidavit that the police threatened to charge him with the victim's murder if he did not agree to return to court and reaffirm his earlier preliminary examination testimony and implicate Hubbard.   Hubbard also asserts that Collins now admits to committing perjury, which conclusively would establish Hubbard's perjury claim.   That affidavit, though, does not change the date on which "the factual predicate" for the perjury and *Brady* claims "could have been discovered through the exercise of due diligence."   As discussed above, those claims already were presented on direct appeal in 1994.

Likewise, Collins's polygraph examination results in 2018 is supporting evidence, but it does not establish a new factual predicate for an old claim.

The same must be said of the several affidavits Hubbard presented in support of his claim that trial counsel was ineffective for failing to call Roy Burford, Steve Konja, Samir Konja, and Raad Konja to testify that Collins was not present at the party store or near it at the time of the shooting and thus could not have witnessed the shooting.   At trial, defense counsel elicited testimony from Andrew Smith that he knew Collins but did not see him near the store on the night of the shooting.   Raymond Williams, one of the affiants, actually testified at trial and indicated that Collins was gambling at "Big Ron's" house from 8:00 p.m. to around 10:00 p.m. on the night of the shooting.   Williams testified that when he left the house at around 10:00 p.m., Collins was still there.   Defense counsel also called Ronney Fulton, who testified that Collins spent the entire day and night of January 17, 1992 gambling at his house.   Fulton confirmed that Williams was at his house also from about 8:00 p.m. to 10:30 p.m.   Fulton became aware that there had been a shooting at Mack and Gray Streets in Detroit around 9:30 p.m.   Fulton testified that Collins was

- 14 -

still at his house when he learned about the shooting. The other witnesses' affidavits asserting that Collins was not present at the crime scene at the time of the shooting are cumulative of evidence already introduced at trial and thus do not constitute a newly discovered factual predicate for a fresh claim. *See Souter v. Jones,* 395 F. 3d 577, 586-87 (6th Cir. 2005).

Hubbard says that he received evidence on August 9, 2016 that the prosecutor's office subpoenaed records from the Checker Cab Company regarding Collins's activity on the night of the shooting. He has not yet obtained the actual cab company records. That evidence played no role in his first or second post-judgment motions for relief. But even if that evidence can be deemed "newly discovered," Hubbard did not file his third post-conviction motion for relief from judgment until June 21, 2018, more than two years after learning that information. And that evidence is just more support for the previously asserted perjury claim, of which Hubbard already knew the factual predicate well before then.

Hubbard's final piece of new evidence is Hill's affidavit, in which he claims that he witnessed Goings kill Penn. Even if that affidavit could not have been obtained earlier through due diligence, it does not trigger the limitations period in section 2244(d)(1)(D) on any of the claims stated in the original or amended petition. Section 2244(d)(1)(D) is applied on a claim-by-claim basis, rather than on all of the claims in the petition. *See Ege v. Yukon's*, 485 F. 3d 364, 373-74 (6th Cir. 2007) (holding that section 2244(d)(1)(D) did not start the limitations period for the petitioner's ineffective assistance of counsel claim, but it did save the petitioner's due process claim because the factual predicate of that claim was discovered at a later date); *see also DiCenzi v. Rose*, 452 F. 3d 465, 469-70 (6th Cir. 2006) (holding that statute of limitations on the claim that the state appellate court improperly denied a motion for delayed appeal began on a different date than the claims that related to issues that occurred at sentencing). The factual predicates for all of

- 15 -

the claims stated in the original and amended petitions for a writ of habeas corpus were known by Hubbard well before the one-year window closed on his state court post-conviction motions and federal habeas petition filing dates.

C.

The AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). A habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way'" and prevented the timely filing of the habeas petition. *Id.* at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). It is a "doctrine" that "is used sparingly," and the burden is on a habeas petitioner to show that he is entitled it. *Ibid*. Hubbard does not satisfy these criteria because he has not explained why he waited for over ten years before pursuing his post-conviction relief in state court, and he has not identified an "extraordinary circumstance" that inhibited the pursuit of his rights. *See Giles v. Wolfenbarger,* 239 F. App'x. 145, 147 (6th Cir. 2007).

D.

Hubbard also says that the evidence he has furnished shows that he is actually innocent of the murder. Both the Supreme Court and the Sixth Circuit have held that a credible claim of actual innocence may equitably toll the one-year statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *Souter v. Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005). The courts, however, have set the bar high for such a showing. "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *see also Souter*, 395 F.3d at 590. The habeas

- 16 -

petitioner must support his allegations of constitutional error "with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Hubbard's main proof of innocence is the affidavit of Askia Hill, who states that he saw Mark Goings shoot Rodnell Penn. Hill signed his affidavit in February 2011, some nineteen years after the shooting, explaining that he was afraid to come forward earlier. Hill was an inmate in the same prison as Hubbard when he signed the affidavit.

Hill's delay in bringing out this evidence and the co-incidence of his incarceration with Hubbard are factors that cast a pall of suspicion on this evidence. Affidavits from fellow inmates that are created after trial generally are not sufficiently reliable evidence to support a finding of actual innocence. *See Milton v. Secretary, Dep't Of Corr.,* 347 F. App'x. 528, 531-32 (11th Cir. 2009). And a long-delayed affidavit that attempts to exonerate a habeas petitioner should be "treated with a fair degree of skepticism." *Herrera v. Collins*, 506 U.S. 390, 423 (1993). That level of skepticism is appropriate here. Hill's evidence does not amount to "new reliable evidence" that would undermine a jury's beyond-a-reasonable-doubt determination. *See Freeman v. Trombley*, 483 F. App'x. 51, 60 (6th Cir. 2012) (affidavit of petitioner's former girlfriend who provided alibi, signed 15 years after petitioner had been convicted of first degree murder, did not provide the kind of extraordinary showing that was required to establish petitioner's factual innocence, to support equitable tolling of statute of limitations).

Nor do the affidavits of Roy Burford and Emanuel Randall shore up Hill's assertions. Those individuals assert that they overheard from persons in the community that Mr. Goings was the actual killer. Those accounts of the word on the street, however, do not show actual innocence because they recount only hearsay. *See Herrera*, 506 U.S. at 417 (holding that hearsay statements

- 17 -

are insufficient to support a freestanding habeas claim of actual innocence); s*ee also Knickerbocker v. Wolfenbarger*, 212 F. App'x. 426, 433 (6th Cir. 2007) (stating that an affidavit by a codefendant's fellow inmate stating that the codefendant had told him that the petitioner had nothing to do with the strangling murder of the victim was insufficient to demonstrate the petitioner's actual innocence of felony murder, since hearsay statements are presumptively less reliable).

Hubbard also contends that Collins's recantation of his trial testimony amounts to new, reliable evidence of actual innocence. However, like inmate affidavits, recanting affidavits by witnesses are viewed with "extreme suspicion." *United States v. Chambers*, 944 F. 2d 1253, 1264 (6th Cir. 1991); *see also Byrd v. Collins*, 209 F. 3d 486, 508, n.16 (6th Cir. 2000). Courts "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332.

Collins did not sign the affidavit recanting his trial testimony until October 31, 2017, 25 years after Hubbard's trial. Collins explains in his affidavit that he was afraid to recant his trial testimony for a number of years because of the prior threats by the prosecutor and the police to prosecute him for perjury and even the victim's murder. He says that he contacted Raymond Williams in 2014 and told him that he had perjured himself at Hubbard's trial but only did so because the assistant prosecutor and the police had threatened him and he did not want to go to jail for perjury. Collins told Williams at the time that he would sign an affidavit to that effect, but then he went to prison in 2014 and 2015. Upon his release from prison, Collins says that he learned that the assistant prosecutor in Hubbard's case was no longer working and the police on the case were now retired, so he no longer had to worry about threats from these individuals to prosecute him. He also confided that he was "tired from running from the fact that he had put an innocent

- 18 -

man, Carl Hubbard, in prison." But it still took Collins two more years to sign a recanting affidavit, even though his epiphany belatedly occurred 23 years after allegedly bearing false witness. That by itself calls into question the credibility of his affidavit and recantation. *See Lewis v. Smith*, 100 F. App'x. 351, 355 (6th Cir. 2004) (holding that it was proper for the district court to reject as suspicious a witness' recanting affidavit made two years after the petitioner's trial); *see also Strayhorn v. Booker*, 718 F. Supp. 2d 846, 874 (E.D. Mich. 2010) (holding that a long-delayed affidavit of an accomplice recanting a statement to police did not establish the petitioner's actual innocence when it was made almost two years after the petitioner's trial).

This new evidence did not convince the state court of Hubbard's innocence. Rejecting Hubbard's perjury and actual innocence claims made in his third post-conviction motion, the state trial court noted that the additional circumstantial evidence of Hubbard's guilt "was surprisingly strong." ECF No. 56-6, PageID.2555. Collins' testimony that Hubbard was present at the crime scene was supported by the testimony of Andrew Smith, who saw Hubbard with two other persons before he went into the party store where Collins testified the murder took place. Smith was inside the store for three or four minutes before he heard gunshots. That evidence supports Collins's testimony that Hubbard was in front of the party store before the shooting, as opposed to after the shooting as his alibi witnesses asserted. John Tramel also testified that he saw Hubbard in the area of Gray and Dickerson Streets on the evening of January 17, 1992. Tramel states that he saw Hubbard standing with a crowd of people around an ambulance and police cars right after the shooting.

The victim's brother, Leon Penn, saw the victim with Hubbard the day before the shooting. Hubbard told the victim that he would see him "tomorrow." The victim's brother testified that the victim had been selling drugs for Hubbard for years. A stipulation was entered that an earlier first-

degree murder case against Hubbard was dismissed because the witnesses failed to appear and one of those witnesses was the victim, Rodnell Penn. The victim's cousin testified that the victim had a large amount of money on him when he dropped off the victim at the bus stop. The victim's girlfriend also said that the victim had a large amount of money on him that day and that when he called her later, it sounded like he was calling from an outdoor telephone booth and someone was trying to hurry him off the telephone. There was a telephone booth outside the party store.

Hubbard also gave a false statement to the police following his arrest, in which he asserted that although he knew the victim, he had not seen him since the 1980s, he denied being with the victim on either the 16th or the 17th of January, he did not know about the shooting on Gray and Mack, and had not been on Gray and Mack at the time of the shooting. Hubbard denied that there had been a murder charge against him where Penn had been a witness. Hubbard's statement was contradicted by other evidence in the case, including the testimony of Officer Craig Turner, who knew Hubbard from the neighborhood and had seen him at the scene as the ambulance was taking the victim away. During a conversation with Hubbard about the shooting, Hubbard made a remark about the rough nature of the illegal narcotics scene at Gray and Mack, even though Turner had not told him that the shooting was drug related. Turner thought that Hubbard had a "fake look of shock" on his face.

Evidence that Collins passed a polygraph examination regarding his alleged perjured testimony does not seal the deal for Hubbard. Although in limited circumstances, evidence that a person was willing to take a polygraph test may be admissible, *see Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273 (6th Cir. 1985), the use of polygraph results to prove a party's innocence generally is prohibited, *Barnier v. Szentmiklosi*, 810 F. 2d 594, 596 (6th Cir. 1987). Remember that a habeas petitioner must show actual innocence with "new reliable evidence," which can

- 20 -

include "exculpatory scientific evidence."  *Schlup*, 513 U.S. at 324.  But "polygraph examinations are not admissible evidence in Michigan state courts, which have held that they are not scientifically valid and thus not reliable."  *Bolton v. Berghuis*, 164 F. App'x. 543, 549-50 (6th 2006) (citing *People v. Ray*, 431 Mich. 260, 430 N.W.2d 626, 628 (1988)).

On this record considered as a whole, Collins's recantation, even when considered with the other information that Hubbard has submitted, is insufficient to establish Hubbard's actual innocence that would toll the habeas limitations period.  *See Davis v. Bradshaw*, 900 F.3d 315, 329–33 (6th Cir. 2018).

III.

The petitioner filed his habeas corpus petition after the one-year statute of limitations expired under both 28 U.S.C. § 2244(d)(1)(A) and (D).  He is not entitled to equitable tolling of the limitations period.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the petitioner's motion to compel disclosure of the Checker Cab Company records (ECF No. 60) is **DENIED** as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  August 31, 2021

- 21 -